MICHAEL N. FEUER, SBN 111529
City Attorney
JAMES P. CLARK, SBN 64780
Chief Deputy City Attorney
LEELA A. KAPUR, SBN 125548
Executive Assistant City Attorney
VALERIE L. FLORES, SBN 138572
Managing Senior Assistant City Attorney
MICHAEL DUNDAS, SBN 226930
Deputy City Attorney
200 North Main Street, City Hall East
Suite 800
Los Angeles, California 90012
james.p.clark@lacity.org
Telephone: (213) 978-8344
Facsimile: (213) 978-8312

MITCHELL A. KAMIN, SBN 202788
MÓNICA RAMÍREZ ALMADANI, SBN 234893
NEEMA T. SAHNI, SBN 274240
Covington & Burling LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, California 90067-4643
mkamin@cov.com
Telephone:  (424) 332-4800
Facsimile:  (424) 332-4749

DAVID M. ZIONTS, *pro hac vice* application forthcoming
IVANO M. VENTRESCA, *pro hac vice* application forthcoming
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
dzionts@cov.com
Telephone: (202) 662-6000
Facsimile:  (202) 662-5987

*Attorneys for Plaintiff City of Los Angeles*

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF LOS ANGELES,<br><br>        Plaintiff,<br><br>        v.<br><br>JEFFERSON B. SESSIONS, III, in his official capacity as Attorney General of the United States; ALAN R. HANSON, in his official capacity as Acting Assistant Attorney General of the Office of Justice | Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Programs; RUSSELL WASHINGTON, in
his official capacity as Acting Director of
the Office of Community Oriented Policing
Services; UNITED STATES
DEPARTMENT OF JUSTICE.

     Defendants.

**INTRODUCTION**

1.     In this Complaint, the City of Los Angeles seeks declaratory and injunctive relief to prevent an arm of the Executive Branch of the United States Government from unconstitutionally seeking to wield authority it does not have to advance policy objectives it cannot lawfully effectuate—all at the potential expense of public safety and community trust in Los Angeles and other communities.

2.      Ironically, the offending edicts issue from the United States Department of Justice ("DOJ" or "Department"), which seeks unconstitutionally to impose terms on two grants enacted by Congress: one a formula-based program to assist state and local criminal justice programs, the other a program to fund state and local community policing efforts, including by putting more officers on the streets.  As a consequence, DOJ puts the City of Los Angeles—and other state and local government entities—to an untenable choice: commit to participating in federal civil immigration investigation and enforcement efforts, or sacrifice funds for public safety and community policing.

3.     The funds at issue are part of the Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") Program and the Community Oriented Policing Services ("COPS") Program.

**The Byrne JAG Program**

4.     Congress established the Byrne JAG Program specifically to fund "additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice."  34 U.S.C. § 10152(a)(1). Byrne JAG grants are awarded through a statutory formula based on population and crime rates.  They are administered by a component of DOJ, the Office of Justice Programs, Bureau of Justice Assistance.

5.     Nothing in the Byrne JAG legislation that Congress enacted permits DOJ to require, as a condition for receiving those federal funds, that recipients change policies and the operation of their programs and facilities to afford federal civil immigration officials access to local jails for federal civil immigration purposes.  Likewise, Congress,

1
2
3
4

in the Byrne JAG legislation, did not give DOJ authority to cause recipients to provide advance notice to federal immigration officials before an arrestee is released from custody.  To the contrary, DOJ's terms subvert Congress's intent in fashioning the program.

5

### The COPS Program

6
7
8
9
10
11
12
13
14
15
16

6.      The COPS Program was designed to fund a range of community policing efforts, from hiring and rehiring new law enforcement officers to funding school-based partnerships between local law enforcement and schools.  34 U.S.C. § 10381(b)(1)-(22). DOJ's Office for Community Oriented Policing Services ("COPS Office") administers this Program.  Congress authorized the Attorney General to give preferential consideration to applicants with laws concerning the treatment of human trafficking victims and who agreed to contribute more than the required minimum matching contribution for certain grants.  *Id.* § 10381(c).  This preferential consideration takes the form of "bonus points" awarded to applicants applying for COPS grants.  The Program at issue here awards grants for the hiring or rehiring of law enforcement officers.  *See* 2017 COPS Hiring Program ("CHP") Application Guide.[1]

17
18
19
20
21
22
23
24

7.      As with the Byrne JAG Program, DOJ seeks to insert new terms (this time it calls them "additional considerations") into the COPS grant program, designed to affect the distribution of COPS awards.  The result of these additional considerations would be to favor those applicants that agree to engage in federal civil immigration investigations and enforcement and to disfavor those applicants that focus on the community policing purposes of the COPS statute, but do not agree to act as agents of DOJ in enforcing federal civil immigration law.  As with the Byrne JAG conditions, DOJ's actions with respect to the COPS program are unauthorized and incompatible with the statute.

25

### Constitutionality

26
27

8.      Whether called "conditions" or "considerations," the new immigration-

28

---

[1] *Available at* https://cops.usdoj.gov/pdf/2017AwardDocs/chp/app_guide.pdf.

related terms DOJ has attached to both the Byrne JAG and COPS Programs are facially unconstitutional. **First**, they violate the constitutional doctrine of Separation of Powers. The constitutional authority to spend government money, and (with constitutional limitations) to attach terms and conditions to the receipt of federal funds, belongs to Congress, not the Executive Branch. An agency of the Executive Branch may not unilaterally impose terms and conditions on federal grants in the absence of a specific and unambiguous delegation from Congress, which has not occurred with respect to either of the Byrne JAG or COPS Programs. On this basis alone, the new Byrne JAG conditions and COPS considerations violate the Constitution.

9. In addition, DOJ's actions offend the basic Separation of Powers principle that an Executive Branch agency has no power to act unless Congress has conferred on it authority to do so. DOJ's new terms are not authorized by, and indeed are incompatible with, the statutes Congress enacted to establish the Byrne JAG Program and the COPS Program. The Byrne JAG conditions cannot be reconciled with Congress's directive that funds be allocated through an explicit funding formula. DOJ's conditions also would flout Congress's express directive that Byrne JAG funds be used only for one or more of eight specified criminal justice programs, by redirecting those funds to efforts by state and local law enforcement that participate in federal civil immigration investigations. Indeed, one court has already found it likely that DOJ's efforts to impose the conditions on the Byrne JAG grants "violate the separation of powers doctrine and are *ultra vires*." *City of Chicago v. Sessions*, 2017 WL 4081821 (N.D. Ill. Sept. 15, 2017), *appeal filed*.

10. Similarly, the new COPS considerations are not among the three preferential considerations that Congress authorized the Attorney General to take into account in awarding COPS grants, nor are they related to any of the twenty-two purposes for which COPS grants may be awarded.

11. The new terms would also contravene Congress's statutory mandate that the Byrne JAG and COPS Programs not empower any federal agency or officer to exercise *any* direction or control over a local police force.

12. **Second,** even if the new terms had been imposed by Congress, they would be unconstitutional under the Spending Clause and Tenth Amendment to the United States Constitution, which limit the power of the federal government to affect funding to the States (and their municipalities) regarding matters of law and policy that are properly reserved to the States.

13. When Congress attaches new terms to federal funds, it must meet several requirements to ensure that it is not abusing the spending power to improperly regulate and commandeer state and local officials. Terms that Congress places on federal funding must be unambiguous, so state and local governments know to what they are agreeing. Here, however, DOJ's terms, by whatever name DOJ calls them, exceed federal Spending Clause authority because Los Angeles cannot know what is expected of it, as set forth in detail below.

14. The constitutional defects in DOJ's conditions and considerations run even deeper. Another important limit on the Spending Clause is that terms Congress imposes on the use by a State or local government of federal funds must be sufficiently related to the purpose of those funds. Congress's express purpose for creation of the Byrne JAG Program was to fund local criminal justice programs, specifically one or more of the eight types of programs listed in the statute. For the COPS Program, Congress specified twenty-two purposes related to community policing. DOJ's new conditions and considerations do not relate to those purposes, but rather attempt to use the Byrne JAG and COPS Programs to induce communities to engage in federal civil immigration investigations and enforcement.

15. Additionally, in promulgating these conditions and considerations, DOJ did not rely on any analysis or findings to support the implicit premise that individuals whom DHS believes may be unlawfully present in the United States commit more crime than do individuals legally resident in the United States. In fact, there is substantial evidence to the contrary. For this reason, DOJ's attempt to attach the new terms to these grant programs is arbitrary and capricious in violation of the Administrative Procedure Act.

