MICHAEL N. FEUER, SBN 111529
City Attorney
JAMES P. CLARK, SBN 64780
Chief Deputy City Attorney
LEELA A. KAPUR, SBN 125548
Executive Assistant City Attorney
VALERIE L. FLORES, SBN 138572
Managing Senior Assistant City Attorney
MICHAEL DUNDAS, SBN 226930
Deputy City Attorney
200 North Main Street, City Hall East
Suite 800
Los Angeles, California 90012
james.p.clark@lacity.org
Telephone: (213) 978-8344
Facsimile: (213) 978-8312

MITCHELL A. KAMIN, SBN 202788
MÓNICA RAMÍREZ ALMADANI, SBN 234893
NEEMA T. SAHNI, SBN 274240
Covington & Burling LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, California 90067-4643
mkamin@cov.com
Telephone:  (424) 332-4800
Facsimile:  (424) 332-4749

DAVID M. ZIONTS, *pro hac vice*
application forthcoming
IVANO M. VENTRESCA, *pro hac vice*
application forthcoming
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
dzionts@cov.com
Telephone: (202) 662-6000
Facsimile:  (202) 662-5987

*Attorneys for Plaintiff City of Los Angeles*

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

CITY OF LOS ANGELES,

    Plaintiff,

    v.

JEFFERSON B. SESSIONS, III, in his official capacity as Attorney General of the United States; ALAN R. HANSON, in his official capacity as Acting Assistant

Case No.:

**CITY OF LOS ANGELES' MEMORANDUM IN SUPPORT OF APPLICATION FOR PRELIMINARY INJUNCTION**

Attorney General of the Office of Justice Programs; RUSSELL WASHINGTON, in his official capacity as Acting Director of the Office of Community Oriented Policing Services; UNITED STATES DEPARTMENT OF JUSTICE.

       Defendants.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................ ii

I.    INTRODUCTION ......................................................... 1

II.   FACTUAL BACKGROUND............................................ 2

    A.    Community Oriented Policing Services ("COPS") Grant Program For Hiring Police Officers In Support Of Community Policing ................ 2

    B.    Defendants' Attempt To Disfavor COPS Grant Applicants That Do Not Participate In Federal Civil Immigration Enforcement................. 4

    C.    Consistent With The Statutory Purpose Of The COPS Program, Los Angeles Uses Its Funding To Enhance Community Policing.............. 8

    D.    Los Angeles' Policies Against Engaging In Federal Civil Immigration Enforcement ......................................................... 9

III.  ARGUMENT............................................................ 11

    A.    Los Angeles Is Likely To Succeed On the Merits. ........................... 11

        1.    The Challenged Considerations Are Ultra Vires and Violate the Separation of Powers. ............................................. 11

        2.    The Challenged Considerations Violate the Spending Clause. 15

        3.    The Challenged Considerations Are Invalid Under the Administrative Procedure Act................................... 20

    B.    Los Angeles Will Suffer Irreparable Injury Absent An Injunction From This Court. .................................................... 21

    C.    The Balance Of Equities And The Public Interest Weigh Heavily In Favor Of The Requested Injunction. ................................ 23

IV.   CONCLUSION............................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alliance for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ........................ 11

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
   559 F.3d 1046 (9th Cir. 2009) ........................ 23

*Arizona v. United States*,
   132 S. Ct. 2492 (2012) ........................ 14, 18

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
   548 U.S. 291 (2006) ........................ 17

*Az. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*,
   273 F.3d 1229 (9th Cir. 2001) ........................ 20

*Bullfrog Films, Inc. v. Wick*,
   847 F.2d 502 (9th Cir. 1988) ........................ 22

*Chubb Custom Ins. Co. v. Space Systems/Loral, Inc.*,
   710 F.3d 946 (9th Cir. 2013) ........................ 12

*City and Cty. of San Francisco v. Trump*,
   2017 WL 1459081 (N.D. Cal. Apr. 25, 2017) ........................ 5, 12, 23, 24

*City of Arlington v. FCC*,
   133 S. Ct. 1863 (2013) ........................ 11

*City of Chicago v. Sessions*,
   2017 WL 4081821 (N.D. Ill. Sept. 15, 2017) ........................ 6, 12, 13, 23, 25

*Com. Va., Dep't of Educ. v. Riley*,
   106 F.3d 559 (4th Cir. 1997 ........................ 15

*Gordon v. Holder*,
   721 F.3d 638 (D.C. Cir. 2013) ........................ 24

*Gregory v. Ashcroft*,
   501 U.S. 452 (1991) ........................ 15

*Int'l Franchise Ass'n, Inc. v. City of Seattle*,
    803 F.3d 389 (9th Cir. 2015) ...................................................................... 22

*Kansas v. United States*,
    249 F.3d 1213 (10th Cir. 2001) ................................................................... 22

*Louisiana Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986)..................................................................................... 11

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ....................................................................... 24

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)...................................................................................... 22

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983)........................................................................................ 21

*Ne. Fla. Ch. of Assoc. Gen. Contractors of Am. v. City of Jacksonville*,
    508 U.S. 656 (1993)...................................................................................... 22

*Nevada v. Skinner*,
    884 F.2d 445 (9th Cir. 1989) ....................................................................... 16

*Nken v. Holder*,
    556 U.S. 418 (2009)...................................................................................... 24

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981).......................................................................................... 16

*Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*,
    822 F.2d 1390 (6th Cir. 1987) ..................................................................... 24

*S. Dakota v. Dole*,
    483 U.S. 203 (1987)............................................................................. 15, 16, 17

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
    747 F.3d 581 (9th Cir. 2014) ....................................................................... 20

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
    709 F.3d 1281 (9th Cir. 2013) ..................................................................... 22

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    136 S. Ct. 1807 (2016).................................................................................. 20

*Winter v. Natural Resources Defense Council,*
    555 U.S. 7 (2008) ......................................................................................................... 24

**Statutes**

5 U.S.C. § 706(2)(A) .......................................................................................................... 20

8 U.S.C. § 1357(g) ...................................................................................................... 14, 18

34 U.S.C. § 10228(a) ......................................................................................................... 14

34 U.S.C. § 10381 ........................................................................... 3, 4, 6, 9, 12, 13, 16, 25

34 U.S.C. § 10382(b) ......................................................................................................... 13

CITY OF LOS ANGELES' MEMORANDUM IN SUPPORT OF APPLICATION FOR PRELIMINARY INJUNCTION

## I. **INTRODUCTION**

Congress enacted the Community Oriented Policing Services ("COPS") grant program to help local communities put more officers on the street in order to advance community policing efforts. The Attorney General is attempting to change the terms of that program as Congress created it, using it as a vehicle to require state and local governments to participate in the enforcement of federal *civil* immigration policies. Specifically, the Department of Justice ("DOJ") has decided that in the COPS award decisions that are soon to issue, it will disfavor state and local governments that are unwilling or unable to participate in federal civil immigration enforcement.

