1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CHAD A. READLER
Acting Assistant Attorney General
SANDRA R. BROWN
United States Attorney
JOHN R. TYLER
Assistant Director
W. SCOTT SIMPSON (Va. Bar #27487)
Senior Trial Counsel
Department of Justice, Room 7210
Civil Division, Federal Programs Branch
Post Office Box 883
Washington, D.C.  20044
Telephone:     (202) 514-3495
Facsimile:     (202) 616-8470
E-mail:         scott.simpson@usdoj.gov

COUNSEL FOR DEFENDANTS

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF LOS ANGELES,<br><br>Plaintiff,<br><br>v.<br><br>JEFFERSON B. SESSIONS, III, *et al.*,<br><br>Defendants. | Case No. 2:17-cv-07215-R-JCx<br><br>**OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:      October 23, 2017<br>Time:      10:00 a.m. |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................. 1

STATUTORY AND ADMINISTRATIVE BACKGROUND ...................................................... 3

    I.    COPS Hiring Program and the Office of Community Oriented
         Policing Services .................................................................................. 3

        A.    Governing Statutes and Creation of the Program ....................... 3

        B.    Scoring Applications and Selecting Grantees ............................. 5

        C.    Immigration-Related Factors ..................................................... 7

    II.    Immigration and Nationality Act .................................................... 9

    III.    Los Angeles's COPS Hiring Program Applications ........................ 10

ARGUMENT ................................................................................................................. 10

    I.    Plaintiff's Claims Are Non-Justiciable ........................................... 11

    II.    Plaintiff Cannot Establish a Likelihood of Success on the Merits ....... 12

        A.    Plaintiff Is Unlikely to Succeed on Its *Ultra Vires* and
            Separation of Powers Claims ................................................... 12

        B.    Plaintiff Is Unlikely to Succeed on Its Spending Clause Claim ............... 18

            1.    The Immigration-Related Factors Are
                Sufficiently Clear .......................................................... 19

            2.    The Immigration-Related Factors Are Sufficiently
                Related to the Purposes of the COPS Hiring Program ................. 20

        C.    The Immigration-Related Factors Are Consistent
            with the Administrative Procedure Act ..................................... 22

    III.    The City Fails to Establish Irreparable Harm Absent
        Preliminary Relief ......................................................................... 23

    IV.    The Public Interest and the Balance of Equities Militate
        Against an Injunction .................................................................... 24

    V.    Any Injunction Herein Should Be Limited to the Plaintiff ................. 25

CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

**CONSTITUTION**

U.S. Const. art. I, § 8, cl. 1 .......................................................................... 12, 18

U.S. Const. art. III, § 2, cl. 1 ............................................................................. 11

**CASES**

*All. for the Wild Rockies v. Peña*, 865 F.3d 1211 (9th Cir. 2017) ....................... 2, 22, 23

*Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009) ............... 11

*Ameron, Inc. v. U.S. Army Corps of Engineers*, 809 F.2d 979 (3d Cir. 1986) ............. 13

*Arizona v. United States*, 567 U.S. 387 (2012) ......................................................... 9, 17

*Barbour v. Washington Metro. Area Transit Auth.*, 374 F.3d 1161 (D.C. Cir. 2004) ................. 21

*Barnhart v. Peabody Coal Co.*, 537 U.S. 149 (2003) ....................................................... 15

*Bigelow v. Virginia*, 421 U.S. 809 (1975) ....................................................................... 11

*Campbell v. Feld Entm't Inc.*, No. 12-CV-4233-LHK,
  2013 WL 4510629 (N.D. Cal. Aug. 22, 2013) ......................................................... 11

*Clinton v. City of New York*, 524 U.S. 417 (1998) ............................................................ 13

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) ....................................................................... 18

*Int'l Franchise Ass'n v. City of Seattle,* 803 F.3d 389 (9th Cir. 2015) ......................... 23

*Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949) ................ 13, 14

*Lopez v. Brewer*, 680 F.3d 1068 (9th Cir. 2012) ............................................................. 10

*Mayweathers v. Newland*, 314 F.3d 1062 (9th Cir. 2002) ...................................... 21, 22

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) ................................................................... 10

*Miller ex rel. NLRB v. California Pac. Med. Ctr.*, 991 F.2d 536 (9th Cir. 1993) .......... 23

*New Comm Wireless Services, Inc. v. SprintCom, Inc.*, 287 F.3d 1 (1st Cir. 2002) ...... 12

*New York v. United States*, 505 U.S. 144 (1992) .............................................................. 21

*Nken v. Holder*, 56 U.S. 418 (2009) .......................................................................... 24

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656 (1993) .......................................... 23, 24

*Ore. Bureau of Labor & Indus. ex rel. Richardson v. U.S. W. Commc'ns, Inc.*, 288 F.3d 414 (9th Cir. 2002) ................................................... 11

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984) ................................ 13

*Price v. City of Stockton*, 390 F.3d 1105 (9th Cir. 2004) ........................................... 25

*S. Dakota v. Dole*, 483 U.S. 203 (1987) .................................................... 18, 19, 21

*Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682 (7th Cir. 1986) ..................................... 24

*Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105 (9th Cir. 2012) .......................... 25

*Sofinet v. INS*, 188 F.3d 703 (7th Cir. 1999) ............................................................ 24

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ....................................... 11

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) ................................................ 25

*Thomas v. Zachry*, ___ F. Supp. 3d ___, No. 3:17-CV-0219-LRH-WGC, 2017 WL 2633692 (D. Nev. June 19, 2017) ................................................ 12

*U.S. Bank, N.A. v. SFR Invs. Pool 1, LLC*, 124 F. Supp. 3d 1063 (D. Nev. 2015) ............ 11

*United States v. Dang*, 488 F.3d 1135 (9th Cir. 2007) ............................................... 14

*United States v. Texas*, 136 S. Ct. 2271 (2016) ........................................................ 25

*Viceroy Gold Corp. v. Aubry*, 75 F.3d 482 (9th Cir. 1996) ......................................... 24

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) .................................................. 19

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ............................................................ 11

*Wilcox v. First Interstate Bank of Or., N.A.*, 815 F.2d 522 (9th Cir. 1987) .................. 24

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656 (1993 .......................................... 23, 24

*Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008) ............................ 11, 24

**STATUTES**

5 U.S.C. § 706(2)(A) ........................................................................................... 22

8 U.S.C. §§ 1101-07 .............................................................................................. 9

8 U.S.C. § 1227(a) ................................................................................................. 9

8 U.S.C. § 1228 ...................................................................................................... 9

8 U.S.C. § 1252c .............................................................................................. 10, 21

8 U.S.C. § 1324(c) ........................................................................................... 10, 21

8 U.S.C. § 1357(a)(1) ............................................................................................. 9

8 U.S.C. § 1357(a)(2) ........................................................................................... 17

8 U.S.C. § 1357(g) ..................................................................................... 10, 19, 21

8 U.S.C. § 1373(a) .............................................................................................. 7, 9

8 U.S.C. § 1373(b) ................................................................................................. 9

8 U.S.C. §§ 1101-07 .............................................................................................. 9

8 U.S.C. § 1357(a)(1) ............................................................................................. 9

34 U.S.C. § 10122(c)(2)(F) ................................................................................... 18

34 U.S.C. § 10228 ................................................................................................. 17

34 U.S.C. § 10261(a)(11)(B) ............................................................................. 5, 13

34 U.S.C. § 10381(b)(1) .......................................................................... 3, 13, 16, 21

34 U.S.C. § 10381(b)(2) ...................................................................... 3, 7, 13, 16, 21

34 U.S.C. § 10381(b)(3) - (22) ............................................................................... 4

34 U.S.C. § 10381(b)(3) .......................................................................................... 4

34 U.S.C. § 10381(b)(10) ...................................................................................... 16

34 U.S.C. § 10381(b)(16) ...................................................................................... 16

34 U.S.C. § 10381(c) ............................................................................................ 14

34 U.S.C. § 10381(c)(1) ........................................................................................ 15

34 U.S.C. § 10381(c)(2) ............................................................................. 15

34 U.S.C. § 10381(c)(3) ............................................................................. 15

34 U.S.C. § 10381(f) ............................................................................. 4, 13

34 U.S.C. § 10381(g) ............................................................................. 5, 14

34 U.S.C. § 10381(h) ............................................................................. 5, 13

34 U.S.C. § 10382(b) ................................................................................. 16

34 U.S.C. § 10382(c)(2) ......................................................................... 5, 14

34 U.S.C. § 10382(c)(3) ......................................................................... 5, 14

34 U.S.C. § 10382(c)(10) ....................................................................... 5, 14

Pub. L. No. 96-157, 93 Stat. 1167 (1979) ................................................. 17

Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322,
     Title I, § 10003(a), 108 Stat. 1808 (1994) ...................................... 3, 21

Pub. L. No. 111-5 ....................................................................................... 7

Pub. Law No. 112-55, 125 Stat. 552 (2011) ......................................... 4, 16

Pub. Law No. 113-6, 127 Stat. 198 (2013) ........................................... 4, 16

Pub. Law No. 113-235, 128 Stat. 2130 (2014) ..................................... 4, 16

Pub. L. No. 114-22, 129 Stat. 227 (2015) ................................................ 15

Pub. L. No. 115-37 ...................................................................................... 7

**REGULATIONS**

28 C.F.R. §§ 0.119 ...................................................................................... 3

28 C.F.R. §§ 0.120 ...................................................................................... 3

**INTRODUCTION**

The COPS Hiring Program ("CHP" or "Program") awards federal grants to selected state, local, and tribal governments to assist in hiring, rehiring, and training law enforcement officers to enhance public safety and promote "community-oriented policing."  CHP is a discretionary federal grant program, with grants awarded to recipients following a competitive application and scoring process.  Every year, hundreds of law enforcement agencies request funding through this program, requests that far exceed the total available funds appropriated by Congress.  From 2011 through 2016, for example, the total requests have been an average of more than five times the available funds.  To reconcile these competing requests, Congress gave the Department of Justice ("DOJ" or "Department") broad discretion to determine, on an annual basis, which jurisdictions should receive CHP funding.  DOJ exercises that discretion to promote and support public safety objectives.

DOJ's Office of Community Oriented Policing Services ("COPS Office" or "Office") awards CHP grants.  To apply for funding, a state, local, or tribal agency must submit an application that (1) provides information about the jurisdiction's needs and practices and (2) explains how the jurisdiction intends to utilize the new officers it will use CHP funds to hire.  The COPS Office scores the applications according to both the comparative needs of the applicants and metrics that emphasize the Federal Government's enforcement priorities in any given year.  To that end, each year the Office selects several key "focus areas" for law enforcement and gives extra points to applications that focus on those areas.  Over time, those focus areas have ranged from Violent Crime Problems to Child and Youth Safety to Drug Abuse.

For Fiscal Year 2017, the COPS Office has included two law-enforcement related immigration factors in its scoring system.  First, one of the focus areas for this year is "Illegal Immigration," which means that applicants can earn extra points by proposing ways to contribute to combatting illegal immigration.  Second, applicants can earn extra points by adopting policies to ensure (1) that the Department of Homeland Security ("DHS") has access to the applicant's detention facilities to meet with non-U.S. citizens, and (2) that DHS receives advance notice of the scheduled release of a non-citizen in the jurisdiction's custody when DHS requests it.

1    Los Angeles seeks a preliminary injunction against the COPS Office's use of these law-

2    enforcement-related immigration factors, claiming they are *ultra vires* and violate the

3    constitutional Separation of Powers, the limitations on the federal Spending Power, and the

4    Administrative Procedure Act.  But Los Angeles does not have standing to challenge these factors

5    at all, much less seek emergency relief.  The City has neither pled nor shown that its injury – not

6    receiving CHP funding – is traceable to the immigration factors it attacks.  Nor could it.  As the

7    accompanying declaration from the COPS Office makes clear, Los Angeles would not receive

8    CHP funding this year even if all points related to illegal immigration were excluded from the

9    scoring.  Los Angeles does not have standing to challenge a supposed violation that does not

10   affect it.

11    Even if the City did have standing, its suit is unlikely to succeed.  The COPS statutes give

12   DOJ broad discretion to allocate scarce CHP funds among the many applicants who seek them,

13   such that the Office is not acting *ultra vires* or encroaching on the congressional sphere.  As for

14   the Spending Clause, the immigration-related factors – which are mere scoring criteria rather than

15   conditions on federal funds – are clear and clearly related to the Program's purposes.  The COPS

16   Office offered to answer any questions from potential applicants (an offer Los Angeles did not

17   accept), and the COPS Office believes illegal immigration is a public safety issue best addressed

18   by facilitating federal access to non-citizens who are in custody and who have thus either

19   committed crimes or are suspected of committing crimes.  Finally, as for plaintiff's APA claim,

20   the immigration-related factors are consistent with the CHP's purposes, and nothing in the statute

21   suggests these factors are off limits.  Plaintiff may have a "difference in view," but that is not an

22   APA violation.  *See*, *e.g.*, *All. for the Wild Rockies v. Peña*, 865 F.3d 1211, 1217 (9th Cir. 2017).

23    Further, the City cannot show a likelihood of irreparable harm absent a preliminary

24   injunction, and the public interest weighs against the injunction sought.  Again, Los Angeles

25   would not receive a CHP grant this year *regardless* of the immigration-related factors.  It will

26   thus suffer no harm – much less irreparable harm – absent an injunction.  And the public interest

27   weighs heavily in favor of enforcing the law and protecting public safety.

28    For these reasons, plaintiff's motion for preliminary injunction should be denied.

2

**STATUTORY AND ADMINISTRATIVE BACKGROUND**

**I.      COPS Hiring Program and the Office of Community Oriented Policing Services**

    **A.      Governing Statutes and Creation of the Program**

In the Violent Crime Control and Law Enforcement Act of 1994, Congress authorized the Attorney General to "make grants to States, units of local government, [and] Indian tribal governments . . . to increase police presence, to expand and improve cooperative efforts between law enforcement agencies and members of the community to address crime and disorder problems, and otherwise to enhance public safety."  Pub. L. No. 103-322, Title I, § 10003(a), 108 Stat. 1808 (1994).  As later amended and currently codified, the statute provides authority to make grants for any of several specific purposes, including –

       (1) to rehire law enforcement officers who have been laid off as a result of State, tribal, or local budget reductions for deployment in community-oriented policing; [and]

       (2) to hire and train new, additional career law enforcement officers for deployment in community-oriented policing across the Nation, including by prioritizing the hiring and training of veterans . . . .

34 U.S.C. § 10381(b)(1), (2).

The Attorney General created the Office of Community Oriented Policing Services to administer grants under the Violent Crime Control and Law Enforcement Act of 1994.  *See* Declaration of Andrew A. Dorr ¶ 2 ("Dorr Decl.") (Attachment 1 hereto).  In addition to administering grant programs that promote "community policing," the COPS Office provides community policing training and technical assistance to state, local, and tribal law enforcement agencies.  *Id.* The Office is headed by a Director appointed by the Attorney General.  *Id.*; 28 C.F.R. §§ 0.119, 0.120.  The COPS Office began implementing 34 U.S.C. § 10381(b)(1) and (b)(2) in 1994. Initially, the Office operated two programs, one for large grantees and one for small grantees.  *See* Dorr Decl. ¶ 5.  The programs were combined in 1995, and it was named the COPS Hiring Program in 2010.  *Id.*

Under CHP, the COPS Office makes grants to States, units of local government, and

1  Indian tribal governments to hire, rehire, or train law enforcement officers for deployment in

2  "community-oriented policing," which the Office defines as "a philosophy that promotes

3  organizational strategies that support the systematic use of partnerships and problem-solving

4  techniques to proactively address the immediate conditions that give rise to public safety issues

5  such as crime, social disorder, and fear of crime." *Id.* ¶¶ 5, 7.  A COPS Hiring Program grant is

6  discretionary, *id.* ¶ 4 – that is, it is a grant "for which the federal awarding agency generally may

7  select the recipient from among all eligible recipients, may decide to make or not make an award

8  based on the programmatic, technical, or scientific content of an application, and can decide the

9  amount of funding to be awarded."  *See* Discretionary Grant, Grant Terminology,

10  https://www.grants.gov/ web/ grants/ learn-grants/ grant-terminology.html (last visited Oct. 11,

11  2017).  Discretionary grants differ from formula grants, which, when awarded, must follow

12  statutorily created statistical criteria.  *See* Formula Grant, Grant Terminology,

13  https://www.grants.gov/ web/ grants/ learn-grants/ grant-terminology.html (last visited Oct. 11,

14  2017).

