MICHAEL N. FEUER, SBN 111529
City Attorney
JAMES P. CLARK, SBN 64780
Chief Deputy City Attorney
LEELA A. KAPUR, SBN 125548
Executive Assistant City Attorney
VALERIE L. FLORES, SBN 138572
Managing Senior Assistant City Attorney
MICHAEL DUNDAS, SBN 226930
Deputy City Attorney
200 North Main Street, City Hall East
Suite 800
Los Angeles, California 90012
james.p.clark@lacity.org
Telephone: (213) 978-8344
Facsimile: (213) 978-8312

MITCHELL A. KAMIN, SBN 202788
MÓNICA RAMÍREZ ALMADANI, SBN 234893
NEEMA T. SAHNI, SBN 274240
Covington & Burling LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, California 90067-4643
mkamin@cov.com
Telephone:  (424) 332-4800
Facsimile:  (424) 332-4749

DAVID M. ZIONTS, admitted *pro hac vice*
IVANO M. VENTRESCA, admitted *pro hac vice*
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
dzionts@cov.com
Telephone: (202) 662-6000
Facsimile:  (202) 662-5987

*Attorneys for Plaintiff City of Los Angeles*

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

CITY OF LOS ANGELES,

    Plaintiff,

    v.

JEFFERSON B. SESSIONS, III, in his official capacity as Attorney General of the United States; ALAN R. HANSON, in his official capacity as Acting Assistant

Case No. 2:17-cv-07215-R-JCx

**CITY OF LOS ANGELES' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Judge: The Honorable Manuel L. Real
Date:   February 5, 2018
Time:  10:00 a.m.

Attorney General of the Office of Justice
Programs; RUSSELL WASHINGTON, in
his official capacity as Acting Director of
the Office of Community Oriented Policing
Services; UNITED STATES
DEPARTMENT OF JUSTICE.

      Defendants.

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................... 1

II.    FACTUAL BACKGROUND.......................................................... 2

    A.    Congress Establishes the COPS Grant Program to Support the Hiring of Police Officers to Engage in Community-Oriented Policing. ......... 2

    B.    Defendants' Attempts to Use Federal Funds as a Weapon to Pressure State and Local Governments to Participate in Federal Civil Immigration Enforcement. ................................................. 4

    C.    Los Angeles' Applications for COPS Hiring Program Grant Funding. ................................................................................ 8

III.   STANDARD OF REVIEW............................................................ 10

IV.    ARGUMENT................................................................................ 11

    A.    The Challenged Considerations Are *Ultra Vires* and Violate the Separation of Powers.......................................................... 11

        1.    DOJ Cannot Use COPS Grant Decisions to Pressure State and Local Governments to Change Their Regulations, Policies, and Practices. ....................................................................... 12

        2.    DOJ Cannot Redirect COPS Funds Toward Civil Immigration Enforcement and Disfavor Communities That Intend to Use COPS Funds to Engage in Community-Oriented Policing. .... 16

    B.    The Challenged Considerations Violate the Spending Clause Because They Are Not Reasonably Related to Congress's Purpose of Promoting Community-Oriented Policing. ........................................ 18

    C.    The Challenged Considerations Are Invalid Under the Administrative Procedure Act. ...................................................................... 20

    D.    The Court Should Enter a Permanent Injunction. .............................. 23

V.     CONCLUSION............................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. United States,*
  132 S. Ct. 2492 (2012)..........................................................................13, 18

*Arrington v. Daniels,*
  516 F.3d 1106 (9th Cir. 2008) .........................................................................22

*Az. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.,*
  273 F.3d 1229 (9th Cir. 2001) .........................................................................21

*Bullfrog Films, Inc. v. Wick,*
  847 F.2d 502 (9th Cir. 1988) ...........................................................................10

*Burlington Truck Lines, Inc. v. United States,*
  371 U.S. 156 (1962).........................................................................................22

*Chubb Custom Ins. Co. v. Space Systems/Loral, Inc.,*
  710 F.3d 946 (9th Cir. 2013) ...........................................................................13

*City & Cty. of San Francisco v. United States,*
  130 F.3d 873 (9th Cir. 1997) ...........................................................................10

*Cty. of Santa Clara v. Donald J. Trump*; *City and Cty. of San Francisco v. Trump,*
  2017 WL 5569835 (N.D. Cal. Nov. 20, 2017) ..........................................5, 12

*City of Chicago v. Sessions,*
  2017 WL 4081821 (N.D. Ill. Sept. 15, 2017)....................................................6

*City of Philadelphia v. Sessions,*
  2017 WL 5489476 (E.D. Pa. Nov. 15, 2017) ............................6, 13, 20, 22

*Com. Va., Dep't of Educ. v. Riley,*
  106 F.3d 559 (4th Cir. 1997) (en banc) ..........................................................14

*DeCanas v. Bica,*
  424 U.S. 351 (1976)..........................................................................................13

*Gregory v. Ashcroft,*
  501 U.S. 452 (1991)..........................................................................................14

*Int'l Franchise Ass'n, Inc. v. City of Seattle*,
    803 F.3d 389 (9th Cir. 2015) ........................................................................ 24

*Kingdomware Technologies, Inc. v. United States*,
    136 S. Ct. 1969 (2016) ................................................................................. 10

*Louisiana Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986) ..................................................................................... 11

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ........................................................................ 25

*Miranda-Olivares v. Clackamas Cty.*,
    2014 WL 1414305 (D. Or. Apr. 11, 2014) .............................................. 6, 17

*Monsanto Co v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ..................................................................................... 24

*Monterey Mechanical Co. v. Wilson*,
    125 F.3d 702 (9th Cir. 1997) ........................................................................ 24

*Morales v. Chadbourne*,
    793 F.3d 208 (1st Cir. 2015) .......................................................................... 6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983) ....................................................................................... 23

*Ne. Fla. Chapter of Associated Gen. Contractors of America v. Jacksonville*,
    508 U.S. 656 (1993) ..................................................................................... 10

*Nevada v. Skinner*,
    884 F.2d 445 (9th Cir. 1989) ........................................................................ 19

*Ochoa v. Campbell*,
    2017 WL 3476777 (E.D. Wash. July 31, 2017) ....................................... 6, 17

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981) ......................................................................................... 20

*Planned Parenthood Arizona Inc. v. Betlach*,
    727 F.3d 960 (9th Cir. 2013) ........................................................................ 24

*Preston v. Heckler*,
    734 F.2d 1359 (9th Cir. 1984) ...................................................................... 10

*Regents of the Univ. of Cal. v. Bakke*,
   438 U.S. 265 (1978) ................................................................................ 10

*Robbins v. Reagan*,
   780 F.2d 37 (D.C. Cir. 1985) ................................................................ 12

