CHAD A. READLER
Acting Assistant Attorney General
SANDRA R. BROWN
United States Attorney
JOHN R. TYLER
Assistant Director
W. SCOTT SIMPSON (Va. Bar #27487)
Senior Trial Counsel
Department of Justice, Room 7210
Civil Division, Federal Programs Branch
Post Office Box 883
Washington, D.C.  20044
Telephone:   (202) 514-3495
Facsimile:    (202) 616-8470
E-mail:        scott.simpson@usdoj.gov

COUNSEL FOR DEFENDANTS


# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF LOS ANGELES,<br><br>Plaintiff,<br>v.<br><br>JEFFERSON B. SESSIONS, III, *et al.*,<br><br>Defendants. | Case No. 2:17-cv-07215-R-JCx<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:       February 20, 2018<br>Time:      10:00 a.m. |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ii

NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY
JUDGMENT .......................................................................................viii

MEMORANDUM OF POINTS AND AUTHORITIES........................................ 1

INTRODUCTION ................................................................................... 1

STATUTORY AND ADMINISTRATIVE BACKGROUND ............................... 3

    I.    COPS Hiring Program and the COPS Office ....................................... 3

        A.    Governing Statutes and Creation of the Program...................... 3

        B.    Scoring Applications and Selecting Grantees ........................... 5

        C.    Factors Related to Enforcement of Immigration Laws .............. 7

    II.    Immigration and Nationality Act ...................................................... 9

    III.    Los Angeles's CHP/UHP Applications and Grants............................ 10

    IV.    Procedural History .......................................................................... 10

ARGUMENT........................................................................................ 11

    I.    All of Plaintiff's Claims Must Be Dismissed as Non-Justiciable........ 11

    II.    Alternatively, the Court Should Enter Judgment for the
        Defendants on the Merits ................................................................ 13

        A.    The Immigration-Related Factors Are Consistent
            with the Governing Statutes ..................................................... 13

        B.    The Immigration-Related Factors Are Consistent
            with the Spending Clause ......................................................... 20

1. The Immigration-Related Factors Are Sufficiently Clear .......................................................... 21

2. The Immigration-Related Factors Are Sufficiently Related to the Purposes of the COPS Hiring Program .. 22

C. The Challenged Factors Are Consistent with the APA ............ 24

CONCLUSION ....................................................................................... 25

1

**TABLE OF AUTHORITIES**

2

3

**CONSTITUTION**

4

U.S. Const. art. I, § 8, cl. 1 ......................................................................14

5

6

**CASES**

7

8    *Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544 (9th Cir. 2016) .....................24, 25

9    *All. for the Wild Rockies v. Peña*, 865 F.3d 1211 (9th Cir. 2017).................2, 24, 25

10
     *Arizona v. United States*, 567 U.S. 387 (2012) .....................................................9, 18
11

12   *Barbour v. Washington Metro. Area Transit Auth.*,
        374 F.3d 1161 (D.C. Cir. 2004)............................................................................22
13

14   *Barnhart v. Peabody Coal Co.*, 537 U.S. 149 (2003) ..............................................16

15   *Brown v. Or. Dep't of Corr.*, 751 F.3d 983 (9th Cir. 2014)....................................12

16
     *Cal. Sea Urchin Comm'n v. Bean*, 828 F.3d 1046 (9th Cir. 2016) .........................12
17

18   *Canatella v. California*, 304 F.3d 843 (9th Cir. 2002).............................................12

19   *City of Chicago v. Sessions*, 264 F. Supp. 3d 933 (N.D. Ill. 2017).........................20

20
     *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)...............................................12, 13
21

22   *City of Los Angeles v. McLaughlin*, 865 F.2d 1084 (9th Cir. 1989) .........................4

23   *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999) ..............................20

24
     *Clinton v. City of New York*, 524 U.S. 417 (1998) ..................................................14
25

26   *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 2054 (4th Cir. 2002)............20

27   *Gregory v. Ashcroft*, 501 U.S. 452 (1991) ..............................................................19

28

*Indep. Acceptance Co. v. California*, 204 F.3d 1247 (9th Cir. 2000) ...............24, 25

*Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949) ................14

*Mann v. Lee*, No. C 07-00781 MMC (PR), 2009 WL 5178095,
    (N.D. Cal. Dec. 22, 2009)  ....................................................................................11

*Mayweathers v. Newland*, 314 F.3d 1062 (9th Cir. 2002) .................................22, 23

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984) ..........................14

*Pierce v. SEC*, 786 F.3d 1027 (D.C. Cir. 2015) ......................................................25

*Price v. City of Stockton*, 390 F.3d 1105 (9th Cir. 2004) ........................................11

*Quechan Tribe of Ft. Yuma Indian Reservation v. U.S. Dep't of the Interior*,
    927 F. Supp. 2d 921 (S.D. Cal. 2013), *aff'd*, 673 F. App'x 709 (9th Cir. 2016) .25

*Reno v. Condon*, 528 U.S. 141 (2000)......................................................................20

*S. Dakota v. Dole*, 483 U.S. 203 (1987)........................................................19, 20, 21

*Sanford v. MemberWorks, Inc.*, 625 F.3d 550 (9th Cir. 2010)..................................13

*Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105 (9th Cir. 2012).....................11

*Spencer v. Kemna*, 523 U.S. 1 (1998) ......................................................................13

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)....................................12

*U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388 (1980)..........................................13

*United States v. Dang*, 488 F.3d 1135 (9th Cir. 2007).............................................15

*Wash. Dep't of Ecology v. EPA*, 752 F.2d 1465 (9th Cir. 1985).............................24

**STATUTES**

5 U.S.C. § 704...........................................................................................................12

iv

8 U.S.C. §§ 1101-1107 ...................................................................................... 9

8 U.S.C. § 1227(a) ......................................................................................... 10

8 U.S.C. § 1228 .............................................................................................. 10

8 U.S.C. § 1252c ....................................................................................... 10, 23

8 U.S.C. § 1324(c) ..................................................................................... 10, 23

8 U.S.C. § 1357(a)(1) .................................................................................... 10

8 U.S.C. § 1357(a)(2) .................................................................................... 18

8 U.S.C. § 1357(g) ..................................................................................... 10, 23

8 U.S.C. § 1373 .............................................................................................. 20

8 U.S.C. § 1373(a) ....................................................................................... 8, 10

34 U.S.C. § 10122(c)(2)(F) .......................................................................... 18

34 U.S.C. § 10228 .......................................................................................... 18

34 U.S.C. § 10261(a)(11)(B) ..................................................................... 5, 15

34 U.S.C. § 10381(b)(1) ......................................................................3, 14, 17, 23

34 U.S.C. § 10381(b)(2) ......................................................................3, 14, 17, 23

34 U.S.C. § 10381(b)(3)-(22) ......................................................................... 4

34 U.S.C. § 10381(b)(10) .............................................................................. 17

34 U.S.C. § 10381(b)(16) .............................................................................. 17

34 U.S.C. § 10381(c) ..................................................................................... 16

34 U.S.C. § 10381(c)(1) ................................................................................ 16

34 U.S.C. § 10381(c)(2) ................................................................................ 16

v

34 U.S.C. § 10381(c)(3) ............................................................... 16

34 U.S.C. § 10381(f) ................................................................ 5, 15

34 U.S.C. § 10381(g) ............................................................... 5, 15

34 U.S.C. § 10381(h) ............................................................... 5, 15

34 U.S.C. § 10382(c)(2) ........................................................... 5, 15

34 U.S.C. § 10382(c)(3) ........................................................... 5, 15

34 U.S.C. § 10382(c)(10) .......................................................... 6, 15

Pub. L. No. 96-157, 93 Stat. 1167 (1979) .................................... 18

Pub. L. No. 103-322, 108 Stat. 1808 (1994) ............................... 3, 23

Pub. L. No. 113-235, 128 Stat. 2130 (2014) ............................... 4, 17

Pub. L. No. 114-22, 129 Stat. 2242 (2015) ..................................... 16

