CHAD A. READLER
Acting Assistant Attorney General
NICOLA T. HANNA
United States Attorney
JOHN R. TYLER
Assistant Director
W. SCOTT SIMPSON (Va. Bar #27487)
Senior Trial Counsel
Department of Justice, Room 7210
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, D.C. 20530
Telephone:   (202) 514-3495
Facsimile:   (202) 616-8470
E-mail:      scott.simpson@usdoj.gov

COUNSEL FOR DEFENDANTS

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF LOS ANGELES,<br><br>Plaintiff,<br>v.<br><br>JEFFERSON B. SESSIONS, III, *et al.*,<br><br>Defendants. | Case No. 2:17-cv-07215-R-JCx<br><br>**REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:      February 20, 2018<br>Time:      10:00 a.m. |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .........................................................................................ii

INTRODUCTION .................................................................................................. 1

ARGUMENT ........................................................................................................ 2

    I.    All of Plaintiff's Claims Must Be Dismissed as Non-Justiciable ........ 2

        A.    Plaintiff's Claims Are Moot in Relation to
               the FY 2017 Factors.................................................................... 3

        B.    Plaintiff Lacks Standing in Relation to Future
               Scoring Factors ............................................................................ 5

    II.    Alternatively, the Court Should Enter Judgment for the
          Defendants on the Merits ........................................................................ 6

        A.    "Community-Oriented Policing" Permeates All Aspects
               of Law Enforcement and Public Safety...................................... 6

        B.    The Immigration-Related Factors Are Consistent
               with the Governing Statutes ........................................................ 9

        C.    The Immigration-Related Factors Are Consistent
               with the Spending Clause .......................................................... 13

        D.    The Challenged Factors Are Consistent with the
               Administrative Procedure Act .................................................. 15

    III.    Any Injunction Herein Should Be Limited to the Plaintiff................. 16

CONCLUSION.................................................................................................. 18

# TABLE OF AUTHORITIES

**CASES**

*Arizona v. United States*, 567 U.S. 387 (2012) ........................................................12

*Barnhart v. Peabody Coal Co.*, 537 U.S. 149 (2003) ...............................................11

*Bullfrog Films, Inc. v. Wick*, 847 F.2d 502 (9th Cir. 1988)........................................6

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983).......................................................5

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)......................................16

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) ...................................................10, 12, 13

*Indep. Acceptance Co. v. California*, 204 F.3d 1247 (9th Cir. 2000) ......................15

*J & J Sports Prods., Inc. v. Dean*, No. 10-05088 CW,
   2011 WL 4080052 (N.D. Cal. Sept. 12, 2011)......................................................16

*Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644
   (9th Cir. 2011)........................................................................................................17

*Mayweathers v. Newland*, 314 F.3d 1062 (9th Cir. 2002) .................................13, 14

*Nelsen v. King Cty.*, 895 F.2d 1248 (9th Cir. 1990).....................................................4

*Price v. City of Stockton*, 390 F.3d 1105 (9th Cir. 2004).......................................2, 16

*S. Dakota v. Dole*, 483 U.S. 203 (1987)....................................................................13

*Sanford v. MemberWorks, Inc.*, 625 F.3d 550 (9th Cir. 2010)....................................4

*Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105 (9th Cir. 2012).....................17

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)....................................16

*Taylor v. Westly*, 488 F.3d 1197 (9th Cir. 2007).........................................................5

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) ...............................................18

1

2

*U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388 (1980)..............................................4

3

*United States v. AMC Entm't, Inc.*, 549 F.3d 760 (9th Cir. 2008) ...........................17

4

5

*United States v. Mendoza*, 464 U.S. 154 (1984) ......................................................17

6

*Virginia Department of Education v. Riley*, 106 F.3d 559 (4th Cir. 1997)..............13

7

*Whitmore v. Arkansas*, 495 U.S. 149 (1990).............................................................5

8

9

*Wickenkamp v. Baum*, No. 2:15-CV-00483-PK, 2015 WL 5686746
   (D. Or. Sept. 22, 2015)..........................................................................................16

10

11

*Zepeda v. INS*, 753 F.2d 719 (9th Cir. 1983) ............................................................16

12

13

**STATUTES**

14

8 U.S.C. § 1231(a)(1)(B)(iii) .....................................................................................14

15

8 U.S.C. § 1231(a)(4)(A)............................................................................................14

16

17

34 U.S.C. § 10381(b)(1) ..............................................................................................6

18

34 U.S.C. § 10381(b)(2) ..............................................................................................6

19

34 U.S.C. § 10381(c)(2) ............................................................................................11

20

34 U.S.C. § 10381(c)(3) ............................................................................................11

21

22

34 U.S.C. § 10382(c)(2) ............................................................................................10

23

Pub. L. No. 103-322, 108 Stat. 1808 (1994) ............................................................14

24

25

**LEGISLATIVE HISTORY**

26

H.R. Rep. No. 103-324 (1993) ...............................................................................7 14

27

28

1

# INTRODUCTION

2        Los Angeles seeks funds under a highly competitive, discretionary grant

3  program, but argues that the Department of Justice ("USDOJ") is forbidden from

4  exercising its discretion to consider the extent to which the City cooperates with

5  federal law and federal enforcement prerogatives.  In Fiscal Year 2017, USDOJ's

6  Office of Community Oriented Policing Services ("COPS Office") considered,

7  among many other scoring factors, whether applicants in the COPS Hiring Program

8  ("CHP" or "Program") had either chosen to focus on Illegal Immigration during the

9  grant period or had committed to give federal immigration authorities access to

10  aliens in the applicant's custody and to notify federal authorities before the

11  scheduled release of an alien.

