MICHAEL N. FEUER, SBN 111529
City Attorney
JAMES P. CLARK, SBN 64780
Chief Deputy City Attorney
LEELA A. KAPUR, SBN 125548
Executive Assistant City Attorney
VALERIE L. FLORES, SBN 138572
Managing Senior Assistant City Attorney
MICHAEL DUNDAS, SBN 226930
Deputy City Attorney
200 North Main Street, City Hall East
Suite 800
Los Angeles, California 90012
mike.dundas@lacity.org
Telephone: (213) 978-8130
Facsimile: (213) 978-8312

MITCHELL A. KAMIN, SBN 202788
MÓNICA RAMÍREZ ALMADANI, SBN 234893
NEEMA T. SAHNI, SBN 274240
Covington & Burling LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, California 90067-4643
mkamin@cov.com
Telephone:  (424) 332-4800
Facsimile:  (424) 332-4749

DAVID M. ZIONTS, *pro hac vice*
IVANO M. VENTRESCA, *pro hac vice*
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
dzionts@cov.com
Telephone: (202) 662-6000
Facsimile:  (202) 662-5987

*Attorneys for Plaintiff City of Los Angeles*

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF LOS ANGELES,<br><br>Plaintiff,<br><br>v.<br><br>JEFFERSON B. SESSIONS, III, in his official capacity as Attorney General of the United States; ALAN HANSON, in his official capacity as Acting Assistant Attorney General of the Office of Justice | Case No.: 2:17-cv-07215-R-JCx<br><br>**CITY OF LOS ANGELES' MEMORANDUM IN SUPPORT OF APPLICATION FOR PRELIMINARY INJUNCTION**<br><br>Judge: The Honorable Manuel L. Real<br>Date: Not set<br>Time: Not set |

Programs; UNITED STATES
DEPARTMENT OF JUSTICE.

      Defendants.

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................ 1

II.   FACTUAL BACKGROUND............................................ 2

    A.    The Edward Byrne Memorial Justice Assistance Grant Program ....... 2

    B.    Consistent With Congress's Purpose, Los Angeles Uses Byrne JAG Funding To Promote Critical Local Law Enforcement Objectives ..... 3

    C.    Defendants' Imposition Of New DOJ Conditions On Byrne JAG Funds ................................................................... 4

    D.    Defendants Implement And Revise Their New Conditions For FY 2017 Applications................................................... 6

    E.    Los Angeles Applies For FY 2017 Funding ........................... 8

    F.    Courts Enjoin The Notice And Access Conditions..................... 9

III.  ARGUMENT........................................................... 11

    A.    Los Angeles Is Likely To Succeed On The Merits. ................... 11

        1.    DOJ's Notice And Access Conditions Are *Ultra Vires*........... 11

        2.    DOJ's Conditions Violate The Spending Clause.................... 18

        3.    DOJ's Conditions Violate the Administrative Procedure Act. 20

    B.    Los Angeles Will Suffer Irreparable Injury Absent An Injunction. .. 22

    C.    The Balance Of Equities And The Public Interest Weigh Heavily In Favor Of The Requested Injunction. ................................. 24

IV.   CONCLUSION......................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ..................................................................... 11

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
    559 F.3d 1046 (9th Cir. 2009) .................................................................... 22

*Az. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*,
    273 F.3d 1229 (9th Cir. 2001) .................................................................... 21

*Az. State Bd. for Charter Sch. v. U.S. Dep't of Educ.*,
    464 F.3d 1003 (9th Cir. 2006) .................................................................... 16

*City of Arlington v. FCC*,
    569 U.S. 290 (2013) .................................................................................... 11

*City of Chicago v. Sessions*,
    264 F. Supp. 3d 933 (N.D. Ill. 2017) ........................................................... 9

*City of Chicago v. Sessions*,
    888 F.3d 272 (7th Cir. 2018) ............................................................... *passim*

*City of Los Angeles v. McLaughlin*,
    865 F.2d 1084 (9th Cir. 1989) ............................................................... 3, 12

*City of Los Angeles v. Sessions*,
    293 F. Supp. 3d 1087 (C.D. Cal. 2018) ................................................ *passim*

*City of Philadelphia v. Sessions*,
    2018 WL 2725503 (E.D. Pa. Jun 6, 2018) ............................................ 10, 24

*City of Philadelphia v. Sessions*,
    280 F. Supp. 3d 579 (E.D. Pa. 2017) ................................................... *passim*

*Cty. of Santa Clara v. Trump*,
    250 F. Supp. 3d 497 (N.D. Cal. 2017) ........................................................ 22

*Cty. of Santa Clara v. Trump*,
    275 F. Supp. 3d 1196 (N.D. Cal. 2017) ............................................ 5, 23, 25

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016) ................................................................................ 20

*Genuine Parts Co. v. EPA*,
    890 F.3d 304 (D.C. Cir. 2018) ................................................................ 22

*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013) ................................................................ 25

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991) ................................................................................ 15

*Kansas v. United States*,
    249 F.3d 1213 (10th Cir. 2001) .............................................................. 22

*Louisiana Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986) ................................................................................ 11

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ...................................................... 19, 23, 25

*Morales v. Trans World Airlines*,
    504 U.S. 374 (1992) ................................................................................ 22

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983) .................................................................................. 21

*Murphy v. NCAA*,
    138 S. Ct. 1461 (2018) ...................................................................... 20, 24

*Nat. Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ................................................................................ 14

*Nevada v. Skinner*,
    884 F.2d 445 (9th Cir. 1989) .................................................................. 19

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................................ 24

*Organized Vill. of Kake v. Dep't of Agric.*,
    795 F.3d 956 (9th Cir. 2015) (en banc) ................................................. 21

*South Dakota v. Dole*,
    483 U.S. 203 (1987) ................................................................................ 19

*Sever v. NLRB,*
    231 F.3d 1156 (9th Cir. 2000) ....................................................................... 20

*Shell Offshore, Inc. v. Greenpeace, Inc.,*
    709 F.3d 1281 (9th Cir. 2013) ....................................................................... 22

*Sturgeon v. Bratton,*
    174 Cal. App. 4th 1407 (Cal. Ct. App. 2009) ............................................... 24

*United States v. California,*
    2018 WL 3301414 (E.D. Cal. July 5, 2018) ...................................... 19, 23, 24

*Util. Air Regulatory Grp. v. EPA,*
    134 S. Ct. 2427 (2014) ............................................................................ 13, 18

*Winter v. Natural Resources Def. Council, Inc.,*
    555 U.S. 7 (2008) ......................................................................................... 24

*Whitman v. Am. Trucking Ass'n,*
    531 U.S. 457 (2001) ..................................................................................... 18