16.     In short, DOJ's unilateral and unauthorized attempt to hold hostage federal funding that Congress authorized to assist state and local criminal justice programs and local community policing efforts, to cause state and local agencies to assist with federal civil immigration investigations, is unconstitutional and unlawful, and cannot be allowed to stand.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction under 28 U.S.C. § 1331 (federal question).  The Court also has authority to award declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–2202.

18.     Venue is proper in this District under 28 U.S.C. § 1391(e) because Plaintiff resides in this District and a substantial part of the events or omissions giving rise to this action occurred in this District.

## PARTIES

19.     Plaintiff City of Los Angeles ("City" or "Los Angeles") is a municipal corporation organized and existing under the laws of the State of California, and is a charter city pursuant to Article XI of the California Constitution.

20.     Defendant Jefferson B. Sessions, III, is the Attorney General of the United States.  The Attorney General is charged with the administration and enforcement of federal criminal law and policy, and oversees the U.S. Department of Justice, which administers the Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") Program and the Community Oriented Policing Services ("COPS") Program.  Defendant Sessions has supervisory responsibility and is sued in his official capacity.

21.     Defendant U.S. Department of Justice is an agency of the United States. The Bureau of Justice Assistance ("BJA") is a component of the Office of Justice Programs of DOJ ("OJP").  BJA's stated mission is "to provide leadership and services in grant administration and criminal justice policy development to support local, state, and tribal justice strategies to achieve safer communities."  BJA administers the Byrne JAG Program.  The Office of Community Oriented Policing Services is also a component

within DOJ.  The COPS Office is "responsible for advancing the practice of community policing by the nation's state, local, territorial, and tribal law enforcement agencies through information and grant resources."  The COPS Office administers the COPS grants.

22.     Defendant Alan Hanson is the Acting Assistant Attorney General for the Office of Justice Programs at DOJ and oversees BJA.  Defendant Hanson has supervisory responsibility and is sued in his official capacity.

23.     Defendant Russell Washington is the Acting Director for the COPS Office at DOJ.  He oversees the COPS Office, which administers the COPS grants.  Defendant Washington has supervisory responsibility and is sued in his official capacity.

## FACTUAL ALLEGATIONS

### A.     Policies and Practices of the City of Los Angeles' Police Department

24.     For nearly four decades, the Los Angeles Police Department ("LAPD") has implemented policies and practices designed to promote the public safety of all Los Angeles residents by engendering cooperation and trust between members of the City's many immigrant communities and law enforcement.  The fundamental goal of these local policies and practices has been to encourage victims of and witnesses to crime to cooperate with LAPD, irrespective of their immigration status.  Central to these policies has been the determination by local law enforcement and its civilian overseers to leave federal civil immigration investigations and enforcement to the federal government.

25.      For example, in 1979, LAPD began a policy—adopted by the Los Angeles Board of Police Commissioners and signed by then-Chief of Police Daryl Gates—that restricts an officer from initiating a police action with the objective of discovering a person's immigration status, and also prohibits arrests based solely on civil immigration status.

26.     This policy, known as Special Order 40, resulted in the addition of Section 1/390 (Undocumented Aliens) to the LAPD Manual, and an amendment to Section 4/264.50 of the Manual (Enforcement of United States Immigration Laws).  Section

1/390 provides that "[u]ndocumented alien status in itself is not a matter for police action," and proclaims that LAPD personnel are required to enforce the law and serve members of the public equally without regard to immigration status. Section 1/390 also recognizes that its policy encourages participation by undocumented persons in police activities and investigations, which increases LAPD's ability to protect and serve the entire community.

27.    Manual Section 4/264.50 provides that "[o]fficers shall not initiate police action where the objective is to discover the alien status of a person." This section also specifies that "[o]fficers shall neither arrest nor book persons for violation of Title 8, Section 1325 of the United States Immigration Code (Illegal Entry)."

28.    The LAPD policies promulgated by Special Order 40 are compliant with existing federal law. In the 2009 case, *Sturgeon v. Bratton*, the California Court of Appeal rejected a legal challenge to Special Order 40—as set forth in Section 4/264.50 of the LAPD Manual—ruling that the language of the policy does not conflict with 8 U.S.C. § 1373 ("Section 1373"), and is not invalid. As the Court of Appeal recognized, Section 1373 addresses certain communications between federal and state or local authorities; Special Order 40 does not address that issue, but rather prohibits police officers from initiating police action to determine immigration status and making arrests for illegal entry. 174 Cal. App. 4th 1407 (Cal. Ct. App. 2009). It has nothing to do with communications between LAPD and federal authorities.

29.    In 2014, LAPD adopted a practice of refusing to detain individuals, otherwise eligible for release from custody under state law, on the basis of requests from U.S. Immigration and Customs Enforcement ("ICE"). LAPD does not detain individuals in response to such requests unless they are supported by a judicial determination of probable cause, or a valid warrant from a judicial officer. This practice was developed in response to judicial decisions declaring compliance with such ICE requests to be unconstitutional, and also potentially subjecting LAPD to significant liability for violations of the Fourth Amendment. *See, e.g.*, *Miranda-Olivares v. Clackamas County*,

2014 WL 1414305, at *11 (D. Or. Apr. 11, 2014).

30.     When a member of LAPD arrests an individual in connection with a criminal offense, the arrestee may be cited and released in the field, or taken to one of LAPD's ten jail detention facilities for booking.  Those LAPD jail facilities are all categorized by the State of California as Type I facilities, which are local detention facilities used for the temporary, short-term detention of persons who may be held for no more than 96 hours.  In practice, persons arrested by members of LAPD generally are kept in LAPD custody for no more than 48 hours after arrest because of the limitations imposed by state law and the Constitution with respect to the period of time within which law enforcement agencies must: 1) obtain a probable cause determination that an arrested individual committed a criminal offense to support the detention of the individual without a warrant; and 2) transfer a detainee to court for arraignment.  *See* Cal. Pen. Code § 825; *Cty. of Riverside v. McLaughlin*, 500 U.S. 44 (1991).

31.     In many situations, arrestees are eligible for release from custody within a few hours of arrest and booking, including by posting bail or bond, on their own recognizance, or by a certificate of release.

32.     While arrestees are in LAPD custody, LAPD permits DHS and ICE personnel access to LAPD detention facilities to interview individual arrestees regarding civil immigration status.  LAPD does so consistent with the state statutory requirement that such persons be provided with advance written notice explaining the purpose of the interview, that the interview is voluntary, and that the person may decline to speak or opt to be interviewed only in the presence of his or her attorney.  *See* California TRUTH Act, Cal. Gov. Code § 7283 *et seq.* ("California TRUTH Act").  LAPD implements this state law by obtaining a written expression of the arrestee's willingness prior to any such interview.  If the arrestee declines the interview, LAPD does not provide DHS and ICE personnel access to its facilities in order to interview that individual.

**B.     The Edward Byrne Memorial Justice Assistance Grant Program**

33.     Congress established the Byrne JAG Program to fund "additional personnel,

equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice."  34 U.S.C. § 10152(a)(1).  Congress specified that these funds be used "for any one or more of the following programs":

- "Law enforcement programs."
- "Prosecution and court programs."
- "Prevention and education programs."
- "Corrections and community corrections programs."
- "Drug treatment and enforcement programs."
- "Planning, evaluation, and technology improvement programs."
- "Crime victim and witness programs (other than compensation)."
- "Mental health programs and related law enforcement and corrections programs, including behavioral programs and crisis intervention teams."

34 U.S.C. § 10152(a)(1)(A)-(H).

34.     Byrne JAG funding is administered by BJA within the U.S. Department of Justice's Office of Justice Programs.  *See* 34 U.S.C. §§ 10151-58.  Each fiscal year, BJA selects state and local government awardees to receive funds that, in general, may be used over a period of four years.

35.     In awarding funds, BJA employs a congressional formula to allocate funds to eligible States and local governments.  By statute, funding is allocated based on two factors: population and rate of violent crime.  The Attorney General must allocate 50 percent of the available funds to each State in amounts proportionate to its population and its crime statistics.  *Id.* § 10156(a).  The remaining 50 percent of the funds is allocated to each State in amounts proportionate to its rate of violent crime.  *Id.*  Of the total amount allocated to a State, 60 percent is provided as a direct grant to the State, and 40 percent as grants for local governments.  *Id.* § 10156(b)(2), (d).