This is just the latest in a series of unlawful efforts by the Executive Branch to use federal funds as a "weapon" to induce support for its current civil immigration enforcement agenda. Many communities, including Los Angeles, have made the policy decision that enmeshing themselves in federal immigration enforcement harms public safety and erodes the community's trust in local law enforcement. Well-settled principles of federalism make clear that state and local governments are entitled to make that sovereign choice. Since the beginning of this year, however, the Executive has imposed a steady stream of measures attempting to require states and local governments to participate in federal civil immigration enforcement. While framed in terms of "enforcing the law," it is the Administration's approach that has proved unlawful. In April, a district court in San Francisco enjoined an Executive Order by President Trump attempting to broadly tie federal funding to civil immigration enforcement. Just two weeks ago, a district court in Chicago enjoined Attorney General Sessions' attempt to require specific types of participation in federal civil immigration efforts as a condition for receipt of federal funding under the Byrne Justice Assistance Grant ("JAG") program.

DOJ's rewriting of the COPS program is more of the same. Apparently recognizing its lack of authority to impose immigration-related conditions on these grants, DOJ is attempting a new way to dragoon state and local entities into participating in federal civil immigration enforcement. DOJ is now providing "Additional

Consideration"—essentially bonus points—to applicants willing to treat civil immigration enforcement as a "focus area" of their grant-supported program, even though Congress did not authorize COPS funding to be used for immigration enforcement.  And just in the last few weeks, after applications for COPS grants were already received, DOJ sprung on applicants a further "Additional Consideration" for communities willing to meet specific federal demands for participation in federal civil immigration enforcement—requirements that are materially identical to the two conditions that another federal court just enjoined.  The result is that in the competition for federal funds to support community policing, DOJ is stacking the deck in favor of jurisdictions that are willing to volunteer to support federal civil immigration enforcement, and disfavoring communities that are not.

This latest effort to tie federal funding to the Executive Branch's unrelated civil immigration enforcement agenda is unlawful, just like its predecessors.  The Attorney General is violating the separation of powers by disregarding the limits on his statutory authority; is acting in violation of the Spending Clause and Tenth Amendment by failing to adhere to the constitutional requirements on conditioning federal funds; and has adopted an award process that is arbitrary and capricious.  DOJ has stated that it will issue COPS awards as early as October 30, 2017.  If DOJ is not prevented from using unlawful considerations in deciding who does and does not receive COPS funding, the skewed awards would prove difficult or impossible to unwind and reallocate through a lawful process.  Accordingly, the City of Los Angeles respectfully requests that the court enter a preliminary injunction to prevent immediate and irreversible harm, and prohibit DOJ from using the unlawful considerations in its COPS award determinations.

## II.    FACTUAL BACKGROUND

### A.    Community Oriented Policing Services ("COPS") Grant Program For Hiring Police Officers In Support Of Community Policing

In a provision in the legislation creating the COPS program entitled "Authority to make public safety and community policing grants," Congress authorized the Attorney

General to "make[] grants to States, units of local government, Indian tribal governments, other public and private entities, and multi-jurisdictional or regional consortia for the purposes described in subsection (b) of this section."  34 U.S.C. § 10381(a).  In subsection (b), Congress limited "[t]he purposes for which grants . . . may be made," *id.* § 10381(b), to twenty-two specific purposes regarding the hiring and rehiring of law enforcement officers for community policing, implementing related training, procuring related equipment and technology, and developing new related technology and programs. *Id.* § 10381(b)(1)-(22).

COPS grant funding is administered by the Office of Community Oriented Policing Services ("COPS Office") within the U.S. Department of Justice.  *See* 2017 CHP Application Guide, attached as Ex. B to Decl. of Stella Larracas at 61.  The COPS Office administers several types of COPS programs each year, including the COPS Hiring Program ("CHP") grant.  This COPS grant "provides funding directly to law enforcement agencies to hire and/or rehire career law enforcement officers in an effort to increase their community policing capacity and crime prevention efforts." *Id.* at 1, 7.  Pursuant to statute, COPS grants may fund up to 75 percent of the salary and benefits of the hired or rehired officers.  *See id.*; *see also* 34 U.S.C. § 10381(g).  Each fiscal year, the COPS Office selects local government awardees to receive CHP funds that, in general, may be used over a period of three years.  *See* Larracas Decl. Ex. B at 1.

In evaluating COPS grant applications, Congress authorized the Attorney General to give "preferential consideration, where feasible, to an application" that meets one or more of three criteria: (1) an application "for hiring and rehiring additional career law enforcement officers that involves a non-Federal contribution exceeding the 25 percent minimum" non-federal contribution; (2) the applicant is in a state that has in effect anti-human trafficking laws that treat minors engaged in commercial sex as victims; or (3) the applicant is in a state that has in effect laws related to allowing the vacatur of arrests or convictions for non-violent crimes committed by human trafficking victims directly related to their human trafficking.  34 U.S.C. § 10381(c).

3

The COPS Office determines which applicants receive CHP grants through a points system.  In calculating an applicant's score for a CHP grant in FY 2016, for example, "fiscal need . . . constitute[d] 20 percent, crime 30 percent, and community policing 50 percent of the overall score."  2016 CHP Application Guide, attached as Ex. C to Larracas Decl. at 21.  The COPS Office also provided "additional consideration" to applicants on various grounds.  *Id.*  The COPS Office does not explain how localities receive points in the various categories, or the relative weight given to additional considerations in the overall scoring system.  *See id.*

**B.    Defendants' Attempt To Disfavor COPS Grant Applicants That Do Not Participate In Federal Civil Immigration Enforcement**

President Donald J. Trump has declared that he would use federal funds as a "weapon" to require state and local support for his civil immigration enforcement policies.[1]  On January 25, 2017, President Trump issued Executive Order 13768 directing the Attorney General and Secretary of Homeland Security to withhold federal funds from what he called "Sanctuary Jurisdictions."[2]  On April 25, 2017, a federal district court enjoined Section 9(a) of the Executive Order, ruling that the plaintiff jurisdictions in that case are likely to succeed on their claims that the order is unconstitutional because the Executive Branch is usurping authority that belongs to Congress under the Spending Clause; the order violates constitutional limits on federal spending authority; the order violates the Tenth Amendment's prohibition against the federal government commandeering local jurisdictions to administer a federal regulatory program; the order is unconstitutionally vague; and the order violates requirements of due process.  *Cty. of*

---

[1] Harriet Taylor, Trump to Fox News: "I may defund California as 'a weapon' to fight illegal immigration," CNBC.com (Feb. 5, 2017), https://tinyurl.com/TaylorCNBC.