15      The operation of the CHP – like all other COPS Office grant programs – is subject to

16  specific annual appropriations by Congress.  *See* Dorr Decl. ¶¶ 3, 5.  Each year, Congress

17  appropriates a certain amount "for the hiring and rehiring of additional career law enforcement

18  officers" under the Program.  *See, e.g.*, Pub. Law No. 113-235, 128 Stat. 2130, 2196 (2014); Pub.

19  Law No. 113-6, 127 Stat. 198, 257 (2013); Pub. Law No. 112-55, 125 Stat. 552, 618 (2011).[1]

20  Those amounts have decreased over the last several years, making the Program increasingly

21  competitive.  *See* Dorr Decl. ¶¶ 12-13.  Each year, the applications that the COPS Office receives

22  for CHP grants seek more funds, in the aggregate, than Congress has appropriated.  *Id.* ¶ 13.

23      The statute sets forth certain specific requirements for the COPS Hiring Program.  For

24  example, the COPS Office must award at least 0.5% of the available funding to the grantees

25  within any State that has eligible applicants (which helps ensure that smaller States are not

26  excluded from funding), 34 U.S.C. § 10381(f); Dorr Decl. ¶ 9; the Office must allocate 50% of

---

27

28      [1] 34 U.S.C. § 10381(b) provides statutory authority for several other potential grants, 34 U.S.C. § 10381(b)(3) - (22), but Congress has never appropriated funds for most of them and, therefore, the COPS Office has never offered grants under most of them.  *See* Dorr Decl. ¶ 6.

1  each year's available funds to jurisdictions with a population over 150,000 and 50% of available

2  funds to jurisdictions with a population less than 150,000, 34 U.S.C. § 10381(h); *see id.*

3  § 10261(a)(11)(B); and each grantee must provide a portion of the money used to hire or rehire

4  each law enforcement officer that CHP funds (i.e., local matching funds), subject to discretionary

5  waiver by the Attorney General, *id*. § 10381(g).

6  **B.    Scoring Applications and Selecting Grantees**

7  Other than these broad rules, the statutes governing the COPS Hiring Program do not

8  prescribe any particular method or factors for evaluating applications or choosing which applica-

9  tions to fund.  The COPS Office must thus necessarily exercise judgment and discretion in

10  choosing among applications.  And the COPS Office has developed methods to evaluate and

11  score applications in order to determine how best to allocate the Program's finite funds.  *See* Dorr

12  Decl. ¶ 14.  A jurisdiction seeking a CHP grant fills out and submits an electronic application on

13  the COPS Office web site.  *Id*. ¶ 10.  The application is part of a system that assigns a specific

14  number of points for each answer given by the applicant.  *Id*. ¶ 15.

15  Some of the factors that the COPS Office uses in scoring applications are reflected in the

16  statutes.  For example, the statute states that applicants "shall . . . demonstrate a specific public

17  safety need [and] explain the applicant's inability to address the need without Federal assistance."

18  34 U.S.C. § 10382(c)(2), (3).  The Office has implemented this directive by requesting data

19  reflecting each applicant's crime statistics and financial need and by according extra points in the

20  application system based on higher crime rates within a jurisdiction and comparatively greater

21  fiscal need.  *See* Dorr Decl. ¶ 16.  Similarly, the application system scores the quality of the

22  applicant's community policing plan pursuant to the statutory requirement that applicants

23  "explain how the grant will be utilized to reorient the affected law enforcement agency's mission

24  toward community-oriented policing or enhance its involvement in or commitment to

25  community-oriented policing."  *Id*.; 34 U.S.C. § 10382(c)(10).

26  Most of the factors that the COPS Office has historically used to score applications are not

27  expressly reflected in the statutes, but are adopted as an exercise of the Office's statutory discre-

28  tion to evaluate applications and distribute scarce funding.  The Office has employed such

discretionary factors since the inception of the COPS Hiring Program, and Congress has continued to appropriate funding for the Program each year with a complete understanding of how the Office administers it.  The COPS Office exercises its discretion through several scoring mechanisms, without which the program's limited funding could not be rationally awarded.

First, each year, the COPS Office designates several broad areas of public safety and community policing, and applicants must indicate which areas their proposed activities will support.  And each year, the COPS Office prioritizes certain of the available areas; applicants who select those focus areas receive extra points in the application system.  *See* Dorr Decl. ¶ 18. The available areas, and the focus areas, have changed over the years, reflecting changes in both national law enforcement necessities and Department of Justice priorities.  For example, in FY 2014, after the Newtown (Connecticut) Police Department failed to score high enough in FY 2013 to receive a CHP grant following the December 2012 Sandy Hook Elementary School shooting, the COPS Office added a "catastrophic event" question to the application and assigned it the highest level of extra points to ensure that the Office could assist agencies afflicted by unexpected catastrophes like the Sandy Hook shooting.  *Id.*  For Fiscal Year 2017, the available areas are Child and Youth Safety Focus; Child and Youth Safety Focus: School Based Policing; Illegal Immigration; Drug Abuse; Homeland Security Problems; Non-Violent Crime Problems and Quality-of-Life Policing; Building Trust and Respect; Traffic/Pedestrian Safety Problems; and Violent Crime Problems.  *Id.* ¶ 7.

Second, certain questions on the CHP application that do not relate to focus areas are awarded more points than other questions based on their significance to advancing community policing or other priorities.  *Id.* ¶ 18.  For example, the application system accords extra points for certain internal management practices of the applicant, including the regular assessment of employee satisfaction, the exercise of flexibility in officer shift assignments to facilitate address-ing problems, and the operation of an "early intervention system" to identify officers showing signs of stress, personal problems, or questionable work conduct.  *Id.*  Additionally, from FY 2013 through FY 2016, the COPS Office, based on the Attorney General's priorities, assigned extra points for jurisdictions that preferred military veterans in hiring officers with CHP funds,

1    although no such preference was then mandated in the statute.  *Id.* ¶ 19.[2]

2           Third, each individual factor on the CHP application falls into one of three categories:

3    Fiscal Health, Crime, or Community Policing.  *Id.* ¶ 20.  After calculating each applicant's raw

4    scores, the COPS Office gives different weights to the applicant's scores in each of these

5    categories, based on the Attorney General's priorities and the needs of public safety.  *Id.*  For

6    most years, each applicant's score in the Fiscal Health category has been weighted as 20% of the

7    applicant's final score; each applicant's score in the Crime category has been weighted as 30% of

8    the applicant's final score; and each applicant's score in the Community Policing category has

9    been weighted as 50% of the applicant's final score.  *Id.*  The Office changes these weighting

10   percentages from time to time.  In FY 2009, for example, in light of the national fiscal issues that

11   resulted in enactment of the American Recovery and Reinvestment Act of 2009, *see* Pub. L. No.

12   111-5, 123 Stat. 115, the Office accorded 50% of the weighting to the "Fiscal Health" category.

13   *Id.*

14          **C.    Immigration-Related Factors**

15          Beginning with Fiscal Year 2016, certain immigration-related requirements and scoring

16   factors have been included in the COPS Hiring Program.