*S. Dakota v. Dole*,
   483 U.S. 203 (1987) ...................................................................... 19, 20

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
   747 F.3d 581 (9th Cir. 2014) ................................................................ 21

*Santoyo v. United States*,
   2017 WL 2896021 (W.D. Tex. June 5, 2017) ................................. 6, 17

*Schneider v. Chertoff*,
   450 F.3d 944 (9th Cir. 2006) ................................................................ 20

*Sierra Forest Legacy v. Sherman*,
   646 F.3d 1161 (9th Cir. 2011) .............................................................. 24

*Tarin v. Cty. of Los Angeles*,
   123 F.3d 1259 (9th Cir. 1997) .............................................................. 10

*Tongatapu Woodcraft Hawaii, Ltd. v. Feldman*,
   736 F.2d 1305 (9th Cir. 1984) .............................................................. 22

*Valle de Sol Inc. v. Whiting*,
   732 F.3d (9th Cir. 2013) ....................................................................... 13

**Statutes**

5 U.S.C. § 706(2)(A) ................................................................................. 21

8 U.S.C. § 1357(g)(1) ................................................................... 6, 17, 18

34 U.S.C. § 10228(a) ................................................................................ 15

34 U.S.C. § 10381 ........................................ 2, 3, 4, 11, 13, 16, 18, 19, 20

**Other Authorities**

Fed. R. Civ. P. 56 ..................................................................................... 10

Fed. R. Civ. P. 54(b) ........................................................................... 2, 25

H.R. Rep. 103-324 ........................................................................................................ 15

CITY OF LOS ANGELES' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

## I.    INTRODUCTION

This is a case about a federal agency abusing its power—offending the separation of powers and federalism all at once.  Congress created a grant program to support state and local governments in hiring officers for deployment in "community-oriented policing" (the "COPS Hiring Program" or "COPS").  The U.S. Department of Justice ("DOJ") is charged with administering that grant program.  DOJ's stewardship over this program requires it to make discretionary judgments about what communities most need the money, what grant proposals are most likely to meet Congress's goals, and other salient factors.  But Congress did not write DOJ a blank check.  DOJ cannot use its hold of the purse strings to pressure sovereign governments to change unrelated policies, or to misdirect funds away from the types of programs Congress directed DOJ to support.

That is what DOJ has done in two unlawful manipulations of the COPS grant competition.  *First*, DOJ decided to award "additional consideration"—effectively bonus points—to applicants that adopt regulations, policies, and practices reflecting particular types of "partnership" with federal civil immigration authorities, and sign a "Certification of Illegal Immigration Cooperation."  This necessarily means that communities that are *not* willing or able to certify that they have adopted these DOJ-preferred regulations or policies are disfavored in the grant process.  These disfavored communities are then less likely to receive federal support to hire officers for deployment in community-oriented policing.  This attempt to induce state and local governments to change their regulations, policies, and practices is directly contrary to DOJ's statutory authority.  The COPS statute identifies just one narrow area (treatment of victims of human trafficking) where DOJ is authorized to favor applicants based on laws and policies unrelated to their use of grant funds.  DOJ plainly lacks broader authority to use the COPS grant program as leverage to extract policy concessions from state and local governments.

*Second*, DOJ decided to award grants to applicants that focus on "Illegal Immigration"—and to give preferential treatment in the grant competition to applicants who choose that focus.  This too is unlawful.  No plausible interpretation of "community-

oriented policing" includes participating in civil immigration enforcement. Congress certainly does not think so; it enacted a detailed list of twenty-two statutory purposes it considered relevant to its goal of promoting community-oriented policing, and civil immigration enforcement is conspicuously absent. DOJ's attempt to fund state and local officers to perform the duties of federal civil immigration agents is not only contrary to the text and structure of the COPS statute, but squarely contradicts provisions of the immigration laws that DOJ purports to be championing.

These forms of preferential treatment are no small detail. In a recent press release announcing this year's COPS awards, DOJ made clear that immigration-related considerations were critical to award decisions—and that the agency is treating its statutory mandate of promoting community-oriented policing as all but incidental. *See* Request for Judicial Notice ("RJN") Ex. H, DOJ, Office of Public Affairs, Attorney General Sessions Announces $98 Million To Hire Community Policing Officers (Nov. 20, 2017) ("November Press Release").

Defendants' abuse of the COPS program must be rejected. It is *ultra vires* and a violation of the separation of powers, it is an unconstitutional attempt to use Congress's Spending Clause power, and it is arbitrary and capricious. The Court should grant partial summary judgment and enter final judgment under Federal Rule of Civil Procedure 54(b) in favor of Plaintiff on Counts Four, Five, and Six; declare that Defendants' actions are unlawful; and enjoin them from administering the COPS program in this unlawful manner going forward.

## II.    FACTUAL BACKGROUND

### A.    Congress Establishes the COPS Grant Program to Support the Hiring of Police Officers to Engage in Community-Oriented Policing.

Community-oriented policing, according to the component of DOJ responsible for promoting it, "begins with a commitment to building trust and mutual respect between police and communities." RJN Ex. A, Office of Community Oriented Policing Services, "About". Congress created the COPS program to support state and local government

efforts to engage in community-oriented policing.  To achieve that purpose, the COPS statute authorized the Attorney General to "make[] grants to States, units of local government, Indian tribal governments, other public and private entities, and multi-jurisdictional or regional consortia."  34 U.S.C. § 10381(a).

Congress authorized the COPS program as a "single grant program" and enumerated twenty-two "purposes for which grants . . . may be made."  *Id.* § 10381(b).  These purposes include "to rehire" and "to hire and train new" law enforcement officers "for deployment in community-oriented policing."  *Id.* § 10381(b)(1), (2).

DOJ administers the COPS grant program through its Office of Community Oriented Policing Services ("COPS Office").  *See* Decl. of Stella Larracas, Ex. B, 2017 CHP Application Guide at 61.  The COPS Office administers several types of COPS programs each year, including the COPS Hiring Program ("CHP") grant, which "provides funding directly to law enforcement agencies to hire and/or rehire career law enforcement officers in an effort to increase their community policing capacity and crime prevention efforts."  *Id.* at 1, 7.  Each fiscal year, the COPS Office issues applications for the CHP grant and selects local government awardees to receive funds that can typically be used over a three-year period.