Pub. L. No. 114-113, 129 Stat. 2242 (2015) ................................... 4

Pub. L. No. 115-37, 131 Stat. 854 (2017) ....................................... 7

**LEGISLATIVE HISTORY**

H.R. Rep. No. 103-324 .................................................................. 19

**REGULATIONS**

28 C.F.R. §§ 0.119 ........................................................................ 3

28 C.F.R. §§ 0.120 ........................................................................ 4

1

2

3

**RULES**

Fed. R. Civ. P. 56(a) ................................................................................................11

Fed. R. Civ. P. 56(b) ...............................................................................................11

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION FOR**

**PARTIAL SUMMARY JUDGMENT**

PLEASE TAKE NOTICE that on Tuesday, February 20, 2018, at 10:00 a.m., or as soon thereafter as counsel may be heard, before The Honorable Manuel L. Real, in Courtroom 880 on the Eighth Floor of the Edward R. Roybal Federal Building and United States Courthouse, 255 East Temple Street, Los Angeles, California, the defendants will move, and hereby do move, for partial summary judgment in this action under Rules 54(b) and 56 of the Federal Rules of Civil Procedure. Defendants move for summary judgment dismissing Counts Four, Five, and Six of plaintiffs' Complaint, which challenge certain scoring factors used in the COPS Hiring Program administered by the Office of Community Oriented Policing Services of the U.S. Department of Justice.

This motion is based on the following Memorandum of Points and Authorities, the accompanying Statement of Uncontroverted Facts, the evidence and records on file in this action, and any other written or oral evidence or argument that may be presented at or before the time this motion is heard by the Court.

Dated: January 12, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

SANDRA R. BROWN
United States Attorney

JOHN R. TYLER
Assistant Director

1

2
/s/ W. Scott Simpson

3
_____

4
W. SCOTT SIMPSON (Va. Bar #27487)
Senior Trial Counsel

5
Attorneys, Department of Justice

6
Civil Division, Room 7210

7
Federal Programs Branch
Post Office Box 883

8
Washington, D.C. 20044
Telephone:(202) 514-3495

9
Facsimile: (202) 616-8470

10
E-mail:     scott.simpson@usdoj.gov

11
COUNSEL FOR DEFENDANTS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ix

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

The COPS Hiring Program ("CHP") awards federal grants to selected state, local, and tribal governments to assist in hiring, rehiring, and training law enforcement officers to enhance public safety and promote "community-oriented policing." CHP is a discretionary grant program, with grants awarded to recipients following a competitive application and scoring process. Since 2013, an average of nearly 1,300 law enforcement agencies have requested funding through CHP each year – requests that far exceed the available funds appropriated by Congress. To ensure that these limited funds are allocated sensibly, Congress gave the Department of Justice ("DOJ") broad discretion to determine which jurisdictions should receive CHP funding. DOJ exercises that discretion to promote and support public safety objectives.

DOJ's Office of Community Oriented Policing Services ("COPS Office" or "Office") awards CHP grants. To apply for funding, an agency must submit an application that (1) provides information about the jurisdiction's needs and practices and (2) explains how the jurisdiction intends to utilize the new officers it will hire using CHP funds. The COPS Office scores the applications according to both the comparative needs of the applicants and metrics that emphasize the Federal Government's enforcement priorities in any given year. To that end, every year the Office selects several key "focus areas" for law enforcement and gives extra points to applications that focus on those areas. Over time, those focus areas have changed to reflect differing law enforcement priorities and pressing needs, ranging broadly from Homicide to Homeland Security to "Children Exposed to Violence."

For Fiscal Year 2017, the COPS Office included two new law-enforcement related immigration factors in its scoring system. First, one of the focus areas was "Illegal Immigration," such that applicants could earn extra points by proposing ways to contribute to combatting illegal immigration. Second, applicants could

1  earn extra points by adopting policies to ensure (1) that the Department of

2  Homeland Security ("DHS") has access to the applicant's detention facilities to

3  meet with aliens who have, or may have, committed crimes, and (2) that upon its

4  request, DHS receives advance notice of the scheduled release of a criminal alien in

5  the jurisdiction's custody.

6  Los Angeles challenges the "decision" to include these factors in the FY

7  2017 application and scoring system (Doc. 1 ¶¶ 85, 112, 128), claiming it was *ultra*

8  *vires* and violated the Separation of Powers, limitations on the Spending Power, and

9  the Administrative Procedure Act ("APA").  The City's claims regarding that

10  decision, however, are non-justiciable.  As the accompanying declaration makes

11  clear, Los Angeles would not have received CHP funding this year even if all points

12  related to illegal immigration had been excluded, such that the City has no legally

13  cognizable interest in the FY 2017 factors.  Moreover, to the extent plaintiff seeks

14  to rely on any interest in whatever factors will be used in the FY 2018 grant cycle,

15  its claims would be non-justiciable because one cannot assume that Los Angeles

16  will seek a CHP grant at that time or that the same factors will be used.

17  But even if plaintiff's claims were otherwise cognizable, they would fail on

18  the merits.  The statutes give DOJ broad discretion to allocate scarce CHP funds

19  among the many applicants that seek them, such that the Office was not acting *ultra*

20  *vires* or encroaching on the congressional sphere.  As for the Spending Clause, the

21  immigration-related factors – which were mere scoring criteria rather than condi-

22  tions on federal funds – were unambiguous and clearly related to the CHP's

23  purposes.  The COPS Office offered to answer any questions from potential

24  applicants (an offer Los Angeles did not accept), and facilitating federal access to

25  criminal aliens in local custody promotes public safety.  Finally, as for plaintiff's

26  APA claim, the factors were consistent with the CHP's purposes, and nothing in the

27  statute suggests these factors are off limits.  Plaintiff may have a "difference in

28  view," but that is not an APA violation.  *See*, *e.g.*, *All. for the Wild Rockies v. Peña*,

865 F.3d 1211, 1217 (9th Cir. 2017).

For these reasons, plaintiff's motion for partial summary judgment should be denied, and judgment should be entered dismissing Counts Four, Five, and Six of plaintiff's Complaint.[1]

## STATUTORY AND ADMINISTRATIVE BACKGROUND

### I.      COPS Hiring Program and the COPS Office

#### A.      Governing Statutes and Creation of the Program

In the Violent Crime Control and Law Enforcement Act of 1994, Congress authorized the Attorney General to "make grants to States, units of local government, [and] Indian tribal governments . . . to increase police presence, to expand and improve cooperative efforts between law enforcement agencies and members of the community to address crime and disorder problems, and otherwise to enhance public safety."  Pub. L. No. 103-322, Title I, § 10003(a), 108 Stat. 1808 (1994).  As later amended and currently codified, the statute provides authority to make grants for any of several specific purposes, including –

> (1) to rehire law enforcement officers who have been laid off as a result of State, tribal, or local budget reductions for deployment in community-oriented policing; [and]
> (2) to hire and train new, additional career law enforcement officers for deployment in community-oriented policing across the Nation, including by prioritizing the hiring and training of veterans . . . .