12        Aside from the merits, Los Angeles's challenge to the FY 2017 factors is

13  moot because those factors had no effect on the City's non-receipt of a CHP grant

14  for FY 2017.  Despite plaintiff's protestations, defendants' earlier misstatement

15  regarding the effect of the factors on *other* applicants had no bearing on *this*

16  plaintiff or on *this* plaintiff's withdrawal of its request for a preliminary injunction.

17  And Los Angeles lacks standing to challenge whatever immigration-related factors

18  might be used in the FY 2018 grant season because those factors are not yet known

19  and Los Angeles has no reasonable expectation that they will affect the City.

20        On the merits, Los Angeles misunderstands the meaning of "community-

21  oriented policing" under the COPS Hiring Program.  The COPS Office's programs

22  are not simply a matter of "police-community relations," as the City claims; they

23  embody, rather, an entire "philosophy" of law enforcement that focuses on antici-

24  pating and preventing crime rather than merely responding to crimes after they

25  happen.  The breadth of what community-oriented policing includes affects both

26  plaintiff's *ultra vires* / Separation of Powers Claim and its Spending Clause claim.

27  Giving an applicant extra points in the CHP scoring process for cooperating with

28  immigration enforcement with respect to aliens *who have committed crimes or are*

*suspected of committing crimes* contributes to Congress's overarching goal of aiding local law enforcement in *preventing crime*. These scoring factors accordingly fit well within the COPS Office's statutory discretion, and are closely related to the purposes of the COPS Hiring Program. The immigration-related law enforcement factors are also eminently reasonable given the connections between the criminal law and federal immigration law, thus defeating plaintiff's claim under the Administrative Procedure Act.

Finally, should the Court grant relief, any such relief should be limited to the plaintiff before the Court. The City's proposed order on its motion for summary judgment would prohibit the COPS Office from relying on the challenged factors in the COPS Hiring Program as a whole, nationwide (Doc. 49-6). But that does not make sense, given that Los Angeles does not represent a class and does not need a nationwide injunction to obtain complete relief. It is axiomatic that "an injunction must be narrowly tailored to affect only those persons over which [the court] has power, and to remedy only the specific harms shown by the plaintiffs, rather than to enjoin all possible breaches of the law." *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004) (internal quotation marks omitted). Should the Court side with the City, it should order the COPS Office to score Los Angeles's future applications (assuming there are such applications) as if the City has qualified for any additional points attributable to immigration-related factors. Such an order would make the plaintiff whole, while refraining from issuing relief to thousands of jurisdictions that are not parties to this suit and have not sought any relief here.

Accordingly, judgment should be entered for the defendants on Counts Four, Five, and Six of plaintiff's Complaint.

## ARGUMENT

## I.     All of Plaintiff's Claims Must Be Dismissed as Non-Justiciable

Plaintiff challenges certain scoring factors used in awarding grants on an annual basis. Therefore, although some of plaintiff's arguments regarding justicia-

bility do not specify the time period to which they relate, the justiciability of plaintiff's claims must be considered on an annual basis.  To the extent plaintiff seeks relief regarding the FY 2017 scoring factors, its claims are moot.  To the extent plaintiff seeks relief regarding the scoring factors for FY 2018 or later years, the City lacks standing because its prophesied injury is too speculative.

### A.    Plaintiff's Claims Are Moot In Relation to the FY 2017 Factors

Regardless of whether Los Angeles originally had standing in relation to the FY 2017 scoring factors when it filed this action (Doc. 57 at 4), any request for relief regarding those factors became moot when the COPS Office determined, during the pendency of this action, that Los Angeles would not have received a Fiscal Year 2017 award even without regard to the immigration-related factors challenged here.  That circumstance – not the effect of the FY 2017 factors on any other applicants – deprived Los Angeles of any cognizable interest in the FY 2017 factors.  Plaintiff seems to have recognized as much in withdrawing its motion for preliminary injunction.

In responding to the City's motion, defendants stated that "Los Angeles would not receive CHP funding this year even if all points related to illegal immigration were excluded from the scoring" such that the City could not establish standing or irreparable harm (Doc. 33 at 2).  Four days after the filing of defendants' opposition, plaintiff's counsel stated in an email that the City would be withdrawing its motion for preliminary injunction "in light of the Government's statement in your Opposition (and the accompanying sworn declaration) that the challenged considerations will not impact the fate of the City's 2017 COPS grant application."  *See* Declaration of W. Scott Simpson, Ex. A (Attachment 1 hereto).  The plaintiff then filed a formal notice stating that it was withdrawing the motion because the COPS Office "had putatively determined that Los Angeles' award application was unaffected by the inclusion of immigration-related considerations"

1   (Doc. 37).