**Statutes**

5 U.S.C. § 706(2)(A) ................................................................................... 20

8 U.S.C. § 1373 ........................................................................... 6, 10, 23, 24

34 U.S.C. § 10102(a)(6) ..................................................................... 15, 16, 18

34 U.S.C. § 10142(2) ................................................................................... 12

34 U.S.C. § 10152(a)(1) ................................................................... 1, 2, 14, 19

34 U.S.C. § 10153(a)(1)-(5) ...................................................................... 3, 11

34 U.S.C. § 10156(a) ................................................................................ 3, 12

34 U.S.C. § 10228(a) ................................................................................... 13

34 U.S.C. § 10446(e)(3) ............................................................................... 17

34 U.S.C. § 20927(a) ................................................................................... 12

**Other Authorities**

28 C.F.R. § 66.12 ........................................................................................ 16

H.R. Rep. No. 109-233 ........................................................................................ 20

CITY OF LOS ANGELES' MEMORANDUM IN SUPPORT OF APPLICATION FOR PRELIMINARY INJUNCTION

# I.    __INTRODUCTION__

The Justice Department ("DOJ") continues its unlawful use of grant funds as a weapon to pressure States and localities to adopt DOJ's immigration policy preferences. These efforts disregard the Constitution, Congress's intent, and State sovereignty.  In the face of this Court's explicit holding that DOJ's imposition of immigration-related "bonus points" on the discretionary community-policing "COPS" grant was unlawful, DOJ nonetheless continues to attach those same factors as conditions on Edward Byrne Memorial Justice Assistance Grants ("Byrne JAG" grants).  Byrne JAG grants are formula grants for local criminal justice programs.  Notwithstanding the holding of the Seventh Circuit (and other courts) that DOJ's immigration-related conditions are unlawful, DOJ is currently awarding Fiscal Year ("FY") 2017 Byrne JAG grant funds to jurisdictions it deems "cooperative," and withholding them from applicants like Los Angeles.  Thus, Los Angeles has not received funds that it expected to receive nearly a year ago to support critical anti-gang programs.

For reasons similar to those articulated earlier by this Court in *City of Los Angeles v. Sessions*, 293 F. Supp. 3d 1087 (C.D. Cal. 2018), and as the Seventh Circuit and other courts have squarely held, the conditions now at issue are unlawful, and immediate relief is necessary.  Indeed, in adhering to its immigration-related conditions on Byrne JAG grants, DOJ flouts the spirit of this Court's prior Order.  Since imposing these factors as considerations in the award of discretionary COPS grants is unconstitutional, imposing them as conditions on the awarding of the non-discretionary Byrne JAG grant is *a fortiori* unlawful as well.

Congress designed the Byrne JAG grants to fund "additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice" for use by States and local governments.  34 U.S.C. § 10152(a)(1).  It further structured the program as a formula grant, meaning that the Attorney General must allocate funding pursuant to a statutory formula, not in his discretion.  In derogation of Congress's intent, the Attorney General has required, as a condition of receiving Byrne

JAG awards, that jurisdictions certify that they will provide two types of federal immigration partnership: (1) giving advance notice to federal immigration officials, when requested, before releasing individuals from custody; and (2) affording federal civil immigration officials access to local jails for federal civil immigration purposes. It is undisputed that no provision in the Byrne JAG statute authorizes these conditions. Indeed, in the statute, Congress both specified the duties with which applicants had to comply to obtain funding, and delegated limited powers to the Attorney General. In none of those provisions did Congress mention state and local partnership with civil immigration enforcement.

DOJ is attempting to put the City to an untenable choice—either accept funding and damage its relationship with the communities it serves, or maintain that trust and lose a critical source of funding to combat gang violence. Los Angeles seeks preliminary relief because DOJ has now awarded the majority of grant funds, but has so far declined to award Byrne JAG funding to Los Angeles. Given the formula structure of the grant, the City may not be able recoup its award once the funds are disbursed. A preliminary injunction is necessary to prevent immediate and irreversible harm, and prohibit DOJ from attaching the unlawful conditions.

## II.    FACTUAL BACKGROUND

### A.    The Edward Byrne Memorial Justice Assistance Grant Program

The Bureau of Justice Assistance ("BJA"), a component of DOJ's Office of Justice Programs, administers and oversees the Byrne JAG program, a federal government grant program established by Congress to fund "additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice." 34 U.S.C. § 10152(a)(1). Congress specified that funding could be used for eight types of programs: law enforcement programs; prosecution and court programs; prevention and education programs; corrections and community corrections programs; drug treatment and enforcement programs; planning, evaluation, and technology

improvement programs; crime victim and witness programs; and mental health programs. *Id.* § 10152(a)(1)(A)-(H).

Congress structured the Byrne JAG program as a formula grant. *Id.* §§ 10151-58. Formula grants "are not awarded at the discretion of a state or federal agency, but are awarded pursuant to a statutory formula." *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989). The formula enacted by Congress requires the Attorney General to allocate 50 percent of available funds to each State in amounts proportionate to its population, with the remaining 50 percent allocated to each State in amounts proportionate to its rate of violent crime. 34 U.S.C. § 10156(a). Of the amount allocated to an individual State, 60 percent is a direct grant to the State, and 40 percent is for grants to local governments. *Id.* § 10156(b)(2), (d).

Congress enumerated specific requirements to be imposed on award applicants. Pursuant to statute, each applicant must make certain certifications and assurances. *See id.* § 10153(a)(1)-(5). For example, an applicant must certify that it will not use Byrne JAG funds to "supplant State or local funds," will "comply with all provisions of [the JAG statute] and all other applicable Federal laws," and it must assure that, for each fiscal year, it will "maintain and report such data, records, and information (programmatic and financial)" as the Attorney General may reasonably require. *Id.* § 10153(a)(1), (4), (5). These congressionally mandated certifications and assurances all relate to the application or administration of the grant, or use of the grant funds.

### B. Consistent With Congress's Purpose, Los Angeles Uses Byrne JAG Funding To Promote Critical Local Law Enforcement Objectives

Los Angeles has applied for and received Byrne JAG funding each year since FY 2005, with annual funding of upwards of $1 million. Decl. of Jeff Gorell ¶ 4. In the last application cycle, the City received approximately $1.8 million in Byrne JAG funding, of which $800,000 went to the County of Los Angeles as a sub-grantee. *Id.* The remaining $1 million is used by the City to help fund its Community Law Enforcement and Recovery ("CLEAR") program, which combats violent crime in local communities and

neighborhoods through efforts to: (1) reduce gang activity and promote community recovery; (2) work closely with special criminal investigative units; and (3) adopt an aggressive vertical prosecutorial program, including probation and parole officers, youth intervention organizations, and schools.  *Id.* ¶¶ 10-18.  Byrne JAG funds help support the salaries for personnel needed to make the program a success.  And the CLEAR program *has* been a success:  in 2014, for instance, CLEAR communities had 22 percent less gang crime over a three-year period than non-CLEAR communities.  *Id.* ¶ 15.

The City's use of Byrne JAG funds for the CLEAR program promotes Congress's core objectives in enacting the Byrne JAG program.  Without Byrne JAG funding, Los Angeles would have fewer resources to support its local law enforcement efforts.  Indeed, those funds are needed to help ensure that CLEAR staff can continue to dedicate their time to the program.  It is that dedication and cross-agency collaboration—which Byrne JAG funding has supported in the past—that is so central to making the CLEAR program a success.  Eliminating those funds could undo the good progress the City has made to date of reducing crime in high-crime communities.  *Id.* ¶¶ 17-18.