36.     Local governments wishing to receive a grant must submit an award application to BJA.  In order to be eligible for an award, an applicant must furnish certain certifications and assurances related to the application or administration of the grant, or

use of the grant funds.  Specifically, Congress enumerated two certifications and three assurances that an applicant must make:

- "A certification that Federal funds made available under this part will not be used to supplant State or local funds, but will be used to increase the amounts of such funds that would, in the absence of Federal funds, be made available for law enforcement activities." 34 U.S.C. § 10153(a)(1).

- "An assurance that, not fewer than 30 days before the application (or any amendment to the application) was submitted to the Attorney General, the application (or amendment) was submitted for review to the governing body of the State or unit of local government (or to an organization designated by that governing body)." *Id.* § 10153(a)(2).

- "An assurance that, before the application (or any amendment to the application) was submitted to the Attorney General (A) the application (or amendment) was made public; and (B) an opportunity to comment on the application (or amendment) was provided to citizens and to neighborhood or community-based organizations, to the extent applicable law or established procedure makes such an opportunity available." *Id.* § 10153(a)(3).

- "An assurance that, for each fiscal year covered by an application, the applicant shall maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require." *Id.* § 10153(a)(4).

- "A certification . . . that (A) the programs to be funded by the grant meet all the requirements of this part; (B) all the information contained in the application is correct; (C) there has been appropriate coordination with affected agencies; and (D) the applicant will comply with all provisions of this part and all other applicable Federal laws." *Id.* § 10153(a)(5).

37.     Byrne JAG applications are accepted through an online program.  In order to complete the application, a representative of the applicant is required to electronically

sign a page stating that the applicant will comply with standard "assurances" promulgated by the Office of Management and Budget.  These assurances include that, "throughout the period of performance for the award," "the Applicant will comply with all award requirements."

38.     When BJA grants an application for a Byrne JAG award, BJA requires the recipient to agree to an additional set of "Special Conditions."  These conditions generally relate to the administration of the grant or the use of grant funds.  The "Special Conditions" imposed in Los Angeles' fiscal year ("FY") 2016 grant award governed various aspects of how the City would be required to administer its Byrne JAG award, such as a "[r]equirement for data on performance and effectiveness under the award," "[r]equirements related to System for Award Management and Unique Entity Identifiers," compliance with civil rights and nondiscrimination regulations in the administration of the award, and reporting of any fraud, waste, and abuse in the award implementation.

C.     **The City of Los Angeles Uses Byrne JAG Funds For Critical Local Law Enforcement Needs**

39.     Each year since 1997, the City of Los Angeles has received more than $1 million in funding under the Byrne JAG Program (and its predecessor).  Every year that Los Angeles has applied for Byrne JAG funds, it has been approved for funding.

40.      In the FY 2016 application cycle, Los Angeles applied for and received approximately $1.8 million in Byrne JAG funding for FY 2016 through FY 2019. Approximately $800,000 of the funding went to the County of Los Angeles as a sub-grantee, and $1 million remained with the City.  For FY 2016, Los Angeles received its funding directly from the federal government as part of a formula grant, *see* 34 U.S.C. § 10156(d), not as a distribution from the Byrne JAG funds awarded separately to the State of California.

41.     Byrne JAG funds support important criminal justice programs in Los Angeles.  Specifically, the City's FY 2016 Byrne JAG funds assist in funding its

Community Law Enforcement and Recovery ("CLEAR") program, which aims to reduce gang violence in Los Angeles and rehabilitate communities that have experienced significant criminal activity.  Through effective collaboration among several city, county, and state criminal justice agencies, the program targets high crime areas and promotes community recovery by working closely with special criminal investigative units, an aggressive vertical prosecutorial program, probation and parole officers, youth intervention organizations, and schools.

42.     The CLEAR program has been successful.  In 2014, the CLEAR program areas had 22 percent less gang crime over a three-year period than similar non-CLEAR areas.  For FY 2016, the Byrne JAG funds supported 20 to 30 percent of the salaries for nine Deputy City Attorneys, nine Deputy District Attorneys, and nine Deputy Probation officers related to the CLEAR program.

43.     The City's use of Byrne JAG funds to support the CLEAR program and reduce violent crime advances the core criminal justice mission of the Byrne JAG Program.  The CLEAR program's key to success in reducing violent crime in targeted neighborhoods has been the dedication of various agency assets to the goal of reducing crime in CLEAR sites.  Each CLEAR site includes an operational team made up of representatives from LAPD, the County District Attorney's Office, the City Attorney's Office, and the County Probation Department.  In addition to their focus on reducing crime, the CLEAR team members collaborate with residents within each CLEAR site through the creation of a Community Impact Team.  The Community Impact Team's focus is specifically on quality of life issues such as graffiti, litter, and juvenile loitering. Community members on the team identify effective community organizations in their CLEAR area and facilitate a relationship between those organizations and CLEAR team members to secure support from individuals and businesses within the community.

44.     The year-over-year federal funding for the CLEAR program has been a catalyst for turning Los Angeles into a leader on coordinated approaches to seemingly intractable issues related to violent crime in general, and gang-related violence in

particular.  The CLEAR model was innovative and went beyond the traditional methods of criminal suppression.  It combined, in one program, elements which have been copied by numerous other jurisdictions, and are now a common approach to addressing not only gang violence but violent crimes generally.  These elements, such as vertical prosecution of all cases, regular sharing of best practices from public safety teams in various parts of the City, and community outreach, have significantly informed the creation of other innovative approaches to criminal justice in the City, such as the City Attorney's neighborhood prosecutor program.

45.    If the City of Los Angeles were to lose its Byrne JAG funding, it would be deprived of valuable resources that enhance Los Angeles' local criminal law enforcement efforts and advance public safety.  Continued Byrne JAG funding ensures that the CLEAR staff can continue to dedicate their time to their roles within the CLEAR team.  The funding also ensures that a continued dedication to cross-agency collaboration will pave the way for future successes and innovations still to come.

**D.    Defendants' Announcement Of Federal Civil Immigration-Related Conditions For State And Local Government Receipt of Byrne JAG Funding**

46.    President Donald J. Trump has declared that he would use federal funds as a "weapon" to require state and local support for his civil immigration enforcement policies.[2]  On January 25, 2017, President Trump issued Executive Order 13768 directing the Attorney General and Secretary of Homeland Security to withhold federal funds from what he called "Sanctuary Jurisdictions."[3]  On April 25, 2017, a federal district court enjoined Section 9(a) of the Executive Order, ruling that the plaintiff jurisdictions in that

[2] Harriet Taylor, Trump to Fox News: "I may defund California as 'a weapon' to fight illegal immigration," CNBC.com (Feb. 5, 2017), https://tinyurl.com/TaylorCNBC.

[3] The White House Office of the Press Secretary, "Executive Order:  Enhancing the Public Safety on the Interior of the United States," Whitehouse.gov (January 25, 2017), § 9(a), *available at* https://tinyurl.com/EO13768.

case are likely to succeed on their claims that the order is unconstitutional because the Executive Branch is usurping authority that belongs to Congress under the Spending Clause; the order violates constitutional limits on federal spending authority; the order violates the Tenth Amendment's prohibition against the federal government commandeering local jurisdictions to administer a federal regulatory program; the order is unconstitutionally vague; and the order violates requirements of due process.  *Cty. of Santa Clara v. Donald J. Trump*; *City and Cty. of San Francisco v. Trump*, 2017 WL 1459081 (N.D. Cal. Apr. 25, 2017), *appeal filed* No. 17-16886 (9th Cir. Sept. 18, 2017).

47.     In a July 25, 2017, press release, the Attorney General announced "immigration compliance requirements" that BJA would be imposing on Byrne JAG applicants to render certain jurisdictions ineligible for funds if they did not change their policies and operations.[4]  The Byrne JAG Press Release explained that, "[f]rom now on, the Department will only provide Byrne JAG grants to cities and states that comply with federal law, allow federal immigration access to detention facilities, and provide 48 hours' notice before they release an illegal alien wanted by federal authorities." Defendant Sessions further stated that the conditions were intended to encourage jurisdictions that he described as "sanctuary jurisdictions" to change their policies and operations.