[2]  The White House Office of the Press Secretary, "Executive Order:  Enhancing the Public Safety on the Interior of the United States," Whitehouse.gov (January 25, 2017), § 9(a), attached as Ex. A to Decl. of Steven Hong.

*Santa Clara v. Donald J. Trump*; *City and Cty. of San Francisco v. Trump*, 2017 WL 1459081 (N.D. Cal. Apr. 25, 2017), *appeal filed* No. 17-16886 (9th Cir. Sept. 18, 2017).

On July 25, 2017, Defendant Sessions launched another effort to tie federal funds for states and localities to their participation in federal civil immigration enforcement. He announced in a press release three new conditions that the Department of Justice would attempt to impose on funding for the Edward Byrne Memorial Justice Assistance Grants ("Byrne JAG") program.  Specifically, he announced that, "[f]rom now on, the Department will only provide Byrne JAG grants to cities and states that [1] comply with federal law, [2] allow federal immigration access to detention facilities, and [3] provide 48 hours notice before they release an illegal alien wanted by federal authorities."[3]  In announcing these conditions, DOJ asserted as a justification—without citing empirical or any other support—that the conditions are "part of accomplishing the Department of Justice's top priority of reducing violent crime." *Id.*  Defendants did not identify any evidence that supports their implied premise that undocumented immigrants commit violent crimes at higher rates than the general population, or that cities with so-called "sanctuary" policies have more violent crime on average than those that do not.  Nor could they, as prevailing research demonstrates there is either no relationship between a city's so-called "sanctuary" policies and that city's crime rate, or an inverse relationship,[4] despite Defendant Sessions' claims to the contrary in a speech delivered earlier this summer to law enforcement officials.[5]

---

[3] Department of Justice Office of Public Affairs, "Attorney General Sessions Announces Immigration Compliance Requirements for Edward Byrne Memorial Justice Assistance Grant Programs," Justice.gov (July 25, 2017), attached as Ex. B to Hong Decl.

[4]  Nick Roll, *Correcting Jeff Sessions*, INSIDE HIGHER ED (July 17, 2017), attached as Ex. C to Hong Decl.; Loren Collingwood, Benjamin Gonzalez-O'Brien and Stephen El-Khatib, *Sanctuary cities do not experience an increase in crime*, THE WASHINGTON POST (Oct. 3, 2016), attached as Ex. D to Hong Decl.

[5] Hong Decl. Ex. C.

A federal court recently issued a preliminary injunction barring DOJ from enforcing the new immigration-related conditions on Byrne JAG funding, reasoning that it is likely that these conditions exceed DOJ's statutory authority.  *See City of Chicago v. Sessions*, 2017 WL 4081821 (N.D. Ill. Sept. 15, 2017), *appeal filed*.[6]

DOJ now seeks to transform the COPS grant into a tool for obtaining participation by localities in federal civil immigration enforcement.  In the FY 2017 application guide for CHP grants, the COPS Office expanded the types of local law enforcement programs that would receive additional consideration beyond those authorized by the COPS grant statute.  *See* 34 U.S.C. § 10381(b), (c).  For FY 2017, additional consideration is provided for grant-supported programs whose "focus area" is "Illegal Immigration" (the "Immigration Enforcement Focus Consideration").[7]

---

[6] In addition to challenging DOJ's creation of new considerations in the COPS grant award process, Los Angeles in this lawsuit challenges the new immigration-related conditions on receipt of funding under the Byrne JAG program.  The City does not seek a preliminary injunction with respect to the Byrne JAG conditions because the *Chicago* injunction prevents DOJ from enforcing those conditions nationwide.

[7] Additional consideration is also provided for grant-supported programs focusing on "Violent Crime" or "Homeland Security."  *See* Larracas Decl. Ex. B at 27.  Unlike "Illegal Immigration," these focus areas correspond with authorized statutory purposes for COPS funding.  *See* 34 U.S.C. § 10381(b)(5), (8), (9), (11), (12), (15) (crime control); *id.* § 10381(b)(4) (homeland security).

The COPS Office also included the authorized preferential considerations for "applicants in states with certain anti-human trafficking laws that treat minors engaged in commercial sex as victims (referred to as 'safe harbor' laws) and permit individuals to vacate arrest or prosecution records for non-violent offenses as a result of being trafficked."  Larracas Decl. Ex. B at 27; *see* 34 U.S.C. § 10381(c)(2)-(3).  It indicated that applicants will receive additional consideration for hiring a military veteran.  Larracas Decl. Ex. B at 39; *see* 34 U.S.C. § 10381(b)(2) (establishing "prioritizing the hiring and training of veterans" as an authorized purpose of COPS grants).  The COPS office also indicated that applicants that "experienced an unanticipated catastrophic event" might be given additional consideration.  Larracas Decl. Ex. B at 27-28, 50; *see* 34 U.S.C. § 10381(b)(4), (17) (programs to counter mass shootings and terrorism); *cf.* 42 U.S.C.

The COPS Office separately stated that further "additional consideration" might be given to "applicants that partner with federal law enforcement to address illegal immigration" (the "Immigration Enforcement Partnership Consideration").  *See* Larracas Decl. Ex. B at 27-28.  Nearly two months after CHP grant applications were due—and after briefing was complete on the preliminary injunction motion in the *Chicago* challenge to the Byrne JAG conditions—Los Angeles and other localities received an email from the COPS Office informing them that DOJ had adopted an Immigration Enforcement Partnership Consideration.  *See* Email from COPS Office (Sept. 7, 2017), attached as Ex. A to Larracas Decl.  To qualify, a COPS applicant would have to certify that it has implemented, or would implement, versions of the same civil immigration-related requirements DOJ had recently attempted to impose on the Byrne JAG Program.  *Id.*