17          CHP grantees, like all federal grantees, are required to comply with all applicable federal

18   laws.  *Id.* ¶ 23.  Beginning with FY 2016, the COPS Office has advised each CHP applicant that

19   this requirement includes compliance with 8 U.S.C. § 1373, which provides that "a Federal, State,

20   or local government entity or official may not prohibit, or in any way restrict, any government

21   entity or official from sending to, or receiving from, the Immigration and Naturalization Service

22   information regarding the citizenship or immigration status, lawful or unlawful, of any

23   individual."  *Id.* § 1373(a); *see* Dorr Decl. ¶ 23.  In FY 2017, the COPS Office required applicants

24   to certify compliance with Section 1373 as a threshold eligibility requirement, although there is

25   no scoring associated with it.  *Id.*

26          For FY 2017, the priority areas on the CHP application included proposals that explicitly

27
28          [2] Beginning with a legislative amendment in 2017, the statute now expressly authorizes
     "prioritizing the hiring and training of veterans."  34 U.S.C. § 10381(b)(2); *see* Pub. L. No.
     115-37, 131 Stat. 854 (2017).

prioritized addressing problems with violent crime; proposals that focused on homeland security, such as protecting critical infrastructure; and proposals that focused on contributing to the control of illegal immigration or cooperating with federal authorities in enforcing federal immigration law. *Id*. ¶ 18. Thus, the application system assigned extra points for focusing on Illegal Immigration, although it also gave an equal or greater number of points for focusing on other specified areas. *Id*. ¶ 24. Some jurisdictions chose Illegal Immigration as the focus area of their FY 2017 applications, but none scored high enough to permit further consideration, regardless of any points attributable to the access-and-notice factors described below. *Id*.

Lastly, beginning in FY 2017, the COPS Office has offered applicants the opportunity to receive additional points by certifying that the applicant has implemented or would implement regulations or policies to ensure (1) that DHS would have access to the applicant's correctional or detention facilities "to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or to remain in the United States," and (2) that the applicant's correctional and detention facilities will "provide advance notice as early as practicable (at least 48 hours, where possible) to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien." *Id*. ¶ 25. To inform applicants of the opportunity to receive points based on these "access" and "notice" factors, the COPS Office electronically sent each applicant a letter, certification form, and background documents. *Id*. ¶ 27 & Ex. B. These materials stated, among other things, that the certification would not commit applicants to detain any individuals beyond their scheduled time of release, and that applicants would not be penalized if they did not operate detention facilities. *Id*. ¶ 27.

A jurisdiction's certification regarding these factors does not forbid the jurisdiction from informing detainees that they may choose not to meet with federal immigration authorities where the jurisdiction's laws require providing that information. *Id*. ¶ 26. Nor does the certification require a jurisdiction to notify DHS before releasing a non-U.S. citizen under short-term detention with an unknown release time. *Id*. Rather, the certification means that when DHS requests

advance notice of a particular suspected non-citizen's release, the jurisdiction will provide that notice as early as practicable before releasing the suspected non-citizen.  *Id.*

## II.     Immigration and Nationality Act

Enforcement of the immigration laws, including and especially the investigation and apprehension of criminal aliens, is a quintessential law enforcement function.  Through the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101-07, Congress granted the Executive Branch significant authority to control the entry, movement, and other conduct of foreign nationals in the United States.  These responsibilities are assigned to law enforcement agencies, as the INA authorizes DHS, DOJ, and other Executive Branch agencies to administer and enforce the immigration laws.  The INA permits the Executive Branch to exercise considerable executive discretion to direct enforcement pursuant to federal policy objectives.  *See*, *e.g*., *Arizona v. United States*, 567 U.S. 387, 396 (2012).

The INA includes several provisions that protect the ability of federal officials to investigate the status of non-citizens in the United States and otherwise enforce the immigration laws.  For example, the statute provides that a federal immigration officer "shall have power without warrant . . . to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States."  8 U.S.C. § 1357(a)(1).  Separately, as noted above, 8 U.S.C. § 1373 provides that "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual."  *Id*. § 1373(a).[3]  The INA provides that certain classes of non-citizens shall be removed from the United States upon the order of the Attorney General or the Secretary of Homeland Security.  *See*, *e.g*., *id.* §§ 1227(a), 1228.

---

[3] Additionally, 8 U.S.C. § 1373(b) provides that "[n]otwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual: (1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service. (2) Maintaining such information. (3) Exchanging such information with any other Federal, State, or local government entity."

1   The INA also establishes immigration enforcement as a cooperative endeavor among

2   federal, state, and local law enforcement agencies. *See, e.g.*, *id*. § 1357(g) (providing that DHS

3   may enter into formal cooperative agreements with states and localities under which appropriately

4   trained and qualified state and local officers may perform specified functions of a federal

5   immigration officer in relation to the investigation, apprehension, or detention of aliens); *see also*

6   *id*. § 1324(c) (authorizing state and local law enforcement officers to make arrests for violations

7   of the INA's prohibition against smuggling, transporting, or harboring aliens); *id*. § 1252c

8   (authorizing state and local officers to arrest certain felons who have unlawfully returned to the

9   United States).

10  **III.     Los Angeles's COPS Hiring Program Applications**

11  Los Angeles has applied for CHP grants three times:  in FY 2012, FY 2016, and FY 2017.

12  The 2012 and 2016 applications were granted, with the City receiving $6,428,350 for 25 officers

13  in 2012, and $3,125,000 for 25 officers in 2016. *See* Dorr Decl. ¶ 30.  The City's application for

14  FY 2017 sought $3.125 million to support hiring twenty-five officers for a Community Safety

15  Partnership Program. *Id*. ¶ 31.  Los Angeles neither listed Illegal Immigration as a focus area in

16  its FY 2017 application nor returned a certification regarding the access and notice factors. *Id*.

17  After plaintiff commenced this action, the COPS Office tabulated the scores of this year's

18  CHP applicants and determined that Los Angeles would not receive a CHP grant even absent the

19  immigration-related factors described above. *Id*. ¶ 32.  Moreover, among the large-population

20  jurisdictions, only one applicant listed "Illegal Immigration" as a focus area, and it still scored

21  lower than Los Angeles; thus, the existence of the "Illegal Immigration" focus area did not affect

22  Los Angeles's receipt or non-receipt of an award. *Id*.  Thus, even if all points associated with

23  illegal immigration were excluded from the scoring, Los Angeles still would not score highly

24  enough among large-population applicants to receive a grant. *Id*.

25  **ARGUMENT**

26  A preliminary injunction is "an extraordinary and drastic remedy" that should not be

27  granted "unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Lopez v.*

28  *Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972

1   (1997) (per curiam)).  The Supreme Court has clarified the requirements for a preliminary

2   injunction in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008).  Under *Winter*,

3   "[a] plaintiff seeking a preliminary injunction must establish that he is *likely* to succeed on the

4   merits, that he is *likely* to suffer irreparable harm in the absence of preliminary relief, that the

5   balance of equities tips in his favor, *and* that an injunction is in the public interest."  *Id*. at 20

6   (emphasis added).  Critically, this is "a four-part conjunctive test, not . . . a four-factor balancing

7   test"; thus, *Winter* "reject[ed] the sliding-scale test as to the irreparable-injury prong" previously

8   used by some courts.  *U.S. Bank, N.A. v. SFR Invs. Pool 1, LLC*, 124 F. Supp. 3d 1063, 1070 (D.

9   Nev. 2015); *see Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009)

10  ("To the extent that our cases have suggested a lesser standard, they are no longer controlling, or

11  even viable.") (footnote omitted).  Further, "[t]he party seeking the injunction bears the burden of

12  proving these elements."  *Campbell v. Feld Entm't Inc.*, No. 12-CV-4233-LHK, 2013 WL

13  4510629, at *4 (N.D. Cal. Aug. 22, 2013).

14        Plaintiff's motion for a preliminary injunction should be denied both because its request

15  for an injunction is non-justiciable and because it cannot meet the requirements for preliminary

16  relief.

17  **I.**      **Plaintiff's Claims Are Non-Justiciable**

18        Article III of the Constitution limits federal court jurisdiction to "Cases" and

19  "Controversies."  U.S. Const. art. III, § 2, cl. 1.  Matters outside this rubric are "nonjusticiable."