Congress has generally not appropriated sufficient money to fund all of the grant requests the COPS Office receives.  Decl. of Andrew Dorr in Opposition to Plaintiff's Motion for Preliminary Injunction, filed Oct. 12, 2017 (Doc. 33-1), at ¶ 12 ("Dorr Decl.").  The COPS Office has therefore created a scoring system tailored to the statutory purpose of awarding funds to communities that most need federal assistance to engage in community policing, and have the best plans for promoting that type of police work.  Thus, the Office awards points based on criteria falling in three categories: Fiscal Health, Crime, or Community Policing.  *Id.* ¶ 20.  "Community Policing" generally accounts for 50% of the score, "Crime" for 30%, and "Fiscal Health" for 20%.  *Id.*

The COPS Office also generally allocates "additional consideration"—in the form of extra points under its scoring system—for specified reasons.  Applicants are directed

to select particular "community policing problems or focus areas" that their proposed program will address, and the Office awards extra points to communities that select a focus area that is prioritized for that year.  *See* Larracas Decl., Ex. C, 2016 CHP Application Guide at 21; Dorr. Decl. ¶ 18 ("[T]he application system assigns extra points for applications that are focused on that year's priority areas.").  The COPS Office has in prior years also provided extra points under its scoring system to communities affected by an unanticipated catastrophic event, reflecting the heightened needs of such communities.  Larracas Decl., Ex. C, 2016 CHP Application Guide at 21.

Congress has also authorized one basis for the COPS Office to award preferential consideration that does not relate to an applicant's need for, or use of, COPS grant funds. Section 10381(c) of the statute provides that DOJ "may" give an application "preferential consideration" if the applicant is in a state that has in effect particular types of laws that grant leniency to victims of human trafficking.  34 U.S.C. § 10381(c)(2), (3).  The COPS Office, acting on this express authorization, generally provides extra points to applicants in states with these congressionally-favored human trafficking laws.  *See* Larracas Decl. Ex. C, 2016 CHP Application Guide at 21.

The COPS Office does not disclose the weight that individual factors are given in scoring, or the relative weight given to additional considerations in the overall scoring system.  *See id.*; Dorr Decl. ¶ 15.

### B. Defendants' Attempts to Use Federal Funds as a Weapon to Pressure State and Local Governments to Participate in Federal Civil Immigration Enforcement.

Early in his presidency, President Donald J. Trump declared that he would use federal funds as a "weapon" to require state and local support for his federal civil immigration enforcement policies.[1]  His Administration has sought to make good on this announcement by conditioning federal grants on state and local enforcement of federal

---

[1] Harriet Taylor, Trump to Fox News: "I May Defund California as 'a weapon' to fight illegal immigration," CNBC.com (Feb. 5, 2017), https://tinyurl.com/TaylorCNBC.

civil immigration law.  The Administration's two prior attempts have thus far been enjoined as unconstitutional; the latest is the subject of this motion.

On January 25, 2017, President Trump issued Executive Order 13768, directing the Attorney General and Secretary of Homeland Security to withhold federal funds from what he called "Sanctuary Jurisdictions."[2]  On November 20, 2017, a federal district court permanently enjoined Section 9(a) of the Executive Order, ruling that the order is unconstitutional, because: (1) the Executive Branch is attempting to usurp authority that belongs to Congress under the Spending Clause; (2) the order violates constitutional limits on federal spending authority; (3) the order violates the Tenth Amendment's prohibition against commandeering local jurisdictions to administer a federal program; (4) the order is unconstitutionally vague; and (5) the order violates requirements of due process.  *Cty. of Santa Clara v. Donald J. Trump*; *City and Cty. of San Francisco v. Trump*, 2017 WL 5569835 (N.D. Cal. Nov. 20, 2017).

DOJ then launched another effort to condition federal funds for states and localities on their participation in federal civil immigration enforcement, attempting to impose such conditions on receipt of funding under the Edward Byrne Memorial Justice Assistance Grants ("Byrne JAG") program.  Defendant Sessions announced in a press release that Byrne JAG grants would be awarded only to cities and states that, *inter alia*, "allow federal immigration access to detention facilities," and "provide 48 hours notice before they release an illegal alien wanted by federal authorities."  RJN Ex. B, DOJ, Office of Public Affairs, Attorney General Sessions Announces Immigration Compliance Requirements for Edward Byrne Memorial Justice Assistance Grant Programs (July 25, 2017).  Again, this effort was rejected—by two different courts—as an overreach by DOJ of its statutory authority.  *City of Chicago v. Sessions*, 2017 WL 4081821 (N.D. Ill. Sept.

---

[2] The White House Office of the Press Secretary, "Executive Order: Enhancing the Public Safety on the Interior of the United States," Whitehouse.gov (January 25, 2017), § 9(a), *available at* https://www.whitehouse.gov/the-press-office/2017/01/25/presidential-executive-order-enhancing-public-safety-interior-united.

15, 2017), *appeal filed*; *City of Philadelphia v. Sessions*, 2017 WL 5489476 (E.D. Pa. Nov. 15, 2017).

Defendants now seek to use the COPS grant to pressure states and localities into changing their laws and policies, and otherwise participating in federal civil immigration enforcement.  In the fiscal year ("FY") 2017 application cycle for the COPS grant program, the COPS Office added a "focus area" it called "Illegal Immigration."  The Office described this focus area as involving "partnering with federal law enforcement to combat illegal immigration," including by participating in "287(g) partnerships" and "honoring detainers."  Dorr Decl. ¶ 24; *see also* Larracas Decl. Ex. B, 2017 CHP Application Guide at 27.[3]  Defendants did not just create this "Illegal Immigration" category as an available use of COPS grant funds, but encouraged applicants to select it by offering additional consideration in the form of extra points for that choice.  *See* Larracas Decl. Ex. B, 2017 CHP Application Guide at 27.

Defendants further stated in the Application Guide that "[a]dditional consideration . . . may  be given" to "applicants that partner with federal law enforcement to address illegal immigration."  *See id.* at 27-28.  Defendants offered no additional explanation of this possibility until two months after the due date for grant applications.  Then, in early

---

[3] A "287(g) partnership" is a carefully limited and regulated statutory mechanism by which state and local police officers can be authorized to act as immigration officers.  *See* 8 U.S.C. § 1357(g)(1).  "Honoring detainers," though imprecise in its terminology, presumably refers to DHS's practice of requesting state and local law enforcement to detain individuals who otherwise would be released, so that DHS can decide whether to take custody and then do so.  *See* DHS, Form I-247A, Immigration Detainer-Notice of Action (2017).  Courts have held municipalities liable for violating the Fourth Amendment for "honoring detainers."  *See, e.g.*, *Ochoa v. Campbell*, 2017 WL 3476777 at *7, *14 (E.D. Wash. July 31, 2017), *appeal filed*, No. 17-35679*; Santoyo v. United States*, 2017 WL 2896021 at **3-8 (W.D. Tex. June 5, 2017); *Miranda-Olivares v. Clackamas Cty.*, 2014 WL 1414305 at *11 (D. Or. Apr. 11, 2014); *see also Morales v. Chadbourne*, 793 F.3d 208, 215-19 (1st Cir. 2015) (holding that detaining an individual pursuant to an immigration detainer without additional probable cause is a clearly established violation of the Fourth Amendment).