34 U.S.C. § 10381(b)(1), (2).

The Attorney General created the COPS Office to administer grants under this enactment.  *See* Declaration of Andrew A. Dorr ¶ 2 ("Dorr Decl.").  The Office is headed by a Director appointed by the Attorney General.  *Id.*; 28 C.F.R. §§ 0.119,

---

[1] Counts One, Two and Three relate to a different program, the Edward Byrne Memorial Justice Assistance Grant Program.  This Court has stayed proceedings on those claims pending developments in *City of Chicago v. Sessions*, No. 17-2991 (7th Cir.).

0.120.  The COPS Office began implementing 34 U.S.C. § 10381(b)(1) and (b)(2) in 1994.  Initially, the Office operated two programs, one for large grantees and one for small grantees.  Dorr Decl. ¶ 5.  The programs were combined in 1995 under the name Universal Hiring Program ("UHP"), which was renamed the COPS Hiring Program in 2010.  *Id.*

Under CHP, the COPS Office makes grants to state and local governments to hire, rehire, or train law enforcement officers for deployment in "community-oriented policing."  *Id.* ¶¶ 5, 7.  A COPS Hiring Program grant is discretionary, *id.* ¶ 4 – that is, it is a grant "for which the federal awarding agency generally may select the recipient from among all eligible recipients, may decide to make or not make an award based on the programmatic, technical, or scientific content of an application, and can decide the amount of funding to be awarded."  *See* Discretionary Grant, Grant Terminology, https://www.grants.gov/ web/ grants/ learn-grants/ grant-terminology.html (last visited Jan. 11, 2018).  Discretionary grants differ from formula grants, under which a "statutory device" "determines who the recipients are and how much money each shall receive."  *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989) (citation omitted).

The operation of the CHP – like all other COPS Office programs – is subject to annual appropriations by Congress.  Dorr Decl. ¶¶ 3, 5.  Each year, Congress appropriates a certain amount "for the hiring and rehiring of additional career law enforcement officers" under the Program.  *See, e.g.*, Pub. L. No. 114-113, 129 Stat. 2242, 2310-11 (2015); Pub. Law No. 113-235, 128 Stat. 2130, 2196 (2014).[2]  Those appropriated amounts have decreased over the last several years, making CHP increasingly competitive.  Dorr Decl. ¶¶ 12-13.  Each year, the applications that the COPS Office receives seek more funds than Congress has appropriated.  *Id.* ¶ 13.

---

[2] 34 U.S.C. § 10381(b) provides statutory authority for several other potential grants, 34 U.S.C. § 10381(b)(3) - (22), but Congress has never appropriated funds for most of them and, therefore, the COPS Office has never offered grants under most of them.  Dorr Decl. ¶ 6.

The statute sets forth certain specific requirements for the Program.  For example, the Office must award at least 0.5% of the available funding to grantees within any State that has eligible applicants (which helps ensure that smaller States are not excluded), 34 U.S.C. § 10381(f); Dorr Decl. ¶ 9; the Office must allocate 50% of each year's available funds to jurisdictions with a population over 150,000 and 50% of the funds to jurisdictions with lower population, 34 U.S.C. § 10381(h); *see id*. § 10261(a)(11)(B); and each grantee must provide a portion of the money used to hire or rehire officer that CHP funds, subject to discretionary waiver by the Attorney General, *id*. § 10381(g).

## B. Scoring Applications and Selecting Grantees

Other than these broad rules, the statutes governing the Program do not prescribe any particular method or factors for evaluating applications or choosing which applications to fund.  Therefore, the COPS Office must necessarily exercise judgment and discretion in choosing among applications.  The Office has developed methods to evaluate and score applications to determine how best to allocate the Program's finite funds, and those scoring factors change from time to time to reflect varying public safety priorities.  Dorr Decl. ¶ 14.

A jurisdiction seeking a CHP grant submits an electronic application on the COPS Office web site.  *Id*. ¶ 10.  The application is part of a system that assigns a specific number of points for each answer given.  *Id*. ¶ 15.  Some of the factors that the Office uses in scoring are reflected in the statutes.  For example, the statute states that applicants "shall . . . demonstrate a specific public safety need [and] explain the applicant's inability to address the need without Federal assistance."  34 U.S.C. § 10382(c)(2), (3).  The Office has implemented this directive by requesting data reflecting each applicant's crime statistics and financial need and by according extra points based on higher crime rates and comparatively greater fiscal need.  Dorr Decl. ¶ 16.  Similarly, the system scores the quality of the applicant's community policing plan pursuant to the statutory requirement that applicants

1    "explain how the grant will be utilized to reorient the affected law enforcement

2    agency's mission toward community-oriented policing or enhance its involvement

3    in or commitment to community-oriented policing." *Id*.; 34 U.S.C. § 10382(c)(10).

4         Most of the factors that the COPS Office has historically used to score are

5    adopted as an exercise of the Office's discretion to evaluate applications and

6    distribute scarce funding.  The Office has employed such discretionary factors since

7    the inception of the Program, and Congress has continued to appropriate funding

8    each year with a complete understanding of how the Office administers it.  The

9    Office exercises its discretion through several mechanisms, without which the

10   program's limited funding could not be rationally awarded.

11        First, each year, the COPS Office designates several broad areas of public

12   safety and community policing, and applicants must indicate which areas their

13   activities will support.  And each year, the Office prioritizes certain of the available

14   areas; applicants that select those focus areas receive extra points in the system.

15   Dorr Decl. ¶ 18.  The available areas and the focus areas have changed over the

16   years, reflecting changes in both national law enforcement necessities and DOJ

17   priorities.  For example, in FY 2014, after the Newtown (Conn.) Police Department

18   failed to score high enough to receive a CHP grant after the 2012 Sandy Hook

19   shooting, the COPS Office added a "catastrophic event" question and assigned it

20   the highest level of extra points to ensure that the Office could assist agencies

21   afflicted by unexpected catastrophes like that shooting.  *Id*.  For FY 2017, the

22   available areas were Child and Youth Safety Focus; Child and Youth Safety Focus:

23   School Based Policing; Illegal Immigration; Drug Abuse; Homeland Security

24   Problems; Non-Violent Crime Problems and Quality-of-Life Policing; Building

25   Trust and Respect; Traffic/Pedestrian Safety Problems; and Violent Crime

26   Problems.  *Id*. ¶ 7.  Consistent with the statute, the areas often reflect priorities for

27   which "cooperative efforts between law enforcement agencies" at the federal and

28

local levels can be beneficial.

Second, certain questions on the CHP application that do not relate to focus areas are awarded more points than other questions based on their significance to advancing community policing or other law enforcement priorities. *Id.* ¶ 18. For example, the system accords extra points for certain management practices, including the regular assessment of employee satisfaction, the exercise of flexibility shift assignments to facilitate addressing problems, and the operation of an "early intervention system" to identify officers showing signs of stress. *Id.* Additionally, from FY 2013 through FY 2016, the COPS Office, based on the Attorney General's priorities, assigned extra points for jurisdictions that preferred military veterans in hiring officers with CHP funds, although no such preference was then mandated in the statute. *Id.* ¶ 19; *see* Pub. L. No. 115-37, 131 Stat. 854 (2017) (expressly authorizing "prioritizing the hiring and training of veterans").