2          Defendants' partial motion for summary judgment, filed later, stated that

3   defendants' opposition had inadvertently misstated the effect of the immigration

4   related-factors on certain *other* applicant*s*, but reiterated that *Los Angeles's* FY

5   2017 application "was denied because it scored below those of other large-

6   population jurisdictions, even without regard to any immigration-related factors"

7   (Doc. 53 at 8, 10 & n.3).  Los Angeles did not claim – and it would not have made

8   sense to claim – that it withdrew its motion for preliminary injunction because the

9   challenged scoring factors advantaged or disadvantaged some *other* CHP applicant.

10  Rather, the City's stated reason for withdrawing its motion was that *it* would not

11  have received a 2017 CHP grant even if it obtained preliminary relief.  That fact is

12  as true today as it was then.  Plaintiff's attempt to inflate this immaterial, honest

13  mistake by a declarant from the COPS Office's career staff into a "material

14  misrepresentation" is thus belied by both commonsense and the City's own prior

15  statements (Doc. 57 at 2).

16         Given that the challenged scoring factors had no effect on Los Angeles in FY

17  2017, the City's claims are moot to the extent it seeks relief regarding those factors.

18  As the Ninth Circuit has explained, the "requisite personal interest that must exist at

19  the commencement of the litigation (standing) must continue throughout its exis-

20  tence (mootness)").  *Sanford v. MemberWorks, Inc*., 625 F.3d 550, 556 (9th Cir.

21  2010) (quoting *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980)).

22  Under these circumstances, Los Angeles has no "interest" in the FY 2017 factors.[1]

23  _____

24         [1] Plaintiff seeks to rely on the "capable of repetition" doctrine, but that
    exception to mootness cannot apply here because the FY 2017 grant season has
25  passed and cannot be "repeated."  Future grant seasons will involve different
    factors, different considerations, and myriad different facts.  And besides, that
26  doctrine is an exception to mootness – *not standing*.  *See Nelsen v. King Cty*., 895
    F.2d 1248, 1254 (9th Cir. 1990) ("[T]he 'capable of repetition but evading review'
27  doctrine is an exception only to the mootness doctrine; it is not transferable to the
    standing context.").
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### B.    Plaintiff Lacks Standing in Relation to Future Scoring Factors

As for the future, Los Angeles cannot, for different reasons, have any cognizable interest in whatever immigration-related factors will be used for future grant years, including FY 2018.  "To demonstrate standing to pursue prospective injunctive relief, [the plaintiff] must demonstrate a concrete injury and a realistic likelihood that the injury will be repeated." *Taylor v. Westly*, 488 F.3d 1197, 1199 (9th Cir. 2007); *see City of Los Angeles v. Lyons*, 461 U.S. 95, 105, 109 (1983). The injury must be "certainly impending" rather than "speculative." *See Whitmore v. Arkansas*, 495 U.S. 149, 157-58 (1990).

Plaintiff cannot show a "realistic likelihood" of future injury from the use of immigration-related factors in the COPS Hiring Program.  First, the COPS Office has not yet determined the focus areas for FY 2018 or how immigration-related factors will be handled in the FY 2018 application (nor, obviously, in future years). *See* Declaration of Andrew A. Dorr ¶¶ 14, 18, 24, 29 ("Dorr Decl.") (Doc. 53-1). Plaintiff argues that the challenged factors are a "priority" for the Attorney General (Doc. 57 at 6), but the City cannot derive standing from its assumptions about the Attorney General's priorities or the future of this specific program.  Second, Los Angeles has applied for grants under the COPS Hiring Program (or its predecessor) in less than half the years it has existed – just nine times during the twenty-three years these grants have been awarded. *Id.* ¶ 36.  Plaintiff now claims that that it "intends" to seek a CHP grant in the FY 2018 grant cycle (Doc. 57 at 6-7).  But that bare, self-serving assertion – conveyed only in response to defendants' motion to dismiss rather than in the Complaint – does not create a cognizable interest in future, unknown scoring factors that may never materialize and, if they do, may never actually affect the City, even if the City decides to apply, which history suggests it very well may not.

Los Angeles also seeks to rely on "competitive harm" compared to other jurisdictions in seeking CHP grants (*id*. at 3-4).  But the cases on which plaintiff relies on that subject relate primarily to commercial harm such as "competitive disadvantage in the international marketplace," *see Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 506 (9th Cir. 1988); they do not stand for the proposition that "competitive disadvantage" in a grant program constitutes cognizable harm.  In any event, the immigration-related factors in the COPS Hiring Program create a disad-vantage for a given applicant only if those factors actually have some effect on whether the applicant receives an award.  If a jurisdiction seeks an award and those factors do, in fact, cause the COPS Office to deny the application, only *then* might that jurisdiction have a cognizable interest in challenging them.