## C.    Defendants' Imposition Of New DOJ Conditions On Byrne JAG Funds

President Donald J. Trump issued Executive Order 13768 on January 25, 2017, directing the Attorney General and Secretary of Homeland Security to withhold funds from so-called "sanctuary jurisdictions."[1] A federal court permanently enjoined Section 9(a) of the Executive Order, ruling that the order is unconstitutional because it usurps authority that belongs to Congress under the Spending Clause; violates the limits on federal spending authority; violates the Tenth Amendment's prohibition against the federal government commandeering local jurisdictions to administer a federal regulatory program; is unconstitutionally vague; and violates requirements of due process.  *Cty. of*

---

[1] Enhancing Public Safety in the Interior of the United States, Exec. Order No. 13768, 82 Fed. Reg. 8799 (Jan. 25, 2017).

*Santa Clara v. Trump*, 275 F. Supp. 3d 1196 (N.D. Cal. 2017), *appeal docketed*, No. 17-17480 (9th Cir. Dec. 14, 2017).

On July 25, 2017, Defendant Sessions announced in a press release three new conditions that DOJ decided to impose on Byrne JAG funding.[2]  Specifically, he announced that, "[f]rom now on, the Department will only provide Byrne JAG grants to cities and states that [1] comply with federal law, [2] allow federal immigration access to detention facilities, and [3] provide 48 hours notice before they release an illegal alien wanted by federal authorities."  RJN Ex. A.  This pronouncement was accompanied by a one-page "Byrne JAG Grant Policy Backgrounder," restating that the new DOJ conditions meant that state and local governments would need to satisfy these conditions to qualify for such funding.  *See* RJN Ex. B.

In announcing these conditions, the Press Release asserted as a justification—without citing any support—that the conditions are "part of accomplishing the Department of Justice's top priority of reducing violent crime."  Defendants did not identify any evidence that supports their implied premise that undocumented immigrants commit violent crimes at higher rates than the general population, or that cities with so-called "sanctuary" policies have more violent crime on average than those that do not. Nor could they, as prevailing research demonstrates there is either no relationship between a city's so-called "sanctuary" policies and that city's crime rate, or an inverse relationship, despite Defendant Sessions' claims to the contrary in a speech delivered to law enforcement officials.[3]

---

[2] Request for Judicial Notice ("RJN"), Ex. A, DOJ Office of Public Affairs, *Attorney General Sessions Announces Immigration Compliance Requirements for Edward Byrne Memorial Justice Assistance Grant Programs* (July 25, 2017) ("Press Release").

[3] RJN Ex. C, Nick Roll, *Correcting Jeff Sessions*, INSIDE HIGHER ED (July 17, 2017); RJN Ex. D, Richard Pérez-Peña, *Contrary to Trump's Claims, Immigrants Are Less Likely to*

### D.    Defendants Implement And Revise Their New Conditions For FY 2017 Applications

On August 3, 2017, BJA solicited applications for FY 2017 Byrne JAG grants.[4] The Solicitation mandated that applicants certify compliance with 8 U.S.C. § 1373 ("Section 1373 Condition"), and stated that awards "will include two new express conditions."  Under those conditions, grant awardees must: (1) "permit personnel of the U.S. Department of Homeland Security (DHS) to access any correctional or detention facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or remain in the United States"; and (2) "provide at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act."  RJN Ex. G at 30.

Following the issuance of the Solicitation, a number of jurisdictions, including Los Angeles, filed lawsuits challenging these conditions.  In response, DOJ represented in litigation that it had changed the conditions.  Claiming that the "express new conditions" in the Solicitation in fact were not intended to represent the actual conditions, DOJ promulgated different versions in an award issued to the County of Greenville, South Carolina ("Greenville Award").  *See* Dkt. 1-4 (Compl. Ex. 4).  DOJ represented that the same language would be used in other awards.  *City of Chicago v. Sessions*, No. 17-2991, Doc. 40, App. at 42-43 ¶ 6 (Decl. of Alan Hanson) (filed 7th Cir. Nov. 28, 2017).

The Greenville Award states that, "as of the date the recipient accepts [its] award," the recipient must have in place a "a local ordinance, -rule, -regulation, -policy, or -practice (or an applicable State statute, -rule, -regulation, -policy, or -practice)" that is "designed to ensure" that:

---

*Commit Crimes*, N.Y. TIMES (Jan. 26, 2017).  These articles demonstrate the information that was publicly available at the time DOJ decided to implement the conditions.

[4] RJN Ex. G, BJA, *Edward Byrne Memorial Justice Assistance Grant Program:  FY 2017 Local Solicitation* (Aug. 3, 2017) ("Solicitation").

"agents of the United States acting under color of federal law in fact are given access [to] a local-government (or local-government-contracted) correctional facility for the purpose of permitting such agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States" (the "Access Condition"); and

"when a local-government (or local-government contracted) correctional facility receives from DHS a formal written request authorized by the Immigration and Nationality Act that seeks advance notice of the scheduled release date and time for a particular alien in such facility, then such facility will honor such request and — as early as practicable (see 'Rules of Construction' incorporated by para. 4.B. of this condition) — provide the requested notice to DHS." (the "Notice Condition").

Greenville Award, ¶ 56(1).

In addition, the "Rules of Construction" referenced in the Notice Condition state: "Nothing in this condition shall be understood to authorize or require any recipient, any subrecipient at any tier, any State or local government, or any other entity or individual to maintain (or detain) any individual in custody beyond the date and time the individual would have been released in the absence of this condition." *Id.* ¶¶ 55-56, at Para. 4.B. The Rules of Construction also state: "Current DHS practice is ordinarily to request advance notice of scheduled release 'as early as practicable (at least 48 hours, if possible).' (See DHS Form I-247A (3/17)). In the event that (e.g., in light of the date DHS made such request) the scheduled release date and time for an alien are such as not to permit the advance notice that DHS has requested, it shall not be a violation of this condition to provide only as much advance notice as practicable." *Id.*

Like the Solicitation, the Greenville Award claims that compliance with the Notice and Access Conditions is an "authorized and priority purpose" of the award, and that grant funds "may be obligated" for the costs of complying with those Conditions. *Id.* ¶¶ 55(3), 56(3); *see also* RJN Ex. G at 30.

### E.   Los Angeles Applies For FY 2017 Funding

In September 2017, Los Angeles timely applied for Byrne JAG funding.  Dkt. 1-5. An allocation list published by BJA indicated that Los Angeles is eligible to receive $1.9 million for this application cycle, with $1.5 million allocated directly to the City and the remainder allocated to the County of Los Angeles as a sub-grantee.[5]  If not for Defendants' conditioning of Byrne JAG funding on compliance with the Notice and Access Conditions, Los Angeles would almost certainly receive these funds as it has in prior years, because it qualifies for funding under Congress's statutory formula.