48.     The Byrne JAG Press Release was accompanied by a one-page "Byrne JAG Grant Policy Backgrounder" that was "attributable to a DOJ official."[5]  The

---

[4] Department of Justice Office of Public Affairs, "Attorney General Sessions Announces Immigration Compliance Requirements for Edward Byrne Memorial Justice Assistance Grant Programs," Justice.gov (July 25, 2017), *available at* https://www.justice.gov/opa/pr/attorney-general-sessions-announces-immigration-compliance-requirements-edward-byrne-memorial ("Byrne JAG Press Release") (attached hereto as Exhibit 1).

[5] Department of Justice, Backgrounder on Grant Requirements, *available at* https://www.justice.gov/opa/press-release/file/984346/download ("Backgrounder") (attached hereto as Exhibit 2).

Backgrounder provides that States and local governments will be required to satisfy three conditions in order to receive Byrne JAG funding. *First*, they must "certify compliance with section 1373, a federal statute applicable to state and local governments that generally bars restrictions on communications between state and local agencies and officials at the Department of Homeland Security" (the "Section 1373 Condition"). Section 1373 pertains to providing information regarding the "citizenship or immigration status, lawful or unlawful," of an individual. 8 U.S.C. § 1373. *Second*, Byrne JAG funding recipients must permit Department of Homeland Security ("DHS") personnel to "access any detention facility in order to meet with an alien and inquire as to his or her right to be or remain in the United States" (the "Access Condition"). *Third*, Byrne JAG funding recipients must "provide at least 48 hours advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien" (the "Notice Condition").[6]

49.     Neither the Byrne JAG Press Release nor the Backgrounder provides a colorable justification for the Access Condition or the Notice Condition. And neither document explains how the purpose of the Byrne JAG Program to provide federal funding to criminal justice programs at the state and local level relates to the new conditions, which instead are directed to facilitating efforts by DHS to investigate the federal civil immigration status of individuals.

50.     The sole rationale provided for the new grant conditions is an unsupported assertion in the Byrne JAG Press Release that the new conditions are "part of accomplishing the Department of Justice's top priority of reducing violent crime." *See* Byrne JAG Press Release. But no evidence is cited in either the Byrne JAG Press Release or the Backgrounder to support the implied premise that undocumented immigrants or other non-citizens commit violent crimes at higher rates than the general

---

[6] The Access Condition and Notice Condition are phrased differently in the Backgrounder and the Byrne JAG Press Release. *See supra* ¶¶ 47-48.

population, or to indicate that the investigation of federal civil immigration status of individuals pursuant to the new DOJ conditions is focused on individuals involved in violent crime.

51.     Defendant Sessions did deliver a speech on July 12, 2017, to law enforcement personnel in which he cited a University of California Riverside study for the proposition that cities with sanctuary policies "have more violent crime on average than those that don't,"[7] but the authors of that study immediately disputed the Attorney General's characterization of their research.[8]  They clarified that their study showed there was no relationship between a city's so-called "sanctuary" policies and that city's crime rate.[9]  One of the authors explained: "All of the data to date suggests that either there's no relationship, which is what our study found, or there's an inverse relationship."[10]

**E.     DOJ's Imposition Of New Federal Civil Immigration-Related Conditions In The Agency's Solicitation For Grant Applications for FY 2017 Byrne JAG Awards**

52.     BJA implemented the Attorney General's announcement by including the new DOJ conditions in its solicitations for the current Byrne JAG application cycle.  On

---

[7] U.S. Department of Justice Office of Public Affairs, "Attorney General Jeff Sessions Delivers Remarks in Las Vegas to Federal, State and Local Law Enforcement About Sanctuary Cities and Efforts to Combat Violent Crimes," Justice.gov (July 12, 2017), *available at* https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-las-vegas-federal-state-and-local-law.

[8] Nick Roll, *Correcting Jeff Sessions*, INSIDE HIGHER ED (July 17, 2017), *available at* https://www.insidehighered.com/news/2017/07/17/academics-push-back-against-attorney-generals-misrepresentation-their-study.

[9] Loren Collingwood, Benjamin Gonzalez-O'Brien and Stephen El-Khatib, *Sanctuary cities do not experience an increase in crime*, THE WASHINGTON POST (Oct. 3, 2016), *available at*  https://www.washingtonpost.com/news/monkey-cage/wp/2016/10/03/sanctuary-cities-do-not-experience-an-increase-in-crime.

[10] Roll, *supra* note 7.

August 3, 2017, BJA solicited applications from local governments for FY 2017 Byrne JAG grants.  The agency's solicitation, attached hereto as Exhibit 3, states that applicants must certify compliance with Section 1373 in order to qualify for Byrne JAG funding.[11] A Byrne JAG application will not be considered by the agency to be complete without that certification.

53.     Separately, the agency's solicitation states that individual awards "will include two new express conditions."  These conditions "are designed to ensure" that local governments that receive JAG funds:

> a.  "permit personnel of the U.S. Department of Homeland Security (DHS) to access any correctional or detention facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or remain in the United States"; and
>
> b.  "provide at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act."

54.     The agency's solicitation states that these two new conditions (the "Challenged Conditions") "will be an authorized and priority purpose of the award," even though the purposes specified by Congress for the Byrne JAG awards did not include federal civil immigration investigation or enforcement activities.  Indeed, none of the program priorities set by Congress contemplate federal civil immigration activities.  The agency's solicitation also specifies that the costs of complying with these "requirements" are "allowable costs under the award."  The solicitation further provides that "all award conditions" are included in the "award requirements"—that is, the same requirements that

---

[11] Bureau of Justice Assistance, Office of Justice Programs, U.S. Department of Justice, "Edward Byrne Memorial Justice Assistance Grant Program:  FY 2017 Local Solicitation," *available at*  https://www.bja.gov/Funding/JAGLocal17.pdf ("Solicitation").

an applicant must agree to abide by in submitting its application.  *See* ¶ 38.

### F.   DOJ's Modification Of Its Federal Civil Immigration-Related Funding Conditions In Response To Litigation.

55.   After DOJ announced its new federal immigration-related conditions and included them in the agency's Byrne JAG solicitation, a number of jurisdictions filed lawsuits challenging these conditions.

56.   In response, DOJ represented in litigation that it had changed the conditions. Claiming that the "express new conditions" it had defined as "award requirements" in the agency's solicitation in fact were not intended to represent the actual conditions, DOJ promulgated different versions in an award issued to the County of Greenville, South Carolina ("Greenville Award"), attached hereto as Exhibit 4.  DOJ submitted that award to a federal court as an example and represented to that court that the same language would be used in other awards.  Notwithstanding that the agency's solicitation treats the new conditions as "award requirements," DOJ represented in court that applicants actually would not be required to confirm compliance with the conditions until after receiving an award.

57.   The Greenville Award states that, "as of the date the recipient accepts [its] award," the recipient must have in place a "a local ordinance, -rule, -regulation, -policy, or -practice (or an applicable State statute, -rule, -regulation, -policy, or -practice) that is "designed to ensure" that:

    a.   "agents of the United States acting under color of federal law in fact are given access [to] a local-government (or local-government-contracted) correctional facility for the purpose of permitting such agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States" (the revised "Access Condition"); and

    b.   "when a local-government (or local-government contracted) correctional facility receives from DHS a formal written request authorized by the

1
2
3
4
5
6

Immigration and Nationality Act that seeks advance notice of the scheduled release date and time for a particular alien in such facility, then such facility will honor such request and — *as early as practicable* (see 'Rules of Construction' incorporated by para. 4.B. of this condition) — provide the requested notice to DHS." (the revised "Notice Condition").

Greenville Award, ¶ 56(1) (emphasis added).

7
8
9
10
11
12

58.     In addition, the "Rules of Construction" referenced in the Notice Condition state: "Nothing in this condition shall be understood to authorize or require any recipient, any subrecipient at any tier, any State or local government, or any other entity or individual to maintain (or detain) any individual in custody beyond the date and time the individual would have been released in the absence of this condition." *Id.* ¶¶ 55-56, at Para. 4.B.

13
14
15
16
17
18

59.     The Rules of Construction also state: "Current DHS practice is ordinarily to request advance notice of scheduled release 'as early as practicable (at least 48 hours, if possible).' (See DHS Form I-247A (3/17)).  In the event that (e.g., in light of the date DHS made such request) the scheduled release date and time for an alien are such as not to permit the advance notice that DHS has requested, it shall not be a violation of this condition to provide only as much advance notice as practicable." *Id.*

19
20
21
22

60.     Like the agency's solicitation, the Greenville Award claims that compliance with the Challenged Conditions is an "authorized and priority purpose" of the award, and that grant funds "may be obligated" for the costs of complying with those Conditions. *Id.* ¶¶ 55(3), 56(3).