Specifically, the COPS Office offered this additional consideration to an applicant that certifies compliance with both an "Access Requirement" and a "Notice Requirement."  *See* Certification of Illegal Immigration Cooperation, attached as Attachment 1 to Ex. A to Larracas Decl.  Under the Access Requirement, the applicant must have in place or implement "rules, regulations, policies, and/or practices that ensure that U.S. Department of Homeland Security ('DHS') personnel have access to any of the governing body's correctional or detention facilities in order to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or to remain in the United States."  *Id.*  Under the Notice Requirement, the applicant must have in place or implement "rules, regulations, policies, and/or practices that ensure that any of the governing body's correctional and detention facilities provide advance notice as early as practicable (at least 48 hours, where possible) to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in

---

§ 5141 (permitting modification of administrative conditions of federal assistance programs in light of a "major disaster").

order to take custody of the alien. This certification does not require holding an alien

beyond his or her scheduled time of release." *Id.*  Los Angeles was given until

September 19, 2017 to respond and make the necessary certification—less than two

weeks. *Id.*

On the same day that the e-mail was sent, DOJ explained in a statement that

jurisdictions would receive "additional points in the application scoring process [for

COPS grants] if their agencies cooperate with federal law enforcement to address illegal

immigration."  DOJ, Office of Public Affairs, Department of Justice Announces Priority

Consideration Criteria for COPS Office Grants (Sept. 7, 2017), attached as Ex. E to Hong

Decl.  The statement included the following from Defendant Sessions:  "[c]ities and

states that cooperate with federal law enforcement make all of us safer by helping remove

dangerous criminals from our communities," and "jurisdictions with these policies in

place should be acknowledged for their commitment to ending violent crime, including

violent crime stemming from illegal immigration." *Id.*  DOJ would thus "recognize

jurisdictions that commit to the rule of law by awarding additional points in the

application scoring process for COPS Office grants." *Id.*; *see also* COPS Office:

Immigration Cooperation Certification Process Background, attached as Attachment 1 to

Ex. E to Hong Decl.

### C.    Consistent With The Statutory Purpose Of The COPS Program, Los Angeles Uses Its Funding To Enhance Community Policing

Los Angeles applied for CHP grants in 2012 and 2016, and received the grants in

both years.  Larracas Decl. ¶¶ 3, 10.  In FY 2016, Los Angeles' score for the CHP grant

was 150.67—the 14th highest score among the 1,110 applications.  *See* COPS Office,

FY2016 COPS Hiring Program Applicant Rankings, attached as Ex. F to Larracas Decl.

Los Angeles received $3.125 million in CHP funding in FY 2016, which went

toward the hiring of 25 officers to improve community policing.  Los Angeles explained

in its 2016 application that the funds would help expand the "Summer Night Lights" and

"Fall Friday Nights" programs, in which parks around Los Angeles extend their operating

hours and host free events for the community, and including as a vital component the presence of LAPD officers to ensure the safety of residents and make the program successful.  *See* Los Angeles 2016 Application, attached as Ex. D to Larracas Decl.  In addition, Los Angeles used funds to expand training programs in community policing.  *Id*.

The City's use of CHP funds promotes Congress' core objectives in enacting the COPS program.  Those funds are needed to help ensure the hiring and rehiring of officers who can dedicate their time to community policing, as well as ensuring those officers are equipped with the proper training programs.

In its FY 2017 application, Los Angeles applied for $3.125 million in CHP funds to support hiring officers for its Community Safety Partnership ("CSP") Program.  The CSP Program operates in selected public housing developments located throughout the Los Angeles Area.  Officers implement programs for at-risk youth, ensure safe passage on school routes, and build relationships in the communities through neighborhood watch groups, quality of life committees, and citizen-police enforcement teams.  Thus, in its application, Los Angeles identified "Building Trust and Respect" as the focus of its grant-supported program.  Los Angeles 2017 CHP Application, attached as Ex. G to Larracas Decl.; *see* 34 U.S.C. § 10381(b)(1), (2), (5), (11).  DOJ is not providing additional consideration for programs within this focus area.

### D.    Los Angeles' Policies Against Engaging In Federal Civil Immigration Enforcement

For nearly forty years, Los Angeles has implemented "policies and practices designed to promote the public safety of all Los Angeles residents by engendering cooperation and trust between members of the City's many immigrant communities and law enforcement."  Decl. of Michael Hyams ¶ 4.  As the COPS Office has long recognized, "uncertainty and concern about local law enforcement's role in immigration enforcement causes many immigrants to fear that any contact with officers could potentially bring about their deportation and/or that of undocumented family members."

9

*See* Enhancing Community Policing With Immigrant Populations: Recommendations from a Roundtable Meeting of Immigrant Advocates and Law Enforcement Leaders, COPS Office (2010 summary of Aug. 2008 roundtable), attached as Ex. G to Hong Decl. at 16.  To avoid sowing distrust, the Los Angeles Police Department has maintained a policy that "restricts an officer from initiating a police action with the objective of discovering a person's immigration status, and also prohibits arrests based solely on civil immigration status."  Hyams Decl. ¶ 3 (citing Special Order 40).

Accordingly, Los Angeles did not identify "Illegal Immigration" as a focus area of its grant.  *See* Larracas Decl. Ex. G.  The City therefore will not receive preferential treatment under the Immigration Enforcement Focus Consideration.  The City's application will therefore be less competitive with other jurisdictions that are willing to divert COPS funding to participation in federal civil immigration enforcement.

Los Angeles also did not certify compliance with the Access and Notice Requirements, and so will not receive preferential treatment under the Immigration Enforcement Partnership Consideration.  Larracas Decl. ¶ 6.  In the 12 days the City was allotted to decide whether to certify compliance, Los Angeles was unable to determine whether DOJ would consider its detention facility practices to comply with these Requirements, or whether making a certification to "partnership" in immigration enforcement would erode the community trust Los Angeles has long fostered.  Hyams Decl. ¶ 14.  The City's application will therefore be less competitive with other jurisdictions willing to certify their "partnership" in civil immigration enforcement.

Thus, as a result of DOJ's creation of the Immigration Enforcement Focus Consideration and the Immigration Enforcement Partnership Consideration (together, the "Challenged Considerations"), the deck is now stacked against the City of Los Angeles in its competition for federal community policing funds.  In awarding extra "points" to localities that are willing to "focus" on "Illegal Immigration," and more "points" to those that are able and willing to certify to DOJ's specified forms of "partnership" with federal civil immigration enforcement efforts, DOJ is necessarily *dis*favoring jurisdictions, like

Los Angeles, that are unwilling to divert community policing funds to federal civil immigration enforcement, or compromise public safety and community trust in law enforcement.  The City has therefore brought this lawsuit, and seeks a preliminary injunction, to level the playing field and allow it to compete for federal funds without being disadvantaged by unlawful "considerations."