20  *Ore. Bureau of Labor & Indus. ex rel. Richardson v. U.S. W. Commc'ns, Inc*., 288 F.3d 414, 416

21  (9th Cir. 2002).  To satisfy the "irreducible constitutional minimum" of standing to sue, a plaintiff

22  must demonstrate an "injury in fact," a "fairly traceable" causal connection between the injury

23  and defendant's conduct, and redressability.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83,

24  102-03 (1998).  The injury needed for constitutional standing must be "concrete," "objective,"

25  and "palpable," not merely "abstract" or "subjective."  *See Whitmore v. Arkansas*, 495 U.S. 149,

26  155 (1990); *Bigelow v. Virginia*, 421 U.S. 809, 816-17 (1975).  Finally, the plaintiff must show "a

27  likelihood that the requested relief will redress the alleged injury."  *Steel Co*., 523 U.S. at 103.

28

Under these principles, plaintiff's request for an injunction against using the immigration-related factors in the COPS Hiring Program is non-justiciable.  Plaintiff's alleged harm is "a disadvantage in the competition" for CHP funds (Doc. 7-1 at 21), and, to eliminate that disadvantage and secure a grant, plaintiff seeks an injunction against use of the immigration-related factors.  As described above, however, the COPS Office has now calculated the scores of this year's CHP applicants, and has determined that Los Angeles would not receive a grant even without consideration of the factors challenged here.  *See* Dorr Decl. ¶ 32.  Therefore, the relief that plaintiff seeks – an injunction against the immigration-related factors – would not alter the outcome.  Either way, Los Angeles would receive no grant, which means that the City's suit, even if successful, would not redress its harm.  Thus, plaintiff cannot establish standing.

**II.      Plaintiff Cannot Establish a Likelihood of Success on the Merits**

Even if this case were not moot, Los Angeles would be unable to show the "sine qua non" of eligibility for a preliminary injunction:  that is, likelihood of success on the merits of its claims.  *See Thomas v. Zachry*, ___ F. Supp. 3d ___, No. 3:17-CV-0219-LRH-WGC, 2017 WL 2633692, at *2 (D. Nev. June 19, 2017) ("The sine qua non of preliminary injunction inquiry is likelihood of success on the merits:  if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.") (quoting *New Comm Wireless Services, Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)).

**A.      Plaintiff Is Unlikely to Succeed on Its *Ultra Vires* and Separation of Powers Claims**

Plaintiff's first claim is that the COPS Office has acted beyond its authority and encroached upon the constitutional authority of Congress in adopting immigration-related factors in the COPS Hiring Program (Doc. 7-1 at 11-15).  In this case, at least, the concepts of statutory authority and constitutional separation of powers are two ways of looking at the same issue.  Article I of the Constitution confers on Congress the authority to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.  In exercising this power, Congress may – and necessarily does – delegate to the Executive Branch the authority to make decisions regarding the

expenditure of funds.  *See*, *e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 488 (1998) ("Congress has frequently delegated the President the authority to spend, or not to spend, particular sums of money."); *Ameron, Inc. v. U.S. Army Corps of Engineers*, 809 F.2d 979, 983 (3d Cir. 1986) ("Congress appropriates funds for a wide variety of purposes and delegates to executive branch officials the authority to make certain decisions regarding how those funds are to be spent.").

The Executive Branch is responsible for implementing the law.  The Supreme Court has held that an Executive "officer may be said to act *ultra vires* only when he acts without any authority whatever."  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984) (internal quotation marks omitted).  Thus, claims that an agency has used its authority erroneously or inappropriately are insufficient to state an *ultra vires* claim.  Rather, *ultra vires* claims must be based on an "officer's *lack* of delegated power"; merely claiming an "error in the exercise of that power is . . . not sufficient."  *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690 (1949) (emphasis added).

Here, the Department of Justice, acting through the COPS Office, is responsible for disseminating the scarce funds appropriated under 34 U.S.C. § 10381(b)(1) and (b)(2).  The statute gives the COPS Office discretion in disseminating those funds, and the inadequacy of the available funds to cover all applications requires DOJ to adopt and employ factors to rank and choose among them.  Although the statute imposes certain requirements on disseminating CHP funding, those requirements are only broad guidelines that are too general to actually allocate the awards.  Congress gave DOJ discretion to fill in the gaps.

By statute, the funds must be used to hire, rehire, and train law enforcement officers "for deployment in community-oriented policing."  34 U.S.C. § 10381(b)(1), (2).  The statute also provides a broad framework for DOJ's discretionary awards.  Recognizing that there would likely not be enough money to fund every applicant, Congress required that at least 0.5% of available funding be awarded to the grantees within any State that has eligible applicants, *id*. § 10381(f), that DOJ equally allocate the available funds between large and small jurisdictions, *id*. § 10381(h); *id*. § 10261(a)(11)(B), and that DOJ generally require local jurisdictions to provide

1  matching funds, *id*. § 10381(g).  Congress also specified that each application must, among other

2  things, "demonstrate a specific public safety need," "explain the applicant's inability to address

3  the need without Federal assistance," and "explain how the grant will be utilized to reorient the

4  [applicant's] mission toward community-oriented policing or enhance its involvement in or

5  commitment to community-oriented policing."  *Id*. § 10382(c)(2), (3), (10).

6      Beyond these basic requirements, the statute provides no comprehensive framework or

7  formula for choosing among the many jurisdictions that satisfy them.  Indeed, the statute does not

8  even direct DOJ to prioritize applications that show the *greatest* "public safety need," the *most*

9  *dire* "inability to address the need without Federal assistance," or the *greatest* ability or willing-

10  ness "to reorient the [applicant's] mission toward community-oriented policing."  It instead leaves

11  the details to DOJ, which means the COPS Office must either choose the winning applicants via

12  random lottery – an irrational method that losing applicants would surely challenge as arbitrary

13  and capricious – or develop a logical method of selecting worthy applicants that represents a

14  reasonable exercise of DOJ's statutory discretion.  By taking the latter course, the Office is not

15  encroaching on Congress.  It is simply filling in gaps that Congress left for it to fill, no doubt

16  because Congress wanted DOJ to use its law-enforcement expertise to award these discretionary

17  grants in ways that best promote Congress's broad goal of making our communities safer through

18  community-oriented policing.  *Cf. United States v. Dang*, 488 F.3d 1135, 1140 (9th Cir. 2007)

19  ("Here, a plain reading of the statute indicates that Congress intended to leave a statutory gap for

20  the administrative agency to fill.").  Los Angeles might disagree with how the COPS Office is

21  exercising its statutory discretion, but simply asserting an "error in the exercise" of delegated

22  authority is "not sufficient" to state an *ultra vires* claim.  *Larson*, 337 U.S. at 690.

23      The seven arguments listed in plaintiff's motion do not establish a likelihood of succeed-

24  ing on the Separation of Powers or *ultra vires* claim.  *First*, the three (really two) discretionary

25  considerations set forth at 34 U.S.C. § 10381(c), are not mandatory considerations, let alone

26  exhaustive ones.  They are, rather, bases on which "the Attorney General *may* give preferential

27  consideration, where feasible," *id.* (emphasis added), should he decide to do so in his discretion.

28  And these factors obviously are not exhaustive, because merely prioritizing jurisdictions that

provide greater than 25% matching funds, *id*. § 10381(c)(1), or that have certain laws related to child sex trafficking, *id*. § 10381(c)(2)-(3), would not be sufficient to allocate limited CHP funding among the many applicants.  Congress's inclusion of a few factors that the COPS Office "may" consider plainly does not foreclose the Office from developing additional factors to guide how it awards its discretionary grants.  *See Barnhart v. Peabody Coal Co*., 537 U.S. 149, 168 (2003) ("We do not read the enumeration of one case to exclude another unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it.").[4]

Over the last twenty-three years, the COPS Office has used many discretionary factors, not expressly reflected in the statute, to identify which applicants are most deserving of COPS hiring grants.  *See* Dorr Decl. ¶ 18-20.  For example, the statute says nothing about prioritizing different areas of public safety from year to year, which is an obvious means of directing priorities and distributing funds logically and equitably.  *See id*. ¶ 18.  Nor does the statute expressly direct the Office to favor localities that have recently experienced a catastrophic public safety event (like the December 2015 terror attack in San Bernardino, California, which resulted in a FY 2016 CHP grant to the San Bernardino Police Department), or to assign extra points for exercising flexibility in officer shift assignments, or for attempting to identify officers showing signs of stress or questionable work conduct.  *Id*.  Nor did the statute mandate the COPS Office's military veteran preference until Congress added it in 2017.  *Id*. ¶ 19.  In short, since Congress created the COPS discretionary grant program, DOJ has exercised its statutory discretion to develop and use a variety of different factors to award funding.  The immigration-related factors at issue here are just the latest example of that broad discretion.  If plaintiff's theory were correct, all of these discretionary actions over the years – from prioritizing mass shootings to stressing officer safety – would have to be deemed *ultra vires*.  And Congress, knowing of this (purportedly) *ultra vires* activity, would have to be deemed to have ignored it time and time again

---

[4] This is confirmed by the fact that Congress added the human-trafficking provisions only in 2015.  *See* Pub. L. No. 114-22, § 1002, 129 Stat. 227, 266-67 (2015).  If plaintiff's construction of the statute were correct, prior to 2015, the COPS Office would have been limited to ranking applicants based on a jurisdiction's willingness to exceed the minimum matching requirement.

by repeatedly appropriating funding for the program every year without restriction.