September 2017, the COPS Office sent an e-mail to applicants informing them that this additional consideration would be available.  *See* Larracas Decl. Ex. A, E-mail from COPS Office (Sept. 7, 2017).  The e-mail attached a certification form that would have to be signed and returned within 12 days in order to qualify for the extra points.

Defendants called the form "Certification of Illegal Immigration Cooperation," and required it to be signed by the highest-ranking law enforcement official (*e.g.*, police chief) and government executive (*e.g.*, mayor).  *Id.*; *see also id.* Attachment 1.  These officials were required to certify versions of the "Access" and "Notice" requirements that DOJ has been enjoined from enforcing as conditions on Byrne JAG grants.  Specifically, an applicant was required to certify that it had implemented, or would implement, specific "rules, regulations, policies, and/or practices" relating to federal civil immigration enforcement:

- "The applicant entity and/or its governing body has implemented or, before drawing down grant funds if awarded, will implement rules, regulations, policies, and/or practices that ensure that U.S. Department of Homeland Security ('DHS') personnel have access to any of the governing body's correctional or detention facilities in order to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or to remain in the United States." (the "Access Requirement")

- "The applicant entity and/or its governing body has implemented or, before drawing down grant funds if awarded, will implement rules, regulations, policies, and/or practices that ensure that any of the governing body's correctional and detention facilities provide advance notice as early as practicable (at least 48 hours, where possible) to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien. This certification does not require holding an alien beyond his or her scheduled time of release."  (the "Notice Requirement")

*Id.* Attachment 1.

DOJ recognized that the effect of these changes to the COPS program was to give "additional consideration" to communities that "cooperate[d] with federal law enforcement to address illegal immigration."  *Id.* at 1.  The sole explanation for this

change was a press statement that Defendant Sessions believes "[c]ities and states that cooperate with federal law enforcement make all of us safer by helping remove dangerous criminals from our communities," and "jurisdictions with these policies in place should be acknowledged for their commitment to ending violent crime, including violent crime stemming from illegal immigration." RJN Ex. D, DOJ, Office of Public Affairs, Department of Justice Announces Priority Consideration Criteria for COPS Office Grants (Sept. 7, 2017).

### C. Los Angeles' Applications for COPS Hiring Program Grant Funding.

Los Angeles has historically been a competitive applicant for COPS funds. The City applied for CHP grants in 2012 and 2016, and obtained grant funding in both years. Larracas Decl. ¶ 3. In 2016, Los Angeles received one of the highest scores out of more than one thousand applications. *Id.* Ex. D, COPS Office, FY 2016 COPS Hiring Program Applicant Rankings.

In its FY 2017 application, Los Angeles applied for $3.125 million in CHP funds—the same amount it received in 2016—to support hiring officers for its Community Safety Partnership ("CSP") Program. Larracas Decl. Ex. E, Los Angeles 2017 CHP Application at 22. The CSP program is a paradigmatic community-oriented policing program. It operates in selected public housing developments located throughout the Los Angeles area. The CSP program deploys officers to implement programs for at-risk youth, ensure safe passage on school routes, and build relationships in the communities through neighborhood watch groups, quality of life committees, and citizen-police enforcement teams. *Id.* at 12. In its application, Los Angeles identified "Building Trust and Respect" as the focus of its grant-supported program. *Id* at 11.

The City did not attempt to create a different program, unrelated to community-oriented policing, in order to select "Illegal Immigration" as its focus area and receive extra points for its application. In addition to its commitment to using grant funds for the community policing purposes Congress intended, Los Angeles has made a longstanding

decision that it can best protect public safety by not participating in federal civil immigration enforcement. Specifically, Los Angeles has implemented "policies and practices designed to promote the public safety of all Los Angeles residents by engendering cooperation and trust between members of the City's many immigrant communities and law enforcement." Decl. of Michael Hyams ¶ 4. This includes the Los Angeles Police Department's longstanding policy that "restricts an officer from initiating a police action with the objective of discovering a person's immigration status, and also prohibits arrest based solely on civil immigration status." *Id.* ¶ 3.

Los Angeles also did not submit a signed "Certification of Illegal Immigration Cooperation" in the twelve days it was allotted. Los Angeles was unable to determine in that time whether DOJ would consider its detention facility practices to comply with the Access and Notice Requirements, or whether a "Certification of Illegal Immigration Cooperation," bearing the signatures of the Mayor and Chief of the LAPD, would erode the community trust Los Angeles has long fostered. Hyams Decl. ¶ 7. Thus, because Los Angeles was unwilling to use a COPS grant in order to "partner[] with federal law enforcement to address illegal immigration," Larracas Decl. Ex. B, 2017 CHP Application Guide at 28, or to complete a "Certification of Illegal Immigration Cooperation," the deck was doubly stacked against the City in the competition for COPS funds.

An official in the COPS Office has made the unsupported assertion that Los Angeles would not have received an FY 2017 grant even in the absence of the immigration-related considerations. Dorr Decl. ¶ 32. There is every reason to believe, however, that the COPS Office will continue to disfavor cities like Los Angeles in subsequent award decisions. Indeed, in announcing FY 2017 awards, DOJ advertised that 80% of successful applicants completed the "Certification of Illegal Immigration Cooperation." *See* RJN Ex. H, November Press Release. The City therefore seeks relief to restore an equal playing field for future grant cycles. Specifically, Los Angeles seeks a declaration and an injunction preventing DOJ from giving applicants extra points if they

adopt particular laws and policies supporting "Illegal Immigration Cooperation," and if they commit to a grant-supported program involving partnership with federal authorities in combating "Illegal Immigration."[4]

## III.    STANDARD OF REVIEW

Rule 56 requires summary judgment be granted for the moving party where the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Tarin v. Cty. of Los Angeles*, 123 F.3d 1259, 1263 (9th Cir. 1997), *superseded by statute on other grounds*.  Partial summary judgment may be granted on particular claims.  Fed. R. Civ. P. 56(a).

Summary judgment is generally appropriate to decide challenges to administrative agency action that turn on the lawfulness of that action or whether, on the existing administrative record, the action is arbitrary and capricious.  *See, e.g.*, *City & Cty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) ("In reviewing an administrative agency decision, summary judgment is an appropriate mechanism for

---

[4] Los Angeles' standing to bring this action is based on the uneven playing field Defendants created by favoring or disfavoring applicants on the basis of improper immigration-related considerations.  This is precisely the sort of competitive injury that has "often been recognized as grounds for standing."  *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 507 (9th Cir. 1988); *see also Preston v. Heckler*, 734 F.2d 1359, 1365 (9th Cir. 1984); *Ne. Fla. Chapter of Associated Gen. Contractors of America v. Jacksonville*, 508 U.S. 656, 664-669 (1993) (summarizing competitive harm standing cases); *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 281 n.14 (1978).