Third, each individual factor on the application falls into one of three categories:  Fiscal Health, Crime, or Community Policing.  Dorr Decl. ¶ 20.  After calculating each applicant's raw scores, the Office gives different weights to the applicant's scores in each of these categories, based on the Attorney General's priorities and the needs of public safety. *Id.* For most years, the Fiscal Health category has been weighted as 20% of the final score, the Crime category has been weighted as 30% of the final score, and the Community Policing category has been weighted as 50% of the final score. *Id.* The Office changes these percentages from time to time. In FY 2009, for example, in light of the fiscal issues that resulted in enactment of the American Recovery and Reinvestment Act of 2009, the Office accorded 50% of the weighting to the "Fiscal Health" category. *Id.*

### C.    Factors Related to Enforcement of Immigration Laws

Beginning with Fiscal Year 2016, certain immigration-related requirements and scoring factors have been included in the COPS Hiring Program.

CHP grantees, like all federal grantees, are required to comply with all

applicable federal laws.  Dorr Decl. ¶ 23.  Beginning with FY 2016, the Office has advised each applicant that this requirement includes compliance with 8 U.S.C. § 1373, which provides that "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual."  8 U.S.C. § 1373(a); Dorr Decl. ¶ 23.  In FY 2017, the Office required applicants to certify compliance with Section 1373 as a threshold eligibility requirement, although there was no scoring associated with it.  *Id.*

For FY 2017, the priority areas on the CHP application included proposals that prioritized addressing problems with violent crime; those that focused on homeland security, such as protecting critical infrastructure; and those that focused on contributing to the control of illegal immigration or cooperating with federal authorities in enforcing immigration law.  *Id.* ¶ 18.  Thus, the system assigned extra points for focusing on Illegal Immigration, although it also gave an equal or greater number of points for focusing on other specified areas.  *Id.* ¶ 24.  Seven jurisdictions chose Illegal Immigration as the focus area of their FY 2017 applications, but none scored high enough to receive funding prior to the addition of any points attributable to the access-and-notice factors described below.  *Id.*[3]

Lastly, beginning in FY 2017, the COPS Office offered applicants the opportunity to receive additional points by certifying that the applicant had implemented or would implement regulations or policies to ensure (1) that DHS would have access to the applicant's detention facilities "to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or to remain in the United States," and (2) that the applicant's detention facilities would

---

[3] Defendants' opposition to plaintiff's preliminary injunction motion stated that none of the applicants that chose Illegal Immigration scored high enough to receive an award.  Shortly before the filing of the present motion, however, the COPS Office realized that statement was in error.  Dorr Decl. ¶¶ 30-35 & n.5.

"provide advance notice as early as practicable (at least 48 hours, where possible) to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien." *Id*. ¶ 25. To inform applicants of the opportunity to receive points based on these factors, the Office electronically sent each applicant a letter, certification form, and background documents. *Id*. ¶ 27 & Ex. B. These materials stated that the certification would not commit applicants to detain any individuals beyond their scheduled time of release and that applicants would not be penalized if they did not operate detention facilities. *Id*. ¶ 27. A jurisdiction's certification regarding these factors did not forbid the jurisdiction from informing detainees that they may choose not to meet with federal immigration authorities where the jurisdiction's laws required providing that information. *Id*. ¶ 26. Nor did the certification require a jurisdiction to notify DHS before releasing an alien under short-term detention with an unknown release time. *Id*.

## II.   Immigration and Nationality Act

Enforcement of the immigration laws, including and especially the investigation and apprehension of criminal aliens, is a quintessential law enforcement function. Through the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101-07, Congress granted the Executive Branch significant authority to control the conduct of foreign nationals in the United States. These responsibilities are assigned to law enforcement agencies, as the INA authorizes DHS, DOJ, and other Executive agencies to administer and enforce the immigration laws. The INA permits the Executive Branch to exercise considerable discretion to direct enforcement pursuant to federal policy objectives. *See*, *e.g*., *Arizona v. United States*, 567 U.S. 387, 396 (2012).

The INA includes several provisions that protect the ability of federal officials to investigate the status of aliens and otherwise enforce the immigration laws. For example, the statute provides that a federal immigration officer "shall

have power without warrant . . . to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1). Separately, as noted above, 8 U.S.C. § 1373 provides that "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id*. § 1373(a). The INA provides that certain classes of aliens shall be removed from the United States upon the order of the Attorney General or the Secretary of Homeland Security. *See*, *e.g*., *id.* §§ 1227(a), 1228.

The INA also establishes immigration enforcement as a cooperative endeavor among federal, state, and local law enforcement agencies. *See, e.g.*, *id*. § 1357(g) (providing that DHS may enter into formal agreements with states and localities under which trained and qualified state and local officers may perform specified functions of a federal immigration officer); *see also id*. § 1324(c) (authorizing state and local officers to make arrests for violations of the INA's prohibition against smuggling aliens); *id*. § 1252c (authorizing state and local officers to arrest certain felons who have unlawfully returned to the United States).

## III.   Los Angeles's CHP/UHP Applications and Grants

Since 1995, Los Angeles has applied for grants under the CHP or its predecessor nine times – in Fiscal Years 1995, 1996, 1998, 2003, 2009, 2011, 2012, 2016, and 2017. The 2011 and 2017 applications were denied, and the others were granted. Dorr Decl. ¶¶ 30-32. The City's application for FY 2017 was denied because it scored below those of other large-population jurisdictions, even without regard to any immigration-related factors. *Id*. ¶ 32. The COPS Office has now completed reviewing all of the CHP applications for FY 2017, and has awarded all of the available CHP funds. *Id*. ¶ 33.

## IV.   Procedural History

Plaintiff commenced this action on September 29, 2017, and simultaneously

1  filed a motion for preliminary injunction seeking to enjoin use of the immigration-

2  related scoring factors for FY 2017 (Doc. 7-1).  Defendants' opposition to the

3  motion explained that Los Angeles would not receive a CHP grant even without

4  regarding to those factors (Doc. 33), and plaintiff withdrew its motion (Doc. 37).

5                                        **ARGUMENT**

6          A party may file a motion for summary judgment "at any time" until after the

7  close of discovery.  *See* Fed. R. Civ. P. 56(b).  "The court shall grant summary

8  judgment if the movant shows that there is no genuine dispute as to any material

9  fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

10  56(a).  A party may file a motion for summary judgment without having filed an

11  answer, and the filing of such a motion tolls the time to answer.  *See Mann v. Lee*,

12  No. C 07-00781 MMC (PR), 2009 WL 5178095, at *2 (N.D. Cal. Dec. 22,

13  2009).