## II.   Alternatively, the Court Should Enter Judgment for Defendants on the Merits

### A.   "Community-Oriented Policing" Permeates All Aspects of Law Enforcement and Public Safety

By statute, CHP funds must be used to hire, rehire, or train officers "for deployment in community-oriented policing."  34 U.S.C. § 10381(b)(1), (2).  Much of City's argument on the merits is based on a fundamental misunderstanding of community-oriented policing.  Specifically, the City understands this concept as limited to improving "police-community relations" (Doc. 57 at 19).  In other words, Los Angeles believes the purpose of the COPS Hiring Program – and of the COPS Office generally – is merely to help law enforcement agencies build better relation-ships with the communities they serve.  The City thus argues, for example, that "[j]urisdictions suffering from a catastrophic event can [reasonably] be expected to *divert* resources to respond to the tragedy and *away from* community policing" (*id*. at 19, emphases added).  Similarly, Los Angeles says, "the fact that something is a 'public safety issue' does not mean it is a '*community-oriented policing* issue.'  All policing has to do with public safety, but Congress did not authorize COPS funds to

1   hire officers for 'deployment in policing' generally" (*id*. at 16).  This narrow

2   understanding of community-oriented policing infects plaintiff's arguments on both

3   its *ultra vires* / Separation of Powers claim and its Spending Clause claim.

4          The truth is that community-oriented policing is not such a crabbed concept.

5   To the contrary, as Congress understood community-oriented policing and as the

6   COPS Office has long implemented that understanding, it is not simply about

7   building relationships but is, rather, a *philosophy* that should guide *all* aspects of a

8   law enforcement agency's work.  This is reflected, for example, in the legislative

9   history of the Violent Crime Control and Law Enforcement Act of 1994.  In

10  explaining the need for community-oriented policing, the House Judiciary

11  Committee lamented that law enforcement officials were spending too much time

12  "simply responding to crimes after the fact" and not enough time "anticipat[ing]

13  and prevent[ing] crime by use of community-oriented, problem solving

14  techniques."  H.R. Rep. No. 103-324 at 8-9 (1993).  Quoting the Deputy Attorney

15  General, the committee explained that the sort of "community policing" required to

16  make law enforcement preventive rather than reactive involves not merely

17  "community engagement" or "community relations," but "tailoring solutions, based

18  on thoughtful, in-depth analysis, to unique neighborhood crime and disorder

19  problems."  *Id*. at 9.  In short, community-oriented policing is "an organization-

20  wide philosophy."  *Id*. at 11.

21         The COPS Office's materials and activities reflect Congress's broad under-

22  standing of community policing.  For example, as stated in the CHP Application

23  Guide for 2017, "[c]ommunity policing is a philosophy that promotes organiza-

24  tional strategies that support the systematic use of partnerships and problem-solving

25  techniques, to proactively address the immediate conditions that give rise to public

26  safety issues such as crime, social disorder, and fear of crime.  Rather than simply

27  responding to crimes once they have been committed, community policing

28  concentrates on preventing crime and eliminating the atmosphere of fear it creates."

*See 2017 COPS Hiring Program (CHP) Application Guide* at 91 (Doc. 49-4, Ex. B).  Although the Guide also discusses the importance of "[e]arning the trust of the community," that is just one aspect of community-oriented policing.  Similarly, several of the COPS Office's recent budget proposals to Congress explain that the Office's "mission is to advance public safety through the practice of community policing," which "concentrates on preventing both crime and the atmosphere of fear it creates" by "proactively addressing the root causes of criminal and disorderly behavior, rather than simply responding to crimes once they have been committed." Defs.' Req. Jud. Notice, Exs. A, B (Attachment 2 hereto); *see id*., Exs. C, D.[2]  The breadth of community-oriented policing is reflected in the wide variety of areas on which a CHP grant may focus – including everything from Violent Crime Problems to Traffic/Pedestrian Safety Problems.  Dorr Decl. ¶ 7.  Whatever focus area an applicant chooses, it must use the principles of community policing to address the problems.

Indeed, plaintiff's own police department agrees:  "The Los Angeles Police Department strongly embraces the philosophy of Community Policing in all its daily operations and functions."  *See* Community Policing Unit, *available at* http://www.lapdonline.org/support_lapd/content_basic_view/731 (last visited Feb. 8, 2018).  As LAPD itself explains, "Community-Police Problem Solving uses the 'SARA' approach (Scanning, Analysis, Response, and Assessment) to examine characteristics of problems in the community and to develop appropriate strategies to reduce these community-identified crime and disorder issues."  *Id*.  More specifically, the SARA approach to community-oriented policing involves "[i]dentify[ing] and prioritiz[ing] problems"; "[r]esearch[ing] what is known about the problem"; [d]evelop[ing] solutions to bring about lasting reductions in the

---

[2] Given that these are initial budget proposals, the program details and funding amounts contained in them do not necessarily reflect the final programs or funding amounts for the fiscal years in question.

number and extent of problems"; and [e]valuat[ing] the success of the responses." Pl.'s Req. Jud. Notice, Ex. F at 6 (Doc. 49-3).