In submitting its application, Los Angeles notified DOJ that "[i]n light of the[] representations made by the DOJ"—specifically, representations made in the *Chicago* litigation that applicants needed to certify compliance with the Notice and Access Conditions only upon accepting the award, not in the application—"the City is submitting its Application with the qualification that it is withholding any commitment to, or confirmation of, its compliance with the Conditions."  Dkt. 1-5 at 19.

The Los Angeles Police Department ("LAPD") permits "access to LAPD detention facilities to interview individual arrestees . . . consistent with California law which requires obtaining informed, written consent prior to any such interview."  Decl. of Arif Alikhan ¶ 20.  Absent such consent, "LAPD does not provide DHS or ICE personnel access to its facilities in order to interview that individual."  *Id.*  At the time of its application, the City could not ascertain whether DOJ would regard this practice as consistent with the Conditions.  But in *City of Philadelphia v. Sessions*, DOJ took the position that the Condition "require[s] allowing access . . . even if the inmate might decline to answer questions," which Los Angeles does not do.  Defs.' Mem. in Opp. to Pl.'s Mot. for Pre. Inj. at 32, No. 17-cv-03894 (filed E.D. Pa. Oct. 12, 2017), Dkt. 28.

Even apart from DOJ's claims, Los Angeles could not certify compliance with the Notice and Access Conditions without "a negative impact on the LAPD's relationship

---

[5] RJN Ex. H, Bureau of Justice Assistance, *2017 California Local JAG Allocations.*

with the immigrant communities it polices, causing those communities to be less willing to report crimes and cooperate with criminal investigations, thus threatening the public safety of all who live and work in Los Angeles."  Alikhan Decl. ¶ 16.  DOJ has shown that it will publicize cities that certify compliance as "cooperating" with federal civil immigration enforcement.  *See* RJN Ex. I, DOJ, Office of Public Affairs, *Attorney General Sessions Announces $98 Million To Hire Community Policing Officers* (Nov. 20, 2017); Laura Jarrett (@LauraAJarrett), Twitter (Jun. 26, 2018, 4:10 PM), https://tinyurl.com/y88kx8cr ("The Justice Department will work to release Byrne JAG funds to *cooperating* jurisdictions in an expeditious manner." (emphasis added) (quoting DOJ spokesperson)).  Being "perceived as a 'cooperating' jurisdiction in the view of the current Administration would harm public safety in Los Angeles" because "immigrant communities would likely perceive LAPD as weakening its traditional policies against entanglement with immigration enforcement."  Alikhan Decl. ¶ 16.

## F.    Courts Enjoin The Notice And Access Conditions

The Notice and Access Conditions have been enjoined by multiple courts.  First, the Northern District of Illinois entered a nationwide preliminary injunction on September 15, 2017, holding that the City of Chicago was likely to succeed on the merits because "[t]he Executive Branch cannot impose the conditions without Congressional authority, and that authority has not been conferred."  *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 940-43 (N.D. Ill. 2017).  The court further held that Chicago suffered irreparable harm in part because "[t]he harm to the City's relationship with the immigrant community if it should accede to the conditions is irreparable."  *Id.* at 950.  The Seventh Circuit affirmed the district court, holding that the government's position "defies reason" and "is at odds with the nature of the Byrne JAG grant."  *City of Chicago v. Sessions*, 888 F.3d 272, 285, 287 (7th Cir. 2018).  Following the government's en banc petition on the scope of the injunction, the en banc court granted review on that issue, stayed the injunction as it applies outside Chicago, but did not otherwise disturb the panel's ruling. *See Chicago*, No. 17-2991, Dkt. 134 (7th Cir. June 26, 2018).

The Eastern District of Pennsylvania has also enjoined the conditions. It initially found that Philadelphia would likely succeed on the merits of its claim that the Notice and Access Conditions were *ultra vires*, violated the Spending Clause, and did not comply with the Administrative Procedure Act ("APA"). *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579 (E.D. Pa. 2017). The court also held that the City would suffer irreparable harm in part because it was "faced with a 'Hobson's Choice' between, on the one hand, complying with a law it credibly believes is unconstitutional, and on the other hand, foregoing funds it plans to use for life-saving projects." *Id.* at 657.[6] That court later entered a permanent injunction against the Notice and Access Conditions, as well as the requirement to certify compliance with Section 1373. *City of Philadelphia v. Sessions*, 2018 WL 2725503 (E.D. Pa. June 6, 2018).

Finally, this Court enjoined very similar considerations imposed by DOJ on the COPS grant as "bonus points." *Los Angeles*, 293 F. Supp. 3d 1087.[7] Los Angeles also sued to enjoin the Byrne JAG Conditions, and those claims had been held in abeyance due to the *Chicago* injunction. Dkt. 77. After the en banc Seventh Circuit's stay of the scope of the injunction, the parties agreed to resume proceedings on the City's Byrne JAG claims.

**G. Los Angeles Has Not Received A Byrne JAG Award**

Following the stay by the en banc Seventh Circuit, DOJ issued nearly $200 million in Byrne JAG awards to over 800 so-called "cooperating" jurisdictions. *See supra* at 9; RJN Ex. E, DOJ, Awards Made for BJA FY 17 Edward Byrne Memorial Justice

---

[6] The Court did not enter a preliminary injunction against the Conditions because of the nationwide relief granted in *Chicago*. *Id.* at 659 n.30.

[7] Even after this Court had enjoined the "considerations" promulgated by DOJ with respect to the COPS grant, the agency nonetheless issued solicitations with similar immigration-related considerations to those this Court had enjoined. *See, e.g.*, 2018 COPS Office Anti-Heroin Task Force (AHTF) Program Application Guide at 58, *available at* https://cops.usdoj.gov/pdf/2018AwardDocs/ahtf/2018_AHTF_App_Guide.pdf.

Assistance Grant (JAG) Program - Local Solicitation; RJN Ex. F, DOJ, Awards Made for BJA FY 17 Edward Byrne Memorial Justice Assistance Grant (JAG) Program - State Solicitation.  Los Angeles has not received a Byrne JAG award.

## III.    <u>ARGUMENT</u>

"'A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citation omitted).  Because Los Angeles meets all four of these elements, the Court should preliminarily enjoin Defendants from: (1) implementing the Notice and Access Conditions in conjunction with Los Angeles' FY 2017 Byrne JAG application and award; and (2) withholding or delaying Los Angeles' Byrne JAG award on the basis that Los Angeles is not a "cooperating" jurisdiction.

### A.    **Los Angeles Is Likely To Succeed On The Merits**

#### 1.    **DOJ's Notice And Access Conditions Are *Ultra Vires***

An agency "has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).  When agencies "act improperly . . . what they do is ultra vires." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013).  As three courts have held, DOJ lacks authority to impose the Notice and Access Conditions on States and localities as a condition of their receipt of Byrne JAG funds.  *See supra* at 9-10.