23
24
25
26

61.     Notwithstanding DOJ's revisions to the Challenged Conditions, DOJ was preliminarily enjoined from imposing them on the Byrne JAG awards because it was likely the conditions exceed DOJ's statutory authority. *City of Chicago v. Sessions*, 2017 WL 4081821 (N.D. Ill. Sept. 15, 2017), *appeal filed*.

27
28

### G. DOJ's New Federal Civil Immigration-Related Conditions Put Los Angeles' Byrne Criminal Justice Assistance Funding At Risk.

62.    In prior years, Los Angeles has established eligibility for, and received funds under, the Byrne JAG Program.  The City is presently seeking Byrne JAG funding for the FY 2017 cycle.  In response to the agency's Solicitation, on August 31, 2017, the City timely submitted its application for funding ("Application"), attached hereto as Exhibit 5. The City appended a letter to its Application, noting that, in light of DOJ's representation that an applicant would not be required to accept or reject the Challenged Conditions until it signed its award document, the City was "submitting its Application with the qualification that it [was] withholding any commitment to, or confirmation of, its compliance with the Conditions."  Application, at Attachment 1.

63.    Based on the statutory funding formula, and Los Angeles' track record, Los Angeles anticipates that the City would receive an award and funding but for any complications posed by the new conditions.  BJA has already calculated that Los Angeles is eligible to receive $1.9 million in Byrne JAG funds, an amount it divides with the County of Los Angeles as a sub-grantee.[12]  The City has authority to further adjust the division of Byrne JAG funds, and the funds are generally divided evenly between the City and County.

64.    Although Los Angeles does not concede that DOJ has authority to impose the Section 1373 Condition, Los Angeles can certify its compliance with 8 U.S.C. § 1373.

65.    Los Angeles previously raised concerns about the original version of the Notice Condition, which appeared to require the City to prolong the detention of arrestees in order to provide DHS with a full 48 hours' notice of release.  The Notice Condition as purportedly revised in the Greenville Award—which DOJ represents it will also include

---

[12] Bureau of Justice Assistance, Office of Justice Programs, U.S. Department of Justice, "2017 California Local JAG Allocations," *available at* https://www.bja.gov/Programs/JAG/jag17/17CA.pdf (attached hereto as Exhibit 6).

in future awards—specifies that prolongation of detention is not authorized or required. However, the Notice Condition remains ambiguous.  DOJ demands "notice as early as practicable" regarding "the scheduled release date and time for a particular alien" when the "correctional facility receives from DHS a formal written request authorized by the Immigration and Nationality Act."  "Scheduled release," however, is generally not an applicable term in the context of short-term detention operations, like LAPD's.  Los Angeles therefore cannot determine what is required of it under the Notice Condition, and so would be unable to make an unqualified assurance that it complies.

66.     Los Angeles also cannot determine whether DOJ would consider Los Angeles' policies and the operations of its jail facilities to be consistent with the agency's Access Condition as set forth in the Greenville Award.  The City does not prevent ICE officials from accessing its detention facilities to interview individuals, but the City complies with state statutory law (the California TRUTH Act) requiring that detainees receive notice and information regarding requested interviews by federal authorities.  LAPD's practice in implementing this law is to determine the arrestee's willingness to be interviewed by federal immigration officials, and not to facilitate any federal civil immigration interview that the detainee has declined.  In light of Defendants' previous actions and rhetoric, and the language of the Access Condition as revised in the Greenville Award, the City remains concerned that DOJ is demanding "access" that is inconsistent with state law and LAPD's related operational policy and practices in its jails.  Thus, the City cannot ascertain whether, in DOJ's view, by informing detainees of the requested interview pursuant to state law, and by declining to facilitate interviews that the detainee has declined, the City would not be considered to have a policy or practice under which federal agents "in fact are given access . . . to meet with individuals."

67.     As a result, if the Access Condition is not enjoined, the ambiguity as to what DOJ intends the Condition to require of the City will force the City to submit a qualified assurance, since DOJ has made it impossible to ascertain what the Condition actually requires.

68.     This Court's intervention is required to invalidate these unlawful conditions.

**H.     Community Oriented Policing Services ("COPS") Grant Program**

69.     In a provision entitled "Authority to make public safety and community policing grants," Congress authorized the Attorney General to "make[] grants to States, units of local government, Indian tribal governments, other public and private entities, and multi-jurisdictional or regional consortia for the purposes described in subsection (b) of this section."  34 U.S.C. § 10381(a).  In subsection (b), Congress limited "[t]he purposes for which grants . . . may be made," *id.* § 10381(b), to the following twenty-two purposes:

- to rehire law enforcement officers who have been laid off as a result of State, tribal, or local budget reductions for deployment in community-oriented policing;

- to hire and train new, additional career law enforcement officers for deployment in community-oriented policing across the Nation, including by prioritizing the hiring and training of veterans (as defined in section 101 of Title 38);

- to procure equipment, technology, or support systems, or pay overtime, to increase the number of officers deployed in community-oriented policing;

- to award grants to pay for office[r]s hired to perform intelligence, anti-terror, or homeland security duties;

- to increase the number of law enforcement officers involved in activities that are focused on interaction with members of the community on proactive crime control and prevention by redeploying officers to such activities;

- to provide specialized training to law enforcement officers to enhance their conflict resolution, mediation, problem solving, service, and other skills needed to work in partnership with members of the community;

- to increase police participation in multidisciplinary early intervention teams;

- to develop new technologies, including interoperable communications technologies, modernized criminal record technology, and forensic technology, to assist State, tribal, and local law enforcement agencies in reorienting the emphasis of their activities from reacting to crime to preventing crime and to train law enforcement officers to use such technologies;

- to develop and implement innovative programs to permit members of the community to assist State, tribal, and local law enforcement agencies in the prevention of crime in the community, such as a citizens' police academy, including programs designed to increase the level of access to the criminal justice system enjoyed by victims, witnesses, and ordinary citizens by establishing decentralized satellite offices (including video facilities) of principal criminal courts buildings;

- to establish innovative programs to reduce, and keep to a minimum, the amount of time that law enforcement officers must be away from the community while awaiting court appearances;

- to establish and implement innovative programs to increase and enhance proactive crime control and prevention programs involving law enforcement officers and young persons in the community;

- to establish school-based partnerships between local law enforcement agencies and local school systems by using school resource officers who operate in and around elementary and secondary schools to combat school-related crime and disorder problems, gangs, and drug activities;

- to develop and establish new administrative and managerial systems to facilitate the adoption of community-oriented policing as an organization-wide philosophy;

- to assist a State or Indian tribe in enforcing a law throughout the State or tribal community that requires that a convicted sex offender register his or her address with a State, tribal, or local law enforcement agency and be subject to criminal prosecution for failure to comply;

- to establish, implement, and coordinate crime prevention and control programs (involving law enforcement officers working with community members) with other Federal programs that serve the community and community members to better address the comprehensive needs of the community and its members;

- to support the purchase by a law enforcement agency of no more than 1 service weapon per officer, upon hiring for deployment in community-oriented policing or, if necessary, upon existing officers' initial redeployment to community-oriented policing;

- to participate in nationally recognized active shooter training programs that offer scenario-based, integrated response courses designed to counter active shooter threats or acts of terrorism against individuals or facilities;

- to provide specialized training to law enforcement officers to—
  - recognize individuals who have a mental illness; and
  - properly interact with individuals who have a mental illness, including strategies for verbal de-escalation of crises;

- to establish collaborative programs that enhance the ability of law enforcement agencies to address the mental health, behavioral, and substance abuse problems of individuals encountered by law enforcement officers in the line of duty;

- to provide specialized training to corrections officers to recognize individuals who have a mental illness;

- to enhance the ability of corrections officers to address the mental health of individuals under the care and custody of jails and prisons, including specialized training and strategies for verbal de-escalation of crises; and

- to permit tribal governments receiving direct law enforcement services from the Bureau of Indian Affairs to access the program under this section for use in accordance with the above purposes.