## III.   <u>ARGUMENT</u>

To obtain a preliminary injunction, the plaintiff must establish that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008)).  Because Los Angeles meets all four of these elements, the Court should preliminarily enjoin Defendants from making COPS award determinations using the Challenged Considerations.

### A.   **Los Angeles Is Likely To Succeed On the Merits.**

#### 1.   **The Challenged Considerations Are Ultra Vires and Violate the Separation of Powers.**

An agency "has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).  When agencies "act improperly . . . what they do is ultra vires." *City of Arlington v. FCC*, 133 S. Ct. 1863, 1869 (2013).  DOJ lacks authority to change the terms of the COPS grant program as enacted by Congress by imposing additional considerations that disfavor jurisdictions that are unwilling or unable to use funding intended for community policing on civil immigration enforcement, or to certify compliance with specified forms of "partnership" with federal civil immigration authorities.  DOJ's ultra vires imposition of these additional considerations is "an improper attempt to wield Congress's exclusive spending power and is a violation of the Constitution's separation of powers principles." *Santa Clara*, 2017 WL 1459081 at *22.

1
2
3
4
5
6
7

Congress created the COPS program to bolster local community policing efforts by putting more officers on the street—not as a tool for the Executive Branch to advance unrelated policy agendas.  Thus, Congress enumerated twenty-two express purposes "for which grants . . . may be made."  *See* 34 U.S.C. § 10381(b)(1)-(22).  And Congress further identified three grounds on which "the Attorney General may give preferential consideration."  *Id.* § 10381(c).  The Challenged Considerations cannot be reconciled with these and additional critical features of the statutory scheme.

8
9
10
11
12
13
14
15
16
17
18
19

*First*, Congress authorized DOJ to give "preferential consideration" to COPS grant applicants in three—and only three—circumstances.  34 U.S.C. § 10381(c)(1)-(3).  The agency is not permitted to invent its own separate grounds to give an applicant favorable treatment; otherwise the statutory provision allowing three limited grounds for such preference would be wholly superfluous.  *See Chubb Custom Ins. Co. v. Space Systems/Loral, Inc.*, 710 F.3d 946, 966 (9th Cir. 2013) ("It is a well-established rule of statutory construction that courts should not interpret statutes in a way that renders a provision superfluous."); *cf. Chicago*, 2017 WL 4081821 at *5 (DOJ's view that it can impose conditions on Byrne JAG grants "would render superfluous the explicit statutory grant of authority to impose conditions" on certain other grants).  When Congress says "the Attorney General may give preferential consideration" on three specified grounds, it necessarily follows that he *may not* give preferential consideration on other grounds.[8]

20
21
22
23

*Second*, the Challenged Considerations are not only excluded from the three authorized grounds for preference—they are not even within the twenty-two enumerated purposes of the COPS program.  *See* 34 U.S.C. § 10381(b)(1)-(22).  Congress did not include using state and local resources to combat "Illegal Immigration" as an authorized

24
25
26
27
28

---

[8] DOJ obviously cannot circumvent this limitation by using the phrase "additional consideration" instead of the statutory phrase "preferential consideration."  Indeed, DOJ itself treats these phrases as interchangeable.  *See* Larracas Decl. Ex. B at 27 (treating the statutory ground for preferential consideration based on anti-trafficking laws as a basis for "[a]dditional consideration").

purpose of COPS funding at all, let alone as a "focus area" warranting preferential treatment.  Neither does a single one of the twenty-two authorized purposes have anything to do with state and local governments' willingness to assist in federal civil immigration investigations and enforcement.  Participation in civil immigration enforcement is thus not just an invalid ground for additional consideration, but a diversion of funds Congress allocated for community policing.

*Third*, Congress authorized the Attorney General to "prescribe by regulation or guidelines" only the "form" of a COPS application and the "information" it must contain. 34 U.S.C. § 10382(b); *see also id.* § 10381(f) (referring to "application[s]" "which meet[] the requirements prescribed by the Attorney General").  In the context of the Byrne JAG program, a district court recently recognized that the Attorney General's "limited express authority" to "determine the 'form' of the application" "indicates an express reservation" by Congress of any broader authority.  *Chicago*, 2017 WL 4081821, at *4.  So too here: Congress' decision to authorize the Attorney General to "prescribe" the form and content of a COPS application renders conspicuous the absence of any congressional delegation of authority for an agency to invent new grounds for preferential treatment.

*Fourth*, DOJ has recently asked Congress—as part of the COPS Office's appropriations request—to "authorize DHS and DOJ to condition certain grants and cooperative agreements on requirements that recipients agree to cooperate with specific Federal immigration enforcement activities and requests."  U.S. DOJ, FY 2018 Congressional Justification, Office of Community Oriented Policing Services (Apr. 23, 2017), attached as Ex. F to Hong Decl. at 23-26.  DOJ thus tacitly concedes that it presently lacks authorization to use grant programs to compel or induce participation in federal civil immigration enforcement.

*Fifth*, the Immigration Enforcement Focus Consideration would undermine Congress' carefully balanced framework for federal-state immigration cooperation. Congress has been careful *not* to give blanket authorization for state and local officers to engage in civil immigration enforcement.  "Federal law specifies *limited* circumstances in

which state officers may perform the functions of an immigration officer." *Arizona v. United States*, 132 S. Ct. 2492, 2506 (2012) (emphasis added). Such cooperation requires a "287(g)" agreement, under which state and local officers act "subject to the direction and supervision of the Attorney General." 8 U.S.C. § 1357(g)(3). DOJ's attempt to disadvantage those jurisdictions that do not focus on the generic category "illegal immigration" ignores Congress' reason for imposing this limitation in Section 287(g): "[t]here are significant complexities involved in enforcing federal immigration law." *Arizona*, 132 S. Ct. at 2506. By stacking the deck for awarding CHP funds in favor of those jurisdictions willing to "focus" their policing efforts on "illegal immigration" generally, *without* the protections and limitations Congress established, DOJ is disrupting a carefully balanced statutory framework.

Critically, moreover, when state and local officers are authorized to act as immigration officers pursuant to a 287(g) agreement, Congress required this participation to be "*at the expense of the State or political subdivision*." 8 U.S.C. § 1357(g)(1) (emphasis added). DOJ has admitted that it intends to use the COPS program to *fund* "287(g) partnerships." Hong Decl. Ex. F at 31. In other words, DOJ—without any authorization in the COPS statute—would override Section 287(g) and fund state and local participation in federal immigration enforcement despite Congress' express provision to the contrary.