*Second*, plaintiff misreads the statute in arguing that most of the factors on which the Office relies are not among "the twenty-two enumerated purposes of the COPS program" in 34 U.S.C. § 10381(b)(1) through (22) (Doc. 7-1 at 12-13).  The COPS Hiring Program is authorized by only the first two paragraphs of Section 10381(b), which authorize providing grants for hiring, rehiring, and training law enforcement officers "for deployment in community-oriented policing." 34 U.S.C. § 10381(b)(1), (2).  That language is reflected in Congress's annual appropriations, which provide funds specifically "for the hiring and rehiring of additional career law enforcement officers."  *See, e.g.*, Pub. Law No. 113-235, 128 Stat. 2130, 2196 (2014); Pub. Law No. 113-6, 127 Stat. 198, 257 (2013); Pub. Law No. 112-55, 125 Stat. 552, 618 (2011).  The other para-graphs of Section 10381(b) authorize *other* potential grants, when appropriated by Congress, such as grants "to establish innovative programs to reduce, and keep to a minimum, the amount of time that law enforcement officers must be away from the community while awaiting court appear-ances" or "to support the purchase by a law enforcement agency of no more than 1 service weapon per officer."  34 U.S.C. § 10381(b)(10), (16).  Congress has never appropriated money to fund those other programs and accordingly the COPS Office does not award grants for those purposes.  *See* Dorr Decl. ¶ 6.

*Third*, the COPS Office's authority to develop and employ factors to choose among the various applicants for scarce CHP funds does not derive from the Office's statutory authority to dictate the "form" and content of applications, 34 U.S.C. § 10382(b) (Doc. 7-1 at 13).  It derives, rather, from the statutory scheme that establishes the CHP discretionary grant program.  The COPS Office's authority to develop an application is simply a small subset of that broader discretion.

*Fourth*, the proposed legislative amendment on which plaintiff relies (Doc. 7-1 at 13) is not a proposal to amend the statutes governing the COPS Hiring Program.  It is, rather, a request to amend an entirely separate statute, 8 U.S.C. § 1373, to "condition" federal funding on affirmative cooperation with federal immigration authorities.  *See* Declaration of Steven Hong (Doc. 7-3), Ex. F at 26.  The immigration considerations at issue here are not "conditions" on

1   receiving COPS funding; indeed, numerous jurisdictions that are focusing on goals other than

2   immigration and did not execute the "access" and "notice" certification will receive CHP funding

3   this year.  *See* Dorr Decl. ¶ 32.  That is because these considerations are simply some of the many

4   factors the COPS Office is using in Fiscal Year 2017 to allocate its scarce grant awards – no

5   different from the many other considerations the Office has used over the years in exercising its

6   statutory discretion.

7        *Fifth*, 8 U.S.C. § 1357(g)(3), does not limit the means by which a state or local

8   government can assist in the enforcement of immigration law or prohibit the COPS Office from

9   assigning extra points to jurisdictions that opt to assist federal immigration enforcement (*contra*

10   Doc. 7-1 at 13-14).  As the Supreme Court has observed, that statute only delineates some of the

11   circumstances under which "state officers may perform the functions of an immigration officer,"

12   *Arizona v. United States*, 567 U.S. 387, 408 (2012), which include arresting aliens for "entering

13   or attempting to enter the United States in violation of any law or regulation made in pursuance of

14   law regulating the admission, exclusion, expulsion, or removal of aliens."  8 U.S.C. § 1357(a)(2).

15   No formal agreement under Section 1357(g) is required for state and local officers to assist in

16   other ways, such as by providing access to non-citizens they have detained or informing federal

17   authorities of the impending release of such persons where practical.  That kind of rudimentary

18   assistance – essentially making a phone call to DHS and then letting DHS personnel into a

19   building – does not require addressing the "complexities involved in enforcing federal immigra-

20   tion law, [such as] the determination whether a person is removable."  *Arizona*, 567 U.S. at 409.

21        *Sixth*, the challenged immigration-related factors in the COPS Hiring Program do not

22   impermissibly exercise "direction, supervision, or control over any police force or any other

23   criminal justice agency" in violation of 34 U.S.C. § 10228 (*contra* Doc. 7-1 at 14).  Merely

24   encouraging cooperation with federal authorities by giving additional points as one portion of a

25   broader scoring system to administer a discretionary grant program does not exercise "direction,

26   supervision, or control."  Indeed, concurrent with the enactment of 34 U.S.C. § 10228, Congress

27   created the National Institute of Justice, *see* Pub. L. No. 96-157, §§ 202, 815, 93 Stat. 1167

28   (1979), one of whose very purposes is "to develop programs and projects . . . to improve and

1    expand cooperation among the Federal Government, States, and units of local government . . . ."

2    34 U.S.C. § 10122(c)(2)(F).

3        *Seventh*, the "clear statement" rule in *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991), does

4    not apply to the development and use of scoring factors in the COPS Hiring Program (*contra*

5    Doc. 7-1 at 15).  In *Gregory*, the Supreme Court addressed whether federal law would override a

6    provision of the Missouri constitution requiring most state judges to retire at age seventy.  *Id.* at

7    455-61.  The Court held that it would not "upset the usual constitutional balance of federal and

8    state powers" without a "clear statement" from Congress.  *Id.* at 460-61.  But this case does not

9    involve overriding state or local law.  It is, rather, simply the latest iteration of an over-two-

10   decades-old discretionary grant program that gives state and local agencies an opportunity to

11   focus on federal enforcement priorities and thereby increase their chances of receiving a federal

12   grant.  Nothing in this voluntary program risks "overriding" Los Angeles law.

13       **B.      Plaintiff Is Unlikely to Succeed on Its Spending Clause Claim**

14       Plaintiff's second claim is that the use of immigration-related factors in the COPS Hiring

15   Program exceeds federal power under the Spending Clause (Doc. 7-1 at 15-20).  This Clause

16   provides that Congress may "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts

17   and provide for the common Defence and general Welfare of the United States."  U.S. Const. art.

18   I, § 8, cl. 1.  As the Supreme Court has held, "Congress may attach conditions on the receipt of

19   federal funds, and has repeatedly employed the power to further broad policy objectives by

20   conditioning receipt of federal moneys upon compliance by the recipient with federal statutory

21   and administrative directives."  *S. Dakota v. Dole*, 483 U.S. 203, 206 (1987) (internal quotation

22   marks omitted).

23       The Court in *Dole* described certain limitations or potential limitations on the spending

24   power.  Among other things, conditions on the receipt of federal funds must be stated "unambig-

25   uously" so that recipients can "exercise their choice knowingly, cognizant of the consequences of

26   their participation."  *Id.* at 207.  Also, the Court observed, "our cases have suggested (without

27   significant elaboration) that conditions on federal grants might be illegitimate if they are unrelated

28

1   to the federal interest in particular national projects or programs." *Id*. at 207-08 (internal quota-

2   tion marks omitted).  Assuming the immigration-related factors used by the COPS Office could

3   be classified as "conditions," they satisfy both of these aspects of *Dole*.[5]

### 1.     The Immigration-Related Factors Are Sufficiently Clear

5         Plaintiff argues that the COPS Office has not crafted the immigration-related factors so

6   the City can "clearly understand" them (Doc. 7-1 at 17-18).  In truth, however, there is nothing

7   "ambiguous" about the Illegal Immigration focus area or the access and notice factors, and

8   applicants can choose those factors "knowingly, cognizant of the consequences of their

9   [choices]." *Dole*, 483 U.S. at 207; *cf. Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)

10  (noting that "perfect clarity and precise guidance have never been required even of regulations

11  that restrict expressive activity").