The agency's apparent decision not to award Los Angeles a grant in the 2017 cycle does not render Los Angeles' claims moot.  The important issues raised by the City's Complaint are capable of repetition in a manner that evades meaningful judicial review. *See Kingdomware Technologies, Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016); Wright & Miller, Fed. Prac. & Proc. § 3533.8 (noting the "wide array of circumstances [that] have led courts to deny mootness" as capable of repetition yet evading review, including "disputes over the terms or awards of government contracts or grants [which] often involve short contract periods and repeat bidders").

deciding the legal question of whether the agency could reasonably have found the facts as it did." (citation omitted)).

## IV.    **ARGUMENT**

Defendants have transformed the COPS program from the one that Congress enacted.  Defendants are giving extra points in the application process to applicants that certify that they have in place particular regulations or policies reflecting what Defendants call "Illegal Immigration Cooperation."  And Defendants are authorizing the use of grant funds for programs focusing not on community-oriented policing but on civil immigration enforcement—a job that belongs to the federal government—and giving extra points to applicants willing to adopt this focus.  Together, Plaintiff refers to these as the "Challenged Considerations."

The Challenged Considerations are unlawful.  First, they exceed the authority that Congress delegated to DOJ and thus violate the separation of powers.  Second, even if Congress had delegated to DOJ the authority to disfavor communities like Los Angeles on the basis of the Challenged Considerations, they would not pass constitutional muster under the Spending Clause.  Third, DOJ's actions are arbitrary and capricious.

### A.    **The Challenged Considerations Are *Ultra Vires* and Violate the Separation of Powers.**

An agency "has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).  The power conferred on DOJ in this case is to administer the COPS grant program to support state and local governments in hiring police officers to engage in community-oriented policing. *See* 34 U.S.C. § 10381.  That authority certainly requires DOJ to exercise a degree of discretion in determining how best to allocate the limited resources Congress appropriates for this statutory purpose.  But that discretion is not limitless.  "When Congress limits the purpose for which a grant can be made," as it did with the COPS program, "it can be presumed that it intends that the dispersing agency make its allocations based on factors *solely* related to the goal of implementing the stated statutory

purposes in a reasonable fashion, rather than taking irrelevant or impermissible factors into account." *Robbins v. Reagan*, 780 F.2d 37, 55, 48 (D.C. Cir. 1985) (emphasis added).

DOJ has done exactly what it may not do: it has changed the COPS program to focus on irrelevant and impermissible factors. There are two fundamental problems with DOJ's actions. *First*, by giving extra points to communities that certify specified forms of "partnership" with federal civil immigration authorities, DOJ is attempting to pressure state and local governments to change their laws and policies, in a way that has nothing to do with their use of, or need for, grant funds. *Second*, by authorizing grant recipients to use funds to focus on "illegal immigration," and then awarding extra points to communities that adopt that focus, DOJ is diverting COPS funds away from their statutorily-assigned purpose and disfavoring communities that are unwilling to participate in the diversion.

The text and structure of the COPS statute make clear that DOJ is not faithfully administering the COPS grant program but unilaterally altering it. Indeed, it is striking that DOJ announced this year's grant awards by boasting of the importance of its immigration-related considerations—rather than any achievement having to do with community-oriented policing. RJN Ex. H, November Press Release. DOJ's actions are "an improper attempt to wield Congress's exclusive spending power" and "a violation of the Constitution's separation of powers principles." *Cty. of Santa Clara v. Donald J. Trump*; *City and Cty. of San Francisco v. Trump*, 2017 WL 5569835 at *12.

### 1. DOJ Cannot Use COPS Grant Decisions to Pressure State and Local Governments to Change Their Regulations, Policies, and Practices.

DOJ favors COPS applications from state and local governments that are willing and able to certify particular forms of "partnership" with federal civil immigration enforcement efforts. This "partnership" has nothing to do with how the COPS funding will actually be used. The Access and Notice Requirements, which local law

enforcement are asked to adopt in their detention operations, do not concern the hiring of local police officers to engage in community oriented policing. The requirement of adopting such regulations and policies is focused only on whether and how local governments partner with *federal* immigration officers performing *federal* civil immigration enforcement duties. Those duties fall squarely within the province of the federal government, not states or localities. *Arizona v. United States*, 132 S. Ct. 2492, 2498 (2012) ("The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens."); *Valle de Sol Inc. v. Whiting*, 732 F.3d, 1006, 1023 (9th Cir. 2013) ("[p]ower to regulate immigration is unquestionably exclusive federal power" (quoting *DeCanas v. Bica*, 424 U.S. 351, 354 (1976)). DOJ is thus using its control over funds appropriated to support the hiring of police officers in order to advance an unrelated policy agenda. *See Philadelphia*, 2017 WL 5489476 at *48 ("Immigration law has nothing to do with the enforcement of local criminal laws."). The COPS statute makes clear that this action oversteps DOJ's delegated authority.

Congress specifically defined the circumstances in which "the Attorney General may give preferential consideration" to COPS applicants. 34 U.S.C. § 10381(c). In order for this authorization to make any sense, the agency cannot be permitted to invent entirely new grounds on which to award preferential treatment. Otherwise, the statutory provision allowing limited grounds for preference would be wholly superfluous. *See Chubb Custom Ins. Co. v. Space Systems/Loral, Inc.*, 710 F.3d 946, 966 (9th Cir. 2013) ("It is a well-established rule of statutory construction that courts should not interpret statutes in a way that renders a provision superfluous.").

Significantly, the limited authorization to give preferential consideration is the only place in the statute where Congress contemplates DOJ looking *beyond* the actual need for, or use of, the grant funds involved, and awarding points simply to encourage states to pass laws or enact policies or practices that the federal government favors. Thus, the Attorney General "may" give preferential consideration for a COPS "applicant in a State that has in effect a law" providing for lenient treatment of human trafficking victims. *See*

34 U.S.C. § 10381(c)(2)-(3).  In providing that DOJ "may" give preferential consideration for this carefully defined reason, Congress made clear that the agency does not have blanket authority to use COPS funding to encourage state and local governments to make any law or policy change DOJ desires.  Because the list of preferential factors the Attorney General may consider makes no mention of immigration enforcement at all, Congress cannot be said to have allowed the Attorney General to give preferential consideration to state and local governments that are willing to adopt laws, regulations, ordinances, or policies that support federal civil immigration enforcement efforts.