14          In light of the governing statutes and the language of the challenged scoring

15  factors, "there is no genuine dispute as to any material fact and the [defendants are]

16  entitled to judgment as a matter of law."  Plaintiff's claims regarding the CHP are

17  non-justiciable because it lacks a cognizable interest in the decisions to include

18  immigration-related factors.  Alternatively, even if plaintiff's claims were

19  cognizable, they would be without merit.  Thus, plaintiff's motion for partial

20  summary judgment should be denied, and judgment should be entered for the

21  defendants on these claims.[4]

22  **I.     All of Plaintiff's Claims Must Be Dismissed as Non-Justiciable**

23          Article III of the Constitution limits federal court jurisdiction to live "Cases"

24  and "Controversies."  To satisfy the "irreducible constitutional minimum" of

25  _____

26          [4] Even if this Court were to conclude that Los Angeles had established a right
    to judgment, any injunction should be limited to the plaintiff rather than applying to
27  all CHP applicants.  *See Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir.
    2004) (internal quotation marks omitted); *see also Skydive Arizona, Inc. v.*
28  *Quattrocchi*, 673 F.3d 1105, 1116 (9th Cir. 2012).

standing to sue, a plaintiff must demonstrate an "injury in fact," a "fairly traceable" causal connection between the injury and defendant's conduct, and redressability. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-03 (1998). Further, to establish standing to seek equitable relief, the plaintiff must show a likelihood of *future* injury. *See City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). In *Lyons*, for example, the Supreme Court held that there was no "real and immediate threat" that the plaintiff would be subjected to certain police conduct in the future. *Id*. at 105. Thus, "the speculative nature of [plaintiff's] claim that he [would] again experience injury" deprived him of standing. *Id*. at 109. This rule applies regardless of the type of equitable relief sought – whether declaratory or injunctive. *See Brown v. Or. Dep't of Corr.*, 751 F.3d 983, 990 (9th Cir. 2014); *Canatella v. California*, 304 F.3d 843, 852 (9th Cir. 2002).

Under these principles, plaintiff's claims regarding the CHP factors must be dismissed as non-justiciable, whether focused forward on the eventual FY 2018 factors or backward on the FY 2017 factors.[5] Plaintiff purports to rely on a "competitive disadvantage . . . in future grant cycles" for CHP funds (Doc. 49 at 23), and to seek declaratory and injunctive relief to eliminate that future "disadvantage." *See* Complaint at 39-40 (Doc. 1). As noted above, however, Los Angeles has applied for CHP or UHP grants only nine times during the twenty-three years of the program's existence. Dorr Decl. ¶ 36. Moreover, the focus areas and other scoring factors that the Office uses in selecting among applications change from time to time, and the Office has not determined the focus areas for FY 2018 or how immigration-related factors will be handled in the FY 2018 application. *Id*. ¶¶ 14, 18, 24, 29.

In light of these circumstances, plaintiff lacks a cognizable "injury in fact" in

---

[5] Additionally, to the extent plaintiff seeks to challenge whatever factors the Office may decide to use in the FY 2018 grant season, the City's claim under the APA should be dismissed for lack of "final" agency action. 5 U.S.C. § 704. *See Cal. Sea Urchin Comm'n v. Bean*, 828 F.3d 1046, 1049 (9th Cir. 2016).

relation to future grant cycles.  Plaintiff's case for standing necessarily assumes both that it will seek a CHP grant in FY 2018 and that the same challenged factors will be used at that time.  Both assumptions are fatally "speculative."  *Lyons*, 461 U.S. at 109.  Thus, there is no "real and immediate threat" that plaintiff will again be subjected to the scoring factors challenged here, and all of plaintiff's claims must be dismissed for lack of Article III standing.  *Id*. at 105.

Moreover, to the extent plaintiff relies on any interest in the FY 2017 scoring factors, its claims have become moot.  *See Sanford v. MemberWorks, Inc*., 625 F.3d 550, 556 (9th Cir. 2010) (stating that the "requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)") (quoting *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980)).  Plaintiff would not have received a FY 2017 award regardless of those factors, and the COPS Office has awarded all 2017 funds; thus, the City can have no legally cognizable interest in the FY 2017 factors.  Also, the "capable-of-repetition" exception (Doc. 49-1 at 10 n.4) cannot apply here because it requires "a reasonable expectation that the same complaining party will be subject to the same action again."  *See Spencer v. Kemna*, 523 U.S. 1, 17 (1998) (internal quotation marks omitted).  There is no such "reasonable expectation," especially given that Los Angeles has applied for CHP/UHP grants only nine times during the program's twenty-three years – 39% of the time.

## II.    Alternatively, the Court Should Enter Judgment for Defendants on the Merits

### A.    The Immigration-Related Factors Are Consistent with the Governing Statutes

Plaintiff's Count Four alleges that the COPS Office acted beyond its authority and encroached upon that of Congress in adopting immigration-related factors in the CHP.  In this case, at least, the concepts of statutory authority and separation of powers are two ways of looking at the same issue.  Article I of the

1   Constitution confers on Congress the authority to "lay and collect Taxes, Duties,

2   Imposts and Excises, to pay the Debts and provide for the common Defence and

3   general Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.  In exercising

4   this power, Congress may – and often does – delegate to the Executive Branch the

5   authority to make decisions regarding the expenditure of funds.  *See*, *e.g*., *Clinton v.*

6   *City of New York*, 524 U.S. 417, 488 (1998) ("Congress has frequently delegated

7   the President the authority to spend, or not to spend, particular sums of money.").

8       The Executive Branch is responsible for implementing the law.  The

9   Supreme Court has held that an Executive "officer may be said to act *ultra vires*

10  only when he acts without any authority whatever."  *Pennhurst State Sch. & Hosp.*

11  *v. Halderman*, 465 U.S. 89, 101 n.11 (1984) (internal quotation marks omitted).

12  Thus, claims that an agency has used its authority erroneously or inappropriately

13  are insufficient to state an *ultra vires* claim.  Rather, *ultra vires* claims must be

14  based on an "officer's *lack* of delegated power"; merely claiming an "error in the

15  exercise of that power is . . . not sufficient."  *Larson v. Domestic & Foreign*

16  *Commerce Corp.*, 337 U.S. 682, 690 (1949) (emphasis added).

17      Here, the Department of Justice, acting through the COPS Office, is

18  responsible for disseminating the scarce funds appropriated under 34 U.S.C.

19  § 10381(b)(1) and (b)(2).  The statute gives the Office discretion in disseminating

20  those funds, and the inadequacy of the available funds to cover all applications

21  requires DOJ to adopt and employ factors to rank and choose among them.

22  Although the statute imposes certain requirements on disseminating CHP funding,

23  those requirements are only broad guidelines that are too general to actually

24  allocate the awards.  Congress gave DOJ discretion to fill in the gaps.

25      By statute, CHP funds must be used to hire, rehire, and train officers "for

26  deployment in community-oriented policing."  34 U.S.C. § 10381(b)(1), (2).  The

27  statute also provides a broad framework for DOJ's discretionary awards.

28  Recognizing that there would likely not be enough money to fund every applicant,

1   Congress required that at least 0.5% of available funding be awarded to the grantees

2   within any State that has eligible applicants, *id*. § 10381(f), that DOJ equally

3   allocate the available funds between large and small jurisdictions, *id*. § 10381(h);

4   *id*. § 10261(a)(11)(B), and that DOJ generally require local jurisdictions to provide

5   matching funds, *id*. § 10381(g).  Congress also specified that each application must,

6   among other things, "demonstrate a specific public safety need," "explain the

7   applicant's inability to address the need without Federal assistance," and "explain

8   how the grant will be utilized to reorient the [applicant's] mission toward

9   community-oriented policing or enhance its involvement in or commitment to

10  community-oriented policing."  *Id*. § 10382(c)(2), (3), (10).