Los Angeles is thus confused when it suggests that a jurisdiction might sometimes have to "divert resources . . . *away from* community policing" to respond to a "catastrophic event" (Doc. 57 at 19, emphasis added); rather, the jurisdiction should *use* community-oriented policing strategies to inform and improve its response to catastrophic events.  Contrary to plaintiff's arguments, *all* "public safety issues" *are and should be* "community-oriented policing issues" (*id.* at 16).  CHP funds thus should be used to "hire officers for 'deployment in policing' generally" within the areas described in each jurisdiction's application – all guided by the overarching philosophy of community-oriented policing (*id.*).

### B.   The Immigration-Related Factors Are Consistent with the Governing Statutes

In light of the governing statutes, the COPS Office's authority encompasses the immigration-related factors that Los Angeles attacks.  USDOJ is responsible for disseminating the scarce funds appropriated under 34 U.S.C. § 10381(b)(1) and (b)(2).  The statute gives the COPS Office discretion in disseminating those funds, and the inadequacy of the available funds to cover all applications requires the Office to adopt and employ factors to rank and choose among them.

In attempting to establish that USDOJ lacks authority to use the scoring factors challenged here, Los Angeles argues (1) that defendants are "diverting" funds from community-oriented policing into immigration enforcement (Doc. 57 at 10, 15-17), (2) that the factors expressly described in the statute provide "ample discretion" for the COPS Office to choose among applicants (*id.* at 10, 18), (3) that Congress's inclusion of 34 U.S.C. § 10381(c)(2)-(3), allowing the Office to give preferential consideration to applicants from States with certain laws on human trafficking, forecloses giving preferential consideration based on any other aspect of an applicant's laws, regulations, or policies (*id.* at 11-12); and (4) that the COPS

1    Office could use the challenged factors only if the statute included a "clear state-

2    ment" authorizing them pursuant to *Gregory v. Ashcroft*, 501 U.S. 452 (1991) (*id*.

3    at 13-14).  All of these arguments are incorrect.

4        *First*, as shown above, community-oriented policing is not a discrete activity

5    that the COPS Hiring Program funds, but is rather a philosophy of law enforcement

6    that should imbue everything a grantee does.  The defendants and LAPD agree that

7    "the philosophy of Community Policing [should guide a law enforcement agency]

8    in all its daily operations and functions" – a philosophy of "proactively addressing

9    the root causes of criminal and disorderly behavior, rather than simply responding

10   to crimes once they have been committed."  *See* Community Policing Unit,

11   *available at* http://www.lapdonline.org/support_lapd/content_basic_view/731 (last

12   visited Feb. 8, 2018); Defs.' Req. Jud. Notice, Exs. A, B.  Thus, giving a CHP

13   applicant extra points in the scoring process for cooperating in the enforcement of

14   federal immigration law in relation to persons who have committed crimes or are

15   suspected of committing crimes *contributes* to community-oriented policing rather

16   than "diverting" funds from it.

17       *Second*, USDOJ's statutory responsibility to choose among applicants for

18   scarce CHP funds necessarily entails discretion to consider factors not explicit in

19   the statute.  Plaintiff argues that the COPS Office's discretion is limited to consider-

20   ing (1) the applicants' "public safety needs," (2) which areas of public safety each

21   applicant seeks to promote, and (3) how the applicants will employ community-

22   oriented policing (Doc. 57 at 18).  But none of these considerations are explicit in

23   the statute either.  The COPS statute does not expressly authorize USDOJ to

24   prioritize certain needs over others; it only requires each applicant to "demonstrate

25   a specific public safety need," 34 U.S.C. § 10382(c)(2), leaving the COPS Office

26   without any express statutory authority to prioritize one "need" over another.

27   Accordingly, if USDOJ is entitled to "prioritiz[e] different areas of public safety

28   from year to year" – as Los Angeles concedes it is (Doc. 57 at 18) – there is no

1  reason why it cannot select Illegal Immigration as one of those priority areas.

2  Further, the statute says nothing about weighting the various factors differently

3  depending on whether each factor relates to Fiscal Health, Crime, or Community

4  Policing.  Dorr Decl. ¶ 20.  All of those factors, and others not expressly described

5  in the statute, are needed to allow the COPS Office to choose among the many

6  applications.  *Id.* ¶¶ 12-22.  And indeed, Los Angeles has never challenged the

7  COPS Office's use of any of those factors until now.

8       *Third*, Congress's permissive statement that the Office "may" consider

9  applicants' laws regarding human trafficking, 34 U.S.C. § 10381(c)(2), (3), does

10  not foreclose the consideration of other factors not expressly set forth in the statute

11  or constitute a "superfluous" statutory statement (*contra* Doc. 57 at 11).  The

12  enumeration of one potential discretionary factor should not be read to exclude

13  others "unless it is fair to suppose that Congress considered the unnamed possibility

14  and meant to say no to it."  *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168

15  (2003).  Moreover, the COPS Office has used scoring factors not expressly set forth

16  in the statute since the Office's creation in 1994, and Congress has continued to

17  authorize its programs with full knowledge of its practices.  Dorr Decl. ¶¶ 2, 12-22.