##### (a) **Congress Did Not Delegate Authority To Impose Civil Immigration Conditions On Formula Grants Under the Byrne JAG Program**

The text and structure of the Byrne JAG statute demonstrate that Congress "did not impose any immigration enforcement conditions on the receipt of such funds . . . [n]or . . . authorize the Attorney General to impose such conditions."  *Chicago*, 888 F.3d at 277.

Congress enacted express certifications and assurances that States and localities must make as a condition to receiving Byrne JAG funds.  *See* 34 U.S.C. § 10153(a)(1)-

(5).  It gave no indication that DOJ could undermine those statutory criteria by unilaterally adding civil immigration conditions to that list.

Likewise, Congress "grant[ed] the Attorney General explicit authority to carry out specific actions . . . in 34 U.S.C. § 10152-10158," but "[n]one of those provisions grant the Attorney General the authority to impose conditions that require states or local governments to assist in immigration enforcement, nor to deny funds to states or local governments for the failure to comply with those conditions."  *Chicago*, 888 F.3d at 283-84.  Indeed, Congress knew how to limit Byrne JAG funding based on a jurisdiction's compliance with federal policy objectives, but did not do so for civil immigration partnerships.  *See* 34 U.S.C. § 20927(a) (10% reduction in Byrne JAG funds for failure to substantially comply with the Sex Offender Registration and Notification Act); *id.* § 30307(e)(2)(A) (5% reduction in Byrne JAG funds for failure to fully comply with Prison Rape Elimination Act); *id.* § 60105(c)(2) ("not more than a 10-percent reduction" in Byrne JAG funds for failure to comply with Death in Custody Reporting Act).  "[T]he enumeration of [certain] factors in this context must be read to exclude others."  *Los Angeles*, 293 F. Supp. 3d at 1097[8]; *see also Chicago*, 888 F.3d at 286.

The statutory structure further confirms that Congress did not authorize the Attorney General to impose the Conditions.  In creating the Byrne JAG program, Congress crafted a detailed formula for funding distribution based on objective factors like population and rates of violent crime, while also guaranteeing a minimum allocation to all jurisdictions that meet the statutory requirements.  *See* 34 U.S.C. § 10156(a); *McLaughlin*, 865 F.2d at 1088 ("In the formula grant program the authorizing Act of Congress determines who the recipients are and how much money each shall receive." (citation omitted)); *cf.* 34 U.S.C. § 10142(2) (authorizing Director of BJA to award

---

[8] This Court rejected a similar argument from DOJ in *Los Angeles*, where the government also attempted to impose additional, unrelated considerations onto grants despite Congress' enumeration of specific statutory authorizations, none of which supported the government's proposed considerations.  293 F. Supp. 3d at 1096-97.

discretionary grants "on terms and conditions determined by the Director to be consistent" with those grants).  Allowing DOJ to deny this congressionally authorized funding to support local criminal justice efforts where States or localities decline to participate in federal civil immigration investigations would disrupt the virtually automatic funding formula Congress enacted.  *See Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2442 (2014) ("An agency interpretation that is inconsistent with the design and structure of the statute as a whole . . . does not merit deference." (citation omitted)); *Chicago*, 888 F.3d at 286 ("[I]t is inconceivable that Congress would have anticipated that the Assistant Attorney General could abrogate the entire distribution scheme and deny all funds to states and localities that would qualify under the Byrne JAG statutory provisions, based on the Assistant Attorney General's decision to impose his or her own conditions.").

Recognizing the potential for agency overreach in the awarding of grants, Congress expressly declined to allow DOJ to demand, as a condition of Byrne JAG funding, that States or localities make the sort of weighty changes to the duties of its law enforcement officers and obligations at its detention facilities contemplated by the Conditions.  Congress specifically directed that the statute not be construed to authorize any federal agency or officer "to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof."  34 U.S.C. § 10228(a).  DOJ's Conditions attempt to do just that, however, by exercising control over Los Angeles and the operation of its police department and detention facilities.  Section 10228(a) confirms that Congress intended to *prevent* DOJ from using the Byrne JAG program to direct local law enforcement conduct in this manner—not to *authorize* DOJ to exercise such a power.

### (b) The Conditions Are An Unlawful Attempt To Divert Byrne JAG Funds Away From The Statutorily Authorized Local Criminal Justice Programs

DOJ's Conditions flout not only the text and structure of the statute, but also Congress's purposes. Congress enacted the Byrne JAG program to fund grants "for use by the State or unit of local government to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice." 34 U.S.C. § 10152(a)(1). Congress further enacted a list of eight types of state and local criminal justice programs for which Byrne JAG funds could be used—none of which mention civil immigration enforcement. *Id.* § 10152(a)(1)(A)-(H).

DOJ now attempts to divert Byrne JAG funds away from those statutorily enacted programs to civil immigration enforcement. In imposing the Conditions, DOJ states that "compliance" "will be an authorized and priority purpose" of the award, notwithstanding that Congress authorized the grant to fund only particular types of state and local criminal justice programs. Greenville Award at 19. Moreover, DOJ will allow award funds to pay for the costs incurred by States and localities for putting in place "statutes, ordinances, rules, regulations, policies and practices to satisfy" the Conditions, as well as the costs incurred for "permitting access" under the Access Condition and "honoring any request from DHS that is encompassed by" the Notice Condition. *Id.* Thus, the Conditions are an unlawful repurposing by DOJ of the local criminal justice grant program that Congress enacted into one that funds the agency's civil immigration policy preferences.

### (c) Federalism Principles Require A Clear Statement By Congress To Authorize DOJ To Condition A Criminal Justice Grant On Civil Immigration Enforcement

The Supreme Court has emphasized that it is "critical to ensur[e] that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *Nat. Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577 (2012) (controlling op. of Roberts, C.J.). And, when federalism values are threatened, the Court demands a "clear statement" from Congress, which "assures that the *legislature* has in

fact faced, and intended to bring into issue, the critical matters involved." *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) (emphasis added).

This Court recognized that the clear statement rule "extend[s] . . . to federal grants" and is critical "where the grant condition require[s] the surrender of a critical power reserved to the states by the Tenth Amendment." *Los Angeles*, 293 F. Supp. 3d at 1096 (citing *Com. of Va., Dep't of Educ. v. Riley*, 106 F.3d 559, 566 (4th Cir. 1997) (en banc)). Just like the bonus-point considerations in *Los Angeles*, the Notice and Access Conditions "upset the constitutional balance between state and federal power by requiring state and local law enforcement to partner with federal authorities" and "participat[e] in a historically federal function—immigration enforcement." *Id.* (citing *Arizona v. United States*, 567 U.S. 387, 394 (2012)). Because the Conditions "infringe upon the state police power . . . the dispositive question before this Court is whether Congress has 'unmistakably' authorized the Attorney General to impose the" Conditions. *Id.*

It has not. The *most* Congress has done is to suggest that DOJ has some authority to craft "special conditions." *See infra* Part III.A.1.d; 34 U.S.C. § 10102(a)(6). This generic delegation is far from evidence that Congress "in fact faced, and intended to bring into issue, the critical matters," *Gregory*, 501 U.S. at 461, implicated by DOJ's Conditions. Because "Congress has not unequivocally conditioned receipt of federal funds in the manner claimed by the [agency], . . . [the] inquiry is at an end." *Los Angeles*, 293 F. Supp. 3d at 1098 (quoting *Riley*, 106 F.3d at 566); *see also Chicago*, 888 F.3d at 287.