34 U.S.C. § 10381(b)(1)-(22).

70.     Grants disbursed under Section 10381 are known as Community Oriented Policing Services ("COPS") grants.  *See* 34 U.S.C. § 10381(k).  COPS grant funding is administered by the Office of Community Oriented Policing Services ("COPS Office") within the U.S. Department of Justice.  *See* 2017 CHP Application Guide at 61.  The COPS Office administers several types of COPS programs each year.  *See, e.g.*, COPS Office, Funding Opportunities, https://cops.usdoj.gov/Default.asp?Item=65 (listing different COPS grant programs).  One of those grants is the COPS Hiring Program ("CHP") grant, which "provides funding directly to law enforcement agencies to hire and/or rehire career law enforcement officers in an effort to increase their community policing capacity and crime prevention efforts."  2017 CHP Application Guide at 1, 7. Pursuant to statute, CHP grants may fund up to 75 percent of the salary and benefits of the hired or rehired officers.  *See id.*; *see also* 34 U.S.C. § 10381(g).  Each fiscal year, the COPS Office selects local government awardees to receive CHP funds that, in general, may be used over a period of three years.  *See* 2017 CHP Application Guide at 1.

71.     For purposes of evaluating COPS grant applications, Congress authorized the Attorney General to give "preferential consideration, where feasible, to an application" that meets one or more of three criteria: (1) an application "for hiring and rehiring additional career law enforcement officers that involves a non-Federal contribution exceeding the 25 percent minimum" non-federal contribution; (2) the

applicant is in a State that has in effect anti-human trafficking laws that treat minors engaged in commercial sex as victims; or (3) the applicant is in a State that has in effect laws related to allowing the vacatur of arrests or convictions for non-violent crimes committed by human trafficking victims directly related to their human trafficking.  34 U.S.C. § 10381(c).

72.    The COPS Office determines which applicants receive CHP grants through a points system.  In calculating an applicant's score for a CHP grant in FY 2016, for example, "fiscal need . . . constitute[d] 20 percent, crime 30 percent, and community policing 50 percent of the overall score."  2016 CHP Application Guide at 21.[13]  The COPS Office also provided "additional consideration" to applicants on various grounds. *Id.*  The COPS Office does not explain how localities receive points in the various categories, or the relative weight given to additional considerations in the overall scoring system.  *See id.*

**I.    Los Angeles Uses COPS Funds For Critical Local Law Enforcement Needs**

73.    Los Angeles applied for CHP grants in 2012 and 2016, and received the grants in both years.  In FY 2016, Los Angeles' score for the CHP grant was 150.67—the 14th highest score among over 1,110 applications.  *See* COPS Office, FY2016 COPS Hiring Program Applicant Rankings, https://cops.usdoj.gov/pdf/2016AwardDocs/chp/Ranking_List.pdf.

74.    Los Angeles received $3.125 million in CHP funding in FY 2016, which went toward the hiring of 25 officers to improve community policing.  Los Angeles explained in its 2016 application that the CHP funds would help expand the "Summer Night Lights" and "Fall Friday Nights" programs, in which parks around Los Angeles extend their operating hours and host free events for the community, with LAPD officers present to ensure the safety of residents.  *See* Los Angeles 2016 CHP Application,

---

[13] *Available at* https://cops.usdoj.gov/pdf/2016AwardDocs/chp/AppGuide.pdf.

attached hereto as Exhibit 7.  In addition, Los Angeles planned to use CHP funds to expand training programs in community policing.  *Id.*

### J.   Defendants' Imposition Of New Immigration-Related "Additional Consideration" Factors For FY 2017 CHP Grants

75.     As with the Byrne JAG Program, DOJ also attempts to transform the CHP grant from a grant for community policing to a tool for pressuring jurisdictions into engaging in federal civil immigration enforcement.

76.     In the FY 2017 application guide, the COPS Office expanded the types of local law enforcement "focus areas" that would receive additional consideration beyond those authorized by the COPS grant statute.  *See* 34 U.S.C. § 10381(b), (c).  For FY 2017 COPS grants, "additional consideration" is provided for grant-supported programs whose "focus area" is "Illegal Immigration" (the "Immigration Enforcement Focus Consideration").  *See* 2017 CHP Application Guide at 27, 43.

77.     Additional consideration is also provided for grant-supported programs focusing on "Violent Crime" or "Homeland Security."  *See* 2017 CHP Application Guide at 27.  Unlike "Illegal Immigration," these focus areas correspond with authorized statutory purposes for COPS funding.  *See* 34 U.S.C. § 10381(b)(5), (8), (9), (11), (12), (15) (crime control); *id.* § 10381(b)(4) (homeland security).  Applicants could select only one "focus area."  *See* 2017 CHP Application Guide at 42.

78.     The COPS Office separately stated that further "additional consideration" might be given to "applicants that partner with federal law enforcement to address illegal immigration" ("Immigration Enforcement Partnership Consideration").  *See id.* at 27-28.  Applicants were also required to certify compliance with 8 U.S.C. § 1373.  *See id.* at 28.

79.     The COPS Office also included the statutorily authorized preferential considerations for "applicants in states with certain anti-human trafficking laws that treat minors engaged in commercial sex as victims (referred to as 'safe harbor' laws) and permit individuals to vacate arrest or prosecution records for non-violent offenses as a result of being trafficked."  *See* 34 U.S.C. § 10381(c)(2)-(3); 2017 CHP Application

Guide at 27.  It also indicated that applicants will receive additional consideration for hiring a military veteran.  *See* 2017 CHP Application Guide at 39; 34 U.S.C. § 10381(b)(2) ("prioritizing the hiring and training of veterans" is one purpose of COPS grants). The COPS office also indicated that applicants "that experienced an unanticipated catastrophic event" might be given additional consideration.  *See* 2017 CHP Application Guide at 27-28 *see* 34 U.S.C. § 10381(b)(4), (17) (programs to counter mass shootings and terrorism); *cf.* 42 U.S.C. § 5141 (permitting modification of administrative conditions of federal assistance programs in light of a "major disaster").

80.     In its FY 2017 application, Los Angeles applied for $3.125 million in CHP funds to support hiring officers for its Community Safety Partnership  ("CSP") Program. *See* Los Angeles 2017 CHP Application, attached hereto as Exhibit 8.  The purpose of the CSP Program is to build trust and respect by promoting community engagement and a safe living environment, and to improve public safety.  The CSP Program operates in selected public housing developments located throughout the Los Angeles Area.  Officers implement programs for at-risk youth, ensure safe passage on school routes, and build relationships in the communities through neighborhood watch groups, quality of life committees, and citizen-police enforcement teams.  Thus, in its application, Los Angeles selected "Building Trust and Respect" as its focus area.  *See* 34 U.S.C. § 10381(b)(1), (2), (5), (11).  DOJ is not providing additional consideration for programs within this focus area.

81.     Nearly two months after CHP grant applications were due—and after briefing was complete on the preliminary injunction motion in the *Chicago* challenge to the Byrne JAG conditions—Los Angeles received an email from the COPS Office informing the City that DOJ had created an Immigration Enforcement Partnership Consideration.  To qualify for that additional consideration, Los Angeles would have had to certify that it has implemented, or would implement, versions of the Notice and Access Conditions that DOJ had recently introduced to the Byrne JAG Program.  *See* Email from

COPS Office (Sept. 7, 2017), attached hereto as Exhibit 9.  In full, the COPS Office offered additional consideration to applicants if:

    a.  "The applicant entity and/or its governing body has implemented or, before drawing down grant funds if awarded, will implement rules, regulations, policies, and/or practices that ensure that U.S. Department of Homeland Security ('DHS') personnel have access to any of the governing body's correctional or detention facilities in order to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or to remain in the United States" (the "Access Requirement"); and

    b.  "The applicant entity and/or its governing body has implemented or, before drawing down grant funds if awarded, will implement rules, regulations, policies, and/or practices that ensure that any of the governing body's correctional and detention facilities provide advance notice as early as practicable (at least 48 hours, where possible) to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien. This certification does not require holding an alien beyond his or her scheduled time of release." (the "Notice Requirement").

*See* "Certification of Illegal Immigration Cooperation," attached as Attachment 1 to Exhibit 9.

    82.    DOJ informed Los Angeles that it had twelve days, until September 19, 2017, to make the necessary certifications in order to receive additional consideration on these grounds.