*Sixth*, the Immigration Enforcement Partnership Consideration impermissibly seeks to direct and control state and local law enforcement agencies in their operation of detention facilities. Congress provided that DOJ's grant-making authority may not be "construed to authorize any [federal agency or officer] to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof." 34 U.S.C. § 10228(a). The Immigration Enforcement Partnership Consideration does just that, using the threat of disfavored treatment to induce police forces to alter their operations so as to arrange for access to detention facilities and notification of release.

*Seventh*, if Congress had truly meant to authorize DOJ to disfavor state and local governments that do not agree to participate in federal civil immigration enforcement, it would have had to make such intention particularly clear.  When federalism values are at stake, the Supreme Court demands a "clear statement" from Congress, which "assures that the *legislature* has in fact faced, and intended to bring into issue, the critical matters involved." *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) (emphasis added).  Applying this clear-statement rule in the context of federal grants, courts have required "unambiguous statutory expression of congressional intent to condition the States' receipt of federal funds in a particular manner." *Com. Va., Dep't of Educ. v. Riley*, 106 F.3d 559, 566 (4th Cir. 1997) (en banc) (adopting the dissenting panel opinion of Luttig, J.), *superseded by statute*.  Congress would have spoken clearly if it had meant to authorize DOJ to disadvantage jurisdictions in competition for federal funds because they use community policing resources for their intended purpose, rather than participation in enforcement of the federal civil immigration laws.

Far from doing so, numerous features of the text and structure of the statute make clear that Congress did *not* permit the Attorney General to arrogate this power to himself.  Cities like Los Angeles may not be put to the choice of agreeing to participate in federal civil immigration enforcement, or jeopardizing their ability to compete for funds Congress made available to support community policing.

### 2.    The Challenged Considerations Violate the Spending Clause.

Even if Congress had delegated its Spending Clause authority to adopt the Challenged Considerations, Congress would still have had to comply with several important restrictions in exercising that constitutional authority.  It is well-settled that conditions on federal grants must meet certain requirements. *See S. Dakota v. Dole*, 483 U.S. 203, 207-09 (1987).  Although DOJ has created what it calls "Additional Considerations" that benefit some applicants, doing so necessarily disadvantages other applicants that are unable or unwilling to comply.  In at least some cases inability to

receive this additional consideration will result in an unsuccessful application; otherwise the considerations would serve no purpose.  A condition by any other name is still a condition, and Congress may not make it more difficult for a state or local government to access federal funds for reasons that do not pass constitutional muster.

Here there are at least two such flaws in the Challenged Considerations: they are not sufficiently related to the purposes of the COPS statute, and they are not unambiguous.  *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *Dole*, 483 U.S. at 207-09.

a)      **The Challenged Considerations Are Not Related To Congress' Purpose In Creating The COPS Grant Program.**

The Challenged Considerations violate a fundamental restriction on the exercise of the Spending Clause authority: "the conditions on receipt of federal funds must be reasonably related to the articulated goal."  *Nevada v. Skinner*, 884 F.2d 445, 447 (9th Cir. 1989).  Congress established the COPS grant program to fund States, "units of local government," and other groups, for use by them in twenty-two specific purposes, ranging from providing "specialized training to law enforcement officers to . . . recognize individuals who have a mental illness" to establishing "school-based partnerships between local law enforcement agencies and local school systems."  34 U.S.C. § 10381(b)(1)-(22).  As the COPS Office recently explained, its basic purpose is to support local law enforcement agencies in "advancing public safety through the implementation of community policing strategies," which "entails developing partnerships between law enforcement agencies and the communities they serve."  Hong Decl. Ex. F at 4.

Neither the COPS authorizing statute nor the COPS Office's own view of its mission mentions state and local participation in federal civil immigration investigations and enforcement.  The CHP grant in particular is concerned with *hiring police officers*.  *See, e.g.*, Larracas Decl. Ex. B. at 7.  The Notice and Access Requirements DOJ seeks to impose to qualify for the Immigration Enforcement Partnership Consideration have

nothing at all to do with hiring local law enforcement officers.  Requiring States and local governments to open their facilities to federal civil immigration authorities, or to respond to any notification request those authorities make, is not related to the purpose of the grant.

The Immigration Enforcement Focus Consideration is likewise unmoored from the statutory purposes of the grant.  Congress identified a long list of twenty-two authorized purposes of COPS funds, making the omission of immigration enforcement especially conspicuous.  That omission may well reflect the view, recognized by the COPS Office itself, that far from being a component of community policing, state and local immigration enforcement often sows *distrust* between communities and police.  *See* Hong Decl. Ex. G. at 16.  But whatever Congress' reason, the point remains that it created a program having nothing to do with civil immigration enforcement.  DOJ cannot constitutionally penalize applicants for community policing grants because they intend to fulfill their responsibilities to their local communities to further public safety and well-being and are unwilling to participate in civil immigration enforcement, a non-germane agenda and one that is the responsibility of the federal government.

### b)   The Challenged Considerations Do Not Provide The Clear Notice A Federal Funding Applicant Must Be Given.

Cities "cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'"  *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).  Congress must therefore state "unambiguously" the conditions attached to federal funds so as to "furnish clear notice" to recipients of what is required of them.  *Id.*; *see also Dole*, 483 U.S. at 207.  If a local official would not "clearly understand" the obligations imposed by the condition, it is unconstitutional.  *Arlington*, 548 U.S. at 296.

In this case, Congress did not adopt either of the Challenged Considerations, let alone an unambiguous version of those considerations.  But, even if the clear notice

requirement could be satisfied by an agency creating the condition, DOJ has not crafted considerations that Los Angeles could "clearly understand."

1.  The Immigration Enforcement Focus Consideration is fatally ambiguous.  The only description of it comes in the COPS Office's appropriations request, which was from April 2017, Hong Decl. Ex. F, and not issued to CHP grant applicants or included in the Application Guide.  Besides that document, DOJ and its COPS Office have offered no guidance on what activities would come within the "Illegal Immigration" focus area.

This vagueness is especially problematic in light of the well-recognized complexities of federal immigration law, under which a host of statutory provisions can form the basis for removal, subject to a maze of possible grounds for cancelling or withholding removal, adjusting status, or according asylum.  *See Arizona*, 132 S. Ct. at 2506 (noting the "significant complexities involved in enforcing federal immigration law, including the determination whether a person is removable").  Congress created a detailed regime for states and localities that *wish* to have their officers perform the functions of a federal immigration officer, which must be pursuant to an agreement that "shall contain," *inter alia*, "a written certification" of adequate training of the particular officers regarding enforcement of federal immigration laws.  8 U.S.C. § 1357(g)(2).  It is not clear whether DOJ means a "focus" on "Illegal Immigration" to take the form of a 287(g) agreement, or whether it has in mind some other, extra-statutory role it wishes local law enforcement to play in relation to immigration enforcement.  Whatever DOJ means, the Constitution requires more clarity than general references to "illegal immigration."