12        In describing focus areas for potential CHP applicants to choose from, the COPS Office

13  provides brief examples of some specific activities an applicant could propose to perform in each

14  focus area, but deliberately avoids telling applicants exactly what to do, so they can develop their

15  own approaches and tactics based on local conditions and their local law enforcement expertise.

16  *See* Dorr Decl. ¶ 8.  For example, in offering Drug Abuse as a potential focus area for FY 2017,

17  the Office simply asked applicants to "specify [their] focus on education, prevention, and

18  intervention to combat drug use and abuse (e.g. marijuana, heroin, prescription opioids, etc.)." *Id*.

19  Similarly, in giving potential applicants the option of focusing on Illegal Immigration, the Office

20  asked interested jurisdictions to "specify [their] focus on partnering with federal law enforcement

21  to combat illegal immigration through information sharing, 287(g) partnerships, task forces and

22  honoring detainers." *Id*. ¶ 24.

23        As in its Separation of Powers argument, plaintiff confuses assisting federal authorities in

24  the enforcement of immigration law with having state and local officers serve as "federal immi-

25  gration officers" under 8 U.S.C. § 1357(g) (Doc. 7-1 at 18).  "[P]artnering with federal law

26  enforcement to combat illegal immigration" – in whatever specific way an applicant might

28  ───────────────

        [5] Although plaintiff repeatedly characterizes the access and notice factors as "require-
ments" (Doc. 7-1 at 10, 16, 25), they are actually scoring factors, not "requirements."

                                        19

propose – will not require comprehensive knowledge of the "significant complexities" of federal immigration law (*id*.).  And if an applicant proposed a Section 287(g) partnership under the Illegal Immigration focus area and a 287(g) agreement were reached, any necessary training could be provided in the context of that lawful agreement.

Finally, to the extent the access and notice factors were unclear to Los Angeles (or any other jurisdiction), the COPS Office made clear in its letter announcing them that applicants were free to contact the Office with questions.  *See* Dorr Decl. ¶ 28.[6]  The Office received numerous inquiries, some of which it referred to its Legal Division, but Los Angeles apparently did not inquire.  *Id*.  Plaintiff now objects that California law requires informing detainees that they may refuse to meet with federal immigration authorities, and that "[i]t is not clear" how the notice factor would apply "in the context of short-term detention operations, like LAPD's, in which 'scheduled release' is generally not a relevant concept" (Doc. 7-1 at 19).  As the COPS Office has made clear in this filing – and as it would have made clear to Los Angeles had it asked these questions before – the Office does not understand these factors to forbid a jurisdiction from informing detainees, where required by law, that they may choose not to meet with federal immigration authorities, or to require that a jurisdiction notify DHS before the release of a non-citizen under short-term detention whose release time is unknown.  *See* Dorr Decl. ¶ 26.  Plaintiff's concerns are unfounded.

**2.      The Immigration-Related Factors Are Sufficiently
Related to the Purposes of the COPS Hiring Program**

Plaintiff also argues that the immigration-related factors are not "reasonably related" to the goals of the COPS Hiring Program (Doc. 17-1 at 16).  But this aspect of *Dole* suggests only a "possible ground" for invalidating an enactment, and does not impose an "exacting standard":

The Supreme Court has suggested that federal grants conditioned on compliance

---

[6] As described earlier, to satisfy those factors, a jurisdiction must implement regulations or policies to ensure that DHS has access to the jurisdiction's correctional or detention facilities "to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or to remain in the United States," and that DHS receives "advance notice as early as practicable (at least 48 hours, where possible) . . . regarding the scheduled release date and time of an alien in the jurisdiction's custody" when requested.  *See* Dorr Decl. ¶ 25 & Ex. B.

> with federal directives *might* be illegitimate if the conditions share no relationship to the federal interest in particular national projects or programs. This possible ground for invalidating a Spending Clause statute, which only suggests that the legislation *might* be illegitimate without demonstrating a nexus between the conditions and a specified national interest, is a far cry from imposing an exacting standard for relatedness.

*Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) (citing *Dole*, 483 U.S. at 207). Thus, conditions on federal funding must only "bear some relationship to the purpose of the federal spending." 314 F.3d at 1067 (quoting *New York v. United States*, 505 U.S. 144, 167 (1992)); *see Barbour v. Washington Metro. Area Transit Auth.*, 374 F.3d 1161, 1168 (D.C. Cir. 2004) (noting that Supreme Court has never "overturned Spending Clause legislation on relatedness grounds").

The immigration considerations at issue here easily meet this standard (assuming they are "conditions" at all). Congress established the COPS Hiring Program to promote "community-oriented policing," 34 U.S.C. § 10381(b)(1), (2), "to increase police presence, to expand and improve cooperative efforts between law enforcement agencies and members of the community to address crime and disorder problems, and otherwise to enhance public safety," Pub. L. No. 103-322, Title I, § 10003(a), 108 Stat. 1808 (1994). Assisting in the enforcement of immigration law helps achieve these goals. The COPS Office believes that the intersection of illegal immigration and crime is a serious public safety issue that can be addressed most effectively through community policing. *See* Dorr Decl. ¶ 29. This is also reflected in Congress's desire, expressed in the INA, to make immigration enforcement a cooperative endeavor among federal, state, and local law enforcement agencies. *See, e.g.*, 8 U.S.C. § 1357(g) (providing for formal agreements under which state and local officers may function as federal immigration officers); *see also id.* § 1324(c) (authorizing state and local officers to make arrests for violations of the INA's prohibition against smuggling, transporting, or harboring aliens); *id.* § 1252c (authorizing state and local officers to arrest certain felons who have unlawfully returned to the United States).

The access and notice factors relate only to non-citizens who are under detention; almost invariably, those will be people who have either committed crimes or who are suspected of having committed crimes. *See* Dorr Decl. ¶ 29. Working with the Federal Government to

enforce federal immigration law against aliens who are criminals or suspected criminals makes communities safer.  *Id.*  The immigration-related factors at issue *directly* advance the purposes of the COPS Hiring Program.  They thus easily clear the low bar of bearing "some relationship" to those purposes.  *See Mayweathers*, 314 F.3d at 1067.  Indeed, Los Angeles itself acknowledges that there is a relationship between immigration enforcement and public safety (*see* Doc. 7-1 at 9, 22).

### C.   The Immigration-Related Factors Are Consistent with the Administrative Procedure Act

Plaintiff's final claim is that the immigration-related factors are "arbitrary and capricious [and] not in accordance with law" under the Administrative Procedure Act (Doc. 7-1 at 20-21).  5 U.S.C. § 706(2)(A).  The Court of Appeals has held in numerous cases that "[a]n agency action is arbitrary and capricious *only* if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *E.g.*, *All. for the Wild Rockies v. Peña*, 865 F.3d 1211, 1217 (9th Cir. 2017) (emphasis added) (internal quotation marks omitted).  The challenged factors in the COPS Hiring Program violate none of these parameters.

As detailed above, Congress established the COPS Hiring Program to promote public safety and community-oriented policing, and thus intended the Department of Justice to consider those aims in awarding grants.  Those goals are enhanced by facilitating federal access to non-citizens who have violated federal immigration law and who have violated, or are suspected of violating, state or local criminal laws.  Nothing in the statutes governing CHP suggests the Department should not consider the extent to which a jurisdiction cooperates in the enforcement of federal immigration law when exercising its discretion to disseminate scarce federal resources.

Los Angeles asserts that public safety is best served by pursuing "policies against engaging in federal civil immigration enforcement" and that "enmeshing LAPD in civil immigration enforcement would erode community trust and undermine public safety" (Doc. 7-1 at 9, 22).  For this reason, plaintiff contends, it "did not identify 'Illegal Immigration' as a focus area of its grant

1  [application]" application and did not certify compliance with the access and notice factors (Doc.