In our federal system, it is a serious matter when the federal government attempts to pressure a state or local government to change its laws and policies.  This is precisely the type of action requiring a "clear statement" from Congress, to ensure that the national legislature—not unaccountable bureaucrats—"in fact faced, and intended to bring into issue, the critical matters involved."  *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991). Thus, in the grant context, courts do not allow agencies to invent their own conditions on state and local governments, but require "unambiguous statutory expression of congressional intent to condition the States' receipt of federal funds in a particular manner."  *Com. Va., Dep't of Educ. v. Riley*, 106 F.3d 559, 566 (4th Cir. 1997) (en banc) (adopting the dissenting panel opinion of Luttig, J.), *superseded by statute*.  Congress paid heed to these federalism principles in spelling out the limited circumstances in which DOJ may favor a grant applicant because of the unrelated policies it has in effect. It would subvert this canon of construction, in addition to the plain text of the statute itself, to read into the law a broader authorization for DOJ to give preferential treatment to jurisdictions with laws and policies the agency prefers—and to disfavor those that are unwilling to change their laws and policies to meet DOJ's demands.

Congress further recognized that seeking to change the policies of state and local *law enforcement* is especially sensitive.  Thus, Congress provided that nothing in DOJ's grant-making authorities (or any other Act) "shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction,

supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof." 34 U.S.C. § 10228(a). Here, DOJ seeks to direct, supervise, and control local police forces by pressuring them to change their policies and operations in order to compete for valuable federal resources on an even playing field. Congress's clear reason for including this rule of construction was its recognition that DOJ may attempt to do exactly what it is now doing—using its stewardship of federal grant funds, and the leverage that comes with it, to tell state and local law enforcement what unrelated policies they should adopt.

Finally, although the text of the statute is more than sufficient to conclude that DOJ lacks this authority, the legislative history confirms that conclusion. The House Report listed the types of factors Congress expected DOJ to consider in making grant decisions: "the needs of areas with high crime rates, low officer to population ratios, understaffing of law enforcement agencies in relation to the size of the geographic areas for which they are responsible, high unemployment and economic dislocation rates that may contribute to increased crime problems, and other relevant trends." H.R. Rep. 103-324, at 10. What is notable about this list is that every item has to do with the need for police officers on the street to combat crime, and thus falls squarely within the statutory purposes of the COPS program. Not one suggests that DOJ could use COPS funds as a tool to extract any policy commitments it wishes, including relating to civil immigration enforcement, from state and local governments.

It is thus clear that DOJ lacks authority to award extra points to COPS applicants that adhere to the "partnership" policies DOJ demands. DOJ's contrary view—that it *can* discriminate against COPS applicants that are unwilling to change their laws and policies to accord with the agency's preferences—lacks any limiting principle. Today, the agency is using federal funds to promote state and local governments adopting particular laws and policies concerning federal civil immigration enforcement. The next administration might wish to use federal grant funds to encourage states to abolish capital punishment, or to resort to capital punishment more frequently. To stop prosecuting marijuana

offenses, or to prosecute marijuana offenses more vigorously. None of this fits within the role Congress assigned to DOJ in administering the COPS grant, a program designed to support the hiring of police officers to engage in community-oriented policing. Congress did not authorize DOJ to take advantage of that administrative role to impose the agency's own policy agenda on state and local governments, whatever that agenda happens to be.

### 2. DOJ Cannot Redirect COPS Funds Toward Civil Immigration Enforcement and Disfavor Communities That Intend to Use COPS Funds to Engage in Community-Oriented Policing.

DOJ also favors COPS applicants willing to use their grant funds to engage in civil immigration enforcement. Congress not only excluded immigration as a ground for preferential consideration, but it did not consider state and local participation in civil immigration enforcement to be even an appropriate use of COPS funding at all. The agency's attempt to redirect COPS funding to promote federal civil immigration enforcement, and then to favor state and local governments willing to participate in that enforcement, is thus doubly flawed.

DOJ has taken the position that the only statutory authority for the COPS Hiring Program is paragraphs (b)(1) and (2) of 34 U.S.C. § 10381. (*See* Doc. 33 at 3). These paragraphs expressly limit DOJ's authority to support the hiring of police officers "for deployment in community-oriented policing." 34 U.S.C. § 10381(b)(1), (2). Congress did not include the "community-oriented" modifier as surplusage. It did not intend for grant funding to be used for any police activity DOJ wishes to support at a given time, but rather for a subset of that work: *community-oriented* policing.

DOJ itself defines community-oriented policing as "begin[ning] with a commitment to building trust and mutual respect between police and communities." *See* RJN Ex. A, COPS Office, "About". Law enforcement veterans, including the chiefs of police of the country's major cities, have concluded that state and local police participation in civil immigration enforcement "undermines the trust and cooperation

with immigrant communities which are essential elements of *community oriented policing*."  *See* RJN Ex. E, Major Cities Chiefs Association, *Immigration Policy* (emphasis added).  This Court need not go so far as to agree with that view.  But given the widespread recognition that civil immigration enforcement is *in tension with* community-oriented policing, it is highly unlikely that Congress intended funds appropriated for community-oriented policing to be used to *subsidize* state and local participation in civil immigration enforcement.

Indeed, it is difficult to see how the particular activities DOJ wishes to subsidize bear any connection to "community-oriented policing."  The agency has said, for example, that it intends to use the COPS program to fund "287(g) partnerships," under which state and local police are empowered to act as immigration officers.  RJN Ex. F, DOJ FY 2018 COPS Office Congressional Justification at 31; *see* 8 U.S.C. § 1357(g)(1).  Carrying out civil immigration raids in support of federal enforcement efforts bears no logical connection to "building trust and mutual respect between police and communities."  Neither does "honoring detainers," a practice that concerns a state or local government's internal detention operations, and has led to several cases holding municipalities to be in violation of the Fourth Amendment.  *See, e.g.*, *Ochoa*, 2017 WL 3476777 at *7, *14; *Santoyo*, 2017 WL 2896021 at **3-8; *Miranda-Olivares*, 2014 WL 1414305 at *11.  Unless all policing can be characterized as "community-oriented policing"—turning Congress's carefully chosen words into surplusage—this is not an authorized use of COPS funds.

The broader structure of the statute further demonstrates that DOJ is not authorized to redirect COPS funding toward civil immigration enforcement.  Congress enacted a detailed list of twenty-two purposes that the COPS grant, as "a single grant program," could be used to advance.  *See* 34 U.S.C. § 10381(a), (b)(1)-(22).  These statutory purposes highlight, among other things, crime control and terrorism.  *See id.* § 10381(b)(4), (5), (8), (9), (11), (12), (15).  But civil immigration enforcement is notably absent from this long list of congressionally authorized purposes of COPS grants.  If

Congress had reached the counterintuitive conclusion that funds for "community-oriented policing" can be spent to promote state and local participation in federal civil immigration enforcement, surely it would have given some hint of that somewhere in a statute that is otherwise quite specific.