11      Beyond these basic requirements, the statute provides no comprehensive

12  framework or formula for choosing among the many jurisdictions that satisfy the

13  requirements.  Indeed, the statute does not even direct DOJ to prioritize applications

14  that show the *greatest* "public safety need," the *most dire* "inability to address the

15  need without Federal assistance," or the *greatest* ability or willingness "to reorient

16  the [applicant's] mission toward community-oriented policing."  It instead leaves

17  the details to DOJ, which means the COPS Office must either choose the winning

18  applicants via random lottery – an irrational method that losing applicants would

19  surely challenge as arbitrary and capricious – or develop a logical method of select-

20  ing worthy applicants that represents a reasonable exercise of DOJ's discretion.  By

21  taking the latter course, the Office is not encroaching on Congress.  It is simply

22  filling in gaps that Congress delegated for it to fill, no doubt because Congress

23  wanted DOJ to use its law-enforcement expertise to award these grants in ways that

24  best promote Congress's broad goal of making our communities safer through

25  community-oriented policing.  *Cf. United States v. Dang*, 488 F.3d 1135, 1140 (9th

26  Cir. 2007) ("Here, a plain reading of the statute indicates that Congress intended to

27  leave a statutory gap for the administrative agency to fill.").

28      Plaintiff's arguments do not establish a right to judgment on the Separation

of Powers or *ultra vires* claim.  *First*, the discretionary considerations set forth at 34 U.S.C. § 10381(c) are not mandatory considerations, let alone exhaustive ones (Doc. 49-1 at 13).  They are, rather, bases on which "the Attorney General *may* give preferential consideration, where feasible."  *Id.* (emphasis added).  And these factors obviously are not exhaustive, because merely prioritizing jurisdictions that provide greater than 25% matching funds, *id.* § 10381(c)(1), or that have certain laws related to child sex trafficking, *id.* § 10381(c)(2)-(3), would not be sufficient to allocate limited CHP funding among the many applicants.  Congress's inclusion of a few factors that the Office "may" consider plainly does not foreclose the Office from developing additional factors to guide how it awards these discretionary grants.  *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003).[6]

Over the last twenty-three years, the COPS Office has used many discretionary factors, not expressly reflected in the statute, to identify which applicants are most deserving of COPS hiring grants.  Dorr Decl. ¶ 18-20.  For example, the statute says nothing about prioritizing different areas of public safety from year to year, which is an obvious means of directing priorities and distributing funds logically and equitably.  *Id.* ¶ 18.  Nor does the statute expressly direct the Office to favor localities that have recently experienced a catastrophic event (like the 2015 terror attack in San Bernardino, California, which resulted in a FY 2016 grant to that city's police department), or to assign extra points for exercising flexibility in shift assignments, or for attempting to identify officers showing signs of stress.  *Id.*  Nor did the statute mandate the Office's military veteran preference until Congress added it in 2017.  *Id.* ¶ 19.  In short, since Congress created the CHP discretionary grant program, DOJ has exercised its discretion to develop and use a

---

[6] This is confirmed by the fact that Congress added the human-trafficking provisions only in 2015.  *See* Pub. L. No. 114-22, § 1002, 129 Stat. 227, 266-67 (2015).  If plaintiff's construction of the statute were correct, prior to 2015, the COPS Office would have been limited to ranking applicants based on a jurisdiction's willingness to exceed the minimum matching requirement.

variety of factors to award funding.  The factors at issue here are just the latest example of that broad discretion.  If plaintiff's theory were correct, all of these discretionary actions over the years – from prioritizing mass shootings to stressing officer safety – would have to be deemed *ultra vires*.  And Congress, knowing of this (purportedly) *ultra vires* activity, would have to be deemed to have ignored it repeatedly by appropriating funding for the program every year without restriction.

*Second*, plaintiff misreads the statute in arguing that most of the factors on which the Office relies are not among the alleged "detailed list of twenty-two purposes" for the program in 34 U.S.C. § 10381(b)(1) through (22) (Doc. 49-1 at 17).  The COPS Hiring Program is authorized by only the first two paragraphs of Section 10381(b), which authorize providing grants for hiring, rehiring, and train-ing law enforcement officers "for deployment in community-oriented policing."  34 U.S.C. § 10381(b)(1), (2).  That language is reflected in Congress's annual appropriations, which provide funds specifically "for the hiring and rehiring of additional career law enforcement officers."  *See*, *e.g*., Pub. Law No. 113-235, 128 Stat. 2130, 2196 (2014).  The other paragraphs of Section 10381(b) authorize *other potential* grants, when appropriated by Congress, such as grants "to establish innovative programs to reduce, and keep to a minimum, the amount of time that law enforcement officers must be away from the community while awaiting court appearances" or "to support the purchase by a law enforcement agency of no more than 1 service weapon per officer."  34 U.S.C. § 10381(b)(10), (16).  Congress has never appropriated money to fund those other grants, and accordingly the COPS Office does not award funds for those purposes.  Dorr Decl. ¶ 6.[7]

*Third*, the challenged factors in the COPS Hiring Program do not

---

[7] Quoting subsection (a) of 34 U.S.C. § 10381, plaintiff argues that the statute Act created "a single grant program" (Doc. 49-1 at 19).  However, regard-less of whether subsections (b)(1) through (b)(22) are characterized as having authorized  twenty-two potential programs or one program with twenty-two

impermissibly exercise "direction, supervision, or control over any police force or any other criminal justice agency" in violation of 34 U.S.C. § 10228 (*contra* Doc. 7-1 at 14-15).  Merely encouraging cooperation with federal authorities by giving additional points as one portion of a broader scoring system to administer a discretionary program does not exercise "direction, supervision, or control."  Indeed, concurrent with the enactment of 34 U.S.C. § 10228, Congress created the National Institute of Justice, *see* Pub. L. No. 96-157, §§ 202, 815, 93 Stat. 1167 (1979), which has as one of its express statutory purposes "to develop programs and projects . . . to improve and expand cooperation among the Federal Government, States, and units of local government . . . ."  34 U.S.C. § 10122(c)(2)(F).

*Fourth*, Section 287(g) of the INA, 8 U.S.C. § 1357(g)(3), does not limit the means by which a state or local government can assist in the enforcement of immigration law or prohibit the COPS Office from assigning extra points to jurisdictions that opt to assist federal immigration enforcement (*contra* Doc. 49-1 at 17-18 & n.5).  As the Supreme Court has observed, Section 287(g) only delineates some of the circumstances under which "state officers may perform the functions of an immigration officer," *Arizona v. United States*, 567 U.S. 387, 408 (2012), which include arresting aliens for "entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens."  8 U.S.C. § 1357(a)(2).  No formal agreement is required for state and local officers to assist in other ways, such as by providing access to aliens they have detained or informing federal authorities of the impending release of such persons where practical.[8]

---

potential purposes, the statute, in practice, is funded as one program with essentially one purpose.

[8] Also, although a willingness to enter into an agreement under that provision may accord a CHP applicant additional points in the scoring process, any funds awarded would have to be used to hire or rehire officers pursuant to the requirements of the Program, not for any state or local expenses of such an agreement. Dorr Decl. ¶ 24 n.2.