18  The best interpretation of 34 U.S.C. § 10381(c)(1) and (2) is thus what they plainly

19  say:  Not that the COPS Office's discretion to consider different priorities is

20  limited, but that its discretion is broad and that Congress has suggested a few

21  specific, important priorities that the Office "may" – not "shall," not "may only" –

22  consider when exercising that discretion.[3]

23  _____

24      [3] In addition, the fact that 34 U.S.C. § 10381(c)(1) and (2) expressly refer to
the applicants' statutes does not suggest that the COPS Office otherwise lacks

25  authority to consider an applicant's "law and policies" (*contra* Doc. 57 at 11).
Many of the factors long considered by the Office relate to an applicant's "laws and

26  policies," including the preference of military veterans in hiring (not reflected in the
COPS statute until 2017), the regular assessment of employee satisfaction, and the

27  exercise of flexibility in officer shift assignments.  Dorr Decl. ¶¶ 18-19.  Further,

28  plaintiff asserts incorrectly that the access and notice factors seek to change

*Fourth*, the Supreme Court's decision in *Gregory v. Ashcroft* does not require a "clear statement" in the statute authorizing the COPS Office to use the challenged scoring factors (*contra* Doc. 57 at 13-14).  The circumstances that led the *Gregory* Court to require a "clear statement" of agency authority in that case do not exist here.  There, Missouri state judges argued that a state constitutional provision requiring judges to retire at age seventy violated the Age Discrimination in Employment Act ("ADEA").  501 U.S. at 455-61.  The Court observed that the authority to "establish a qualification for those who sit as their judges . . . goes beyond an area traditionally regulated by the States; it is a decision of the most fundamental sort for a sovereign entity."  *Id*. at 460.  In that context, the Court observed, it would not construe a federal statute as overriding the State's will unless that intention were "unmistakably clear."  *Id*.

Committing to focus on immigration enforcement during the period of a grant, as well as the *ad hoc* cooperation that the "access" and "notice" factors envision, are entirely unlike the qualifications of state judges at issue in *Gregory*.  As the Court observed there, state judges are among the "most important [state] government officials," *id*. at 463, and the ADEA would have categorically over-ridden the State's constitutional choice regarding their qualifications.  By contrast, taking advantage of the challenged scoring factors in the COPS Hiring Program would only require a jurisdiction to cooperate with immigration enforcement in ways proposed by the grantee or to give federal authorities access to certain aliens in the United States – aliens whose admission, conduct, presence, and potential removal are quintessentially the responsibility of the Federal Government.  *See Arizona v. United States*, 567 U.S. 387, 394-95 (2012).  Securing such voluntary cooperation or access – far from endangering "the independence of the States,"

---

applicants' "laws" (Doc. 57 at 10); rather, those factors ask whether the applicant has "rules, regulations, policies, and/or practices" that provide the described access and notice to federal immigration authorities (Doc. 1 ¶ 81).

1  *Gregory*, 501 at 460 – merely assists federal authorities in performing their duties.

2  Furthermore, *Gregory* did not involve an exercise of the spending power, but rather

3  the direct regulation of a state government activity.  Thus, there is no basis for

4  applying *Gregory*'s "unmistakable clarity" rule here.[4]

### C.    The Immigration-Related Factors Are Consistent with the Spending Clause

7  Plaintiff's complaint alleges that the immigration-related factors violate the

8  Spending Clause both because they are "ambiguous" and because they are purport-

9  edly "unrelated" to the purposes of CHP grants (Doc. 1 ¶¶ 124-125).  *See S. Dakota*

10  *v. Dole*, 483 U.S. 203 (1987).  Plaintiff's opposition says nothing about the ambi-

11  guity component of *Dole*, so the City has apparently withdrawn that challenge.  In

12  any event, as explained in defendants' motion, the COPS Office provided brief

13  examples of some specific activities an applicant could propose in each focus area

14  (including Illegal Immigration), but deliberately allowed applicants to develop their

15  own approaches.  Dorr Decl. ¶ 8.  The notice and access factors are reasonably

16  detailed, and the Office offered to answer any questions an applicant had about

17  them.  *Id.* ¶ 28.

18  Under *Mayweathers v. Newland*, the "relatedness" component of *Dole* is only

19  a "possible ground" for invalidating an enactment and does not impose an "exacting

20  standard."  314 F.3d 1062, 1067 (9th Cir. 2002).  Plaintiff argues that "enforcement

21  of federal civil immigration laws is unrelated to the COPS grant's purpose of

---

23  [4] The Fourth Circuit's decision in *Virginia Department of Education v. Riley*,
24  106 F.3d 559 (4th Cir. 1997), also weighs against applying *Gregory* in this case
   (*contra* Doc. 57 at 13).  The court held there that the Individuals with Disabilities
25  Education Act did not authorize the U.S. Department of Education to withhold
   Virginia's *entire* annual IDEA grant based on the State's refusal to provide educa-
26  tional services for students who had been expelled for reasons unrelated to their
27  disabilities.  In so holding, the court repeatedly emphasized that the case involved
   "matters peculiarly within the province of the States" – that is, the "core function of
28  ensuring order and discipline in their schools."  106 F.3d at 562; *see id.* at 565, 566.