### (d) Section 10102(a)(6) Does Not Justify the Conditions

In litigation, DOJ has offered 34 U.S.C. § 10102(a)(6) as the only basis for the Notice and Access Conditions. *See, e.g.*, *Chicago*, 888 F.3d at 284. That provision falls under the heading of "Duties and functions of Assistant Attorney General." It states that the Assistant Attorney General "shall . . . exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and

determining priority purposes for formula grants." 34 U.S.C. § 10102(a)(6).  According to DOJ, the statutory clause "including placing special conditions on all grants" is a stand-alone grant of authority to impose any conditions on any grants under the auspices of the Assistant Attorney General.  This fails for several reasons.

The Seventh Circuit correctly held that DOJ's reliance on section 10102(a)(6)—located in a different subchapter from the Byrne JAG statute—is "contrary to the plain meaning of the statutory language."  *Chicago*, 888 F.3d at 284.  The language following "including" in Section 10102(a)(6) "set[s] forth a subcategory of the types of powers and functions that the Assistant Attorney General may exercise when vested in the Assistant Attorney General either by the terms of this chapter or by delegation of the Attorney General."  *Id.* at 285.  The term "including" does not enlarge the powers of either the Attorney General or the Assistant Attorney General, but instead "connotes simply an illustrative application of" the authority already vested in those officers.  *See Az. State Bd. for Charter Sch. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1008 (9th Cir. 2006) (citation omitted).  Because DOJ has never claimed that "[t]he power exercised [to impose the Conditions] . . . is authorized anywhere in the chapter, nor that the Attorney General possesses that authority and therefore can delegate it to the Assistant Attorney General," section 10102(a)(6) does not authorize the Conditions.  *Chicago*, 888 F.3d at 285; *see also Philadelphia*, 280 F. Supp. 3d at 617.

Even assuming "including" in section 10102(a)(6) could be interpreted as a delegation of authority, rather than an illustration of pre-existing authority, the glancing reference to "special conditions" does not evince any intent to give DOJ the authority it is now asserting.  Congress added "special conditions" to section 10102(a)(6) in 2006 and, under regulations effective at that time, the phrase referred to conditions imposed on high-risk grantees, such as "additional project monitoring" and "requiring additional, more detailed financial reports."  28 C.F.R. § 66.12 (eff. through Dec. 25, 2014).  Thus, "the term 'special conditions' referred to in the subsection . . . is a term of art for conditions intended for 'high-risk grantees' with difficulty adhering to existing grant

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

requirements." *Philadelphia*, 280 F. Supp. 3d at 617.

But even if Congress intended a broader definition for "special conditions," the phrase could at most apply to the technical administration of the award or the appropriate use of specific grant funds, such as requirements for a recipient to "collect and maintain data that measure the performance and effectiveness of activities under the award," to comply with nondiscrimination laws in the administration of the award, and to report any duplicative funding, fraud, waste or abuse in the award implementation. *See* Greenville Award ¶¶ 4-21. No one familiar with the federal grant process would consider DOJ's demand that a recipient State or locality participate in federal civil immigration investigations to be a bona fide "special condition" on the grant.

Congress's use of different text and structure when creating other federal funding programs confirms that, even if Congress authorized "special conditions" for the Byrne JAG program, they are limited in nature. For example, Congress specifically authorized DOJ to impose "reasonable conditions" on grant awards under the Violence Against Women Act "to ensure that the States meet statutory, regulatory, and other program requirements." 34 U.S.C. § 10446(e)(3).

With regard to the Byrne JAG program, however, Congress provided the "Attorney General authority over a carefully delineated list of actions, with no such broad authority to impose reasonable conditions" of the agency's choosing. *Chicago*, 888 F.3d at 287. As with the COPS grant, "Congress knew how to confer . . . broad power" on the Attorney General but "chose not to here." *Los Angeles*, 293 F. Supp. 3d at 1097 (citing 42 U.S.C. § 3796gg-1(e)(3), now 34 U.S.C. § 10446(e)(3)).[9] Furthermore, adopting DOJ's position would render meaningless *both* Congress's limited delegation of authority

---

[9] The limits on DOJ's authority are confirmed by the fact that Congress has considered—and rejected—attempts to link Byrne JAG funds to state and local participation in federal civil immigration investigations. *See, e.g.*, Stop Sanctuary Cities Act, S. 1814, 114th Cong. § 2(b)(2) (2015); Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. § 3(b) (2015).

in the Byrne JAG program, and its broader delegations in other BJA grant programs. *See Los Angeles*, 293 F. Supp. 3d at 1097 (rejecting argument that Attorney General had "complete discretion to favor certain applicants" because it would render Congress' "directives . . . meaningless"); *Philadelphia*, 280 F. Supp. 3d at 616 ("[I]f 34 U.S.C. § 10102(a)(6) were to apply to the Byrne Program, it would render superfluous the explicit statutory authority Congress gave to the Director of [BJA] on other BJA grants.").

DOJ's reading of its statutory authority lacks any logical stopping point.  If DOJ can withhold local criminal justice funding provided by Congress if a State or locality refuses to change its policies relating to civil immigration enforcement, then the next Administration could withhold that funding—or any other funding disbursed by the Assistant Attorney General—if a State or locality refuses to agree to DOJ's policy demands on capital punishment, marijuana legalization, access to firearms, or a range of other matters.  But Congress does not "hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001), and when it "wishes to assign to an agency decisions of vast . . . political significance," it speaks clearly, *Util. Air*, 134 S. Ct. at 2444. Congress did not, in an innocuous grant administration provision, hide a sweeping tool for DOJ to extract from States and localities their agreement to participate in federal civil immigration investigations to receive funding for local criminal justice programs.  *See Chicago*, 888 F.3d at 287 ("The Attorney General's argument that such sweeping authority over the major source of funding for law enforcement agencies nationwide was provided to the Assistant Attorney General by merely adding a clause to a sentence in a list of otherwise-ministerial powers defies reason."); *Los Angeles*, 293 F. Supp. 3d at 1097 ("In the absence of clear statutory guidance, this Court cannot conclude that Congress intended to stretch Defendants' authority so broadly.").