    83.    On the same day that Los Angeles received the e-mail, DOJ released a statement that jurisdictions would receive "additional points in the application scoring process [for COPS grants] if their agencies cooperate with federal law enforcement to address illegal immigration."  DOJ, Office of Public Affairs, Department of Justice Announces Priority Consideration Criteria for COPS Office Grants (Sept. 7, 2017),

https://www.justice.gov/opa/pr/department-justice-announces-priority-consideration-criteria-cops-office-grants, attached hereto as Exhibit 10.  The statement included the following from Defendant Sessions:  "[c]ities and states that cooperate with federal law enforcement make all of us safer by helping remove dangerous criminals from our communities," and "jurisdictions with these policies in place should be acknowledged for their commitment to ending violent crime, including violent crime stemming from illegal immigration."  *Id.*  DOJ would thus "recognize jurisdictions that commit to the rule of law by awarding additional points in the application scoring process for COPS Office grants."  *Id.*; *see also* COPS Office: Immigration Cooperation Certification Process Background, https://www.justice.gov/opa/press-release/file/995376/download, attached hereto as Exhibit 11.

84.     After receiving the September 7, 2017, email from the COPS Office, Los Angeles did not, in the allotted 12 days, certify compliance with the Access and Notice Requirements.

85.     DOJ's decision to favor jurisdictions that participate in civil immigration investigations and enforcement and *disfavor* those jurisdictions that focus on the community policing goals of the COPS statute creates an uneven playing field and harms the City of Los Angeles's ability to fairly compete for a COPS grant.

## COUNT ONE

### (Byrne JAG: Violation of Separation of Powers / Ultra Vires Agency Action)

86.     Los Angeles incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

87.     This cause of action is alleged against Defendants Sessions, Hanson and the Department of Justice.

88.     Defendants' imposition on Byrne JAG grant applicants of the Access Condition and the Notice Condition violates constitutional principles of Separation of Powers and exceeds DOJ's lawful authority.

89.     The Constitution confers the power of the Spending Clause on Congress, not

the Executive Branch.  *See* U.S. Const. art. I, § 8, cl. 1.  It is Congress, then, not an Executive Branch agency, that has the constitutional authority to impose conditions on the receipt of federal funds, and even that power is subject to limitations such as relatedness and clarity.  Defendants here are attempting to wield authority that is vested in Congress, not in DOJ.

90.    While Congress may have limited authority to delegate its Spending Clause powers, it must at a minimum speak clearly and unmistakably when it does so, with specific guidance as to the conditions the Executive Branch may attach on receipt of federal funds.  This requirement is critical, especially when federalism concerns come into play, as they do here.  Absent a clear statement, it cannot lightly be presumed that Congress permitted an agency to invent conditions on federal funds, tying those funds to that agency's views on what federal immigration policies state and local governments should be required to adopt.

91.    Moreover, Congress has made no specific and unambiguous delegation of authority to DOJ, and under our system of government, a federal agency "has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).  "[W]hen the [Executive] takes measures incompatible with the expressed or implied will of Congress, [its] power is at its lowest ebb . . . ." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).  Here, DOJ is exceeding its delegated authority and contravening the text and structure of the statute Congress crafted to authorize the expenditure of federal funds under the Byrne JAG Program.

92.    Congress specifically directed that Byrne JAG funds be used "to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice" efforts by state and local entities.  34 U.S.C. § 10152(a)(1).  In so doing, Congress enumerated eight types of criminal justice programs that could receive funding, such as "law enforcement programs," "prosecution and court programs," and "prevention and education programs."

*Id.* § 10152(a)(1)(A)-(H).

93.     The programs to which Congress expressly directed Byrne JAG funding do *not* include inducing state and local support for federal investigations of civil immigration status.  Yet in imposing the Challenged Conditions, Defendants attempt to divert federal funds to exactly that purpose.  DOJ goes so far as to convert these immigration-related requirements into a "priority purpose" of the Byrne JAG award.  The Department also purports to permit award recipients to dissipate Byrne JAG funds on changing local laws and policies to comply with the federal immigration conditions on the funds, and even to spend Byrne JAG funds on the costs to the recipient of "honor[ing] any duly authorized request from DHS that is encompassed by the[] conditions."  In essence, DOJ expressly authorizes the shifting of money that Congress appropriated to advance local criminal justice programs away from that clear statutory purpose to fund, instead, federal civil immigration investigations.  This is an unprecedented departure from the way Congress has chosen to exercise its Spending Clause power.

94.     Congress specifically recognized when it created the Byrne JAG program that state and local governments maintain the sovereign police power to protect the public health and safety of their residents by providing police departments with the "flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution."  H.R. Rep. No. 109-233, at 89 (2005).  The record also shows Congress intended to "lessen the administrative burden of applying for the grants."  *Id.*  DOJ's blatant attempt to syphon monies from creative, locally driven Byrne JAG funded criminal justice programs, like the City's CLEAR program, Chicago's Force for Good and police vehicle purchasing programs, or San Francisco's drug court and drug diversion programs, into a complex, "one size fits all" effort to support federal civil immigration investigations, clearly runs afoul of this congressional intent.

95.     The Challenged Conditions are also grossly inconsistent with the funding formula established in 34 U.S.C. § 10156.  BJA is required, by congressional mandate, to allocate funds based on a prescribed formula that takes into account a State's population,

and the violent crime rates in a given State or locality.  34 U.S.C. § 10156(a), (d).
Congress enumerated specific certifications and assurances the applicant must make to
access these funds.  Again, Congress did not include a condition mandating local law
enforcement involvement in federal civil immigration investigations.

96.     Not only are the Challenged Conditions incompatible with the basic
structure of the Byrne JAG Program, but they also violate an express rule of construction
imposed by Congress.  Congress directed that the statute creating the Byrne JAG
Program not be construed to authorize DOJ to exercise "any direction, supervision, or
control over any police force or any other criminal justice agency of any State or any
political subdivision thereof."  34 U.S.C. § 10228(a).  The Challenged Conditions do just
that, asserting federal control over Los Angeles and its police department in the operation
of its jail facilities.

97.     The purported basis of DOJ's attempt to defeat this statutory scheme of the
Byrne JAG program, which was carefully structured by Congress, is a narrow, generally
applicable provision, found elsewhere in the federal law, regarding the overall and
delegation authority within DOJ, set forth in 34 U.S.C. § 10102(a)(6).  Section
10102(a)(6) states, under the heading of "Duties and functions of Assistant Attorney
General [for the Office of Justice Programs]", that the Assistant Attorney General "shall .
. . exercise such other powers and functions as may be vested in the Assistant Attorney
General pursuant to this chapter or by delegation of the Attorney General, including
placing special conditions on all grants, and determining priority purposes for formula
grants."  *Id.*

98.     This glancing reference to "special conditions" evinces no congressional
intent to give DOJ the authority it now asserts.  The statute does not give blanket
authority to Defendants to place *any* conditions on *any* grants; it simply defines the
Assistant Attorney General of OJP as the representative within the DOJ's hierarchy who
is able to place special conditions on a grant when that authority "may be vested in him."
When Congress wishes to actually vest authority to create new conditions, it does so

expressly, for example, authorizing OJP's Bureau of Justice Assistance to impose "reasonable conditions" on grant awards under the Violence Against Women Act, so long as those conditions are limited "to ensure that the States meet statutory, regulatory, and other program requirements."  34 U.S.C. § 10446(e)(3).  By contrast, the only authority Congress vested in the Attorney General with respect to the Byrne JAG Program was to specify the "form" of the application and the "data, records, and information (programmatic and financial)" that an applicant must report and maintain, *id.* § 10153(a), (a)(4), as well as to "develop[] guidelines" for a "program assessment" "in coordination with the National Institute of Justice," *id.* § 10152(c).

99.     To the extent DOJ has authority to impose conditions on Byrne JAG awards, that authority is limited.  Conditions on Byrne JAG awards must relate to the administration of the grant or the use of grant funds, such as providing funds on a reimbursement basis, requiring additional, more detailed financial reports, or requiring the grantee to comply with statutory mandates of nondiscrimination in connection with grant programs.  *See, e.g.*, 29 U.S.C. § 794.  Congress did not, in an innocuous grant administration provision, hide an "elephant[] in [a] mousehole[]," *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001)—permitting DOJ to demand significant policy commitments about operations of local jail facilities to further federal civil immigration matters in exchange for funding that Congress authorized for local criminal justice efforts.

100.   All of these limits on DOJ's delegated authority are confirmed by the fact that Congress has considered—and rejected—attempts to link Byrne JAG funding to state and local participation in federal civil immigration investigations.  *See, e.g.*, Stop Sanctuary Cities Act, S. 1814, 114th Cong. § 2(b)(2) (2015); Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. § 3(b) (2015).