2.  The Immigration Enforcement Partnership Consideration is similarly infirm.  To avoid being disfavored in the grant award process,  a locality must certify compliance with both the Access Requirement and the Notice Requirement.  Neither is sufficiently clear.

The Access Requirement demands that a locality have in place "rules, regulations, policies, and/or practices that ensure that [DHS] personnel have access to any of the

governing body's correctional or detention facilities in order to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or to remain in the United States."  Larracas Decl. Ex. A, Attachment 1.  Los Angeles does not prevent DHS access to its detention facilities, but the City does comply with state law by informing the detainee of the request, and it does not facilitate interviews that the detainee has declined.  Hyams Decl. ¶ 13.  Los Angeles cannot determine whether DOJ would be satisfied with this access, or whether the requirement is meant to prevent Los Angeles from providing individuals the required information about the interview request under state law, or to require the City to facilitate meetings that have been declined by individuals.  *Id.* ¶ 14. Moreover, the Access Requirement does not explain what is meant by an "inquiry" triggering the obligation, and includes no reasonableness requirement or limiting language to prevent DHS from consuming significant amounts of LAPD staff time or tying up LAPD interview rooms in a manner that interferes with the safety, efficiency, or legal time restraints that LAPD must consider in operating its jail facilities.

The Notice Requirement is also insufficiently clear.  DOJ demands "notice as early as practicable" regarding "the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien."  Larracas Decl. Ex. A, Attachment 1.  It is not clear what this would mean in the context of short-term detention operations, like LAPD's, in which "scheduled release" is generally not a relevant concept.  *See* Hyams Decl. ¶ 12.  The Notice Requirement is vague in terms of how, if at all, it is meant to be applied in such circumstances.

These ambiguities made it impossible for Los Angeles to understand what strings DOJ meant to attach to the CHP funding and whether the City could, as a legal matter, or should, as a policy matter consistent with its responsibilities over local law enforcement and to promote public safety, agree to comply with the Challenged Considerations to increase its chances to obtain CHP funding.  *See* Hyams Decl. ¶ 14.  These difficulties were compounded by DOJ waiting until the eleventh hour to adopt the Immigration Enforcement Partnership Consideration, leaving the City with less than 2 weeks to decide

whether it could or should sign the certification.  *See* Larracas Decl. Ex. A.  This is not the clear notice the Spending Clause demands.

### 3.    The Challenged Considerations Are Invalid Under the Administrative Procedure Act.

Agency actions are unlawful under the Administrative Procedure Act if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).[9]  Defendants' imposition of the Challenged Considerations as part of the 2017 CHP Application is not in accordance with law as set forth above.  Moreover, Defendants' imposition of the Challenged Considerations cannot survive arbitrary-and-capricious review, where the court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (citation omitted); *Az. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1236 (9th Cir. 2001) ("[W]e carefully review the record to ensure that agency decisions are founded on a reasoned evaluation of the relevant factors." (citation omitted)).

The Challenged Considerations are arbitrary and capricious because DOJ adopted them without a reasoned basis and provided no support for DOJ's attempt to link participation in, and facilitation of, federal civil immigration investigations by state and local officials to Congress' goals in establishing and designing the COPS grant program to provide funding for specified state and local community policing purposes.  DOJ has asserted that "[c]ities and states that cooperate with federal law enforcement make all of us safer by helping remove dangerous criminals from our communities," including by

---

[9] The imposition of the Challenged Considerations is a final agency action.  The Challenged Considerations "mark the consummation of the agency's decision-making process" and "give[ ] rise to direct and appreciable legal consequences"— Los Angeles' inability to compete on an equal playing field for CHP grants.  *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813-14 (2016) (internal quotation marks omitted)).

ending "violent crime stemming from illegal immigration." *See* Hong Decl. Ex. E. But no evidence is cited to support the implied premise that undocumented immigrants or other non-citizens commit violent crimes at higher rates than the general population, or to indicate that the investigations of federal civil immigration violations facilitated by the Challenged Considerations are focused on individuals involved in violent crime. Nor do any of those sources suggest that state or local participation in federal civil immigration investigations would decrease violent crime. Ironically, the real impact of DOJ's new policy is the opposite of its expressed intent—*depriving* states and cities of resources to address public safety needs by hiring new law enforcement officers.

The Attorney General, in a speech unrelated to the Challenged Considerations, relied on a study that does not support his claim that there is a relationship between so-called "sanctuary" policies and violent crime, but rather indicates that there is no such relationship; other studies, meanwhile, show an *inverse* relationship. *See* Hong Decl. Ex. C.; *see also Contrary to Trump's Claims, Immigrants Are Less Likely to Commit Crimes*, N.Y. Times (Jan. 26, 2017), attached as Ex. H to Hong Decl. There is no connection between that study's conclusions and imposing the Challenged Considerations as a means of advancing local community policing. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) ("[A]n agency rule would be arbitrary and capricious if the agency . . . offered an explanation for its decision that runs counter to the evidence before the agency."). Absent a rational connection between the Challenged Considerations and Congress' goal in establishing the COPS grants, one that is stated and supported by the agency, the Considerations are arbitrary and capricious.

## B.   Los Angeles Will Suffer Irreparable Injury Absent An Injunction From This Court.

Los Angeles will suffer immediate and irreparable harm if DOJ considers the Challenged Considerations in making funding decisions for the FY 2017 CHP grant cycle. Unless enjoined, the Challenged Considerations will be used to put Los Angeles at a disadvantage in the competition for federal funds. Jurisdictions that agree to participate

in federal civil immigration investigations and enforcement efforts will be favored in the application process; those that are not able or willing will be disfavored, losing valuable "points" in a competitive process. *Supra* pp. 6-8, 10. "A rule putting plaintiffs at a competitive disadvantage constitutes irreparable harm." *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 411 (9th Cir. 2015); *see also Ne. Fla. Ch. of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ("[T]he 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract.").[10]

Los Angeles is also irreparably harmed by the coercive choice DOJ put the City to. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). One option the agency presented to the City was to sacrifice its "sovereign interests and public policies." *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001). By agreeing to participate in federal civil immigration efforts in order to compete on equal footing for community policing resources, Los Angeles would have been required to compromise its longstanding policy decision that enmeshing LAPD in civil immigration enforcement would erode community trust and undermine public safety. *See* Hyams Decl. ¶¶ 3-5.