2  7-1 at 10).  But those assertions only reflect a "difference in view" with the Federal Government

3  regarding how best to promote public safety.  *See All. for the Wild Rockies*, 865 F.3d at 1217.

4  Los Angeles is entitled to its views; but its disagreement does not establish a violation of the

5  Administrative Procedure Act.

6  **III.    The City Fails to Establish Irreparable Harm Absent Preliminary Relief**

7          For the same reason Los Angeles does not have standing, it cannot establish that it will

8  suffer irreparable harm – a threshold requirement for a preliminary injunction.  As the attached

9  declaration from the COPS Office explains, even if Los Angeles were correct that the immigra-

10  tion considerations are unlawful and cannot be considered, it *still* would not receive any CHP

11  funding this year.  The City has thus failed to establish it will suffer *any* harm – much less

12  irreparable harm – absent preliminary relief.  Its failure to satisfy this "crucial" requirement in

13  securing a preliminary injunction is alone sufficient basis to deny relief.  *Miller ex rel. NLRB v.*

14  *California Pac. Med. Ctr.*, 991 F.2d 536, 543 (9th Cir. 1993).

15          Plaintiff seems to suggest that being at a "disadvantage" in the competition for COPS

16  funding is *itself* irreparable injury (Doc. 7-1 at 21-22).  But none of the decisions it cites hold that

17  merely being considered under (allegedly) improper factors in a grant program constitutes

18  irreparable harm requiring emergency judicial relief.  For example, the case that plaintiff cites for

19  the proposition that "[a] rule putting plaintiffs at a competitive disadvantage constitutes irrepar-

20  able harm," *Int'l Franchise Ass'n v. City of Seattle,* 803 F.3d 389 (9th Cir. 2015), involved a city

21  ordinance that subjected certain businesses to a steeper schedule for incremental minimum-wage

22  increases than other businesses.  *Id.* at 397-98.  Businesses subject to the steeper schedule sought

23  a preliminary injunction against the ordinance, and the court held that plaintiffs' "competitive

24  injury" compared to other businesses constituted irreparable harm.  *Id.* at 411.  Similarly, another

25  case cited by the plaintiff, *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of*

26  *Jacksonville*, 508 U.S. 656 (1993), had nothing to do with irreparable harm.  Rather, it dealt with

27  a city ordinance that accorded preferential treatment to certain minority-owned businesses in the

28  award of city contracts.  *Id.* at 658-59.  An organization of non-minority building contractors

1  challenged the ordinance, and the Seventh Circuit held that plaintiffs had failed to show the

2  injury-in-fact needed for standing.  *Id*. at 664.  The Supreme Court reversed, holding that when a

3  person's constitutional right to equal protection is at stake, "the denial of equal treatment resulting

4  from the imposition of [a] barrier" in the bidding process is itself a cognizable injury for standing

5  purposes.  *Id*. at 666.

6      The competitive injuries recognized in those cases do not exist here, however.  The courts

7  readily accept that "competitive harm" to ongoing business interests can supply standing and be

8  relevant in determining an appropriate remedy.  *See*, *e.g*., *Viceroy Gold Corp. v. Aubry*, 75 F.3d

9  482, 488 (9th Cir. 1996); *Wilcox v. First Interstate Bank of Or., N.A*., 815 F.2d 522, 529 (9th Cir.

10  1987).  But here, the plaintiff cannot complain of competitive harm to any business interests.

11  Rather, plaintiff's only possible harm is losing a grant – one it would not win regardless.

12  **IV.    The Public Interest and the Balance of Equities Militate Against an Injunction**

13      Lastly, a party seeking a preliminary injunction must "establish . . . that the balance of

14  equities tips in [its] favor, and that an injunction is in the public interest."  *Winter*, 555 U.S. at 20.

15  These factors merge in a suit against the Federal Government.  *Nken v. Holder*, 556 U.S. 418, 435

16  (2009).  Here, the public interest weighs heavily against plaintiff's attempt to enjoin statutorily

17  authorized Executive Branch policies that are designed to promote enforcement of federal

18  immigration law in jurisdictions that receive federal law enforcement funds.  Courts have

19  routinely held that "[t]he United States has an interest in enforcing federal law . . . ."  *Sec'y of

20  Labor v. Fitzsimmon*s, 805 F.2d 682, 693 (7th Cir. 1986) (emphasis omitted).  The City's

21  requested relief threatens, in particular, "the public interest in the speedy and effective

22  enforcement of the immigration laws . . . ."  *Sofinet v. INS*, 188 F.3d 703, 708 (7th Cir. 1999).

23      As discussed in the accompanying declaration from DHS, the challenged CHP scoring

24  factors – especially the access and notice factors – promote these interests by, for example,

25  minimizing potentially hazardous public safety situations that may arise where criminal aliens are

26  released into the community, minimizing officer safety risk by limiting potentially dangerous

27  arrest situations, and promoting operational efficiency by conserving the resources needed by

28  DHS to execute its mission.  *See* Declaration of Jim Brown ¶¶ 6-11 (Attachment 2 hereto).  At

1   bottom, encouraging cooperation between local governments and DHS promotes the public

2   interest in executing federal laws that require removal of criminal aliens. *Id.* These concrete

3   interests tip the relevant equities sharply against the injunction sought here.

4   **V.      Any Injunction Herein Should Be Limited to the Plaintiff**

5          The proposed order on plaintiff's motion for preliminary injunction would prohibit the

6   COPS Office from relying on immigration-related factors across the board (Doc. 7-5).  If this

7   Court were to conclude, however, that Los Angeles had satisfied the requirements for preliminary

8   relief, any injunction should be limited to the plaintiff rather than applying to all CHP

9   applicants.  "[A]n injunction must be narrowly tailored to affect only those persons over which

10  [the court] has power, and to remedy only the specific harms shown by the plaintiffs, rather than

11  to enjoin all possible breaches of the law."  *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th

12  Cir. 2004) (internal quotation marks omitted).  Thus, courts routinely deny requests for

13  nationwide injunctive relief.  *See Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1116 (9th

14  Cir. 2012) (affirming district court's refusal to grant nationwide relief).

15         Moreover, Los Angeles has vigorously *objected* to the entry of a nationwide injunction in

16  an analogous situation.  In *Texas v. United States*, the Fifth Circuit affirmed a nationwide injunc-

17  tion against programs allowing certain non-citizens to remain in the United States.  809 F.3d 134

18  (5th Cir. 2015).  In an amicus brief filed with the Supreme Court, Los Angeles and other jurisdic-

19  tions urged the Court to vacate the injunction because the plaintiffs had failed "to establish injury

20  sufficient to enjoin the [programs] *nationwide*."  *See* Brief for Amici Curiae, *United States v.*

21  *Texas*, 136 S. Ct. 2271 (2016) (No. 15-674), 2016 WL 891345, at *20 (Attachment 3 hereto).

22  The City and its fellow amici argued that, to justify "an expansive nationwide injunction," the

23  plaintiffs there would have to "establish standing to justify the scope of the injunction."  *Id*. at

24  *19, *30.  In this case, the plaintiff has not even attempted to establish standing to seek a nation-

25  wide injunction against the use of immigration-related factors in the COPS Hiring Program.  By

26  its own arguments, any preliminary injunction herein should be limited to Los Angeles.

27                                    **CONCLUSION**

28         Plaintiff's motion for preliminary injunction should be denied.

25

Dated:  October 12, 2017

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

SANDRA R. BROWN
United States Attorney

JOHN R. TYLER
Assistant Director

/s/ W. Scott Simpson

W. SCOTT SIMPSON (Va. Bar #27487)
Senior Trial Counsel

Attorneys, Department of Justice
Civil Division, Room 7210
Federal Programs Branch
Post Office Box 883
Washington, D.C. 20044
Telephone:   (202) 514-3495
Facsimile:    (202) 616-8470
E-mail:        scott.simpson@usdoj.gov

COUNSEL FOR DEFENDANTS