DOJ's view is not just at odds with the COPS statute but with immigration laws as well. Congress has mandated that state and local participation in civil immigration enforcement through 287(g) partnerships be undertaken "*at the expense of the State or political subdivision*." 8 U.S.C. § 1357(g)(1) (emphasis added). DOJ is contravening that clear mandate: it is *offering federal funds*, through the COPS program, to sponsor 287(g) partnerships, even though Congress directed that such partnerships be at state and local expense. And it does so in order to fund partnerships with the federal government that have nothing to do with "community-oriented policing."[5]

DOJ's decision to give extra points in the COPS application process to communities that are willing to focus on "illegal immigration" with their COPS funds only compounds its error. Because civil immigration enforcement is not one of the purposes Congress recognized as relevant to community-oriented policing, DOJ plainly lacks authority to *disfavor* communities unwilling to participate in this diversion of COPS resources.

### B.    The Challenged Considerations Violate the Spending Clause Because They Are Not Reasonably Related to Congress's Purpose of Promoting Community-Oriented Policing.

The Challenged Considerations operate as a type of condition on COPS funding. If a community is unwilling or unable to certify that it has in place certain laws or policies demonstrating "partnership" with federal civil immigration authorities, it is less

---

[5] To the extent DOJ means to sponsor state and local governments to engage in civil immigration enforcement *without* 287(g) agreements, it is exceeding Congress's "limit[s]" on the "circumstances in which state officers may perform the functions of an immigration officer." *Arizona*, 132 S. Ct. at 2506.

likely to get the grant.  Likewise, if a community is unwilling to pledge to use its COPS award to focus on "illegal immigration," it is less likely to get the grant.  In at least some cases, a community's unwillingness or inability to comply with the Challenged Considerations will be the difference between receiving a grant and not receiving a grant. In fact, DOJ has emphasized that the vast majority of successful COPS applicants for FY 2017 certified compliance with the Notice and Access Requirements, demonstrating how important that additional consideration was.  *See* RJN Ex. H, November Press Release.

Accordingly, even if DOJ had statutory authority to adopt these funding conditions—which it does not—the agency would still need to comply with constitutional restrictions in exercising that authority.  *See S. Dakota v. Dole*, 483 U.S. 203, 207-09 (1987).  The Challenged Considerations violate at least one such restriction.

An exercise of Spending Clause authority is unconstitutional if it is not "reasonably related to the articulated goal" of the grant program Congress established. *Nevada v. Skinner*, 884 F.2d 445, 447 (9th Cir. 1989).  Here, the program Congress established is concerned with hiring police officers to be deployed in community-oriented policing.  34 U.S.C. § 10381(b)(1), (2); *see also id.* § 10381(b)(1)-(22) (identifying twenty-two authorized purposes for the "single grant program" Congress created).  As the COPS Office itself recently explained, the goal of the program is to "advanc[e] public safety through the implementation of community policing strategies," which "entails developing partnerships between law enforcement agencies and the communities they serve."  RJN Ex. F, DOJ FY 2018 COPS Office Congressional Justification at 4.

The Challenged Considerations are not at all related to this fundamental goal.  *See Philadelphia*, 2017 WL 5489476 at *48 (concluding that "the argument that enforcement of federal immigration laws is related to this objective [of enhancing local criminal justice under a different law enforcement assistance grant] is unsustainable").  Whether or not a community's regulations, policies, and practices provide the access to detention facilities that DOJ demands, or the notice of a detainee's release time that DOJ demands, has nothing to do with its hiring of police officers to develop better "partnerships between

law enforcement agencies and the communities they serve." *See supra* 12-16.  Neither does developing a program to assist federal authorities in civil immigration enforcement have anything to do with community-oriented policing.  *See supra* 16-18.  Indeed, there is no mention of civil immigration enforcement in the COPS statute—an omission that is especially conspicuous in light of Congress's detailed list of twenty-two authorized purposes of the grant program.  *See* 34 U.S.C. § 10381(b)(1)-(22); *see also Schneider v. Chertoff*, 450 F.3d 944, 954 (9th Cir. 2006) ("[I]t is a well-established maxim of statutory interpretation that the expression of one thing is the exclusion of another.").

Put simply, Defendants cannot show any reasonable relationship between its new immigration-related considerations and the express goals of the COPS program.  Under *Dole*, DOJ cannot penalize COPS applicants on the basis of these unrelated factors.[6]

### C.    The Challenged Considerations Are Invalid Under the Administrative Procedure Act.

Agency actions must be set aside under the Administrative Procedure Act if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  For the reasons noted above, the Challenged Considerations are not in accordance with law.  They also cannot survive scrutiny under the arbitrary and capricious standard.

---

[6] The Notice and Access Requirements that DOJ articulated in its September 7, 2017 e-mail also fail to meet the requirement that conditions attached to grant funding be unambiguous on their face.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *Dole*, 483 U.S. at 207-09.  Implicitly acknowledging this defect, DOJ has taken the position in this lawsuit that it does not understand those Requirements to "forbid a jurisdiction from informing detainees, where required by law, that they may choose not to meet with federal immigration authorities, or to require that a jurisdiction notify DHS before the release of a noncitizen under short-term detention whose release time is unknown."  Opp. to PI at 20 (Doc. 33) (citing Dorr Decl. ¶ 26).  Los Angeles does not intend to press the ambiguity defect in the Notice and Access Requirements so long as DOJ adheres to its representations.

In subjecting an agency decision to arbitrary-and-capricious review, the Court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (citation omitted); *Az. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1236 (9th Cir. 2001) ("[W]e carefully review the record to ensure that agency decisions are founded on a reasoned evaluation of the relevant factors." (citation omitted)).

Here, there is no evidence in the record to suggest that DOJ adopted the Challenged Considerations following any reasoned evaluation at all, nor is there any support for the agency's attempt to tie federal civil immigration enforcement to Congress's community policing goals in establishing and designing the COPS grant program. Indeed, before announcing its new policy, or even at the time of its announcement, DOJ did not offer any justifiable basis for how that policy advances the purposes of the COPS program.

Since then, DOJ has made vague allusions about how city and state cooperation with federal law enforcement "make all of us safer by helping remove dangerous criminals from our communities," including by ending "violent crime stemming from illegal immigration." *See* RJN Ex. D, DOJ, Office of Public Affairs, Department of Justice Announces Priority Consideration Criteria for COPS Office Grants (Sept. 7, 2017). But these conclusory, post-hoc justifications have nothing to do with the statute DOJ purports to be administering. In other words, DOJ has articulated no justification at all for how the extra points it is awarding for immigration-related reasons have anything to do with its statutory responsibility to allocate funds for use in community-oriented policing.