18

*Fifth*, nothing in the governing statutes or case law prohibits DOJ from using scoring factors that "encourage states to pass laws or enact policies or practices that the federal government favors" (Doc. 49-1 at 13-15).[9]  Indeed, the Supreme Court has made clear that a federal agency can use grant conditions as a "relatively mild encouragement" for States and localities to change their laws and policies, including statutes on subjects like the purchase of alcohol.  *See S. Dakota v. Dole*, 483 U.S. 203, 211 (1987).  Moreover, many of the other scoring factors in the CHP – factors not challenged here and never challenged elsewhere – "encourage" potential grantees to change their laws or policies, such as according extra points for exercising flexibility in shift assignments and for operating an "early interven-tion system" to identify officers showing signs of stress.  Dorr Decl. ¶ 18.

*Sixth*, the "clear statement" rule in *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991), does not apply to the development and use of scoring factors in the COPS Hiring Program (*contra* Doc. 49-1 at 14).  In *Gregory*, the Court addressed whether federal law would override a state constitutional provision requiring judges to retire at age seventy.  *Id*. at 455-61.  The Court held that it would not "upset the usual constitutional balance of federal and state powers" without a "clear statement" from Congress.  *Id*. at 460-61.  But this case does not involve overriding state or local law.  It is, rather, simply the latest iteration of an over-two-decades-old

---

[9] Nor does the legislative history limit the COPS Office's discretion (*contra* Doc. 49-1 at 15).  Indeed, that history *supports* the addition of the factors chal-lenged here.  The portion of the history quoted by the plaintiff reads in full:  "In establishing funding levels and selection criteria for these grants, the Attorney General is expected to take into account local needs, costs, *and other factors*.  It is contemplated . . . that the Attorney General will consider *a wide range of relevant criteria, including – among other factors* – the needs of areas with high crime rates, low officer to population ratios, understaffing of law enforcement agencies in relation to the size of the geographic areas for which they are responsible, high unemployment and economic dislocation rates that may contribute to increased crime problems, *and other relevant trends*."  H.R. Rep. No. 103-324 at 10 (emphasis added).

discretionary program that gives state and local agencies an opportunity to focus on federal enforcement priorities and thereby increase their chances of receiving a grant.  Nothing in this voluntary program risks "overriding" Los Angeles law.

### B.  The Immigration-Related Factors Are Consistent with the Spending Clause

Plaintiff's Count Five alleges that the challenge factors exceed federal power under the Spending Clause.[10]  As the Supreme Court has held, "Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives."  *Dole*, 483 U.S. at 206 (internal quotation marks omitted).

The Court in *Dole* described certain limitations or potential limitations on the spending power.  Among other things, conditions on the receipt of federal funds must be stated "unambiguously" so that recipients can "exercise their choice knowingly, cognizant of the consequences of their participation."  *Id*. at 207.  Also, the Court observed, "our cases have suggested (without significant elaboration) that conditions on federal grants might be illegitimate if they are unrelated to the federal interest in particular national projects or programs."  *Id*. at 207-08 (internal quotation marks omitted).  Plaintiff's Complaint alleges that the challenged factors violate both of these aspects of *Dole* (Doc. 1 ¶¶ 124-125).  Although plaintiff now

---

[10] Although the heading of Count Five also mentions the Tenth Amendment, it does not otherwise allege that the CHP factors violate that amendment (Doc. 1 at 38-39).  In any event, such a claim would be without merit.  This case does not involve any direct federal mandate, but rather factors in the award or denial of a grant that the City is free to accept or reject.  Moreover, the courts have rejected Tenth Amendment challenges to a number of federal statutes, including 8 U.S.C. § 1373, that regulated the handling of information.  *See City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999) (rejecting Tenth Amendment challenge to Section 1373); *City of Chicago v. Sessions*, 264 F. Supp. 3d 933 (N.D. Ill. 2017) (same); *see also Reno v. Condon*, 528 U.S. 141, 143-46, 149-150 (2000); *Freilich v. Upper Chesapeake Health, Inc*., 313 F.3d 205, 213-14 (4th Cir. 2002).

1    says it "does not intend to press" its allegation of ambiguity in light of post-

2    Complaint developments (Doc. 49-1 at 20 n.6), plaintiff has not withdrawn that

3    allegation.  In any event, assuming the challenged factors could be characterized as

4    "conditions" at all, they satisfy these aspects of *Dole*.[11]

5              **1.      The Immigration-Related Factors Are Sufficiently Clear**

6              There is nothing "ambiguous" about the Illegal Immigration focus area or the

7    access and notice factors, and applicants can choose those factors "knowingly,

8    cognizant of the consequences of their [choices]."  *Dole*, 483 U.S. at 207.  In

9    describing focus areas for potential applicants to choose from in FY 2017, the

10   COPS Office provided brief examples of some specific activities an applicant could

11   propose to perform in each area, but deliberately avoided telling applicants exactly

12   what to do, so they could develop their own approaches and tactics based on local

13   conditions and their local law enforcement expertise.  Dorr Decl. ¶ 8.  For example,

14   in offering Drug Abuse as a potential focus area, the Office simply asked applicants

15   to "specify [their] focus on education, prevention, and intervention to combat drug

16   use and abuse (e.g. marijuana, heroin, prescription opioids, etc.)."  *Id*.  Similarly, in

17   giving potential applicants the option of focusing on Illegal Immigration, the Office

18   asked interested jurisdictions to "specify [their] focus on partnering with federal

19   law enforcement to combat illegal immigration through information sharing, 287(g)

20   partnerships, task forces and honoring detainers."  *Id*. ¶ 24.

21             In any event, to the extent the access and notice factors were unclear to Los

22   _____

23        [11] Contrary to plaintiff's argument, the challenged factors cannot be
     characterized as "conditions" on the basis that an applicant unwilling to satisfy
24   them is "less likely" to receive a grant (*contra* Doc. 49-1 at 18-19).  As explained
     already, these factors are only a few among many factors used in selecting among
25   applicants.  Indeed, choosing "Illegal Immigration" as a focus area in the FY 2017
     cycle did not guarantee receipt of an award, and many jurisdictions that neither
26   chose that focus area nor executed the access-and-notice certification were awarded
27   funds.  Dorr Decl. ¶ 33.  For the same reasons, the scoring factors cannot fairly be
     called "requirements" (*contra* Doc. 49-1 at 9, 12, 13, 19, 20 n.6).
28

Angeles (or any other jurisdiction), the COPS Office made clear that applicants were free to contact the Office with questions. *Id.* ¶ 28. The Office received numerous inquiries, some of which it referred to its Legal Division, but Los Angeles apparently did not inquire. *Id.* Plaintiff objects that state law requires informing detainees that they may refuse to meet with federal immigration authorities, and that it "cannot determine" how the access and notice factors would apply "in the context of short-term detention operations, like LAPD's" (Doc. 1 ¶¶ 65-66). As the Office has made clear in this filing – and as it would have made clear to Los Angeles had it asked these questions before – the Office does not understand these factors to forbid a jurisdiction from informing detainees, where required by law, that they may choose not to meet with immigration authorities, or to require that a jurisdiction notify DHS before the release of an alien under short-term detention whose release time is unknown. Dorr Decl. ¶ 26.