13

1    promoting community-oriented policing" and that the COPS Office is "diverting
2    [CHP] funds to federal immigration enforcement and away from their statutorily
3    authorized purpose" (Doc. 57 at 10, 20).  But particularly given the breadth of what
4    community-oriented policing includes, the immigration-related factors challenged
5    here bear much more than the minimally required "some relationship" to the
6    congressional purposes behind the COPS Hiring Program.  *Mayweathers*, 314 F.3d
7    at 1067.

8         Congress established the CHP to promote "community-oriented policing," 34
9    U.S.C. § 10381(b)(1), (2), "to increase police presence, to expand and improve
10   cooperative efforts between law enforcement agencies and members of the
11   community to address crime and disorder problems, and otherwise to enhance
12   public safety," Pub. L. No. 103-322, Title I, § 10003(a), 108 Stat. 1808 (1994).  As
13   discussed above, community-oriented policing is an overall philosophy that should
14   inform all law enforcement activities.  It focuses on "anticipat[ing] and prevent[ing]
15   crime by use of community-oriented, problem solving techniques" rather than
16   "simply responding to crimes after the fact."  H.R. Rep. No. 103-324 at 8-9.

17        Both community-oriented policing and the enforcement of federal immigra-
18   tion law seek to prevent crime and "enhance public safety."  Adjudications under
19   the criminal laws often have consequences under federal immigration law.  The
20   Immigration and Nationality Act ("INA") explicitly coordinates prosecution under
21   the criminal laws and enforcement of immigration laws – by, among other things,
22   requiring that aliens serve criminal sentences before entering immigration custody
23   and providing that federal custody under the immigration laws commence
24   immediately upon conclusion of a criminal sentence.  *See* 8 U.S.C. § 1231(a)(4)(A)
25   (providing that Department of Homeland Security "may not remove an alien who is
26   sentenced to imprisonment until the alien is released from imprisonment"); *id.*
27   § 1231(a)(1)(B)(iii) (stating that removal period "begins on . . . the date the alien is
28   released from [state or local criminal] detention").  Finally, the access and notice

factors at issue relate to aliens who are under *criminal detention* and thus have either committed crimes or are suspected of having committed crimes.  Dorr Decl. ¶ 29.  Accordingly, to the extent *Dole* requires "relatedness," that requirement is satisfied here.

### D.    The Challenged Factors Are Consistent with the Administrative Procedure Act

The validity of plaintiff's claim under the Administrative Procedure Act essentially depends on the validity of the City's constitutional challenges to the immigration-related factors.  The crux of plaintiff's APA claim is that defendants have not "explained the connection between the immigration factors and community policing" (Doc. 57 at 22).  As discussed above, however, "community policing" affects all aspects of public safety, and the INA inextricably links the enforcement of criminal law with the enforcement of immigration law, especially in relation to the aliens in criminal custody who are covered by the access and notice factors challenged here.  The challenged scoring factors are reasonable because Congress established the COPS Hiring Program to promote public safety, cooperation among law enforcement agencies, and community-oriented policing – goals that are all enhanced by facilitating federal access to aliens who have violated immigration law and who have violated, or are suspected of violating, state or local criminal laws.

USDOJ believes that "[c]ities and states that cooperate with federal law enforcement make all of us safer by helping remove dangerous criminals from our communities."  Pl.'s Req. Jud. Notice, Ex. D (Doc. 49-3).  The "arbitrary and capricious" standard under the APA is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision."  *Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000) (internal quotation marks omitted).  "[A] court is not to substitute its judgment for that of the agency, and should uphold a decision of less than ideal

1   clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television*

2   *Stations, Inc*., 556 U.S. 502, 513-14 (2009) (internal quotation marks omitted).

3   That standard is readily met here.

4   **III.    Any Injunction Herein Should Be Limited to the Plaintiff**

5          Plaintiff's proposed order on its motion for summary judgment would

6   prohibit the COPS Office from relying on the challenged factors in the COPS

7   Hiring Program as a whole, nationwide (Doc. 49-6).  But if this Court were to

8   conclude that Los Angeles had established a right to judgment, any injunction

9   should be limited to the plaintiff rather than applying to all CHP applicants.  This is

10  compelled by principles of both standing and the proper scope of equitable relief.

11         First, a plaintiff generally has standing to pursue relief only for itself, and not

12  for absent third parties.  *See J & J Sports Prods., Inc. v. Dean*, No. 10-05088 CW,

13  2011 WL 4080052, at *4 (N.D. Cal. Sept. 12, 2011).  This is consistent with the

14  basic rules of standing:  Injury to third parties does not usually affect the plaintiff,

15  and relief for a third party normally cannot redress any injury to the plaintiff.  *See*

16  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-03 (1998).  A contrary

17  ruling would exceed the scope of a district court's jurisdiction under Article III.