### 2.    DOJ's Conditions Violate The Spending Clause

Under the Spending Clause, U.S. Const. art. I, § 8, cl. 1, Congress may provide grants to States and cities and may condition such grants on the States and cities fulfilling

certain requirements.  *See South Dakota v. Dole*, 483 U.S. 203, 207-09 (1987).  But Congress must comply with several important restrictions when it exercises that constitutional authority.  The Notice and Access Conditions fail at least one of those restrictions: they are not sufficiently related to the purposes of the Byrne JAG statute.  *See id.*

The "conditions on receipt of federal funds must be reasonably related to the articulated goal."  *Nevada v. Skinner*, 884 F.2d 445, 447 (9th Cir. 1989).  Congress established the Byrne JAG program to provide States and localities with funds for "additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for *criminal* justice."  34 U.S.C. § 10152(a)(1) (emphasis added).  Congress further specified the purposes of this criminal justice grant by listing eight specific types of state and local programs that can be funded, from drug treatment programs to crime victim programs.  *Id.*  Congress was so focused on the criminal justice goal of the grant that it structured the program as a formula grant, tying the amount of funds States would receive to their level of violent crime.  *See id.* § 10156.

Requiring States and localities to facilitate federal civil immigration investigations has nothing to do with the purpose of the Byrne JAG program: to enhance local criminal justice enforcement.  *See Philadelphia*, 280 F. Supp. 3d at 643 ("Any relationship connecting this formula grant program, which provides wide latitude to states and municipalities, and the [C]onditions . . . is . . . difficult to discern.").  The Conditions pertain only to *civil* immigration law, not criminal law, and it is well-established that "[u]nlawful presence is not criminal," and "detain[ing] individuals solely because of their immigration status" is "a purely civil matter."  *Melendres v. Arpaio*, 695 F.3d 990, 1001-02 (9th Cir. 2012).  And Congress has made the "deliberate decision to condition enforcement cooperation on consistency with state law"—making it highly unlikely it intended for DOJ to use a local criminal justice grant to pressure states and localities into abandoning their law enforcement policies to assist in immigration enforcement.  *United States v. California*, 2018 WL 3301414, at *19 (E.D. Cal. July 5, 2018).  The Conditions

19

are thus wholly unrelated to Congress's goal to provide States and localities with "more flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89. In other words, DOJ's "argument that enforcement of federal immigration laws is related to th[e] objective [of enhancing local criminal justice under the Byrne JAG grant] is unsustainable." *Philadelphia*, 280 F. Supp. 3d at 642.

Absent any relationship between the Conditions and the purposes of the Byrne JAG statute, the Conditions constitute impermissible commandeering of States and local governments in violation of the Tenth Amendment. The anti-commandeering doctrine is "simply the expression of a fundamental structural decision incorporated into the Constitution, *i.e.*, the decision to withhold from Congress the power to issue orders directly to the States." *Murphy v. NCAA*, 138 S. Ct. 1461, 1475 (2018). Yet the Notice and Access Conditions are direct orders to State and local law enforcement, and thus violate the anti-commandeering doctrine. *See id.* at 1477 (holding that anti-commandeering applies "not only to state officers with policymaking responsibility but also to those assigned more mundane tasks").

### 3. DOJ's Conditions Violate the Administrative Procedure Act

Agency actions are unlawful under the APA if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Defendants' imposition of the Notice and Access Conditions on recipients of Byrne JAG funding is not in accordance with law as set forth above, *supra* Part III.A.1-2, and also cannot survive arbitrary-and-capricious review.

The fundamental requirement the APA imposes on federal agencies is to engage in "reasoned decisionmaking." *Sever v. NLRB,* 231 F.3d 1156, 1164 (9th Cir. 2000). An agency therefore "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (citation omitted). In evaluating an arbitrary-and-capricious challenge, courts "carefully review

the record to ensure that agency decisions are founded on a reasoned evaluation of the
relevant factors." *Az. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land
Mgmt.*, 273 F.3d 1229, 1236 (9th Cir. 2001) (citation omitted).

The agency provided no support for its attempt to link facilitation of federal civil
immigration investigations by state and local officials to Congress's stated goal to
provide funding for specified state and local criminal justice programs. DOJ asserted in
its Press Release that the Conditions are "part of accomplishing the Department of
Justice's top priority of reducing violent crime." *See* RJN Ex. A. But DOJ has cited no
evidence to support the implied premise that undocumented immigrants commit violent
crimes at higher rates than the general population, or to indicate that the investigations of
federal civil immigration violations facilitated by the Conditions are focused on
individuals involved in violent crime. The real impact of DOJ's new policy is the
opposite of its expressed intent, in that it *deprives* states and cities of resources to
"reduc[e] violent crime." As with the community policing grant, DOJ adopted the
Conditions with "no evidence of record" and did not "base[] th[eir] conclusion on any
findings or data." *Los Angeles*, 293 F. Supp. 3d at 1099. Accordingly, Defendants
lacked "a 'reasonable basis' for imposing" the Conditions. *Id.*

DOJ not only failed to make decisions based on the evidence, but: (1) actively
mischaracterized evidence; and (2) ignored substantial contrary evidence. *First*, the only
source that DOJ has cited in support of its policy does not support the Conditions. In a
related context, the Attorney General cited a study supposedly in support of his claim that
there is a relationship between so-called "sanctuary" policies and violent crime. In fact,
as the study authors have themselves explained, their study shows *no* relationship
between so-called "sanctuary" policies and crime. *See supra* n.3. Because the agency
has offered "an explanation for its decision that runs counter to the evidence before the
agency," the decision is arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of U.S., Inc.
v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Organized Vill. of
Kake v. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc) ("Agency action is

arbitrary and capricious if the agency has . . . offered an explanation for its decision that runs counter to the evidence before the agency.").

*Second*, DOJ ignored contrary evidence from studies showing that there is no relationship, or an inverse relationship, between "sanctuary" policies and crime. *See supra* n.3. DOJ's wholesale failure to consider this substantial body of evidence renders its decision arbitrary and capricious. *See Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018) (agency "cannot ignore evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation").

**B.    Los Angeles Will Suffer Irreparable Injury Absent An Injunction**

Los Angeles will suffer immediate and irreparable harm from DOJ's implementation of the Notice and Access Conditions for FY 2017 Byrne JAG funding.

*First*, Los Angeles suffers irreparable harm because it is faced with an impossible choice:  either it must certify compliance with unconstitutional and unlawful directives that impinge on the City's sovereignty, damage community trust, and harm public safety, or it will lose congressionally authorized Byrne JAG funding. *See Chicago*, 264 F. Supp. 3d at 950 ("[A] 'Hobson's choice' can establish irreparable harm."); *Philadelphia*, 280 F. Supp. 3d at 657 ("The choice itself demonstrates irreparable harm.").  A "very real penalty" attaches regardless of how the City proceeds. *See Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009); *Morales v. Trans World Airlines*, 504 U.S. 374, 381-82 (1992).  "By forcing the [City] to make this unreasonable choice," the Conditions "result[] in a constitutional injury" that establish standing and irreparable harm. *Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 538 (N.D. Cal. 2017); *see also Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1286-87 (9th Cir. 2013) (facts demonstrating a likelihood of success on the merits and irreparable harm "necessarily establish" standing).