101.   In sum, DOJ is attempting to exercise a power it does not have.  Defendants' attempt to condition federal criminal justice funding intended for cities like Los Angeles violates the Separation of Powers enshrined in our Constitution.

## COUNT TWO

### (Byrne JAG: Tenth Amendment and Spending Clause)

102.   Los Angeles incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

103.   This cause of action is alleged against Defendants Sessions, Hanson and the Department of Justice.

104.   Even if Congress could have delegated the spending power to DOJ to impose the Challenged Conditions, and even if it had intended to do so, the delegated power would still be subject to constitutional restrictions that are not met here.  It is well-established that the Spending Clause requires that conditions on providing federal funds to States and local governments must, *inter alia*, be unambiguous, and be sufficiently germane to the purpose of the federal funds.  Otherwise, the "condition" amounts to impermissible regulation and commandeering of States and local governments, in violation of the Tenth Amendment.  The Challenged Conditions fail both of these requirements.

105.   Conditions on allocations of federal funds must be stated unambiguously. "The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts" the conditions, and there can be "no knowing acceptance if a State [or city] . . . is unable to ascertain what is expected of it." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).  It is Congress, not an agency, that must speak clearly in defining the type of conditions at issue.  But even if DOJ could satisfy this requirement by speaking with the requisite clarity, it has not done so here.

106.   The Notice Condition as revised requires "notice as early as practicable" for "the scheduled release date and time for a particular alien" after the "correctional facility receives from DHS a formal written request authorized by the Immigration and Nationality Act."  It is not clear what this would mean in the context of short-term detention operations, like LAPD's, in which "scheduled release" is generally not a

relevant concept.

107.   The Access Condition may be read to require unfettered access to local detention facilities, even when an individual is informed of the request and declines to be interviewed in accordance with state law, but the Condition does not make this requirement unambiguously clear.  If DOJ does intend to view and enforce this Condition expansively—for instance, to prevent Los Angeles from delivering to detainees the required "know-your-rights" form, or to require the City to facilitate meetings that have been declined by the detainees—it would have to have been written in much clearer and more explicit terms.  Moreover, the Access Condition does not explain what is meant by an "inquiry" triggering the obligation, and includes no reasonableness requirement or limiting language to prevent DHS from consuming hours of LAPD staff time, or tying up LAPD interview rooms, in a manner that interferes with the safety, efficiency, or legal time restraints that LAPD must consider in operating its jail facilities.

108.   Conditions imposed on recipients of federal funding must also "bear some relationship to the purpose of federal spending."  *New York v. United States*, 505 U.S. 144, 167 (1992).  The Challenged Conditions concern federal civil immigration investigations, which are not sufficiently related—or related at all—to the purpose of the Byrne JAG Program created by Congress specifically to support state and local criminal justice efforts.

## COUNT THREE

### (Byrne JAG: Violation of the Administrative Procedure Act - Arbitrary and Capricious Agency Action)

109.   Los Angeles incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

110.   This cause of action is alleged against Defendants Sessions, Hanson and the Department of Justice.

111.   Agency actions are unlawful if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

112.   The decision to impose the Challenged Conditions is arbitrary and capricious because DOJ adopted it without any reasoned basis, provides no support for its linkage between participation by state and local law enforcement officials in federal civil immigration investigations and violent crime, and appears to rely on clearly erroneous and debunked interpretations of existing studies.

**COUNT FOUR**

**(COPS Grant: Violation of Separation of Powers / Ultra Vires Agency Action)**

113.   Los Angeles incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

114.   This cause of action is alleged against Defendants Sessions, Washington and the Department of Justice.

115.   Defendants' imposition of the Immigration Enforcement Focus Consideration and the Immigration Enforcement Partnership Consideration (the "Challenged Considerations") as "additional considerations" for receiving CHP grants violates constitutional principles of Separation of Powers and exceeds DOJ's lawful authority.

116.   Congress permitted the Attorney General to give "preferential consideration" only to grant applicants that meet one or more of three enumerated criteria.  The preferential considerations authorized by Congress do *not* include inducing state and local support for federal investigations of civil immigration violations. *See* 34 U.S.C. § 10381(c).

117.   Congress specifically directed that COPS grant funds be used for twenty-two specific purposes.  As with the preferential considerations, none of these purposes mentions "illegal immigration" or assisting in civil immigration enforcement and investigations.  *See* 34 U.S.C. § 10381(b)(1)-(22).

118.   By imposing the Challenged Considerations as "additional considerations" in receiving CHP grants, Defendants attempt to divert federal funds to a consideration not authorized by Congress, and to disfavor jurisdictions that focus on community policing,

but who are unwilling to participate in federal civil immigration enforcement.  This is an unprecedented departure from the way Congress has chosen to exercise its Spending Clause power.

119.   Not only are the Challenged Considerations incompatible with the basic structure of the COPS statutory framework, but they also violate an express rule of construction, which Congress adopted.  Congress directed that the statute creating the COPS grants not be construed to authorize DOJ to exercise "any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof."  34 U.S.C. § 10228(a).  The Challenged Considerations attempt to do just that, asserting federal control over Los Angeles and its police department in the operation of its custodial facilities.

120.   Defendants' efforts to alter the COPS grant program and invent unrelated "additional considerations" to favor jurisdictions that participate in civil immigration investigations and enforcement—and necessarily disadvantage communities that do not—violates the Separation of Powers enshrined in our Constitution.

## COUNT FIVE

## (COPS Grant: Tenth Amendment and Spending Clause)

121.   Los Angeles incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

122.   This cause of action is alleged against Defendants Sessions, Washington and the Department of Justice.

123.   Even if Congress could have delegated the spending power to DOJ to impose the Challenged Considerations, and even if it had intended to do so, the delegated power would still be subject to constitutional restrictions.

124.   Terms and conditions on federal funds, including "additional considerations" that materially affect to whom a grant is awarded, must be stated unambiguously.  *See supra* ¶ 105.

125.   The Notice Requirement and Access Requirement are ambiguous for the

same reason that the related Byrne JAG conditions are ambiguous.  *See supra* ¶¶ 106-07.  They are likewise unrelated to the purpose of the COPS grants to support state and local community policing efforts.  Indeed, in announcing the new conditions, DOJ made no effort to substantiate any connection between these spheres of policy that Congress has treated as distinct.

## COUNT SIX

### (COPS Grant: Violation of the Administrative Procedure Act - Arbitrary and Capricious Agency Action)

126.   Los Angeles incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

127.   This cause of action is alleged against Defendants Sessions, Washington and the Department of Justice.

128.   Agency actions are unlawful if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The decision to impose the Challenged Considerations is arbitrary and capricious because DOJ adopted it without any reasoned basis, provides no support for its linkage of state cooperation in federal immigration enforcement with violent crime, and appears to rely on clearly erroneous and debunked interpretations of existing studies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff City of Los Angeles respectfully requests that this Court enter judgment in its favor, and grant the following relief:

1.     Declare that the Challenged Conditions relating to the Byrne JAG program are unconstitutional or otherwise unlawful;

2.     Permanently enjoin Defendants from imposing or enforcing the Challenged Conditions relating to the Byrne JAG program;

3.     Declare that the Challenged Considerations relating to the COPS program are unconstitutional or otherwise unlawful;

4.    Permanently enjoin Defendants from imposing or enforcing the Challenged Considerations relating to the COPS program;

5.    Award Plaintiff City of Los Angeles reasonable fees and costs; and,

6.    Grant any further relief that this Court may deem fit and proper.

Dated: September 29, 2017

By: _____

MICHAEL N. FEUER
City Attorney

MITCHELL A. KAMIN
MÓNICA RAMÍREZ ALMADANI
NEEMA T. SAHNI
Covington & Burling LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, California 90067-4643

DAVID M. ZIONTS, *pro hac vice*
application forthcoming
IVANO M. VENTRESCA, *pro hac vice*
application forthcoming
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001

JAMES P. CLARK
Chief Deputy City Attorney
LEELA A. KAPUR
Executive Assistant City Attorney
VALERIE L. FLORES
Managing Senior Assistant City
   Attorney
MICHAEL DUNDAS
Deputy City Attorney
200 North Main Street, City Hall
   East Room 700
Los Angeles, California 90012
Telephone: (213) 978-8344
Facsimile: (213) 978-8312

*Attorneys for Plaintiff*
*City of Los Angeles*