The other option, and the path Los Angeles ultimately followed, was to compete for COPS funding at a disadvantage. The loss of Los Angeles' ability to compete on fair and lawful terms threatens the City's concrete public safety interests. If Los Angeles is denied a grant because DOJ has disfavored it for being unwilling to participate in civil immigration enforcement, the result will not just be a monetary loss but a loss of funding to *hire police officers*. Specifically, Los Angeles plans to use grant funds to hire officers in support of its Community Safety Partnership Program, which needs these resources to

---

[10] Such competitive injury has also "often been recognized as grounds for standing." *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 507 (9th Cir. 1988) (listing cases); *see also Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1286-87 (9th Cir. 2013) (facts demonstrating a likelihood of success on the merits and irreparable harm "necessarily establish" standing to seek injunctive relief).

create programs for at-risk youth, escort children safely to school, and engage in other critical community policework.  Larracas Decl. Ex. G.  Lost opportunities to strengthen community safety partnerships through a fully-funded program are plainly irreparable harm.

By forcing the City to make this "unreasonable choice," the Challenged Considerations also "result[] in a constitutional injury" sufficient to establish irreparable harm.  *Santa Clara*, 2017 WL 1459081, at *27–28; *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009); *Chicago*, 2017 WL 4081821 at *13.

Immediate intervention is warranted here, as DOJ intends to make award determinations as early as October 30.  Hong Decl. ¶ 10.  Once DOJ makes COPS grant awards, it would be difficult (if not impossible) to unwind those awards and reallocate funds.  If DOJ is not prevented from issuing awards that are skewed by reliance on unlawful considerations, it would be impossible to compensate Los Angeles for (1) the loss of opportunity to fairly compete for funding, (2) the constitutional injury it suffers from being put to the impossible choice of either acceding to the violation of its constitutional rights or risking the loss of funds supporting the hiring of police officers, and (3) the lack of a fully funded Community Safety Partnership Program, if DOJ's decision to disfavor Los Angeles proves dispositive.

### C.    The Balance Of Equities And The Public Interest Weigh Heavily In Favor Of The Requested Injunction.

This Court must "balance the competing claims of injury" made by Los Angeles and Defendants in determining whether to grant the requested relief.  *Winter*, 555 U.S. at 24.  In addition, the Court should "pay particular regard for the public consequences" of issuing an injunction.  *Id.*  These two factors merge when the Federal Government is a party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Here, they both weigh strongly in favor of granting preliminary injunctive relief.

The City of Los Angeles has a number of important interests at stake here.  It has a strong interest in protecting its sovereignty against unwarranted federal incursion and

demands that the City forfeit its long-held views on the public safety dangers of enmeshing local law enforcement in federal civil immigration enforcement.  *See* Hyams Decl. ¶¶ 3-5.  The City has a strong related interest in avoiding the "coercive effects" of "unconstitutional federal enforcement."  *Santa Clara*, 2017 WL 1459081, at *28.  It also has an interest in maintaining the trust and cooperation of Los Angeles residents to effectively police local communities and promote public safety amongst some of the City's most vulnerable residents.  The Challenged Considerations undermine each of those interests by forcing the City to choose either to forgo them, or lose its ability to effectively compete for COPS funding.

The Challenged Considerations also threaten the public's interest in a well-functioning City law enforcement apparatus—one built on trust with the community and founded on the sound policy judgments of local law enforcement authorities, *i.e.*, those best-equipped to determine how to effectively protect their citizens and police crime in local communities.  And it is "always in the public's interest" to issue an injunction in order to "prevent the violation of a party's constitutional rights" as would occur here if DOJ is allowed to consider the Challenged Considerations in assessing Los Angeles' application.  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012); *accord Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1399 (6th Cir. 1987) ("the public is certainly interested in the prevention of enforcement of [laws] which may be unconstitutional").

In contrast to the material hardship that will be imposed on Los Angeles and its residents if the Challenged Considerations are imposed, Defendants will suffer little to no harm whatsoever if the injunction is granted.  The considerations are wholly unrelated to the federal grant program here that is directed toward promoting community-oriented policing, and they fall outside the statutory purposes specified by Congress in 34 U.S.C. § 10381.  Absent any reasoned basis for implementing the Challenged Considerations, Defendants can hardly claim they will be harmed by any delay resulting from a preliminary injunction.  And even if DOJ *could* provide a sound justification for its new

policy, there is no reason why those Challenged Considerations must be implemented *now*, since Defendants have successfully implemented the COPS grant program for years without them.  Indeed, the fact that DOJ adopted the Immigration Enforcement Partnership Consideration at the last minute, well after issuing its Application Guide, is a telling indication that Defendants lack a substantial interest in immediately implementing this hastily revised grant process.

Compared to the immediate and substantial harm Los Angeles will face if the Challenged Considerations *are* considered, Defendants can point to no immediate harm that the Federal Government will suffer from a preliminary injunction.  *See Chicago*, 2017 WL 4081821 at *14.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Court should issue a preliminary injunction to prevent Defendants from making COPS award determinations by providing "additional consideration" or any other preferential treatment to applicants that choose "Illegal Immigration" as a focus area of the grant, or applicants that certify compliance with the Notice and Access Requirements.

Dated: September 29, 2017

Respectfully Submitted,

By: 

MITCHELL A. KAMIN
MÓNICA RAMÍREZ ALMADANI
NEEMA T. SAHNI
Covington & Burling LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, California 90067-4643

DAVID M. ZIONTS, *pro hac vice*
application forthcoming
IVANO M. VENTRESCA, *pro hac vice*
application forthcoming
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001

MICHAEL N. FEUER
City Attorney

JAMES P. CLARK
Chief Deputy City Attorney
LEELA A. KAPUR
Executive Assistant City Attorney
VALERIE L. FLORES
Managing Senior Assistant City
  Attorney
MICHAEL DUNDAS
Deputy City Attorney
200 North Main Street, City Hall
  East Room 700
Los Angeles, California 90012
Telephone: (213) 978-8344
Facsimile: (213) 978-8312

*Attorneys for Plaintiff*
*City of Los Angeles*

CITY OF LOS ANGELES' MEMORANDUM IN SUPPORT OF APPLICATION FOR PRELIMINARY INJUNCTION