DOJ's thin justifications in any event do not amount to the sort of tangible evidence and reasoned justification required to survive arbitrary-and-capricious review. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962) (stating that post-hoc rationalizations are irrelevant as "an agency's discretionary order [must] be

upheld, if at all, on the same basis articulated in the order by the agency itself"); *Arrington v. Daniels*, 516 F.3d 1106, 1111-12 (9th Cir. 2008) (holding that even when an agency had discretion to promulgate a rule, the rule was arbitrary and capricious because "the administrative record contains no rationale explaining the Bureau's decision"). Indeed, the agency has not pointed to any *actual evidence* to support its implied premise that undocumented immigrants or other non-citizens commit violent crimes at higher rates than the general population, or to indicate that the investigations of federal civil immigration violations facilitated by the Challenged Considerations are focused on individuals involved in violent crime. *See Philadelphia*, 2017 WL 5489476 at *32 (concluding that DOJ's imposition of a similar immigration enforcement condition on the Byrne JAG program was arbitrary and capricious where the court could not "find a link between, on one hand, imposing the Certification Condition, and on the other hand, 'protect[ing] the public and reduc[ing] crime and violence'" (alterations in original)); *see also Tongatapu Woodcraft Hawaii, Ltd. v. Feldman*, 736 F.2d 1305, 1308 (9th Cir. 1984) ("We have held it an abuse of discretion for the [INS] to act if there is no evidence to support the decision . . . .") (internal citation and quotation marks omitted).

In fact, the little evidence the Attorney General has cited in other contexts belies his claim that there is a relationship between so-called "sanctuary" policies and violent crime, as that evidence indicates no such relationship at all, while other studies show an *inverse* relationship. *See* RJN Ex. C, Nick Roll, *Correcting Jeff Sessions*, Inside Higher Ed (July 17, 2017); *see also id.* at Ex. G, *Contrary to Trump's Claims, Immigrants Are Less Likely to Commit Crimes*, N.Y. Times (Jan. 26, 2017).[7] These studies demonstrate that, not only does the agency lack any reasoned explanation for implementing the Challenged Considerations, but also that it failed to consider relevant and available evidence before announcing its new policy. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc.*

_____

[7] Los Angeles introduces these articles to demonstrate the information that was publicly available at the time DOJ decided to implement the Challenged Considerations.

*v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) ("[A]n agency rule would be arbitrary and capricious if the agency . . . offered an explanation for its decision that runs counter to the evidence before the agency.").

The irony of Defendants' position is that DOJ's policy actually undermines public safety.  It deprives states and localities of critical funds needed to hire new police officers, or alternatively, forces them to adopt policies that erode the trust they have worked hard to cultivate.  Either way, the Challenged Considerations work against the purposes Congress had in mind when it created the COPS program, further demonstrating that the agency failed to adequately consider all relevant factors before announcing its new preferential criteria.

### D.    The Court Should Enter a Permanent Injunction.

Because the Challenged Considerations are unlawful, this Court should permanently enjoin Defendants from considering them in connection with any future evaluation of COPS grant applications.  A court may grant a permanent injunction if the moving party demonstrates:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Monsanto Co v. Geertson Seed Farms*, 561 U.S. 139, 157-58 (2010); *accord Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1184 (9th Cir. 2011).  All four factors are met here.

First, it is well-established that "[a] rule putting plaintiffs at a competitive disadvantage constitutes irreparable harm."  *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 411 (9th Cir. 2015).  Absent an injunction, Los Angeles will be at a competitive disadvantage, and thus suffer irreparable harm, in future grant cycles.  The fact that DOJ used the Challenged Considerations in violation of the Constitution further

confirms the existence of irreparable harm.  *See Monterey Mechanical Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) ("[A]n alleged constitutional infringement will often alone constitute irreparable harm.").

Second, monetary damages cannot adequately remedy the competitive injury Los Angeles has suffered.  The only way to prevent future harm is to ensure Los Angeles can compete on an even playing field in future grant cycles.  Moreover, the Ninth Circuit has held that a permanent injunction is an appropriate remedy for the government's unlawful allocation of funds.  *See Planned Parenthood Arizona Inc. v. Betlach*, 727 F.3d 960, 975 (9th Cir. 2013) (granting a permanent injunction against Arizona's *ultra vires* condition on Medicaid reimbursement).

Third, the balance of equities weighs strongly in favor of granting a permanent injunction.  The City has a strong interest in protecting itself against unwarranted federal pressure that the City change its long-held views on the public safety dangers of enmeshing local law enforcement in federal civil immigration enforcement.  *See* Hyams Decl. ¶¶ 3-5.  It also has a related interest in maintaining the trust and cooperation of Los Angeles residents to effectively police local communities and promote public safety amongst some of the City's most vulnerable residents.  In contrast, the government has no legitimate interest in awarding funds on the basis of unconstitutional factors.  For similar reasons, an injunction is in the public interest, in addition to the fact that it is "always in the public interest" to issue an injunction in order to "prevent the violation of a party's constitutional rights."  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).

## V.    **CONCLUSION**

For the foregoing reasons, the Court should grant partial summary judgment to the City of Los Angeles as to each of its claims concerning the COPS grant program (Counts Four, Five, and Six), and enter final judgment pursuant to Rule 54(b) on those claims. The Court should declare that the Challenged Considerations are (1) *ultra vires* and a violation of the Separation of Powers, (2) in violation of the Spending Clause, and (3) an arbitrary and capricious agency action in violation of the Administrative Procedure Act.

The Court should further enjoin Defendants from using the Challenged Considerations in making COPS grant determinations in future grant cycles.

Dated: November 21 , 2017

MITCHELL A. KAMIN
MÓNICA RAMÍREZ ALMADANI
NEEMA T. SAHNI
Covington & Burling LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, California 90067-4643

DAVID M. ZIONTS, *pro hac vice*
admitted
IVANO M. VENTRESCA, *pro hac vice*
admitted
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001

Respectfully Submitted,

By: _____

MICHAEL N. FEUER
City Attorney

JAMES P. CLARK
Chief Deputy City Attorney
LEELA A. KAPUR
Executive Assistant City Attorney
VALERIE L. FLORES
Managing Senior Assistant City
Attorney
MICHAEL DUNDAS
Deputy City Attorney
200 North Main Street, City Hall
East Room 700
Los Angeles, California 90012
Telephone: (213) 978-8344
Facsimile: (213) 978-8312

*Attorneys for Plaintiff*
*City of Los Angeles*