## 2. The Immigration-Related Factors Are Sufficiently Related to the Purposes of the COPS Hiring Program

Plaintiff also argues that the challenged factors are not "reasonably related" to the goals of the CHP (Doc. 49-1 at 18). But this aspect of *Dole* suggests only a "possible ground" for invalidating an enactment, and does not impose an "exacting standard":

> The Supreme Court has suggested that federal grants conditioned on compliance with federal directives *might* be illegitimate if the conditions share no relationship to the federal interest in particular national projects or programs. This possible ground for invalidating a Spending Clause statute, which only suggests that the legislation *might* be illegitimate without demonstrating a nexus between the conditions and a specified national interest, is a far cry from imposing an exacting standard for relatedness.

*Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002). Thus, conditions on federal funding must only "bear some relationship to the purpose of the federal spending." *Id.*; *see Barbour v. Washington Metro. Area Transit Auth.*, 374 F.3d

1  1161, 1168 (D.C. Cir. 2004) (noting that Supreme Court has never "overturned

2  Spending Clause legislation on relatedness grounds").

3        The factors at issue here easily meet this standard (assuming they are

4  "conditions" at all).  Congress established the CHP to promote "community-

5  oriented policing," 34 U.S.C. § 10381(b)(1), (2), "to increase police presence, to

6  expand and improve *cooperative efforts* between law enforcement agencies and

7  members of the community to address crime and disorder problems, and otherwise

8  to enhance public safety," Pub. L. No. 103-322, Title I, § 10003(a), 108 Stat. 1808

9  (1994) (emphasis added).  Assisting in the enforcement of immigration law helps

10  achieve these goals.  The COPS Office believes the intersection of illegal immigra-

11  tion and crime is a serious public safety issue that can be helpfully addressed

12  through "cooperative efforts" among federal, state, and local law enforcement.

13  Dorr Decl. ¶ 29.  Indeed, Congress codified this very principle in the INA.  *See,*

14  *e.g.*, 8 U.S.C. § 1357(g) (providing for formal agreements under which state and

15  local officers may function as federal immigration officers); *see also id*. § 1324(c)

16  (authorizing state and local officers to make arrests for violations of the INA's

17  prohibition against smuggling aliens); *id*. § 1252c (authorizing state and local

18  officers to arrest certain felons who have unlawfully returned to the United States).

19        The access and notice factors relate to aliens who are under detention and

20  who have either committed crimes or are suspected of having committed crimes.

21  Dorr Decl. ¶ 29.  Cooperating with the Federal Government by providing basic

22  information and access allows effective enforcement of federal immigration law

23  against aliens who are criminals or suspected criminals and makes communities

24  safer.  *Id*.  The factors at issue *directly* advance the purposes of the CHP.  They thus

25  easily clear the low bar of bearing "some relationship" to those purposes.  *See*

26  *Mayweathers*, 314 F.3d at 1067.

27

28

### C.    The Challenged Factors Are Consistent with the APA

Plaintiff's final claim, in Count Six, is that the decision to include the challenged factors for FY 2017 was "arbitrary and capricious [and] not in accordance with law" in violation of the APA.  This claim is also without merit.  The Court of Appeals has "described the arbitrary and capricious standard as deferential and narrow, establishing a high threshold for setting aside agency action." *Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544, 554 (9th Cir. 2016) (internal quotation marks omitted).  Under this standard, a court "presume[es] the agency action to be valid and affirm[s] the agency action if a reasonable basis exists for its decision." *Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000) (internal quotation marks omitted).  The court has also held in numerous cases that "[a]n agency action is arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *E.g.*, *All. for the Wild Rockies v. Peña*, 865 F.3d 1211, 1217 (9th Cir. 2017) (internal quotation marks omitted).  This review is even more deferential where, as here, the question relates to the interpretation of a statute the defendants are responsible for administering, especially where gaps in the statute require the agency to exercise discretion. *See Wash. Dep't of Ecology v. EPA*, 752 F.2d 1465, 1469 (9th Cir. 1985) ("By leaving a gap in the statute, Congress implicitly has delegated policy-making authority to the agency.").

The challenged factors violate none of these parameters.  As detailed above, Congress established the CHP to promote public safety, cooperation among law enforcement agencies, and community-oriented policing, and thus intended DOJ to consider those aims in awarding grants.  Those goals are enhanced by facilitating federal access to aliens who have violated immigration law and who have violated, or are suspected of violating, state or local criminal laws.  Nothing in the statutes

24

1  governing CHP suggests DOJ should not consider the extent to which a jurisdiction

2  cooperates in the enforcement of immigration law when exercising its discretion to

3  disseminate scarce federal resources.  Thus, the scoring factors have more than a

4  "reasonable basis" and easily satisfy the "deferential and narrow" APA standard.

5  *Indep. Acceptance Co.*, 204 F.3d at 1251; *Alaska Oil & Gas Ass'n*, 815 F.3d at 554.

6  This is especially true given that the COPS Office must necessarily develop and

7  apply means of choosing among applicants beyond those stated in the statute.

8      In response, plaintiff argues that the challenged factors are arbitrary and

9  capricious because defendants have not presented "tangible evidence" to support

10  them (Doc. 49-1 at 21).  But the City misunderstands the nature of APA review.  As

11  noted already, this standard is satisfied if there is a "reasonable basis" for the

12  agency's decision, and the burden is on the plaintiff to show that the challenged

13  action is arbitrary and capricious, not on the defendants to disprove plaintiff's

14  claim.  *See Pierce v. SEC*, 786 F.3d 1027, 1035 (D.C. Cir. 2015); *Quechan Tribe of*

15  *Ft. Yuma Indian Reservation v. U.S. Dep't of the Interior*, 927 F. Supp. 2d 921, 928

16  (S.D. Cal. 2013), *aff'd*, 673 F. App'x 709 (9th Cir. 2016).

17      Moreover, in an apparent attempt to satisfy its burden, Los Angeles asserts

18  that certain "studies show an *inverse* relationship" between violent crime and a

19  refusal to cooperate with federal immigration authorities (Doc. 49-1 at 22).  On this

20  basis, plaintiff contends that "DOJ's policy actually undermines public safety" (*id*.

21  at 23).  But those assertions only reflect a "difference in view" with the Federal

22  Government regarding how best to promote public safety.  *See All. for the Wild*

23  *Rockies*, 865 F.3d at 1217.  Los Angeles is entitled to its views, but its disagree-

24  ment does not establish a violation of the APA.

25  **CONCLUSION**

26      Accordingly, plaintiff's motion for partial summary judgment should be

27  denied, and judgment should be entered for the defendants on Counts Four, Five,

28  and Six.

Dated:  January 12, 2018

                                        Respectfully submitted,

                                        CHAD A. READLER
                                        Acting Assistant Attorney General

                                        SANDRA R. BROWN
                                        United States Attorney

                                        JOHN R. TYLER
                                        Assistant Director

                                        /s/ W. Scott Simpson
                                        _____
                                        W. SCOTT SIMPSON (Va. Bar #27487)
                                        Senior Trial Counsel

                                        Attorneys, Department of Justice
                                        Civil Division, Room 7210
                                        Federal Programs Branch
                                        Post Office Box 883
                                        Washington, D.C. 20044
                                        Telephone:(202) 514-3495
                                        Facsimile: (202) 616-8470
                                        E-mail:     scott.simpson@usdoj.gov

                                        COUNSEL FOR DEFENDANTS