18  *See Wickenkamp v. Baum*, No. 2:15-CV-00483-PK, 2015 WL 5686746, at *5 (D.

19  Or. Sept. 22, 2015).

20         Second, equitable relief should normally be limited to what is needed to

21  make the plaintiff whole.  "[A]n injunction must be narrowly tailored to affect only

22  those persons over which [the court] has power, and to remedy only the specific

23  harms shown by the plaintiffs, rather than to enjoin all possible breaches of the

24  law."  *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004) (internal

25  quotation marks omitted).  It should be "no more burdensome to the defendant than

26  necessary to provide complete relief to plaintiffs."  *Zepeda v. INS*, 753 F.2d 719,

27  728 n.1 (9th Cir. 1983) (internal quotation marks omitted).  For these reasons,

28  courts routinely deny requests for nationwide injunctive relief.  *See Los Angeles*

1     *Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) (affirming

2     judgment for plaintiff but reversing entry of nationwide injunction as abuse of

3     discretion); *see also Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1116 (9th

4     Cir. 2012) (affirming district court's refusal to grant nationwide relief).

5         Third, these principles are especially important in litigation involving the

6     Federal Government.  The Supreme Court has held, for example, that non-mutual

7     collateral estoppel does not apply against the Federal Government because it would

8     "substantially thwart the development of important questions of law by freezing the

9     first final decision rendered on a particular legal issue." *United States v. Mendoza*,

10    464 U.S. 154, 160 (1984).  Such "freezing" would "deprive [the Supreme] Court of

11    the benefit it receives from permitting several courts of appeals to explore a

12    difficult question." *Id.*  A nationwide injunction against the Government would

13    have much the same effect, preventing the implementation of a challenged measure

14    in all circuits.  *See Los Angeles Haven Hospice, Inc.*, 638 F.3d at 664 ("The

15    Supreme Court has . . . suggested that nationwide injunctive relief may be inappro-

16    priate where a regulatory challenge involves important or difficult questions of law,

17    which might benefit from development in different factual contexts and in multiple

18    decisions by the various courts of appeals."); *see also United States v. AMC Entm't,*

19    *Inc.*, 549 F.3d 760, 773 (9th Cir. 2008) ("Courts in the Ninth Circuit should not

20    grant relief that would cause substantial interference with the established judicial

21    pronouncements of . . . sister circuits.  To hold otherwise would create tension

22    between circuits and would encourage forum shopping.").

23        Despite these principles, Los Angeles argues here that only a nationwide

24    injunction can provide the relief it seeks because its injury consists of the additional

25    points "unlawfully" given to other applicants in the CHP scoring process (Doc. 57

26    at 24).  But the Court could provide complete relief, properly limited to the

27    plaintiff, by ordering the COPS Office to score Los Angeles's future application

28    (assuming there is such an application) as if the City had qualified for any addi-

tional points attributable to immigration-related factors.  Such an order would make the plaintiff whole.

Moreover, Los Angeles has vigorously *objected* to the entry of a nationwide injunction in an analogous situation.  In *Texas v. United States*, the Fifth Circuit affirmed a nationwide injunction against programs allowing certain aliens to remain in the United States.  809 F.3d 134 (5th Cir. 2015).  In an amicus brief filed with the Supreme Court, Los Angeles and other jurisdictions urged the Court to vacate the injunction because the plaintiffs had failed "to establish injury sufficient to enjoin the [programs] *nationwide.*"  *See* Brief for Amici Curiae, *United States v. Texas*, 136 S. Ct. 2271 (2016) (No. 15-674), 2016 WL 891345, at *20 (Attachment 3 hereto).  The City and its fellow amici argued that, to justify "an expansive nationwide injunction," the plaintiffs there would have to "establish standing to justify the scope of the injunction." *Id*. at *19, *30.  In this case, the plaintiff has not even attempted to establish standing to seek a nationwide injunction against the use of immigration-related factors in the COPS Hiring Program.  By its own arguments, any injunction herein should be limited to Los Angeles.

## CONCLUSION

For the above reasons and for those stated in Defendants' Motion for Partial Summary Judgment, judgment should be entered for the defendants on Counts Four, Five, and Six of plaintiff's Complaint.

Dated:  February 8, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

NICOLA T. HANNA
United States Attorney

JOHN R. TYLER
Assistant Director

18

1

2

/s/ W. Scott Simpson

3

_____

4

W. SCOTT SIMPSON (Va. Bar #27487)
Senior Trial Counsel

5

6

Attorneys, Department of Justice
Civil Division, Room 7210

7

Federal Programs Branch
20 Massachusetts Avenue, NW

8

Washington, D.C. 20530
Telephone:(202) 514-3495

9

Facsimile:  (202) 616-8470

10

E-mail:      scott.simpson@usdoj.gov

11

COUNSEL FOR DEFENDANTS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28