One option DOJ presented to the City was to sacrifice its "sovereign interests and public policies"—a harm that is itself "irreparable." *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001).  And, by agreeing to participate in federal civil immigration

efforts in order to receive Byrne JAG funds, Los Angeles would have to compromise its longstanding policy that enmeshing LAPD in civil immigration enforcement erodes community trust and undermines public safety.  *See California*, 2018 WL 3301414, at *20 ("Defendant and amici highlight the impact these perceptions [of federal civil immigration cooperation] have on the community's relationship with local law enforcement."); *Chicago*, 888 F.3d at 282 (localities "may see such cooperation as impeding the community relationships necessary to identify and solve crimes").  "The harm to the City's relationship with the immigrant community if it should accede to the conditions is irreparable."  *Chicago*, 264 F. Supp. 3d at 950.

*Second*, the Notice and Access Conditions deprive Los Angeles of Byrne JAG funding for FY 2017.  The City would thus be foreclosed from receiving a funding opportunity to which it would otherwise be entitled based on Congress's statutory formula, and so it is irreparably harmed.  Since "a rule putting plaintiffs at a competitive disadvantage constitutes irreparable harm," *Los Angeles*, 293 F. Supp. 3d at 1100 (citation omitted), a rule that definitively strips Los Angeles of funding must also constitute irreparable harm.  Given the formula structure of the grant, those funds may be allocated to other jurisdictions, with no ability for Los Angeles to reclaim those funds.

*Third*, Defendants' conditioning of Los Angeles' Byrne JAG funding on the Notice and Access Conditions, which violate the separation of powers and the Spending Clause, effects constitutional harm on the City in a manner that "'unquestionably constitutes irreparable injury.'"  *Melendres*, 695 F.3d at 1002 (citation omitted); *Trump*, 250 F. Supp. 3d at 537 (separation of powers violation "constitutes irreparable harm").

The City anticipates that the agency may argue no injury from the Notice and Access Conditions, because the City would not receive the award based on the Section 1373 Condition.  Under Section 1373, state and local governments may not "prohibit, or in any way restrict," their law enforcement officers from (a) "sending to, or receiving from" federal immigration officials "information regarding the citizenship or immigration status, lawful or unlawful, of any individual," and (b) "maintaining such information" or

"exchanging such information with any other Federal, State or local government entity." 8 U.S.C. § 1373(a)-(b).  Los Angeles policies are consistent with Section 1373, *see Sturgeon v. Bratton*, 174 Cal. App. 4th 1407, 1421 (Cal. Ct. App. 2009), so the City did not challenge that condition in its complaint.  Since that time, however, DOJ has adopted an aggressive approach under which Section 1373 no longer means what it says.  Specifically, it has argued in court that the recently-enacted California Values Act, which of course binds Los Angeles, is inconsistent with Section 1373.  A federal court has rejected DOJ's new, atextual reading of Section 1373, and held that the California Values Act is consistent with Section 1373.  *See California*, 2018 WL 3301414, at *13-16.  Moreover, Section 1373 is unconstitutional, which the Supreme Court's recent *Murphy* decision makes clear.  *Murphy*, 138 S. Ct. at 1475 (Constitution "withholds from Congress the power to issue orders directly to the States"); *see also Philadelphia*, 2018 WL 2725503, at *32 (Section 1373 "regulate[s] state and local governmental entities and officials, which is fatal to [its] constitutionality under the Tenth Amendment").  Since Los Angeles policies are consistent with Section 1373, and Section 1373 is in any event unconstitutional, the Section 1373 Condition presents no obstacle to the City's Byrne JAG Award or the relief it requests here.

## C.  The Balance Of Equities And The Public Interest Weigh Heavily In Favor Of The Requested Injunction

This Court must "balance the competing claims of injury" made by Los Angeles and Defendants in determining whether to grant the requested relief.  *Winter v. Natural Resources Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  In addition, the Court should "pay particular regard for the public consequences" of issuing an injunction.  *Id.*  These two factors merge when the federal government is a party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Here, these considerations strongly favor preliminary injunctive relief.

As discussed above, Los Angeles will suffer imminent and significant harm absent this Court's intervention, as it will lose Byrne JAG funding if it refuses to sacrifice the trust it has built with its community.  As a result, it will be deprived of valuable resources

24

needed to adequately fund its local law enforcement efforts, including the CLEAR program, aimed at reducing violent crime related to gang activity.  Ironically, Defendant Sessions claims that DOJ's new funding conditions are intended to help the federal government "take down" gangs.  RJN Ex. A.  But, as applied to Los Angeles, DOJ's Conditions would have the opposite effect, taking away critical funds that support the City's efforts to target gang violence.  *See Philadelphia*, 280 F. Supp. 3d at 658 ("[T]he public interest is better served if the City is not forced to choose between foregoing the JAG Grant funds and losing hard-fought goodwill amongst the immigrant community.").

The City also has a strong interest in both "avoiding unconstitutional federal enforcement and the significant budget uncertainty that has resulted from" the Conditions.  *Trump*, 250 F. Supp. 3d at 539; *see also* Gorell Decl. ¶ 21.  In addition, it is "always in the public's interest" to issue an injunction to "prevent the violation of a party's constitutional rights."  *Melendres*, 695 F.3d at 1002; *see Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).

In contrast to the material hardship that will be imposed on Los Angeles if the Conditions are allowed to stand, Defendants will suffer *little to no harm* if the injunction is granted, especially given that DOJ has already awarded the majority of Byrne JAG funds.  *See Philadelphia*, 280 F. Supp. 3d at 658 ("enjoining the imposition of the Challenged Conditions with respect to Philadelphia would only cause the DOJ—at most—a minor hardship: paying funds that Congress had appropriated for disbursement consistent with the purposes of the Byrne JAG Program").  Thus, enjoining implementation of the Conditions pending litigation on the merits will not cause any hardship to Defendants.

## IV.    CONCLUSION

For the foregoing reasons, the Court should issue a preliminary injunction to prevent Defendants from conditioning Los Angeles' Byrne JAG award on the Notice and Access Conditions, and from withholding or delaying Los Angeles' Byrne JAG award on the basis that Los Angeles is not a "cooperating" jurisdiction.

Dated: July 18, 2018

Respectfully Submitted,

By: _____

MITCHELL A. KAMIN
MÓNICA RAMÍREZ ALMADANI
NEEMA T. SAHNI
Covington & Burling LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, California 90067-4643

DAVID M. ZIONTS, *pro hac vice*
IVANO M. VENTRESCA, *pro hac vice*
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001

MICHAEL N. FEUER
City Attorney

JAMES P. CLARK
Chief Deputy City Attorney
LEELA A. KAPUR
Executive Assistant City Attorney
VALERIE L. FLORES
Managing Senior Assistant City
    Attorney
MICHAEL DUNDAS
Deputy City Attorney
200 North Main Street, City Hall
    East Room 700
Los Angeles, California 90012
Telephone: (213) 978-8344
Facsimile: (213) 978-8312

*Attorneys for Plaintiff*
*City of Los Angeles*