**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CITY OF LOS ANGELES,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>WILLIAM P. BARR, Attorney General; ALAN R. HANSON, in his official capacity as Acting Assistant Attorney General of the Office of Justice Programs; RUSSELL WASHINGTON, in his official capacity as Acting Director of the Office of Community Oriented Policing Services; UNITED STATES DEPARTMENT OF JUSTICE,<br>*Defendants-Appellants*. | No. 18-55599<br><br>D.C. No.<br>2:17-cv-07215-R-JC<br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued and Submitted August 30, 2018
Pasadena, California

Filed July 12, 2019

2          CITY OF LOS ANGELES V. BARR

Before:  Kim McLane Wardlaw, Jay S. Bybee,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta;
Dissent by Judge Wardlaw

## SUMMARY[*]

### Federal Spending / Immigration

The panel reversed the district court's summary judgment in favor of the City of Los Angeles in an action challenging the U.S. Department of Justice ("DOJ")'s use of certain factors in determining scores for applicants to a competitive grant program – the Community Oriented Policing Services (COPS) grant program – that allocates a limited pool of funds to and local applicants under the Public Safety Partnership and Community Policing Act (the "Act"), enacted as part of the Violent Crime Control and Law Enforcement Act.

DOJ gave additional points to an applicant that chose to focus on the illegal immigration area (instead of other focus areas), and gave additional points to an applicant who agreed to the Certification of Illegal Immigration Cooperation – in which the applicant agreed to ensure Department of Homeland Security personnel had access to the applicant's detention facilities to meet with an alien, and to provide notice to DHS regarding scheduled release of an alien in

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

custody.  Los Angeles submitted an application under the Act but was not awarded any funding; it chose "building trust and respect" as its focus area and declined to submit the Certification.

As initial matters, the panel held that the appeal was not moot because although there was no longer a live controversy regarding the 2017 grant program, the situation was capable of repetition yet evading review.  The panel also held that Los Angeles had Article III standing to bring the appeal.  The panel concluded that Los Angeles's slight competitive disadvantage due to its policy of not assisting the federal government on immigration-related issues was sufficient to give Los Angeles standing in this action.

The panel rejected Los Angeles's argument that DOJ's practice of giving additional consideration to applicants that choose to further the two specified federal goals violated the Constitution's Spending Clause.  Because DOJ's scoring factors encouraged, but did not coerce, an applicant to cooperate on immigration matters, the panel also rejected Los Angeles's claims that DOJ's use of the factors infringed on state autonomy in a manner that raised Tenth Amendment concerns.

The panel held that DOJ did not exceed its statutory authority in awarding bonus points to applicants that selected the illegal immigration focus area or that agreed to the Certification.  Specifically, the panel first held that DOJ's understanding that illegal immigration presents a public safety issue has been acknowledged by the Supreme Court.  Second, DOJ's determination that the techniques of community policing may be used to address this public safety issue was entirely reasonable.  Finally, because Congress did not directly address the precise question at

issue, the panel must defer to DOJ's interpretation as long as it is reasonable.

The panel held that DOJ did not act arbitrarily and capriciously under the Administrative Procedure Act when it decided to give points for adopting the illegal immigration focus and submitting the Certification.

Judge Wardlaw dissented from the majority's holding that DOJ's diversion of COPS grant funding from community policing to civil immigration enforcement was lawful. Judge Wardlaw would hold that DOJ exceeded its delegated powers to administer the COPS grant program, and she would, therefore, affirm the district court's order permanently enjoining DOJ from including the illegal immigration focus area and Cooperation Certification on its COPS grant applications and from using these considerations as preferences in awarding COPS grants.

## COUNSEL

Jesse Panuccio (argued), Brad Hinshelwood, Katherine Twomey Allen, Daniel Tenny, and Mark B. Stern, Appellate Staff; Nicola T. Hanna, United States Attorney; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

David M. Zionts (argued), Benjamin L. Cavataro, and Ivano M. Ventresca, Covington & Burling LLP, Washington, D.C.; Neema T. Sahni, Mónica Ramirez Almadani, and Mitchell A. Kamin, Covington & Burling LLP, Los Angeles, California; Michael Dundas, Deputy City Attorney; Valerie L. Flores, Managing Senior Assistant City Attorney; Leela A. Kapur, Executive Assistant City Attorney; James P.

Clark, Chief Deputy City Attorney; and Michael N. Feuer, City Attorney; Office of the City Attorney, Los Angeles, California; for Plaintiff-Appellee.

Matthew J. Piers, Caryn C. Lederer, and Chirag G. Badlani, Hughes Socol Piers Resnick & Dym Ltd., Chicago, Illinois; Daniel B. Rice, Joshua A. Geltzer, and Mary B. McCord, Institute for Constitutional Advocacy and Protection, Georgetown University Law Center, Washington, D.C.; for Amici Curiae Current and Former Prosecutors and Law Enforcement Leaders.

## OPINION

IKUTA, Circuit Judge:

In 1994, Congress enacted the Violent Crime Control and Law Enforcement Act (VCCLEA), Pub. L. No. 103-322, 108 Stat. 1796, to provide a range of federal assistance to state and local law enforcement. The Public Safety Partnership and Community Policing Act of 1994, Pub. L. No. 103-322, 108 Stat. 1807 (the Act), which was enacted as part of the VCCLEA, authorizes the Department of Justice (DOJ) to administer a competitive grant program that allocates a limited pool of funds to state and local applicants whose applications are approved by the Attorney General.

In 2017, Los Angeles applied for a grant, but failed to score highly enough to earn one. It challenges the use of two of the many factors DOJ uses in determining the scores for each applicant. Because DOJ's use of these two factors in evaluating applicants for a competitive grant program did not violate the Spending Clause of the U.S. Constitution, art. I, § 8, cl. 1, did not exceed DOJ's statutory authority, and did

not violate the Administrative Procedure Act, we reverse the district court's grant of summary judgment in favor of Los Angeles.

I

The Act's grant program, codified at 34 U.S.C. §§ 10381 to 10389, gives broad discretion to DOJ to allocate grants and administer the grant program for the purposes set forth in § 10381(b). Section 10381(b) authorizes twenty-three different purposes, each generally linked to the goal of enhancing the crime prevention function of state and local law enforcement through working with the community. DOJ is authorized to "promulgate regulations and guidelines to carry out" the grant program, 34 U.S.C. § 10388, and may prescribe the required form and content of grant applications through regulations or guidelines, *id.* § 10382(b). By statute, the application must contain eleven broad categories of information, including an assessment of the impact of the proposed initiative on other aspects of the criminal justice system. *See id.* § 10382(c). Each application must also "identify related governmental and community initiatives which complement or will be coordinated with the proposal" and "explain how the grant will be utilized to reorient the affected law enforcement agency's mission toward community-oriented policing or enhance its involvement in or commitment to community-oriented policing." *Id.* § 10382(c)(4), (10).

The statute permits DOJ to give "preferential consideration, where feasible," on specified grounds, including whether the application proposes hiring and rehiring additional career law enforcement officers, where a non-Federal contribution will cover more than the required

25 percent of the program cost. *Id.* § 10381(c)(1).**[1]** The statute was amended in 2015 to allow DOJ to give preferential treatment to a state that has enacted certain laws designed to combat human trafficking. *See id.* § 10381(c)(2), (3); Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22, §§ 601, 1002, 129 Stat. 227, 259–60, 266–67.

Congress has regularly made appropriations for grants administered under this statute. DOJ has determined that Congress intended these appropriations to be used for two of the twenty-three purposes set forth in § 10381, namely "to rehire law enforcement officers who have been laid off as a result of State, tribal, or local budget reductions for deployment in community-oriented policing," 34 U.S.C. § 10381(b)(1), and "to hire and train new, additional career law enforcement officers for deployment in community-oriented policing across the Nation," *id.* § 10381(b)(2).**[2]**

---

**[1]** The Act includes other technical requirements for awarding grants. For instance, each state that applies or that contains an applying entity must receive, together with any grantees in the state, at least .5 percent of a fiscal year's total allocation for the grant program. 34 U.S.C. § 10381(f). Second, allocated funds must be divided equally between small (fewer than 150,000 people) and large (more than 150,000 people) jurisdictions. *Id.* § 10261(a)(11)(B). Third, a grant cannot account for more than 75 percent of a recipient program's costs, although the Attorney General can waive this requirement. *Id.* § 10381(g).

**[2]** Contrary to the dissent, Dissent at 33 n.1, 43, Congress has set aside funds that could be expended for any of § 10381's purposes. Appropriations bills have directed funds "for community policing development activities in furtherance of [§ 10381's purposes]" and "for the collaborative reform model of technical assistance in furtherance of [§ 10381's purposes]," Consolidated Appropriations Act, Pub. L. 115-31, Div. B, Tit. II, 131 Stat. 135, 207 (2017), as well as for the hiring and rehiring of additional career law enforcement officers.

DOJ has exercised its broad discretion under the Act by developing a combined guidelines and application form for parties that wish to apply for a grant to hire or rehire officers for community-oriented policing. *See* COPS Office Application Attachment to SF-424 (referred to hereafter as "Application Guidelines"). The Application Guidelines define "community policing" as "a philosophy that promotes organizational strategies that support the systematic use of partnerships and problem-solving techniques to proactively address the immediate conditions that give rise to public safety issues such as crime, social disorder, and fear of crime." Community policing strategies may include "ongoing collaborative relationships" with local and federal agencies, as well as "systematically tailor[ing] responses to crime and disorder problems to address their underlying conditions."

The Application Guidelines set out a series of questions and instructions that allow an applicant to explain why it is seeking a grant and why it is best qualified to receive one. Among other things, an applicant must explain its need for federal assistance, provide information about its fiscal health, agree to comply with various provisions of federal law, and provide additional information and assurances of various kinds. An applicant must also specify its law enforcement and community policing strategy, including a "crime and disorder problem/focus area." The Application Guidelines direct the applicant to choose one of eight focus areas: "illegal immigrations," "child and youth safety focus," "drug abuse education, prevention and intervention," "homeland security problems," "nonviolent crime problems and quality of life policing," "building trust and respect," "traffic/pedestrian safety problems," and "violent crimes problems." The Application Guidelines provide examples of the type of problems included in each focus area. For the

homeland security focus area, for instance, the Application Guidelines state, "Please specify your critical infrastructure problem; for example, addressing threats against facilities, developing and testing incident response plans, etc." For the illegal immigration focus area, the Application Guidelines state, "Please specify your focus on partnering with the federal law enforcement to address illegal immigration for information sharing, [§] 287(g) partnerships,[3] task forces and honoring detainers."[4]

DOJ evaluates, scores, and ranks the submitted applications, then awards grant funds to the highest scoring applicants.[5] The scoring process is designed to allocate

---

[3] A § 287(g) partnership is a written agreement between the Attorney General and a state or a local jurisdiction, under which "an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across State lines to detention centers), may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law." 8 U.S.C. § 1357(g)(1).

[4] An "immigration detainer" is issued by the Department of Homeland Security (DHS) to advise another law enforcement agency that DHS seeks custody of an alien for arrest and removal, and serves as "a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible." 8 C.F.R. § 287.7(a). Upon DHS's request, a law enforcement agency "shall maintain custody of the alien for a period not to exceed 48 hours," excluding weekends and holidays, "in order to permit assumption of custody by" DHS. *Id.* § 287.7(d).

[5] According to DOJ, it "does not disclose the number of points assigned to any particular answer, because disclosing the scoring system could skew the application process and subject that process to manipulation."

federal assistance to programs, focuses, or conduct that DOJ deems to best further statutory purposes and federal goals. Consistent with the statutory criteria, DOJ gives points to applicants that best demonstrate "a specific public safety need" and show an "inability to address the need without Federal assistance," 34 U.S.C. §§ 10382(c)(2), (c)(3), and to applicants that best "explain how the grant will be utilized to reorient the affected law enforcement agency's mission toward community-oriented policing or enhance its involvement in or commitment to community-oriented policing," *id.* § 10382(c)(10). DOJ also gives points to applicants in jurisdictions with higher crime rates and comparatively lower fiscal health. Additionally, DOJ scores applicants on how their proposals relate to that year's federal goals. In various years, DOJ has awarded points for applicants that gave work to military veterans, that adopted specified management practices (such as making regular assessments of employee satisfaction, exercising flexibility in officer shift assignments, and operating an early intervention system to identify officers with specified personal risks), or that experienced certain catastrophic events, such as a terror attack or school shooting. In 2017, DOJ gave additional points to applicants that focused on the federal priority areas of violent crime, homeland security, and control of illegal immigration. Also in 2017, an applicant could elect to receive additional points by submitting a "Certification of Illegal Immigration Cooperation" (the "Certification") in which the applicant agrees that (1) the applicant will implement rules, regulations, or practices that ensure DHS personnel have access to the entity's correctional or detention facilities in order to meet with an alien, and (2) the applicant will implement rules, regulations, policies, or practices to ensure that the entity's correctional or detention facilities provide notice "as early as practicable (at least 48 hours, where

possible) to DHS regarding the scheduled release" of an alien in custody.

As usual, in the 2017 grant cycle, DOJ received more requests for funding than it was able to grant.  Congress allocated roughly $98.5 million for grants, but applicants requested almost $410 million.  From a total applicant pool of 90 large jurisdictions and 1,029 small jurisdictions, DOJ awarded grant funds to 30 of the large jurisdictions and 149 of the small jurisdictions.  An applicant did not need to select the illegal immigration focus or submit the Certification to receive funds.  Of the seven applicants that chose illegal immigration as a focus area, only one large jurisdiction and one small jurisdiction received an award.  Of the successful applicants, only 19 of the 30 large jurisdictions and 124 of the 149 small jurisdictions received bonus points for submitting the Certification.  Los Angeles submitted an application but was not awarded any funding.  It chose "building trust and respect" as its focus area and declined to submit the Certification.

In September 2017, Los Angeles filed a complaint seeking to enjoin DOJ's practice of awarding points to applicants that selected the illegal immigration focus area and to applicants that completed a Certification related to illegal immigration.  Los Angeles argues that these two elements of DOJ's scoring system are unlawful because they (1) violate constitutional principles of separation of powers and exceed DOJ's lawful authority, (2) violate the Spending Clause, and (3) are arbitrary and capricious under the Administrative Procedure Act.  The district court agreed with Los Angeles on each of these claims.  The court entered a permanent injunction against the challenged practices, and DOJ appealed.

## II

Although Los Angeles claims it was injured by DOJ's use of two scoring elements in its 2017 grant cycle, that cycle has long since been completed. Therefore, we must determine whether this appeal is moot, and if not, whether Los Angeles has standing to bring its claims.

We first conclude that the appeal is not moot. Article III limits the jurisdiction of federal courts to actual cases and controversies. U.S. Const. art. III, § 2, cl. 1. Because there is no longer a live controversy regarding the 2017 grant program, the appeal would ordinarily be moot. Nevertheless, the Supreme Court has held that an appeal is not moot in "exceptional situations" when it is "capable of repetition, yet evading review." *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016) (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)). Here, the case meets the requirements to avoid mootness. First, "the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration," *id.* (alteration in original) (quoting *Spencer*, 523 U.S. at 17), because any one grant cycle is too short to provide for meaningful review. In 2017, for instance, fewer than three months passed between DOJ's announcement of the scoring factors and the grant awards. Second, "there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again." *Id.* (alteration in original) (quoting *Spencer*, 523 U.S. at 17). Los Angeles is reasonably likely to apply for a DOJ grant in the future, and has done so in the previous two consecutive years. Los Angeles also submitted a declaration of its intent to apply for a grant in the 2018 cycle. Although DOJ states it has not yet determined "how immigration-related factors will be handled in the FY 2018 application," it has not agreed to stop giving bonus points for

such factors in the future. Even if it had, voluntary cessation of the practice does not deprive us of power to hear the case "unless it can be said with assurance that there is no reasonable expectation . . . that the alleged violation will recur." *Fikre v. FBI*, 904 F.3d 1033, 1037 (9th Cir. 2018) (internal quotation marks and citation omitted). No such assurances are present here.

We also conclude that Los Angeles has standing to bring this appeal. Los Angeles states it "has made a longstanding decision that it can best protect public safety by not participating in federal civil immigration enforcement." It also states that its police department has a longstanding policy that "restricts an officer from initiating a police action with the objective of discovering a person's immigration status, and also prohibits arrests based solely on civil immigration status." As a result of these policies, Los Angeles declined to select the illegal immigration focus and declined to submit the Certification. Accordingly, Los Angeles claims that when it applied for a grant, it was disadvantaged relative to other applicants that were able to choose the illegal immigration focus area or complete the Certification, and this inability to compete on an even playing field constitutes a concrete and particularized injury. *See Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 506 (9th Cir. 1988); *Preston v. Heckler*, 734 F.2d 1359, 1365 (9th Cir. 1984) ("[W]hen challenged agency conduct allegedly renders a person unable to fairly compete for some benefit, that person has suffered a sufficient 'injury in fact.'" (quoting *Glacier Park Found. v. Watt*, 663 F.2d 882, 885 (9th Cir. 1981)); c*f. Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 280 n.14 (1978) (holding that plaintiff suffered an injury when he could not compete for all places in his entering medical school class). While DOJ states that Los Angeles would not have received funding regardless of

whether DOJ awarded bonus points for the illegal immigration focus area or the Certification, Los Angeles need not prove that it would have received funding absent the challenged considerations. *See Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993). Further, Los Angeles argues that such injury is directly traceable to DOJ's use of the challenged scoring elements. Should a court bar DOJ from using these scoring factors, Los Angeles contends, applicants that are willing to choose the illegal immigration focus area or to sign the Certification would no longer have that advantage over Los Angeles. *See Bullfrog Films*, 847 F.2d at 507–08.

Los Angeles's claim of injury is thin. Los Angeles does not argue it was prevented by law from selecting an illegal immigration focus or from agreeing to the Certification; it merely chose not to do so. Moreover, Los Angeles's decision not to select the illegal immigration focus did not itself put it at a competitive disadvantage. An applicant can choose only one focus area, and Los Angeles could have equalized the focus area bonus points by choosing the homeland security or violent crime focus area, both of which also received additional points, rather than choosing the "building trust and respect" focus area. (DOJ did not offer applicants equal points for conduct comparable to agreeing to the Certification, however.)

Despite the weakness of Los Angeles's argument, a plaintiff need show only a slight injury for standing. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973). We conclude that Los Angeles's slight competitive disadvantage due to its policy of not assisting the federal government on

immigration-related issues is sufficient to give Los Angeles standing in this action.

## III

Before turning to the merits of Los Angeles's claims, we first note the limited nature of the dispute.  As noted above, in administering a federal grant program and scoring the applications it receives, DOJ gives additional points to an applicant that chooses to focus on the illegal immigration area (instead of other focus areas) and gives additional points to an applicant who agrees to the Certification.  Choosing the illegal immigration area and submitting the Certification are not conditions of receiving a grant, and numerous applicants received grants without doing so.   Likewise, numerous applicants who chose the illegal immigration focus area or submitted the Certification did not receive a grant.   The question before us, therefore, is whether DOJ's scoring practice of giving these additional points is unconstitutional or exceeds DOJ's authority in administering the grant program.

## A

We begin with Los Angeles's argument that DOJ's practice of giving additional consideration to applicants that choose to further the two specified federal goals violates the Spending Clause.   The Spending Clause provides that Congress has the power "to pay the Debts and provide for the common Defence and general Welfare of the United States."   U.S. Const. art. I, § 8, cl. 1.  This power gives Congress the ability "to grant federal funds to the States, and [Congress] may condition such a grant upon the States' 'taking certain actions that Congress could not require them to take.'" *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 576 (2012) ("*NFIB*") (quoting *Coll. Sav. Bank v. Fla.*

*Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 686 (1999)).

Although Congress has broad power to attach conditions to the receipt of federal funds, the power is not unlimited. *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). First, "the exercise of the spending power must be in pursuit of the general welfare." *Id.* (internal quotation marks omitted). "In considering whether a particular expenditure is intended to serve general public purposes, courts should defer substantially to the judgment of Congress." *Id.*

Moreover, if Congress decides to impose conditions on the allocation of funds to the states, it "must do so unambiguously . . . , enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* (alteration in original) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). In *Pennhurst*, the plaintiffs argued that a federal-state grant program should be reinterpreted as retroactively imposing significant costs on states that received those funds. 451 U.S. at 20. In rejecting that reinterpretation, the Court held that legislation allocating funds to states in return for states accepting specified conditions is analogous to a contract between Congress and the states. *Id.* at 17. "The legitimacy of Congress'[s] power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Id.* Congress goes too far when it surprises states with "post acceptance or 'retroactive' conditions." *Id.* at 25. Therefore, the Court declined to reinterpret the "contract" between Congress and the states as retroactively imposing such unexpected and burdensome conditions. *Id.*

Nor can the federal government attach conditions to the receipt of federal funds if "the financial inducement offered

by Congress might be so coercive as to pass the point at which pressure turns into compulsion," *Dole,* 483 U.S. at 211 (internal quotation marks omitted). In *South Dakota v. Dole*, Congress attempted to induce states to adopt a minimum drinking age of twenty-one years by threatening to cut five percent of federal highway funding to those states that failed to do so. *Id.* at 211. The Court held this was only "relatively mild encouragement to the States," and therefore "a valid use of the spending power." *Id.* at 211–12. By contrast, the threat to eliminate all of a state's existing Medicaid funding if the state opted out of the Affordable Care Act's expansion in health care coverage was "much more than 'relatively mild encouragement'—it [was] a gun to the head," and therefore was an impermissible use of Congress's spending power. *NFIB*, 567 U.S. at 581. Accordingly, Congress may offer conditional funding only if the "State has a legitimate choice whether to accept the federal conditions in exchange for federal funds." *Id.* at 578.

Further, Congress may not impose conditions on federal grants that "are unrelated 'to the federal interest in particular national projects or programs.'" *Dole*, 483 U.S. at 207–08 (quoting *Massachusetts v. United States*, 435 U.S. 444, 461 (1978) (plurality opinion)). This standard is not demanding—the conditions need only "bear some relationship to the purpose of the federal spending." *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) (quoting *New York v. United States*, 505 U.S. 144, 167 (1992)). In *Dole*, for instance, the requirement that states adopt a minimum drinking age was sufficiently related to the payment of federal highway funds. Rejecting the dissent's argument that the restriction had too "attenuated or tangential [a] relationship to highway use or safety," *Dole*, 483 U.S. at 215 (O'Connor, J., dissenting), the Court held that the age restriction was "directly related to one of the

main purposes for which highway funds are expended—safe interstate travel," *id.* at 208 (majority opinion).  Indeed, the Court has never struck down a condition on federal grants based on this relatedness prong.

Finally, Congress may not require states to engage in actions that are themselves unconstitutional.  *Id.* at 210–11.

As even this brief description of the limitations on Congress's spending power makes clear, the applicable Spending Clause principles do not readily apply to an allocation of grant funds through a competitive grant process, such as the program in this case.[6]  As a threshold matter, DOJ does not propose to withdraw significant federal funds from a state or local jurisdiction unless they comply with specified federal requirements.  *Cf. NFIB*, 567 U.S. at 579–80; *Dole*, 483 U.S. at 205.  Nor does DOJ propose to reinterpret the terms of a grant retroactively to impose costly new responsibilities on a recipient.  *Cf. Pennhurst*, 451 U.S. at 25.  Nor does DOJ offer a financial inducement for an applicant to cooperate on illegal immigration issues that is so coercive that it is tantamount to compulsion.  *Cf. NFIB*, 567 U.S. at 579–80.  Rather, an applicant is free to choose one of many focus areas, and numerous applicants obtained funding without selecting illegal immigration or signing the

---

[6] Our analysis requires us to bridge one gap in existing Spending Clause precedent—that the principles of *Dole* and *NFIB* apply to agency-drawn conditions on grants to states and localities just as they do to conditions Congress directly places on grants.  In both *Dole* and *NFIB*, Congress had written the challenged conditions directly into the statutes authorizing the grants.  Here, conversely, Congress delegated the task of specifying these conditions to DOJ.  We see no reason why the addition of an agency middleman either expands or contracts Congress's power to "provide for the . . . general Welfare," U.S. Const. art. I, § 8, cl. 1, and thus analyze DOJ's conditions under the principles of *Dole* and *NFIB*.

Certification. Nor did DOJ impose surprise or ambiguous conditions on recipients of the funds, *cf. Pennhurst*, 451 U.S. at 25; the immigration-related conditions were clearly presented in the Application Guidelines and Certification.

At most, DOJ's decision to give additional points to applicants that select an illegal immigration focus or that agree to the Certification encourages applicants to focus on these federal priorities. Because an applicant is free to select other prioritized focus areas or not to apply for a grant at all, such a subtle incentive offered by DOJ's scoring method is far less than the coercion in *Dole*, which directly reduced the amount of funds allocated to a state, and which the Court held was consistent with Spending Clause principles.[7]

Finally, cooperation relating to enforcement of federal immigration law is in pursuit of the general welfare, and meets the low bar of being germane to the federal interest in providing the funding to "address crime and disorder problems, and otherwise . . . enhance public safety," VCCLEA § 1701(a), "one of the main purposes for which" the grant is intended, *Dole*, 483 U.S. at 208. As explained in more detail below, DOJ has reasonably determined that cooperation on illegal immigration matters furthers the

---

[7] Because DOJ's scoring process does not coerce an applicant or authorize the federal government to exercise any control over state or local law enforcement, it does not violate 34 U.S.C. § 10228(a), which states: "Nothing in this chapter or any other Act shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof." *Id.* § 10228(a). We reject Los Angeles's argument to the contrary.

purposes of the Act.  *See infra* at 22–27.  Accordingly, we reject Los Angeles's Spending Clause argument.

### B

Because DOJ's scoring factors encourage, but do not coerce, an applicant to cooperate on immigration matters, we also reject Los Angeles's claims that DOJ's use of the factors infringes on state autonomy in a manner that raises Tenth Amendment concerns.  Los Angeles's reliance on *Gregory v. Ashcroft*, 501 U.S. 452 (1991), and *Virginia Department of Education v. Riley*, 106 F.3d 559 (4th Cir. 1997) (en banc) (per curiam), is meritless.  *Gregory* held that the federal Age Discrimination in Employment Act did not prohibit Missouri from enforcing its law requiring state judges to retire at age 70.  501 U.S. at 473.  According to the Court, while Congress has the power to override a state age requirement, it would have to use unmistakably clear statutory language to do so, because such a question "is a decision of the most fundamental sort for a sovereign entity."  *Id.* at 460.  The Fourth Circuit applied a similar presumption in *Riley*, holding that the Individuals with Disabilities Education Act did not clearly establish that Congress intended to condition Virginia's receipt of federal funds on the state's provision of "private educational services to each of the State's 126 disabled students who had been expelled for reasons wholly unrelated to their disabilities."  106 F.3d at 560.  Here, contrary to Los Angeles's argument, DOJ's decision to give points to applicants that submit the Certification and agree to give DHS personnel access to the applicant's correctional or detention facilities to meet with alien detainees, or to give DHS notice before an alien detainee is released, does not override state laws and therefore does not give rise to any Tenth Amendment concern.

## IV

We now turn to Los Angeles's argument that DOJ exceeded its statutory authority in awarding bonus points to applicants that selected the illegal immigration focus area or that agreed to the Certification.

When Congress has "explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984). "Such legislative regulations are given controlling weight unless they are arbitrary, capricious or manifestly contrary to the statute." *Id.* at 844. This standard is "deferential and narrow"; there is a "'high threshold' for setting aside agency action." *Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544, 554 (9th Cir. 2016) (quoting *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1067, 1070 (9th Cir. 2010)). As long as a "reasonable basis exists for the decision"—meaning the agency "considered the relevant factors and articulated a rational connection between the facts found and the choices made"—we presume the action is valid. *Id.* (internal quotation marks omitted). Moreover, when Congress has explicitly given an agency the substantive authority to prescribe standards, the agency's promulgations are "entitled to more than mere deference or weight"; rather, they are entitled to "legislative effect." *Schweiker v. Gray Panthers*, 453 U.S. 34, 44 (1981) (quoting *Batterton v. Francis*, 432 U.S. 416, 425–26 (1977)).

This highly deferential standard is applicable here. As noted above, the Act gives DOJ broad authority to "promulgate regulations and guidelines to carry out" the Public Safety and Community Policing subchapter, 34 U.S.C. § 10388, authorizing the creation and

implementation of a competitive grant program, and to "prescribe by regulation or guidelines" the form of an application and the information it will require, *id.* § 10382(b). Because Congress authorized DOJ to fill gaps through its promulgation of the Application Guidelines and implementation of the grant program, we give DOJ's inclusion of an illegal immigration focus area and use of the Certification controlling weight unless they are manifestly inconsistent with the statute or lack any reasonable basis, "even if the agency's reading differs from what the court believes is the best statutory interpretation." *Glacier Fish Co. v. Pritzker*, 832 F.3d 1113, 1121 (9th Cir. 2016) (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005)).

DOJ's inclusion of immigration-related scoring factors as a component of its implementation of its grant program is well within DOJ's broad authority to carry out the Act. At the threshold, the Application Guidelines' inclusion of the illegal immigration focus area, which asks an applicant to "specify your focus on partnering with federal law enforcement to address illegal immigration for information sharing, [§] 287(g) partnerships, task forces and honoring detainers," is not "manifestly contrary to the statute." *Chevron*, 467 U.S. at 844. Nothing in the Act precludes DOJ from allocating federal funds to state or local governments to focus on problems raised by the presence of illegal aliens within their jurisdictions.[8]

---

[8] In addition to listing the immigration focus area, the Application Guidelines list multiple other focus areas, including violent crime, traffic and pedestrian problems, and "quality of life policing." While the Act does not expressly mention any of these focus areas, its gives DOJ broad discretion to identify and rank such a range of goals. Given DOJ's

Rather, DOJ's determination "that illegal immigration enforcement is a public safety issue and that this issue can be addressed most effectively through the principles of community policing that [DOJ] promotes—including through partnerships and problem-solving techniques," is entirely consistent with the broad scope of the Act.  First, DOJ's understanding that illegal immigration presents a public safety issue has been acknowledged by the Supreme Court.  *See Arizona v. United States*, 567 U.S. 387, 397–98 (2012).  While "it is not a crime for a removable alien to remain present in the United States," *id.* at 407, the Court has recognized that in some jurisdictions, such as Arizona's "most populous county," aliens who have entered the country illegally "are reported to be responsible for a disproportionate share of serious crime," *id.* at 397–98.  The Court has noted that "[a]ccounts in the record suggest there is an 'epidemic of crime, safety risks, serious property damage, and environmental problems' associated with the influx of illegal migration across private land near the Mexican border."  *Id.* at 398.  Congress has likewise expressed concern about "increasing rates of criminal activity by aliens."  *Demore v. Kim*, 538 U.S. 510, 518 (2003).

Second, DOJ's determination that the techniques of community policing may be used to address this public safety issue is entirely reasonable.  As DOJ explains, community policing is an important crime-fighting technique that officers use along with others to address various law-enforcement and community safety goals.  The

---

authority to administer the grant program along these lines, the dissent's argument that immigration enforcement cannot be a permissible focus area because the Act makes no mention of immigration enforcement, Dissent at 42, is meritless.

public safety issues that arise from illegal immigration can be addressed through collaborative interactions and information flow between law enforcement and the community, just as with any other sort of public safety issue, such as those arising from "violent crime problems" and other focus areas. If a jurisdiction selects an illegal immigration focus due to community concerns, it is reasonable to consider that officers may be more effective in addressing such issues if they act pursuant to § 287(g) partnerships, which allow state or local officers to perform immigration officer functions, *see* 8 U.S.C. § 1357(g)(1).[9] Nothing in the Act precludes such cooperation; rather, the Act requires applicants to "identify related governmental and community initiatives which complement or will be coordinated with the proposal," 34 U.S.C. § 10382(c)(4), and to explain how officers' use of community-oriented policing techniques will be coordinated with such initiatives.

---

[9] Los Angeles argues that § 287(g) partnerships cannot be part of a federally funded initiative because 8 U.S.C. § 1357(g)(1) requires § 287(g) partnerships to be undertaken "at the expense of the State or political subdivision." *See also* Dissent at 55 (stating that a local officer's participation in a § 287(g) partnership "*must* be 'at the expense of the State or political subdivision'" (emphasis added) (quoting 8 U.S.C. § 1357(g)(1))). Los Angeles and the dissent misunderstand both § 1357(g)(1) and the grant program. Section 1357(g)(1) clarifies only that states and localities are not entitled to federal reimbursement for work carried out in a § 287(g) partnerships. *See* 8 U.S.C. § 1357(g)(1) (stating that an officer or employee of the state or subdivision who is qualified to perform certain functions of an immigration officer "may carry out such function at the expense of the State or political subdivision"). The statute does not forbid the use of federal funds to assist a state or local entity that has entered into such a partnership. Moreover, DOJ has made clear that grant funds may be used only to hire or rehire officers, not for any state or local expenses of a § 287(g) agreement.

Nor does the Act's community-policing focus limit DOJ to considering only those factors directly related to interaction with the community.  Obviously, an officer's responsibilities involve a broad array of tasks, including administrative tasks like sharing information with relevant federal agencies or honoring detainers.  Just as DOJ considers a jurisdiction's fiscal health and crime rate, as well as a jurisdiction's attention to other federal priorities like the mental health of officers, giving work to military veterans, and responding to catastrophic events like school shootings, it can also consider a jurisdiction's attention to the federal priority of illegal immigration through the Certification.  A jurisdiction's willingness to provide notice that a detained removable alien will be released from custody, or to provide facility access so that federal officials can interview removable aliens while in custody, is consistent with the Act's purpose to enhance public safety, *see* VCCLEA § 1701(a), through means including both community-oriented policing and attention to intelligence, anti-terror, or homeland security duties.  *See* 34 U.S.C. §§ 10381(b)(1)–(2), (4).

Finally, DOJ's broad definition of community-oriented policing in the Application Guidelines as "a philosophy that promotes organizational strategies that support the systematic use of partnerships and problem-solving techniques to proactively address the immediate conditions that give rise to public safety issues such as crime, social disorder, and fear of crime," clearly encompasses all DOJ's scoring factors, including partnering with federal law enforcement to address illegal immigration for information sharing, [§] 287(g) partnerships, task forces, and honoring detainers.  The Act does not define "community-oriented policing" or delineate what sorts of strategies are sufficiently "community-oriented."  *See Brand X*, 545 U.S. at 980–81.

Therefore, because Congress has not "directly spoken to the precise question at issue," we must defer to DOJ's interpretation so long as it is reasonable, that is, so long as it "reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress'[s] expressed intent." *Glacier Fish*, 832 F.3d at 1120–21 (first quoting *Chevron*, 467 U.S. at 842; then quoting *Rust v. Sullivan*, 500 U.S. 173, 184 (1991)).[10] This is true even if the agency's interpretation is "not necessarily the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009) (emphasis in original).

---

[10] The dissent offers a lengthy political history of community-oriented policing, and asserts that Congress incorporated the dissent's view of the term "community-oriented policing" in the statute. Dissent at 35–40, 52 n.39. But Congress enacts statutory text, not political history, and the contours of "community-oriented policing" are not "unambiguously expressed by the statutory language." *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 93 (2007). "Policing" that is "oriented" toward the "community" can describe a broad set of policing techniques. These techniques may include direct police interactions with the community in some circumstances. But the statute does not limit community-oriented policing to such strategies, and other techniques may be better suited to address the community's priorities, such as public safety issues related to illegal immigration. As the dissent acknowledges, problem solving—"the process through which the specific concerns of communities are identified and through which the most appropriate remedies to abate these problems are found"—is a key component of community-oriented policing, Dissent at 37–38, and a range of different remedies may be valid for furthering the statute's public safety goals. In light of the statute's broad purposes, we conclude "the language of the statute is broad enough to permit" DOJ's reasonable definition of community-oriented policing. *Zuni Pub. Sch. Dist.*, 550 U.S. at 100.

Here, DOJ's interpretation is permissible, because it reasonably construes the statutory language ("community-oriented" and "policing") and is consistent with the statute's purposes, which go far beyond interactions between law enforcement and the community. The general purpose of the Act is to enhance the crime prevention functions of state and local law enforcement and to enhance public safety through interacting with and working with the community. *See* 34 U.S.C. § 10381(b); *see also* VCCLEA § 1701(a) (stating that it is among the Act's purposes "to increase police presence, to expand and improve cooperative efforts between law enforcement agencies and members of the community to address crime and disorder problems, and otherwise to enhance public safety").[11]

The dissent argues that DOJ's interpretation and implementation of the Act may reflect the administration's policy goals, and these goals may change from time to time. Dissent at 59 & n.48. We agree that an administration's policy goals may influence the selection of factors warranting additional consideration for awarding competitive grants. But Congress contemplated such a result

---

[11] Although unnecessary to our analysis, the legislative history of the Act supports DOJ's broad interpretation of community-oriented policing. While facilitating increased interaction between law enforcement and members of the community was one focus of community-oriented policing as described in the legislative history, *see* H.R. Rep. No. 103-324, at 6 (1993), the Judiciary Committee report on the bill also notes intent to reduce law enforcement's reliance on reactive policing and renew law enforcement's ability "to anticipate and prevent crime by use of community-oriented, problem solving techniques," *id.* DOJ's definition of community-oriented policing incorporates the focus on community interaction with the additional goal of supporting proactive policing that involves "analyzing crime and disorder problems, working with the community on a search for alternative solutions, implementing solutions, and evaluating their effectiveness." *Id.* at 7.

28                   CITY OF LOS ANGELES V. BARR

when it enacted a statute that left substantial gaps for the implementing agency to fill. Where Congress affords an agency such discretion, we ask only whether the agency's interpretation was reasonable. *See Glacier Fish*, 832 F.3d at 1120. Whether an interpretation serves an administration's policy goals has no bearing on that inquiry. *See Dep't of Commerce v. New York*, No. 18-966, slip op. at 24 (U.S. June 27, 2019) ("[A] court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities.").

Los Angeles and the dissent also contend that DOJ exceeded its authority by including the option of the illegal immigration focus area and considering whether an applicant submitted the Certification because DOJ is constrained by § 10381(c), which states that the "Attorney General may give preferential consideration, where feasible, to an application" from "an applicant in a state" that has certain human trafficking laws. Dissent at 53–54. According to this argument, DOJ's inclusion of an illegal immigration focus area in the Application Guidelines renders §§ 10381(c)(2) and (c)(3) "superfluous" because Congress would not have needed to enact §§ 10381(c)(2) and (c)(3) if DOJ had the authority to favor applicants based on efforts related to illegal immigration and other extraneous matters. Dissent at 53–54.

This argument lacks any support in the text or history of the Act. First, it is based on Los Angeles's baseless assumptions that (1) preferring applicants who focus on illegal immigration is the same as preferring states that have enacted specified human trafficking laws, and (2) DOJ could not prefer either without specific authorization from Congress. Nothing in the Act supports these assumptions.

First, as we have explained, an award of grant funds to states or localities that intend to focus on illegal immigration is well within the statute's scope, and DOJ has broad discretion to adopt such a focus area. Second, while § 10381(c) encourages DOJ to give preferential consideration to states with specified human trafficking laws, the statute does not indicate whether DOJ would have lacked authority to do so before the enactment of § 10381(c). More important, it is clear that nothing in that section limits DOJ's discretion to select additional factors to assist it in allocating grant funds. *See id.* § 10382(b). Had Congress intended to limit DOJ's discretion in ranking applications according to various criteria, which DOJ had been doing for years before Congress amended the Act to add § 10381(c), we would expect Congress to give some express indication of such an intent. It did not do so. Accordingly, we reject the argument that § 10381(c) has any bearing on DOJ's current methodology.

We conclude that DOJ did not exceed its statutory authority in including two scoring factors related to illegal immigration as part of its implementation of the grant program.

V

Finally, Los Angeles argues that DOJ violated the APA because it failed to engage in reasoned decisionmaking and because its explanation for its policy is contrary to the evidence before it when it decided to give points for adopting the illegal immigration focus and submitting the Certification.

"One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions." *Encino Motorcars, LLC*

*v. Navarro*, 136 S. Ct. 2117, 2125 (2016).  The agency satisfies this requirement "when the agency's explanation is clear enough that its 'path may reasonably be discerned.'" *Id*. (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight Sys.*, *Inc.*, 419 U.S. 281, 286 (1974)).  The agency need provide only a "minimal level of analysis" to avoid its action being deemed arbitrary and capricious.  *Id.*  Although a reviewing court "must not rubber-stamp administrative decisions," it also "must not substitute its judgment for that of the agency."  *Alaska Oil*, 815 F.3d at 554  (internal quotation marks omitted).  Agency action may also be deemed arbitrary and capricious if the agency has "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

According to Los Angeles, DOJ's action was not based on empirical evidence establishing that cooperation between state and local authorities and federal authorities on illegal immigration addresses crime or public safety issues.  Los Angeles points to studies it claims show that recidivism rates for illegal aliens are not disproportionate relative to the general population and to news articles describing studies that it claims show that sanctuary policies do not lead to increased crime rates.  According to Los Angeles, DOJ ignored these studies and articles, and also failed to make a careful study of how community policing relates to civil immigration enforcement.  Because DOJ adopted its two scoring factors without reviewing relevant evidence, Los Angeles argues, DOJ's scoring factors are arbitrary and capricious, and thus invalid under the APA.

We disagree.  Under the APA, an agency must give adequate reasons for its decision, and DOJ has done so here. DOJ has reasonably determined that "illegal immigration enforcement is a public safety issue [that] can be addressed most effectively through the principles of community policing."  And because the Certification "relate[s] to non-citizens who are being detained and who have committed crimes or are suspected of having committed crimes," DOJ reasonably concluded that "[w]orking with the federal government to enforce the federal immigration laws against aliens who have committed crimes or are suspected of having committed crimes makes communities safer."  As the Supreme Court has noted, "increasing rates of criminal activity by aliens" and federal immigration authorities' failure to remove "deportable criminal aliens" have been the subject of congressional concern.  *Demore*, 538 U.S. at 518.

Moreover, the studies and articles cited by Los Angeles do not undercut DOJ's conclusion that removing aliens who are convicted or suspected of crimes makes communities safer.  At most, the studies and articles provide some evidence that the recidivism rate for removable aliens who engaged in criminal activities is comparable to the recidivism rate for U.S. citizens and aliens who are not removable; such studies do not bear on whether addressing illegal immigration enforcement through community-oriented policing can make communities safer.[12]

---

[12] *See, e.g.*, Bianca E. Bersani, *An Examination of First and Second Generation Immigrant Offending Trajectories*, 31 Just. Q. 315, 335 (2014); Jennifer S. Wong, Laura J. Hickman & Marika Suttorp-Booth, *Examining Recidivism Among Foreign-Born Jail Inmates: Does Immigration Status Make a Difference over the Long Term?*, 16 Global Crime 265, 280–81 (2015).

Accordingly, there is no basis for Los Angeles's argument that DOJ acted counter to the evidence before it.

Los Angeles may believe that addressing illegal immigration is not the most effective way to improve public safety, but the wisdom of DOJ's policy is not an element of our arbitrary and capricious review. We may not "substitute [our] judgment for that of the agency." *State Farm*, 463 U.S. at 43. And DOJ "need not demonstrate to [our] satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better[.]" *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original).

We conclude that DOJ's policy decision has a "rational connection" to the goal of enhancing public safety and was not counter to the evidence before the agency, and therefore is not arbitrary and capricious. *Alaska Oil*, 815 F.3d at 554.

\*\*\*

In sum, DOJ's use of the two scoring factors is well within its statutory discretion, is not arbitrary and capricious, and complies with the constitutional restrictions imposed on congressional action under principles of federalism and the Spending Clause.

**REVERSED.**

WARDLAW, Circuit Judge, dissenting:

A quarter of a century ago, in 1994, the United States Congress passed the Public Safety Partnership and Community Policing Act (the Act), which established the Community Oriented Policing Services (COPS) grant program. Congress's purpose was to increase the number of "cops on the beat" and to enhance officers' interaction within their communities to improve communication and cooperation; that is, to create "community partnerships" between police officers and the communities they serve. Congress specified twenty-three "purposes for which grants may be made" but *to date* has appropriated funds for only two of those purposes: (1) to rehire officers who were laid off due to budgetary concerns for deployment in community-oriented policing, and (2) to hire and train new additional officers for deployment in community-oriented policing. Thus, since authorizing grants for community-oriented policing, a term well understood by Congress in 1994 to connote partnering with the community, Congress's sole appropriations have been to fund deployment of more officers on the streets.[1]

Congress funds states and localities that deploy community-oriented policing through the COPS grant program. It delegated the administration of the COPS grant program to the Department of Justice (DOJ). In 1994, Attorney General Janet Reno created the COPS Office within DOJ to handle applications and the awards of grants

---

[1] The majority opinion is simply inaccurate on this point. *See* Majority Op. at 7 n.2. It is only for the COPS Hiring Program—the grant program at issue here—that Congress has ever appropriated funds for the community-oriented policing purposes delineated in 34 U.S.C. § 10381(b)(1) and (2).

to cities and states for community-oriented policing. Through its entire existence, the COPS grant program has been administered with this congressional purpose in mind.

That is, until 2017, when DOJ decided to usurp the COPS funds for its own immigration policy directives. As part of a broader effort to divert federal funds from congressionally authorized purposes to the Trump Administration's efforts to press state and local police into federal immigration enforcement, Attorney General Jefferson B. Sessions III imposed new preferences for obtaining COPS grant awards that effectively substitute "federal law enforcement" for "community" in the "community partnerships" Congress sought to fund through the Act. Congress did not contemplate general policing when devoting funds for community-oriented policing, and it certainly did not contemplate federal immigration enforcement when it attempted to reduce crime by adding "cops on the beat."

Because the term "community-oriented policing" had in 1994 and has through today a commonly understood meaning that excludes federal immigration enforcement functions, the new federal immigration preferences are, as the district court held, *ultra vires* as a matter of law. I therefore respectfully dissent from the majority's holding that DOJ's diversion of COPS grant funding from community policing to civil immigration enforcement is lawful.[2]

---

[2] I agree with the majority and the district court that the City of Los Angeles has standing and that the case is not moot under the "capable of repetition yet evading review" exception.

## I.

### A.  History of Community-Oriented Policing in the United States

To comprehend just how antithetical to the concept of community-oriented policing DOJ's new federal immigration considerations are, one must have an understanding of what community partnership means, the history and development of the principles it embraces, and the history of the COPS grant program itself.  Community-oriented policing is "a collaboration between the police and the community that identifies and solves community problems."[3]  This policing strategy, which emerged in the 1970s, is rooted in the principle that "the police are the public and the public are the police."[4]  In the 1960s and 1970s, unstable social conditions, scandals, and recessions led to cuts in the ranks of police departments across the country, driving the need for policing reform.[5]  Despite

---

[3] Bureau of Justice Assistance, U.S. Dep't of Justice, Understanding Community Policing: A Framework for Action vii (1994) [hereinafter 1994 Monograph].

[4] *Id.* at 5–7 (quoting Sir Robert Peel's remarks upon establishing the London Metropolitan Police).

[5] Gayle Fisher-Stewart, Int'l City/Cty. Mgmt. Ass'n, Community Policing Explained: A Guide for Local Governments 3 (2007) [hereinafter 2007 Local Government Guide] (report created with COPS Office support); George L. Kelling & Mark H. Moore, *The Evolving Strategy of Policing*, Perspectives on Policing, Nov. 1988, at 8–9 (citation omitted) (publication of National Institute of Justice, U.S. Department of Justice, and the Program in Criminal Justice Policy and Management, John F. Kennedy School of Government, Harvard University); Michael Norman, *One Cop, Eight Square Blocks*, N.Y.

tactical use of automobiles for crime-preventive patrol and rapid response to calls for service, the 1960s had ushered in an era of rising crime and fear.[6]  The civil rights and antiwar movements further challenged the legitimacy of police and police tactics.[7]  Police were inadequately equipped to serve their socially and culturally diverse communities.[8]  The public's "erosion of confidence" in the police translated into a significant loss of political and financial support.[9]

Recognizing the inability of existing police practices to curb rising civil disorder and crime, police administrators, civic leaders, and politicians sought to remedy frayed police-community relations and reform how law enforcement related to the communities it served.[10]  These reforms emphasized community contribution and support to legitimize police activity—and to create a partnership between the community and the police to meet public safety goals.[11]

---

Times Mag. (Dec. 12, 1993), https://nyti.ms/29jx5SU (last visited May 22, 2019).

   [6] Kelling & Moore, *supra* note 5, at 8.

   [7] *Id.*

   [8] 1994 Monograph, *supra* note 3, at 6.

   [9] Kelling & Moore, *supra* note 5, at 9.

   [10] *See* 1994 Monograph, *supra* note 3, at 7; *see also* 2007 Local Government Guide, *supra* note 5, at 3.

   [11] *See* Kelling & Moore, *supra* note 5, at 11–12.

The hallmark of community-oriented policing is a return to a historical policing mainstay: foot patrol, or, "cops on the beat."[12]  Government reports, academic studies, and news articles consistently formulate community-oriented policing as a strategy based on building trust between police and the communities they serve through direct interaction with individuals within the communities.[13]  As a 1994 DOJ monograph on community policing explained:

> The foundations of a successful community policing strategy are the close, mutually beneficial ties between police and community members.  Community policing consists of two complementary core components, *community partnership* and *problem solving*.  To develop community partnership, police must develop positive relationships with the community, must involve the community in the quest for better crime control and prevention, and must pool their resources with those of the community to address the most urgent concerns of community members.  Problem solving is the process through which the specific concerns of communities are identified and through

---

[12] *Id.* at 10; Norman, *supra* note 5.

[13] *See, e.g.*, 1994 Monograph, *supra* note 3, at 13–17; Kelling & Moore, *supra* note 5, at 12; Office of Cmty. Oriented Policing Servs., U.S. Dep't of Justice, Community Policing Defined 1 (2014); U.S. Gen. Accounting Office, GAO/GGD-96-4, Community Policing: Information on the "COPS on the Beat" Grant Programs 1 (1995) [hereinafter 1995 GAO Report].

which the most appropriate remedies to abate these problems are found.[14]

More "cops on the beat" proved enormously politically popular and, more importantly, measurably contributed to public safety.[15]  Studies conducted throughout the 1970s suggest that foot patrol "reduced fear, increased citizen satisfaction with police, improved police attitudes toward citizens, and increased the morale and job satisfaction of police."[16]  Significantly, the foot patrol experiments of this decade suggested that the more information police learned directly from community members, the better police could effectively combat crime.[17]

By the 1980s, most law enforcement agencies had adopted community-oriented policing practices.[18]  Around 1980, DOJ began to support community-oriented policing efforts through various implementation and research grants.[19]  Many police departments participated in "demonstration projects" in the early 1980s, "reflecting an

---

[14] 1994 Monograph, *supra* note 3, at 13.

[15] Kelling & Moore, *supra* note 5, at 10.

[16] Id.

[17] Id.

[18] 2007 Local Government Guide, *supra* note 5, at 3.

[19] 1995 GAO Report, *supra* note 13, at 1.

innovative period for the development of practical application of the community policing paradigm."[20]

Over the 1980s and early 1990s, community-oriented policing continued to gain momentum and wider acceptance by law enforcement agencies.[21] It is estimated that by 1992, 50% of police departments in cities with populations of 50,000 or more had adopted some form of community policing.[22] A 1994 survey found that 80% of police chiefs and over 50% of sheriffs questioned stated that their departments had already adopted community policing or desired to adopt it in the future.[23]

On December 20, 1993, President Clinton announced an award of approximately $50 million in grants to 74 cities to hire 658 more police officers "to put more police on the street and expand community policing."[24] Describing these

---

[20] Willard M. Oliver & Elaine Bartgis, *Community Policing: A Conceptual Framework*, 21 Policing: Int'l J. Police Strategy & Mgmt. 490, 490 (1998).

[21] *See* Norman, *supra* note 5.

[22] Oliver & Bartgis, *supra* note 20, at 490.

[23] Id.

[24] *Community Policing Grants Announcement*, C-SPAN (Dec. 20, 1993), https://www.c-span.org/video/?53243-1/community-policing-grants-announcement (last visited May 22, 2019); *Policing Hiring Supplement Program*, Bureau of Justice Assistance Fact Sheet (Bureau of Justice Assistance, U.S. Dep't of Justice), Nov. 1995, at 2, https://www.ncjrs.gov/pdffiles/polhirng.pdf (last visited May 22, 2019); *see also* Sharon LaFraniere et al., *FY 1994*, Wash. Post (Apr. 9, 1993), https://www.washingtonpost.com/archive/politics/1993/04/09/fy-1994/f62d729a-d631-44cf-8a2c-c4d90b96f44f/?utm_term=.d4d4d6569379 (last visited May 22, 2019) ("Clinton proposes [in his FY 1994 budget]

first 74 awards of the Police Hiring Supplement Program[25] as a "down payment" on a goal to hire 100,000 police officers across the country, President Clinton remarked, "we know community policing works."[26]   Mayor Richard Riordan of Los Angeles campaigned on a pledge to put thousands more police officers on the street, and his newly elected administration secured on behalf of Los Angeles one of the first 74 awards, receiving $4 million to train and pay 54 new recruits.[27]   By May 1994, DOJ had awarded $100 million more to 176 jurisdictions to hire or rehire 1,365 officers.[28]

## B.  The Public Safety Partnership and Community Policing Act of 1994

Against this backdrop, Congress passed the Act to establish the COPS grant program.  Pub. L. No. 103-322, §§ 10001–10003, 108 Stat. 1796, 1807–15 (codified as

---

spending $50 million on 'community policing' programs that strike to get officers out of patrol cars and more in touch with neighborhoods.").

[25] DOJ distributed funds for the Police Hiring Supplement Program from the Supplemental Appropriations Act of 1993, Pub. L. No. 103-50, 107 Stat. 241.  *See* David Teasley & JoAnne O'Bryant, Cong. Res. Serv., 97-196 GOV, *The Community Oriented Policing Services (COPS) Program: An Overview* 3 (2003).

[26] Community Policing Grants Announcement, *supra* note 24.

[27] *NBC Today Show: Los Angeles Gets Federal COPS Grant—But Is It Enough?* (NBC television broadcast Dec. 21, 1993) (referencing Mayor Richard Riordan's campaign promise to put 3,500 new officers on the street).

[28] *Policing Hiring Supplement Program*, *supra* note 24, at 2.

amended at 34 U.S.C. §§ 10381–10389). Enacted as part of the Violent Crime Control and Law Enforcement Act of 1994, the Act authorized grants for community-oriented policing: techniques that "strengthen the relationship between the police and the people they serve, fostering trust and increasing accountability." H.R. Rep. No. 103-324, at 7 (1993). As a House Report stated, "[t]he newest development in law enforcement techniques is also one of the oldest—police officers walking a beat." *Id.* at 6. The Act's express purposes include "substantially increas[ing] the number of law enforcement officers interacting directly with members of the community ('cops on the beat')" and "provid[ing] additional and more effective training to law enforcement to enhance their problem solving, service, and other skills needed in interacting with members of the community."[29] § 10002, 108 Stat. at 1807. As reported out of the House Judiciary Committee, the bill was enacted "to allow grants to increase police presence, to expand and improve cooperative efforts between law enforcement agencies and members of the community to address crime and disorder problems, and otherwise to enhance public safety." H.R. Rep. No. 103-324, at 1.

The Act rested on Congress's findings that community-oriented policing would enhance public safety: "community-oriented policing ('cops on the beat') enhances communication and cooperation between law enforcement

---

[29] The other two stated purposes are to "encourage the development and implementation of innovative programs to permit members of the community to assist State, Indian tribal government, and local law enforcement agencies in the prevention of crime in the community" and to "encourage the development of new technologies to assist State, Indian tribal government, and local law enforcement agencies in reorienting the emphasis of their activities from reacting to crime to preventing crime." *Id.*

and members of the community; such communication and cooperation between law enforcement and members of the community significantly assists in preventing and controlling crime and violence, thus enhancing public safety." 103 Cong. Rec. 23,376, 23,475 (1994). Similarly, the House Judiciary Committee Report noted three purposes for the COPS grants: "to increase police presence, to enhance *police-community cooperation* in addressing crime and disorder, and otherwise to enhance public safety." H.R. Rep. No. 103-324, at 9 (emphasis added).

Consistent with the Act's statutory purposes, Congress authorized the Attorney General to "make grants . . . to increase police presence, to expand and improve cooperative efforts between law enforcement agencies and members of the community to address crime and disorder problems, and otherwise to enhance public safety." § 10003, 108 Stat. at 1808 (inserting new sections 1701 to 1709 into title I of the Omnibus Crime Control and Safety Streets Act of 1968). In October 1994, Attorney General Janet Reno established the COPS Office to distribute and monitor congressional appropriations for statutorily authorized programs, including the COPS Hiring Program grant program.[30]

Nothing in the congressional record nor the Act itself remotely mentions immigration or immigration enforcement as a goal. And nothing in the Act discusses "federal partnerships" for civil immigration enforcement. In the quarter-century of the Act's existence, Congress has not once denoted civil immigration enforcement as a proper purpose for COPS grants.

---

[30] Teasley & O'Bryant, *supra* note 25, at 3. The COPS Hiring Program is one of six grant programs the COPS Office administers.

## C.  COPS Hiring Program Grants

The Act, codified at 34 U.S.C. §§ 10381 to 10389, delegates to the Attorney General the authority to (1) "carry out a single grant program" under which he makes grants for twenty-three congressionally determined purposes, with permission to extend preferential consideration under three specified circumstances, 34 U.S.C. § 10381(a), (b), (c); (2) "prescribe by regulation or guidelines" information contained in applications for COPS grants, *id.* § 10382(b); and (3) oversee the ministerial processes involved in administering, monitoring, and evaluating funded projects, *id.* §§ 10385–10386.  Congress periodically updates the statutory purposes for COPS Office grants.  *See, e.g.*, Law Enforcement Mental Health and Wellness Act of 2017, Pub. L. No. 115-113, 131 Stat. 2276, 2276 (2018) (codified at 34 U.S.C. § 10381(b)(23)) (adding "peer mentoring mental health and wellness pilot programs" as a purpose for COPS grants).  These statutory provisions underscore Congress's stated purposes in passing the Community Policing Act of 1994.  *See* § 10002, 108 Stat. at 1807.

For COPS Hiring Program grants, Congress has appropriated funds to solicit applications and award grants for hiring or rehiring "law enforcement officers for deployment in community-oriented policing."  34 U.S.C. § 10381(b)(1)–(2).  In the history of the grant program, Congress has only ever appropriated funds for these two purposes.  That is, Congress has yet to authorize funding for the remaining twenty-one purposes for which the COPS Office may make grants.

As Congress directed, jurisdictions must apply to the Attorney General to receive COPS funding.  *Id.* § 10382(a). Congress empowered the Attorney General to prescribe the application's form and contents but also mandated several

explicit application requirements. *Id.* § 10382(b), (c). Grant applicants must, for example, "demonstrate a specific public safety need" and "explain how the grant will be utilized to reorient the affected law enforcement agency's mission toward community-oriented policing or enhance its involvement in or commitment to community-oriented policing." *Id.* § (c)(2), (10). Grant applicants must also identify a "crime and disorder problem/focus area" that officers hired with COPS Hiring Program funding would address "to ensure that [applicants] satisfy the requirements for COPS Office funding" and "to ensure that ultimately the additional grant-funded officers . . . will initiate or enhance [an] agency's capacity to implement community policing strategies and approaches."

Each year, the COPS Office scores and ranks each submitted application to determine which applications to fund. The electronic COPS Hiring Program application system assigns a specific (and undisclosed) number of points for each answer an applicant jurisdiction provides. The Office categorizes each question on the application as falling into the "fiscal health," "crime," or "community policing" categories; generally, answers in the "fiscal health" category account for 20% of the final score, answers to "crime" questions for 30%, and answers to "community policing" questions for 50%.

COPS grants are competitive; congressional appropriations have been historically inadequate to fund the amount of grant requests. Accordingly, since the fiscal year 2011 application cycle, the COPS Office has determined priority focus areas for the COPS Hiring Program and awarded bonus points to applications that focus on that year's priority areas. The bonus points give a competitive advantage to the applicant. Jurisdictions also receive bonus

points if catastrophic events have affected their law enforcement agencies. Furthermore, Congress permitted the Attorney General to "give preferential consideration, where feasible" specifically to applications that commit to contributing more than 25% of the grant to hiring and rehiring officers. *Id.* § 10381(c)(1). Congress also permitted the Attorney General to accord preferential consideration to applications from states with safe harbor laws for human trafficking victims—that is, for this limited factor *unrelated* to COPS grant purposes. *See id.* § 10381(c)(2)–(3). DOJ usually announces the awards by September 30 of each year.

## D. Federal Funding in the Trump Administration

The Trump Administration was openly determined to deprive jurisdictions with so-called "sanctuary" policies of federal funds. Five days after his inauguration, President Trump attempted to withhold federal funding from "sanctuary" jurisdictions by executive order in an effort to deliver on his campaign promise to "end the sanctuary cities that have resulted in so many needless deaths."[31] *See* Exec. Order No. 13,768, 82 Fed. Reg. 8799 (Jan. 25, 2017) ("Enhancing Public Safety in the Interior of the United States"). Section 9(a) of the executive order directs "the Attorney General and the Secretary" to "ensure that jurisdictions that willfully refuse to comply with 8 U.S.C.

---

[31] Philip Bump, *Here's What Donald Trump Said in His Big Immigration Speech, Annotated*, Wash. Post (Aug. 31, 2016), http://wapo.st/2cg2kS9?tid=ss_tw&utm_term=.146ecbf7c567 (last visited May 23, 2019); *see also* Office of the Press Sec'y, *President Donald J. Trump Taking Action Against Illegal Immigration*, White House (June 28, 2017), http://www.whitehouse.gov/the-press-office/2017/06/28/president-donald-j-trump-taking-action-against-illegal-immigration (last visited May 23, 2019) (quoting the President's August 31, 2016, remarks).

1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary." *Id.* at 8801. Within three months, a federal district court preliminarily enjoined Section 9(a), a decision made permanent that fall. *See County of Santa Clara v. Trump*, 275 F. Supp. 3d 1196 (N.D. Cal. 2017), *aff'd in part, vacated in part, remanded sub nom. City & County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018); *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017). Our court agreed that the President's attempt to wrest for his policy goals the power of the purse vested exclusively in Congress violated the U.S. Constitution's separation of powers. *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1231–35 (9th Cir. 2018).

In March 2017, Attorney General Jefferson B. Sessions III ordered a review of all DOJ activities, including all grant programs such as the COPS grant program. Memorandum from Jefferson B. Sessions III, U.S. Attorney Gen., to Heads of Dep't Components & U.S. Attorneys, Supporting Federal, State, Local and Tribal Law Enforcement (Mar. 31, 2017).[32] According to the March 2017 memorandum, this review would ensure that all DOJ activities "fully and effectively promote[d]" several "principles" to advance the DOJ mission statement. *Id.* at 2. One principle declared that "[c]ollaboration between federal and local law enforcement is important, and jurisdictions whose law enforcement agencies accept funding from the Department are expected to adhere to the Department's grant conditions as well as to all federal laws." *Id.*

---

[32]   https://www.justice.gov/opa/press-release/file/954916   (last visited May 23, 2019).

This review resulted in major changes to COPS Office programs. For example, Attorney General Sessions's directive reduced the COPS Collaborative Reform Initiative for Technical Assistance, which DOJ created to help reform beleaguered police departments, from a program that investigated and suggested reforms to police departments to a mere grant-making body. *See* Press Release, U.S. Dep't of Justice, Department of Justice Announces Changes to the Collaborative Reform Initiative (Sep. 15, 2017).[33] And, in July 2017, Attorney General Sessions limited the award of grants under the Edward Byrne Memorial Justice Assistance Grant (Byrne JAG) Program, which awards funding for local criminal justice efforts through a statutory formula, *see* 34 U.S.C. § 10152, to only those jurisdictions that "allow federal immigration access to detention facilities, and provide 48 hours notice before they release an illegal alien wanted by federal authorities." Press Release, U.S. Dep't of Justice, Attorney General Sessions Announces Immigration Compliance Requirements for Edward Byrne Memorial Justice Assistance Grant Programs (July 25, 2017).[34] To date, every court to consider the challenges to immigration enforcement conditions the Trump DOJ imposed on the

---

[33] https://www.justice.gov/opa/pr/department-justice-announces-changes-collaborative-reform-initiative (last visited May 23, 2019); *see also* Mary Kay Mallonee & Eli Watkins, *DOJ Scaling Back Program to Reform Police Departments*, CNN Pol. (Sep. 15, 2017), https://www.cnn.com/2017/09/15/politics/doj police-program/index.ht ml (last visited May 23, 2019).

[34] http://www.justice.gov/opa/pr/attorney-general-sessions-announces-immigration-compliance-requirements-edward-byrne-memorial    (last visited May 23, 2019).

Byrne JAG grants has soundly rejected them as unconstitutionally exceeding DOJ's statutory authority.[35]

Turning to the COPS Hiring Program grants, DOJ decided, for the first time in the fiscal year 2017 application cycle, to award bonus points to jurisdictions that committed to "partnering with the federal law enforcement to address illegal immigration." Applicants could earn these bonus points by partnering with the federal government in two ways. First, they could select "illegal immigration" as the focus area on their applications.[36] This focus area required jurisdictions to detail how newly hired officers would cooperate with federal immigration authorities through "information sharing, 287(g) partnerships, task forces and honoring detainers."

These means of "partnering with the federal law enforcement" were well understood methods of federal

---

[35] *See City of Philadelphia v. Attorney Gen.*, 916 F.3d 276, 284–91 (3d Cir. 2019); *City of Chicago v. Sessions*, 888 F.3d 272, 283–87 (7th Cir.), *vacated in part on other grounds*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018); *New York v. Dep't of Justice*, 343 F. Supp. 3d 213, 227–31 (S.D.N.Y. 2018), *appeal docketed sub nom. City of New York v. Whitaker*, No. 19-275 (2d Cir. Jan. 28, 2019); *City & County of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 945–48, 954–55 (N.D. Cal. 2018), *appeal docketed sub nom. City & County of San Francisco v. Whitaker*, No. 18-17308 (9th Cir. Dec. 4, 2018); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 874–76 (N.D. Ill. 2018); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 321 (E.D. Pa. 2018), *aff'd in part, vacated in part sub nom. City of Philadelphia v. Attorney Gen.*, 916 F.3d 276 (3d Cir. 2019).

[36] The other fiscal year 2017 focus areas were: "child and youth safety focus," "drug abuse education, prevention, and intervention," "homeland security problems," "nonviolent crime problems and quality-of-life policing," "building trust and respect," "traffic/pedestrian safety problems," and "violent crime problems."

deployment of local police officers in civil immigration enforcement. With "information sharing," state and local police share arrest data with the Federal Bureau of Investigation (FBI). *See* Cristina Rodríguez, *Enforcement, Integration, and the Future of Immigration Federalism*, 5 J. on Migration & Hum. Security 509, 519 (2017). Pursuant to 8 U.S.C. § 1722, the FBI then shares that information with the Department of Homeland Security (DHS), which compares the arrest data to that in its own databases to determine whether an individual in state or local custody is removable. *Id.* A "287(g) partnership" authorizes the Attorney General in limited circumstances to enter into a formal agreement for state or local officers to act as immigration officers, "subject to the direction and supervision of the Attorney General." 8 U.S.C. § 1357(g)(1), (3); *see also Arizona v. United States*, 567 U.S. 387, 408–09 (2012). The "task force" model of 287(g) agreements "makes immigration status checks part of state or local police work in the field." Hiroshi Motomura, Immigration Outside the Law 79 (2014); *see also Arizona*, 567 U.S. at 410–13. Finally, "honoring detainers" asks state and local law enforcement to comply with DHS requests to advise the agency of when individuals in their custody would otherwise be released, so that DHS can arrange to assume custody. *See* 8 C.F.R. § 287.7(a); *see also City & County of San Francisco*, 897 F.3d at 1241 n.7.

Second, two months *after* the 2017 applications were due, DOJ announced a bonus consideration: applicants could submit a "Certification of Illegal Immigration Cooperation" (Cooperation Certification), which required a jurisdiction's highest-ranking law enforcement official and government executive to certify that the jurisdiction had already or would "implement rules, regulations, policies, and/or practices that" provide DHS (1) "access to any of the governing

body's correctional or detention facilities in order to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or to remain in the United States" (the "access" requirement) and (2) "advance notice as early as practicable . . . to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien" (the "notice" requirement).   Announcing the Cooperation Certification option, Attorney General Sessions explained that local and state law enforcement agency cooperation with federal authorities "make[s] all of us safer by helping remove dangerous criminals from our communities."   Press Release, U.S. Dep't of Justice, Department of Justice Announces Priority Consideration Criteria for COPS Office Grants (Sep. 7, 2017).[37]   At no point has DOJ indicated that the "illegal immigration" focus area and Cooperation Certification (together, the "federal immigration preferences") are in any way related to community-oriented policing.

In fiscal year 2017, the COPS Office received 1142 applications requesting $409,028,743 in funding.   Los Angeles requested $3.125 million to hire 25 officers for the city's Community Safety Partnership Program.   It neither selected "illegal immigration" as its focus area nor submitted a signed Cooperation Certification.   One out of the 90 large applicant jurisdictions and 6 out of the 1029 small applicant jurisdictions selected "illegal immigration" as a focus area. Approximately 39% of the large jurisdictions and 47% of the small jurisdictions submitted the Cooperation Certification.

---

[37]   https://www.justice.gov/opa/pr/department-justice-announces-priority-consideration-criteria-cops-office-grants (last visited May 23, 2019).

The COPS Office denied Los Angeles's application on November 28, 2017.  The week before, on November 20, 2017, the COPS Office awarded $98,503,539 to 179 jurisdictions for the fiscal year 2017 application cycle.  Attorney General Sessions personally announced the 2017 awards.  He recognized that eighty percent of the grantees "have agreed to cooperate with federal immigration authorities in their detention facilities" and "applaud[ed grantees'] commitment to the rule of law and to ending violent crime, including violent crime stemming from illegal immigration."

Aside from abstract allusions to public safety, DOJ has never articulated how the federal immigration preferences relate to community-oriented policing.  This is no doubt because enforcement of federal immigration policy is entirely unrelated to community-oriented policing, as amici current and former prosecutors and law enforcement leaders[38] point out.  And this is why DOJ's imposition of the illegal immigration focus area and Cooperation Certification was enjoined by the district court: by imposing conditions that are unrelated—indeed, antithetical—to the goals of community-oriented policing, DOJ exceeded its delegated powers to administer the COPS grant program.

## II.

DOJ exceeded its statutory authority specifically by giving preference to jurisdictions willing to partner with federal immigration enforcement authorities.  Its decision to

---

[38] The amici include current and former assistant U.S. attorneys, DOJ attorneys, district attorneys, police department chiefs, state's attorneys, and sheriffs.

implement both the illegal immigration focus area and the Cooperation Certification is foreclosed by the text, structure, and purpose of the Community Policing Act.[39] *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 359 (1986). "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *Id.* at 374. Here, the Act both prescribes the directives the Attorney General must follow and circumscribes the discretion he may exercise in executing the COPS grant program. "When Congress limits the purpose for which a grant can be made, it can be presumed that it intends that the dispersing agency make its allocations based on factors solely related to the goal of implementing the stated statutory purposes in a reasonable fashion, rather than taking irrelevant or impermissible factors into account." *Robbins v. Reagan*, 780 F.2d 37, 48 (D.C. Cir. 1985) (per curiam). When agencies "act improperly . . . what they do is ultra vires." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). The federal immigration preferences flout the clear congressional purpose of COPS grants—to promote partnership between local law enforcement and the communities they serve—by instead favoring partnerships between local police and federal

---

[39] The majority goes astray by finding no meaning in Congress's use of the term "community-oriented policing" and then deferring under *Chevron* to DOJ's Orwellian effort to define "community-oriented policing" to include "partnering with federal law enforcement to address illegal immigration." *Chevron* deference is particularly unwarranted here because we can discern congressional intent "through the use of the traditional techniques of statutory interpretation." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1237 (9th Cir. 2001) (quoting *Chem. Mfrs. Ass'n v. Nat. Res. Def. Council, Inc.*, 470 U.S. 116, 152 (1985)); *see Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). As the Supreme Court made clear in *Chevron*, "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Chevron*, 467 U.S. at 843 n.9.

immigration authorities.  *See* 34 U.S.C. § 10381(b)(1)–(2); H.R. Rep. No. 103-324, at 7.

Congress did not authorize COPS grants for anything other than placing additional state and local cops on the beat to promote community partnerships.  34 U.S.C. § 10382 authorizes DOJ to evaluate the applications of law enforcement agencies competing for limited grant funding, but in exercising this discretion, DOJ must adhere to Congress's express purpose of promoting local and state law enforcement agencies' efforts to "interact[] directly with members of the community."  § 10002, 108 Stat. at 1807; *see also* 34 U.S.C. § 10381(b)(1)–(2); *cf. Alexander v. Sandoval*, 532 U.S. 275, 291 (2001) ("Agencies may play the sorcerer's apprentice but not the sorcerer himself.").  For example, grant applications must require law enforcement agencies to "explain how the grant will be utilized to reorient the affected law enforcement agency's mission toward community-oriented policing or enhance its involvement in or commitment to community-oriented policing."  34 U.S.C. § 10382(c)(10).  Congress also specifically permitted the Attorney General to give "preferential consideration" to applicants in only three specified circumstances, none of which is related to immigration.  *Id.* § 10381(c).  For example, section 10381(c)(2) and (3) specifically encourages states and localities to adopt a federal policy priority—treating human trafficking victims leniently—otherwise unrelated to the goal of promoting community-oriented policing.  The clear import of this section demonstrates Congress's intention to authorize DOJ to accord preference beyond community-oriented policing only where it expressly authorizes DOJ to do so.[40]  If, as DOJ

_____

[40] Congress well understood the problems of illegal immigration when it enacted the Community Policing Act.  In fact, title XIII of the

urges, the agency has unfettered discretion to impose additional preferences, subsection (c) has no meaning.  *See Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 965–66 (9th Cir. 2013).

The illegal immigration focus area impermissibly extends preferences to partnerships between local police and federal immigration authorities, contravening the Act's identified purpose of "law enforcement officers interacting directly with members of the community."   § 10002, 108 Stat. at 1807.   The current COPS grant application instructions require jurisdictions that select the illegal immigration focus area to "specify your focus on partnering with the federal law enforcement to address illegal immigration for information sharing, 287(g) partnerships, task forces and honoring detainers."  It is telling that in no other focus area on the application is the applicant required to explain how it would use the grant to partner with the federal government as opposed to partnering with the community it serves.  Furthermore, whereas the "illegal immigration" focus area mandates specific commitment to four conjunctive avenues of cooperation with federal immigration enforcement, all other focus areas allow for wide discretion by applicants to propose program ideas implementing those areas.  For example, the "drug abuse education, prevention, and intervention" focus area instructs applicants to "specify your focus on education, prevention, and intervention to combat drug use and abuse; *for example*,

---

Violent Crime Control and Law Enforcement Act of 1994 (of which the Community Policing Act comprises title I) addresses "criminal aliens and immigration enforcement."   *See* §§ 130001–130010, 108 Stat. at 2023–31.  Nonetheless, Congress chose to omit illegal immigration in the Community Policing Act.

marijuana, heroin, prescription opioids, *etc.*" (Emphases added).

Congress never contemplated that COPS funds would be used to finance state or local police officers performing the function of federal immigration officers, as certifying "section 287(g) partnerships" would suggest. *See* 8 U.S.C. § 1357(g)(1). Under § 1357 itself, local police officers operating under an agreement to carry out the functions of federal immigration officers must be "at the expense of the State or political subdivision." *Id.* Congress could not have contemplated the absurdity of the Attorney General awarding grants to fund the section 287(g) partnerships that states were statutorily bound to pay for themselves. And it's difficult to see how awarding a grant for state or local police to act as federal immigration officers furthers the congressional purpose of community-oriented policing.[41]

The required focus on "honoring detainers" is no less problematic. Detainers, federal immigration enforcement requests for local jurisdictions to use their own funds to detain individuals in their custody after the individuals' scheduled release, foist upon local police federal policy priorities that have nothing to do with community-oriented policing. *See* 8 C.F.R. § 287.7; *City & County of San*

---

[41] It is the majority opinion that distorts the plain language of § 1357(g)(1), which reads: "the Attorney General may enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across State lines to detention centers), may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law."

*Francisco*, 897 F.3d at 1241 n.7.  DOJ offers no explanation plausibly connecting detainer requests to "enhanc[ing] *police-community* cooperation."   H.R. Rep. No. 103-324, at 9 (emphasis added).

The Cooperation Certification is likewise *ultra vires*. DOJ argues that the federal immigration preferences are a permissible exercise of DOJ's authority under § 10381(b)(1) and (2) because "illegal immigration enforcement is a public safety issue" that "can be addressed most effectively through the principles of community policing that [the COPS Hiring Program] promotes."   But providing federal immigration authorities advance notice of detainees' release and access to local jails, as the Cooperation Certification demands, is completely untethered to "the principles of community policing" authorizing the COPS grant program.  *See* 34 U.S.C.  § 10381(b)(1)–(2).    It may be that illegal immigration enforcement is a public safety issue, but, as the City of Los Angeles argues, demanding that local police partner with federal immigration enforcement could well erode the trust and mutual respect on which community policing depend, to the *detriment* of public safety.  A 2017 Pew Research Center survey reported that two-thirds of Hispanic immigrants and about half of all Hispanic adults in the United States worry "a lot" or "some" about the deportation of themselves or someone close to them.[42]  With this rising fear of federal immigration enforcement, police officers have reported a concomitant decline in crime reporting.  As of April 2017, for example, reports in Los

---

[42] *Latinos and the New Trump Administration*, Pew Research Ctr.: Hispanic Trends (Feb. 23, 2017), http://www.pewhispanic.org/2017/02/23/latinos-and-the-new-trump-administration/ (last visited May 23, 2019).

Angeles of sexual assault among Latinos dropped 25% and reports of domestic violence by 10% compared to the year prior.[43]  Chief of the Los Angeles Police Department Charlie Beck explained that these downturns were likely due to fear of the federal government.[44]   Unreported and therefore unpunished crimes lead to "greater numbers of perpetrators at large," posing a clear threat to community safety.[45]   In fact, a 2012 COPS Office study identified federal immigration enforcement as detrimental to "local trust-building" because immigrant communities "may attribute immigration raids or other federal immigrant enforcement activities to local police and, therefore, mistrust community policing efforts."[46]

---

[43] Jennifer Medina, *Too Scared to Report Sexual Abuse. The Fear: Deportation.*, N.Y. Times (Apr. 30, 2017), https://nyti.ms/2pifXFC (last visited May 23, 2019) (reporting "a sharp downturn in reports of sexual assault and domestic violence among Latinos throughout the country [since the 2016 presidential election that] many experts attribute . . . to fears of deportation"); *see also* James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts*, L.A. Times (Oct. 9, 2017), https://www.latimes.com/local/lanow/la-me-ln-undocumented-crime-reporting-20171009-story.html (last visited May 23, 2019).

[44] Medina, *supra* note 43.

[45] Rafaela Rodrigues et al., Nat'l Immigrant Women's Advocacy Project, Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforcement: Initial Report from a 2017 National Survey 103 (2018), http://library.niwap.org/wp-content/uploads/Immigrant-Access-to-Justice-National-Report.pdf (last visited May 23, 2019).

[46] Pradine Saint-Fort et al., Engaging Police in Immigrant Communities: Promising Practices from the Field 4 (Oct. 2012),

The Seventh Circuit has similarly recognized that the Cooperation Certification's notice and access requirements could result in under-reported crime and thereby undermine public safety:

> [P]ersons who are here unlawfully—or who have friends or family members here unlawfully—might avoid contacting local police to report crimes as a witness or a victim if they fear that reporting will bring the scrutiny of the federal immigration authorities to their home. . . .   [T]he reluctance to report . . . could be magnified in communities where reporting could turn a misdemeanor into a deportation.   And the failure to obtain . . . cooperation could both hinder law enforcement efforts and allow criminals to freely target communities with a large undocumented population, knowing that their crimes will be less likely to be reported.

*City of Chicago*, 888 F.3d at 280.

All policing is ultimately designed with public safety in mind.   But, all policing is not community-oriented policing, which fosters partnership between the police and their communities, not the partnerships between police and federal immigration enforcement that the federal immigration preferences require.   Because such a focus is directly at odds with, and arguably undermines the very

https://goo.gl/ZGQfJA (last visited May 23, 2019) (funded by and published in partnership with the COPS Office).

purpose of, the Act and the COPS grant program, the Attorney General exceeded his authority by adding them as preferences for grant awards.[47]

### III.

The COPS grant program was enacted to increase the number of "cops on the beat" who would enter into partnership with their communities, furthering trust and respect, with the ultimate goal of public safety. DOJ may have imposed the federal immigration preferences because it shares that goal of public safety, but that is where the mutuality between the Community Policing Act and DOJ's immigration enforcement policy ends. The preference for applicants who abandon community partnerships in favor of federal immigration partnerships is directly contrary to the language, structure, history, and purpose of the Act. By enacting the COPS grant program, Congress did not authorize DOJ to coopt local and state officers into carrying out the current or any other presidential administration's agenda, unrelated to community-oriented policing.[48]

---

[47] Because I would hold that the DOJ's imposition of the federal immigration preferences is *ultra vires*, my analysis does not reach the spending clause or Administrative Procedure Act violations. Whichever of the three violations we consider, however, the fundamental point is the same: Congress did not authorize the Attorney General to act with unfettered discretion in imposing conditions for COPS grants unrelated to community-oriented policing.

[48] As the district court noted, DOJ's "broad interpretation of [its] authority carries extraordinary implications. If the Attorney General can favor applicants based on any factors relevant to public safety, he enjoys nearly limitless discretion to select grant awardees in ways not even tangentially related to community policing." Today's political agenda is to increase federal immigration enforcement; tomorrow's may be to increase enforcement of federal gun registration and licensing. Both are

60          CITY OF LOS ANGELES V. BARR

Cooperation between local police and federal immigration enforcement oppugns the police-community partnership the COPS Hiring Program was created to promote.  I would therefore affirm the district court's order permanently enjoining DOJ from including the illegal immigration focus area and Cooperation Certification on its COPS grant applications and from using these considerations as preferences in awarding COPS grants.

---

related to public safety; neither is related to community-oriented policing.

**ARCHIVES** | 1993

# *One Cop, Eight Square Blocks*

By **MICHAEL NORMAN**   DEC. 12, 1993

About the Archive

This is a digitized version of an article from The Times's print archive, before the start of online publication in 1996. To preserve these articles as they originally appeared, The Times does not alter, edit or update them.

Occasionally the digitization process introduces transcription errors or other problems. Please send reports of such problems to archive_feedback@nytimes.com.

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

**Read 10 stories a month for free.** Create an account or log in.

CONTINUE

CAMPS
CO-ED

# Theater

STAGEDOOR Manor

PINE TREE LANGUAGE CAMPS

TRAVEL

PATHWAYS
At Amherst College
Middle School
Enrichment Program
Summer Program
Grades 7 thru 9

## POLICE

Continued from page 90

policing, however, would argue that even a less eccentric cop, one from Sam Cupcake, could have assumed ownership of Beat 12. It might have taken more time, but a smart, determined cop armed with the penal code can, they say, "establish a presence" anywhere.

To be sure, the baneful reality — the return of drug dealers, gun merchants, loan sharks, pimps, robbers, burglars and mercenaries — powerfully suggests otherwise. But no one knows for sure. After citing incessantly that more than a generation, reported crimes have declined in New York for two straight years, to the lowest level since 1985. Yet officials are reluctant to ascribe the trend to any one factor, or even to recognize the existence of a trend based on such notoriously unreliable statistics. There is no data on community policing either, and the case studies are too narrow and anecdotal to serve as proof.

The basic idea of community policing — marrying a cop to a piece of ground — seems sound. If a cop can more own a beat, resist the bad guys and reach the upstanding citizens how to resist their enemy, then that's one piece of ground where crime is unlikely to breed. But the job of organizing and educating places like Beat 12 is more daunting than the job of patrolling them. As one insider put it, "half the community is showing the cops on, but the other half is still showing things at them." And without the community, there is no community policing.

To imagine an N.Y.P.D. devoted entirely to community policing is to understand how far the department still has to go. It might have to be twice as large, perhaps 60,000 to 70,000 officers around by 15,000 to 30,000 civilian workers, with an annual budget of about twice the current 31.3 ...

In reality, of course, the municipal budget is tight and growing tighter, and the municipal mood is ill disposed to bureaucratic reorganization. Cops want to be crime fighters not problem solvers, Alexandra Wachting the Gendees hears rather than controlling it. The average cop sees himself as a lone agent, isolated and besieged, the enemy in front of him, his departmave-mapping at his back.

And there is more — the overwhelming issues of crime and punishment, rehabilitation, new prisons, disintegrating families, murderous sons, turbulent schools, immigration, the economic isolation of the inner cities, racial warfare, guest politics, urban alienation and fear so rampant it threatens to make the idea of compassion a concept from another age.

Can community policing work? Yes.

Does it work in the rough precincts of New York? Again, yes, though, at the moment, only by degrees and, at times, as much by accident as design.

Will the entire force — uniformed squads, patrol cars, narcotics division and so on — adopt the new science? Will the "dominant philosophy" ever become dominant practice? Herman Goldstein says that David Cooper, the recently retired Police Chief of Madison, Wis., spent 20 years trying to reform that city's tiny 300-member force. In that measure, New York won't have a comprehensive community police force until the year 4220.

Perhaps the problem-solving and organizing can wait a bit. In the Bronx, at least, it seems enough for now just to have some bluejackets back on the beat. ■

The reporting in this article draws on the work of the following: Michael J. Farrell, associate director, New Institute of Justice, New York; Michael A. Jackson, coordinator of community policing; New York Police Department; George L. Kelling, professor of criminal justice; Robert Trojanowicz, director of the National Center for Community Policing, Michigan State University; Robert Wasserman, research fellow with the Program in Criminal Justice Policy and Management at the Kennedy School.



EXCLUSIVE.

OFTEN
EXPENSIVE.

AND SO
EXQUISITE.

Find the Art & Antiques featured advertising features in The New York Times Magazine.

And let your imagination take over.

The New York Times Magazine

There's something important in it for you.



Officers Jett with, from left, his son, Kevin 2d, his daughter, Charlene, his mother, Bonnie Ruth, and Cheryl Lowe, Kevin 3d's mother, at the Greater Emmanuel Temple in the Bronx.

PHOTOGRAPHS BY OZIER MUHAMMAD FOR THE NEW YORK TIMES

**VIEW PAGE IN TIMESMACHINE**

It will always come down to this -- one mutt, one cop, eye to eye, struggling for control of the street. The cop is Kevin Jett, Badge No. 19980, Beat 12, Sector George, the 52d Precinct in the northwest Bronx. The mutt is Killer, a Jamaican drug dealer with arctic eyes and a taste for letting blood.

The cop patrols on foot from East 194th Street to East 198th Street, from Decatur Avenue to Valentine Avenue -- one man, eight square blocks, perhaps 12,000 people. Most of these, in the officer's words, are "upstanding citizens." They work hard, worry about their children, struggle to survive. Among them, however, boldly encamped on corners or lying in alleyways, is a species of citizen that Kevin Jett has come to despise: the urban predator -- Cuco and Sweet Pea, Gravy and Chisel Head, Scarface and Killer.

In the gathering warmth of a summer day, the officer has turned down Valentine in search of a murder suspect, a Jamaican dealer named Leopold. As it happens, Killer is on the street, his first day back after a while away.

Killer shot a man a few months back, a rival in the drug trade, then left the man for dead. The victim, however, recovered. When Killer discovered his blunder, he fled, eventually to Philadelphia, where his nemesis caught up with him. There, Killer was shot. Naturally, neither man sought comfort in the law, so the police had no case. But "we knew the deal," says Kevin Jett.

"Killer's feared around here, so every once in a while I got to bring him down a peg." And today, spotting him around the bend on Valentine, the officer has decided to do just that.

ADVERTISEMENT

"Hey! Killer!"

The dealer wheels, his face sour, his eyes full of rage.

"What you call me Killer for!" he snaps. "You know my name."

Kevin Jett had only wanted to tweak the mutt, not force a duel. But one word has led to another and a line has been drawn, and now, too, from out of nowhere, come Killer's supernumeraries, five in all, among them a giant in a track shirt.

"Where's Leopold?" Jett asks. He stands squarely in front of Killer, but he can sense that the others are close. "Why don't you tell him to turn himself in?"

Killer lets the question dangle. His hands are deep in the pouch of his hooded sweatshirt -- hooded sweatshirt? On a day as hot as this? Maybe Killer has poor circulation. "Don't know where Leopold is." He's sullen and still full of fire. "I'm not into that -- that life anymore, man."

Jett closes the distance, closer . . . closer . . . so close, now, Killer can see the flakes of breakfast oatmeal still in the officer's teeth.

"There's no reason for you to get angry," says the cop. "What are you trying to do? Show off in front of your friends here?"

Killer spits and curses.

"You just tell Leopold if you see him," Jett goes on.

"I'll tell him," says Killer, pulling back from the edge, but still sullen, still snarling.

"You know what I like about you Killer? I'll ask you a question and you'll stand there and lie to me."

And all at once, Kevin Jett turns his back and walks silently away. Around the corner on East 194th Street, the officer looks over his shoulder.

"Guys like Killer will eat you alive, even with the uniform on. They can sense fear, smell it like a dog smells it. Some of the mopes will come right out and tell you you're nothing, and you don't want that, oh, no. If you're going to do this job, wear this uniform, you definitely don't want that. If it gets around that you're soft, that without your nightstick and gun you can't fight, that's bad. If you allow someone to smoke a joint in front of you or curse you out, word will spread throughout the neighborhood like a disease. You're a beat cop, out here every day, alone, so you set standards right away, and for those that don't like it. . . . "

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

THERE HAS ALWAYS BEEN A SHARP EYE IN THE streets: the colonial watch, the gaslight bluebottles, the Roaring 20's copper. Even after the advent of the radio car, most cities still relied on foot patrol, the cop on the beat. By the 1970's however, the role of the police had changed. Department after department, rocked by scandals and racked by recessions, saw their ranks shrink. Many decided to narrow their job to emergency response -- 911, a cop in a car racing from call to call, crime scene to crime scene. Soon, the police became isolated, strangers in the neighborhoods they were sworn to serve and, worse, little more than a passing annoyance to criminals. Disturbed by this state of affairs, a new generation of police executives began to experiment. In the late 70's, in Flint, Mich., and Newark, they took a lesson from history and put bluebottles back on the beat.

Watching all this was Herman Goldstein, a law professor at the University of Wisconsin in Madison. From his work in criminology, he knew the experiments would fail if the police simply followed form: answered calls, filled out reports, made arrests. They needed to focus on substance, which meant attacking the circumstances that make crime possible.

Goldstein proposed what he called a basic "problem-solving method." Step 1: Analyze the problem. If there is a rash of burglaries in an apartment building, find out when the thefts occur, what floors they occur on and what's being taken. Step 2: Use this information to fashion solutions. Train a tenant watch, persuade the landlord to improve building security, install alarms and show the tenants how to cage their windows and secure their doors. Step 3: Follow up. Watch the building, stay current with the tenants.

In time Goldstein's method and the experiments in foot patrol coalesced in the practice known as "community policing." While some of the early trials in regular foot patrol had little real effect on crime, people in the test neighborhoods embraced the idea. The beat cop was back, and no matter what the statistics said, the neighborhood seemed somehow more secure.

Encouraged by this reception, a number of places, Portland, Ore., and Madison, Wis., among them, adopted the practice. By 1990, Lee P. Brown, then Commissioner in New York, declared community policing "the dominant philosophy" in his department. But in New York, a city of quarreling multitudes, the most densely populated major municipality in the country, community policing has been slow to take hold.

Part of the problem is the size and nature of the force. The N.Y.P.D., with more than 31,000 uniformed officers, is the largest such force in the United States. Its bureaucracy, which includes 8,000 civilian workers, is inflexible.

Its rank-and-file officers, wedded to traditions that date from the middle of the last century, resist new ideas. What is more, the new policing demands a special breed of officer, tough but skilled, and smart -- an organizer, a planner, an ombudsman. Finally, there are the streets, which seem meaner and more savage than anywhere else -- perhaps, say beat cops, too tough for tenant patrols and problem-solving protocols and nuisance-abatement programs.

In New York, then, community policing is a mass experiment in urban order, maybe the largest and most important policing experiment any government has tried to conduct.

The question is, can a city this large, hobbled by chronic budget deficits and a hidebound bureaucracy, make it work in a violent world?

THE SKY IS CLEAR THIS MORNING, THE SUN white-hot. On Briggs Avenue, Kevin Jett stops in front of No. 2773, an apartment building with an elegant arch. Last summer a clique of teen-agers used the entryway as their hangout; by early fall, three boys in that clique -- boys absorbed by drugs -- were killed.

"That sobered the others up," says Kevin Jett. "They got jobs. They realized what was going to come of hanging out and doing nothing."

Two teen-age girls are sitting on the steps under the arch. One has a ponytail, the other a gold ring in her nose. Ponytail is talking about getting a job. Gold Ring is talking about her boyfriend, who is "on vacation," a neighborhood term for a stretch in jail.

"I don't need no job," says Gold Ring. "I got a man to support me. He got money."

Jett asks: "Doing what?" She laughs, sheepishly.

"So, what's he do?" Jett again asks, pressing for an answer he already knows.

"He makes lots of loot -- that's what he do," says the girl, sticking her tongue out.

"You ought to get yourself a regular man," says Jett.

"A regular man?" The girl shakes her head. "Ain't none of them out here."

In fact, there are legions of men and women leading respectable lives on Beat 12. They pack the aisles of the Roman Catholic Church, they usher their children through the streets to school, they crowd the busy bodegas and

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

Laundromats. Without the regulars -- day laborers, office workers, welfare mothers -- the neighborhood would surely fall, as have so many others in the Bronx. But more and more of late, the regulars -- and their allies, the police -- wonder how long they can hold their ground.

So many stores have been robbed so often that many, including the Post Office, conduct business from behind thick Plexiglas partitions. Some streets are so dangerous that the auxiliary police won't drive down them. And when regular patrol officers respond to calls in some zones they are often met with "air mail," bricks and chunks of concrete that rain down from above.

At night Beat 12 echoes with gunfire, much of it random; few here are foolish enough to sleep with their bed by a window. When the gunmen have a target, as they often do, the next morning the neighbors are out with broom and hose sweeping blood from the sidewalk. All this, of course, creates an air of dread, a feeling best expressed by a T-shirt popular among teen-age boys. "Back up," it reads, "and live."

NOW AND THEN KEVIN JETT does traditional police work -- writing tickets, making collars -- but usually only in passing. The sector cars answer most emergencies. And special units -- narcotics, morals and so on -- work the streets.

Jett's main mission is to insinuate himself into the lives of the people on his beat, to walk and talk, analyze their trouble and then find a way to stop it. He's a collector of suggestions, a clearinghouse for complaints. He listens, weighs options, takes action.

Sometimes he attacks the context of crime, the disrepair and disorder that make mayhem possible -- drunks on a corner, drug addicts in a lobby, trash on the sidewalk, burned-out cars in the street. And sometimes he moves against the criminals themselves -- a burglar preying on a building, a motorcycle gang staking out a block.

All of this seems to take place more at random than by plan. Kevin Jett is not a textbook cop. He has not read the department's new problem-solving manuals and knows almost nothing of Herman Goldstein's methods; his training in community policing was so short and superficial that he barely remembers it. He embraces the objectives of community policing, but seems to work more by instinct than design. In short, he is no poster boy for community policing. He's a street cop, a grunt who relies more on old-fashioned savvy than problem-solving protocols. As an average cop, one who has to moonlight to make ends meet, he stands as a good test of the new police science.

Down East 194th Street, then north on Bainbridge, then west to Valentine. Across the street four young Hispanic Americans are sitting on the hood of a car. "Let's stop," says Jett. "Just stand here."

He hooks his hands in his gun belt and studies the scene. "They've been dealing heroin up here. I've been in the precinct five years and I've watched them grow up from kids. They were about nothing then, so I guess I shouldn't expect much now. You hope things will change, but they don't."

A moment later, the group moves on and the officer seems satisfied. "If they don't know my name at least they know there's a big black cop who's always around. That's my reputation. I like that."

Always around? Not in this neighborhood, or anywhere else. With vacations, furloughs and sick leave, court time, paper work, meetings, training sessions, special assignments and details, the average beat cop can spend as much as half of his regular 43-hour week off the street. To put it another way, if a neighborhood sees its cop 1 hour out of every 10, it's lucky.

Actually, Kevin Jett is hardly ever around. He tries to stagger his shifts to create the illusion of omnipresence -- one of the new tactics. But while this gambit fools some people -- "Man, you is always working!" says a surprised mutt -- it does not mollify the regulars.

Down Valentine toward East 194th Street, half a block from the corner, a middle-aged Hispanic woman with reddish hair corners the officer. A pack of boys, she says, have been smoking marijuana in front of her building.

"I tell them to leave. I tell them I live here 18 years. They say, 'So what?' "

The officer looks down the block. Four teen-agers are standing in front of the Right Spot pizza parlor.

"That them?" he asks.

"That's them," says the woman.

"Yo!" yells Jett. "C'mere!"

They are 14, perhaps 15 years old.

"You keep hanging out all day," he tells them, "and you're going to get in trouble, or catch a bullet. Don't destroy the neighborhood you live in."

"It wasn't us," one of them says. "It was our friend."

"I saw you," says the woman, so angry she begins to shake. "Don't come in our building! You got no business here! I don't want our kids to see the reefer. It's dirty. Dirty!" And suddenly she begins to cry.

Jett leans forward. "You hear her," he tells the boys, in a voice so soft it's almost lost in traffic. "This is somebody's mother."

SATURDAY AFTERNOON AND THE STATION house is quiet. A sergeant mans the front desk. To his right an officer answers the phone.

The sergeant is writing in a log book and complaining out loud. "Another community event and it's pulling officers from the sector cars, but that's community policing. It's great, huh? We're all community policing."

The cop on the phone cups his hand on the mouthpiece. "Yeah, the community policing unit does something and we have to clean up the mess."

"Ten years," the sergeant goes on, "they've had it for 10 years and it's a failure, but the department keeps trying it because it's the new thing."

In one form or another, New York has had a cop on the beat since 1783 Even in the 1970's, when most of the force rode patrol cars, there were still walking posts and trial programs in foot patrol. Today, on average, about 40 officers in each precinct walk a neighborhood; some 2,700 cops on 1,320 beats, or roughly 20 percent of the patrol force. The experiment is broad, and the results, so far, show just how complicated and difficult the job of radically restructuring the police really is.

In the subculture of the station house, the answer to crime is swift punishment, not social work. To many cops, community policing is too "soft" to deal with the mopes and knuckleheads roaming the streets. Even those officers who joined the force because they wanted to "help people," as so many of them put it, do not relish the role of "government liaison," "problem-solving facilitator" and community organizer.

"If you live in Mayberry R.F.D. then it will work, but I don't see it happening in New York," says one cop, speaking anonymously for fear of official censure. Now an undercover man, he walked a beat for more than a year. "I don't think a police officer should be involved in community organizing. The department also wants you to solve long-term problems, but that was impossible -- the drug problem, that's never going to go away. Community policing -- it sounds great, but I think it's a big waste of time."

The bureaucracy adds to the problems by rewarding cops for "turning numbers," making arrests, not for solving problems. Then there are the dual

diseases of brutality and corruption. Beat cops, for the most part, are on their own -- historically a risky practice, particularly in New York. In the early 1970's, a commission headed by Judge Whitman Knapp revealed an entrenched system of corruption -- thousands of cops on the take, mostly from bookmakers and gamblers. This year, two decades after the Knapp Commission's final report, another commission, this one headed by a former judge, Milton Mollen, found new pockets of corruption: small clusters of brutal cops beating up drug dealers and stealing their merchandise and cash.

Finally, as the most trenchant critics of community policing point out, it makes little sense for the police department to become "client oriented," to take its marching orders from the people it serves, if the rest of the city government continues on its centralized, bureaucratic, self-absorbed ways. To truly reform the police, one must first reform the other agents of government -- the sanitation inspector, the Health Department officer and so on -- making them problem solvers too, directed by the community and working in concert with the police. It makes little sense, for example, for the Police Department to target a building for action if it's going to take the Department of Housing Preservation and Development a year or more to evict dealers from their apartments. It's not a foothill that has to be moved; it's a mountain.

THE DAY HE LEARNED THE department planned to hire him, Kevin Jett drove to his parents' house in Mount Vernon to break the good news.

His father was elated. "Go on, boy." he said. "Go on!" His mother, however, seemed heavy-hearted. "A policeman?" she said. "Kevin, are you sure you really want to do this?"

By his own lights, Kevin Maurice Jett, 31 years old, a former amateur boxer and black belt in karate, six feet, 200 pounds, strong and swift, is a mama's boy.

He calls his mother several times a week. She asks if he's wearing his bulletproof vest; she worries the dealers will target him. Not long ago he bought a beeper so she would always be able to reach him. "The beeper makes her feel better," he says. "But I don't tell her half the things that happen on my beat."

Bennie Ruth Jett, an assistant teacher at an elementary school, and her husband, Morris Jett, a supervisor with the city Housing Authority, were born and raised in Mississippi. Twenty-eight years ago they came north in search of a better life, settling in the Bronx on the ninth floor of a 22-story

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

building in a public-housing project, the Mott Haven Houses.

Bennie Ruth's passion was the Pentecostal Church. She sent her children -- Bruce, Cheryl and Kevin -- to Bible study and encouraged them to sing in the choir. Kevin, the youngest, spent so much time singing hymns and studying scripture his friends starting calling him Church Boy.

Mott Haven then was not as mean and dangerous as it is now, but it was still a place to be wary. So the Jetts set down rules: no smoking, drinking or languishing on the corner. After school, there were chores, then homework.

Church Boy went to Christopher Columbus High School, and it was there, one winter day midway through his freshman year, that he learned just how savage the streets can be.

He was on his way home in the late afternoon, walking along Pelham Parkway toward a subway station, when, nearing a corner, he heard footfalls from behind. By the time he turned, he was surrounded.

There were 13 in all, he says, white teen-agers, poised for an attack. He fought off the first, then the second -- even then he was sturdy and quick and well schooled in self-defense. Soon, however, the gang overwhelmed him. They beat his face and kicked and pummeled his body. And then he saw a silver blade catch the light, a sharp blade that sliced through his ear and came though his coat, again and again. He struggled onto the subway, then up the stairs to his family's ninth-floor apartment, where he sank into a chair. His mother came into the room. "What happened?" she asked. He looked up . . . then collapsed at her feet.

ROLL CALL. THE AFTERNOON SHIFT. DOWN Webster to East 194th street, then up a block to Decatur. On the southeast corner looms a soot-stained brick building with Tudor trim, 384 East 194th Street, six stories, 81 shabby apartments -- a haven, the police say, for drug dealers.

The sidewalks are empty, the building quiet. "To look at it now," says Kevin Jett, "you wouldn't think it's notorious. Now is when real-estate brokers bring clients to see apartments. Little do those clients know what lurks in the shadows."

Informers say that business is booming, with at least 3,000 packets of heroin and hundreds of vials of crack sold every day. The dealers use women -- mothers, wives and girlfriends -- to fetch their stock. They are organized and they are ruthless. "You get personal with these guys," an informant told the police, "and they'll just blow you away."

The building is just outside Kevin Jett's beat, but he regularly slides a block east to check it. Sometimes he stands on the corner, as he is doing now, his thick arms folded across his chest, a bugbear in blue frightening away flocks of buyers.

Occasionally he'll cross the street and wade into the circle of young mutts who do the dealers' work -- the lookouts and ushers and cashiers. He'll ask for identification, demand to know what they're doing there -- question after question until he forces them to scatter. But a beat cop has to circulate, so he'll move on, up the hill toward Valentine, knowing, without looking back, that the boys have returned and the next sale is already under way.

The police in the 52d have tried everything to rout the dealers from Decatur Avenue, all the tricks from the old book, all the techniques from the new. Narcotics squads have conducted operations and made arrests. Building inspectors have issued 800 housing-code violations to prod the landlord to fix the building and evict the dealers. Police lawyers have invoked the city's padlock law and closed down crooked storefronts. Beat cops have talked to the "good" tenants, mining them for information; they've also used traffic tickets and miscellaneous summonses to harass the dealers and scare off their trade. Nothing has worked.

The tenants are terrified, and all the tickets and citations are like so many "flea bites," as one cop put it, "when you consider the volumes of money," the profit from drug sales, the revenue from rent. (The building is owned by L. P. East 194th Street Realty. Its lawyer, Irwin Cohen of Brooklyn, says his client knows of no tenants who are selling drugs.)

Still, every month when the precinct captain, the community-policing lieutenant, the sergeants and beat officers gather to identify the precinct's five most pressing problems, 384 East 194th Street is near the top of the list. They hope one day to build a case with enough arrests and complaints to convince a Federal court that the building is a "crime instrument" that should be seized, cleaned out and turned over to a nonprofit community group. But such a legal procedure takes time. Meanwhile, Kevin Jett's supervisors urge him to look for a "creative" solution to the problem.

"Here's the creative solution to that problem," says Kevin Jett, shaking his large fist at the building.

Up 196th Street to Valentine. School is out and the street is crowded with children.

"Excuse me, Mr. Policeman."

There are two of them, dark-eyed girls with wan smiles.

"Hey, hi," says Kevin Jett.

The taller of the two is holding a plastic cage. Inside are two hamsters, one very large, one very small. The large one is chasing the small one, round and round and round. And their keeper is worried.

"Do you think," she asks, "do you really think the father will eat the baby?"

Bennie Ruth Jett was afraid of animals, save the goldfish she allowed in the house, so Kevin Jett knows nothing of hamsters. But a beat cop must have an answer for everything, even a head-hunting rodent.

"I don't think the father will eat him," says the officer, watching the chase. "But you got to get the mother to help."

"Oh," said the little girl, her voice fading. "I just wanted the baby. I gave the mother away."

Down East 196th Street to Decatur. Across the street comes a short, stout boy leading a short, stout dog, both scowling. The dog is a pit bull, the boy is J. J.

"Oh, my, my, my," says Kevin Jett, "here comes the terror of the neighborhood. Now J. J. lives at 384 East 194th Street, so you can guess what he's into. He told me he's raising that dog to hate cops. He used to be the balls of a gang that robbed kids. Now he's a steerer, leading customers to the dealers at 384. He was away for a few months in a juvenile detention center. They should have kept him until he was 40."

OFF THE BEAT, FOR THE moment, on Kingsbridge Road, headed for the New Capitol diner and lunch.

Kingsbridge Road is like a suq, or bazaar, clothing and shoe stalls as packed as old closets, produce stands with the world's fruit piled high. In the stacks of sugar cane and mangoes, there's a little Santo Domingo; in the cans of rambutan, a breath of Bombay. No neighborhood in New York is more eclectic: Koreans, Puerto Ricans, Albanians and Mexicans, Irish, Jamaicans, Italians and Guyanese.

Up the street comes Joanne Pritchard of Valentine Avenue with her companion and son.

"How you doin', Kevin?"

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

"Doin' fine, how about you?"

"Well, do you believe they shot a dealer in the chest on our street?"

"I heard a little about it this morning."

"We knew him," she says. "He was a nice guy, real nice to the kids. I'll tell ya, we're getting outta here. I got to get the hell out. It's really changed, the neighborhood. People have tried to bring it back, but. . . . "

"Yeah, ah huh, I hear you."

As it happens, two of the precinct's detectives are sitting across the street in a dark sedan. Jett walks over and leans down to the open window.

"What was the deal on Valentine?"

One dealer shot another, says one of the detectives. The victim was Tony Manning.

"Tan-gray Maxima?" asks Jett.

"Yeah," says the detective, "that's the car."

"Why did he get it?"

"Some kind of dispute. Don't really know yet. You know the saying, 'Dead men tell no tales.' "

For the moment, the murder troubles Kevin Jett. The drug dealer, his line of work aside, gave the police their "props," their respect. He was discreet about his business and well liked by his neighbors. Still, Jett says, "I guess if you live by the sword, you die by the sword."

Turkey burgers, yellow rice and marinara sauce. He eats light, lifts weights, runs to keep trim. After the meal, three more turns of the beat, then down to Webster to catch a bus back to the precinct.

Aboard climbs a young Jamaican, a thin man with a toothy grin. He looks toward the back for a seat, but, spotting the officer, decides to stand in front, by the door.

Jett looks up and smiles. Toothy Grin is new to the neighborhood, an apprentice in the drug trade.

"Let's go up front," says Jett.

Cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

Toothy Grin loses his glow. He looks at the driver. The bus isn't stopping. He's trapped.

Jett slides up next to him.

"What is it?" says the officer.

"I just be riding here, man," says the Jamaican, the grin now a faint smile.

"Guess you heard what happened to Tony Manning."

"I don't hear no-ting, man."

"You heard."

"No, man, what you say?"

"Better stay out of trouble or you might end up the same way."

Back at the station house, the shift is changing, with cops coming, cops going and the first arrests of the late afternoon crowding the cells. Jett climbs the stairs to the second floor and finds the detective in charge of the Manning case, a stocky man with a square face.

"What happened?" Jett asks.

The detective digs in a large folder and fishes out a stack of snapshots.

"Enjoy," he says.

Tony Manning, in blue jeans and a denim jacket, is lying face down on a white tile landing in front of an apartment at 2685 Valentine Avenue. The landing is covered in blood. Next to the body is a large red V-shaped smear, as if the victim had tried to raise himself before he died. He was shot twice. The first bullet entered his chest and struck an artery. This was the fatal shot. The second bullet hit him in the groin. This was a message.

"My, my, my," says Kevin Jett, shaking his head. "Look at that."

"How old was he?" someone asks.

The detective looks at the folder. "Thirty-two," he says. "But don't feel sorry for him. He wasn't one of the good guys. Shouldn't even investigate this one. Waste of the city's money."

Kevin Jett wasn't so sure. That night at home, he did his laundry, cooked some fish and wondered to himself how Tony Manning, by all accounts a

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

polite and civil man, came to "waste his life" selling drugs. "I kept thinking, he wasn't a bad, bad guy. He wasn't a real thorn in my side. Maybe I'm getting soft."

HE BOXED HIS WAY INTO THE Golden Gloves. He ran track. He played football. At the end of his senior year, Kevin Jett graduated with honors, but when it came time to sort through the scholarships and choose a college, he stayed home, close to his church and his mother, and enrolled at the City College of New York. He studied education, then began to think about the law. Along the way, he married a woman from his church and soon had a daughter, Charisse. Then he began to drift, away from his studies and out of his marriage.

He ended up in front of a sorting machine at the Post Office, "brain dead" and desperately wishing he were somewhere else. He took the test for the Police Department and passed, but when he was called to report, his wife protested that she was afraid. Before long the marriage had dissolved, and in April 1987, Kevin Jett reported for duty with Training Company 8746 at the New York City Police Academy.

Across the six months that followed, he heard lots of advice. "They told us: 'It's a war out there. You're going to lock people up on a Monday and on a Wednesday, they'll be back on the street looking for you.' That was true. We were also told that someone you know on the job will get killed in the line of duty. That was true, too."

Some of the training was easy. "Being from Mott Haven I already knew how to treat people in the streets -- like you want to be treated, even the bad guys, until they show you disrespect." The book work, however, left him struggling, so much so he almost gave it up. "I just kept thinking about graduation, that day when you wear the white gloves and stand and salute with your family watching."

His first day on the job, he left for work from his parents' house. "My mother said, 'Be careful.' I turned around and said, 'What do you mean?' Then I realized, Wow -- I'm a cop."

After six months of field training, he was assigned to the Five-Two, a precinct of about 300 officers on Webster Avenue in the northwest Bronx. He walked short foot posts at first -- back and forth on the same stretch -- then rode in a sector car. In 1991, he volunteered for the precinct's small community policing unit. He liked the flexible shifts -- beat cops set their own hours -- and, he says, "I like to work alone with no one looking over my shoulder." He was assigned to Beat 12, one of the most dangerous in the

precinct.

He surveyed the neighborhood and sized up the "players." Then he did what beat cops have always done to make the terrain theirs -- he set out to establish a presence.

"You have to project an image, especially if you work alone. So you have a little talk with the knuckleheads, introduce yourself and tell them where your coming from. You say: 'I'm Officer Jett. This is my neighborhood. If you mess up and I see you around, I'm going to take care of you.' "

His background, of course, helped him do his job. "The average white rookie out of the academy on a beat like this is terrified. I grew up in Mott Haven, and the mutts understand that that's different from East Cupcake, Long Island. They feel that guys who came from there are soft.

"I also tell the rookies that sometimes you can use bluff, trickery and deceit with the bad guys. Some of the knuckleheads say, 'Without that gun you ain't nothing.' I say, 'If we have to do it, let's do it.' Then I say: 'This is my job. Let me do my job and you get on about your business.'

"If I have to fight, I'm the type who hits first and radios for help second. Most cops don't know how to fight. My technique is to pick you up and body-slam you to the concrete. Bam.

"Of course, you got to remember that no matter who you are, there will be somebody bigger, so you have to have the gift of gab. Once at the corner of Briggs and 194, I saw a guy I hadn't seen in the neighborhood before. He was only about 5 feet 8 inches, but he had muscles coming out of his ears. I said, 'Damn, that guys's got some muscles.'

"I go into a video store for a routine check and pretty soon this woman comes in and says there's a guy outside who had slapped her and had some money that belonged to her. I went outside. She says, 'Officer, officer, there's the guy who slapped me.' It was the guy with the muscles -- I mean, muscles in his neck, in his knees, in his toes, muscles everywhere. I said, 'Damn.' She says, 'They call him 'Grape Ape.' I said, 'Damn.' Then she said, 'He just got out of jail.' I said, 'Oh, no.' Then she leans over to me and whispers in my ear: 'The last time it took 10 cops to lock him up. His arms were so big they couldn't get them together to cuff him. They needed two sets.' I said, 'Lady, you ain't helping me none.' I could see myself going though the plate-glass window.

"I said to myself: 'Shoot, you don't want to get into a fight with this guy. You

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

don't know how many of those 10 cops got hurt.' I said, 'I better do some talking.' I wasn't going to walk up and say, 'Look, give her the money or I'm going to lock you up.' So I said: 'Excuse me, fella. Could you come here for a minute.' I said: 'Look, I heard you just got out of jail. Here's the charges you face so far: robbery, assault three, and if you want to fight me, it will be assault on a police officer. Why don't you give her the money and you can walk.' He said, 'O.K., officer.' I was so happy."

Kevin Jett keeps his uniform spotless and neatly pressed. He carries a .38-caliber Ruger revolver with a four-inch barrel, two extra cylinders with six rounds each, handcuffs, a can of Mace and a radio. He also packs two additional pieces of equipment not listed in the regulations.

The first is a pair of black leather driving gloves. In the beginning, he wore the gloves as prophylactics, to search addicts and dealers, anyone with cuts or open sores. Then, perhaps acting on his boxer's instincts, he began wearing them for trouble. Now the gloves are a kind of signature. "When people see me with my gloves on," he says, "they know it's not about talking to anyone." Another part of his kit is a pocketful of quarters, which, every day, he slips into the hands of the small, often thirsty fold that tugs at his trousers or trails him wide-eyed and silent along the street.

IT IS JUST AFTER 7 P.M. and Ted Husted is calling to order the monthly meeting of the Bainbridge-Marion Community Association, a neighborhood group bent on beating back the muggers.

Kevin Jett is at the head of the table. Meetings like these are part of his routine. Last month, the precinct commander, Capt. Raymond Redmond, was there. So were 150 angry and emotive citizens.

Tonight, the mood is different. There have been some changes in the neighborhood. "We've seen more police on the beat and more sector cars," Ted Husted is telling his neighbors. "And now that they've put helicopters up, there's not as much gunfire at night. We've even seen Captain Redmond on patrol in the neighborhood, so it's not just show. We don't have any promises, but they're doing something."

Kevin Jett leans back and smiles.

The meeting is in the parish center of Our Lady of Refuge Roman Catholic Church. The church and the church school are one side of 196th Street. P.S. 46 is on the other. Together they anchor the neighborhood and are a large part of the reason that Ted Husted, a teacher, and Milton Mendoza, a carpenter, have not fled.

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

They own homes on Bainbridge Avenue, across the street from the public school. They are neighbors and friends. In the fight for the streets, they are also a flanking force for police. If they and others like them leave, the knuckleheads will overrun the neighborhood.

Ted Husted teaches second grade at P.S. 46. He and his wife, Jo Anne, will not let their three children walk the streets or visit the homes of their friends. "Maybe a drug dealer might be living next door to the apartment they would go to and maybe someone looking for that dealer will get the wrong address, break down the door and start shooting," Ted Husted says. The Husteds lead a Cub Scout pack, a Girl Scout troop and the local Little League -- recreation for 600 children. Without them, there would be nothing but makeshift basketball in the street. More and more, however, the Husteds talk about leaving. To them, the neighborhood seems lawless.

"If a guy can drive down the block with his radio blasting so loud it shakes the buildings and no one stops him, then he might as well drive down the street with a megaphone announcing, 'I have drugs.' " It is a neighborhood with a hollow heart, says Husted, a place with no moral center. "Parents in this neighborhood teach their children they're entitled to certain things like if the local bodega is price-gouging, it's O.K. to take what you want and walk out without paying." And children, of course, tend to absorb the worst of society, not the best. "I talked to kids who've seen movies like 'Sleeping With the Enemy.' One of my students said, 'Yeah, my Dad took me. It was great. The guy slapped the [ expletive ] out of that [ expletive ] ' -- I'm talking about a second grader here."

Their values have become so warped, so twisted that violence, in the end, is the only ethos most people know. "I have one student in class who refused to do anything. One day I said, 'Joey, why don't you do what I tell you to do?' He said, 'Because you don't really want me to do that.' I said, 'What gives you that impression?' He said, 'If you really wanted me to do it, you'd hit me.' "

MILTON Mendoza grew up in the Bronx. His father was a laborer, his mother worked in a sweatshop. Five years ago, he and his wife, Aurora, a nurse, and their two children moved into a house a few doors down from the Husteds'. It's a fine house, with a modern kitchen and parquet floors. Milton Mendoza the carpenter knows his trade. He has worked hard getting his place in shape. In a year, he says, he hopes it is owned by someone else.

It was winter when they arrived and the neighborhood was quiet. Then came the spring and the mutts emerged from their dens. They urinated on the

sidewalk in front of his house, burglarized cars along the curb and filled the street with gunfire. One morning Milton Mendoza found three bullet holes near his front door.

He is 39, a man who has taken his lumps. "I come from the streets," he says. "I know how to handle myself." And yet:

One evening in November 1990, as he was driving home from work, something crashed against his car. He pulled to the curb to see what had happened and discovered that a teen-ager had tossed a brick at him. "I asked the kid, 'What are you doing?' He looked at me and said, 'Get the hell out of here or I'll put you in a body bag.' I thought of my family and said to myself, 'This guy is a moron.' So I started to walk away. Suddenly, seven or eight guys were surrounding me. The kid slapped me. So I grabbed him and slammed him against the building. I got in the car and took off.

"I was only a couple blocks from home. I stopped at the house to pick up the wife. When I came out, I saw them on the corner just down from my door. I figured I'd better try to talk to them. All of a sudden someone hit me from behind with a baseball bat. I went down. They sat me up and gave me 25 or 30 shots. Just about then the mailman came by and yelled at them. I was trying to block some of the blows with my arms. They broke my forearm, my wrist, my fingers. They dislocated an ankle and a knee. I had pins in my hand, a carpenter with pins in his hand. When I grew up we had fistfights, but today you look at the wrong person the wrong way and they want to shoot you, stab you, beat your brains out -- they want to kill you. These kids are like time bombs."

STREET COPS CALL HIM Popeye. He is short and muscular, with a balding pate and a canny smile. He worked his way from cadet to Commissioner -- the cops' cop. This year, an election year, is Ray Kelly's last as the top cop. New York's Mayor-elect, Rudolph W. Giuliani, has appointed William J. Bratton, the Police Commissioner in Boston, New York's next Police Commissioner. All three men support community policing.

But Giuliani's campaign promise to push the police to make more street arrests contradicts the whole idea of the new police science. The professionals know that wholesale arrests are a pointless exercise when courts are overbooked and prisons are beyond capacity. "Turning numbers," as the police call it, does little to lower fear or restore order.

Ray Kelly believes that the upstanding citizens he has served all his professional life are more perceptive than most politicians grant. He's walked a beat, he ought to know. "The public," he says, "wants a more

personal relationship with the police."

So the Commissioner committed himself to community policing. It's a "work in progress," says Ray Kelly. And progress is slow.

It has not been easy to sell the rank and file on the value of problem-solving protocols. Young cops have the lights-and-siren syndrome; they're all action. And the veterans, those who have been on the job five years or more, suspect that community policing is a smoke screen for "social work." They're angry at the courts, the revolving door of justice, and they're careworn by the suffering they see in the streets. Many are so cynical, so demoralized, they echo the ethos of the streets: justice is swift and sure, some say, only at the end of a nightstick. Kelly knows too that many of his beat cops are ill trained and poorly supervised. Field officers get just two days of training in community policing, and the sergeants who direct them on the job frequently do little more than "scratch," or sign, their log books.

Even Kelly's executive corps has often failed him. Who knows how many tradition-bound captains, inspectors, commanders and chiefs have issued daily orders that sabotaged the new philosophy. Recently two such commanders -- apparently convinced that a cop out of sight is a corrupt cop -- stopped their beat officers from patrolling in apartment buildings, an essential tactic in community policing. "They're paranoid about integrity," says one precinct commander. "The whole idea is to watch your back, to make sure nothing happens, so you can move up to the next slot."

But it is the Commissioner who directs the department, not a small corps of cautious traditionalists. And it is unlikely the new Commissioner will change policies. "We're moving," says Kelly, "there's no going back."

Out in the precincts, the rank and file watches and waits. Some cops long for the old days. Others believe Kelly is right: community policing is here to stay.

On most mornings the troops under his command find Capt. Raymond Redmond, the precinct commander at the Five-Two, an amiable boss, one worthy of respect. He jogs through the precinct and every week spends hours walking a different beat. "The old precinct commander," says Jett, "could barely walk to his car."

Redmond runs the Five-Two with an even hand, an approachable autocrat. This morning, however, the word has spread that the boss is grumpy.

"Well, yeah, I am grumpy and I don't care if my cops don't like it."

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

He's piqued, in part, from a trip he made the day before to 1 Police Plaza. He had traveled to headquarters for a ceremony to honor the good work of several community police officers, among them one of his own.

"They take them down there and give them a certificate. A certificate? I would have given them a detective shield. That's a reward."

EARLY AFTERNOON and Kevin Jett is back on the job, in the cool, wood-paneled rectory of Our Lady of Refuge, conferring with the pastor, the Rev. John Jenik.

Father Jenik is a multifarious man, 49 years old, a firebrand from the 1960's who abandoned his bourgeois background, joined the church and, some 20 years ago, began a career with the poor in the Bronx. The archetype of the urban priest, he can quote from St. Augustine, plot urban policy, curse like a drunken marine.

He arrived at Our Lady in 1978 and formed the Fordham Bedford Housing Corporation, a nonprofit group that restores and runs buildings seized by the city or the courts. Then he went after the dealers. He organized boycotts of the stores that were drug fronts, then held marches and Masses and vigils at the neighborhood's "hot spots."

The dealers were angry; the priest was hurting business. And before long, John Jenik -- blond-haired, blue-eyed John Jenik, who daily walks his parish unescorted -- had a price on his head. "There's big money out here," he says. "You get in the dealers' way and you get killed."

Which is why Kevin Jett has come to the rectory today. Father Jenik has planned another all-night vigil and Mass -- this time at the hottest spot in the neighborhood, 384 East 194th Street, the six-story heroin house on Decatur.

"Well, Father, we're going to bring in big lights and flood the building and we're going to put people on the roof to make sure you don't get any airmail," says Kevin Jett.

"Good," says the priest. "We'll gather in the church and walk down from there. Thanks, Kevin."

Out on the street, the cop looks back at the rectory. "Father Jenik is a thorn in everyone's side," he says. "But he's a good thorn."

Across the street at P.S. 46, the afternoon session has just started. "Let's pay them a visit," says the cop, and he heads up the steps and though the gray

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

Gothic arch.

Kevin Jett "owns" P.S. 46, and everyone in the neighborhood, including the school's principal, Aramina Ferrer, knows it. "He's told the bad element in the street, 'You don't come into my school and mess with my teachers and my kids,' " says Ferrer. "I feel like he's part of the staff."

The patron of P.S. 46 is always on hand. He speaks to classes about safety and drugs; he roams the peach-colored halls under the big clocks to keep the building secure; and when the final bell rings, he's on the corner, chasing away dealers and ne'er-do-wells.

Last year, when an angry parent confronted the assistant principal, Ferrer turned to Kevin Jett.

"I got five cops and went to the house. I asked him what happened, 'Why did you assault a teacher?' He said: 'I didn't assault him, I moshed him.' I said: 'Oh, you moshed him. Well this is my school, you hear me? Mine. And I don't like nobody coming into my school and moshing the teachers.' I said, 'You do it again, and you'll be getting locked up.' I said, 'If you really have an urge to fight, we can accommodate you.' "

When Kevin Jett surveys his career, three days come back to him. One morning he helped close the smoke shop on Briggs; the evening he saved the life of an asthmatic struggling to breathe; and the afternoon he addressed the final assembly of fourth graders at P.S. 46.

"Come on into the auditorium," he is saying now. "Let me show you where I stood." He climbs some stairs, turns a corner and steps onto the stage. "Here, right here by the piano. See, this is where you stand. Then you have to shake everybody's hand. I wore my best dress shoes that day. Patent leather. Really shines."

He steps forward for a moment and stands silently on the apron, looking out into the quiet hall and the long rows of empty seats.

"I love what I do," he says. "But I'm not going to make detective here. No, that's not going to happen."

ANY DAY NOW, JETT IS scheduled to be transferred, most likely to a job as a narcotics officer in the Organized Crime Control Bureau. In New York there's no reward for walking a beat; no detective's gold shield, no sergeant's stripes, no cash bonus. The path to promotion and a raise is still through the special units -- narcotics, vice, organized crime. And Kevin Jett must move up: to support his three children he supplements his base pay of $3,100 a

cited in City of Los Angeles v. Barr
No: 18-55599, archived on July 9, 2019

month with his earnings in a supermarket as a part-time fishmonger. By all standards, his own and those of his superiors, Kevin Jett has succeeded. Crime statistics in his monthly community policing log show that when he was off the beat for any substantial period, there were more burglaries, robberies, car thefts. His sources on the street have told him that when he's sick, injured or on leave, drugs sales go up, too. He attributes his success to his size, strength and background: a black belt in karate, a Bronxite wise in the ways of the streets. "Not every cop can work single patrol," he says. "I grew up in the city. I faced everything the knuckleheads faced." The advocates of community policing, however, would argue that even a less streetwise cop, one from East Cupcake, could have assumed ownership of Beat 12. It might have taken more time, but a smart, determined cop armed with the penal code can, they say, "establish a presence" anywhere.

To be sure, the baneful reality -- the swarms of drug dealers, gun merchants, loan sharks, pimps, robbers, burglars and extortionists -- powerfully suggests otherwise. But no one knows for sure. After rising inexorably for more than a generation, reported crimes have declined in New York for two straight years, to the lowest level since 1985. Yet officials are reluctant to ascribe the trend to any one factor, or even to recognize the existence of a trend based on such notoriously unreliable statistics. There is no data on community policing either, and the case studies are too narrow and anecdotal to serve as proof.

The basic idea of community policing -- marrying a cop to a piece of ground -- seems sound. If a cop can move onto a beat, roust the bad guys and teach the upstanding citizens how to resist their return, then that's one piece of ground where crime is unlikely to breed. But the job of organizing and educating places like Beat 12 is more daunting than the job of patrolling them. As one insider put it, "half the community is cheering the cops on, but the other half is still throwing things at them." And without the community, there is no community policing.

To imagine an N.Y.P.D. devoted entirely to community policing is to understand how far the department still has to go. It might have to be twice as large, perhaps 60,000 or 70,000 officers assisted by 15,000 to 20,000 civilian workers, with an annual budget of about twice the current $1.7 billion. A third or more of the force would be on foot patrol, covering the most dangerous and crime-plagued beats 24 hours a day. Cops would be community leaders, practiced in the political art of pushing city bureaucrats -- in sanitation, health and human services -- to do their jobs.

The officer on the beat would patrol where and when he wanted. His

supervisors would be true colleagues, teaming up on tasks. The department would be decentralized; most decisions would be made by precinct commanders and supervisors in concert with neighborhood groups. All the support services -- from the sector cars to the vice squad -- would be organized around the beats and would work closely with the cop on the street.

In reality, of course, the municipal budget is tight and growing tighter, and the municipal mind is ill disposed to bureaucratic reorganization. Cops want to be crime fighters not problem solvers, Alexanders whacking the Gordian knot rather than unraveling it. The average cop sees himself as a lone agent, isolated and besieged, the mutts in front of him, his department nipping at his heels.

And there is more -- the overwhelming issues of crime and punishment, rehabilitation, new prisons, disintegrating families, murderous teens, turbulent schools, immigration, the economic isolation of the inner cities, racial warfare, gutter politics, urban alienation and fear so rampant it threatens to make the idea of compassion a concept from another age.

Can community policing work? Yes.

Does it work in the tough precincts of New York? Again, yes, though, at the moment, only by degrees and, at times, as much by accident as design.

Will the entire force -- detective squads, patrol cars, narcotics division and so on -- adopt the new science? Will the "dominant philosophy" ever become dominant practice? Herman Goldstein says that David Couper, the recently retired Police Chief of Madison, Wis., spent 20 years trying to reform that city's tiny 311-member force. By that measure, New York won't have a comprehensive community police force until the year 4000.

Perhaps the problem-solving and organizing can wait a bit. In the Bronx, at least, it seems enough for now just to have some bluebottles back on the beat.

The reporting in this article draws on the work of the following: Michael J. Farrell, associate director, Vera Institute of Justice, New York; Michael A. Julian, coordinator of community policing, New York Police Department; George L. Kelling, professor of criminal justice at Northeastern University and lecturer in public policy at the John F. Kennedy School of Government, Harvard University; Felice Kirby, director for anticrime activities at the Citizens Committee for New York City; Mark H. Moore, Guggenheim Professor of Criminal Justice Policy and Management at the Kennedy

School; Michael E. Smith, director of the Vera Institute of Justice; Robert
Trojanowicz, director of the National Center for Community Policing,
Michigan State University; Robert Wasserman, research fellow with the
Program in Criminal Justice Policy and Management at the Kennedy School.

———————

A version of this article appears in print on December 12, 1993, on Page 6006064 of the National edition with
the headline: One Cop, Eight Square Blocks. Today's Paper | Subscribe

**NEWS**

World

U.S.

Politics

N.Y.

Business

Tech

Science

Health

Sports

Education

Obituaries

Today's Paper

Corrections

**OPINION**

Today's Opinion

Op-Ed Columnists

Editorials

Op-Ed Contributors

Letters

Sunday Review

Video: Opinion

**ARTS**

Today's Arts

Art & Design

Books

Dance

Movies

Music

N.Y.C. Events Guide

Television

Theater

Video: Arts

**LIVING**

Automobiles

Crossword

Food

Education

Fashion & Style

Health

Jobs

Magazine

N.Y.C. Events Guide

Real Estate

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

T Magazine

Travel

Weddings & Celebrations

**LISTINGS & MORE**

Reader Center

Classifieds

Tools & Services

N.Y.C. Events Guide

Multimedia

Photography

Video

NYT Store

Times Journeys

Subscribe

Manage My Account

NYTCo

**SUBSCRIBE**

Home Delivery

Digital Subscriptions

Crossword

Email Newsletters

Gift Subscriptions

Group Subscriptions

Education Rate

Mobile Applications

Replica Edition

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

© 2019 The New York Times Company | Privacy | Terms of Service

Site Map | Help | Site Feedback

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

**U.S. Department of Justice**
Office of Justice Programs
*Bureau of Justice Assistance*



*Nancy E. Gist, Director*

# Police Hiring Supplement Program

On August 30, 1993, U.S. Attorney General Janet Reno announced the creation of the Police Hiring Supplement Program, a new $150 million competitive grant program awarding grants directly to law enforcement jurisdictions to hire and/or rehire additional sworn law enforcement officers. This program, funded by a supplemental appropriation by Congress, represents part of the Clinton Administration's commitment to making America's neighborhoods safer through community policing strategies that address crime and crime-related problems. The program is administered by the Bureau of Justice Assistance (BJA) of the U.S. Department of Justice (DOJ).

The goals of the Police Hiring Supplement Program are:

❑  To increase the number of sworn law enforcement officers serving areas where they are needed most.

❑  To improve the long-term ability of law enforcement agencies to engage in community policing by deploying additional sworn law enforcement officers.

❑  To prevent crime, promote problem solving, and enhance public safety through innovative crime prevention, including community policing.

Fifty percent of the $150 million available for these grants ($75 million) was awarded to applicants serving jurisdictions with populations of 150,000 and above, and 50 percent ($75 million) was awarded to applicants serving jurisdictions with populations of less than 150,000. These funds are to be used to help pay the salaries and fringe benefits, excluding overtime, of newly sworn and/or rehired officers for a 3-year period.

## Eligibility Requirements

Eligibility for the Police Hiring Supplement Program was limited to law enforcement agencies and a consortia of law enforcement agencies that could demonstrate both a significant need for additional sworn law

enforcement officers and a commitment to using community policing to address crime and crime-related problems. State law enforcement agencies could apply if they had law enforcement jurisdiction and provided local law enforcement services to communities within the State.

## Federal Share

For each officer funded under this program, the Federal share (award or grant amount) could not exceed the greater of 75 percent of the total salary and benefits over the life of the grant, up to a maximum of $75,000; or 50 percent of the total salary and benefits over the life of the grant. The authorized Federal share per officer could be increased if the agency submitted sufficient evidence of extraordinary economic hardship due to factors such as economic dislocation, natural disaster, or other severe mitigating circumstances. An increase in the Federal share was granted only in the most extreme circumstances.

## Maximum Award Amount

Maximum award amounts were based on the population of the jurisdiction served by the applicants:

❑  A maximum of $1 million over the life of the grant for jurisdictions *with a population of less than 150,000*.

❑  A maximum of $2 million over the life of the grant for jurisdictions *with a population between 150,000 and 749,999*.

❑  A maximum of $3 million over the life of the grant for jurisdictions *with a population between 750,000 and 2 million*.

❑  A maximum of $4 million over the life of the grant for jurisdictions *with a population in excess of 2 million*.

No waiver of the maximum award amounts was allowed.

## Application Requirements

Applications for the Police Hiring Supplement Program were developed by law enforcement agencies in consultation with community groups and appropriate public and private agencies. The applications reflected each community's unique needs and responsiveness to local circumstances. Applicants were required to:

❑ Demonstrate the jurisdiction's public safety need for additional sworn law enforcement officers, as well as the reason(s) that local funding was not available to meet these needs, including a description of the jurisdiction's overall crime situation.

❑ Include a 3-year strategy for community policing in the jurisdiction that specified how additional sworn officers would lead to increased community policing targeted against crime and related problems in the jurisdiction.

❑ Specify how the hiring or rehiring of additional sworn law enforcement officers would help the jurisdiction implement community policing activities.

❑ Describe how the applicant intended to continue the project and retain the positions created with the project funds following the conclusion of the grant period.

❑ Discuss the availability and use of nonproject funds and resources from other organizations (Federal, State, local, or private), providing the fund sources, the fund amounts, and how the resources were to be used.

❑ Include a budget and budget narrative that specifically identified the number of officers to be hired, the salary and fringe benefits per officer, and the total salary and fringe benefits costs.

Applicants also certified that Federal funds made available under the grant would not be used to supplant State or local funds, but would be used exclusively to increase the amount of State or local funds that would be available for law enforcement purposes in the absence of Federal funds.

## Application Deadlines

Applications for funding under the Police Hiring Supplement Program were considered competitively in three rounds, with funding distributed over the three rounds. Applications were due on October 14, 1993; November 1, 1993; and December 1, 1993.

## Award Information

On December 20, 1993, DOJ announced the first 74 awards totaling approximately $50 million to local law enforcement agencies to hire 658 officers. On February 9, 1994, the second round of awards was announced, with 34 local law enforcement agencies receiving grants for a total of $26 million to hire or rehire 364 police officers. On May 12, 1994, the third round was announced, with 142 jurisdictions receiving funds to hire a total of 1,001 officers for approximately $74 million.

In total, the program has funded 250 jurisdictions across the country, for a total of 2,023 additional law enforcement officers in all 50 States. Of the recipients, 225 were from city, town, township, and county police departments serving jurisdictions ranging in population from more than 3.6 million in Los Angeles, California, to 416 in Duncan, Mississippi. Nineteen county sheriff's departments received awards either directly or indirectly from this program. These include 12 sheriff's departments, 3 others that received awards as part of a consortium, and 4 that will contract with cities that received awards to provide law enforcement services. Two State police departments—Illinois and Maine—received awards. Three consortia of law enforcement agencies received awards: a consortium in Oregon composed of a county sheriff, State police, and six municipal police departments; a consortium of a county sheriff and two city police departments in Utah; and a consortium of city police and county sheriffs in Kansas. In addition, two Native American tribes (the Choctaw in Mississippi and the Nisqually in Washington) and one transit police department (Los Angeles County Metropolitan Transit Authority) received grants.

## For Further Information

To obtain a copy of Police Hiring Supplement Program guidelines or for further information, contact:

**Bureau of Justice Assistance Clearinghouse**
P.O. Box 6000
Rockville, MD 20849–6000
Tel: 1–800–688–4252
Fax: 1–301–251–5212
Bulletin Board System: 1–301–738–8895
Internet: look@ncjrs.aspensys.com

**U.S. Department of Justice Response Center**
Tel: 1–800–421–6770

FS000111
November 1995

The Washington Post

# FY 1994

By Sharon LaFraniere ,
Peter Behr ,
John Lancaster ,
Mary Jordan and
Thomas W. Lippman
April 9, 1993

President Clinton's $1.52 trillion tax and spending plan is out. The 1994 budget consists of 1,478 pages, weighs 5.11 pounds and costs $43. Clinton's goal: to reorder priorities and carve $447 billion from deficits over five years. This is a summary of how he plans to do that.

AGRICULTURE

$900 Million Reduction; No Major Subsidy Change

The Agriculture Department proposed cutting about $900 million from its $68 billion operation. But department officials warn their cost projections are based on unpredictable factors like the weather and market prices. Officials expect to save money by closing field offices, cutting a subsidy to honey producers and restricting farm subsidies for those who earn $100,000 or more in non-farm income. President Clinton is not seeking major changes in the farm subsidy programs until 1996. He is proposing funding increases for rural housing, meat inspection and the Women, Infants and Children (WIC) food program.

Sharon LaFraniere

COMMERCE

Large Increase Slated To Build Competitiveness

Commerce gets the biggest departmental increase, on a percentage basis, thanks to a large-scale boost in spending on research and technology programs intended to strengthen U.S. industrial competitiveness. At $3.5 billion, Commerce's budget is 17 percent above its spending level in President Bush's final budget. A major increase goes to The National Institute of Standards and Technology (NIST), the agency leading federal efforts to boost manufacturing R&D and help smaller companies access new production technologies. NIST's budget request is $535.2 million, up 39 percent from the previous year, to expand research and training centers.

More funds go to build the federal "information highway," a proposed fiber-optic network designed to connect computers in universities, businesses, government agencies and, eventually, private residences. The Census Bureau and the Bureau of Export Administration are Commerce's only agencies to shrink.

Peter Behr

DEFENSE

Modest Personnel Cuts; Tough Choices Deferred

The fiscal 1994 defense budget is more remarkable for what it doesn't change than what it does. The president's spending plan -- $263 billion in budget authority; $277 billion in actual spending -- kills no major weapons program, makes only modest personnel reductions and defers until next year most tough decisions about the size and shape of the post-Cold War military. In fact, the higher actual spending figure reflects the Pentagon's efforts to complete several weapons programs, including the B-2 bomber. Total budget savings are roughly $12 billion beyond Bush's plan.

The budget hints at where the Clinton administration will end up on defense. The plan would cut $2.5 billion from the Strategic Defense Initiative anti-missile system and accelerate cuts in force structure.

The largest savings, $5.8 billion, would come out of procurement accounts, achieved mostly by scaling back weapons purchases or slipping production schedules. In the short term, the military will continue

Cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

producing Cold War-era weapons systems like submarine-launched Trident II ballistic missiles and
F-22 fighters.

Defense Secretary Les Aspin has acknowledged that the changes in the 1994 budget amount to little
more than "treading water." But he promises a more aggressive approach during the next budget cycle.

John Lancaster

EDUCATION Service Program, Direct Lending Proposed

Those looking for a big federal investment in education will be disappointed. Clinton's new budget
doesn't even seek the same level of increase in education as Bush did in his last year.

However, there are major changes in what this administration wants to do with its $30 billion -- about
the same as was appropriated for this fiscal year: The department wants to phase in a new direct lending
program, one that aims to lower students' interest rates; launch a national service program, so students
can work off college bills through community service; and spend millions for capital improvements to
historically black colleges and minority teacher fellowships. Secretary Richard W. Riley said 1994 is a
year for structural change and "the proper thing to do" now isn't "to pour money into old programs."

Mary Jordan

ENERGY

For First Time, Cleanup Gets as Much as A-Arms

Energy's budget is a post-World War II landmark: The amount for environmental restoration and waste
management at the department's nuclear weapons plants almost equals the amount for weapons
production and handling. The department plans to spend $6.65 billion for weapons development and
testing, stockpile management, naval reactors and other defense-related activities. The environmental
cleanup allocation is $6.55 billion, including $721 million for former weapons plants now sitting idle
while cleanup programs are developed.

Secretary Hazel R. O'Leary put the weapons spending figure at $5.9 billion, down 19 percent from fiscal
1993, but the actual amount is $6.65 billion, including money left over from earlier years. The total
budget request is $19.6 billion, up from $19 billion this year. Beyond the weapons programs, the biggest
changes are increases for solar and renewable energy research -- up from $251 million to $327 million --
and for "fundamental science research," up from $2.7 billion to $2.9 billion, including $628 million for
the Superconducting Super Collider.

-- Thomas W. Lippman

EPA

Spending Cut Proposed, With 6% From Superfund

An administration that prides itself on its commitment to the environment has chosen a funny way to
show it: cutting the budget for the Environmental Protection Agency. Administrator Carol M. Browner
gamely tried to portray her 1994 budget as an increase, but to do it she had to count as fiscal 1994 funds
about $915 million in spending included in the administration's job stimulus package -- which is fiscal
1993 money. Absent the stimulus funds, the EPA's budget would go from $6.9 billion in fiscal 1993 to
about $6.4 billion next year, a decrease of almost 8 percent. Significant reductions include a 6 percent
cut in the Superfund program to clean up hazardous waste sites.

-- Tom Kenworthy

HHS

Medical, Security Programs Hold With Inflation

The Health and Human Services budget jumps from $592 billion this year to $641 billion in fiscal 1994,
which includes $44 billion in Social Security, Medicare and Medicaid to match inflation. That would

have been higher but for plans to save $53 billion over five years by controlling payments to doctors and hospitals. Secretary Donna E. Shalala emphasized new planned spending of $840 million for immunizations, up $400 million over what Congress provided for 1993; $4.2 billion for Head Start, up $1.4 billion; a new $60 million block grant to strengthen troubled families; $1.4 billion, up $328 million, for women's health programs; and $10.7 billion, up $1.2 billion, for disease prevention.

-- Spencer Rich

HUD

Slight Total Increase; Housing Programs Frozen Secretary Henry Cisneros outlined a $25.4 billion discretionary budget for the Department of Housing and Urban Development, a $200 million increase over 1993 outlays. Neither figure includes the $2.9 billion requested as part of Clinton's stimulus package. Cisneros defended what he called "unfair attacks" in Congress against the stimulus package's $2.5 billion in community development grants. The HUD budget requests $4.2 billion in grants, whether the stimulus package is approved or not. The budget also abandoned efforts to fold new public housing and housing for the elderly and disabled into a third program, but froze the individual allocations at 1993 levels.

-- Guy Gugliotta

INTERIOR

Parks, Wildlife Service Get Big Increases

The Interior Department gets not only an 8 percent increase in funding under the new budget, from $9 billion to $9.5 billion, but a significant shift in emphasis to parks, conservation and wildlife. The National Park Service and U.S. Fish and Wildlife Service budgets would go up by 19 percent and 18 percent, respectively. The Interior budget also assumes increases in the fees ranchers pay to graze their stock on federal lands, and a first-ever royalty on gold and other minerals taken from federal property. The White House was criticized for agreeing not to push for those fees in budget reconciliation legislation, but Interior Secretary Bruce Babbitt said he will do that administratively.

-- Tom Kenworthy

JUSTICE

Budget Stays Flat; Policing Funds Sought

The Justice Department's budget would remain flat at $11.2 billion. Clinton proposes spending $50 million on "community policing" programs that strive to get officers out of patrol cars and more in touch with neighborhoods. About $25 million would go for a "Police Corps" to provide scholarships to college students who pursue law enforcement careers. The department estimates it can save about $116 million in administrative and personnel costs, including travel for conferences and training. There are no new funds for prison construction after fiscal 1994 -- a big change from Bush's plans.

-- Sharon LaFraniere

LABOR

Employment, Training Set for Added Funds

Labor gets a major increase for employment and training programs, keeping with Clinton's call for more spending -- or "investment" -- to help those who lose their jobs due to corporate downsizing, defense cuts and the North American Free Trade Agreement. Funds for employment and training would rise from $5.8 billion to $7.5 billion, but actual spending would be slightly less than this year because much of the money -- spent on a program year, not a fiscal-year basis -- won't be paid out until summer. To pay for these programs, $5 billion will be cut elsewhere. Overall, labor's budget goes down from $47.9 billion in 1993 to $40.4 billion next year. Most of the cut reflects the expiration of the Emergency Unemployment Compensation Act, an unemployment trust fund.

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

-- Frank Swoboda

STATE

Toward 'Redirecting' U.S. Foreign Policy

Secretary of State Warren Christopher said the new foreign affairs budget "begins the process of redirecting our foreign policy" and "reforming our foreign policy institutions" such as the State Department, the Agency for International Development and international broadcasting agencies.

Overall, the international affairs budget calls for $21.6 billion, about $450 million more than fiscal 1993, and $21.3 billion in actual outlays, or spending, within fiscal 1994. Some programs saw major increases, including $300 million more for the former Soviet Union; $170 million more for peace-keeping efforts; $100 million more for population programs; $50 million for a new non-proliferation fund; and $35 million more for international environmental programs.

The administration also proposed $98 million for U.S. payments to the United Nations in fiscal 1994 and $163 million in the next year to end Washington's debtor status there.

Cuts of more than $400 million were announced in security assistance programs, mainly by phasing out a Special Defense Acquisition Fund.

Because of the cut in the size of the total program, the $3 billion allocated to Israel and $2.1 billion to Egypt make up 87 percent of all security assistance funding proposed for fiscal 1994.

Don Oberdorfer

TRANSPORTATION

10 Percent Increase; Shift to R&D

The $40.24 billion Transportation Department budget is 10.2 percent greater than 1993. However, if Clinton's fiscal 1993 economic stimulus package is passed, the 1994 budget would be the same as this year's. As usual, the major share of the budget -- 71 percent -- would go for infrastructure, mainly highway building and repair.

However, the budget represents a major change in philosophy from 12 years of GOP budgets. Clinton recommends increased funding for transit and more money for research and development into new transportation systems such as high-speed rail and "intelligent" vehicle and highway systems. Transportation Secretary Federico Pena described it as "transit-friendly."

Amtrak funding would remain at current levels, unlike past years when Republican administrations repeatedly tried to kill the passenger train corporation.

-- Don Phillips

TREASURY

Cuts in Customs, ATF; Increase for the IRS

The Treasury operating budget remains virtually frozen at 1993 levels.

Spending in many areas -- such as the Financial Management Service, the U.S. Customs Service and the Bureau of Alcohol, Tobacco and Firearms -- is trimmed by about 1 to 2 percent. However, the Treasury's biggest bureaucracy -- the Internal Revenue Service -- gets about a 9 percent increase to help it get tougher on taxpayer enforcement, up to $20.4 million from $18.7 million, and fulfill a key Clinton campaign promise. Some enforcement areas in the department get cut, however: air and marine interdiction and financial crimes enforcement, which would be $21 million, down from $24 million.

Treasury's total budget would rise substantially, however, because it includes interest payments made on the steadily rising national debt. Clinton has asked for $318.9 billion for fiscal 1994, up from $301.7 billion estimated for 1993.

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 96 of 380   Page ID #:3060

-- Steven Mufson

VETERANS

$1 Billion Increase; Homeless Initiatives

The fiscal 1994 budget request for the Department of Veterans Affairs is $36.4 billion, a $1 billion increase. The VA said that is about a 5 percent rise in discretionary spending over the fiscal 1993 appropriation.

The VA's medical programs would receive $15.6 billion, with $287 million of that going to equip and staff newly completed construction projects. About $100 million would be spent to recover funds owed the VA from insurance companies and third parties. The recovery effort should bring in $668 million in fiscal 1994, the department said. The VA's benefits programs would get $19.5 billion, including a cost-of-living adjustment for persons receiving veterans benefits and up to $7 million to support 100 housing loans for Native American veterans under a pilot project.

VA Secretary Jesse Brown issued a statement pointing out that the fiscal 1994 budget proposal includes $53.8 million for initiatives aimed at the homeless and $47.6 million for post-traumatic stress disorder programs.

-- Stephen Barr

The New Regime will resume Monday.

💬 0 Comments

**Mary Jordan**
Mary Jordan is a Pulitzer Prize-winning correspondent currently writing about politics. She spent 14 years as a Washington Post foreign correspondent based in Tokyo, Mexico City a

The Washington Post
Others cover stories. We uncover them.
**Limited time offer:** Get unlimited digital access for less than $1/week.

Try 1 month for $1

Send me this offer

Already a subscriber? **Sign in**

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

The Washington Post

**The Fix**

# Here's what Donald Trump said in his big immigration speech, annotated

By Philip Bump

August 31, 2016

*Donald Trump delivered his long-awaited speech outlining his immigration policy on Wednesday night in Phoenix, the city where he launched his campaign on the same issue last year. A transcript of Trump's speech is below. Sections in yellow have been annotated by The Fix team and will offer more information when clicked.*

Thank you, Phoenix. I am so glad to be back in Arizona.

The state that has a very, very special place in my heart. I love people of Arizona and together we are going to win the White House in November.

Now, you know this is where it all began for me. Remember that massive crowd also. So, I said let's go and have some fun tonight. We're going to Arizona, OK?

This will be a little bit different. This won't be a rally speech, per se. Instead, I'm going to deliver a detailed policy address on one of the greatest challenges facing our country today, illegal immigration.

I've just landed having returned from a very important and special meeting with the President of Mexico, a man I like and respect very much. And a man who truly loves his country, Mexico.

And, by the way, just like I am a man who loves my country, the United States.

We agree on the importance of ending the illegal flow of drugs, cash, guns, and people across our border, and to put the cartels out of business.

We also discussed the great contributions of Mexican-American citizens to our two countries, my love for the people of Mexico, and the leadership and friendship between Mexico and the United States. It was a thoughtful and substantive conversation and it will go on for awhile. And, in the end we're all going to win. Both countries, we're all going to win.

This is the first of what I expect will be many, many conversations. And, in a Trump administration we're going to go about creating a new relationship between our two countries, but it's going to be a fair relationship. We want fairness.

But to fix our immigration system, we must change our leadership in Washington and we must change it quickly. Sadly, sadly there is no other way. The truth is our immigration system is worse than anybody ever realized. But the facts aren't known because the media won't report on them. The politicians won't talk about them and the special interests spend a lot of money trying to cover them up because they are making an absolute fortune. That's the way it is.

Today, on a very complicated and very difficult subject, you will get the truth. The fundamental problem with the immigration system in our country is that it serves the needs of wealthy donors, political activists and powerful, powerful politicians. It's all you can do. Thank you. Thank you.

Let me tell you who it does not serve. It does not serve you the American people. Doesn't serve you. When politicians talk about immigration reform, they usually mean the following, amnesty, open borders, lower wages. Immigration reform should mean something else entirely. It should mean improvements to our laws and policies to make life better for American citizens.

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

Thank you. But if we're going to make our immigration system work, then we have to be prepared to talk honestly and without fear about these important and very sensitive issues. For instance, we have to listen to the concerns that working people, our forgotten working people, have over the record pace of immigration and its impact on their jobs, wages, housing, schools, tax bills and general living conditions.

These are valid concerns expressed by decent and patriotic citizens from all backgrounds, all over. We also have to be honest about the fact that not everyone who seeks to join our country will be able to successfully assimilate. Sometimes it's just not going to work out. It's our right, as a sovereign nation to chose immigrants that we think are the likeliest to thrive and flourish and love us.

Then there is the issue of security. Countless innocent American lives have been stolen because our politicians have failed in their duty to secure our borders and enforce our laws like they have to be enforced. **I have met with many of the great parents who lost their children to sanctuary cities and open borders. So many people, so many, many people. So sad.** They will be joining me on this stage in a little while and I look forward to introducing, these are amazing, amazing people.

Countless Americans who have died in recent years would be alive today if not for the open border policies of this administration and the administration that causes this horrible, horrible thought process, called Hillary Clinton.

This includes incredible Americans like 21 year old Sarah Root. The man who killed her arrived at the border, entered Federal custody and then was released into the U.S., think of it, into the U.S. community under the policies of the White House Barack Obama and Hillary Clinton. Weak, weak policies. Weak and foolish policies.

He was released again after the crime, and now he's out there at large. Sarah had graduated from college with a 4.0, top student in the class one day before her death.

Also among the victims of the Obama-Clinton open-border policy was Grant Ronnebeck, a 21-year-old convenience store clerk and a really good guy from Mesa, Arizona. A lot of you have known about Grant.

He was murdered by an illegal immigrant gang member previously convicted of burglary, who had also been released from federal custody, and they knew it was going to happen again.

Another victim is Kate Steinle. Gunned down in the sanctuary city of San Francisco, by an illegal immigrant, deported five previous times. And they knew he was no good.

Then there is the case of 90-year-old Earl Olander, who was brutally beaten and left to bleed to death in his home, 90 years old and defenseless. The perpetrators were illegal immigrants with criminal records a mile long, who did not meet Obama administration standards for removal. And they knew it was going to happen.

In California, a 64-year-old Air Force veteran, a great woman, according to everybody that knew her, Marilyn Pharis, was sexually assaulted and beaten to death with a hammer. Her killer had been arrested on multiple occasions but was never, ever deported, despite the fact that everybody wanted him out.

A 2011 report from the Government Accountability Office found that illegal immigrants and other non-citizens, in our prisons and jails together, had around 25,000 homicide arrests to their names, 25,000.

On top of that, illegal immigration costs our country more than $113 billion a year. And this is what we get. For the money we are going to spend on illegal immigration over the next 10 years, we could provide 1 million at-risk students with a school voucher, which so many people are wanting.

While there are many illegal immigrants in our country who are good people, many, many, this doesn't change the fact that most illegal immigrants are lower skilled workers with less education, who compete directly against vulnerable American workers, and that these illegal workers draw much more out from the system than they can ever possibly pay back.

And they're hurting a lot of our people that cannot get jobs under any circumstances.

But these facts are never reported. Instead, the media and my opponent discuss one thing and only one thing, the needs of people living here illegally. In many cases, by the way, they're treated better than our vets.

Not going to happen anymore, folks. November 8th. Not going to happen anymore.

The truth is, the central issue is not the needs of the 11 million illegal immigrants or however many there may be -- and honestly we've been hearing that number for years. It's always 11 million. Our government has no idea. It could be 3 million. It could be 30 million. They have no idea what the number is.

Frankly our government has no idea what they're doing on many, many fronts, folks.

But whatever the number, that's never really been the central issue. It will never be a central issue. It doesn't matter from that standpoint. Anyone who tells you that the core issue is the needs of those living here illegally has simply spent too much time in Washington.

Only the out-of-touch media elites think the biggest problems facing America -- you know this, this is what they talk about, facing American society today, is that there are 11 million illegal immigrants who don't have legal status. And they also think the biggest thing, and you know this, it's not nuclear, and it's not ISIS, it's not Russia, it's not China, it's global warming.

To all the politicians, donors, and special interests, hear these words from me and all of you today. There is only one core issue in the immigration debate, and that issue is the well-being of the American people.

Nothing even comes a close second. Hillary Clinton, for instance, talks constantly about her fears that families will be separated, but she's not talking about the American families who have been permanently separated from their loved ones because of a preventable homicide, because of a preventable death, because of murder.

No, she's only talking about families who come here in violation of the law. We will treat everyone living or residing in our country with great dignity. So important.

We will be fair, just, and compassionate to all, but our greatest compassion must be for our American citizens.

Thank you.

President Obama and Hillary Clinton have engaged in gross dereliction of duty by surrendering the safety of the American people to open borders, and you know it better than anybody right here in Arizona. You know it.

President Obama and Hillary Clinton support sanctuary cities. They support catch and release on the border. They support visa overstays. They support the release of dangerous, dangerous, dangerous, criminals from detention. And, they support unconstitutional executive amnesty.

Hillary Clinton has pledged amnesty in her first 100 days, and her plan will provide Obamacare, Social Security, and Medicare for illegal immigrants, breaking the federal budget.

On top of that she promises uncontrolled, low-skilled immigration that continues to reduce jobs and wages for American workers, and especially for African-American and Hispanic workers within our country. Our citizens.

Most incredibly, because to me this is unbelievable, we have no idea who these people are, where they come from. I always say Trojan horse. Watch what's going to happen, folks. It's not going to be pretty.

This includes her plan to bring in 620,000 new refugees from Syria and that region over a short period of time. And even yesterday, when you were watching the news, you saw thousands and thousands of people coming in from Syria. What is wrong with our politicians, our leaders if we can call them that. What the hell are we doing?

Hard to believe. Hard to believe. Now that you've heard about Hillary Clinton's plan, about which she has not answered a single question, let me tell you about my plan. And do you notice --

And do you notice all the time for weeks and weeks of debating my plan, debating, talking about it, what about this, what about that. They never even mentioned her plan on immigration because she doesn't want to get into the quagmire. It's a tough one, she doesn't know what she's doing except open borders and let everybody come in and destroy our country by the way.

While Hillary Clinton meets only with donors and lobbyists, my plan was crafted with the input from federal immigration offices, very great people. Among the top immigration experts anywhere in this country, who represent workers, not corporations, very important to us.

I also worked with lawmakers, who've led on this issue on behalf of American citizens for many years. And most importantly I've met with the people directly impacted by these policies. So important.

Number one, are you ready? Are you ready?

We will build a great wall along the southern border.

And Mexico will pay for the wall.

One hundred percent. They don't know it yet, but they're going to pay for it. And they're great people and great leaders but they're going to pay for the wall. On day one, we will begin working on intangible, physical, tall, power, beautiful southern border wall.

We will use the best technology, including above and below ground sensors that's the tunnels. Remember that, above and below.

Above and below ground sensors. Towers, aerial surveillance and manpower to supplement the wall, find and dislocate tunnels and keep out criminal cartels and Mexico you know that, will work with us. I really believe it. Mexico will work with us. I absolutely believe it. And especially after meeting with their wonderful, wonderful president today. I really believe they want to solve this problem along with us, and I'm sure they will.

Number two, we are going to end catch and release. We catch them, oh go ahead. We catch them, go ahead.

Under my administration, anyone who illegally crosses the border will be detained until they are removed out of our country and back to the country from which they came.

And they'll be brought great distances. We're not dropping them right across. They learned that. President Eisenhower. They'd drop them across, right across, and they'd come back. And across.

Then when they flew them to a long distance, all of a sudden that was the end. We will take them great distances. But we will take them to the country where they came from, OK?

Number three. Number three, this is the one, I think it's so great. It's hard to believe, people don't even talk about it. Zero tolerance for criminal aliens. Zero. Zero.

Zero. They don't come in here. They don't come in here.

According to federal data, there are at least 2 million, 2 million, think of it, criminal aliens now inside of our country, 2 million people criminal aliens. We will begin moving them out day one. As soon as I take office. Day one. In joint operation with local, state, and federal law enforcement.

Now, just so you understand, the police, who we all respect -- say hello to the police. Boy, they don't get the credit they deserve. I can tell you. They're great people. But the police and law enforcement, they know who these people are.

They live with these people. They get mocked by these people. They can't do anything about these people, and they want to. They know who these people are. Day one, my first hour in office, those people are gone.

And you can call it deported if you want. The press doesn't like that term. You can call it whatever the hell you want. They're gone.

Beyond the 2 million, and there are vast numbers of additional criminal illegal immigrants who have fled, but their days have run out in this country. The crime will stop. They're going to be gone. It will be over.

They're going out. They're going out fast.

Moving forward. We will issue detainers for illegal immigrants who are arrested for any crime whatsoever, and they will be placed into immediate removal proceedings if we even have to do that.

We will terminate the Obama administration's deadly, and it is deadly, non-enforcement policies that allow thousands of criminal aliens to freely roam our streets, walk around, do whatever they want to do, crime all over the place.

That's over. That's over, folks. That's over.

Since 2013 alone, the Obama administration has allowed 300,000 criminal aliens to return back into United States communities. These are individuals encountered or identified by ICE, but who were not detained or processed for deportation because it wouldn't have been politically correct.

My plan also includes cooperating closely with local jurisdictions to remove criminal aliens immediately. We will restore the highly successful Secure Communities Program. Good

Cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

program. We will expand and revitalize the popular 287(g) partnerships, which will help to
identify hundreds of thousands of deportable aliens in local jails that we don't even know about.

Both of these programs have been recklessly gutted by this administration. And those were
programs that worked.

This is yet one more area where we are headed in a totally opposite direction. There's no
common sense, there's no brain power in our administration by our leader, or our leaders.
None, none, none.

On my first day in office I am also going to ask Congress to pass Kate's Law, named for Kate
Steinle.

To ensure that criminal aliens convicted of illegal reentry receive strong mandatory minimum
sentences. Strong.

And then we get them out.

Another reform I'm proposing is the passage of legislation named for Detective Michael Davis
and Deputy Sheriff Danny Oliver, to law enforcement officers recently killed by a previously
deported illegal immigrant.

The Davis-Oliver bill will enhance cooperation with state and local authorities to ensure that
criminal immigrants and terrorists are swiftly, really swiftly, identified and removed. And they
will go face, believe me. They're going to go.

We're going to triple the number of ICE deportation officers.

Within ICE I am going to create a new special deportation task force focused on identifying and
quickly removing the most dangerous criminal illegal immigrants in America who have evaded
justice just like Hillary Clinton has evaded justice. OK?

Maybe they'll be able to deport her.

The local police who know every one of these criminals, and they know each and every one by
name, by crime, where they live, they will work so fast. And our local police will be so happy that
they don't have to be abused by these thugs anymore. There's no great mystery to it, they've put
up with it for years, and no finally we will turn the tables and law enforcement and our police
will be allowed to clear up this dangerous and threatening mess.

We're also going to hire 5,000 more Border Patrol agents. Who gave me their endorsement,
16,500 gave me their endorsement.

And put more of them on the border instead of behind desks which is good. We will expand the
number of border patrol stations significantly.

I've had a chance to spend time with these incredible law enforcement officers, and I want to
take a moment to thank them. What they do is incredible.

And getting their endorsement means so much to me. More to me really than I can say. Means
so much. First time they've ever endorsed a presidential candidate.

Number four, block funding for sanctuary cities. We block the funding. No more funds.

We will end the sanctuary cities that have resulted in so many needless deaths. Cities that refuse
to cooperate with federal authorities will not receive taxpayer dollars, and we will work with
Congress to pass legislation to protect those jurisdictions that do assist federal authorities.

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

Number five, cancel unconstitutional executive orders and enforce all immigration laws.

We will immediately terminate President Obama's two illegal executive amnesties in which he defied federal law and the Constitution to give amnesty to approximately 5 million illegal immigrants, 5 million.

And how about all the millions that are waiting on line, going through the process legally? So unfair.

Hillary Clinton has pledged to keep both of these illegal amnesty programs, including the 2014 amnesty which has been blocked by the United States Supreme Court. Great.

Clinton has also pledged to add a third executive amnesty. And by the way, folks, she will be a disaster for our country, a disaster in so many other ways.

And don't forget the Supreme Court of the United States. Don't forget that when you go to vote on November 8. And don't forget your Second Amendment. And don't forget the repeal and replacement of Obamacare.

And don't forget building up our depleted military. And don't forget taking care of our vets. Don't forget our vets. They have been forgotten.

Clinton's plan would trigger a constitutional crisis unlike almost anything we have ever seen before. In effect, she would be abolishing the lawmaking powers of Congress in order to write her own laws from the Oval Office. And you see what bad judgment she has. She has seriously bad judgment.

Can you imagine? In a Trump administration all immigration laws will be enforced, will be enforced. As with any law enforcement activity, we will set priorities. But unlike this administration, no one will be immune or exempt from enforcement. And ICE and Border Patrol officers will be allowed to do their jobs the way their jobs are supposed to be done.

Anyone who has entered the United States illegally is subject to deportation. That is what it means to have laws and to have a country. Otherwise we don't have a country.

Our enforcement priorities will include removing criminals, gang members, security threats, visa overstays, public charges. That is those relying on public welfare or straining the safety net along with millions of recent illegal arrivals and overstays who've come here under this current corrupt administration.

Number six, we are going to suspend the issuance of visas to any place where adequate screening cannot occur.

According to data provided by the Senate Subcommittee on Immigration, and the national interest between 9/11 and the end of 2014, at least 380 foreign born individuals were convicted in terror cases inside the United States. And even right now the largest number of people are under investigation for exactly this that we've ever had in the history of our country.

Our country is a mess. We don't even know what to look for anymore, folks. Our country has to straighten out. And we have to straighten out fast.

The number is likely higher. But the administration refuses to provide this information, even to Congress. As soon as I enter office I am going to ask the Department of State, which has been brutalized by Hillary Clinton, brutalized.

cited in brief of Los Angeles v. Barr No. 18-55599 archived on July 9, 2019

Homeland Security and the Department of Justice to begin a comprehensive review of these cases in order to **develop a list of regions and countries from which immigration must be suspended until proven and effective vetting mechanisms can be put in place.**

I call it extreme vetting right? Extreme vetting. I want extreme. It's going to be so tough, and if somebody comes in that's fine but they're going to be good. It's extreme.

And if people don't like it, we've got have a country, folks. Got to have a country. Countries in which immigration will be suspended would include places like Syria and Libya. And we are going to stop the tens of thousands of people coming in from Syria. **We have no idea who they are, where they come from. There's no documentation. There's no paperwork. It's going to end badly folks. It's going to end very, very badly.**

For the price of resettling one refugee in the United States, 12 could be resettled in a safe zone in their home region. Which I agree with 100 percent. We have to build safe zones and **we'll get the money from Gulf states.** We don't want to put up the money. We owe almost $20 trillion. **Doubled since Obama took office, our national debt.**

But we will get the money from Gulf states and others. We'll supervise it. We'll build safe zones which is something that I think all of us want to see.

Another reform, involves new screening tests for all applicants that include, and this is so important, especially if you get the right people. And we will get the right people. **An ideological certification to make sure that those we are admitting to our country share our values and love our people.**

Thank you. We're very proud of our country. Aren't we? Really? With all it's going through, we're very proud of our country. For instance, in the last five years, we've admitted nearly 100,000 immigrants from Iraq and Afghanistan. And these two countries according to Pew Research, a majority of residents say that the barbaric practice of honor killings against women are often or sometimes justified. That's what they say.

That's what they say. They're justified. Right? And we're admitting them to our country. Applicants will be asked their views about honor killings, about respect for women and gays and minorities. Attitudes on radical Islam, which our president refuses to say and many other topics as part of this vetting procedure. And if we have the right people doing it, believe me, very, very few will slip through the cracks. Hopefully, none.

Number seven, we will insure that other countries take their people back when they order them deported.

There are at least 23 countries that refuse to take their people back after they've been ordered to leave the United States. Including large numbers of violent criminals, they won't take them back. So we say, OK, we'll keep them. Not going to happen with me, not going to happen with me.

Due to a Supreme Court decision, if these violent offenders cannot be sent home, our law enforcement officers have to release them into your communities.

And by the way, the results are horrific, horrific. There are often terrible consequences, such as Casey Chadwick's tragic death in Connecticut just last year. Yet despite the existence of a law that commands the Secretary of State to stop issuing visas to these countries.

Secretary Hillary Clinton ignored this law and refused to use this powerful tool to bring nations into compliance. And, they would comply if we would act properly.

In other words, if we had leaders that knew what they were doing, which we don't.

The result of her misconduct was the release of thousands and thousands of dangerous criminal aliens who should have been sent home to their countries. Instead we have them all over the place. Probably a couple in this room as a matter of fact, but I hope not.

According to a report for the Boston Globe from the year 2008 to 2014 nearly 13,000 criminal aliens were released back into U.S. communities because their home countries would not, under any circumstances, take them back. Hard to believe with the power we have. Hard to believe.

We're like the big bully that keeps getting beat up. You ever see that? The big bully that keeps getting beat up.

These 13,000 release occurred on Hillary Clinton's watch. She had the power and the duty to stop it cold, and she decided she would not do it.

And, Arizona knows better than most exactly what I'm talking about.

Those released include individuals convicted of killings, sexual assaults, and some of the most heinous crimes imaginable.

The Boston Globe writes that a Globe review of 323 criminals released in New England from 2008 to 2012 found that as many as 30 percent committed new offenses, including rape, attempted murder and child molestation. We take them, we take them.

Number eight, we will finally complete the biometric entry-exit visa tracking system, which we need desperately. For years Congress has required biometric entry-exit visa tracking systems but it has never been completed. The politicians are all talk, no action, never happens. Never happens.

Hillary Clinton, all talk. Unfortunately when there is action it's always the wrong decision. You ever notice? In my administration we will ensure that this system is in place. And, I will tell you, it will be on land, it will be on sea, it will be in air. We will have a proper tracking system.

Approximately half of new illegal immigrants came on temporary visas and then never, ever left. Why should they? Nobody's telling them to leave. Stay as long as you want, we'll take care of you.

Beyond violating our laws, visa overstays, pose -- and they really are a big problem, pose a substantial threat to national security. The 9/11 Commission said that this tracking system would be a high priority and would have assisted law enforcement and intelligence officials in August and September in 2001 in conducting a search for two of the 9/11 hijackers that were in the United States expired visas.

And, you know what that would have meant, what that could have meant. Wouldn't that have been wonderful, right? What that could have meant?

Last year alone nearly half a million individuals overstayed their temporary visas. Removing these overstays will be a top priority of my administration.

If people around the world believe they can just come on a temporary visa and never, ever leave, the Obama-Clinton policy, that's what it is, then we have a completely open border, and we no longer have a country.

We must send a message that visa expiration dates will be strongly enforced.

Number nine, we will turn off the jobs and benefits magnet.

We will ensure that E-Verify is used to the fullest extent possible under existing law, and we will work with Congress to strengthen and expand its use across the country.

Immigration law doesn't exist for the purpose of keeping criminals out. It exists to protect all aspects of American life. The work site, the welfare office, the education system, and everything else.

That is why immigration limits are established in the first place. If we only enforced the laws against crime, then we have an open border to the entire world. We will enforce all of our immigration laws.

And the same goes for government benefits. The Center for Immigration Studies estimates that 62 percent of households headed by illegal immigrants use some form of cash or non-cash welfare programs like food stamps or housing assistance.

Tremendous costs, by the way, to our country. Tremendous costs. This directly violates the federal public charge law designed to protect the United States Treasury. Those who abuse our welfare system will be priorities for immediate removal.

Number 10, we will reform legal immigration to serve the best interests of America and its workers, the forgotten people. Workers. We're going to take care of our workers.

And by the way, and by the way, we're going to make great trade deals. We're going to renegotiate trade deals. We're going to bring our jobs back home. We're going to bring our jobs back home.

We have the most incompetently worked trade deals ever negotiated probably in the history of the world, and that starts with NAFTA. And now they want to go TPP, one of the great disasters.

We're going to bring our jobs back home. And if companies want to leave Arizona and if they want to leave other states, there's going to be a lot of trouble for them. It's not going to be so easy. There will be consequence. Remember that. There will be consequence. They're not going to be leaving, go to another country, make the product, sell it into the United States, and all we end up with is no taxes and total unemployment. It's not going to happen. There will be consequences.

We've admitted 59 million immigrants to the United States between 1965 and 2015. Many of these arrivals have greatly enriched our country. So true. But we now have an obligation to them and to their children to control future immigration as we are following, if you think, previous immigration waves.

We've had some big waves. And tremendously positive things have happened. Incredible things have happened. To ensure assimilation we want to ensure that it works. Assimilation, an important word. Integration and upward mobility.

Within just a few years immigration as a share of national population is set to break all historical records. The time has come for a new immigration commission to develop a new set of reforms to our legal immigration system in order to achieve the following goals.

To keep immigration levels measured by population share within historical norms. To select immigrants based on their likelihood of success in U.S. society and their ability to be financially self- sufficient.

We take anybody. Come on in, anybody. Just come on in. Not anymore.

You know, folks, it's called a two-way street. It is a two-way street, right? We need a system that serves our needs, not the needs of others. Remember, under a Trump administration it's called America first. Remember that.

To choose immigrants based on merit. Merit, skill, and proficiency. Doesn't that sound nice? And to establish new immigration controls to boost wages and to ensure that open jobs are offered to American workers first. And that in particular African-American and Latino workers who are being shut out in this process so unfairly.

And Hillary Clinton is going to do nothing for the African-American worker, the Latino worker. She's going to do nothing. Give me your vote, she says, on November 8th. And then she'll say, so long, see you in four years. That's what it is.

She is going to do nothing. And just look at the past. She's done nothing. She's been there for 35 years. She's done nothing. And I say what do you have to lose? Choose me. Watch how good we're going to do together. Watch.

You watch. We want people to come into our country, but they have to come into our country legally and properly vetted, and in a manner that serves the national interest. We've been living under outdated immigration rules from decades ago. They're decades and decades old.

To avoid this happening in the future, I believe we should sunset our visa laws so that Congress is forced to periodically revise and revisit them to bring them up to date. They're archaic. They're ancient. We wouldn't put our entire federal budget on autopilot for decades, so why should we do the same for the very, very complex subject of immigration?

So let's now talk about the big picture. These 10 steps, if rigorously followed and enforced, will accomplish more in a matter of months than our politicians have accomplished on this issue in the last 50 years. It's going to happen, folks. Because I am proudly not a politician, because I am not behold to any special interest, I've spent a lot of money on my campaign, I'll tell you. I write those checks. Nobody owns Trump.

I will get this done for you and for your family. We'll do it right. You'll be proud of our country again. We'll do it right. We will accomplish all of the steps outlined above. And, when we do, peace and law and justice and prosperity will prevail. Crime will go down. Border crossings will plummet. Gangs will disappear.

And the gangs are all over the place. And welfare use will decrease. We will have a peace dividend to spend on rebuilding America, beginning with our American inner cities. We're going to rebuild them, for once and for all.

For those here illegally today, who are seeking legal status, they will have one route and one route only. To return home and apply for reentry like everybody else, under the rules of the new legal immigration system that I have outlined above. Those who have left to seek entry --

Thank you. Thank you. Those who have left to seek entry under this new system -- and it will be an efficient system -- will not be awarded surplus visas, but will have to apply for entry under the immigration caps or limits that will be established in the future.

We will break the cycle of amnesty and illegal immigration. We will break the cycle. There will be no amnesty.

Our message to the world will be this. You cannot obtain legal status or become a citizen of the United States by illegally entering our country. Can't do it.

This declaration alone will help stop the crisis of illegal crossings and illegal overstays, very importantly. People will know that you can't just smuggle in, hunker down and wait to be legalized. It's not going to work that way. Those days are over.

Importantly, in several years when we have accomplished all of our enforcement and deportation goals and truly ended illegal immigration for good, including the construction of a great wall, which we will have built in record time. And at a reasonable cost, which you never hear from the government.

And the establishment of our new lawful immigration system then and only then will we be in a position to consider the appropriate disposition of those individuals who remain.

That discussion can take place only in an atmosphere in which illegal immigration is a memory of the past, no longer with us, allowing us to weigh the different options available based on the new circumstances at the time.

Right now, however, we're in the middle of a jobs crisis, a border crisis and a terrorism crisis like never before. All energies of the federal government and the legislative process must now be focused on immigration security. That is the only conversation we should be having at this time, immigration security. Cut it off.

Whether it's dangerous materials being smuggled across the border, terrorists entering on visas or Americans losing their jobs to foreign workers, these are the problems we must now focus on fixing. And the media needs to begin demanding to hear Hillary Clinton's answer on how her policies will affect Americans and their security.

These are matters of life and death for our country and its people, and we deserve answers from Hillary Clinton. And do you notice, she doesn't answer.

She didn't go to Louisiana. She didn't go to Mexico. She was invited.

She doesn't have the strength or the stamina to make America great again. Believe me.

What we do know, despite the lack of media curiosity, is that Hillary Clinton promises a radical amnesty combined with a radical reduction in immigration enforcement. Just ask the Border Patrol about Hillary Clinton. You won't like what you're hearing.

The result will be millions more illegal immigrants; thousands of more violent, horrible crimes; and total chaos and lawlessness. That's what's going to happen, as sure as you're standing there.

This election, and I believe this, is our last chance to secure the border, stop illegal immigration and reform our laws to make your life better. I really believe this is it. This is our last time. November 8. November 8. You got to get out and vote on November 8.

It's our last chance. It's our last chance. And that includes Supreme Court justices and Second Amendment. Remember that.

So I want to remind everyone what we're fighting for and who we are fighting for.

I am going to ask -- these are really special people that I've gotten to know. I'm going to ask all of the "Angel Moms" to come join me on the stage right now.

These are amazing women.
These are amazing people.

I've become friends with so many. But Jamiel Shaw, incredible guy, lost his son so violently. Say just a few words about your child.

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

SPEAKER: My son Ronald da Silva (ph) was murdered April 27, 2002 by an illegal alien who had been previously deported. And what so -- makes me so outrageous is that we came here legally.

Thank you, Mr. Trump. I totally support you. You have my vote.

TRUMP: Thank you, thank you.

SPEAKER: God bless you.

TRUMP: You know what? Name your child and come right by. Go ahead.

SPEAKER: Laura Wilkerson. And my son was Joshua Wilkerson. He was murdered by an illegal in 2010. And I personally support Mr. Trump for our next president.

SPEAKER: My name is Ruth Johnston Martin (ph). My husband was shot by an illegal alien. He fought the good fight but he took his last breath in 2002. And I support this man who's going to change this country for the better. God bless you.

SPEAKER: My name Maureen Maloney (ph), and our son Matthew Denise (ph) was 23 years old when he was dragged a quarter of a mile to his death by an illegal alien, while horrified witnesses were banging on the truck trying to stop him.

SPEAKER: Our son Matthew Denise, if Donald Trump were president in 2011, our son Matthew Denise and other Americans would be alive today.

SPEAKER: Thank you. My name is Kathy Woods (ph). My son Steve (ph), a high school senior, 17 years old, went to the beach after a high school football game. A local gang came along, nine members. The cars were battered to -- like war in Beirut. And all I can say is they murdered him, and if Mr. Trump had been in office then the border would have been secure and our children would not be dead today.

SPEAKER: Hi. My name is Brenda Sparks (ph), and my son is named Eric Zapeda (ph). He was raised by a legal immigrant from Honduras only to be murdered by an illegal in 2011. His murderer never did a second in handcuffs or jail. Got away with killing an American. So I'm voting for trump. And by the way, so is my mother.

SPEAKER: My name is Dee Angle (ph). My cousin Rebecca Ann Johnston (ph), known as Becky, was murdered on January the 1st, 1989 in North Little Rock, Arkansas. Thank you. And if you don't vote Trump, we won't have a country. Trump all the way.

SPEAKER: I'm Shannon Estes (ph). And my daughter Shaley Estes (ph), 22 years old, was murdered here in Phoenix last July 24 by a Russian who overstayed his visa. And vote Trump.

SPEAKER: I'm Mary Ann Mendoza, the mother of Sergeant Brandon Mendoza, who was killed in a violent head-on collision in Mesa.

Thank you.

I want to thank Phoenix for the support you've always given me, and I want to tell you what. I'm supporting the man who will -- who is the only man who is going to save our country, and what we our going to be leaving our children.

SPEAKER: I'm Steve Ronnebeck, father of Grant Ronnebeck, 21 years old. Killed January 22, 2015 by an illegal immigrant who shot him in the face. I truly believe that Mr. Trump is going to change things. He's going to fight for my family, and he's going to fight for America.

TRUMP: These are amazing people, and I am not asking for their endorsement, believe me that. I just think I've gotten to know so many of them, and many more, from our group. But they are incredible people and what they're going through is incredible, and there's just no reason for it. Let's give them a really tremendous hand.

That's tough stuff, I will tell you. That is tough stuff. Incredible people.

So, now is the time for these voices to be heard. Now is the time for the media to begin asking questions on their behalf. Now is the time for all of us as one country, Democrat, Republican, liberal, conservative to band together to deliver justice, and safety, and security for all Americans.

Let's fix this horrible, horrible, problem. It can be fixed quickly. Let's our secure our border.

Let's stop the drugs and the crime from pouring into our country. Let's protect our social security and Medicare. Let's get unemployed Americans off the welfare and back to work in their own country.

This has been an incredible evening. We're going to remember this evening. November 8, we have to get everybody. This is such an important state. November 8 we have to get everybody to go out and vote.

We're going to bring -- thank you, thank you. We're going to take our country back, folks. This is a movement. We're going to take our country back.

Thank you.

Thank you.

This is an incredible movement. The world is talking about it. The world is talking about it and by the way, if you haven't been looking to what's been happening at the polls over the last three or four days I think you should start looking. You should start looking.

Together we can save American lives, American jobs, and American futures. Together we can save America itself. Join me in this mission, we're going to make America great again.

Thank you. I love you. God bless you, everybody. God bless you. God bless you, thank you.

---

💬 **526 Comments**

---

**Philip Bump**

Philip Bump is a correspondent for The Washington Post based in New York. Before joining The Post in 2014, he led politics coverage for the Atlantic Wire.   Follow 🐦

---

The Washington Post

## Others cover stories. We uncover them.

**Limited time offer:** Get unlimited digital access for less than $1/week.

Try 1 month for $1

Send me this offer

Already a subscriber? **Sign in**



open-

FACT SHEETS

search

# President Donald J. Trump Taking Action Against Illegal Immigration

— IMMIGRATION    |    Issued on: **June 28, 2017**

—    —

🔲 **ALL NEWS**

❝

*Cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019*

# We are protecting the freedoms of law-abiding Americans, and we are going after the criminal gangs and cartels that prey on our innocent citizens.❞

*President Donald J. Trump*

**TAKING ACTION TO COMBAT ILLEGAL IMMIGRATION: For too long, politicians across the country have failed to enforce the immigration laws already on the books.**

- Just months in office, President Donald J. Trump is keeping his promises to the American people and taking action to enforce our country's immigration laws.

  - President Trump's policies have already had an impact, with 64 percent fewer apprehensions and inadmissible entries at the southwest border compared to the

same time last year.

- In the first 100 days after President Trump signed Executive Orders on immigration enforcement, Immigration and Customs Enforcement (ICE) has seen nearly 40 percent more Enforcement and Removal Operations compared to the same time last year.

  - Nearly 75 percent of these illegal aliens have been convicted criminals with offenses ranging from homicide and assault to sexual abuse and drug-related charges.

  - Arrests of convicted criminal aliens climbed by nearly 20 percent in this time compared to the same time last year.

- In fiscal year 2017, ICE has removed 2,798 criminal gang members, compared to 2,057 criminal gang members in all of fiscal year 2016.

  - ICE has specifically targeted MS-13 criminal gang members for removal on immigration violations.

- President Trump has acted to strengthen the country's ability to enforce the laws and stop illegal aliens at the border.

  - He has directed the hiring of 5,000 additional Border Patrol agents and 10,000 ICE agents.

  - He has ordered the construction of a wall on the southern border and prioritized funds in his budget to begin its construction.

**SUPPORTING LEGISLATION TO ENFORCE OUR LAWS: President Trump is supporting legislation in Congress that begins to address sanctuary cities and aliens who repeatedly enter our country in violation of our laws.**

- President Trump supports the passage of the No Sanctuary for Criminals Act (H.R. 3003).

  - According to a recent Harvard-Harris poll, 80 percent of Americans support ending the practice of sanctuary cities that refuse to turn over criminal illegal aliens to Federal authorities.

- Under the bill, States and localities that refuse to follow Federal law and that prevent law enforcement officials from cooperating with Federal authorities will no longer receive certain grants from the Departments of Justice (DOJ) and Homeland Security (DHS).

- Instead, States and localities that adhere to Federal law will see grants shifted towards them.

- The Secretary of Homeland Security can refuse to transfer illegal aliens in DHS custody to authorities that refuse to cooperate with Federal immigration authorities.

- President Trump supports the passage of Kate's Law (H.R. 3004).

  - The law is named after 32-year-old Kate Steinle, who, according to law enforcement officials, was gunned down in broad daylight allegedly by a 5-time deported criminal illegal alien with seven prior felony convictions.

  - The law would increase the mandatory penalties for illegal aliens who re-enter the United States to up to two years in Federal prison.

  - Illegal aliens who re-enter the United States are eligible to up to 25 years of Federal prison.

  - In his efforts to help the victims of these crimes, the President ordered the creation of the Department of Homeland Security's Victims of Immigration Crime Engagement (VOICE) office so the victims of the criminal acts of illegal aliens will no longer be ignored.

**A PROMISE TO THE AMERICAN PEOPLE: While running for President, Donald Trump promised the American people that he would bring law and order back to our broken immigration system.**

- As a Presidential candidate on August 31, 2016, President Trump said:

  - "We will end the sanctuary cities that have resulted in so many needless deaths. Cities that refuse to cooperate with Federal authorities will not receive taxpayer dollars, and we will work with Congress to pass legislation to protect those

jurisdictions that do assist Federal authorities."

- "Countless innocent American lives have been stolen because our politicians have failed in their duty to secure our borders and enforce our laws."

- "Now is the time for all of us, as one country, Democrat and Republican, liberal and conservative, to band together to deliver justice and safety and security for all Americans



The White House

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

LIVE          JOBS          GET INVOLVED          COPYRIGHT POLICY          PRIVACY POLICY



THE UNITED STATES
**DEPARTMENT** *of* **JUSTICE**

Search this site 

ABOUT      OUR AGENCY      PRIORITIES      NEWS      RESOURCES      CAREERS      CONTACT

Home

SHARE

## ATTORNEY GENERAL'S MEMORANDUM SUPPORTING FEDERAL, STATE, LOCAL AND TRIBAL LAW ENFORCEMENT

Attorney General's Memorandum Supporting Federal, State, Local and Tribal Law Enforcement

*cited in City of Los Angeles v. Barr No. 18-55599 archived on July 9, 2019*

---

**U.S. Department of Justice**
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

**Stay Connected with Justice:**

   

**Email Updates** 

en ESPAÑOL
Contact DOJ

Archive
Accessibility
Information Quality
Privacy Policy
Legal Policies & Disclaimers
Social Media

Budget & Performance
Office of the Inspector
General
No FEAR Act
For Employees
FOIA
USA.gov



THE UNITED STATES
DEPARTMENT *of* JUSTICE

Search this site 

ABOUT     OUR AGENCY     PRIORITIES     NEWS     RESOURCES     CAREERS     CONTACT

Home

SHARE

## ATTORNEY GENERAL'S MEMORANDUM SUPPORTING FEDERAL, STATE, LOCAL AND TRIBAL LAW ENFORCEMENT

Attorney General's Memorandum Supporting Federal, State, Local and Tribal Law Enforcement

*cited in City of Los Angeles v. Barr No. 18-55599 archived on July 9, 2019*

---

**U.S. Department of Justice**
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

en ESPAÑOL
Contact DOJ

Archive
Accessibility
Information Quality
Privacy Policy
Legal Policies & Disclaimers
Social Media

Budget & Performance
Office of the Inspector
General
No FEAR Act
For Employees
FOIA
USA.gov

**Stay Connected with Justice:**

   

**Email Updates** 



# Office of the Attorney General
## Washington, D. C. 20530

March 31, 2017

MEMORANDUM FOR HEADS OF DEPARTMENT COMPONENTS AND
UNITED STATES ATTORNEYS

FROM:        THE ATTORNEY GENERAL

SUBJECT:     Supporting Federal, State, Local and Tribal Law Enforcement

Our mission statement directs the Department of Justice "to ensure public safety," "to provide federal leadership in preventing and controlling crime," and "to ensure fair and impartial administration of justice for all Americans."  We fully embrace and share these responsibilities with thousands of law enforcement agencies across the country that also seek to prevent crime and protect the public.  We understand the crucial role interagency partnerships play in successful crime prevention strategies, and the Department is proud of the longstanding relationships it has with our federal, state, local, and tribal law enforcement partners.  The Federal government alone cannot successfully address rising crimes rates, secure public safety, protect and respect the civil rights of all members of the public, or implement best practices in policing.  These are, first and foremost, tasks for state, local, and tribal law enforcement.  By strengthening our longstanding and productive relationships with our law enforcement partners, we will improve public safety for all Americans.

The Department will use its resources to effectively promote a peaceful and lawful society, where the civil rights of all persons are valued and protected.  To that end, I expect that all Department components will adhere to and support principles that will advance those two goals, including, but not limited to the following:

- The safety and protection of the public is the paramount concern and duty of law enforcement officials.

- Law enforcement officers perform uniquely dangerous tasks, and the Department should help promote officer safety, officer morale, and public respect for their work.

- Local law enforcement must protect and respect the civil rights of all members of the public.

- Local control and local accountability are necessary for effective local policing.  It is not the responsibility of the federal government to manage non-federal law enforcement agencies.

Memorandum from the Attorney General
Subject: Supporting Federal, State, Local and Tribal Law Enforcement                    Page 2

- The misdeeds of individual bad actors should not impugn or undermine the legitimate and honorable work that law enforcement officers and agencies perform in keeping American communities safe.

- The collection and analysis of timely, reliable statistics on crime and criminals are essential for effective law enforcement strategies.

- Recruitment and training of law enforcement officers should focus on making law enforcement a rewarding career, and attracting and retaining well-qualified personnel.

- Collaboration between federal and local law enforcement is important, and jurisdictions whose law enforcement agencies accept funding from the Department are expected to adhere to the Department's grant conditions as well as to all federal laws.

The Deputy Attorney General and the Associate Attorney General are hereby directed to immediately review all Department activities – including collaborative investigations and prosecutions, grant making, technical assistance and training, compliance reviews, existing or contemplated consent decrees, and task force participation – in order to ensure that they fully and effectively promote the principles outlined above. Nothing in this Memorandum, however, should be construed to delay or impede any pending criminal or national security investigation or program.

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019



THE UNITED STATES
**DEPARTMENT** *of* **JUSTICE**

Search this site

ABOUT        OUR AGENCY        PRIORITIES        NEWS        RESOURCES        CAREERS        CONTACT

Home » Office of Public Affairs » News

SHARE ➔

## JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

RELATED LINKS

Speeches and Press Releases

Videos

Photos

FOR IMMEDIATE RELEASE                                        Friday, September 15, 2017

### Department of Justice Announces Changes to the Collaborative Reform Initiative

The Department of Justice today announced significant changes to the Office of Community Oriented Policing Services (COPS Office) Collaborative Reform Initiative for Technical Assistance to better align the program with the principles outlined by the Attorney General in support of local law enforcement and the original intent of the authorizing statute. The changes are effective immediately and will provide targeted assistance directly to local law enforcement based on their identified needs and requests.

"Changes to this program will fulfill my commitment to respect local control and accountability, while still delivering important tailored resources to local law enforcement to fight violent crime," said Attorney General Jeff Sessions. "This is a course correction to ensure that resources go to agencies that require assistance rather than expensive wide-ranging investigative assessments that go beyond the scope of technical assistance and support."

Earlier this year, the Attorney General released a memorandum stating that all Department of Justice activities would be reviewed by Department of Justice leadership to ensure that they fully and effectively promote the principles outlined in the memo. Today's announcement is the conclusion of that review for the Collaborative Reform Initiative. These changes will return control to the public safety personnel sworn to protect their communities and focus on providing real-time technical assistance to best address the identified needs of requesting agencies to reduce violent crime.

The COPS Office is a federal agency responsible for advancing community policing nationwide: www.cops.usdoj.gov.

**Component(s):**                           **Press Release Number:**
Community Oriented Policing Services         17-1010
(COPS)

*Updated September 15, 2017*

## U.S. Department of Justice

950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

**Stay Connected with Justice:**

   

**Email Updates** 

| | | |
|---|---|---|
| en ESPAÑOL | Archive | Budget & Performance |
| Contact DOJ | Accessibility | Office of the Inspector |
| | Information Quality | General |
| | Privacy Policy | No FEAR Act |
| | Legal Policies & Disclaimers | For Employees |
| | Social Media | FOIA |
| | | USA.gov |

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

SUPREME COURT

FACTS FIRST

2020 ELECTION

---

Search CNN...

# DOJ scaling back program to reform police departments

By Mary Kay Mallonee and Eli Watkins, CNN

Updated 7:50 PM ET, Fri September 15, 2017



cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019



BRENDAN SMIALOWSKI/AFP/GETTY IMAGES

**STORY HIGHLIGHTS**

Police departments could sign up for the program voluntarily

**(CNN)** — The Justice Department announced Friday that it is significantly scaling back a program created during the Obama administration to help reform police

departments after controversial incidents such as police-involved shootings.

The department will no longer issue audit reports of police departments or suggest reforms; instead it will focus on assisting local law enforcement agencies with specific grants aimed at fighting violent crime.

Sessions ordered the Justice Department to review all programs involving local law enforcement

Under the department's Office of Community Oriented Policing Services (COPS), police departments could sign up for the program voluntarily and work with Justice Department officials to improve trust between police and the public. But, according to a background document provided by the Justice Department, the program over the past several years evolved to much broader investigations of police departments and led to tension and a more adversarial relationship between Justice and the participating departments.

"Changes to this program will fulfill my commitment to respect local control and accountability, while still delivering important tailored resources to local law enforcement to fight violent crime," said Attorney General Jeff Sessions. "This is a course correction to ensure that resources go to agencies that require assistance rather than expensive wide-ranging investigative assessments that go beyond the scope of technical assistance and support."

On March 31, Sessions directed the Justice Department to review all of its programs involving local law enforcement -- including this program, the Collaborative Reform Initiative for Technical Assistance, which COPS administered. Friday's announcement brought the review to a close.

The Justice Department's move was met with immediate criticism from some corners.

Ronald Davis, a criminal justice reform advocate who was the COPS head under former-President Barack Obama, told CNN he disagrees with the Justice Department's shift and said the changes mean "it's no longer collaborative reform."

The Justice Department said the changes will allow it to better assist local law enforcement agencies in fighting gangs and illegal drug activity and other crimes.

Davis countered that the Justice Department already did those tasks well.

"The things Attorney General Sessions says he's shifting to are actually things the Department

cited in City of Los Angeles v. Barr
No. 18-55599, archived on July 8, 2019

of Justice did," Davis said.

The Congressional Black Caucus criticized the decision and noted it came as protests were underway in St. Louis over a judge finding a former police officer not guilty for the shooting death of a black man.

"This decision is wrong, reckless, insensitive, and immature," caucus Chairman Cedric Richmond, D-Louisiana, said in the statement. "It also further divides police departments and communities -- rich and poor, black and white."

The ACLU likewise slammed the move.

"Today's announcement from Attorney General Jeff Sessions to end a program that provides resources to improve police-community relations as we know it is truly appalling," said Kanya Bennett, American Civil Liberties Union legislative counsel. "The police departments benefiting from these resources included Saint Anthony, Minnesota; North Charleston, South Carolina; and Milwaukee -- all places where we witnessed traumatic fatal police shootings and police department failures."

Bennett added, "Ending the program is a big mistake that will adversely impact communities of color."

The Leadership Conference on Civil and Human Rights slammed the move as one of many steps the Justice Department under Sessions has taken to undo Obama-era programs.

"Ending programs that help build trust between police and the communities they serve will only hurt public safety," said Vanita Gupta, the head of the organization, who led the Justice Department's civil rights division under Obama.

The Milwaukee Police Department, which engaged in the program after an officer shot and killed Dontre Hamilton in 2014, issued a statement in anticipation of the changes, which mean a review of the police department under the initiative would not be completed. Milwaukee Police Chief Edward Flynn said it was unfortunate the final version of the report, which includes the police department's feedback, would not be released, and he took issue with parts of the report critical of his department that had been produced.

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

Advertisement

45

CONGRESS

SUPREME COURT

FACTS FIRST

2020 ELECTION

© 2019 Cable News Network. **Turner Broadcasting System, Inc.** All Rights Reserved. CNN Sans ™ & © 2016 Cable News Network.

Terms of service | Privacy guidelines | AdChoices ▷

Attorney General Sessions Announces Immigration Compliance Requirements for Edward Byrne Memorial Justice Assistance Grant Programs | OPA | Department ...

Case 2:17-cv-07215-R-JC    Document 106    Filed 07/12/19    Page 125 of 380    Page ID #:3089



THE UNITED STATES
DEPARTMENT *of* JUSTICE



Search this site    [Search]

ABOUT      OUR AGENCY      PRIORITIES      NEWS      RESOURCES      CAREERS      CONTACT

Home » Office of Public Affairs » News

SHARE ➤

## JUSTICE NEWS

RELATED LINKS

Speeches and Press Releases

Videos

Photos

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                Tuesday, July 25, 2017

## Attorney General Sessions Announces Immigration Compliance Requirements for Edward Byrne Memorial Justice Assistance Grant Programs

The Department of Justice today posted a solicitation for the Edward Byrne Memorial Justice Assistance Grant Programs ("Byrne JAG"). Recipients for FY 2017 will be notified of new conditions of their grants that will increase information sharing between federal, state, and local law enforcement, ensuring that federal immigration authorities have the information they need to enforce immigration laws and keep our communities safe.

"So-called 'sanctuary' policies make all of us less safe because they intentionally undermine our laws and protect illegal aliens who have committed crimes," Attorney General Jeff Sessions said. "These policies also encourage illegal immigration and even human trafficking by perpetuating the lie that in certain cities, illegal aliens can live outside the law. This can have tragic consequences, like the 10 deaths we saw in San Antonio this weekend. As part of accomplishing the Department of Justice's top priority of reducing violent crime, we must encourage these 'sanctuary' jurisdictions to change their policies and partner with federal law enforcement to remove criminals. From now on, the Department will only provide Byrne JAG grants to cities and states that comply with federal law, allow federal immigration access to detention facilities, and provide 48 hours notice before they release an illegal alien wanted by federal authorities. This is consistent with long-established cooperative principles among law enforcement agencies. This is what the American people should be able to expect from their cities and states, and these long overdue requirements will help us take down MS-13 and other violent transnational gangs, and make our country safer."

**Attachment(s):**
Download Byrne JAG Grant Policy Backgrounder

**Topic(s):**
Grants
Immigration

**Component(s):**
Office of the Attorney General

**Press Release Number:**
17-826

*Updated November 8, 2017*

cited in City of Los Angeles v. Barr No. 18-55599 archived on July 9, 2019

Attorney General Sessions Announces Immigration Compliance Requirements for Edward Byrne Memorial Justice Assistance Grant Programs | OPA | Department ...

Case 2:17-cv-07215-R-JC    Document 106    Filed 07/12/19    Page 126 of 380    Page ID #:3090

**U.S. Department of Justice**
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

**Stay Connected with Justice:**

   

**Email Updates**

en ESPAÑOL
Contact DOJ

Archive
Accessibility
Information Quality
Privacy Policy
Legal Policies & Disclaimers
Social Media

Budget & Performance
Office of the Inspector
General
No FEAR Act
For Employees
FOIA
USA.gov

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019





ABOUT        OUR AGENCY        PRIORITIES        NEWS        RESOURCES        CAREERS        CONTACT

Home » Office of Public Affairs » News

SHARE ➦

## JUSTICE NEWS

RELATED LINKS

Speeches and Press Releases

Videos

Photos

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                         Thursday, September 7, 2017

## Department of Justice Announces Priority Consideration Criteria for COPS Office Grants

The Department of Justice today announced additional priority consideration criteria for FY 2017 Office of Community Oriented Policing Services (COPS Office) grants. Jurisdictions for FY 2017 were notified that their applications would receive additional points in the application scoring process if their agencies cooperate with federal law enforcement to address illegal immigration, ensuring that federal immigration authorities have the full ability to enforce immigration laws and keep our communities safe.

*cited in City of Los Angeles v. Barr No. 18-55599 archived on July 9, 2019*

"Cities and states that cooperate with federal law enforcement make all of us safer by helping remove dangerous criminals from our communities," Attorney General Jeff Sessions said. "This cooperation is supported by the vast majority of the American people, and jurisdictions with these policies in place should be acknowledged for their commitment to ending violent crime, including violent crime stemming from illegal immigration. Today, the Justice Department announced it will recognize jurisdictions that commit to the rule of law by awarding additional points in the application scoring process for COPS Office grants. My hope is that this recognition will further incentivize every jurisdiction in America to collaborate with federal law enforcement and help us make this country safer."

**Attachment(s):**
Download COPS Grant Cooperation Backgrounder

**Press Release Number:**
17-976

**Component(s):**
Office of the Attorney General

*Updated September 7, 2017*

**U.S. Department of Justice**
950 Pennsylvania Avenue, NW

en ESPAÑOL
Contact DOJ

Archive
Accessibility

Budget & Performance
Office of the Inspector

Washington, DC 20530-0001

| | | |
|---|---|---|
| **Stay Connected with Justice:** | Information Quality | General |
| | Privacy Policy | No FEAR Act |
| | Legal Policies & Disclaimers | For Employees |
| | Social Media | FOIA |
| | | USA.gov |

   

**Email Updates** 

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

NUMBERS, FACTS AND TRENDS SHAPING YOUR WORLD                    ABOUT    FOLLOW    MY ACCOUNT ▾    DONATE



Pew Research Center

*Hispanic Trends*

MENU                    RESEARCH AREAS                    Search

FEBRUARY 23, 2017                       

# Latinos and the New Trump Administration

*Growing share say situation of U.S. Hispanics is worsening*

**BY PEW RESEARCH CENTER STAFF** (HTTPS://WWW.PEWRESEARCH.ORG/STAFF/PEW-RESEARCH-CENTER-STAFF)

Hispanics are divided about what a Donald Trump presidency means for their place in America, according to a Pew Research Center survey of Hispanic adults taken before his inauguration. The survey also finds that a rising share believes the situation of U.S. Hispanics is worsening and that about half of Hispanics are worried about the deportation of someone they know.

About half (54%) of Hispanics say they are confident about their place in America after Trump's election while four-in-ten Hispanics (41%) say they have serious concerns about their place in America.

(https://www.pewhispanic.org/2017/02/23/latinos-and-the-new-trump-administration/ph-02-23-17_latinos-trump-00-05/) Hispanics who do not hold U.S. citizenship and do not hold a green card – a group likely to be in the country without authorization – are more likely than the U.S. born and other immigrants to express concern.[1] Among likely unauthorized immigrants, 55% say they have serious concerns about their place in the country after Trump's election. Meanwhile, 38% of U.S.-born Hispanics and 34% of Hispanic immigrants who are U.S. citizens say they have serious concerns about their place in America. And among Hispanic immigrants who are lawful permanent residents, 49% say the same.

When it comes to progress for Hispanics as a group in the U.S., Hispanics are divided. Half (49%) say the situation of U.S. Hispanics today is about the same as it was a year ago, while 32% say it has worsened and 16% say their group's situation has improved.

(https://www.pewhispanic.org/2017/02/23/latinos-and-the-new-trump-administration/ph-02-23-17_latinos-trump-00-04/) But the share of Hispanics that see the state of U.S. Hispanics worsening has grown in recent years. For example, the share today that says the group's situation has worsened is about double the share that said the same in 2013 (15%) (https://www.pewhispanic.org/2013/12/18/5-politics-personal-finances-group-progress/) . At the same time, the share that says the situation of U.S. Hispanics is about the same compared with a year ago is down from 58% in 2013. And the share that says the group's situation is better than a year ago is down from 25% in 2013.

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

Among Hispanics, a growing share of many key subgroups say that the state of U.S. Hispanics has deteriorated. For example, 42% of Hispanic immigrants who do not hold U.S. citizenship and do not hold a green card today say that the situation of U.S. Hispanics has worsened in the past year, up from 24% who said the same in 2014. Some 38% of Hispanic immigrants who hold U.S. citizenship say this today, up from 21% who said the same in 2014. And 29% of U.S.-born Hispanics say that Hispanics are worse off today than one year ago, up from 17% in 2014. By comparison, Hispanic immigrants who are lawful permanent residents are as likely today (26%) as in 2014 (24%) to say the group's situation in the U.S. has worsened.

These findings emerge from a new, nationally representative bilingual telephone survey of 1,001 Hispanic adults conducted from Dec. 7, 2016, through Jan. 15, 2017, on landline and cellular telephones by SSRS for Pew Research Center. The survey's margin of error for the full sample is plus or minus 3.6 percentage points at the 95% confidence level.

The U.S. Hispanic population stood at 57 million (http://www.census.gov/newsroom/press-releases/2016/cb16-107.html) in 2015 and is among the nation's fastest growing groups. It is also a largely U.S.-born population – 66% were born here. Among Hispanics who were born in another country, roughly three-in-ten are lawful permanent residents and about four-in-ten are unauthorized immigrants. (Unauthorized immigrants from Latin America make up 78 (https://www.pewhispanic.org/2016/09/20/overall-number-of-u-s-unauthorized-immigrants-holds-steady-since-2009/ph_2016-09-20_unauthorized-19/) % of all unauthorized immigrants as well.) At the same time, the group's population growth has slowed (https://www.pewhispanic.org/2016/09/08/latino-population-growth-and-dispersion-has-slowed-since-



**Latinos divided about their place in America after Trump's election**

*% who say they ____ now that Trump has won the election*

Note: Voluntary responses of Neither/other, don't know and refused not shown. "Not citizens and not residents" refers to immigrants who are neither U.S. citizens or lawful permanent residents.
Source: Survey of Hispanic adults conducted Dec. 7, 2016-Jan. 15, 2017. "Latinos and the New Trump Administration"
PEW RESEARCH CENTER



**Growing share of Hispanics say their group's situation in the U.S. is worse than a year ago**

*% who say the situation of Hispanics in this country today is ____ compared with one year ago*

Note: Voluntary responses of Don't know/Refused not shown. Prior to 2017, question asked about the situation of "Hispanics" or "Latinos," based on respondent's indicated term preference.
Source: Survey of Hispanic adults conducted Dec. 7, 2016-Jan. 15,

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

the-onset-of-the-great-recession/) **in recent years
and is now driven more by births**
(https://www.pewhispanic.org/2014/04/29/hispanic-
nativity-shift/) **in the U.S. than the arrival of new
immigrants, driving down the group's foreign-born share** (https://www.pewhispanic.org/2015/09/15/the-
impact-of-slowing-immigration-foreign-born-share-falls-among-14-largest-us-hispanic-origin-groups/) **in recent
years.**

## Deportation worries

(https://www.pewhispanic.org/2017/02/23/latinos-
and-the-new-trump-administration/ph-02-23-
17_latinos-trump-00-03/) **The U.S. Department of
Homeland Security this week**
(https://www.washingtonpost.com/politics/trump-
administration-seeks-to-prevent-panic-over-new-
immigration-enforcement-
policies/2017/02/21/a2a695a8-f847-11e6-bf01-
d47f8cf9b643_story.html?hpid=hp_rhp-top-table-
main_immigration-1157a%3Ahomepage%
2Fstory&utm_term=.7ae666938f2b) **issued new
immigration enforcement policies that widen the
pool of unauthorized immigrants prioritized for
deportation to include those who have committed
an act that will result in criminal charges, those
charged with a crime but not convicted, and those
convicted of a criminal offense regardless of
severity, among other things.**[2] **In recent weeks,
immigrants around the nation have grown
concerned about stepped-up deportations**



### Hispanics split in their concern over deportation

*% who say, regardless of their legal status, they worry
____ that they, a family member or a close friend could
be deported*

|  | Not much/Not at all | A lot/Some |
|---|---|---|
| All | 52 | 47 |
| U.S. born | 66 | 33 |
| Among foreign born | | |
| U.S. citizens | 45 | 52 |
| Lawful permanent residents | 34 | 66 |
| Not citizens and not residents | 31 | 67 |

Note: Voluntary responses of Don't know/Refused not shown. "Not
citizens and not residents" refers to immigrants who are neither U.S.
citizens nor lawful permanent residents.
Source: Survey of Hispanic adults conducted Dec. 7, 2016-Jan. 15,
2017
"Latinos and the New Trump Administration"

**PEW RESEARCH CENTER**

(https://www.washingtonpost.com/national/immigrant-community-on-high-alert-fearing-trumps-deportation-
force/2017/02/11/e5c30d06-f06f-11e6-9973-c5efb7ccfb0d_story.html?utm_term=.753a9b88caeb) **under the new
administration.**

According to the new survey, which was taken before Trump's inauguration and the reported rise in
deportation concerns, Hispanics are split in their concern about deportation. About half (47%) of Hispanic
adults, regardless of their immigration status, say they worry "a lot" or "some" that they themselves, a
family member or a close friend, could be deported, while 52% say they are worried "not at all" or "not
much."

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 132 of 380   Page ID #:3096

Worries about deportation among immigrants are greatest for those who do not hold U.S. citizenship and do not hold a green card: 67% say they worry a lot (45%) or some (22%) about the deportation of themselves or someone close to them. And among immigrants who are lawful permanent residents, 66% say they are worried about deportation of themselves or someone close to them. Both of these groups are potentially subject to deportation. By comparison, one-third (33%) of U.S.-born Hispanics say they are worried about deportation of someone they know, while 55% say they worry not much or not at all about deportation.

Deportation concerns among Hispanics are little changed from 2013, when 46% of Hispanics said they worried, and is down from 52% in 2010. Overall, all major subgroups of Hispanics have seen a decline in their worry about deportation or no change in recent years. For example, in 2010, 84% of Hispanic immigrants who were not U.S. citizens and not lawful permanent residents said they worried a lot or some that they or someone close to them could be deported, about 17 percentage points higher than today. Meantime, the share of U.S.-born Hispanics who said the same in 2010 was 32%, similar to today's 33%.

## Top priorities for the new administration and Congress in 2017

(https://www.pewhispanic.org/2017/02/23/latinos-and-the-new-trump-administration/ph-02-23-17_latinos-trump-00-02/) Despite the prominence of immigration issues in last year's presidential campaign, U.S. Hispanics do not rate them a top issue for the new administration or Congress, a pattern similar to that found in previous years of polling by Pew Research Center (https://www.pewresearch.org/fact-tank/2014/06/02/top-issue-for-hispanics-hint-its-not-immigration/) . According to the new survey, 46% say dealing with the issue of immigration should be a top priority for the new administration and Congress in 2017, ranking last among the five priorities tested in the new survey.



**Education, terrorism and the economy are top Latino priorities for 2017**

*% rating each a top priority for Trump and Congress in 2017*

| | |
|---|---|
| Improving the educational system | 73 |
| Defending the country from future terrorist attacks | 69 |
| Strengthening the nation's economy | 66 |
| Reducing health care costs | 54 |
| Dealing with the issue of immigration | 46 |

Source: Survey of Hispanic adults conducted Dec. 7, 2016-Jan. 15, 2017.
"Latinos and the New Trump Administration"

**PEW RESEARCH CENTER**

Instead, Hispanics identify education as a top priority issue for the new Trump administration and for the new Congress among those tested. Fully 73% say improving the educational system should be a top priority in 2017. Other top priorities include defending the country from future terrorist attacks (69%) and strengthening the nation's economy (66%). Following these three issues is reducing health care costs (54%).

This rating of issue priorities among Latinos is similar to that of the U.S. general public, though there are some differences. According to a recent Pew Research Center survey of U.S. adults (https://www.people-press.org/2017/01/24/after-seismic-political-shift-modest-changes-in-publics-policy-agenda/) , defending the country from terrorism (76%), strengthening the nation's economy (73%) and improving the educational system (69%) are rated as the top three priorities of more than 20 tested. On terrorism and the economy,

the share of U.S. adults who rate these as top issues is higher than the share of Latinos who say the same. On reducing health care costs, 66% rate the issue as a top priority for Trump and Congress, again a higher share than among Latinos. Meanwhile, on immigration, 43% of U.S. adults say immigration is a top priority, a share similar to that of Latinos.

More broadly, this pattern for top issues among U.S. Latinos has been fairly consistent for a number of years in Pew Research Center surveys. In fall 2016 (https://www.pewhispanic.org/2016/10/11/democrats-maintain-edge-as-party-more-concerned-for-latinos-but-views-similar-to-2012/) , the top issues for Latinos were education, the economy and health care. And in December 2008 (https://www.pewhispanic.org/2009/01/15/hispanics-and-the-new-administration/) , as President-elect Barack Obama prepared to take office for the first time, Latinos cited the economy, education, health care and national security as top issues for the new administration.[3]

## Partisan differences in views of Trump and Obama

(https://www.pewhispanic.org/?attachment_id=25471) Latino views about the kind of president Trump will be and how former President Obama's administration will be viewed splits along party lines.

(https://www.pewhispanic.org/2017/02/23/latinos-and-the-new-trump-administration/ph-02-23-17_latinos-trump-00-00/) Overall, 40% of Hispanic adults think Trump will be a poor or terrible president while 28% say he will be an average president and 22% say he will be a good or great president. But there are sharp divides by political party. About half (53%) of Hispanic Republicans say Trump will be a good or great president. By comparison, Hispanic Democrats hold the opposite view: 58% say Trump will be a poor or terrible president.[4]



**Latinos' views of Trump sharply divided along party lines**

*% who say Donald Trump will be a ____ president*

|  | Great/good | Average | Poor/Terrible |
|---|---|---|---|
| All | 22 | 28 | 40 |
| Republican | 53 | 21 | 18 |
| Democrat | 12 | 23 | 58 |
| Independent | 22 | 33 | 36 |

Note: Voluntary responses don't know/refused not shown.
Source: Survey of Hispanic adults conducted Dec. 7, 2016-Jan. 15, 2017.
"Latinos and the New Trump Administration"

**PEW RESEARCH CENTER**

Divisions along party lines also exist in Latinos' views about the Obama administration. Two-thirds (66%) of Latino Democrats say his administration's accomplishments will be better remembered than its failures. By contrast, 59% of Latino Republicans say the failures will outweigh accomplishments. Overall, half of Latinos (48%) say the Obama administration's accomplishments will outweigh its failures, while 36% say the opposite.

▼ **Terminology**

........................................................................................................

1.  A Pew Research Center analysis of Current Population Survey data indicates that approximately 98% of Hispanic immigrants who are neither U.S. citizens nor lawful permanent residents are unauthorized immigrants. (Livingston, 2009) ↵

cited in City of Los Angeles . Bar
No. 18-56599 archived on July 9, 2019

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 134 of 380   Page ID #:3098

2. In 2014, there were an estimated 11.1 million unauthorized immigrants in the U.S. ↵

3. Pew Research Center surveys of Latino adults have asked about top issues in different ways. For example, in fall 2016, the question about issue priorities tied the importance of each issue to how Latinos might vote in the then upcoming election. In a report from 2009, the question asked Latinos about a select list of issues and how much of a priority they should be for the then new Obama administration. ↵

4. A new Pew Research Center survey of U.S. adults taken one month into the Trump presidency finds that 76% of Hispanics disapprove of the way Trump is handling his job as president (56% of all U.S. adults say the same). The survey also finds that 72% of Hispanics have an unfavorable view of Trump (57% of all U.S. adults say the same). ↵



**Half of Latinos say history will see the Obama administration positively**

*% who say, in the long run, the Obama administration's ...*

| | Accomplishments outweigh failures | Failures outweigh accomplishments |
|---|---|---|
| All | 48 | 36 |
| Republican | 33 | 59 |
| Democrat | 66 | 19 |
| Independent | 42 | 45 |

Note: Voluntary responses don't know/refused not shown.
Source: Survey of Hispanic adults conducted Dec. 7, 2016-Jan. 15, 2017.
"Latinos and the New Trump Administration"

**PEW RESEARCH CENTER**

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

Too Scared to Report Sexual Abuse. The Fear: Deportation. - The New York Times

Case 2:17-cv-07215-R-JC    Document 106    Filed 07/12/19    Page 135 of 380    Page ID #:3099



# *Too Scared to Report Sexual Abuse. The Fear: Deportation.*

"I don't know who to believe or what is safe to do to protect myself," said Yanet, who stepped forward to file a sexual abuse case years ago but is having second thoughts about continuing to pursue it.  Megan Miller for The New York Times

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

Too Scared to Report Sexual Abuse. The Fear: Deportation. - The New York Times

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 136 of 380   Page ID #:3100



"I don't know who to believe or what is safe to do to protect myself," said Yanet, who stepped forward to file a sexual abuse case years ago but is having second thoughts about continuing to pursue it.  Megan Miller for The New York Times

By Jennifer Medina

April 30, 2017

LOS ANGELES — Cristina's husband had hit and threatened her repeatedly for years, she said, but it wasn't until last year that she began to fear for the safety of her young children, too. Reluctantly, she reported him and filed a police report.

Cristina, an immigrant from Mexico who arrived in the United States as a teenager in the 1980s, began to apply for a special visa for victims of abuse that would set her on a path to citizenship and her own freedom. Then last month, she told her lawyer that she no longer wanted to apply. She was too fearful, she said, not of her husband, but of the government.

"I am scared they will find me," Cristina, who lives in a suburb of Los Angeles, said in an interview, asking that her last name not be used.

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

Too Scared to Report Sexual Abuse. The Fear: Deportation. - The New York Times

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 137 of 380   Page ID #:3101

Domestic violence has always been a notoriously difficult crime to prosecute. It often takes victims years to seek help, and they frequently have to be persuaded to testify against their assailants. And for many undocumented victims, taking that step has become exceedingly difficult because of fears that the government will detain and deport them if they press charges, according to law enforcement officials, lawyers and advocates from across the country.

Since the presidential election, there has been a sharp downturn in reports of sexual assault and domestic violence among Latinos throughout the country, and many experts attribute the decline to fears of deportation. Law enforcement officials in several large cities, including Los Angeles, Houston and Denver, say the most dangerous fallout of changes in policy and of harsh statements on immigration is that fewer immigrants are willing to go to the police.

The number of Latinos reporting rapes in Houston has fallen by more than 40 percent this year from the same period last year, Art Acevedo, chief of the Houston Police Department, said this month. The drop, he added, "looks like the beginnings of people not reporting crime."

You have 7 free articles remaining.
Subscribe to The Times

In Los Angeles this year, reports of domestic violence among Latinos have dropped by 10 percent and reports of sexual assault by 25 percent from a year ago, declines that Charlie Beck, the chief of the Police Department, said were likely due to fear of the federal government. Dozens of service providers and lawyers interviewed said immigrant women were deciding not to report abuse or press charges.

"We've always told our clients that even if you are undocumented, you don't need to worry about it — the officers are going to protect you," said Kate Marr, executive director of the Legal Aid Society of Orange County, Calif. The level of fear now, however, is unlike anything Ms. Marr has seen in her nearly two decades of work with domestic violence survivors, she

Cited in City of Los Angeles v. Barr
No. 18-55599, archived on July 9, 2019

Too Scared to Report Sexual Abuse. The Fear: Deportation. - The New York Times

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 138 of 380   Page ID #:3102
said.

"Everything we've ever told our clients is out the window," she said. "It's so demoralizing and so frightening to imagine what happens if it continues."

An image from a security video at a courthouse in El Paso showing a woman who was arrested by Immigration and Customs Enforcement agents in February, moments after she received a protective order.

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

Too Scared to Report Sexual Abuse. The Fear: Deportation. - The New York Times

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 139 of 380   Page ID #:3103



An image from a security video at a courthouse in El Paso showing a woman who was arrested by Immigration and Customs Enforcement agents in February, moments after she received a protective order.

The fear among immigrants was exacerbated by a case in El Paso, where Immigration and Customs Enforcement agents arrested a woman in February moments after she received a protective order against the man she said had abused her. The United States Commission on Civil Rights, a bipartisan independent agency, urged federal officials this past week to reconsider their courthouse arrest tactics. The agency said the Texas case and other courthouse arrests were having a chilling effect on immigrants throughout the country.

Too Scared to Report Sexual Abuse. The Fear: Deportation. - The New York Times

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 140 of 380   Page ID #:3104

The Department of Justice declined to comment on the concerns about increased fear among immigrants.

Laura's House, which helps hundreds of victims of domestic violence in Orange County each year, routinely asks clients about their immigration status so it can help them apply for visa protections if necessary. Under what is known as a U visa, victims of certain crimes receive permission to stay in the United State if they assist the police — and the promise of the visa often persuades victims of sexual assault and domestic violence to come forward.

Previously, nearly half of the more than 70 new cases that Laura's House received each month came from undocumented immigrants. In the last three months, that number has dropped to less than one a week.

Many women share the concerns of April, 23, who waited for years before pressing charges against the father of her children and who asked that her full name not be used.

"I would call the police and use another name or make a neighbor call," said April, who came across the border from Mexico when she was about 8 and lives in Orange County. "When he came after me, he'd say that I would get sent back to Mexico and never see my kids again. I believed him for a long time."

Capt. James Humphries, who oversees the special victims investigations division in Montgomery County, Md., said he saw the willingness to report drastically backsliding in the county, where immigrants make up a large portion of the population. His unit has received roughly half the calls for sexual assault and domestic violence this year that it did in the same period last year, he said.

"It's a constant challenge for us to reassure the community that the way we work has not changed and that the White House cannot dictate to us how to police," Captain Humphries said. "It affects all crimes across the board, but

cited in City of Los Angeles v. Barr
No. 1a-55599 archived on July 9, 2019

Too Scared to Report Sexual Abuse. The Fear: Deportation. - The New York Times

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 141 of 380   Page ID #:3105

if you don't have domestic victims coming forward, the reality is that they do not trust the police."

However, Sheriff Chuck Jenkins of nearby Frederick County, Md., has been a vocal proponent of strict immigration enforcement and said he had seen no evidence of decreased crime reporting among the immigrants there.

"They don't want to be victimized by anyone else," Sheriff Jenkins said. "Nothing that we do on the streets has anything to do with immigration status, and folks in the immigrant communities, both legal and illegal, are smart enough to know that."

Noemi Sanchez, 46, emigrated illegally from Mexico nearly 30 years ago and waited for years before reporting an abusive partner to the police. She now works with other survivors of domestic violence in Suffolk County, on Long Island, N.Y., and said the "fear is stronger than ever — anyone from above could keep us in custody and deport us." an Rong Xu for The New York Times

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

Too Scared to Report Sexual Abuse. The Fear: Deportation. - The New York Times

Case 2:17-cv-07215-R-JC    Document 106    Filed 07/12/19    Page 142 of 380    Page ID #:3106

Noemi Sanchez, 46, emigrated illegally from Mexico nearly 30 years ago and waited for years before reporting an abusive partner to the police. She now works with other survivors of domestic violence in Suffolk County, on Long Island, N.Y., and said the "fear is stronger than ever — anyone from above could keep us in custody and deport us."

an R. Xu for The New York Times

Still, others who work with victims say the impact of the fear is difficult to overstate.

In Austin, Tex., the nonprofit organization SAFE provides forensic exams for sexual assault survivors, and more than half of the clients are Latino. While the organization does not have precise numbers, Kelly White, the chief executive, said that fewer rape victims were coming forward this year, and that many call the organization's hotline for support but say they do not want to contact law enforcement.

In Nassau County on Long Island, N.Y., the district attorney's Office of Immigrant Affairs tip line for crime victims used to get up to 10 calls a week. But it has had none since December. And at End Domestic Abuse

Too Scared to Report Sexual Abuse. The Fear: Deportation. - The New York Times

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 143 of 380   Page ID #:3107

Wisconsin, which helps about 700 women a year get restraining orders against their partners, the requests this year have dropped to almost zero, the lead attorney there said.

The Los Angeles County Domestic Violence Council typically received about a half-dozen calls a week, with at least half from Spanish speakers. But since January, it has received only two calls, said Olivia Rodriguez, the executive director.

"This is not normal," Ms. Rodriguez said. "They assume that if they call a government entity it's all connected, that they will be reported to ICE and sent away. So instead they are just taking the abuse."

Yanet, 56, who asked that her last name not be used out of fear of deportation, said she had endured more than a decade of abuse from her husband in El Salvador, where victims of assault have little recourse, before she decided to flee to the United States several years ago. She mostly worked as a cook in Los Angeles kitchens and in 2005 tried to obtain a visa meant for women escaping violence.

But the lawyer she went to tried to force her to perform oral sex in exchange for his help, she said. Yanet initially worried about reporting him to the police, but she did file a report after deciding she would not be victimized again. Now she is reluctant to move ahead with both the charges and her visa application.

"Every day I am scared that something will happen and afraid to even walk out of the door," she said. "Doing something to get the attention of the government is worse. I don't know who to believe or what is safe to do to protect myself."

Worries over deportation will only increase the feelings of fear and isolation for victims of sexual assault or domestic violence, said Wanda Lucibello, a former prosecutor in the Brooklyn district attorney's office.

For years, Ms. Lucibello said, the office and other local law enforcement

Too Scared to Report Sexual Abuse. The Fear: Deportation. - The New York Times

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 144 of 380   Page ID #:3108

worked to make people feel comfortable that they could report crimes without fear that they would then become a target for deportation. Under the Obama administration, victims of crime were not considered a priority for deportation, and many local law enforcement agencies went out of their way to make inroads with immigrants.

"When you're talking about immigrant communities, you're talking about perceptions and whether those perceptions are accurate or not," Ms. Lucibello said. "If the perception is that there is a greater risk if you go to the police, you are going to be less likely to do so, and you are more likely to stay in an abusive relationship until you need to seek treatment at a hospital."

She added: "It's really the opposite of what anyone should want. All of this strengthens the abusive partner."

Liz Robbins contributed reporting from New York.

A version of this article appears in print on April 29, 2017, on page A1 of the New York edition with the headline: Too Scared to Report Abuse, For Fear of Being Deported. Order Reprints | Today's Paper | Subscribe

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

Read 247 Comments

---

**Related Coverage**

April 29, 2017   **Vetting Delays Snarl Path to Citizenship for Thousands in Military**

---

Comments 247
Too Scared to Report Sexual Abuse. The Fear: Deportation.Skip to Comments
The comments section is closed. To submit a letter to the editor for publication, write to letters@nytimes.com.
Reader Picks
All
Loading...
Subscribe to The Times for $2 a week.
You have 7 free articles remaining.
SEE MY OPTIONS

Too Scared to Report Sexual Abuse. The Fear: Deportation. - The New York Times

Case 2:17-cv-07215-R-JC    Document 106    Filed 07/12/19    Page 145 of 380    Page ID #:3109

The New York Times

Go to Home Page »

**Carbon-free electricity. Gluten-free dumplings.**
And every story in between.

NEWS

OPINION

ARTS

LIVING

LISTINGS & MORE

© 2019 The New York Times Company

Contact Us     Work with us     Advertise     Your Ad Choices     Privacy     Terms of Service     Terms of Sale     Site Map     Help     Subscriptions

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

The 7.1 earthquake could have been so much worse. Here's why



Dodgers manager Dave Roberts would like a White House invitation to decline



Earthquake preparedness: What to do before — and during — a big one



Damage to homes, but no deaths reported, in 7.1 magnitude California earthquake



Latinos are reporting fewer sexual assaults amid a climate of fear in immigrant communities, LAPD says

MAR 21, 2017  |  8:25 PM

In the first six months of 2017, reports of domestic violence have declined among Latino residents in some of California's largest cities, a retreat that crisis professionals say is driven by a fear that interacting with police or entering a courthouse could make immigrants easy targets for deportation.

President Trump's aggressive stance on illegal immigration, executive orders greatly expanding the number of people who can be targeted for deportation and news reports of U.S. Customs and Immigration Enforcement agents making arrests at courthouses have contributed to the downturn, according to civil liberties and immigrant rights advocates.

In Los Angeles, Latinos reported 3.5% fewer instances of spousal abuse in the first six months the year compared with 2016, while reporting among non-Latino victims was virtually unchanged, records show. That pattern extends beyond Los Angeles to cities such as San Francisco and San Diego, which recorded even steeper declines of 18% and 13%, respectively.





Sheriff's Deputy Marino Gonzalez talks with community members during a block meeting in Cudahy. (Brian van der Brug / Los Angeles Times)

Domestic violence is traditionally an under-reported crime. Some police officials and advocates now say immigrants without legal status also may become targets for other crimes because of their reluctance to contact law enforcement.

The Long Beach abuse victim, fearing she had no other recourse, sent her oldest children back to Mexico to live with relatives.

"We're supposed to be that assurance that they don't have. That safety net," Maya said. "But it's getting harder for us to have a positive word for them and say: 'It's going to be OK. You can go into a courtroom. You can call the police.' "

ce to police compared with the sa

Non-Latinos

ce to police compared with the sa

## Non-Latinos

-13.3%

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

s, San Francisco
e departments

(Los Angeles Times)

Los Angeles County sheriff's Deputy Marino Gonzalez said he addresses such apprehension frequently as he patrols the streets of East L.A. — even though his department doesn't question people about their immigration status.

"They're afraid of us. And the reason they're afraid of us is because they think we're going to deport them. They don't know that we don't deport them; we don't ask for their immigration status," he said. "They just gotta go based on what they see on social media and what they hear from other people."

On a warm afternoon, Gonzalez pulled his cruiser to a stop near a row of apartments in Cudahy, ahead of a community meeting in a predominantly Spanish-speaking neighborhood. There was a lone woman waiting for Gonzalez and a few other deputies, offering lemonade to passersby.

The mood in the city was tense. The night before, a pro-Trump demonstrator protesting the city's sanctuary status had been arrested on suspicion of brandishing a gun. Gonzalez and city officials went door-to-door, flashing smiles and speaking Spanish to residents, urging them to attend the meeting.

Gonzalez spoke calmly to the assembly of several dozen people sipping from Styrofoam cups.

"We're not here to ask you where you're from," he said in Spanish, drawing thankful nods.

Gonzalez, who came to the U.S. from Mexico as a child, said he knows why people are scared, but hopes face-to-face conversations will persuade more victims to come forward.

ADVERTISEMENT

"The community here, they don't know, and they won't know, unless we reach out," he said.

# We're not here to ask you where you're from.

— LOS ANGELES COUNTY SHERIFF'S DEPARTMENT DEPUTY MARINO GONZALEZ

Share quote & link





Sheriff's deputy Marino Gonzalez, left, talks with deputies while investigating a disturbance in Maywood. (Brian van der Brug / Los Angeles Times)

ICE officials also said they do not target crime victims for deportation and, in fact, often extend visas to those who report violent crime and sexual abuse.

Officials in the agency's Los Angeles office declined to be interviewed. ICE issued a statement dismissing links between immigration enforcement and a decline in crime reporting among immigrants as "speculative and irresponsible."

The drop in reporting could result from an overall decrease in domestic violence crimes, the agency said. But police statistics reviewed by The Times suggest that statement is inaccurate. The decline in domestic violence reports among Latinos in several cities is far steeper than overall declines in reporting of those crimes.

In Los Angeles and San Diego, reporting of domestic violence crimes remained unchanged among non-Latinos. The decline among Latinos in San Diego was more than double the overall citywide decrease, records show. In San Francisco, the reporting decline among Latinos was nearly triple the citywide decrease.

The pattern extends outside California.

In April, Houston police Chief Art Acevedo said the number of Latino victims reporting sexual assault had dropped 42% in his city. In Denver, at least nine women abandoned pursuit of restraining orders against their abusers after immigration enforcement agents were filmed making an arrest in a city courthouse earlier this year, according to City Atty. Kristi Bronson.

Claude Arnold, who oversaw ICE operations in Southern California from 2010 to 2015, said misconceptions about the agency may be driving the downswing. Crime victims are far more likely to receive a visa application than a removal order by reporting an attack, he said.

"ICE still has a policy that we don't pursue removal proceedings against victims or witnesses of crime, and I haven't seen any documented instances where that actually happened," he said. "To a great degree, we facilitate those people having legal status in the U.S."



ICE agents make arrests at courthouses, sparking backlash from attorneys and state supreme court

MAR 16, 2017   |   10:40 AM

Nationwide, the number of arrests made by ICE agents for violations of immigration law

surged by 37% in the first half of 2017. In Southern California, those arrests increased by 4.5%.

Arnold said some immigrants' rights activists have helped facilitate a climate of fear by spreading inaccurate information about ICE sweeps that either didn't happen, or were in line with the Obama administration's policies.

But professionals who deal with domestic violence victims say the perception of hardcore enforcement tactics under Trump has led to widespread panic.

Adam Dodge, legal director at an Orange County domestic violence shelter called Laura's House, said that before February, nearly half of the center's client base were immigrants in the country illegally. That month, ICE agents in Texas entered a courthouse to arrest a woman without legal status who was seeking a restraining order against an abuser.

"We went from half our clients being undocumented, to zero undocumented clients," he said.

A video recording earlier this year of a father being arrested by ICE agents moments after dropping his daughter off at a Lincoln Heights school had a similar effect on abuse victims in neighboring Boyle Heights, said Rebeca Melendez, director of wellness programs for the East L.A. Women's Center.

ADVERTISEMENT

"They instilled the ultimate fear into our community," she said. "They know they can trust us, but they are not trusting very many people past us."

Even when victims come forward, defense attorneys sometimes use the specter of ICE as a weapon against them, to the frustration of prosecutors.

In the Bay Area, a Daly City man was facing battery charges earlier this year after flashing a knife and striking the mother of his girlfriend, according to court records. The man's defense attorney raised the fact that the victim was in the country illegally during pretrial hearings, although a judge eventually ruled that evidence was irrelevant and inadmissible at trial, records show.

The case ended in a hung jury. But when prosecutors sought a retrial, the victim said she would not cooperate, in part, because her immigration status was raised during the trial, said Max Szabo, a spokesman for the San Francisco district attorney's office.





LAPD officers investigate a reported disturbance in a Sylmar mobile home park. (Robert Gauthier / Los Angeles Times)

San Francisco Dist. Atty. George Gascon said the case was one of several where his prosecutors felt defense attorneys sought to leverage heightened fears of deportation against victims. He believes that tactic, combined with ICE's expanded priorities and presence in courthouses, is driving down domestic violence reporting among immigrants in the city's sprawling Latino and Asian communities.

Gascon described the situation as a "replay" of the fear he saw in the immigrant community while he was the police chief in Mesa, Ariz., during notorious Maricopa County Sheriff Joe Arpaio's crusade against people without legal status, which led to accusations of racial profiling.

Stephanie Penrod, managing attorney for the Family Violence Law Center in Oakland, also said the number of immigrants without legal status willing to seek aid from law enforcement has dwindled.

Abusers frequently will threaten to call immigration enforcement agents on their victims, a threat Penrod believes has more teeth now given ICE's increased presence in courthouses.

"The biggest difference for us now is those threats are legitimate," she said. "Previously we used to advise them we couldn't prevent an abuser from calling ICE, but that it was unlikely ICE would do anything."

If the problem persists, Gascon fears the consequences could be deadly.

"The level of violence increases," he said. "It could, in some cases, lead to severe injury or homicide."

**_Times staff writer Kate Mather contributed to this report._**

james.queally@latimes.com

**Follow @JamesQueallyLAT for crime and police news in California.**

**ALSO**

Hard-line White House immigration proposals could derail deal to protect 'Dreamers'

California becomes 'sanctuary state' in rebuke of Trump immigration policy

San Diego police to continue using gunshot detection system despite some criticism



al California Newsletter

aturday

A roundup of the stories shaping California.

| ENTER YOUR EMAIL ADDRESS |

## James Queally

James Queally writes about crime and policing in Southern California for the Los Angeles Times. A part of the team of reporters that won a Pulitzer Prize for coverage of the 2015 terror attack at the Inland Regional Center in San Bernardino, Queally has written extensively about violence, police pursuits, street racing and hate crimes since coming to The Times. A Brooklyn native, he moved West in 2014 after spending five years covering crime and police news for the Star-Ledger in New Jersey. In that time he profiled Frank Lucas, the drug kingpin who inspired the film "American Gangster," and wrote a series of stories that revealed how the state's largest police departments failed to solve thousands of nonfatal shootings, which led to policy changes. Not content with real-life crimes, he also makes up fictional ones: Queally's debut crime novel, "Line Of Sight," will be published by Polis Books in 2020.

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

ADVERTISEMENT



Copyright © 2019, Los Angeles Times

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 159 of 380   Page ID #:3123

This is the html version of the file http://library.niwap.org/wp-content/uploads/Immigrant-Access-to-Justice-National-Report.pdf.
Google automatically generates html versions of documents as we crawl the web.

Tip: To quickly find your search term on this page, press **Ctrl+F** or **⌘-F** (Mac) and use the find bar.

**Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforcement: Initial Report from a 2017 National Survey**[1]

May 3, 2018

By: Rafaela Rodrigues, Immigrant Women Law and Policy Fellow, National Immigrant Women's Advocacy Project, American University, Washington College of Law;
Alina Husain, Immigrant Women Law and Policy Fellow, National Immigrant Women's Advocacy Project, American University, Washington College of Law;
Amanda Couture-Carron, PhD Candidate, Department of Sociology, University of Toronto;
Leslye E. Orloff, Adjunct Professor and Director, National Immigrant Women's Advocacy Project, American University, Washington College of Law; and
Nawal H. Ammar, Dean, College of Humanities and Social Sciences, and Professor of Law and Justice at Rowan University, New Jersey

*Introduction*

This report explores the impact of that public discussions about immigration, the rise in anti-immigrant sentiment in the public discourse, and the increased federal immigration enforcement are having on immigrant crime victims and their willingness to seek help from courts, police, prosecutors, victim advocates, and attorneys. In particular, we are interested in understanding the experiences of immigrant and limited English proficient (LEP) crime victims in accessing the justice system.

To understand how increased immigration enforcement is affecting immigrant crime victims, we conducted on-line surveys with four different groups of professionals – judges,

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 160 of 380   Page ID #:3124

police, prosecutors, and victim advocates/attorneys. The goal was to learn about judges', law enforcement officials', prosecutors', and victim advocates' and attorneys' observations of differences in their work with immigrant and LEP victims and about immigrant victims' willingness or reticence to access help. The survey of victim advocates and victims' attorneys, contained two different types of questions. Many questions asked the advocate/attorney participants to reply with the number of their immigrant victim clients who had made a particular choice or had the experience described in the question. Other questions asked advocates and attorneys to report more generally about their immigrant victim clients' experiences. In some instances, we aimed to understand better the common themes emerging from these justice system professionals' experiences with immigrant and LEP victims. The results of this survey provide a complex picture developed from multiple perspectives describing:

  • Whether fears about immigration enforcement and immigration status concerns are:

[1] The authors wish to thank the many interns and Deans' Fellows at American University Washington College of Law for their collaboration and hard work including Tolulope Adetayo, Monica Bates, Rachel Nyakotey, Grace Logan, Mae McCauley, Zoe Morgan, Genesis Marte, and Nicole DiOrio. The authors also wish to thank the Judges, Law Enforcement officials and Advocates who provided their assistance and insights.

**National Immigrant Women's Advocacy Project (NIWAP, pronounced *new-app*)**
**American University, Washington College of Law**
4300 Nebraska Avenue NW · Washington, D.C. 20016
(o) 202.274.4457 · niwap@wcl.american.edu · wcl.american.edu/niwap

**Page 2**

cited in City of Los Angeles v. Barr No. 18-55599 archived on July 9, 2019

  o Arising in courtrooms in criminal and family law cases;
  o Affecting the willingness of immigrant and LEP crime victims to cooperate
     with police and prosecutors on criminal investigations and prosecutions;
  o Influencing the ability of law enforcement to hold offenders accountable;
  o Impacting community policing and relationships between law enforcement
     agencies and immigrant crime victims' advocates and attorneys;
  o Deterring immigrant crime victims' and their children's access to the justice
     system for help;
  o Contributing to immigrant crime victims' fears that going to court and
     attending proceedings at courthouses are not safe; and
  o Decreasing victims' willingness to pursue crime victim related protection,
     including those available under immigration, family, and public benefits law.

    The survey instruments questions required participants to provide evidence based information regarding their experience working with immigrant and LEP victims of crime (i.e. numbers and percentages), while also offering respondents the opportunity to provide narrative commentary on their work. The surveys were developed to include questions that are specifically relevant to each professional group's sphere of work and interaction with immigrant and Limited English Proficient (LEP) populations. The surveys contained questions that allowed us to analyze the data we collect both quantitatively and qualitatively as well as to track various changes in each group's interaction with immigrant and LEP populations in 2016 and 2017.

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 161 of 380   Page ID #:3125

Prosecutors were asked to compare the past year, the past three years and the past five years with previous years.

NIWAP distributed the survey to its list of 9,000+ attorneys, advocates, judges, law enforcement officials and organizations that worked with or sought training or assistance in case of immigrant victims, women and children. In addition, several professional organizations assisted NIWAP by sending the survey to their e-mail lists including the Police Executive Research Forum, the National Council of Juvenile and Family Court Judges, the Association of Prosecuting Attorneys, and a number of national and statewide organizations working on domestic violence, sexual assault or immigrant's issues.

A total of 779 individuals from a wide variety of professions and numerous jurisdictions participated in the survey during October and November of 2017. One hundred and eight (108) Judges and court staff from twenty five (25) states returned their *National Survey of Judges*. Two hundred and thirty two (232) law enforcement officials from twenty four (24) states returned their *National Law Enforcement Survey*. A total of fifty (50) prosecutors from nineteen (19) states returned their *National Prosecutors Survey*. Three hundred and eighty-nine victim advocates and attorneys from all 50 states and the District of Columbia completed *The National Victim Advocates and Attorneys Survey*.

All four professional groups reported details about the variety of ways their work with immigrant crime victims and LEP has become more difficult in the past two years. Judges reported on how immigration status is being used more frequently by litigants offensively against immigrant victims in a range of family and criminal court cases. Prosecutors similarly reported that defense attorneys are raising immigration status of crime victims in criminal cases and that immigrant victims' willingness to cooperate in criminal prosecutions is declining. Law

American University, Washington College of Law 2

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

---

**Page 3**

enforcement personnel observed a decline in immigrant victims' willingness to cooperate in criminal prosecutions as well an increase in difficulty of investigating criminal cases involving immigrant crime victims because of immigrant and LEP victims' reluctance to cooperate. Similarly, victim advocates and attorneys saw declines in the number of immigrant victims willing to file for civil protection orders and for VAWA and U visa immigration relief and the number of immigrant domestic violence victims willing to call the police for help.

This report is divided into five parts: part one concentrates on results from the *National Survey of Judges*; part two focuses on the findings of the *National Law Enforcement Survey*; part three provides the results and analysis of the *National Prosecutors Survey*; and part four examines the results of the *National Victim Advocates and Attorneys Survey*. Part five offers broad policy recommendations and conclusions based on the data from all four surveys.

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 162 of 380   Page ID #:3126

TABLE OF CONTENTS

*Report Section*                                                              *Page*

• (Part One) National Survey of Judges …………………………..…... 4
• (Part Two) National Survey of Law Enforcement Officials …………....22
• (Part Three) National Survey of Prosecutors …………………………... 56
• (Part Four) National Survey of Victim Advocates and Attorneys ………79
• (Part Five) Policy Recommendations and Conclusions …….…………... 101

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

American University, Washington College of Law                                    3

**Page 4**

**Part One - National Survey of Judges**

***Findings from 2017 National Survey of Judges (Judicial Survey)***

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 163 of 380   Page ID #:3127

The National Immigrant Women's Advocacy Project (NIWAP), American University, Washington College of Law conducted a survey of 103 Judges and 3 court staff and 2 court administrators from 25 states during November and December 2017. The aim of the survey was to learn from judicial observations regarding cases that come before courts involving immigrant and LEP victims. The survey questions particularly examined the intersection of immigration status and immigration concerns with state family and criminal court proceedings. It also explored whether judges and court administrators are observing changes in the immigrant victims' willingness to participate in various types of court proceedings in 2017 relative to 2016.

Judges participating in the survey were from 25 different states. Figure 1 provides an overview of the regional[2] distribution among participating judges.[3] Judicial survey participants presided over a wide range of different types of state court proceedings (See, figure 2).

## Figure 1: Regional Distribution Among Courts (n=107)

27%

40%

17%

2%

14%

West (n=43)    South (n=15)    Mid Atlantic (n=2)    Midwest (n=19)    Pacific (n=29)

*cited in City of Los Angeles v. Barr No. 18-55599 archived on July 9, 2019*

[2] The states were grouped into the following regions: Middle Atlantic (NY, PA, NJ, DC, DE, MD); New England (NH, ME, VT, RI, MA, CT); Midwest: (ND, MN, SD, NE, IA, MO, KS, WI, MI, IL, IN, OH); South (OK, TX, AR, LA, KY, TN, MS, AL, FL, GA, SC, NC, VA, WV); West (MT, ID, WY, NV, UT, CO, AZ, NM); Pacific (WA, OR, CA, AK, HI).

[3] States participants in the Survey: Midwest (IN, IA, KS, MI, MN, NE, OH, WI); Mid Atlantic (DE, PA); Pacific (WA, OR, CA, AK); South (AR, FL, LA, NC, TN, TX); West (AZ, CO, NV, NM, UT)

American University, Washington College of Law                    4

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 164 of 380   Page ID #:3128

**Page 5**



Figure 2: Types of Court Proceedings Judge Survey
Participants Hear

| | |
|---|---|
| Housing 19% (n=20) | Delinquency 32% (n=41) |
| Guardianship 35% (n=37) | Dependency 41% (n=43) |
| Divorce 46% (n=49) | Child support 49% (n=52) |
| Custody 49% (n=52) | Traffic 59% (n=63) |
| Criminal 78% (n=83) | Protection Orders 81% (n=86) |

Most judges (69%, n=75) reported that they have a large number of LEP residents living in their jurisdictions. Another 25% (n=27) of judges reported working in jurisdictions that did not have a large LEP population living in the court's jurisdiction, and 6% (n=6) of participants said they did not know. Those participating in the judicial survey routinely worked with LEP victims who spoke 29 different languages. The languages most commonly encountered after Spanish included: Vietnamese, Russian, Chinese, Arabic and Korean (Figure 3). Respondents (21%, n=23) indicated that their courts also encounter victims who speak other languages including: American Sign Language, Amharic, Cambodian, Cerundi, Chinese (Mandarin and Cantonese); Farsi, Hindi, Hmong, Kanjabal, Laotian, Mam, Nepali, Polish, Portuguese, Punjabi; Russian, Romanian, Somali, and Swahili.

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 165 of 380   Page ID #:3129

American University, Washington College of Law 5

**Page 6**

Figure 3: Proportion of Courts Encountering LEP
Victims - By Language
(n=239)



Survey participants worked in courts that served communities and jurisdictions with diverse population sizes (See, Figure 4). More of the judicial survey participants (67%, n= 73%) served rural and smaller jurisdictions (under 400,000) than served larger cities and metropolitan communities (33%, n=35). (See, Figure 4).

Figure 4: Population Density Of Court's
Jurisdiction
n=108

**17%**

**32%**

800,000 or more

**16%**                     400,000 to 799,999

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 166 of 380   Page ID #:3130

100,000 to 399,999

Less than 5,000 to 99,999

35%

The survey respondents revealed the extent to which courts outside of large urban centers were encountering immigrant crime victims and children in court cases. The survey findings (see, figure 5) confirm what census data and a study commissioned by the Chicago Council on

American University, Washington College of Law                                                6

Page 7

Global Affairs[4] show that there has been a shift in immigrant settlement trends in the United States from large cities and to locations outside of traditional immigrant gateway cities. A substantial number of those participating in the survey reported immigrant and LEP populations being served by courts in rural communities across the country.

Figure 5: Population Density vs. Percentage of Courts
Reporting Large LEP Populations in Their Jurisdiction
(n=109)



cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

**Judges/Courts Signing U Visa Certifications, T Visa Certifications and Special
Immigrant Juvenile Status (SIJS)**

Participants in the judicial survey were asked to indicate whether judges in their courts signed U visa certifications in cases of immigrant crime victims, T visa certifications in cases

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 167 of 380   Page ID #:3131

involving immigrant human trafficking victim, and/or issued Special Immigrant Juvenile Status (SIJS) findings in cases of immigrant children who had suffered abuse, abandonment or neglect ("Signing Courts"). The majority (64%, n=66) surveyed indicated that judges in their courts do not sign U or T visa certifications and also do not sign SIJS findings ("Non-Signing Courts"). (See, figure 6).

**Figure 6: Courts Signing U or T Visa Certifications or Special Immigrant Juvenile Status Findings**

**(n=318)**

| | U Visa Certifications | | T Visa Certifications | | SIJS Findings | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| Yes - Signing Courts | 19 | 18% | 6 | 6% | 28 | 26% |
| No – Non-Signing Courts | 37 | 35% | 43 | 41% | 41 | 38% |
| Do not know | 50 | 47% | 56 | 53% | 38 | 36% |
| | 106 | 100% | 105 | 100% | 107 | 100% |

[4] The report shows that immigration is responsible for the population growth in five metro areas, including metro areas of Chicago, Rockford, and Akron. Additionally, the report shows growing immigrant populations outside traditional gateway cities. The immigrant population in cities like Champaign-Urbana had grown 8.1 percent in 2000 to 12.9 percent in 2015 and Minneapolis (7.7 to 11.9 percent). *See* Rob Paral, *Immigration a Demographic Lifeline in Midwestern Metros*, The Chicago Council on Global Affairs (March 23, 2017), https://www.thechicagocouncil.org/publication/immigration-demographic-lifeline-midwestern-metros.

American University, Washington College of Law                    7

**Page 8**

Most Signing Courts signed in only one type of case. The following characterizes Signing Courts (which comprise where 36%, n=37 of the participants work):

• 23% (n=24) of these courts had judges who signed in only one case type (either U visas, T visas or SIJS findings); and

• 13% (n=13) of these courts sign more than one of the forms of certification or findings Congress has authorized state court judges to sign.

The survey sought to assess judges' knowledge about U visas and the judicial role as U visa certifiers. More than two-thirds of judges participating in the survey (55%, n=64) reported that

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 168 of 380   Page ID #:3132

they were signing U visa certifications, were willing to sign but had not been asked to sign or wanted more training on U visa certification by judges. The results show that there is a substantial percentage of judicial survey participants (44%, n=47) who were either signing U visa certifications or knew about certification but had not been asked to sign a certification. However, many judicial participants (32%, n=34) reported that they lacked knowledge about both U visas and certification. Additionally, there was a third group of judges (33%, n=36) who were interested in receiving training on U visas and certification. (See, figure 8). Both judges who were signing (11%, n=12) and judges who were not signing (22%, n=24) were interested in receiving training on U visa certification by judges. Responses to the question about whether there has been a change in the numbers of immigrant victims seeking U visa certification or T visa certification from courts between 2016 and 2017 showed no change in a large majority of courts (U Visa: 89%, n=64; T Visa: 99%, n=69). However, a small number of participants reported an increase in certification requests (U Visa: 10%, n=.7; T Visa: 1%, n=1). (See, figure 7).

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

American University, Washington College of Law                                        8

**Page 9**

Figure 7: Do You Understand What a U Visa is and the Role of a Judge as a U Visa Certifier?

(n=117)

Yes, I would like training on U visa certification by judges                                        11%

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 169 of 380   Page ID #:3133



State courts are authorized by federal statute to sign SIJS findings in any state court proceeding where the court has jurisdiction to enter court orders regarding the custody or placement of a child. SIJS is a form of immigration relief that offers protection for immigrant children who have been abused, abandoned or neglected by one or both of the child's parents. In order to apply for SIJS, an immigrant child who has suffered one or more of the harms listed in the SIJS statute must obtain a state court order containing specific SIJS findings as a prerequisite to the child being able to file for SIJS immigration protections.

Over a quarter (26%, n=28) of survey participants reported that judges in their court issued Special Immigrant Juvenile Status (SIJS) findings and 38% (n=41) stated that their courts did not issue SIJS findings. Additionally, 36% (n=38) of responding court staff did not know whether SIJS findings were issued by judges in their courts. Those participating in the judicial survey reported issuing SIJS findings most commonly in dependency (38%, n=19), guardianship (22%, n=11), custody (20%, n=10), and protection order (10% n=5) cases. Judges also reported issuing SIJS orders in divorce, delinquency and child support cases. (See, figure 8). Some participants (15% n=11) reported that requests for SIJS findings for abused, abandoned or neglected immigrant children went up in 2017 compared to 2016, but most participants (81%, n=59) reported no change.

American University, Washington College of Law                                          9

Page 10

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 170 of 380   Page ID #:3134

Figure 8: Judges Issued SIJS findings In a Range of State Court Proceedings

(n=50)



Protection orders 10% (n=5)        Divorce/delequency/child support 10% (n=5)

Custody 20% (n=10)                 Guardianship 22% (n=11)

Dependency 38% (n=19)

Participants in the judicial survey were asked whether the number of cases involving immigrant or LEP victims changed in 2017 relative to 2016. Some judges reported an increase in immigrant victims coming to court in 2017 in several types of cases. Other judges reported a decline in victim participation in criminal, protection orders, and custody cases. (See, figure 9).

Figure 9: Judicial Survey Participants Reporting Changes in Numbers of Cases Involving Foreign Born/LEP Victims in 2017 relative to 2016

(n=463)



cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

### Signing Courts and Non-Signing Courts

Signing Courts differed from Non-Signing Courts in their comparisons of the number of cases involving immigrant or LEP victims appearing in state court proceedings in 2017 relative to 2016. Figures 10 and 11 summarize these results.

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 171 of 380   Page ID #:3135

American University, Washington College of Law                                    10

**Page 11**

**Figure 10:** *Signing Courts Report Increases* in Immigrant Victim Participation in Family Court Proceeding (in 2017 compared to 2016) Relative to Non-Signing Courts

| **Immigrant/LEP Victim Participation in Family Law Proceedings** | **Rate at Which Signing vs Non-Signing Courts Reported Increases in 2017 over 2016** |
| --- | --- |
| Child support | 3 times higher |
| Custody | 2 times higher |
| Child Abuse/Neglect | 1.8 times higher |
| Divorce | 1.7 times higher |
| Civil protection orders | 1.1 times higher |

**Figure 11:** A Higher Proportion of *Non-Signing Courts Report Observing No Changes* in the Rates of Immigrant Victim Participation in Family Court Cases (2016 to 2017) compared to Signing Courts

| **Immigrant/LEP Victim Participation in Family Law Proceedings** | **Rate at Which Non-Signing Courts, Compared to Signing Courts, Report Observing *No Change In Immigrant Victim Participation*** |
| --- | --- |
| Child Support | 1.8 times higher |
| Civil protection orders | 1.7 times higher |
| Divorce | 1.7 times higher |
| Custody | 1.6 times higher |
| Child abuse/neglect | 1.4 times higher |

For criminal proceedings, a substantial portion of those responding to the judicial survey 45% (n= 13) in Signing Courts and 35% (n=22) in Non-Signing Courts reported that they are seeing more criminal cases involving immigrant crime victims in 2017 compared to 2016. Among those from Signing Courts 20% (n=6) reported increases in U visa certification requests and 80% (n=24) reported no change in numbers of U visa certification requests received during 2017 and 2016. With regard to requests for SIJS findings, 30% (n=10) of Signing Court judges reported increases in SIJS requests in 2017 compared to 2016, and 64% (n=21) reported no change in the number of requests received.

In qualitative responses to the survey, participants in the judicial survey included information that provides insight into why "Signing Courts" are seeing increases in immigrant victim willingness to turn to courts for help. Some of their answers noted,

In qualitative responses to the survey, participants included information that provides

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 172 of 380   Page ID #:3136

insight into why Signing Courts are seeing increases in immigrant victims' willingness to turn to courts for help. Some of their answers noted,

- Reasons that immigrant victims continued seeking protection orders at the same or higher rate in 2017 compared to 2016 include:

  o Judges have made it clear that attorneys cannot simply raise allegations regarding a party's or child's immigration status as a negative or positive

American University, Washington College of Law                                    11

**Page 12**

issue. This evidence is limited to cases where it is both relevant and a party presents evidence to support any claim with regard to immigration status.

o Participants in the judicial survey noted that protection order filings dropped during the first half of 2017 from immigrant and LEP victims. However, participants reported that as courts took steps to let immigrant community members know that ICE is not welcome in courthouses, particularly in family court and protection order cases, the number of immigrant victims seeking protection orders increased, including to levels beyond 2016 in some jurisdictions.

When victims are afraid to appear in court due to a fear that coming to court would lead to the victim being subject to immigration enforcement, courts have authorized victims to participate in protection order and divorce cases telephonically

**Protections for Immigrant Crime Victims in Courthouses**

The U.S. Department of Homeland Security (DHS) has several publications that help immigrant crime victims, their advocates and attorneys, the courts and law enforcement professionals to identify, screen for, and understand immigration protections designed to help immigrant victims of domestic violence, sexual assault, stalking, dating violence, human trafficking, and other criminal activities. These DHS materials include:

- DHS Infographic: Protections for Immigrant Victims[5]
- U.S. Citizenship and Immigration Service (USCIS), Immigration Options for Victims of Crime[6]
- U.S. Department of Justice, Domestic Violence and the International Marriage Broker Regulation Act[7]
- USCIS, Continued Presence: Temporary Immigration Status for Victims of Human Trafficking[8]
- USCIS, Immigration Relief for Abused Children: Special Immigrant Juvenile

cited City of Los Angeles v. Barr
No. 18-56599 archived on July 3, 2019

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 173 of 380   Page ID #:3137
Status[9]

[5] Dep't' of Homeland Security, Protection for Immigrant Victims, NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT (January 12, 2017), http://niwaplibrary.wcl.american.edu/pubs/dhs-protections1-6-links-121516/; Alexandra Brown, Leslye Orloff, *The Department of Homeland Security's Interactive Infographic on Protections for Immigrant Victims, in* NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT( February 2, 2017), http://niwaplibrary.wcl.american.edu/pubs/dhs-interactive-infographic-on-protections-for-immigrant-victims-8-29-17/; Translations available: Chinese, Portuguese, Spanish, Russian, and Thai. *See* NIWAP, *The Department of Homeland Security's Interactive Infographic on Protections for Immigrant Victims, in* NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT (February 2, 2017) http://niwaplibrary.wcl.american.edu/dhs-protections-for-immigrant-victims/.

[6] NIWAP, Multilingual Materials by Language, *in* NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT http://niwaplibrary.wcl.american.edu/topic/multilingual-materials-language/

[7] Dep't' of Justice, Domestic Violence and the International Marriage Broker Regulation Act, *in* NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT (2014).

[8] Dep't' of Homeland Security, Continued Presence Temporary Immigration Status for Victims of Human Trafficking, *in* NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT (July, 2010), http://niwaplibrary.wcl.american.edu/pubs/dhs-continued-presence-brochure/, https://www.ice.gov/doclib/human-trafficking/pdf/continued-presence.pdf.

[9] Dep't' of Homeland Security, Immigration Relief for Abused Children: Special Immigrant Juvenile Status, *in* NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT (May 1, 2016), http://niwaplibrary.wcl.american.edu/pubs/uscis_sijs_brochure/,

American University, Washington College of Law                                        12

Page 13

The survey sought to learn about the extent to which these important informational brochures developed by U.S. government agencies were being included by courts in the *"Know Your Rights"* information that courts make available to the public. The survey also asked whether courts were making available know your rights information for immigrant crime victims developed by other entities. The majority of those participating in the judicial survey 76% (n=80) reported that either their courts do not include in the material available at courthouses "*Know Your Rights*" information on immigration law crime victim and children protections 31% (n=34) or that they did not know (42%, n=46) if these materials were include in the information their courts makes publicly available. (See, figure 12).

Figure 12: Do Courts Make Available "Know Your Rights"
Information on Immigration Relief of Crime Victims?
(n=110)

31%     42%

50%          17%
     10%

0%

Yes, we distribute "Know Your Rights" information for immigrant crime victims developed
by the U.S. Department of Homeland Security

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 174 of 380   Page ID #:3138

Yes, we distribute "Know Your Rights" information for immigrant crime victims developed by others

No

I do not know

Connecting immigrant victims who come to court for help with victim and legal services organizations with expertise on the legal rights of immigrant crime victims and children as well as experience serving immigrant victims is an important role courts can play. In 2006 the *National Center for State Courts* conducted *National Institute of Justice* funded research on access to protection orders for LEP domestic violence victims which recommended that courts:

> "Increase the courts' collaboration with community-based organizations" and "Collaborate with community-based organizations to identify LEP communities that may have no access to court and to better understand the barriers to access faced by LEP persons, including those seeking protection orders."[10]

https://www.uscis.gov/sites/default/files/USCIS/Green%20Card/Green%20Card%20Through%20a%20Job/PED.SIJ.1015_Brochure_M-1114B_Revised_05.19.16.pdf.

[10] Brenda K. Uekert et al., The National Center for State Courts, Serving Limited English Proficient (LEP) Battered Women: A National Survey of the Courts' Capacity To Provide Protection Orders (2006), http://niwaplibrary.wcl.american.edu/pubs/lang-gov-white-paper-improvingcourtscapacity-2006/; Brenda K. Uekert et al., The National Center for State Courts, White Paper, Improving the Courts' Capacity to Serve Limited English Proficient Persons Seeking Protection Orders (2016), http://niwaplibrary.wcl.american.edu/pubs/lang-gov-white-paper-improvingcourtscapacity-2006/.

American University, Washington College of Law                                        13

More than a decade later, this survey sought to learn the extent to which, in cases of immigrant crime victims, courts had established these relationships and were making referrals for immigrant victims to community-based programs with expertise serving immigrant and LEP victims. Thirty-seven percent (37%, n=40) of judicial survey participants reported that their courts were providing information to victims about community-based organizations with expertise serving immigrant victims. (See, figure 13)

Figure 13: Do Courts Provide Information to Litigants regarding Services Available to Help Immigrant Crime Victims in the Community?
(n=108)

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 175 of 380   Page ID #:3139

33%                                    37%



30%

Yes        No      I don't know


       The survey also sought to learn about the extent immigration status of parties was affecting their willingness to participate in state court proceedings and whether the survey participants observed any differences between 2017 and 2016. A greater percentage of those participating in the survey reported that court cases were interrupted due to immigrant victims' The survey also sought to learn the extent to which parties' immigration status was affecting their willingness to participate in state court proceedings and whether the survey participants observed any differences between 2016 and 2017. A greater percentage of participants reported that court cases were being interrupted due to immigrant victims' fear of coming to court in 2017 than in 2016. (See, figure 14).

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

American University, Washington College of Law                    14

**Page 15**

Figure 14: Extent to Which the Court Process has been Interrupted Due to Victim's Fear of Coming to Court in 2017 vs 2016

(n = 119)

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 176 of 380   Page ID #:3140



A substantial number of those participating in the judicial additionally survey reported that immigration status was being raised offensively by an opposing party in family court cases, against a victim in a criminal case, and against another parent in family and child abuse cases more frequently in 2017 compared to 2016. (See figure 15). Almost a third of judicial participants reported observing this occurring in civil protection order cases (32%, n=26) and custody cases (31%, n=19), and just under a quarter (23%, n=13) reported these strategies being used in divorce cases.

Figure 15: Extent to Which Immigration Status is Raised
Against Opposing Party in 2017 vs 2016
(n=115)



American University, Washington College of Law                    15

**Page 16**

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 177 of 380   Page ID #:3141

Judges were also asked to describe the kinds of issues that lead to immigration status being raised in the courts. Most of the judges who provided answers (n=7) indicated that immigration status was raised as a form of threat to inform authorities about a litigant's status. Deportation concerns were also raised in criminal cases (n=6) or as a form of threat in other cases (n=3). More Signing Courts reported hearing more cases in 2017 than in 2016 where parties raised the immigration status of an opposing party, victim, or parent than Non-Signing Courts. (See, figure 16).

Figure 16: Signing and Non-Signing Courts Reporting Higher Rates of Immigration Status Being Raised Against an Opposing Party in 2017 vs 2016 (n=115)



Those participating in the judicial survey shared descriptions illustrating how immigration related fears, threats, immigration related abuse, and immigration enforcement at courthouses have been impeding access to justice for immigrant and LEP victims and litigants. Judges reported:

• Examples of immigration related abuse include:

   o Taking and refusing to return a litigant's passport or other important document
   o Threats to kidnap children
   o Threats to report opposing party to ICE if they do not do what the threatening party wants
   o Threats by litigants to report the opposing party to immigration authorities for deportation. The judge further noted:
      ▪ "While these threats to report to immigration are not new, immigrant victims and litigants believe that the abuser, crime perpetrator, or opposing party will be successful in getting ICE to act on these reports in 2017."
   o Parties and attorneys feel more comfortable raising immigration status offensively against an opposing party in 2017 than previously. "It's a disturbing trend."
   o Respondents in protection order cases use their control over the victim's immigration

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 178 of 380   Page ID #:3142
status as leverage and another form of emotional abuse

American University, Washington College of Law                16

**Page 17**

- Examples of how immigration status is coming up in criminal cases include:
    - Witnesses are afraid to come to court to testify
        - In some cases even victims compelled to testify as a material witness in a criminal case are afraid to come to court
    - Jurors asking about a party's immigration status
    - Defense attorneys raising the U visa as an attempt to undermine the testimony of sexual assault victims
- In custody cases the "immigration status of the mother is raised in a crude attempt to show instability in parenting."
- Judges are called upon more often to make rulings that preclude a litigant's ability to raise immigration status issues about another party or victim absent proof of probative value and relevance
- Parties in family court matters are concerned about the impact divorce could have on a party's immigration status and are concerned that coming to court in a family law case could force a victim or party to be separated from their family

Those participating in the judicial survey were asked if they were aware of the VAWA confidentiality laws that place limits on immigration enforcement actions permitted at courthouses. The majority 77% (n=82) reported knowing something about these VAWA confidentiality law protections and fewer (23%, n=25) noted that they were unaware about these VAWA confidentiality protections. (See, figure 17).

Figure 17: Level of Awareness of the Violence
Against Women Act Confidentiality Laws
(n=107)

3%

23%

74%

Not aware          Knows something          Knows a lot

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 179 of 380   Page ID #:3143

Across a wide range of civil, family and criminal court proceedings, the vast majority, (88% to 94%) of those responding to the judicial survey reported being concerned about the impact increased immigration enforcement could have on access to justice for immigrant and LEP victims and witnesses. A substantial percentage of these judges (26% - 40%) reported that they were very concerned about this issue. (See, figure 18)

American University, Washington College of Law                                    17

**Page 18**

Figure 18: Judges' Level of Concern About the Impact of Immigration Enforcement on Immigrant and LEP Litigants by Case Type



Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 180 of 380   Page ID #:3144

Participants in the judicial survey were asked to report the number and types of cases where officials from the DHS were involved in immigration enforcement activities in their courthouses. They reported on 47 cases (civil =18; criminal 29) when immigration enforcement activities were carried out at their courthouses in 2016 and 2017. The number of cases of immigration enforcement in courthouses increased by 47% from 2016 to 2017. (See figure 19). This increase included a 25% increase in incidents of courthouse enforcement in non-criminal cases and a 64% increase in courthouse enforcement in criminal cases.[11] The participants in the judicial survey also identified the type of cases in which enforcement actions occurred during 2016 and 2017 were as follows:

• Criminal cases – 29

[11] The judges' survey did not ask judges to distinguish between victims and offenders when discussing courthouse enforcement taken in criminal cases. However, as discussed in the result of the National Survey of Advocates and Attorneys below reporting on 22 immigration enforcement actions taken at courthouses against immigrant crime victims in court for criminal misdemeanor (n=18) and felony criminal (n-4) matters. (See, figure 115). It is not clear from the survey data whether the victims who were subject to immigration enforcement actions were in court as defendants or as victim in the criminal court cases. Under VAWA confidentiality laws, immigration enforcement against a victim at a courthouse in connection with any criminal, civil or family law case related to the domestic violence, sexual assault or other criminal activity the victim suffered would require a filing by Immigration and Customs Enforcement of an affidavit demonstrating that VAWA confidentiality was not violated in taking any part of an immigration enforcement action. *See,* INA Section 239, 8 U.S.C. 1229(e).

American University, Washington College of Law                                                      18

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

**Page 19**

• Family court cases (protection order, custody, child welfare) – 14
• Employment and civil cases – 4

**Figure 19: Instances of Immigration Enforcement at Courthouses in 2016 and 2017 Reported by Judges**

| Types of cases/Year | 2016 | 2017 |
|---|---|---|
| Family | 6 | 8 |
| Employment | 1 | 2 |
| Criminal | 11 | 18 |
| Other civil | 1 | 0 |
| Total Enforcement Actions | 19 | 28 |
| Percentage Increase in 2017 relative to 2016 | **47%** | |
| Percentage Increase in Criminal Cases in 2017 relative to 2016 | **64%** | |
| Percentage Increase in Family Cases in 2017 relative to 2016 | **25%** | |

Judges reported courthouse enforcement in family or civil court cases in a wide variety of

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 181 of 380   Page ID #:3145

states across the country, including: California, Florida, Kansas, Louisiana, New Mexico, North Carolina, Oregon, Washington, and Wisconsin. In January 2018, ICE issued a new policy on courthouse enforcement that limits when and in which types of proceedings immigration enforcement officials can undertake immigration enforcement actions in courthouses.[12] This policy severely limits courthouse enforcement actions[13] in non-criminal cases and requires that the Field Office Director, the Special Agent in Charge or their designee specifically authorizes courthouse enforcement in a non-criminal case against a particular individual immigrant.[14] Immigrant crime victims who are entitled under federal law to VAWA confidentiality protections should be protected by this policy and VAWA confidentiality laws and policies for courthouse enforcement.[15]

One of the justifications the ICE courthouse enforcement policy provides for immigration enforcement at courthouses is that: "courthouse arrests are often necessitated by the unwillingness of jurisdictions to cooperate with ICE in the transfer of custody of aliens from their prisons and jails".[16] It is important to note that participating judges reported immigration

[12] U.S. Immigration and Customs Enforcement, *FAQ on Sensitive Locations and Courthouse Arrests*, Nat'l Immigrant Women's Advocacy Project (last updated January 31, 2018), http://niwaplibrary.wcl.american.edu/pubs/ice-sensitive-locationcourthouse-faq/.

[13] *See National Map of Local Entanglement with ICE*, Immigrant Legal Resource Center (Jan. 25, 2018), https://www.ilrc.org/local-enforcement-map; Bryan Griffith and Jessica M. Vaughan, *Maps: Sanctuary Cities, Counties, and States*, Center for Immigration Studies (Jul. 27, 2017), https://cis.org/Map-Sanctuary-Cities-Counties-and-States.

[14] U.S. Immigration and Customs Enforcement, *FAQ on Sensitive Locations and Courthouse Arrests*, Nat'l Immigrant Women's Advocacy Project, 2 (last updated January 31, 2018), http://niwaplibrary.wcl.american.edu/pubs/ice-sensitive-locationcourthouse-faq/.

[15] *ICE Courthouse Enforcement Policies and VAWA Confidentiality Protections for Immigrant Crime Victims*, Nat'l Immigrant Women's Advocacy Project (Jan. 31, 2018) http://niwaplibrary.wcl.american.edu/courthouse-protections-and-crime-victims/

[16] U.S. Immigration and Customs Enforcement, *FAQ on Sensitive Locations and Courthouse Arrests*, Nat'l Immigrant Women's Advocacy Project (last updated January 31, 2018), http://niwaplibrary.wcl.american.edu/pubs/ice-sensitive-locationcourthouse-faq/.

American University, Washington College of Law                                    19

**Page 20**

enforcement at courthouses in 18 non-criminal cases in 2016 and 2017 and these cases included reports of immigration enforcement occurring in family and civil courts in states where there is a high level of cooperation between state and local law enforcement and federal immigration enforcement officials (e.g., North Carolina, Kansas, Florida, Wisconsin, and Louisiana).

Only 19% (n=21) of the judges and court staff participating in the survey reported that their courts had a policy addressing immigration enforcement at courthouses. Signing Courts (26%, n=10) were more likely than Non-Signing Courts (16%, n=11) to have adopted policies on steps courts should take if immigration enforcement officials come to judges' courtrooms. (See, figure 20). A small number of judges shared knowing about and/or observations of ICE officials in the parking lots outside courthouses (n=2) and ICE agents following interpreters into

cited in City of Los Angeles v. Barr
No. 18-55599, archived on July 9, 2019

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 182 of 380   Page ID #:3146

courthouse hallways (n=1).



Figure 20: Existence of a Policy in the Courts regarding ICE officials in the Courtroom (n=109)

Courts that had implemented policies regarding immigration enforcement at courthouses reported that their courthouse policies included but were not limited to the following provisions:

• Immigration officials are prohibited from taking any action in a courtroom absent a serious public safety issue. Whether or not the circumstances constitute a serious public safety issue is decided by the court not by immigration enforcement officials.
• Immigration enforcement officers are prohibited from interrupting a court proceeding for any reason.
• All law enforcement officers, including immigration enforcement officers, are prohibited from making arrests and from initiating of any immigration enforcement action of any person in open court unless and until the proceeding involving that person has been concluded.
• Each judge is permitted to restrict any activity that interferes with courtroom operations. If an immigration enforcement official fails to comply with judicial orders, the judge is permitted to contact court security and/or determine if contempt proceedings should be initiated against the immigration officer.

Page 21

• Court policies prohibit immigration officials from entering courtrooms to conduct any of their official duties. If an immigration official enters a courtroom, the judges will ask

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 183 of 380   Page ID #:3147

them to leave and a Marshall will escort them out of the courtroom.
• Immigration arrests may not be preformed in the courthouse and court security are required to contact the local ICE District Office to report immigration officials who arrive at court to conduct immigration enforcement activities.

**In Their Own Words: Judges Concerns in Cases Involving Immigrant or LEP Victims**

At the end of the survey, participants in the judicial survey were asked to identify other concerns or challenges they have observed in cases involving immigrant or LEP victims that were not addressed in the survey. Several judges reported that fear of coming to court, worry, and distrust of the police, courts, justice system and getting involved with any government agencies impedes access to justice for immigrants (n=10). The suggestion was made by one judge that increased community outreach by the courts on the front end, will help immigrant victims and immigrant communities learn about help available to crime victims and children from the courts. Building relationships with community organizations serving immigrants could encourage more immigrant crime victims to report to police and courts about the abuse they have suffered.

Additionally, several judges (n=7) commented about the need for more qualified interpreters, the difficulty of obtaining qualified interpreters in rural areas and that access to qualified interpreters should not be limited to court proceedings. Judges noted that qualified interpreters are needed to assist in preparation for court (e.g., in clerks offices and other court services or court ordered programs). The concerns raised by judges regarding LEP litigants' needs for interpreters are consistent with best practices. Providing qualified interpreters to help LEP persons access the full range of court services including court clerks' offices and court ordered programs and services is both recommended[17] and required.[18]

[17] BRENDA K. UEKERT ET AL., THE NATIONAL CENTER FOR STATE COURTS, SERVING LIMITED ENGLISH PROFICIENT (LEP) BATTERED WOMEN: A NATIONAL SURVEY OF THE COURTS' CAPACITY TO PROVIDE PROTECTION ORDERS (2006), http://niwaplibrary.wcl.american.edu/pubs/lang-gov-white-paper-improvingcourtscapacity-2006/;

[18] Letter from Thomas E. Perez, Assistant Attorney General, U.S. Dep't of Just., to Chief Justice/State Court Administrators, NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT (August 16, 2010), http://niwaplibrary.wcl.american.edu/pubs/lang-access-doj-courts-letter/

http://webcache.googleusercontent.com/....org/wp-content/uploads/Immigrant-Access-to-Justice-National-Report.pdf+&cd=1&hl=en&ct=clnk&gl=us[7/8/2019 2:03:15 PM]

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 184 of 380   Page ID #:3148

Page 22

**Part Two: National Survey of Law Enforcement Officials Findings from 2017 National Survey of *Law Enforcement Agencies*[19]**

The National Immigrant Women's Advocacy Project (NIWAP), American University, Washington College of Law conducted a survey of 232 law enforcement officials in 24 states during October and November 2017. The aim of the survey was to understand changes in law enforcement officials' interactions with immigrant and LEP victims in their communities. More specifically, the survey sought to explore whether law enforcement officials are seeing changes in immigrant victims' cooperation and willingness to report crimes and in law enforcements' ability to investigate crimes involving immigrant and LEP victims in 2017 compared to 2016.

Law enforcement officials from 24 different states participated in the survey.[20] Figure 21 provides an overview of the regional distribution among participating law enforcement officials.[21] Half (50%, n= 95) of those who participated in the survey were from the South. (See figure 1). Participants in the survey were employed by police departments (94%, n=210), sheriff's offices (4%, n=9), state police offices (1%, n=2), and by offices of the prosecutor or inspector general (1%, n=3).

Figure 21: Regional Distribution Among Law
Enforcement Survey Participants
(225 Agencies)



| | |
|---|---|
| SOUTH, N=112 | 50% |
| MIDDLE ATLANTIC, N=67 | 30% |
| MIDWEST, N=18 | 8% |
| PACIFIC, N=12 | 5% |
| MOUNTAIN, N=10 | 4% |
| NEW ENGLAND, N=6 | 3% |

The law enforcement officials participating in the survey included a balanced mix of law enforcement professionals. Over half (57%, n=125) of the survey participants were patrol uniformed (officers/deputies) or detectives and another 43% (n=96) were law enforcement officials in supervisory or managerial roles. (See, figure 22).

[19] The authors wish to thank Stacey Ivie, Detective, Alexandria Police Department; Michael LaRiviere, Investigator, Salem

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 185 of 380   Page ID #:3149

Police Department; Detective Shelli Sonnenberg, Boise Police Department; and Antonio Flores, Sergeant Inspector, San Francisco Police Department for their assistance with this article.

[20] Prosecutors participated in the survey from the following states: AK, AZ, CA, CO, FL, GA, ID, IL, IA, LA, MD, MA, MI, NE, NM, OH, OR, PA, TN, TX, UT, VA, WV, WI

[21] The states were grouped into the following regions: Middle Atlantic (NY, PA, NJ, DC, DE, MD); New England (NH, ME, VT, RI, MA, CT); Midwest: (ND, MN, SD, NE, IA, MO, KS, WI, MI, IL, IN, OH); South (OK, TX, AR, LA, KY, TN, MS, AL, FL, GA, SC, NC, VA, WV); West (MT, ID, WY, NV, UT, CO, AZ, NM); Pacific (WA, OR, CA, AK, HI).

American University, Washington College of Law                    22

**Page 23**

## Figure 22: Survey Participant Law Enforcement Officials by Rank
### (n= 221)



Seventy-two percent (n=168) of officers participating in the survey worked in a specialized unit. (See, figure 23).

## Figure 23: Survey Participants Working in Specialized Units
### (n=168)



Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 186 of 380   Page ID #:3150

| | |
|---|---|
| Criminal Investigations* n=22 | 13% |
| Police Administration/Leadership (n=15) | 9% |
| Patrol (n=15) | 9% |
| Financial/Fraud/Property Crimes (n=10) | 6% |
| Traffic/DWI (n=6) | 4% |

*Criminal investigations include: crisis intervention, homicide, narcotics, robbery, special operations, SWAT

0%    5%    10%    15%    20%    25%    30%    35%    40%

The survey was successful in reaching law enforcement officials who serve communities of different sizes, and who officers characterized as rural (10%, n=23), urban (34%, n=75), or a combination of both (56%, n=124). (See, figure 24).

American University, Washington College of Law                    23

**Page 24**

Figure 24: Law Enforcement Agencies' Jurisdictions
(n=222)



10%

56%                                              34%

Rural n=23        Urban n=75        Both n=124

The majority of the participating law enforcement officers (68%, n=159) worked in larger cities and metropolitan areas. (See, figure 25).

Figure 25: Size of Communities Served by Law
Enforcement Officials Participating in the Survey
(n=237)

Less than 5,000 (n=5)          2%

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 187 of 380   Page ID #:3151



Most of the law enforcement officials participating in the survey (86%, n=193), regardless of rank, unit assignment, or community population size, reported that they encounter large numbers of LEP victims living in their jurisdictions who require the services interpreters. Those LEP victims speak a wide variety of languages including, and in order of most to least spoken, Spanish, Korean, Arabic, Vietnamese Chinese, and Urdu. See, figure 26 for the top 14 languages law enforcement officials reported as encountering.



American University, Washington College of Law

24

**Page 25**

Figure 26: Top 10 languages encountered by Law Enforcement Officials



Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 188 of 380   Page ID #:3152

Tagalog (n=12)                6%

Somali (n=5)          2%

0%        20%        40%        60%        80%        100%        120%

Several law enforcement officials (13%, n=25) provided details about other languages (in addition to those in figure 26) that immigrant and LEP crime victims and witnesses they encounter speak. These languages included: Amharic, American Sign Language, Farsi, Burmese, French, Hmong, Bosnian, French Creole, Hmong, Japanese, Karen, Khmer, Kirundi, Kinyarwanda, Kizigau, Laotian, Nepalese, Pashtu, Portuguese, Romanian, Somali, Sudanese Swahili, Twi, Ukrainian, Uzbek, and several indigenous languages from Guatemala.

### Law Enforcement Agencies Signing U Visa Certifications and T Visa Certifications

Law enforcement officials were asked to indicate whether their agency signed U visa certifications and/or T visa certifications in cases of foreign-born or LEP crime or human trafficking victims. Over a third (35%, n=79) of law enforcement official respondents said that their agencies signed U visa certifications for LEP and foreign-born victims. (See, figure 27).The responses for T-visa certifications were lower showing that 16% (n=36) of the participants' agencies signed T visa certifications. (See, figure 28). There are important differences between the U and T visa programs that help explain why law enforcement officials report that more of their agencies are signing U visas compared to T visas. First, it is important to understand that obtaining a U visa certification is a statutory prerequisite[22] to a victim's ability to file a U visa application. In a T visa application, the certification is not required, but is preferred and helpful.[23] As a result, although DHS encourages law enforcement agencies to sign T visa

[22] INA 101(a) (15)(U); U.S. Citizenship and Immigration Services - DHS, 72 Fed. Reg. 53013, 53015 (Sep. 17, 2007) ("an alien victim must include a certification from such agency in support of his or her request for U nonimmigrant status"); 8 C.F.R. 214.14(c)(2)(ii).

[23] DEP'T OF HOMELAND SECURITY, U AND T VISA LAW ENFORCEMENT RESOURCE GUIDE, NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT 6 (November 30, 2015), http://niwaplibrary.wcl.american.edu/pubs/dhs-updated-u-certification-resource-guide-2015/.

American University, Washington College of Law                                25

**Page 26**

certifications,[24] advocates and attorneys working with U visa victims must obtain a certification. In a T visa case, although the T visa certification is preferred evidence by DHS, if a victim's attorney provides evidence to DHS that they requested the certification and one was not provided,[25] the immigrant human trafficking victim may proceed to file a T visa application and prove eligibility without providing a T visa certification.

Figure 27: Is your agency signing U Visa certifications

cited in City of Los Angeles v. Barr

No. 18-55599 archived on July 9, 2019

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 189 of 380   Page ID #:3153

in cases of foreign born or LEP victims?

36%

50%

15%

Yes n=80          No n=33          Do not know n=112

Figure 28: Is your agency signing T visa certifications
in cases of human trafficking victims?



16%

20%

Yes, n=36          No, n=47          Do not know, n=148

[24]Dep't' of Homeland Security, U and T Visa Law Enforcement Resource Guide, Nat'l Immigrant Women's Advocacy Project 6 (November 30, 2015), http://niwaplibrary.wcl.american.edu/pubs/dhs-updated-u-certification-resource-guide-2015/.

[25] Dep't' of Homeland Security, U and T Visa Law Enforcement Resource Guide, Nat'l Immigrant Women's Advocacy Project 11 (November 30, 2015), http://niwaplibrary.wcl.american.edu/pubs/dhs-updated-u-certification-resource-guide-2015/.

American University, Washington College of Law                                    26

http://webcache.googleusercontent.com/....org/wp-content/uploads/Immigrant-Access-to-Justice-National-Report.pdf+&cd=1&hl=en&ct=clnk&gl=us[7/8/2019 2:03:15 PM]

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 190 of 380   Page ID #:3154

Although, immigrant human trafficking victims can file for a T visa when law enforcement agencies fail to certify, trafficking victims cannot obtain the special protections from deportation and economic support Congress designed for immigrant victims of human trafficking without assistance from law enforcement officials. Continued presence is designed to offer immediate help and protection to stabilize victims of severe forms of human trafficking who are potential witnesses in a trafficking investigation or prosecution.[26] The survey found that only 18% (n=40) of participating law enforcement officials' agencies seek continued presence for immigrant human trafficking victims. (See, figure 29).This is surprising in light of the U.S. DHS's encouragement of law enforcement officials to request continued presence from ICE officials on behalf of immigrants who are victims or potential witnesses in human trafficking prosecutions.[27]

Figure 29: Is your agency seeking continued presence
in cases of human trafficking victims?



18%

13%

69%

Yes, n=41          No, n=30          Do not know, n=160

### "Signing Agencies" Compared to "Non-Signing Agencies"

This report categorizes law enforcement agencies as either Signing Agencies or Non-Signing Agencies. Signing Agencies are law enforcement agencies that sign one or more of the following forms:

- U visa certification;
- T visa certification; or
- Requests for continued presence.

---

[26] NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT, *DHS Roll Call Video on U Visa Certification and T Visa Endorsement by Law Enforcement (Part 2)*, YOUTUBE (Jul 18, 2013), https://www.youtube.com/watch?v=O3t0O2_vdCM.

[27] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, CONTINUED PRESENCE TEMPORARY IMMIGRATION STATUS FOR VICTIMS OF HUMAN TRAFFICKING, NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT (Jun. 2010), http://library.niwap.org/wp-content/uploads/DHS-Continued-Presence-Brochure.pdf; DEP'T' OF HOMELAND SECURITY, U AND T VISA LAW ENFORCEMENT RESOURCE GUIDE, NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT 27 (November 30, 2015), http://niwaplibrary.wcl.american.edu/pubs/dhs-updated-u-certification-resource-guide-2015/ (An application for CP should be initiated immediately upon identification of a victim of human trafficking.)

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC    Document 106    Filed 07/12/19    Page 191 of 380    Page ID #:3155

American University, Washington College of Law                                    27

**Page 28**

The classification of a law enforcement agency as one that does not certify includes law enforcement officials who reported that their agencies do not certify. Officials who reported that they do not know whether their agency signs U visas, T visas or seeks continued presence on behalf of immigrant victims of human trafficking are excluded from the Signing/Non-Signing classification. (See, figure 30). It is important to note the number of law enforcement officers participating in the survey reporting that they did not know about their agencies certification policies or practices may be in part a reflection of the numbers of patrol officers who participated in the survey (33%, n=74). The fact that patrol officers may be less familiar about department certification practices and procedures than officers working in specialized units or with ranks of detective or higher, is not necessarily unusual. Also, the law enforcement officials working in smaller communitites, particularly those that are more rural that have more recently experienced growth in the immigrant populations in their communities, may be less connected with their immigrant populations and the community-based advocates and attorneys organizations that serve immigrant crime victims.



Figure 30: Prosecutors' Offices Answering Do Not Know When Asked If Their Office Signs/Requests



"Non-Signing Agencies" are agencies that do not sign any of these certifications or requests. Figure 31 provides an overview of the signing practices of the participating law enforcement officials.

**Figure 31. Law Enforcement Agencies Signing U or T Visa Certifications or Requesting Continued Presence**

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 192 of 380   Page ID #:3156

| Does the Agency Sign? | U Visa Certifications | | T Visa Certifications | | Continued Presence Requests | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| Yes = Signing Agencies | 80 | 36% | 36 | 16% | 41 | 18% |
| No =Non-Signing Agencies | 33 | 15% | 47 | 20% | 30 | 13% |
| Do not know = Non-Signing Agencies | 112 | 50% | 148 | 64% | 160 | 69% |
| Totals | 225 | 100% | 231 | 100% | 231 | 100% |

American University, Washington College of Law                    28

Page 29

The majority of law enforcement officers participating in the survey do not know if their agencies sign U visa certifications (50%), T visa certifications (64%), or whether they seek continued presence from DHS on behalf of human trafficking victims (69%). Of the law enforcement officials who are aware of their agency's signing practices, the majority work for agencies that sign U visa certifications (71%, n=79) or make continued presence requests (58%, n=40). This is not the case for T visa certifications; the majority of law enforcement officials who are aware of their agency's signing practices do not sign T visa certifications (56%, n=46). (See, figure 32).

Figure 32: Survey Participant Agencies Signing U or T Visa Certifications or Requesting Continued Presence



Additionally, it is important to note that of all survey participants (n=232), 43% (n=99) worked in signing agencies. Among Signing Agencies, the largest proportion signed U visa certifications (81%, n=80) and were less active in assisting human trafficking victims applying for T visas (36%, n=36) and seeking continued presence (41%, n=41).

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 193 of 380   Page ID #:3157

### Figure 33: Percent of All Certifying Agencies That Sign
### Certifications or Make Requests By Case Type
(n=99 Agencies)



American University, Washington College of Law                                    29

**Page 30**

*cited in City of Los Angeles v. Barr No. 18-55599 archived on July 9, 2019*

Several signing agencies signed in more than one type of case. The following list and figure 34 present the survey findings regarding the extent to which Signing Agencies are signing or making requests on behalf of immigrant victims in multiple case types:

• 58% (n=57) signed in only one type of case: U visa certifications T visa certifications or requests for continued presence;

• 26% (n=26) signed in two of the three of these types of cases; and

• 16% (n=16) signed in all three types of cases - U visa certifications, T visa certifications, and requests for continued presence.

### Figure 34: Agencies Signing One or More Case Type: U or T
### Visa Certification or Continued Presence Requests
(Signing Agencies = 99)

16%

26%                                    58%

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 194 of 380   Page ID #:3158

Sign 1 Case Type (n=57)          Sign 2 Case Types (n=26)          Sign All 3 Case Types (n=16)

Just over a quarter (28%, n=28) of participating law enforcement officials working in Signing Agencies provided the number of U visa certifications their agency signs annually. The number of U certifications signed annually ranged from 1 to 200. Figure 35 provides details about the number of certifications signed annually by the survey participants' agencies (for those who reported such numbers).

## Figure 35: Number of U Visa Certifications Signed Annually by Participating Agencies



Number of Certifications Signed Annually

American University, Washington College of Law                                              30

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

---

**Page 31**

### Populations served by Signing and Non-Signing Law Enforcement Agencies

The data collected by the survey allowed for an analysis of whether and how Signing Agencies differed from Non-Signing Agencies with regard to several topics explored in the survey. The majority of law enforcement officials working in Signing Agencies worked in jurisdictions with large LEP populations (97%, n=96). Among the 33 participants working in Non-Signing Agencies, 61% (n=20) worked in jurisdictions with large LEP populations and 39% (n=13) worked in jurisdictions that serve smaller LEP populations. (See, figure 36).

## Figure 36: Jurisdictions with Large LEP Populations Signing Compared to Non-Signing Agencies

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 195 of 380   Page ID #:3159



Law enforcement officials working in Signing Agencies reported that the population sizes of their jurisdictions vary widely. Signing Agencies were located in jurisdictions with population sizes of 800,000 or more (42% n=41), of 400,000 to 799,999 (20% n=19), of 100,000 to 399,999 (15% n=15) as well as small jurisdictions with less than 99,999 inhabitants (23% n=22). Almost half (45%, n=15) of the Non-Signing agencies, however, were located in small jurisdictions (less than 99,999). Similarly, 61% (n=20) of the law enforcement officials working in Non-Signing Agencies worked in large jurisdictions with over 800,000 inhabitants. (See, figure 36).

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

American University, Washington College of Law                        31

**Page 32**

Figure 36: Population Served Signing vs Non-Signing
Agencies

50%        45%                                                42%

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 196 of 380   Page ID #:3160



| | | | |
|---|---|---|---|
| 45% | | | |
| 40% | | | |
| 35% | | | 27% |
| 30% | 23% | | |
| 25% | 20% | |
| 20% | 12% 15% 15% | |
| 15% | | |
| 10% | | |
| 5% | | |
| 0% | | |

Less Than 99,999          100,000 to 399, 999          400,000 to 799,999          800,000 or More
(n=37)                          (n=19)                          (n=24)                          (n=50)

Non-Signing Agencies          Signing Agencies

**The Impact of Increased Immigration Enforcement and Community Policing**

One of the objectives of this survey was to document whether and, if so, the extent to which increased immigration enforcement affected law enforcement's ability to protect and serve immigrant and LEP communities. Receiving information from community members about perpetrated crimes is important for effective policing.

The survey participants provided information about their agency's community policing efforts with immigrant communities in their jurisdictions. The majority of participants (87%, n=201) indicated that their agencies were involved in community policing efforts with immigrant and LEP communities. (See, figure 37).

**Figure 37: Is Your Agency Involved In Community Policing with Immigrant and LEP Communities**
**(n= 232)**

13%

87%

Yes (n=201)          No (n=31)

American University, Washington College of Law                    32

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 197 of 380   Page ID #:3161

**Page 33**

Police departments staffed community policing efforts with immigrant and LEP communities in different ways. Over half of the departments in which officials responding to the survey staffed these community policing efforts with dedicated community outreach/engagement officers (69%, n=134) and/or district-based officers whose goal is community engagement (63%, n=126). Civilian liaison personnel were involved in staffing community policing efforts with immigrant and LEP communities in 39% (n=78) of survey participants' departments. (See, figure 38).

## Figure 38: Types of Community Policing Efforts with Immigrant Communities



The data reveal differences between Signing Agencies and Non-Signing Agencies in their staffing of community policing efforts with immigrant and LEP communities. A greater proportion of Signing Agencies have dedicated community outreach and/or engagement officers than Non-Signing Agencies (73%, n=72 versus 42%, n=14). More Signing Agencies had civilian liaison personnel in the agency's community policing efforts, including bilingual victim advocates working for the law enforcement agency - almost twice as many Signing (45%, n=45) than Non-Signing Agencies (27%, n=9 civilian liaisons). Almost double the number of Signing Agencies had district-based officers in community engagement activities (58%, n=57 versus 30%, n=10) (See, figure 39).

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC Document 106 Filed 07/12/19 Page 198 of 380 Page ID #:3162

American University, Washington College of Law 33

**Page 34**

Figure 39: Community Policing Efforts for Signing and Non-Signing Agencies



According to the law enforcement survey participants, some of their agencies experienced a decline in the number of immigrant community members who are willing to file complaints (18%, n=37) and who are willing to work with officials in criminal cases (15%, n=32) in 2017 compared to 2016 (See, figure 40). Some officials reported that immigrants in their communities were more willing to work with law enforcement on criminal cases (21%, n=45), vocalize complaints (26%, n=54), attend events planned by law enforcement (36%, n76). Almost a third (32%, n=68) reported improved quality of police immigrant community relations. (See, figure 40).

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 199 of 380   Page ID #:3163

American University, Washington College of Law                        34

**Page 35**



Figure 40: Change From 2016 to 2017 in Specific Community Policiing Work with Immigrant and LEP Communities (n=208)

When asked about the effects of community policing efforts in 2017 relative to 2016

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 200 of 380   Page ID #:3164

greater proportion of signing agencies reported more cooperation from immigrant community members on criminal cases than non-signing agencies (27%, n=26; =vs 13%. n=4) . On questions regarding the overall quality of community policing, more law enforcement officers working in signing agencies than non-signing agencies reported improvements in the quality of immigrant community/law enforcement relationships in 2017 relative to 2016 (40%, n=38 vs 27%, n=8).

The narratives provided by law enforcement survey participants showed some detailed explanations of how and why this increase in their Signing agencies occurred. Officers reported that they have increased their community policing and outreach with immigrant and LEP communities specifically because they were seeing the decline in cooperation and a rise in fear of law enforcement. It appears that these community outreach activities combined with the fact that the law enforcement agencies were also Signing U visa certifications as well as in some cases T visa certifications and continued presence lead to the increase in the immigrant communities' willingness to work with them. This ability to increase the immigrant communities' willingness to work with the police can be attributed to the quality of police and immigrant community relations and has resulted in cooperation on criminal investigations. (See figures 41 and 42).

American University, Washington College of Law                                              35

**Page 36**



Figure 41: Signing Agencies - Changes in Effectiveness of Community Policing With Immigrant Communities 2017 Compared to 2016

|  | Complaints coming from the immigrant community (n=95) | Willingness of immigrant community members to work with officers on criminal cases (n=95) | Willingness of community groups to vocalize complaints (n=95) | The number of social events community members are willing to attend with law enforcement (n=95) | Commendations/accolades coming from immigrant community (n=94) | Quality of police immigrant community relations (n=94) |
|---|---|---|---|---|---|---|
| Less | 23% | 22% | 18% | 15% | 11% | 9% |
| More | 16% | 27% | 34% | 39% | 27% | 40% |

| The Same | 61% | 51% | 48% | 46% | 63% | 51% |

Less        More        The Same

## Figure 42: Non-Signing Agencies - Changes in Effectiveness of Community Policing With Immigrant Communities 2017 Compared to 2016



| | Complaints coming from the immigrant community (n=30) | Willingness of immigrant community members to work with officers on criminal cases (n=30) | Willingness of community groups to vocalize complaints (n=29) | The number of social events community members are willing to attend with law enforcement (n=30) | Commendations/accolades coming from immigrant community (n=30) | Quality of police immigrant community relations (n=30) |
|---|---|---|---|---|---|---|
| Less | 23% | 23% | 17% | 17% | 17% | 10% |
| More | 10% | 13% | 17% | 27% | 17% | 27% |
| The Same | 67% | 63% | 66% | 60% | 67% | 63% |

Less        More        The Same

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

American University, Washington College of Law                    36

**Page 37**

**The Impact of Increased Immigration Enforcement, Relationships with Federal Immigration Enforcement Agencies and the Ability to Investigate Crimes Perpetrated Against Immigrant Victims**

Law enforcement officials participating in the survey were also asked whether and how their agencies cooperated with federal immigration efforts, as portrayed in figure 43.

## Figure 43: Cooperation with Federal Immigration Efforts - Signing Agencies Compared with Non-Signing Agencies

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 202 of 380   Page ID #:3166

(n=132)



Do not know (n=45)

Yes, but we do not report victims of crimes ( n=35)

No (n=23)

Yes, in other ways (n=18)

Yes, we participate in the 287(g) program (n=11)

29%
48%
27%
24%
12%
19%
9%
15%
9%
6%

0%    10%    20%    30%    40%    50%    60%

Signing Agencies        Non-Signing Agencies

More than a quarter (27%, n=35) of law enforcement agencies reported that they do not cooperate with federal immigration enforcement efforts when the target of the enforcement action is a crime victim. Just as the data showed more cooperation from immigrant communities with Signing agencies, they show that a slightly higher proportion of Signing agencies (27%, n=27) than Non-Signing agencies (24%, n=8) affirmatively excluded immigrant and LEP crime victims from their agencies cooperation with federal immigration enforcement officials. Additionally, a greater percentage of law enforcement officers working in Non-Signing than Signing agencies did not know what their agencies policies or practices were with regard to cooperation with federal immigration enforcement efforts (48%, n=16 vs. 29%, n=29). The remaining 20% (n=22) of officers suggested that their agencies cooperated with federal immigration efforts in other ways including:

- Notifying Immigration and Customs Enforcement (ICE)when they encounter previously-deported felons (n=4);
- Working with ICE on criminal investigations of gangs, drugs and human trafficking (n=3);
- Only communicating with ICE about persons have been arrested (n=3); and
- Assistance with service of federal judicial warrants, ICE warrants, jail holds, and notifying ICE about the release times and dates of perpetrators from jail (n=6).

The fact that a large majority of survey participant agencies were police departments (94%, n=210) as opposed to Sheriff's Offices (4%, n=9) may explain why the number of survey

American University, Washington College of Law                    37

cited in City of Los Angeles v. Barr 18-55599 archived on July 9, 2019

Page 38

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 203 of 380   Page ID #:3167

participants reporting that their agency collaborates with Immigration and Customs Enforcement on warrants and jail holds may be low. (See, figure 44).



Figure 44: Law Enforcement Agency Type
(n=221)

A number of questions in the survey asked law enforcement officials to compare their ability to investigate crimes perpetrated against immigrant and LEP victims in 2017 relative to 2016. Forty-two percent (42%, n=92) of all respondents felt that federal immigration had affected police-community relationships with foreign born and LEP communities, whereas 57% (n=127) felt it had not. (See, figure 45).

Figure 45: Do you feel that federal immigration has affected police-community relationships with foreign born and LEP communities?



However, law enforcement officials from Signing Agencies reported that immigration enforcement is having a greater impact on their work with immigrant and LEP communities than Non-Signing agencies. Fifty-four percent (n=51) of Signing agencies observed an impact of

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 204 of 380   Page ID #:3168

American University, Washington College of Law                                    38

**Page 39**

immigration enforcement on their relationships with immigrant and LEP communities compared to 41% (n=13) of Non-Signing agencies (See, figure 46).

### Figure 46: Has Federal Immigration Enforcement Affect Community Policing Relationships with Immigrant and LEP Communities? - Signing vs. Non-Signing Agencies



The law enforcement officials participating in the survey were asked to explain the impact of immigration enforcement on their communities. Respondents who believed that federal immigration policies had indeed affected community-police relationships with foreign-born or LEP populations (n=43) were asked to elaborate on what they believed were the main causes for the changed relationships. The responses received fall into the five categories listed in figure 47.

### Figure 47: Effects of Immigration Enforcement on Police-Community Relationships with Foreign-Born or LEP populations



cited in City of Los Angeles v. Barr
No. 19-55599 archived on July 9, 2019

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 205 of 380   Page ID #:3169

0%      5%      10% 15% 20% 25% 30% 35%

The most frequently stated impact was that immigrant and LEP community members believed that local law enforcement and federal immigration enforcement agencies operate similarly. Immigrant victims and immigrant community members assumed that calling police for

American University, Washington College of Law                                    39

**Page 40**

help would result in law enforcement turning victims over to federal immigration enforcement officials. Many law enforcement officials respondent to the survey expressed their frustration that, despite their efforts to assist immigrant and LEP populations, many in the community are hesitant to reach out to law enforcement because they believe local law enforcement have the authority (and in some cases, the desire) to deport these individuals. Participants stated:

- That immigrant populations "fear the police is going to deport them when our primary goal is to assist them…[m]ost do not understand the difference in jurisdiction and responsibility."
- "LEP communities many times do not realize that local level law enforcement are not directly involved in enforcing Federal Law," and
- "There is a sense of fear of communicating with police because they see us as an extension of ICE."

Participants also suggested that:

- Members of their community "live in a daily and pervasive climate of fear" and
- Are "afraid to go to a doctor's appointment, or even take their children to school.

  [T]hey are afraid to open their doors thinking that is immigration. I often hear moms concerned about deportation and leaving their children behind."

Some participants in the survey discussed how they attempted to counteract the increased fear among the immigrant and LEP populations they serve by increasing community engagement efforts. One participant stated,

Although we have experienced and increase in willingness my impression is this is a result of the efforts we have made to reach the immigrant and LEP community and make it known we are available to help and they don't need to fear reaching out to us. The information the immigrant population is receiving from outside our community via media, personal contacts or federal government statements still keeps many from feeling safe reporting crimes to us.

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 206 of 380   Page ID #:3170

Another explained,

> The news created from the new Federal programs continues to affect our ability to be efficient and effective with community groups. We have had to increase our outreach and social events to put a stop to the false news stories and perceptions.

To better assess whether and how the experiences of immigrant and LEP victims may be different from crime victims generally in the communities served by law enforcement officers we asked officers to report their experiences with crime reporting by the population as a whole for certain crimes in their communities. The survey was particularly interested in learning about crimes covered by the U and T visa programs including domestic violence, sexual assault, child/elder abuse, human trafficking, stalking and other violent crimes. For comparison, the survey also added one common non-violent crime category, property crimes, to the survey list. Figure 48 illustrates that while for most crimes more than half of the officers responding to the survey are seeing no change in crime reporting among the general population between 2017

American University, Washington College of Law                                              40

**Page 41**

compared to 2016, over a third of the jurisdictions are experiencing higher levels of crime reporting in 2017 relative to 2016. These crimes include property crimes (48%, n=104), domestic violence (37%, n=80), sexual assault (36%, n=79) and human trafficking (35%, n=74).



### Figure 48: Number of Crimes Being Reported in 2017 Compared to 2016

|  | Property crimes (n=216) | Domestic violence (n=216) | Sexual assault (n=219) | Human trafficking (n=213) | Child abuse (n=215) | Elder abuse/Exploitation (n=213) | Stalking (n=211) | Kidnapping/Abduction/False imprisonment (n=212) | Extortion/Blackmail (n=212) |
|---|---|---|---|---|---|---|---|---|---|
| Lower | 9% | 9% | 10% | 9% | 7% | 5% | 9% | 10% | 11% |
| Higher | 48% | 37% | 36% | 35% | 27% | 25% | 20% | 17% | 15% |
| No Change | 43% | 54% | 54% | 56% | 65% | 69% | 71% | 73% | 74% |

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 207 of 380   Page ID #:3171

Lower          Higher          No Change

This survey's findings regarding law enforcement agencies involved in effective community policing with immigrant and LEP communities and the immigrant and victim advocacy/attorney organizations serving immigrant crime victims (see, figures 37-42), may help explain why there are increases in crime reporting during 2017 compared to 2016 by a number of the law enforcement agencies participating in this survey. (See, figure 48).

The data show a difference between Signing and Non-Signing agencies regarding the numbers of agencies observing lower rates of crime reporting in their communities generally for certain crimes comparing 2016 with 2017. This was particularly clear for violence against women and family violence crimes (See. Figure 49). This question was not limited to immigrant victims. The level of analysis that has been able to be completed with the data to date has not included a more detailed analysis of this question by the size of the LEP and immigrant populations that survey participants who answered this question served. However, it appears from this data that Signing Agencies and agencies involved in community policing with immigrant communities may be more attuned to drops in reporting of violence against women crimes generally.

American University, Washington College of Law                                          41

---

**Page 42**

Figure 49: Non-Signing Agencies Reporting Lower Rates Declines in Reporting of the Family Violence and Violence Against Women Crimes in the Community Generally 2017 Compared to 2016



Child Abuse (Signing=11; Non-Signing=1)          3%          12%

Stalking (Signing=13; Non-Signing=0)          0%          14%

Human Trafficking (Signing=16; Non-Signing=1)          3%          16%

Domestic Violence (Signing=15; Non-Signing=2)          6%          16%

Sexual Assault (Signing =18; Non-Signing =2)          6%

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 208 of 380   Page ID #:3172

19%

| | | | | | | | | | | | |
|0%|2%|4%|6%|8%|10%|12%|14%|16%|18%|20%|

Non-Signing          Signing

When asked to compare immigrant victims' willingness to cooperate in 2017 relative to 2016, several police officials reported decline in immigrant and LEP victim's willingness to cooperate with law enforcement in their jurisdictions. (See, figure 50). Officers reporting reductions in 2017 identified the following areas where immigrant and LEP victims were less willing to seek assistance:

- Making police reports – (22%)
- Investigations when the police arrive at a crime scene – (21%)
- Post-crime scene investigations – (20%)
- Working with prosecutors – (18%)
- Working with victim witness advocates (13%)

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

American University, Washington College of Law                                    42

Figure 50: Top Areas of Immigrant & LEP Victims' Reduced
Willingness to Seek Assistance From Law Enforcement

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 209 of 380   Page ID #:3173

Working with Prosecutors                                                                        18%

Post-Crime Scene Investigations                                                          20%

Investigations at Crime Scenes                                                           21%

Making Police Reports                                                                          22%

0%        5%        10%       15%       20%       25%

 

The survey asked participating law enforcement agencies to report on the extent to which they were observing differences in the willingness of immigrant and LEP crime victims to assist law enforcement officials in criminal investigations and prosecutions in 2011 compared to 2016. With regard to crime scene investigations, willingness to make police reports, and willingness to work with police in post-crime scene investigations, examining the observations reported by law enforcement officials working at Signing Agencies and Non-Signing Agencies there were important differences between agencies' experiences. The survey found that Signing Agencies reported greater declines and greater increases in immigrant and LEP victim willingness to cooperate with law enforcement at each of these three stages of criminal investigation, than Non-Signing Agencies. (See, figure 51).

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

American University, Washington College of Law                                                43

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 210 of 380   Page ID #:3174

**Page 44**

Figure 51: Signing Agencies Observe Both More Decline and More Increase in Cooperation From Immigrant and LEP Victims Than Non-Signing Agencies in 2017 compared to 2016



These differences between the experiences of Signing vs. Non-Signing Agencies were found across a wide range of criminal cases, including, domestic violence, sexual assault, and child abuse. Figures 52-57 provide details regarding law enforcement survey participant's observations of immigrant victim cooperation in criminal cases in 2017 compared to 2016 by the type of criminal case. Examining these findings together with the answers to the qualitative survey questions reported on pages 40-41 of this report, it appears that as Signing Agencies observed drops in immigrant crime victims' willingness to participate, these agencies increased their community policing outreach and this lead to increases in the willingness of immigrant victims to cooperate with law enforcement investigating crimes committed against immigrant victims.

Figure 52: Immigrant And LEP Victim's Wilingness Assisst With Crime Scene Investigations In 2017 Vs 2016 - Signing Agencies

|  | Lower | No Change | Higher |
|---|---|---|---|
| DOMESTIC VIOLENCE N=97 | 36% | 42% | 22% |
| SEXUAL ASSAULT N=98 | 36% | 48% | 16% |
| CHILD ABUSE N=97 | 32% | 52% | 16% |
| HUMAN TRAFFICKING N=96 | 31% | 52% | 17% |
| STALKING N=97 | 31% | 59% | 10% |
| PROPERTY CRIMES N=97 | 31% | 51% | 19% |
| EXTORTION N=96 | 27% | 64% | 9% |

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 211 of 380   Page ID #:3175

| | | | |
|---|---|---|---|
| ELDER ABUSE/EXPLOITATION N=97 | 26% | 63% | 11% |

American University, Washington College of Law                                    44

**Page 45**

Figure 53: Immigrant And LEP Victim's Wilingness
*Assist With Crime Scene Investigations* in 2017 vs
2016 - Non-signing Agencies

| | Lower | No Change | Higher | |
|---|---|---|---|---|
| DOMESTIC VIOLENCEN=33 | 24% | | 67% | 9% |
| SEXUAL ASSAULT N=32 | 22% | | | 6% |
| CHILD ABUSE N=32 | 25% | | 69% | 6% |
| HUMAN TRAFFICKING N=32 | 19% | | 72% | 9% |
| STALKING N=31 | 19% | | 74% | 6% |
| PROPERTY CRIMES N=32 | 22% | | 63% | 16% |
| EXTORTION N=32 | 22% | | 78% | 0% |
| ELDER ABUSE/EXPLOITATION N=32 | 22% | | 75% | 3% |

Figure 54: Immigrant And LEP Victim's Wilingness to
file Police Reports In 2017 Vs 2016 -Signing Agencies

| | Lower | No Change | Higher | |
|---|---|---|---|---|
| SEXUAL ASSAULT ( N=97) | 36% | | 41% | 23% |
| CHILD ABUSE (N=96) | 35% | | 47% | 18% |
| PROPERTY CRIMES (N=96) | 34% | | 46% | 20% |
| HUMAN TRAFFICKING (N=96) | 33% | | 47% | 20% |
| STALKING (N=96) | 31% | | 55% | 14% |
| EXTORTION (N=96) | 31% | | 57% | 11% |
| DOMESTIC VIOLENCE (N=96) | 39% | | 39% | 23% |
| ELDER ABUSE/EXPLOITATION (N=96) | 28% | | 57% | 15% |

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 212 of 380   Page ID #:3176

American University, Washington College of Law                                          45

**Page 46**

### Figure 55: Immigrant And LEP Victim's Wilingness To *File Police Rep*orts In 2017 Vs 2016 - Non Signing Agencies

| | Lower | No Change | Higher |
|---|---|---|---|
| SEXUAL ASSAULT N=33 | 24% | 73% | 3% |
| CHILD ABUSE N=33 | 27% | 67% | 6% |
| PROPERTY CRIMES N=33 | 27% | 64% | 9% |
| HUMAN TRAFFICKING N=33 | 24% | 67% | 9% |
| STALKING N=33 | 27% | 70% | 3% |
| EXTORTION N=33 | 24% | 76% | 0% |
| DOMESTIC VIOLENCE N=33 | 27% | 67% | 6% |
| ELDER ABUSE/EXPLOITATION N=33 | 24% | 73% | 3% |

### Figure 56: Immigrant And LEP Victim's Wilingness Assisst With Post-crime Scene Investigations In 2017 Vs 2016 -Signing Agencies

| | Lower | No Change | Higher |
|---|---|---|---|
| DOMESTIC VIOLENCE (N=97) | 30% | 54% | 16% |
| SEXUAL ASSAULT ( N=98) | 31% | 54% | 15% |
| CHILD ABUSE (N=97) | 30% | 56% | 14% |

cited in City of Los Angeles v. Barr No. 18-55599 archived on July 9, 2019

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC    Document 106    Filed 07/12/19    Page 213 of 380    Page ID #:3177

| | Lower | No Change | Higher |
|---|---|---|---|
| HUMAN TRAFFICKING (N=96) | 27% | 61% | 11% |
| STALKING (N=97) | 27% | 65% | 8% |
| PROPERTY CRIMES (N=97) | 28% | 58% | 14% |
| EXTORTION (N=96) | 26% | 64% | 10% |
| ELDER ABUSE/EXPLOITATION (N=97) | 24% | 66% | 10% |

American University, Washington College of Law                                    46

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

**Page 47**

### Figure 57: Immigrant And LEP Victim's Wilingness
*Assisst With Post-crime Scene Investigations* In 2017
Vs 2016 -Non-signing Agencies

| | Lower | No Change | Higher |
|---|---|---|---|
| DOMESTIC VIOLENCE N=33 | 27% | 70% | 3% |
| SEXUAL ASSAULT N=32 | 25% | 69% | 6% |
| CHILD ABUSE N=32 | 25% | 72% | 3% |
| HUMAN TRAFFICKING N=32 | 22% | 72% | 6% |
| STALKING N=32 | 22% | 75% | 3% |
| PROPERTY CRIMES N=32 | 22% | 66% | 13% |
| EXTORTION N=32 | 25% | 72% | 3% |
| ELDER ABUSE/EXPLOITATION N=31 | 23% | 74% | 3% |

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 214 of 380   Page ID #:3178

About a quarter of both Signing and Non-Signing agencies reported declines in immigrant and LEP crime victim willingness to work with prosecutors on criminal investigations and prosecutions. (See, figure 58).

Figure 58: Percent of Law Enforcement Agencies Reporting That in 2017 Compared to 2016 Immigrant and LEP Victims are Less Willing to Assist Prosecutors



Some of these differences between Signing and Non-Signing jurisdictions may be attributed to the fact that Signing jurisdictions appear from the community policing data discussed above and in figures 38-42 to be more involved with the immigrant communities they serve than Non-Signing jurisdictions. This allowed Signing agencies to catch the changes with the immigrant and LEP population that was on their radar and they responded. Also, Signing agencies' certification practices bring officers working for these agencies in more frequent contact with immigrant and LEP crime victims who communicate with officers about victims' fears and concerns.

American University, Washington College of Law                                      47

Page 48

This trend in the data is reinforced by the differences between Signing and Non-Signing Agencies with regard to the willingness by immigrant and LEP victims to work with police departments' based victim advocates and victim witness staff. Signing agencies more frequently reported increases in immigrant victim cooperation with victim witness staff than Non-Signing agencies (27%, n=26 vs 18%, n=6). Also, consistent with the community policing data and the qualitative responses provided by law enforcement survey participants, a slightly higher percentage of Signing agencies than Non-Signing agencies to saw a decline in immigrant victims' willingness to work with victim advocates police department staff (19%, n=18 vs 15%, n=5) (See, figure 59)

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 215 of 380   Page ID #:3179

Figure 59: Willingness of Immigrant and LEP Victims to work
with Victim Advocates in 2017 Compared to 2016



Law enforcement officials were asked to report on the reasons most commonly given to them by immigrant and LEP crime victims for not cooperating or not continuing to cooperate with law enforcement as the criminal case moves from a crime scene investigation, to a police report, to the post-crime scene investigation, and potentially to a prosecution. Immigration status related concerns were three (3) of the top six (6) concerns victims had and reasons victims provided for non-cooperation (See, figures 60 and 61)

It is important to note that access to legal immigration status brings with it access to legal work authorization. As a result in cases of immigrant domestic violence or work place sexual assault victims, concerns about the victim's inability to support herself and her children if she leaves leads immigrant victims to stay in abusive employment and homes for until the victim obtains legal work authorization through the victim's VAWA or U visa immigration case.[28] Figure 30 lists the top six concerns law enforcement officials reported as concerns immigrant victims have shared with them. Additionally, figure 61 provides more details about the range of

[28] Leslye E. Orloff, National Survey on Timing of Access to Work Authorization by Immigrant Victim VAWA Self-Petitioners and U-Visa Applicants, Legal Momentum (Sep. 28, 2011), http://niwaplibrary.wcl.american.edu/pubs/imm-qref-timingaccessworkauthoriz9-28-11/.

American University, Washington College of Law                               48

**Page 49**

immigrant victims' concerns and reasons for their non-cooperation with numerous justice system

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 216 of 380   Page ID #:3180

officials as reported by the participants in the law enforcement survey. Many of the factors listed are similar to all crime victims who experience family violence, sexual assault, stalking, and human trafficking.

Figure 60: Top Reasons For Immigrant and LEP Victims' Non-Cooperation With Law Enforcement

| | |
|---|---|
| Fear of perpetrator retaliation (n=105) | 54% |
| Threats to harm victim if they cooperated (n=104) | 54% |
| Fear of deportation (n=99) | 51% |
| Threats to harm members of victim's family if victim cooperated (n=94) | 48% |
| Inability to support themselves and/or their children without perpetrator (n=88) | 45% |
| Perpetrator threatened to turn victim in to immigration officials if cooperated (n=81) | 42% |

0%   10%   20%   30%   40%   50%   60%

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 217 of 380   Page ID #:3181

American University, Washington College of Law

49

**Page 50**



Figure 61: Reasons Immigrant and LEP Victims gave Law Enforcement for Non Cooperation

Moreover, the survey showed that police officers are facing increased challenges in investigating crimes involving immigrant and LEP victims in 2017 relative to 2016. A significant percentage (42%) of law enforcement officials felt that federal immigration enforcement practices were affecting police-community relationships with foreign born and LEP communities. (See, figure 62).

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 218 of 380   Page ID #:3182

American University, Washington College of Law                                          50

**Page 51**

Figure 62: Have Federal Immigration Enforcement
Effected Your Agencies' Community Policiing
Relationships with Foreign Born and LEP Communities

42%

58%

Yes (n=92)          No (n=127)

A large proportion of law enforcement officials taking the survey reported that some crimes involving immigrant and LEP victims were becoming harder to investigate in 2017 compared to 2016 due to victim non-cooperation. Fears, threats, and concerns that victim cooperation will trigger the victim's deportation are important factors in victim's non-cooperation decisions. (See, figure 63).

Figure 63: Top Crimes Harder to Investigate Due to Non-
Cooperation with Law Enforcement

Child Abuse (n=94)                                          50%

Sexual Assault                                                  59%
   (n=111)

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 219 of 380   Page ID #:3183



Human Trafficking
(n=121)                                                                                          64%

Domestic Violence
(n=130)                                                                                              69%

0%      10%      20%      30%      40%      50%      60%      70%

Law enforcement officials reported that a wide range of crimes go unreported and have become harder to investigate when the victims are immigrant or limited English proficient. Figure 64 lists the crimes many officers reported have become more difficult to investigate and prosecute in 2017 compared to 2016. These include:

• Domestic violence – (69%)

American University, Washington College of Law                                        51

**Page 52**

• Human trafficking – (64%)
• Sexual assault – (59%)
• Child abuse – (50%)
• Extortion-Blackmail – (38%)
• Elder abuse and exploitation (34%)
• Felonious assaults – (33%)

Figure 64: Crimes that are under-reported or harder to investigate in 2017 compared to 2016



80%

70%      69%
            64%
60%                 59%

                          50%
50%

                                41%39%
40%
                                      35%
                                            33%
                                                  28%
30%
                                                        21%

20%

10%

Domestic violence (n=130)

Human trafficking (n=121)

Sexual assault (n=111)

Child abuse (n=94)

Extortion/blackmail (n=77)

Property crimes (n=74)

Elder abuse/exploitation (n=66)

Felonious assaults (n=62)

Stalking (n=53)

Murder/manslaughter (n=39)

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 220 of 380   Page ID #:3184

0%

The responses of the law enforcement officials employed by Signing agencies indicating that various crimes were becoming underreported and/or harder to investigate differed greatly from those employed by Non-Signing agencies (See, figures 63 and 64). The crimes that substantial numbers of law enforcement officers working in Signing agencies report have become harder to investigate include domestic violence (67%, n=66 vs 52%, n=17) and sexual assault (61%, n=60 vs 48%, n=16). A greater proportion of law enforcement officers in Non-Signing agencies indicated that murder/manslaughter has become underreported/harder to investigate than Signing agencies (24%, n=8 vs 11%, n=11). A slightly higher percentage of officials from Non-Signing than Signing agencies reported that human trafficking and extortion/blackmail is becoming underreported/harder to investigate (61%, n=20 vs 51%, n=50; 42%, n=14 vs 32%, n=32) (See, figure 65).



American University, Washington College of Law                                    52

Page 53

Figure 65: Crimes That Have Become Underreported or Harder to Investigate in 2017 vs 2016 by Signing and Non-Signing Agencies



Proprety Crimes (N=99/33) — 27% / 27%
Stalking (N=99/33) — 21% / 26%
Felonious Assault (N=99/33) — 30% / 24%
Child Abuse (N=99/33) — 39% / 45%
Elder Abuse/Exploiation (N=99/33) — 30% / 37%
Extortion-Blackmail (N=99/33) — 42% / 32%
Human Trafficking (N=99/33) — 61% / 51%

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 221 of 380   Page ID #:3185



| | |
|---|---|
| Murder/Manslaughter (N=99/33) | 11% ... 24% |
| Sexual Assault (N=99/33) | 48% ... 61% |
| Domestic Violence (N=99/33) | 52% ... 67% |

Non-Signing    Signing

Importantly, almost 52 % of law enforcement officials participating in the survey reported that barriers facing LEP and immigrant victims resulted in greater numbers of perpetrators at large in their communities. (See, figure 66).

Figure 66: Do the barriers facing LEP and immigrant victims result in greater numbers of perpetrators at large in your communities?

23%

52%

25%

Yes (n=114)        No (n=55)        Unsure (n=50)

American University, Washington College of Law                                    53

cited in City of Los Angeles v. Barr No. 18-55599 archived on July 9, 2019

Page 54

Survey participants provided more detail on the impact of this when asked whether the barriers affecting immigrant and LEP victims had adverse effects. (See, figure 67). A significant number of those participating in the survey reported an adverse impact on victim, community and officer safety. Higher proportions of Signing Agencies reported impacts on community safety and their ability to hold offenders accountable than Non-Signing Agencies. (See, figure 68).

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 222 of 380   Page ID #:3186

Figure 67: Adverse Impact of Non-Cooperation of
Immigrant and LEP Victims with Law Enforcement



Figure 68: Signing and Non-Signing Agencies Reporting On the
Impact That Barriers Experienced By Immigrant and LEP Victims Have
on Victim and Communtiy Safety and Offender Accountability



Law enforcement officials also reported that the decline in immigrant victim cooperation is leading to increased recidivism by perpetrators of a range of crimes in their communities, including domestic and sexual violence crimes. A greater proportion of law enforcement officials from Signing agencies reported increased recidivism than those from Non-Signing

American University, Washington College of Law                                                     54

http://webcache.googleusercontent.com/....org/wp-content/uploads/Immigrant-Access-to-Justice-National-Report.pdf+&cd=1&hl=en&ct=clnk&gl=us[7/8/2019 2:03:15 PM]

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 223 of 380   Page ID #:3187

agencies in 2017 compared to 2016 including with regard to felonious assault (22% vs. 17%) property crimes (20% vs 16%), and human trafficking (18% vs 8%). (See, figure 69).

Figure 69: Percentage of Agencies Reporting More Recidivism in 2017 Compared to 2016 by Type of Crime for Signing and Non-Signing Agencies



Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

American University, Washington College of Law                                                  55

**Page 56**

*Part Three: National Survey of Prosecutors*
*Findings from 2017 National Survey of Prosecutors*

### Introduction to the Participating Prosecutors

A total of 50 prosecutors participated in the survey from 19 states.[29] Figure 1 provides an overview of the regional distribution among the participating prosecutors.[30] More than half of those who participated in the survey were from the South of the United States and more particularly from the state of Virginia (n=13). (See, figure 70).

Figure 70 : Regional Distribution Among Prosecutors
(n=50)



| | |
|---|---|
| Midwest n=13 | Mountain n=3 | Pacific n=8 | South n=26 |

Most survey participants worked for local, municipal, or county prosecutor offices (56%, n=28) and another 42% (n=21) worked for state prosecutor's offices. (See figure 2).

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 225 of 380   Page ID #:3189

[29] Prosecutors participated in the survey from the following states: AZ, CA, FL, GA, HI, ID, LA, MI, MN, MO, NC, NM, OH, OK, OR, TN, VA, WA, WI

[30] The states were grouped into the following regions: Middle Atlantic (NY, PA, NJ, DC, DE, MD); New England (NH, ME, VT, RI, MA, CT); Midwest: (ND, MN, SD, NE, IA, MO, KS, WI, MI, IL, IN, OH); South (OK, TX, AR, LA, KY, TN, MS, AL, FL, GA, SC, NC, VA, WV); West (MT, ID, WY, NV, UT, CO, AZ, NM); Pacific (WA, OR, CA, AK, HI).

American University, Washington College of Law                                    56

**Page 57**

### Figure 71: Type of Prosecutor's Office
(n=50)



6%

36%

42%

16%

Local n=18        Municipal n=8        State n=21        Other n=3

Survey participants worked in prosecutor offices that serve jurisdictions with diverse population sizes. (See, figure 73). The largest number of survey participants (42%, n=21) served jurisdictions that are both urban and rural. Another 40% (n=20) served only urban jurisdictions and 18% (n=9) served jurisdictions that were exclusively rural. (See, figure 2).

### Figure 72: Type of Jurisdiction
(n=50)

18%

42%

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 226 of 380   Page ID #:3190

40%

Rural (n=9)        Urban (n=20)        Both (n=21)

Over half (56%, n=27) of the prosecutors participating in the survey reported serving smaller jurisdictions with populations under 399,000. A little more than quarter (29%) of the prosecutors participating in the survey serve large cities with populations of more than 800,000. (See figure 73).

American University, Washington College of Law                                          57

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

Figure 73. Population Density Of Prosecutors
Office's Jurisdiction
(n=48)

23%                              29%

33%                              15%

800,000 or more (n= 14)        400,000 to 799,999 (n= 7)

100,000 to 399,999 (n= 16) Less than 99,999 (n= 11)

Most of the participants worked in a specialized unit. Fifty-nine percent (n=27) worked in a domestic violence unit, thirty-three percent (n=15%) worked in a sexual assault unit, thirty percent (n=14%) in a child abuse unit, and twenty percent (n=9) in a human trafficking. (See, figure 74).

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 227 of 380   Page ID #:3191

## Figure 74: Survey Participants Working in Specialized Units
### (n=80)

| | |
|---|---|
| Domestic violence n=27 | 59% |
| Sexual assault n=15 | 33% |
| Child abuse n=14 | 30% |
| Human trafficking n=9 | 20% |
| Elder abuse n=7 | 15% |
| Victim Witness n=4 | 9% |
| Leadership/Management n=4 | 9% |

0%    20%    40%    60%    80%

The majority (71%, n=35) of participants in the survey indicated that their jurisdiction has a large number of Limited English Proficient (LEP) residents. The eight languages most encountered by the prosecutors are listed in figure 6. In order of most to least spoken theses languages are: Spanish (96%, n=43), Vietnamese (38% n=17), and Chinese (31%, n=14) were the three most commonly encountered languages. (See, figure 6). Twenty-nine percent (n=13) of prosecutors reported that they commonly encounter languages that are not included in the top 8 languages listed in figure 75. These prosecutors provided additional details about which languages the crime victims and witnesses they encountered speak. The languages included

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 3, 2019

American University, Washington College of Law                    58

Page 59

Amharic, American Sign Language, Chuukese, Farsi, H'mong, Ilocano, Japanese, Korean, Marshallese, Nahuatl, Somali, Samoan, and several indigenous languages from Guatemala.

## Figure 75: Proportion of Prosecutors Serving LEP Victims - By Language Spoken
### (n= 138)

| | |
|---|---|
| Spanish (n= 43) | 96% |
| Vietnamese (n= 17) | 38% |
| Chinese (n= 14) | 31% |
| Arabic (n= 14) | 31% |

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 228 of 380   Page ID #:3192

| | |
|---|---|
| Other (n= 13) | 29% |
| Korean (n= 12) | 27% |
| Tagalog (n= 11) | 24% |
| Russian (n= 11) | 24% |
| Haitian Creole (n= 3) | 7% |

0%    20%    40%    60%    80%    100%    120%

## Prosecution Agencies Signing U Visa Certifications, T Visa Certifications and/or Requesting Continued Presence

Prosecutors were asked to indicate whether their agency signed U visa certifications and/or T visa certifications in cases of foreign-born or LEP crime victims or human trafficking victims. The majority indicated that their agencies (68%, n=34) sign U visa certifications for LEP and foreign-born victims. For T-visa certifications, only 20% (n=10) of prosecutors reported that their offices signed T visa certifications. The U.S. Department of Homeland Security encourages prosecutors to seek continued presence from immigration and Customs Enforcement (ICE) officials on behalf of immigrants who are victims or potential witnesses in human trafficking prosecutions.[31] Less than a quarter (23%, n=11) of the participants in the survey indicated that their prosecutor offices seek continued presence for human trafficking victims.

---

[31] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, CONTINUED PRESENCE TEMPORARY IMMIGRATION STATUS FOR VICTIMS OF HUMAN TRAFFICKING, NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT (Jun. 2010), http://library.niwap.org/wp-content/uploads/DHS-Continued-Presence-Brochure.pdf; DEP'T' OF HOMELAND SECURITY, U AND T VISA LAW ENFORCEMENT RESOURCE GUIDE, 27 NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT (November 30, 2015), http://niwaplibrary.wcl.american.edu/pubs/dhs-updated-u-certification-resource-guide-2015/ (An application for CP should be initiated immediately upon identification of a victim of human trafficking.)

American University, Washington College of Law                59

---

**Page 60**

The majority of prosecutors reported[32] that their agencies do not sign T-visas (80%, n=39), and are not seeking continued presence (77%, n=36). The majority of prosecutors reported that their agencies are Signing U Visa certifications (68%, n=34). (See figure 76).

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 229 of 380   Page ID #:3193



Figure 76: Agencies Signing and Not Signing U Visa or T Visa certifications or Continued Presence

Of those who are included in the do not certify category, many reported that they do not know whether their agency is Signing U visa certifications, T visa certifications, or was requesting continued presence on behalf of immigrant crime victims and human trafficking victims. (See, figure 77).



Figure 77: Prosecutors' Offices Answering "Do Not Know" When Asked If Their Office Signs/Requests.

32 This includes prosecution offices who reported that their agencies are not signing and survey participants who reported they did not know whether their agency was certifying or requesting continued presence.

American University, Washington College of Law                                        60

http://webcache.googleusercontent.com/....org/wp-content/uploads/Immigrant-Access-to-Justice-National-Report.pdf+&cd=1&hl=en&ct=clnk&gl=us[7/8/2019 2:03:15 PM]

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 230 of 380   Page ID #:3194

**Page 61**

**"Signing Agencies" Compared to "Non-Signing Agencies"**

A significant majority (76%, n=38) of the agencies where the prosecutors participating in the survey worked are "Signing Agencies". The remaining 24% (n=12) participating in the survey worked in "Non-Signing Agencies". (See, figure 78).

### Figure 78: Participants Working in Prosecutors Offices that are Signing U or T Visa Certification and/or SeekingContinued Presence



24%

76%

Signing Agencies (n=38)          Non-Signing Agencies (n=12)

Signing agencies were defined as prosecutors' offices that signed at least one of the following:

- U visa certifications
- T visa certifications
- Requests for continued presence

Most prosecutors participating in the survey signed U visa certifications (68%, n=34). Details about survey participant prosecutors practices of signing U and/or T visa certifications or continued presence requests are reported in Figure 79.

### Figure 79: Prosecution Agencies Signing U or T Visa Certifications or Requesting Continued Presence

| Does the Agency Sign? | U Visa Certifications | | T Visa Certifications | | Continued Presence Requests | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| Yes = Signing Agencies | 34 | 68% | 10 | 20% | 11 | 23.5% |
| No = Non-Signing Agencies | 6 | 12% | 15 | 31% | 11 | 23.5% |
| Do not know = Non-Signing Agencies | 10 | 20% | 24 | 49% | 25 | 53% |
| Totals | 50 | 100% | 49 | 100% 107 | | | 100% |

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 231 of 380   Page ID #:3195

Among the 76% (n=38) of prosecution agencies who reported working in Signing Agencies:

American University, Washington College of Law                                     61

**Page 62**

• 48% (n=24) signed only one type of visas: U visas, T visas, or requests for continued
  presence;
• 22% (n=11) signed two of the three types of cases - U visa certifications, T visa
  certifications or seeking requests for continued presence; and
• 6% (n=3) signed in all three of the case types -U visa certifications, T visa certifications
  and seeking requests for continued presence.

**Practices of U Visa Certifications, T Visa Certifications and Seeking Requests for Continued Presence.**

The survey also asked questions about visa certification practices employed by prosecutor's offices. The following are details about the U visa, T Visa, and requests for continued presence practices.

**U Visa Certification Practices**

Among survey participants, 45% (n=20) reported having a formal U visa certification policy or system in place. (See, figure 80).

Figure 80: Agencies That Have Implemented a Policy or Formal
System for Processing U Visa Certification Requests
(n=44)

55%

45%

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 232 of 380   Page ID #:3196

Have Policy or Formal System (n=24)                    Have No Policy or System (n=20)

Eighteen of the thirty-four (36%) prosecutors participating in the survey who work in agencies that sign U visa certifications reported the numbers of visas they sign annually (See, figure 81). These prosecutors' 18 agencies reported signing a total of 761 U visa certifications annually. The number of U visa certifications signed ranged from 1 to 200.

American University, Washington College of Law                              62

**Page 63**



Figure 81: Number of U Visa Certifications Signed Annually

Number of Certifications Signed

Many prosecutors who work in Signing Agencies reported that they have implemented best practices recommended for U visa certification by the U.S. Department of Homeland Security (DHS).[33] Examples of recommended practices include: signing U visas soon after the agency receives the case (26%, n=9 implemented this), certifying based on detection including when their office decides not to prosecute (6%, n=2), and signing certifications in closed cases (35%, n=12). However, the survey also found certification practices that are not recommended or required by DHS. A substantial percentage of respondents (41%, n=14) sign U visa certifications after the criminal case is completed.[34] Many prosecutors' offices (38%, n=13) reported that

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 233 of 380   Page ID #:3197

employ both of these practices. (See, figure 82).

33 See Dep't' of Homeland Security, U and T Visa Law Enforcement Resource Guide, 18 Nat'l Immigrant Women's Advocacy Project (November 30, 2015), http://niwaplibrary.wcl.american.edu/pubs/dhs-updated-u-certification-resource-guide-2015/ ("There is no required time when you may or may not sign a certification. It is possible to sign a certification at any stage in the case, including at the point of detection, during an investigation, when the prosecutor initiates a prosecution, before a trial, whether or not the victim is needed to testify, and after the case is concluded").

34 Training tools for prosecutors on best practices for prosecutions in cases involving immigrant victims can assist prosecutors' offices in developing case strategies that both remove barriers and address concerns that lead prosecutors to delay certifications and promote a higher probability of attaining convictions in these cases. Tools can be accessed at: http://niwaplibrary.wcl.american.edu/prosecutors-tools/

American University, Washington College of Law                                     63

Page 64



Figure 82: U Visa Certification Practice
(n=55)

| | Sign U certifications after case is completed (n=14) | All of these practices (n=13) | Sign U visa certifications for closed cases (n=12) | Signs U visas certifications for cases soon after the case is opened (n=9) | Sign U visa certifications for cases that your office is not prosecuting (n=2) |
|---|---|---|---|---|---|
| | 41% | 38% | 35% | 26% / n=2 | 6% |

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 234 of 380   Page ID #:3198

Although it can be helpful for prosecution agencies to implement U visa certification policies, they are authorized to certify without having to implement a certification policy under federal regulations.[35] Prosecutor's offices can initiate certification practices with certifications being signed by the head of the prosecution agency (e.g. the elected prosecutor or District Attorney) or by prosecutors with supervisory authority whom the agency head designates.[36]

Survey participants working in agencies that had established U visa certification policies or practices provided the following examples of their U visa practices:

- The U visa certifications are all routed to and processed by a dedicated team of prosecutors and support staff designated as U visa certifiers;
- Each prosecution branch has designated deputies that sign U visa certifications for victims in their respective case load;
- Several senior prosecutors are designated as U visa certifiers for the agency;
- Victim advocates and victim witness staff are involved in reviewing and preparing U visa certification requests for final review by the U visa designated prosecutor certifier (agency head or designated certifier);
- U visa certification requests are U reviewed by the prosecutor who prosecuted the victim's case who drafts the U visa certification and sends it to the agency's U visa certifier for signature; and/or
- Agency staff conduct a thorough case review, speak with prosecutors and law enforcement officials involved in the case, in some cases may interview the victim,

---

[35] DEP'T' OF HOMELAND SECURITY, U AND T VISA LAW ENFORCEMENT RESOURCE GUIDE, 16 NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT (November 30, 2015), http://niwaplibrary.wcl.american.edu/pubs/dhs-updated-u-certification-resource-guide-2015/

[36] DEP'T' OF HOMELAND SECURITY, U AND T VISA LAW ENFORCEMENT RESOURCE GUIDE, NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT 15 (November 30, 2015), http://niwaplibrary.wcl.american.edu/pubs/dhs-updated-u-certification-resource-guide-2015/

American University, Washington College of Law                                    64

**Page 65**

collect and verify information about the victim's helpfulness including but not limited to police reports, 911 calls, investigative interviews with police and prosecutors and provide this information to their prosecution agency certifiers.

**T Visa Certification Practices**

Over half (56%, n=10) of the participating prosecutors reported employing the DHS supported best practices[37] of signing T visa certifications soon after the case is opened. They are also signing U visa certifications for closed cases (44%, n=8), and in cases their office has

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 235 of 380   Page ID #:3199

decided not to prosecute (17%, n=3). As discussed above, in addition to these T visa certification practices, less than a quarter (23%, n=11) of the prosecutors surveyed were also requesting continued presence for human trafficking victims from federal immigration authorities for victims and witnesses of human trafficking criminal investigations and prosecutions.

However, the majority (61%, n=11) of the prosecutors participating in the survey reported that they often wait to sign T visa certifications until after the case is completed (See, figure 12). The data shows that among the prosecutors participating in the survey, the percentage waiting to sign T visas until after prosecution is complete is higher than for U visas (61% vs 41%). As discussed above regarding U visas, prosecutors of human traffickers could improve outcomes of trafficking prosecutors by employing prosecution strategies that include early certification for T visa victims.

Early certification practices should be part of a pre-trial strategy that prepares prosecutors to be ready to respond effectively when defense counsel raises the immigration status of the victim or U or T visa certification in the criminal case. If the victim's credibility is challenged by the defense using the U or T visa, prosecutors can introduce the victim's prior consistent statements in the criminal case. This evidence becomes admissible evidence to rehabilitate the victim, showing that the victim's testimony at trial is the same as the statements the victim made to law enforcement and prosecutors before the victim learned about the U or T visa program.[38]

---

[37] DEP'T OF HOMELAND SECURITY, U AND T VISA LAW ENFORCEMENT RESOURCE GUIDE, NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT 18-19 (November 30, 2015), http://niwaplibrary.wcl.american.edu/pubs/dhs-updated-u-certification-resource-guide-2015/ ("It is possible to sign at any stage of the case including at the point of detection…and after the case is closed."); ("may sign when the prosecutor decided not to prosecute").

[38] Training tools for prosecutors on best practices for prosecutions in cases involving immigrant victims can assist prosecutors' offices in developing case strategies that both remove barriers and address concerns that lead prosecutors to delay certifications and promote a higher probability of attaining convictions in these cases. Tools can be accessed at: http://niwaplibrary.wcl.american.edu/prosecutors-tools/

American University, Washington College of Law                                         65

Page 66

cited in City of Los Angeles v. Barr No. 18-55599 archived on July 9, 2019

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 236 of 380   Page ID #:3200



Figure 83: T-Visa Certification Practices
(n=32)

**Populations served by Signing and Non-Signing Prosecutors' Offices**

The survey data enabled the analysis of whether and how Signing Agencies and Non-Signing Agencies differ. The majority (81%, n=30) of prosecutors in the 37 "Signing Agencies" worked in jurisdictions with large Limited English Proficient (LEP) populations. Among the 12 "Non-Signing Agencies," 42% (n=5) reported that they worked in jurisdictions with large LEP populations and 58% (n=7) reported that they worked in jurisdictions that serve small LEP populations. (See, figure 84).



Figure 84: LEP Population Vs. Signing and Non-signing Agencies
(N=49)

The prosecutors in Signing Agencies served jurisdictions with a wide range of population sizes. Signing Agencies were located in jurisdictions with population sizes of 800,000 or more (33% n=12), of 400,000 to 799,999 (19% n=7), of 100,000 to 399,999 (39% n=14) as well as

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 237 of 380   Page ID #:3201

American University, Washington College of Law                                          66

**Page 67**

small jurisdictions with less than 99,999 inhabitants (8% n=3). In contrast, the majority of prosecutors working in Non-Signing Agencies (67% n=8) worked in small jurisdictions with populations of less than 99,999 (See, figure 85). The data also showed that prosecutors working in signing agencies were not limited to larger jurisdictions with significant LEP populations. Figure 86 illustrates that many of the prosecutors working in signing agencies were working in smaller communities with smaller LEP populations.

### Figure 85: Population served vs. Signing Agencies
(n=48)



### Figure 86: Population vs. Lep Population



Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 238 of 380   Page ID #:3202

**Immigration Status Issues in Criminal Prosecutions**

The survey explored whether the frequency of defense raising immigration status issues about victims or witnesses of a crime in state courts has changed in the past five, three, and one year(s). The majority of participating prosecutors (62%, n=23) indicated that immigration status issues were raised in state criminal courts cases more frequently in the past five years than ever

American University, Washington College of Law                                    67

Page 68

before. However, the extent to which immigration issues were raised about a crime victim or witness appears to be dropping slightly with time. Nevertheless, at least half of prosecutors responding to this question (n=25) reported that the cases where defense counsel is raising immigration status of the victim in criminal prosecutions remains high. The percent of prosecutors reporting higher rates of this defense counsel raise the immigration status of the victim as a defense strategy in the past 3 years compared to prior years was 52% (n=22) and in the past year compared to prior years was 50% (n=21). (See, figure 87).



Figure 87: Frequency of defense raising Immigration status issues about victims or witnesses of a crime in state court cases

The survey also sought to examine the extent to which prosecutors working in both Signing Agencies and Non-Signing Agencies were encountering criminal defense counsel raising

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 239 of 380   Page ID #:3203

immigration status of victims in a criminal prosecution. Although prosecutors in Signing Agencies reported encountering cases where defense counsel attempts to raise the immigration status of a victim in a criminal prosecution more frequently than non-signing agencies, the number of prosecutors encountering this appears to be declining slightly over the past 5 years (See, figure 88).

American University, Washington College of Law                    68

**Page 69**



Figure 88: Percentage Of Prosecutors (Signing Vs Non-signing) Who Reported A Higher Frequency Of Defense Raising Immigration Status Issues About Victims Or Witnesses Of A Crime In State Court Cases

Signing Agencies          Non-Signing Agencies

66%
                                        58%
                                                                        55%
        43%
                                                    30%                 30%

PAST 5 YEARS (N=23; N=3)        PAST 3 YEARS (N=22; N=3)        PAST 1 YEAR (N=21; N=3)

One contributing factor to this decline of defense attorneys raising the victims' immigration status could be the training that prosecutors are receiving on best practices for prosecution of criminal cases involving immigrant crime victims. In a growing number of jurisdictions prosecutors are successful in arguing that raising the immigration status of a victim

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 240 of 380   Page ID #:3204

or witness in a criminal case is prejudicial and irrelevant, and should be excluded from the criminal case.[39] In cases involving immigrant crime victims and witnesses, prosecutors should consider this approach in addition use of prior consistent statements and VAWA confidentiality laws as strategies to educate the jury and limit the impact of immigration-status questions or evidence on the jury.

In cases where the prosecutor is not able to keep immigration status issues out of the criminal case altogether, an alternate strategy is successfully being employing by prosecutors. If the defense counsel questions the witness or presents evidence attacking the credibility of the immigrant victim witness alleging that the victim is lying about the crime victimization to gain access to immigration status, prosecutors can set out a timeline describing when the victim learned about immigration relief and then introduce the victim's prior consistent statements as rebuttal.[40] As prosecutors take this approach in jurisdictions across the country, they are more successful in gaining convictions and the number of cases in which defense counsel raises the U or T visas as a defense tactic in criminal case often declines.

• NIWAP and AEquitas, the Prosecutors Resource on Violence Against Women, have been training prosecutors on these best practices for prosecutors' response when defense attorneys raise any of the following three issues in a prosecution involving an immigrant victim or witness: The victim's immigration status is raised by the defense attorney by during cross examination of the immigrant victim or witness, by presenting evidence in the case or other means

[39] *See* 2017 WA REG TEXT 475745 (NS); *See also Evidence Rule 413 - Updating Washington's New Procedural Protections for Immigrants*, NWLawyer Washington State Bar Association (forthcoming 2018).
[40] *Training Tools for Prosecutors on the U Visa, VAWA and Criminal Court Discovery*, Nat'l Immigrant Women's Advocacy Project (November 8, 2017), http://niwaplibrary.wcl.american.edu/prosecutors-tools/

American University, Washington College of Law                     69

---

• When the defense tries to impugn the victim's credibility by arguing that the victim is lying or has made up the abuse or other crime victimization in order to obtain a U or T visa or VAWA self-petition
• Best practices for responding to discovery requests seeking information about a victim or witnesses immigration case file, the existence of an immigration case, decisions made in the victim's immigration case or the U or T visa certification.

**Immigrant and LEP Victims Willingness Work With Prosecutors over the Last Five, Three, and One Year(s)**

More than a quarter of prosecutors participating in the survey reported higher levels of willingness by immigrant and LEP victims to work with prosecutors in the past 5 years relative

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 241 of 380   Page ID #:3205

to years before. Immigrant and LEP victims were willing to work with prosecutors on sexual assault cases (36%, n=14), domestic violence cases (33%, n=15), stalking (28%, n=11), and child abuse cases (26%, n=10) (See, figure 89).

### Figure 89: Willingness of Foreign or LEP Victims to Work With Prosecutor in the Past 5 Years by Type of Proceeding Compared To Prior Years

| | Human trafficking (n=34) | Elder abuse (n=36) | Property crimes (n=39) | General violent crimes (n=41) | Child abuse (n=39) | Stalking (n=39) | Domestic violence (n=45) | Sexual assault (n=39) |
|---|---|---|---|---|---|---|---|---|
| Higher | 12% | 19% | 21% | 24% | 26% | 28% | 33% | 36% |
| No Change | 71% | 69% | 56% | 49% | 51% | 49% | 40% | 38% |
| Lower | 18% | 11% | 23% | 27% | 23% | 23% | 27% | 26% |

Lower    No Change    Higher

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

The prosecutors' responses to the questions regarding immigrant and LEP victims' willingness to cooperate with them as less or the same for the last three years compared to earlier years. The only type of case for which a substantial number of prosecutors reported a higher level of victim willingness to cooperate with prosecutors in the past 3 years compared to prior years is sexual assault (29%, n=11). Most of the prosecutors however, reported no change in the level of cooperation of immigrant and LEP victims (see figure 90.

American University, Washington College of Law                     70

Page 71

### Figure 90: Willingness of Foreign or LEP Victims To Work With Prosecutor In The Past 3 Years (Compared To Prior Years)

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 242 of 380   Page ID #:3206

| Human trafficking (n=37) | Elder abuse (n=39) | General violent crimes (n=41) | Property crimes (n=39) | Domestic violence (n=45) | Child abuse (n=40) | Stalking (n=40) | Sexual assault (n=38) |
|---|---|---|---|---|---|---|---|
| 14% | 15% | 17% | 18% | 22% | 23% | 23% | 29% |
| 68% | 64% | 59% | 62% | 49% | 53% | 53% | 45% |
| 19% | 21% | 24% | 21% | 29% | 25% | 25% | 26% |

Lower        No Change        Higher

The prosecutors' survey responses regarding immigrant and LEP victims' cooperation with them within the immediate the prior year were also significant. [41] Within the past year, the willingness of immigrant and LEP victims to cooperate in criminal prosecutions according to the prosecutors' responses, was lower than they had reported for earlier years. (See, figure 91). The criminal cases for which immigrant and LEP victims were least willing to cooperate were: domestic violence (43%, n=19); sexual assault (43%, n=17); and child abuse (39%, n=16). However, these were not the only types of cases where immigrant and LEP victims were less willing to cooperate with prosecutors. Figure 21 shows the extent to which in the past year compared to prior years immigrant victims' willingness to work with prosecutors is decreasing for general violence crimes, stalking, human trafficking, property crimes, and elder abuse .

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

[41] The survey was administered between October 9 and November 20, 2017.

American University, Washington College of Law                                    71

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 243 of 380   Page ID #:3207

Page 72

Figure 91: Willingness of Foreign or LEP Victims To Work With
Prosecutor In The Past 1 Year Compared To Prior Years

| 13% | 13% | 14% | 14% | 15% | 15% | 18% | 20% |
|---|---|---|---|---|---|---|---|
| 62% | 63% | 59% | 51% | 46% | 43% | 39% | 49% |
| 26% | 24% | 27% | 34% | 39% | 43% | 43% | 32% |
| Property crimes (n=39) | Elder abuse (n=38) | Human trafficking (n=37) | General violent crimes (n=35) | Child abuse (n=41) | Sexual assault (n=40) | Domestic violence (n=44) | Stalking (n=41) |

Lower    No Change    Higher

Since the majority of survey participant prosecutors worked in Signing Agencies, the next section of this report looks particularly the data from regarding immigrant victim cooperation with Signing Agencies. The survey showed that a large number of prosecutors working in Signing Agencies found that immigrant and LEP victims maintained either the same level or higher levels of willingness to cooperate with prosecutors in the past 5 and 3 years relative to years prior (See, figures 92 and 93). However, this level of cooperation in cases of immigrant crime victims dropped in the during the past year compared to prior years particularly for domestic violence (17-19%), sexual assault (16%) and child abuse (17-19%). (See, figure 94).

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 244 of 380   Page ID #:3208

American University, Washington College of Law                    72

**Page 73**

Figure 92: Signing Agencies Reporting Williingness of Immigrant Victims to Cooperated Higher or the Same as Prior Years by Crime



| | Elder Abuse | Property crimes | Human trafficking | Stalking | General violent crimes | Child Abuse | Sexual assault | Domestic Violence |
|---|---|---|---|---|---|---|---|---|
| Past 5 years | 86% | 75% | 81% | 75% | 73% | 77% | 71% | 72% |
| Past 3 years | 81% | 78% | 83% | 73% | 74% | 75% | 71% | 70% |
| Past 1 year | 77% | 75% | 73% | 68% | 64% | 58% | 55% | 53% |

Past 5 years          Past 3 years          Past 1 year

**Figure 93: Responses of Prosecutors in Signing Agencies about Immigrant Victim's Willingness to Cooperate Compared to Prior Years (Higher or the Same)**

| Types of crimes | Past 5 years | | Past 3 years | | Past 1 year | |
|---|---|---|---|---|---|---|
| | % | # | % | # | % | # |
| Elder Abuse | 86% | 26 | 81% | 26 | 77% | 24 |
| Property crimes | 75% | 24 | 78% | 25 | 75% | 24 |
| Human trafficking | 81% | 22 | 83% | 25 | 73% | 22 |
| Stalking | 75% | 24 | 73% | 24 | 68% | 23 |
| General violent crimes | 73% | 24 | 74% | 25 | 64% | 18 |
| Child Abuse | 77% | 24 | 75% | 24 | 58% | 19 |
| Sexual assault | 71% | 22 | 71% | 22 | 55% | 18 |

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 245 of 380   Page ID #:3209

Domestic Violence                        72%      26        70% 26        53% 19

American University, Washington College of Law                        73

Page 74

Figure 94: Decline in Willingness of Immigrant Crime Victims to Cooparate With Prosecutors in Signing Agencies - Past year compared to Prior Years

| | Elder Abuse (n=26,26, 24) | Property crimes (n=24,25, 24) | Human trafficking (n=22,25, 22) | Stalking (n=24,24, 23) | General violent crimes (n=24,24, 18) | Child Abuse (n=24,24, 19) | Sexual assault (n=22,22, 18) | Domestic Violence (n=26,26, 19) |
|---|---|---|---|---|---|---|---|---|
| Past Year vs Prior 5 years | -9% | 0% | -8% | -7% | -9% | -19% | -16% | -19% |
| Past Year vs Prior 3 years | -4% | -3% | -10% | -5% | -10% | -17% | -16% | -17% |

Past Year vs Prior 5 years        Past Year vs Prior 3 years

To better understand the factors that impede immigrant and LEP victims' willingness to cooperate with prosecutors' offices in criminal cases, the survey asked prosecutors for the reasons that immigrant and LEP victims gave them for not cooperating or not continuing to

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 246 of 380   Page ID #:3210

cooperate in a criminal investigation or prosecution. The top two reasons prosecutors reported are consistent with the concerns of all victims in criminal prosecutions – fear of perpetrator's retaliation (85%, n=39) and perpetrator's direct threats to harm the victim if the victim cooperates (80%, n=37). For immigrant and LEP victims the additional fears that the perpetrator will have the victim deported (72%, n=34) and the perpetrator's direct threats to deport the victim (70%, n= 32%) also play an important role in the unwillingness to cooperate (See figure 95).

American University, Washington College of Law                                                      74

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

Figure 95: Reasons for LEP Victim's Non-Cooperation with Prosecutors
(n=425)

| | |
|---|---|
| Fear of perpetrator retaliation (n=39) | 85% |
| Threats to harm the victim (n=37) | 80% |
| Inability to support themselves/their children (n=34) | 74% |
| Fear of perpetrator turning them in to Imm. officials (n=33) | 72% |
| Do not want to break up their family (n=32) | 70% |
| Fear of being separated from their children (n=32) | 70% |
| Threats to turn them in to immigration officials (n=32) | 70% |
| Stopped communicating with prosecutors (n=31) | 67% |
| Fear of lose housing if they left the perpetrator (n=31) | 67% |
| Threats to harm the victim's family members (n=31) | 67% |
| Threats to harm the victim's children (n=25) | 54% |
| Impact on the victim's children (n=22) | 48% |
| Did not provide a reason (n=21) | 46% |
| In work place abuse cases the victim needs the job (n=14) | 30% |

Threats to harm pets if the victim cooperated (n=11)                                  24%

| | | | | | |
|---|---|---|---|---|---|
| 0% | 20% | 40% | 60% | 80% | 100% |

**% of Respondents**

Prosecutors also provided information about the factors that are negatively affecting prosecutor-community relationships with foreign-born or LEP communities. The factors most commonly listed by survey participants were:

• Victim's increased fear and risk of deportation and fear that deportation will lead to separation from children

• The presence of immigration enforcement officials from the Department of Homeland Security at state courthouses fuels the victim's fears that coming to court will lead to their deportation

• Rise in anti-immigrant sentiments including statements by federal government officials that further reinforce deportation fears

• Immigrant victims misunderstanding of the separate roles and jurisdictions of state, local police and prosecutors versus the immigration enforcement role of ICE

• Lack of knowledge about help available from law enforcement, prosecutors and immigration relief for immigrant crime victims

• Difficulties in communicating with LEP victims due to lack of access to qualified interpreters

The factors contributing to victims' fears of cooperating with prosecutors impact prosecutors' ability to criminally charge and successfully convict perpetrators of crimes committed against immigrant and LEP victims. Prosecutors participating in the survey noted that victims' cooperation is fundamental to the prosecution. The factors listed above and those contained in figure 24 often result in immigrant or LEP victims' decisions not to participate in criminal investigations, not to cooperate with prosecutors, and/or not to testify in criminal

American University, Washington College of Law                                        75

**Page 76**

prosecutions. When victims decide not to cooperate, the participating prosecutors noted that this often results in prosecutors:

• Not being able to prove their case at trial

• Deciding not to prosecute cases that are weaker without the victim's testimony

• Finding the criminal case against the perpetrator more difficult to successfully prosecute

• Agreeing to pleas that result in shorter sentences that the prosecutor would have been able to more successful if victim's cooperation

• Winning fewer convictions

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 248 of 380   Page ID #:3212

The survey asked prosecutors to rank the crimes involving immigrant and LEP victims that have become increasingly underreported or harder to investigate and prosecute during the past year relative to three years prior. Their responses show that domestic violence (82%, n=27), sexual assault (70%, n=23), human trafficking (55%, n=18), and child abuse (48%, n=16) are the crimes that have become increasingly underreported and harder to investigate and/or prosecute (See, figure 96).

Figure 96: Under-reported Crimes/ More Difficult Crimes To Investigate (IN The Past Year Compared to Three Years Ago)



The survey also sought to understand the whether prosecutors from Signing Agencies differed from prosecutors from Non-Signing Agencies in terms of their views about whether the decline in immigrant victim cooperation noted in figure 94 was making cases involving immigrant victims harder to investigate and prosecute. As figure 97 illustrates a higher precentage of prosecutors from Signing Agencies, compared to Non-Signing agencies reported

American University, Washington College of Law                                          76

Page 77

that crimes against immigrant victims were underreported and were harder to prosecute in the

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 249 of 380   Page ID #:3213

past year compared to three years ago. For instance, 61% (n=23) of prosecutors in signing agencies identified domestic violence as underreported/harder to investigate, compared to 33% (n=4) of prosecutors in non-signing agencies. Prosecutors in signing agencies also identified that in the past year murder (26%, n=10) has been underreported/harder to investigate or prosecute compared to 3 years ago compared to 0-% from Non-Signing Agencies. (See, figure 97).

Figure 97: Percentage Of Prosecutors (Signing vs Non-Signing) Who Stated the Following Crimes as Under-reported Or Harder To Investigate Or Prosecute Comparing The Past Year With Three (3) Years Ago



| | Signing Agencies | Non-Signing Agencies |
|---|---|---|
| DOMESTIC VIOLENCE (N=23;4) | 61% | 33% |
| SEXUAL ASSAULT (N=19;4) | 50% | 33% |
| HUMAN TRAFFICKING (N=14;4) | 37% | 33% |
| CHILD ABUSE (N=14;2) | 37% | 17% |
| STALKING (N=13;1) | 34% | 8% |
| GENERAL VIOLENT CRIMES (N=12;1) | 32% | 32% |
| FELONIOUS ASSAULTS (N=11;1) | 29% | 8% |
| PROPERTY CRIMES (N=10;3) | 26% | 25% |
| ELDER ABUSE/EXPLOITATION (N=10;3) | 26% | 25% |
| MURDER/MANSLAUGHTER (N=10;0) | 26% | |

Prosecutors also identified types of cases where recidivism has increased in the past three years. The data shows that the top three types of cases with the largest increase in recidivism during that time period were: property crimes (17%, n=5), violent crimes generally (17%, n=5), and domestic violence (15%, n=5). (See, figure 98).

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 250 of 380   Page ID #:3214

American University, Washington College of Law                    77

Page 78

Figure 98: Extent to Which Recidivism Changes in Crimes Against Foriegn Born and LEP Victims in the Past Year Compared to Three Years Ago



| | Murder-manslaughter (n=29) | Stalking (n=32) | Child abuse (n=31) | Human trafficking (n=30) | Elder abuse (n=29) | Sexual assault (n=30) | Felonious assault (n=29) | Domestic violence (n=33) | General violent crimes (n=30) | Property crimes (n=29) |
|---|---|---|---|---|---|---|---|---|---|---|
| Less | 0% | 0% | 3% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| No Difference | 93% | 91% | 90% | 90% | 90% | 87% | 86% | 85% | 83% | 83% |
| More | 7% | 9% | 6% | 10% | 10% | 13% | 14% | 15% | 17% | 17% |

Less        No Difference        More

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC Document 106 Filed 07/12/19 Page 251 of 380 Page ID #:3215

American University, Washington College of Law                78

Page 79

*Part Four: National Survey of Victim Advocates and Attorneys*
*Findings from 2017 National Survey of Victim Advocates and Attorneys*

A total of 389 advocates and attorneys who work with immigrant survivors of domestic violence, sexual assault, child abuse, elder abuse, human trafficking, and other violent crimes participated in a national survey administered in October and November, 2017. Advocate/attorney survey participants worked with a total of 4,228 immigrant victims who were VAWA self-petitioners or U visa, T visa or civil protection order applicants between January, 2016 to October, 2017. More than half (54%) of the victims the survey participants worked with were limited English proficient. The survey participants worked for agencies that have significant experience assisting immigrant victims, helping a total of 75,979 immigrant victims during this same time period. The immigrant victims they represented had an average of between 2 and 3 children.[43] The majority (85%)[44] of the immigrant victims' children served by the survey participants were U.S. citizens.

Survey participants worked in all 50 states and the District of Columbia. Figure 1 below shows percentage of participants in each region of the United States.[45] The highest percentage of respondents (29%, n=110) were in the Southern part of the United States[46] with the greatest proportion in Texas (n=20) and Florida (n=22). (See, figure 99).

Figure 99: Regional distribution among Advocates and Attorneys (385 Agencies)



13%
18%
5%
12%
24%

Middle Atlantic (n=49)

New England (n=18)

Midwest (n=94)

South (n=110)

Mountain (n=45)

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 252 of 380   Page ID #:3216

Pacific (n=69)

28%

[42] The percentage is equal 228 agencies.

[43] The percentage is equal 292 agencies. Average number of children of the immigrant victims that agencies represent was 2.4 children per immigrant victim client.

[44] The percentage is equal 157 agencies.

[45] The states were grouped into the following regions: Middle Atlantic (NY, PA, NJ, DC, DE, MD); New England (NH, ME, VT, RI, MA, CT); Midwest: (ND, MN, SD, NE, IA, MO, KS, WI, MI, IL, IN, OH); South (OK, TX, AR, LA, KY, TN, MS, AL, FL, GA, SC, NC, VA, WV); West (MT, ID, WY, NV, UT, CO, AZ, NM); Pacific (WA, OR, CA, AK, HI).

[46] The Southern Part of the United States here consisted of West South Central (OK, TX, AR, LA); East South Central (KY, TN, MS, AL) and the South Atlantic (FL, GA, SC, NC, VA, WV).

American University, Washington College of Law                                    79

**Page 80**

The greatest number of survey participants served smaller and rural communities (35%, n=133) with 32% (n=121) working in communities with a population density of 5000 to 99,000 and 3% (n=12) in small isolated rural communities with a population density of less than 5,000 people. Participants working in large cities and metropolitan jurisdictions accounted for 23% (n=88) of the total participants. (See, figure 100).

## Figure 100: Population Density in Survey Participant's Service Areas (293 Agencies)

3%

23%

32%

20%

22%

Population center - 800,000 or more (n=88)

Metropolitan area - 400,000 to 799,999 (n=78)

Midsized community - 100,000 to 399,999 (n=82)

Rural - 5,000 to 99,000 (n=121)

Less than 5,000 (n=12)

Participants in the advocates/attorneys survey included a range of professionals who provide direct services to immigrant survivors of domestic violence, sexual assault, child abuse,

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC    Document 106    Filed 07/12/19    Page 253 of 380    Page ID #:3217

stalking, dating violence, human trafficking and other criminal activities covered by the U visa program.[47] These professionals included:

- Victim advocates working at shelters, rape crisis centers, victim services agencies, immigrant community based organizations and faith based organizations;
- Victim attorneys working in legal aid and legal services organizations, programs serving domestic violence, sexual assault, stalking, dating violence and child abuse victims, immigrant rights legal services agencies, pro bono attorneys working in law firms, and university based victim and immigrant clinics;
- Social workers and other staff working at community base social services programs serving crime victims and/or immigrants;
- Health and mental health care providers; and
- Victim witness staff working in prosecutors' offices.

Over half (60%, n=229) of participants in the survey were victim advocates and another 17% (n=64) were attorneys representing victims. Additionally, 5% of survey participants were victim-witness specialists working for prosecutors' offices. (See, figure 101). The professionals

[47] INA Section 101(a)(15)(U) U-visa qualifying criminal activity includes, but is not limited to: rape, torture, trafficking, incest, domestic violence, sexual assault, abusive sexual contact, prostitution, sexual exploitation, female genital mutilation, stalking, being held hostage, peonage, involuntary servitude, slave trade, kidnapping, abduction, unlawful criminal restraint, false imprisonment, fraud in foreign labor contracting, blackmail, extortion, manslaughter, murder, felonious assault, witness tampering, obstruction of justice, perjury, solicitation to commit any of the above-mentioned crimes, or *any similar activity* in violation of federal, state, or local criminal law.

American University, Washington College of Law                                    80

Cited in City of Los Angeles v. Barr
No. 18-55599 Archived on July 9, 2019

**Page 81**

participating in the National Survey of Victim Advocates and Attorneys will be referred to as "advocates and attorneys" throughout this part of the report.

## Figure 101: Type of Organization Where Survey Participants Work (381 Agencies)

8%      5%

17%

Health, Mental Health, Social Services (n=20)

Domestic violence/sexual assault victim advocates (n=229)

Immigrant/Cultural/Faith based organization (n=37)

10%

Attorneys for Victims (n=64)

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce
Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 254 of 380   Page ID #:3218
60%
Victim Witness specialists (n=31)

Advocates and attorneys participating in the survey were asked questions requiring two different types of answers. For most of the survey, participants were asked to provide the numbers of immigrant victim clients they worked with and provided a variety of services to during 2016 and 2017. The second type of questions in the survey required the attorneys/advocates to report what they have observed about their immigrant victim clients generally in 2017 relative to 2016.

Many victim and legal services organizations who work with victims of domestic and sexual violence and other crimes have developed effective working relationships with law enforcement agencies.[48] It is through these relationships that victim advocates and attorneys provide a partnership with justice system staff (e.g., police, prosecutors, courts) who promote the willingness and ability for immigrant survivors of domestic and sexual violence to access legal protections and safety planning that is vital to the safety, security and healing of immigrant victims and their children.[49] The vast majority (87%, n=314) of this survey's attorney/advocate participants reported having ongoing working relationships with law enforcement in their local communities. (See, figure 102). These close working relationships are common and best practices for programs working on issues of domestic violence and sexual assault. Seventy-nine

[48] See Giselle Hass et. al., U-Visa Legal Advocacy: Overview of Effective Policies and Practices, NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT (2013), http://niwaplibrary.wcl.american.edu/pubs/u-visa-collaboration-policy-brief/; NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT, Fact Sheet: Immigrant and Limited English Proficient Victims' Access to the Criminal Justice System, NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT (2013) http://niwaplibrary.wcl.american.edu/pubs/importance-of-collaboration-victims/; NATALIA LEE ET. AL., NATIONAL SURVEY OF SERVICE PROVIDERS ON POLICE RESPONSE TO IMMIGRANT CRIME VICTIMS, U VISA CERTIFICATION AND LANGUAGE ACCESS, NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT (2013), http://niwaplibrary.wcl.american.edu/pubs/rsch-police-response-immigrant-victims/.
[49] Nawal H. Ammar et. al., Battered Immigrant Women in the United States and Protection Orders, 37 CRIM. JUST. REV. 337, 337-359 (2012), http://niwaplibrary.wcl.american.edu/pubs/battered-women-protection-order-research/.

American University, Washington College of Law                    81

Page 82

percent (n=251) of survey participant agencies worked in agencies that served victims of domestic violence and sexual assault (See, figure 103).

Figure 102: Organizations With Ongoing Relationships
With Law Enforcement (363 Agencies)

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 255 of 380   Page ID #:3219

13%

Yes (n=314)

No (n=49)

87%

The average length of time the participants reported their agency had been working with law enforcement was 19 years.[50] Programs collaborate with law enforcement on cases and on community policing efforts related to domestic and sexual violence, human trafficking, and with immigrant and limited English proficient (LEP) communities (See, figure 103). Other issues where they collaborated with law enforcement include assistance with transportation for victims and referring victims for intake at the victim/legal services organization. The majority of the collaborative work reflects best practices where advocates and attorneys participate with law enforcement both on individual cases of crime victims and on Coordinated Community Response (CCR) to domestic violence teams[51] and Sexual Assault Response Teams (SART).[52] T Prior research found that there is a strong correlation between ongoing collaborations between victim advocates/attorneys on domestic and sexual violence issues and whether a local law enforcement agency signs U visa certification on behalf of immigrant victims.[53]

[50] The percentage is equal 255 agencies reporting.

[51] *The Blueprint for Safety*, PRAXIS INTERNATIONAL, http://praxisinternational.org/blueprint-home/blueprint-communities/. (last visited Apr. 27, 2018)

[52] Rebecca Campbell et. al., *Sexual Assault Response Team (SART) Implementation and Collaborative Process*, NAT' CRIM. JUST. REFERENCE SERVICE (2013), https://www.ncjrs.gov/pdffiles1/nij/grants/243829.pdf; *SARRT Overview*, END VIOLENCE AGAINST WOMEN INTERNATIONAL, http://www.evawintl.org/PAGEID7/Best-Practices/Resources/SARRTs. (last visited Apr. 27, 2018.)

[53] NATALIA LEE ET. AL., NATIONAL SURVEY OF SERVICE PROVIDERS ON POLICE RESPONSE TO IMMIGRANT CRIME VICTIMS, U VISA CERTIFICATION AND LANGUAGE ACCESS, 10 NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT (2013), http://niwaplibrary.wcl.american.edu/pubs/rsch-police-response-immigrant-victims/.

American University, Washington College of Law                                                                      82

**Page 83**

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 256 of 380   Page ID #:3220



Figure 103: Types of Issues and Cases on Which Victims Advocates and Attorneys Collaborate with Law Enforcement (319 Agencies)

**Types of Cases Immigrant Victims Pursue**

The victim and legal services attorneys and advocates together reported filing a total 4,228 cases on behalf of immigrant victims of domestic violence, sexual assault, child abuse, human trafficking, and other criminal activities between January 2016 and October 2017. The three types of cases victim attorneys and advocates pursued most were VAWA self-petitions/VAWA cancellation of removal cases (44%, n=1868), civil protection orders (38%, n=1619), and U visas (16%, n=695) (See, figure 104). In the VAWA self-petition/cancellation of removal cases, 81% (n=360) of the cases were based on battering, extreme cruelty, sexual assault or child abuse perpetrated by a citizen spouse or parent. In 19% (n=84) of the cases, the perpetrator was a lawful permanent resident.

Survey participants' reported that the cases their agencies filed on behalf of immigrant victims in 2016 relative to 2017, declined by 40% (2,118 cases in 2016 – an average of 234 cases/month - to 1,417 cases in 2017 – an average of 142 cases/month).[54] This overall decline in cases filed was composed of substantial declines in some immigration case types and increases in the numbers of protection orders immigrant victims were willing to file. Declines and increases by case type were:[55]

• Decline in VAWA self-petitions – 391% lower (2016 =1567; 2017=325)

---

[54] The survey collected data on cases advocate/attorney participants handled for the full year of 2016 and for January through October 2017. The per month number of cases for all of the agencies participating was used to compare the filing rates in 2016 and 2017.

[55] All 2017 case filing numbers were calculated by taking the numbers of cases reported for January through October 2017, dividing by 10 to arrive at the average monthly case filings and then multiplying by 12 to obtain the full year 2017 projected

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 257 of 380   Page ID #:3221

number of cases filed.

American University, Washington College of Law                    83

**Page 84**

- Decline in U visas – 31% lower (2016=524; 2017=324)
- Increase in T visas – 64% higher (2016=14; 2017=38)
- Increase in civil protection orders filed – 23% higher (2016=775; 2017=1013)

The survey data illustrate the extent to which the climate of increased immigration enforcement and anti-immigrant public discourse have fueled fears of deportation are leading battered immigrant spouses and children abused by U.S. citizens and lawful permanent resident spouses, parents and step-parents locked in abusive homes. Agencies report filing almost 4 times (3.9) lower rate of filing VAWA self-petitions in 2017 compared to 2016. The effects on battered immigrants is also reflected in the 31% decline in U visa filings in 2017 compared to 2016, since domestic violence and child abuse cases make up approximately 46% of U visa cases filed nationally.[56]

Figure 104: Case Types Pursued in 2016 and 2017 by Immigrant Victims Whom Advocates and Attorneys Served (Cases = 4228)



1%
17%

VAWA self-petitions and VAWA Cancellation of Removal (n=1868)

44%

Civil Protection Orders (n=1619)

U Visas (n=695)

38%

T Visas (n=46)

**Types of Abuse and Crime Victimization Suffered**

Figure 105 shows the responses of the advocates/attorneys (n=149) about the numbers of the overlapping forms of abuse their VAWA self-petitioning, U visa and protection order clients and their children suffered. The survey asked them to check all that apply to the clients they served in 2016 and 2017. There were a total of 447 responses. Attorneys and advocates reported that the majority of their clients (across all types – U visa, VAWA, and CPO) were

cited in City of Los Angeles v. Barr No. 18-55599 archived on July 9, 2019

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 258 of 380   Page ID #:3222

victims of abuse that included both battering and sexual assault (ranging from 62% for U visa clients to 80% for VAWA clients). In many relationships, this was accompanied by extreme cruelty (ranging from 30% for protection order clients to 50% for VAWA self-petitioners). It is important to note that in many states protection orders are only available to victims of physical and sexual abuse or other behaviors (e.g. stalking, attempted assaults) that constitute crimes

56 LESLYE E. ORLOFF & PAIGE E. FELDMAN, NATIONAL SURVEY ON THE TYPES OF CRIMINAL ACTIVITIES EXPERIENCED BY U VISA RECIPIENTS (2011), http://niwaplibrary.wcl.american.edu/pubs/u-visa-criminal-activities-survey/.

American University, Washington College of Law                                          84

**Page 85**

under state law.[57] The immigration law definition of domestic violence includes forms of extreme cruelty that may not be considered as criminal or an assault.[58]

This survey also captured the extent to which the abuse underlying the cases advocates and attorneys were working with immigrant victims on included. They included co-occurring domestic violence and child abuse (ranging from 23% in U visa cases to 38% in VAWA self-petitioning cases) and acts based exclusively on physical and/or sexual abuse of a child (ranging from 16% or 25% in civil protection order cases to a high of (40% to 42%) in VAWA self-petitioning cases. While there was co-occurrence of elder abuse reported (ranging from 5% for U visa clients to 13% for VAWA clients), it nevertheless lower than that of child abuse. (See, figure 105).

Figure 105: Types of Abuse Most Often Suffered by Advocates'
and Attorneys' Clients - By Case Type 2016/2017 (149 Agencies)



Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 259 of 380   Page ID #:3223

| | extreme cruelty | abuse | assault | | | | | abuse |
|---|---|---|---|---|---|---|---|---|
| VAWA ('16=149; '17=133) | 30% | 35% | 38% | 37% | 42% | 50% | 57% | 80% |
| U Visa ('16=52; '17=46) | 16% | 23% | 22% | 21% | 23% | 26% | 31% | 62% |
| T Visa ('16=13; '17=14) | 26% | 19% | 7% | 7% | 11% | 7% | 19% | 41% |
| CPO ('16=34; '17=33) | | 25% | 30% | 16% | 25% | 31% | 45% | 79% |

Additionally, a small proportion of advocates and attorneys reported working with immigrant victims who were involved in the following criminal activities:

[57] *See Restraining Orders*, WOMENSLAW.ORG, https://www.womenslaw.org/laws/general/restraining-orders (last visited Apr. 27, 2018); *Appendix N: Domestic Violence Includes Child Abuse and Child Neglect*, *in* NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT, SPECIAL IMMIGRANT JUVENILE STATUS BENCH BOOK: A GUIDE TO BEST PRACTICE FOR JUDGES AND COURTS (2017), http://niwaplibrary.wcl.american.edu/pubs/appendix-n-domestic-violence-abuse-and-neglect/; Catherine F. Klein; Leslye E. Orloff, *Providing Legal Protection for Battered Women: An Analysis of State Statutes and Case Law*, 21 Hofstra L. Rev. 801, 1190 (1993)

[58] Leslye E. Orloff et. al., Battering or Extreme Cruelty: Drawing Examples from Civil Protection Order and Family Law Cases, NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT (2015), http://niwaplibrary.wcl.american.edu/pubs/extreme-cruelty-examples-protection-order/

American University, Washington College of Law                              85

• Blackmail, extortion, perjury, obstruction of justice – U visa (14%, n=14); Civil Protection orders (25%, n=17);
• Kidnapping, unlawful restraint, hostage taking, torture – U visa (17%, n=17), Civil Protection Orders (18%, n=12);
• Felonious assault, murder, manslaughter – U visa (12%, n=12); Civil Protection orders (3%, n=2).

Advocates/attorneys were also asked to respond to questions about the types of abuse the children of their VAWA self-petitioning, U visa and protection order clients suffered indepent of or in addition to the abuse suffered by their immigrant parent. All forms of immigration relief that protect immigrant crime victims allow immigrant parents to apply for protection when their child is abused whether or not the parent is also abused.[59]

Similarly, non-abused parents can bring civil protection order actions on behalf of their abused children. This practice is however, less common than abused immigrant parents filing for immigration relief based on abuse of their children so that they can safely take steps to protect their children from ongoing abuse and help their children heal.[60] The survey asked the particpating advocates and attorneys to check all that apply to the clients they served in 2016 and 2017.The majority of the attorneys and advocates clients' children (across all client types, U visa, T visa, VAWA, and CPO) were physically or sexually abused. (See figure 106). It is

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 260 of 380   Page ID #:3224

important to note that while many attorneys and advocates (n=239) reported working with clients whose children had been either physically or sexually assaulted, a relatively large number (n=179) reported working with clients whose children had been both physically *and* sexually assaulted[61].

[59] See e.g. U visas INA Section 101 (a) (15)(U)(ii); INA Section 203 (a)(1)(A)(ii); and INA Section 204(a)(1)(B)(ii)(1).

[60] JOANNE LIN & COLLEEN O'BRIEN, IMMIGRATION RELIEF FOR CHILD SEXUAL ASSAULT SURVIVORS, *in* NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT, EMPOWERING SURVIVORS (2015), http://niwaplibrary.wcl.american.edu/pubs/ch8-imm-relief-child-sexual-assault-survivors/.

[61] In the case of child or VAWA self-petitions this abuse would have been perpetrated by the child's parent or stepparent.

American University, Washington College of Law                                              86

**Page 87**

Figure 106: Types of Abuse Most Often Suffered by Children of
Advocates' and Attorneys' Clients - By Case Type 2016/2017
(135 Agencies)

60%

50%

40%

30%

20%

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 261 of 380   Page ID #:3225

10%

0%

| | Human trafficking | Sexual assault and extreme cruelty | Child physical and sexual assault | Dating violence | Batttering and chhild abuse | Stalking | Child abuse | Physical and sexual abuse |
|---|---|---|---|---|---|---|---|---|
| VAWA ('16=135; '17=117) | 10% | 14% | 21% | 29% | 30% | 34% | 42% | 49% |
| U Visa ('16=35; '17=33) | 9% | 18% | 26% | 9% | 18% | 21% | 44% | 32% |
| T Visa/CP ('16=11; '17=11) | 27% | 9% | 9% | 14% | 9% | 18% | 18% | 32% |
| CPO ('16=29; '17=28) | 4% | 14% | 16% | 18% | 30% | 19% | 39% | 30% |

The survey also sought to learn about what forms of abuse occur and with what frequency when immigrant crime victims face barriers in seeking help and return to or are unable to leave abusive homes or employment. Figure 107 reports the percent of immigrant victims who stay or return to their abuser by type of case (immigration or protection order) that the immigrant victim is pursuing.

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

American University, Washington College of Law

**Page 88**

Figure 107: Percent Of Immigrant Victims Who Stay/Return to

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 262 of 380   Page ID #:3226

Their Abusers in 2016 and 2017 (838 cases)



Of the participants who reported their clients stayed with or returned to their abusers, almost three-quarters (72%, n=902) suffered daily, weekly or monthly abuse (See, figure 108) and the majority said their clients (regardless of client type) suffered from battering and sexual assault. (See, figure 109 for a detailed report of the types of abuse suffered).

Figure 108: Frequency of Abuse for Victims Who
Stayed/Returned to Their Abusers (2016-2017) (1215 cases)



Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 263 of 380   Page ID #:3227

American University, Washington College of Law                                      88

Page 89

Figure 109: Advocates and Attorneys Reporting Ongoing Abuse Victims and their Children Suffer if they Stay or Return to Their Abusers (2016/2017) (104 Agencies)



| | Child abuse and sexual assault | Human trafficking | Sexual assault and extreme cruelty | Battering and child abuse | Dating violence | Child abuse | Stalking | Battering and sexual assault |
|---|---|---|---|---|---|---|---|---|
| VAWA ('16=104; '17=98) | 11% | 8% | 11% | 23% | 23% | 31% | 31% | 48% |
| U Visa ('16=25; '17=20) | 16% | 6% | 18% | 9% | 13% | 13% | 24% | 33% |
| T Visa/CP ('16=9; '17=9) | 11% | | 11% | 11% | 11% | 11% | 11% | 28% |
| CPO ('16=15; '17=14) | | 9% | 9% | 18% | 29% | 18% | 29% | 50% |

cited in City of Los Angeles v. Barr No. 18-55599 archived on July 9, 2019

**Types of Benefits, Services, and Justice System Assistance Immigrant Victims are Willing to Seek**

The attorneys and advocates were asked what services their VAWA, U visa, T visa, and civil protection order clients were willing to seek. (See, figures 110 and 111). Figure 111 shows the responses the attorneys/advocates gave regarding their clients "likelihood" to seek the following services: healthcare[62], victims' services[63], public benefits[64], and justice system[65]. Victims who were receiving assistance from advocates and attorneys were willing to receive a wide range of victim services, health care and housing and other public benefits. (See, figure 110). Trafficking victims were slightly less likely than other victims to seek these services. Victims were also generally willing with the support of victim advocates and attorney to access justice system help. (See, figure 111). [66] However, as discussed in more detail below, the analysis of data of individual client choices in 2016 and 2017 revealed that their clients continued participation; particularly in the justice, system is affected by fear of negative

---

[62] This refers to healthcare for themselves as well as healthcare for children.

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 264 of 380   Page ID #:3228

63 This is made up of help with an employment, rape crisis center or sexual assault program victim advocacy, counseling services, shelter and the domestic violence program services and victim advocacy.

64 This includes state and federal public benefits for the victim themselves and/or for the victim's children including but not limited to subsidized childcare services, and housing.

65 Justice system assistance from the both the criminal and civil justice systems included help from prosecutors, police, courts, and specifically civil protection orders, custody, child support and divorce in family courts.

66 The survey questionnaire inadvertently did not list sexual assault programs as a services as an option from survivors receiving civil protection orders.

American University, Washington College of Law                                                   89

**Page 90**

immigration consequences of justice system involvement and perpetrator's threats to deportation made to those who participate.

Figure 110: Services Immigrant Victims are Willing to Seek 2016/2017 - By Case Type (142 Agencies)



| | Victim Health-care | Child Health-care | Public benefit s for victims | Childca re | Housin g | Public benefit s for childre n | Rape crisis center | Sexual assault progra m | Counse ling Service s | Shelter | Domes tic violenc e progra m |
|---|---|---|---|---|---|---|---|---|---|---|---|
| VAWA ('16=142; '17=129) 47% | | 80% | 45% | 55% | 68% | 77% | 34% | 49% | 66% | 68% | 83% |
| U Visa ('16=47; '17=46) | 59% | 83% | 50% | 70% | 64% | 83% | 55% | 65% | 76% | 59% | 72% |
| T Visa/CP ('16=13; '17=13) 50% | | 59% | 57% | 42% | 71% | 48% | 41% | 45% | 61% | 70% | 43% |
| CPO ('16=30; '17=32) | 35% | 74% | 39% | 58% | 60% | 74% | 43% | | 79% | 81% | 84% |

Figure 111: Immigrant Victims' Willingness to Turn to Justice System for Help 2016/2017 - By Case Type (142 Agencies)

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 265 of 380   Page ID #:3229

| | Employment Case | Prosecutors | Police | Courts | Child Support | Divorce | Custody | Protection Orders |
|---|---|---|---|---|---|---|---|---|
| VAWA ('16=142; '17=129) | 25% | 26% | 32% | 37% | 49% | 59% | 60% | 63% |
| U Visa ('16=47; '17=46) | 36% | 40% | 48% | 54% | 55% | 56% | 64% | 67% |
| T Visa/CP ('16=13; '17=13) | 39% | 44% | 33% | 39% | 45% | 47% | 53% | 33% |
| CPO ('16=30; '17=32) | 18% | 36% | 51% | 54% | 66% | 59% | 69% | 84% |

American University, Washington College of Law                90

Page 91

## Immigrant Crime Victims' Experiences with Immigration Enforcement

A key focus of this survey involved examining the extent to which immigration enforcement is affecting immigrant crime victims. Advocates and attorneys were asked to report on the numbers of their immigrant victim clients who in 2016 and 2017 had been subject to an immigration enforcement action by U.S. Department of Homeland Security enforcement officials who worked at either Immigration and Customs Enforcement (ICE) or Customs and Border Patrol (CBP). This includes being stopped, questioned, detained, deported, or had a notice to appear in immigration court issued against them. In total, 433 cases advocates and attorneys' immigrant victim clients had been subject to immigration enforcement actions in 2016 and 2017. This constitute 10% of the total number of immigrant victims cases (n= 4228) that attorney and advocates reported in the survey. VAWA self-petitioners at least twice as likely as immigrant victims with other type of cases filed (U visas, T visas and civil protection orders) to subject to immigration enforcement. (18% VAWA self-petitioners compared to U visa 8%, T visa 9% and protection orders 2%).(See, figure 112).

Figure 112: Percent of Immigrant Victims Clients Subjected to Immigration Enforcement in 2016 and 2017 by Client Type (433 Cases) Out of a Total of 4228 Cases Filed

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 266 of 380   Page ID #:3230



| | |
|---|---|
| 12% | U Visa (n=58) |
| 10% | 8% 9% T Visas (n=40) |
| 8% | Civil Protection Order (n=29) |
| 6% | |
| 4% | |
| 2% | 2% |
| 0% | |

Out of the total number of immigrant victim clients exposed to immigration enforcement identified by the advocates/attorneys in this survey, over three-quarters (79%, n=342) of them were VAWA self-petitioners who were abused by their U.S. citizen or lawful permanent resident spouses or parents. (See, figure 113).



American University Washington College of Law                              91

**Page 92**

Figure 113: Enforcement Actions Against Immigrant Victims
Reported By Advocates and Attorneys 2016-2017 By Case Type
(433 cases)



| | |
|---|---|
| 1% | |
| 7% | VAWA (n=342) |
| 13% | U Visa (n=58) |
| | T Visas (n=4) |
| | Civil Protection Order Cases (n=29) |

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 267 of 380   Page ID #:3231

79%

Advocates and attorneys who said that their clients were subjected to immigration enforcement were also asked to identify what led to the enforcement action for each of their clients. The perpetrator or perpetrator's family members calling immigration enforcement officials to turn the victim in for immigration enforcement was the answer given by the largest number of advocates/attorneys. Providing tips and information about the victim to ICE or CBP agents accounted for a quarter to over a third of immigration enforcement actions initiated against immigrant victims who were VAWA self-petitioners ( 38%, n=97), trafficking victims (T visas 30%, n=3) or victims with pending U visas (25%, n=9).[67] Battered immigrant victims who were civil protection order clients were most often (89%) targeted for immigration enforcement during traffic stops. Over a third of U visa victims (36%, n=13) and 17% (n=42) were turned in for immigration enforcement when they had called local police or sheriffs for help and the police arrived at a crime scene. (For a detailed breakdown, See, figure 114).

cited in City of Los Angeles v. Barr No. 18-55599 archived on July 9, 2019

[67] These findings in terms of perpetrator's role in triggering enforcement actions against victims are consistent with prior research conducted in 2013. That research similarly found that when VAWA self-petitioners and U visa victims were subject to immigration enforcement, tips from perpetrators triggered immigration enforcement against victims in 38.3% of the VAWA cases and 26.7% of the U visa cases. Krisztina E. Szabo et. al., Early Access to Work Authorization For VAWA Self-Petitioners and U Visa Applicants, NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT 26 (Feb. 2014), http://niwaplibrary.wcl.american.edu/pubs/final_report-on-early-access-to-ead_02-12/.

American University, Washington College of Law                                    92

**Page 93**

Figure 114: Motives that Triggered the Immigration Enforcement
Action 2016 and 2017 (282 cases)

105%

90%

75%

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 268 of 380   Page ID #:3232

| | Perpetrator or perpetrator's family reported victim | Traffic stops | Victim arrested by police related to incident against victim | Employer reported the victim | Landlord reported the victim | Stopped by local police unrelated to domestic violence or traffic stop | Secure communities program |
|---|---|---|---|---|---|---|---|
| VAWA (n=218) | 38% | 11% | 17% | 7% | 2% | 6% | 4% |
| U Visa (n=36) | 25% | 39% | 36% | | | | |
| T Visa (n=10) | 30% | 10% | 10% | 10% | 20% | 20% | |
| CPO (n=18) | 11% | 89% | | | | | |

Advocates and attorneys were also asked about the locations where the immigration enforcement actions against their clients took place. Of the 206 immigration enforcement actions against victims identified by advocates and attorneys in the survey, 51 of them occurred against immigrant victims in connection with their appearance at courthouses. Another 87 of the enforcement actions[68] reported took place at locations that Congress in the Violence Against Women Act 2005 prohibited immigration enforcement. As part of the VAWA confidentiality protections there is a listed of protected locations where enforcement against immigrant crime victims was to be generally prohibited.[69] The list of VAWA confidentiality protected locations includes:[70]

• Domestic violence shelters
• Rape crisis centers
• Family justice centers
• Supervised visitation centers
• Victim services agencies, and
• Courthouses " (or in connection with that appearance of the alien at a courthouse)

    if the alien is appearing in connection with a protection order case, child custody case, or other civil or criminal case relating to domestic violence, sexual assault,

[68] The 87 enforcement actions were conducted in the following locations: domestic violence shelter (n=33); victims service agencies (n=21); rape crisis center (n=17); family justice center (n=13) and; supervised visitation (n=3)
[69] Leslye E. Orloff, *VAWA Confidentiality Protections for Immigrant Crime Victims*, Nat'l Immigrant Women's Advocacy Project (Jan. 31, 2018), http://niwaplibrary.wcl.american.edu/vawa-confidentiality-materials-tools/.
[70] INA Section 239(e).

American University, Washington College of Law            93

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 269 of 380   Page ID #:3233

trafficking, or stalking in which the alien has been battered or subject to extreme cruelty or if the alien is described in subparagraph (T) or (U) of section 1101(a)(15)"[71]

The Advocates/ attorney identified another 23 enforcement actions[72] against their immigrant victim clients at other protected locations and where immigration enforcements are prohibited. ICE has longstanding policies designed to prevent immigration enforcement actions at sensitive locations[73] these include:

- Schools,
- Hospitals, and
- Places of worship and other religious ceremonies

Figure 115 provides more details regarding attorneys and advocates responses regarding places where their immigrant victims faced immigration enforcements.

Figure 115: Locations At Which Immigration Enforcement Actions Were Initiated Against Immigrant Crime Victims by Case Type 2016-2017 (206 cases)



| | Supervised visitation center (n=3) | Hospitals (n=6) | Schools (n=11) | Places of worship-Religious Ceremonies (n=6) | Family justice center (n=13) | Rape crisis center (n=17) | Victim services agency (n=21) | Domestic violence shelter (n=33) | Traffic stop (n=45) | Court-houses (n=51) |
|---|---|---|---|---|---|---|---|---|---|---|
| VAWA Self Petition (n = 101) | 2% | 4% | 4% | 6% | 7% | 9% | 14% | 14% | 16% | 25% |
| U Visa (n = 65) | 0% | 3% | 6% | 0% | 9% | 11% | 0% | 22% | 26% | 23% |
| T Visa (n = 20) | 5% | 0% | 0% | 0% | 0% | 5% | 0% | 25% | 10% | 35% |
| CPO (n = 20) | 0% | 0% | 15% | 0% | 0% | 0% | 15% | 0% | 50% | 20% |

VAWA Self Petition (n = 101)        U Visa (n = 65)        T Visa (n = 20)        CPO (n = 20)

Figure 116 provides more detail documenting the fact that the immigration enforcement actions initiated against immigrant victims at courthouses were occurring in connection with

[71] INA Section 239(e)(2)(B)

[72] The 27 enforcement actions were conducted in the following locations: hospitals (n=6); schools (n=11); places of worship and other religious ceremony (n=6).

[73] Memorandum from Julie Myers, Assistant Secretary, U.S Immigration and Customs Enforcement, to All Field Office Directors, *Field Guidance on Enforcement Actions or Investigative Activities At or Near Sensitive Community Locations* (Jul 3, 2008), http://niwaplibrary.wcl.american.edu/pubs/guidance-enforcement-sensitive-community/; Memorandum from John Morton, Director, U.S Immigration and Customs Enforcement, to Field Office Directors, *Enforcement Actions at or Focused on*

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 270 of 380   Page ID #:3234

*Sensitive Locations* (Oct. 24, 2011), https://www.ice.gov/doclib/ero-outreach/pdf/10029.2-policy.pdf

American University, Washington College of Law                94

Page 95

cases that should have received VAWA confidentiality protection. Courthouse enforcement was occurring when immigrant victims were going to or were in courts in connection with protection order cases, child custody cases, domestic violence cases and other cases related to seeking civil or criminal court remedies for the abuse or crime victimization.

Each of the enforcement actions related to cases described in figure 115 occurring at courthouses that immigrant victims were reported in the survey by advocates and attorneys (n=228) is prohibited VAWA confidentiality's statutory protections and as a result should have been legally avoided. Instead, the advocates and attorneys' clients were subjected to immigration enforcement in connection with their courthouse appearance. The majority of civil protection order (CPO) clients had immigration enforcement initiated against them during domestic violence court appearance (75%, n=15). Many of the advocates and attorney's T visa clients who were victims of domestic violence related human trafficking were also targeted for immigration enforcement during domestic violence court cases (30%, n=10), during divorce court cases (25%, n=8) and custody court cases (21%, n=7). U visa clients, on the other hand, were often targeted for immigration enforcement during criminal misdemeanor court cases (24%, n=12) and divorce cases (20%, n=10) cases. Many VAWA self-petitioners, targeted for immigration enforcement during protection order cases (26%, n=33) against their citizen or lawful permanent resident spouses. See, figure 116 for further details.

Figure 116: Case Type When Immigrant Victim is Subject to an Immigration Enforcement Action In Connection with a Courthouse Appearance 2016-2017 (228 Cases)



| | Human trafficking (n=1) | Criminal felony (n=4) | Child support (n=6) | Criminal misdemeanor (n=18) | Sexual assualt (n=19) | Child abuse/neglect (n=20) | Custody (n=22) | Divorce (n=37) | Protection order (n=46) | Domestic violence (n=55) |
|---|---|---|---|---|---|---|---|---|---|---|
| VAWA (n = 126) | 1% | 3% | 2% | 5% | 10% | 13% | 12% | 11% | 26% | 17% |
| U Visas (n=49) | | | | 24% | 12% | 8% | | 20% | 16% | 18% |
| T Visas (n=33) | | | 9% | | | | 21% | 24% | 15% | 30% |
| CPOs (n=20) | | | | | | | | 25% | | 75% |

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 271 of 380   Page ID #:3235

VAWA (n = 126)          U Visas (n=49)          T Visas (n=33)          CPOs (n=20)

The survey also obtained information from advocates and attorneys about where in connection with courthouse appearances their immigrant crime victim clients were being arrested and/or subjected to immigration enforcement actions. Most clients who were arrested at courthouses were inside the courtroom, and this is particularly typical for U visa and VAWA clients. (See, figure 117).

American University, Washington College of Law                                        95

**Page 96**



Figure 117: Location of Courthouse Enforcement Actions
Conducted Agaisnt Immigrant Victims
2016-2017 (n=51)

Victim advocates and attorneys were asked to report only about immigration enforcement actions taken against immigrant victim clients at courthouses.[74] The states in which advocates and attorneys reported courthouse enforcement actions against their immigrant victim clients were: Florida, Georgia, Nevada, New Mexico, Oregon, Pennsylvania, Vermont and Wisconsin. These findings are similar to those discussed above in Section I of this report the National Judicial Survey,[75] the states in which this survey data found immigration enforcement to be occurring against immigrant crime victims was not limited to states with lower levels of cooperation with federal immigration enforcement officials. The reports of immigration enforcement occurring against immigrant crime victims were occurring mostly in civil and family court cases (see, figure 116) and also occurred in states that have high levels of cooperation with federal immigration enforcement activities (e.g. Florida, Georgia, Nevada, Pennsylvania, and Wisconsin).[76]

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 272 of 380   Page ID #:3236

The map contained in Figure 118 provides an infographic overview of the Judicial Survey's findings regarding immigration enforcement in non-criminal cases together with the Advocates and Attorneys' survey findings on immigration enforcement at courthouses against immigrant crime victims in both civil and criminal cases. The states in red are the states in which judges and/or victim advocates/attorneys reported immigration enforcement actions.

[74] The questions about immigration enforcement asked in the judges' survey asked about immigration enforcement at courthouses generally and did not specifically ask about immigrant crime victims. Despite this fact, the survey data revealed 18 cases in which immigration enforcement occurred in family court cases including protection orders and child welfare cases that were likely to have directly involved victims.

[75] Figures 19 and 20 in this Survey Report.

[76] *National Map of Local Entanglement with ICE*, IMMIGRANT LEGAL RESOURCE CENTER (Jan. 25, 2018), https://www.ilrc.org/local-enforcement-map; Bryan Griffith and Jessica M. Vaughan, *Maps: Sanctuary Cities, Counties, and States*, CENTER FOR IMMIGRATION STUDIES (Jul. 27, 2017), https://cis.org/Map-Sanctuary-Cities-Counties-and-States.

American University, Washington College of Law                                          96

Page 97

Figure 118: States with 2016-2017 Reports by Judges on Courthouse
Immigration Enforcement in Family Employment and Civil Cases and
Advocates, or Attorneys Reports on Courthouse Enforcement Against Crime
Victims (71 cases; 51 Attorneys/Advocates Survey + 20 Judges Survey)

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 273 of 380   Page ID #:3237

**Impact of Immigration Enforcement on Immigrant Crime Victims and Their Children**

The survey also sought to better understand the impact immigration enforcement in communities and at courthouses has on immigrant crime victims and their willingness to turn to the justice system for help. The advocates and attorneys were, therefore, asked to indicate the experience of their clients who are domestic violence victims and their willingness to call the police for help in 2016 compared to 2017. They reported 1,366 cases where victims called the police for help. The number of immigrant domestic violence victims willing to call the police for help dropped 8% in 2017 vs 2016. (See, figure 119).

*cited in City of Los Angeles v. Barr*
*No. 18-55599 archived on July 9, 2019*

American University, Washington College of Law                                    97

Page 98

Figure 119: Decline (-8%) in the Monthly Rate of
Calls to Police of Help by Immigrant and LEP
Domestic Violence Victims in 2017 Compared to
2016 (1366 Cases)

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 274 of 380   Page ID #:3238

2016                                                                                              2017

The advocates and attorneys noted that there were 4,228 cases of immigrant crime victim clients who in 2016 and 2017 did not call the police for help, decided not to file a court case, or filed but did not follow through on a court case filed. (See, figure 120). These cases are summarized below by type:

- Civil protection order clients 58%, n=938;
- VAWA clients 66%, n=1242:
- Trafficking victim clients 67%, n=31); and
- U visa clients (30%, n=207).

Figure 120: Percentage of Immigrant Crime Victim Clients' Cases Where Victims Did Not Call the Police, Declined to File a Court Case, or Did Not Follow Through on a case Filed 2016-2017 (4228 cases)



Additionally, the information provided in the survey regarding fears, concerns and factors that influence immigrant victims' individual decisions to seek help from the civil and/or criminal justice system is summarized in figure 18. Primary among the reasons for not seeking help from police or courts and not following through with these agencies are fear of deportation (37%, n=899), fear that the perpetrator will retaliate by calling immigration enforcement officials, and

American University, Washington College of Law                                                    98

Page 99

reporting the victim (25%, n=605). (See, figure 121). Fear of losing children was the third factor (24%, n=591). Figure 18 provides information about the range of factors that play a role in influencing immigrant victims' reticence to turn to the justice system for help and

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 275 of 380   Page ID #:3239

figure122provides details about how these factors may be different among immigrant victims by case type.



Figure 121: Reasons Immigrant Victims Did Not Call the Police for Help, File or Follow Through With a Court Case 2016 -2017 (2,418 Cases)

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 276 of 380   Page ID #:3240

Page 100

Figure 122: Reasons Immigrant Victims Did Not Call the Police for Help, File or Follow Through With a Court Case 2016 -2017 - By Case Type (2,418 Cases)



| | Fear of deportation (n=899) | Fear perpetrator would retaliate by having victim deported (n=605) | Fear of losing children (n=591) | Fear of immigration enforcement at courthouse (n=378) | Justice system would not believe victim because of their immigration status (n=366) | Fear it would lead to immigration enforcement (n=344) | Police would turn victim in to immigration enforcement officials (n=240) | Judge would turn victim in to immigration enforcement officials (n=143) | Prosecutor would turn victim in to immigration enforcement officials (n=95) |
|---|---|---|---|---|---|---|---|---|---|
| VAWA (n=1242) | 57% | 36% | 29% | 24% | 21% | 20% | 14% | 10% | 6% |
| U Visa (n=207) | 63% | 20% | 20% | 8% | 4% | 2% | 30% | 43% | 20% |
| T Visa (n=31) | 16% | 13% | 6% | 3% | 3% | 3% | 3% | 19% | 6% |
| CPO (n=938) | 8% | 6% | 5% | 5% | 1% | 2% | 11% | 16% | 7% |

cited in City of Los Angeles · Barr
No. 18-55599 archived on July 9, 2019

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 277 of 380   Page ID #:3241

American University, Washington College of Law                    100

Page 101

**Part Five: Policy Recommendations and Conclusions**

**Initial Implications and Recommendations:**

Over the past 27 years, the numbers of immigrants from linguistically and culturally diverse backgrounds has steadily increased. Immigrants have moved beyond traditional gateway states,[77] settling in urban and rural communities across the country, particularly in the Southeast, the Pacific Northwest, Mountain States, and the Sun Belt.[78] The immigrant population rose by 11.6% between 2000 and 2016. As of 2016:

• 13.5% (43,739,345) of the U.S. population is foreign-born;[79]
• 24.5% of the U.S. population is either foreign born or has one or more foreign born parents;[80]
• 25.8% of children in the U.S. under the age of 18 have one or more immigrant parents;[81]
• 88.2% of children in immigrant families are U.S. citizens.[82]

As a result, greater numbers of courts, law enforcement agencies, prosecutors' offices, victim advocates and attorneys across the country will be called upon to offer assistance to immigrant victims of crime including particularly domestic violence, sexual assault, child abuse, stalking, dating violence and human trafficking. This includes agencies working in new immigrant gateway communities that had not previously been home to growing immigrant populations.[83]

This survey showed some notable declines in immigrant crime victims' willingness to seek help in 2017 compared to 2016:

• 12% of judicial survey participants report declines in requests for protection orders by immigrant victims
• Declines in complaints filed by the immigrant community (18%) and in willingness (15%) of immigrant community members and victims to cooperate on criminal cases were reported by law enforcement survey participants
• Law enforcement officers reported in greater detail the areas in which they observed declines in immigrant victim willingness to:
  o Make a police report – 22%
  o Participate in crime scene investigations – 21%

---

[77] For example, California, Florida, Illinois, New Jersey, New York and Texas.

Cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 278 of 380   Page ID #:3242

[78] *Changing Patterns in U.S. Immigration and Population*, (December 18, 2014), The Pew Charitable Trusts (last visited Feb. 16, 2018), http://www.pewtrusts.org/en/research-and-analysis/issue-briefs/2014/12/changing-patterns-in-us-immigration-and-population.

[79] *United States Demographics*, Migration Policy Institute, (last visited Feb. 16, 2018) https://www.migrationpolicy.org/data/state-profiles/state/demographics/US.

[80] Sources: 2016 census data reported by Migration Policy Institute, United States Demographics 2016 (Foreign born population 13.5%) + 2016 Census Migration Policy Institute, Children in U.S. Immigrant Families (citizen children under age of 18 with one or more immigrant parents 4.9% of US population) + 2014 census data The Pew Charitable Trusts, Changing Patterns in U.S. Immigration and Population (December 18, 2014) (adult citizen children of immigrant parents – Second Generation citizens 6.2%).

[81] *Children in U.S. Immigrant Families*, Migration Policy Institute, (last visited Feb. 16, 2018), https://www.migrationpolicy.org/programs/data-hub/us-immigration-trends#children.

[82] *Children in U.S. Immigrant Families*, Migration Policy Institute, (last visited Feb. 16, 2018), https://www.migrationpolicy.org/programs/data-hub/us-immigration-trends#children.

[83] *Changing Patterns in U.S. Immigration and Population*, (December 18, 2014), The Pew Charitable Trusts (last visited Feb. 16, 2018), http://www.pewtrusts.org/en/research-and-analysis/issue-briefs/2014/12/changing-patterns-in-us-immigration-and-population.

American University, Washington College of Law                   101

Page 102

- o Assist in post-crime scene criminal investigations – 20%
- o Work with prosecutors – 18-25%
- o Work with victim witness staff at police agencies – 13%
- Victim advocates and attorneys participating in the survey reported a:
  - o 39% decline in the numbers of VAWA self-petitions filed on behalf of battered immigrant spouses and children of U.S. citizens and lawful permanent residents by the agencies on behalf of immigrant victim clients
  - o 31% decline in the numbers of U visa cases filed by the agencies on behalf of immigrant victim clients
  - o 8% decline in the number of immigrant domestic violence victims willing to call the police for help

In addition to these findings showing declines in immigrant victims' willingness to seek help through the justice system and willingness to file for immigration relief, there were areas in which the findings show increases in victim's wiliness to use the justice system. These were observed more by Signing Courts and Signing Agencies than those that do not sign. The survey found that that when courts, law enforcement agencies and prosecutors adopt practices, policies and/or protocols that result in U and T visa certifications, submitting requests for continued presence, and/or issue state court findings for immigrant children applying for Special Immigrant Juvenile Status, the message sent to the immigrant community by these Signing Agencies is strong. This agency or courthouse is a safe place where immigrant crime victim and abused, abandoned or neglected immigrant children can turn for help. Even in times of increased immigration enforcement and public anti-immigrant discourse, Signing Agencies including courts, law enforcement and prosecutors report seeing increases in the willingness of immigration crime victims to turn to these agencies and courts for help. Examples include:

cited in City of Los Angeles v. Barr
No. 18-55599, revised on July 9, 2019

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 279 of 380   Page ID #:3243

• 23% of judges reported observing an increase in civil protection order filings by immigrant victims and similarly victim advocates and attorneys reported filing 23% more cases on behalf of immigrant victims in 2017 compared to 2016;

• 20% of judges reported an increase in custody cases involving immigrant crime victims

It is important to note that the qualitative and quantitative date collected in the survey found that both Signing Agencies and Signing Courts reported observing areas of decreases and increases of willingness of immigrant victims to avail themselves of services from their agency or court. The quantitative data collected from courts and law enforcement explains that as police or courts witnessed declines occurring they increased their efforts to reach out to the immigrant community and make it known that their agencies and courts were safe places for immigrants. These efforts resulted in a greater willingness of immigrant victims to use court services and seek help from police in communities where these efforts were underway and particularly when U visa certification, continued presence requests and judges signing SIJS orders were a part of these efforts. Signing Agencies and Signing Courts often work with non-governmental community based agencies providing legal, advocacy and social services to immigrant victims. The National Center for State Courts issued a White Paper that recommends that courts collaborate with community-based organizations to identify barriers and develop strategies to

American University Washington College of Law                                                      102

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

**Page 103**

improve access to the courts for LEP victims. [84] Prior National Institute of Justice funded research has found that victim advocates and attorneys play a key role in improving immigrant victims' willingness to file for civil protection orders. [85]

Another theme across disciplines that the survey data revealed is that although immigrant victims in many communities with victims filing more cases are becoming more difficult and complex:

• Judges observed this complexity as including:

   o The immigration status of victims being raised in criminal (39%), civil protection order (32%), custody (31%), divorce (23%) and other family court cases;

   o Court proceedings being interrupted due to victim's fears of coming to court (54% in 2017 and 45% in 2016)

   o Instances of immigration enforcement at courthouses (2016= criminal 11, family/civil 8; 2017 = criminal 18, family/civil 10)

   o Judges reporting that they are concerned or very concerned about the effect

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 280 of 380   Page ID #:3244

immigration enforcement is having on the willingness of immigrant and LEP litigants and victims to participate in court cases. Examples include:

- ▪ Human trafficking – 94%
- ▪ Sexual assault – 92%
- ▪ Domestic Violence – 91%
- ▪ Child abuse and neglect – 91%
- ▪ Custody – 88%
- ▪ Criminal – 87%

• Law enforcement officers reported

  o That fears about deportation and victim's being turned in by perpetrators to DHS are among the top reasons that criminal cases of crimes committed against immigrant and LEP victims are underreported and becoming harder to prosecute:

  - ▪ Domestic violence – 69%
  - ▪ Human trafficking – 64%
  - ▪ Sexual assault – 59%
  - ▪ Child abuse – 50%
  - ▪ Extortion-Blackmail – 38%
  - ▪ Elder abuse and exploitation 34%
  - ▪ Felonious assaults – 33%

  o That barriers to cooperation by victims are leading to greater numbers of perpetrators at large in their communities (52%)

84 Brenda K. Uekert et al., The National Center for State Courts, White Paper: Improving the Courts' Capacity To Serve Limited English Proficient Persons Seeking Protection Orders (04 2016), http://niwaplibrary.wcl.american.edu/pubs/serving-lep-women-white-br. *See also* Brenda K. Uekert et al., The National Center for State Courts, Serving Limited English Proficient (LEP) Battered Women: A National Survey of the Courts' Capacity To Provide Protection Orders (2006), http://niwaplibrary.wcl.american.edu/pubs/lang-gov-white-paper-improvingcourtscapacity-100/.
85 Mary Ann Dutton et. al., U.S. Dep't of Just., Use and Outcomes of Protection Orders by Battered Immigrant Women Revised Final Technical Report (2006), http://niwaplibrary.wcl.american.edu/pubs/fam-gov-nijtechnicalreportprotectionorders11-10-06/

American University, Washington College of Law                    103

**Page 104**

  o That when immigrant victims do not cooperate this affects officer safety (64%), community safety (69%), victim safety (67% all victims; 69% immigrant and LEP victims) and the ability to hold violent perpetrators accountable (71%)

• Prosecutors participating in the survey reported

  o That immigration status issues about crime victims were being raised in criminal cases more in the past 5 years than ever before (62%)

  o Declines in immigrant victims' willingness to work with prosecutors in the

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 281 of 380   Page ID #:3245

past year compared to prior years:
- Domestic violence – 43%
- Sexual assault – 43%
- Child abuse – 39%
- Stalking – 32%
- Human trafficking – 27%

o Immigration related reasons for non-cooperation in prosecutions included:
- Fear that the perpetrator will turn the victim in to immigration officials – 72%
- Fear of being separated from their children – 70%
- Victims receiving threats from perpetrators to report the victim to immigration officials – 70%

o That the following crimes are harder to prosecute in cases involving immigrant victims
- Domestic violence – 82%
- Sexual assault – 70%
- Human trafficking – 55%
- Child abuse – 48%

**Recommendations for Victim Advocates and Attorneys**

Advocates and attorneys play a critical role in informing immigrant victims of domestic and sexual violence about their legal rights and options and facilitating access to justice system remedies for immigrant victims including help from the civil and criminal justice systems.[86] Victim advocates and attorneys provide essential support and help to victims. Immigrant victims and their children (who are often US citizens) will heal faster if they able to successfully access the full range of public benefits and services that immigrant victims are legally eligible to receive under federal immigration laws, state family laws, state and federal public benefits laws and in criminal court cases.

The surveys this report summarizes show that long sustained relationships between advocacy/ legal services agencies and law enforcement experts on violence against women contributes to immigrant victims' safety and access to justice. The participants in the surveys we conducted have had a 19-year working relationship. Strong working relationships that are built over time and involve work on a range of domestic violence, sexual assault, language access and immigrant community issues lead to positive outcomes for immigrant crime victims and their

[86] Nawal H. Ammar et. al., *Battered Immigrant Women in the United States and Protection Orders*, 37 Crim. Just. Rev. 337, 337-359 (2012), http://niwaplibrary.wcl.american.edu/pubs/battered-women-protection-order-research/.

American University, Washington College of Law                104

**Page 105**

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 282 of 380   Page ID #:3246

access to the civil and criminal justice systems.[87] Particularly in times of increased immigration enforcement, victim advocates and attorneys need to develop and strengthen their relationships with law enforcement officials/prosecutors, and need to build relationships with courts that promote access to justice for immigrant victims.

Immigrant victims' advocates and attorneys can benefit their clients by being proactive in reaching out to law enforcement and prosecutors and bringing them to the table where multi-disciplinary teams are working together to resolve issues and improve community responses to domestic and sexual violence. Close working relationships, built over time that establish mutual respect and trust create strong bridges will facilitate immigrant access to criminal and civil justice system relief for immigrant crime victims.

These relationships further create opportunities for law enforcement and prosecutors to join victim advocates and attorneys in efforts that help ensure that immigration enforcement officials will not initiate prohibited immigration enforcement actions against immigrant crime victims. Additionally, strong and sustained relationships between advocates/attorneys and law enforcement officials will also ensure that law enforcement officials will not initiate immigration enforcement when the victim's perpetrator calls ICE or CBP to turn the victim in for immigration enforcement in retaliation for the victim's cooperation in a criminal case or for the victim seeking a protection order or custody of children in family courts.

Victim advocates and attorneys need to file VAWA, T visa or U visa immigration cases as early as possible so that immigrant crime victims receive VAWA confidentiality protections against deportation. Early filing combined with collaborative working relationships with law enforcement and prosecutors can result in interventions by these justice system partners with immigration enforcement officials to prevent or reverse efforts to initiate immigration enforcement actions against victims.

This research documents the extent of the risk that immigration enforcement actions are triggered against victims by their perpetrators' calls to DHS and the extent to which this research found that perpetrators are persuading law enforcement officials to arrest the victim when the victim calls police for help. The response that victim advocates and attorneys employ to help immigrant survivors subjected to immigration enforcement needs to be expanded to include routine filing of VAWA confidentiality violation complaints whenever the facts lead the victim, attorney or advocate to believe that actions of the perpetrator led to or contributed to immigration enforcement activities being initiated against the immigrant crime victim.

Filing formal VAWA confidentiality violation complaints can play an important role in preventing future immigration enforcement actions against the victim while VAWA, T and U visa cases are pending. These complaints also are useful in informing DHS about officials who are violating VAWA confidentiality protections including by failing to examine the DHS Central Index System that would have notified the immigration enforcement officer that the immigrant against whom they are considering enforcement is a victim. Complaints lead to formal investigations by the Office of Civil Rights and Civil Liberties at DHS that draw attention to the immigration enforcement official's confidentiality violations and educate the officer and their

---

[87] Cite U-Visa Legal Advocacy Overview of Effective Policies and Practices 2013.
http://niwaplibrary.wcl.american.edu/pubs/uvisa-collaboration-policy-brief/

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 283 of 380   Page ID #:3247

American University, Washington College of Law                                    105

**Page 106**

supervisors about statues, regulations, policies and directives that all DHS personnel are required to follow.[88]

The findings from the judge's survey highlighted the extent to which judges participating in the survey (31%) knew about U visas, but had not been asked to sign U visa certifications. Too often, advocates and attorneys limit their U visa certification requests to local law enforcement, when there are a number of government officials who can sign U visa certifications including judges, child and adult protective services, the EEOC and state and federal labor agency staff.[89] Attorneys and advocates working with immigrant victims need training on U visa certification by judges and the range of cases in which victims can seek certification from judges. Examples of the types of cases in which judges can sign U visa certifications based on detection of a U visa listed criminal activity occurring in a case before the court include, but are not limited to, civil protection order, custody and divorce cases.[90] In many of these cases the victim may never have called the police for help or when she did call for help the police did not secure the assistance of a qualified interpreter so the victim was unable to communicate with law enforcement at the crime scene. Judges can certify when the victim has come to court and filed a case that includes providing facts to the court about the criminal activity the victim suffered.

**Recommendations for Courts**

Family courts across the country are seeing growing numbers of immigrants seeking civil protection orders, U visa certification from judges,[91] custody, child support, divorce, guardianship, and state court findings in cases of immigrant children who have been abused, abandoned or neglected by one of their parents applying for Special Immigrant Juvenile Status (SIJS).[92] State courts encounter immigrant children and families in a wide range of state court proceedings including civil protection orders, custody, divorce, child support, paternity, dependency, delinquency, termination of parental rights and adoptions.

Issues that arise in state court cases involving immigrant families, children and crime victims can present challenges for the courts. Immigrant and LEP litigants and children speak many different languages and courts are responsible for providing interpreters to facilitate LEP litigants and crime victims' access to courtroom proceedings, clerks' offices, courthouses

---

[88] For further information about VAWA confidentiality and the complaint process *see*, DEP'T OF HOMELAND SECURITY, VIOLENCE AGAINST WOMEN ACT (VAWA) CONFIDENTIALITY PROVISIONS AT THE DEPARTMENT OF HOMELAND SECURITY (2008), http://niwaplibrary.wcl.american.edu/pubs/conf-vawa-gov-dhscomplaintinstrts-2008/; LESLYE E. ORLOFF, VAWA CONFIDENTIALITY: HISTORY, PURPOSE, DHS IMPLEMENTATION AND VIOLATIONS OF VAWA CONFIDENTIALITY PROTECTIONS, *IN* NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT, EMPOWERING SURVIVORS (2014), *http://niwaplibrary.wcl.american.edu/pubs/ch3-vawa-confidentiality-history-purpose/;* LESLYE E. ORLOFF, VAWA CONFIDENTIALITY, *IN* NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT, BREAKING BARRIERS (2014) *http://niwaplibrary.wcl.american.edu/pubs/ch2-2-vawa-confidentiality/.* For technical assistance on VAWA confidentiality violations or potential violations contact NIWAP at (202) 274-4457 or info@niwap.org

[89] Benish Anver; Leslye E. Orloff, *U Visa Certifications: Range of Potential Certifiers at the Local, State, and Federal*

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 284 of 380   Page ID #:3248

*Government Levels*, NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT, (Jun. 21, 2014),
http://niwaplibrary.wcl.american.edu/pubs/u-visa-range-of-potential-fcertifiers/

[90] DEP'T OF HOMELAND SECURITY, U AND T VISA LAW ENFORCEMENT RESOURCE GUIDE, NAT'L IMMIGRANT WOMEN'S
ADVOCACY PROJECT (Nov. 30, 2015), https://www.dhs.gov/sites/default/files/publications/U-and-T-Visa-Law-Enforcement-
Resource%20Guide_1.4.16.pdf; http://niwaplibrary.wcl.american.edu/pubs/dhs-updated-u-certification-resource-guide-2015/

[91] Department of Homeland Security, *U and T Visa Law Enforcement Resource Guide*, 6 (Jan. 2016)
https://www.dhs.gov/sites/default/files/publications/U-and-T-Visa-Law-Enforcement-Resource%20Guide_1.4.16.pdf;
http://niwaplibrary.wcl.american.edu/pubs/dhs-updated-u-certification-resource-guide-2015/

[92] U.S. Citizenship & Immigration Servs., *USCIS Policy Manual*, Vol. 6, Part J (last updated Aug. 23, 2017),
http://niwaplibrary.wcl.american.edu/pubs/uscis-policy-manual-vol-6-7-part-j-sijs-full/

American University, Washington College of Law                                          106

**Page 107**

through public notices about interpretation services available and courthouse signage, as well as to all court ordered services.[93] In addition, immigrants come from many different cultural and religious backgrounds and their assumptions and expectations about the justice system are influenced by experiences in their home countries. Most live in mixed immigration status families where family members have a range of differing citizenship and immigration statuses.[94]

A review of state family court decisions reveals patterns of courts issuing rulings based on legally incorrect information about U.S. immigration laws and/or about immigration law's applicability to a child, party or a witness in the case before the court.[95] Access to legally accurate information about immigration laws, Department of Homeland Security (DHS) regulations and policies, and federal immigration law protections for immigrant crime victims and immigrant children promotes the fair administration of justice in cases involving immigrant victims, children and families.

Training materials, tools, and webinars have been developed that assist state court judges in swiftly accessing legally correct information to help state courts on a range of topics that arise in cases involving immigrant crime victims, children and families appearing in cases before state courts.[96] The following are examples of information such materials provide:

- *Immigration:* Federal immigration law protections for immigrant victims of domestic
  violence, child and elder abuse, sexual assault, human trafficking and other mostly
  violent criminal activities under the Violence Against Women Act (VAWA) and the
  Trafficking Victims Protection Act (TVPA) that have been an essential part of U.S.
  immigration laws for 18 years[97] creating a State court judge's role as U and T visa
  certifiers. The U visa offers immigration relief for immigrant victims of 26 types of
  criminal activities including domestic violence, sexual assault, human trafficking,
  felonious assault and kidnapping.[98]

- *Life and Safety Programs* offer government funded programs that are legally required to
  be open to all persons without regard to immigration status;[99]

- *Federal and state public benefits* are available to many immigrant crime victims and their
  children, access to benefits grows as victims and children apply for and are granted

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC    Document 106    Filed 07/12/19    Page 285 of 380    Page ID #:3249

[93] Letter from Loretta King, Deputy Assistant Attorney General, Dep't of Just., to Director of State Court and/or State Court Administrator, *Handout 18: Limited English Proficiency & the Courts* (Dec. 1, 2003), http://niwaplibrary.wcl.american.edu/pubs/lep-courts-doj-2003/.

[94] Randy Capps, Michael Fix, and Jie Zong, *A Profile of U.S. Children with Unauthorized Immigrant Parents, Fact Sheets*, 1 (January 2016) available at https://www.migrationpolicy.org/research/profile-us-children-unauthorized-immigrant-parents.

[95] *See* Soraya Fata et al., *Custody of Children in Mixed-Status Families: Preventing the Misunderstanding and Misuse of Immigration Status in State-Court Custody Proceedings*, 47 Fam. L.Q. 191, 244 (2013); Veronica T. Thronson et al., *Winning Custody Cases for Immigrant Survivors: The Clash of Laws, Cultures, Custody and Parental Rights*. 9 Fam. & Intimate Partner Violence Q. 2-3, 1-169 (2017). http://www.courts.ca.gov/documents/BTB24-PreCon1E-11.pdf

[96] *Immigration Relief for Crime Victims and Children* (Dec. 11, 2017), NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT (Last visited Feb. 17, 2018), http://niwaplibrary.wcl.american.edu/uandtvisatrainingmat/.

[97] *See* Leslye E. Orloff, Charles Palladino, *Bench Card: Overview of Types of Immigration Status*, NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT (October 14, 2013), http://niwaplibrary.wcl.american.edu/pubs/bchcrd-immstatustypes/; Dep't of Homeland Security, Protections for Immigrant Victims (Jan 12, 2017), http://niwaplibrary.wcl.american.edu/pubs/appendix-f-dhs-interactive-infographic-on-protections-for-immigrant-victims/

[98] Leslye E. Orloff, et al., *U Visa Certification Toolkit For Federal, State And Local Judges, Commissioners, Magistrates And Other Judicial Officers*, NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT (Last updated Nov. 7, 2017), http://niwaplibrary.wcl.american.edu/pubs/u-visa-certification-tool-kit-federal-state-local-judges-magistrates/

[99] Victim Rights Law Ctr., *Safety Planning with Adult Sexual Assault Survivors: A Guide for Advocates and Attorneys* (2013), http://niwaplibrary.wcl.american.edu/pubs/safety-planning-with-adult-sa-survivors/.

American University, Washington College of Law                    107

---

**Page 108**

immigration relief. Courts need tools that provide the information needed to ensure court orders are consistent with state and federal benefits laws.[100]

- *What benefits an immigrant qualifies for varies by the*:

  o Immigration status an individual has received or applied for;
  o Date of entry into the U.S.;
  o Benefits program the immigrant needs; and
  o State the immigrant lives in.

- *Intersection of Immigration and State Family Law* including the following topics:

  o *Special Immigrant Juvenile Status (SIJS)*: Role of state court judges issuing findings that immigrant children need to file for SIJS;[101]
  o *Custody, Protection Orders, Economic Relief*: Special issues that arise in cases involving immigrant children, victims, and litigants;[102]

- *Federal VAWA Confidentiality Laws* implications for discovery in civil and criminal court cases and limitations on courthouse enforcement against immigrant crime victims.[103]

- *Policies Limiting Courthouse Immigration Enforcement:* DHS Immigration and Customs Enforcement's policies on courthouse immigration enforcement and how these policies intersect with federal VAWA confidentiality laws.[104]

To promote access to justice for immigrant and LEP victims and children in immigrant families, judges, court leadership, and national judicial organizations nationwide should implement the following recommendations at courthouses serving urban and rural communities

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 286 of 380   Page ID #:3250

across the country:

1) Implement practices and policies that promote understanding of the laws regarding U and T visa certification and issuance of SIJS findings by state court judges;

2) Adopt, implement and keep up-to-date language access plans and practices that ensure language access to all court services including courtrooms, clerks offices, self-help centers and, court ordered services (e.g. home studies, treatment programs, paternity testing);

3) Make available at courthouses DHS produced "Know Your Rights" information on immigration protections for immigrant crime victims and immigrant children;

100 See, e.g. *Public Benefits FAQs*, Nat'l Immigrant Women's Advocacy Project (last visited Feb. 17, 2018), http://niwaplibrary.wcl.american.edu/frequently-asked-questions/public-benefits-faqs/; *Interactive Public Benefits Map*, Nat'l Immigrant Women's Advocacy Project (last visited Feb. 17, 2018), http://www.niwap.org/benefitsmap/.

101 U.S. Citizenship & Immigration Servs., *supra* note 9.

102 *See* Leslye E. Orloff et. al., *Bench Card for State Court Judges on Common Issues That Arise From Parties' Immigration Status: Economic Remedies* (Oct. 15, 2013), http://library.niwap.org/pubs/fam-tool-econrelief-childspousalsuprt/; Andrea Carcamo Cavazos & Leslye E. Orloff, Immigrants and Protection Orders Bench Card (Aug. 27, 2013), http://niwaplibrary.wcl.american.edu/pubs/bench-card-imm-protection-orders/; Candace Evilsizor et al., *Common Immigration Issues that Arise in Custody Cases Involving Immigrant Crime Victims and Their Children* (Mar. 4, 2014), http://niwaplibrary.wcl.american.edu/pubs/common-imm-issues-custody-cases/.

103 *VAWA Confidentiality Protections for Immigrant Crime Victims (March 3, 2017-Update January 31, 2018)*, Nat'l Immigrant Women's Advocacy Project (last visited Feb. 16, 2018), http://niwaplibrary.wcl.american.edu/vawa-confidentiality-materials-tools/.

104 *Immigration and Customs Enforcement January 2018 Courthouse Enforcement Policy and VAWA Confidentiality Protections for Immigrant Crime Victims (January 31, 2018)*, Nat'l Immigrant Women's Advocacy Project (last visited Feb. 16, 2018), http://niwaplibrary.wcl.american.edu/courthouse-protections-and-crime-victims/.

American University, Washington College of Law                                    108

**Page 109**

4) Develop professional relationships with local agencies serving immigrant and LEP communities and work collaboratively with these agencies to promote access to justice for crime victims and other litigants in immigrant communities;[105]

5) State court judges should take leadership roles in a multidisciplinary team approach to resolve immigration issues that may arise for domestic violence and sexual assault survivors in order to improve communication, protect confidentiality and enhance safety;

6) Adopt policies regarding courthouse immigration enforcement that guide judges on what steps to take should immigration enforcement officials come to civil, family and criminal courtrooms;

7) Educate and provide technical assistance to judges offered by judicial resource officers and/or national experts providing judges and judicial staff access to legally correct information about the issues that arise in state courts at the intersection of state laws and legal protections with federal immigration laws;[106]

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 287 of 380   Page ID #:3251

8) Provide training for state court judges on:[107]

    a. Immigration relief designed to protect immigrant victims of domestic violence, sexual assault, human trafficking, U visa criminal activities and child abuse, abandonment or neglect perpetrated against immigrant children;

    b. U and T visa certification by judges;

    c. Special Immigrant Juvenile Status findings;

    d. Obtaining and applying legally correct information about immigration law and immigrant crime victim and children's benefits eligibility in custody, protection order, divorce, child support, child welfare and other state court cases in which immigration status is raised by a party as an issue in the case;

    e. VAWA confidentiality protections against courthouse enforcement and against discovery of copies of information about immigration contained in federal immigration case files in family and criminal court cases; and

    f. Federal immigration laws and policies that limit courthouse enforcement of immigration laws

9) The Chief Judge or Presiding Judge in each state or court should make trainings on U visas, T visas and SIJS mandatory for state court judges; and

10) Build these polices, trainings and practices into court budgets, grants, and court management and strategic plans so that the access to justice gained by courts that implement these recommendations become sustainable.

**Recommendations for Law Enforcement**

These survey results found approximately 20% the law enforcement survey participants were seeing a reduction in immigrant and LEP crime victims' willingness to provide information to officers at the crime scenes, to make police reports and/or to participate in post-crime scene investigative interviews. A larger number of law enforcement officials reported that crimes involving immigrant crime victims, particularly, family violence and crimes of violence against

[105] *See* Recommendation section: Brenda K. Uekert et al.. The National Center for State Courts, White Paper, Improving the Courts' Capacity To Serve Limited English Proficient Persons Seeking Protection Orders 200-205 (2016), http://niwaplibrary.wcl.american.edu/pubs/lang-gov-white-paper-improvingcourtscapacity-2006/;

[106] See, e.g. San Francisco Superior Court Civil Division, U-Visa Certification Protocol (Oct. 27, 2017) http://niwaplibrary.wcl.american.edu/pubs/san-francisco-court-civil-division-u-visa-certification-protocol/

[107] Training and technical assistance is available to judges and court staff from NIWAP (202) 274-4457 or info@niwap.org.

**Page 110**

women and children were becoming harder to detect, investigate and prosecute in 2017 compared with 2016 due to underreporting. Officers participating in the survey reported, as did victim advocates and attorneys, that victims' fears of deportation, perpetrators' deportation threats, and fears that police will turn in undocumented victims for immigration enforcement

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 288 of 380   Page ID #:3252

play a key role in victim's reticence to cooperate with law enforcement. Similarly, qualitative survey responses from judges and prosecutors showed that judges and prosecutors are hearing the same fears and concerns from immigrant victims explaining victim's reasons for not continuing to participate in criminal and family court cases.

Law enforcement agencies are undertaking community policing efforts designed to lessen fears, confusion and concerns of immigrant crime victims about calling the police for help and cooperating in criminal investigations. These community policing efforts will slowly convince immigrant crime victims that calling some police departments will not lead to their deportation or subject them to immigration enforcement. In many communities, law enforcement are working hard to establish, maintain and reestablish trust with immigrant communities. Partnering and collaborating with victim and legal services agencies with expertise serving immigrant crime victims are a very important part of successful community policing efforts.

The law enforcement survey results show some differences between Signing and Non-Signing agencies in terms of reporting rates for immigrant victims of crime. These differences could be interpreted as being due to more engaged role the Signing agencies play with their immigrant communities, which as a result puts them in a better position to observe the declines in participation with law enforcement. The fact that Non-Signing agencies had fewer dedicated community engagement and civilian liaison staff working with immigrant communities may have meant that Non-Signing these agencies were less involved with their immigrant communities and as a result less likely to gauge the changes between 2017 and 2016.

These survey findings regarding the differences between Signing and Non-Signing agencies demonstrate that since the U and T visas programs were fully implemented by DHS over a decade ago, law enforcement agencies across the country have found these visa certifications to be effective tools for fighting crime. These visa programs are important tools for building trust with immigrant crime victims and immigrant communities by removing fear of deportation as an obstacle to cooperation. This survey research found that law enforcement agencies are active in Signing certification (e.g. U visas 35% and T visas 17.8%). However, a significant number of law enforcement agencies represented in the survey did not know whether their agency was Signing certifications in either U visa (50%) or T visa (64%) cases.

Knowledge about the U and T Visa programs helps officers better protect and serve immigrant community members and immigrant crime victims while simultaneously protecting officer safety. By implementing U and T Visa certification practices and adopting certification policies, law enforcement agencies demonstrate to the community that they are receptive to and interested in protecting and helping immigrant and LEP victims.

Implementation of U and T visa certification programs is a necessary component of an effective community policing strategy that builds trust and develops strong working relationships with immigrant and LEP crime victims, the victim advocates and attorneys who serve immigrant and LEP victims, and with immigrant and LEP communities. Building trust, breaking the barriers

American University, Washington College of Law                                          110

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 289 of 380   Page ID #:3253

**Page 111**

of language access and fear of deportation allows law enforcement agencies to undertake criminal investigations that would not otherwise be possible, often revealing other crimes and identifying dangerous criminal offenders in the community.

The value of the U and T visa programs as effective community oriented policing strategies has been well established.

• *FBI Law Enforcement Bulletin* (2009): Described the benefits of the U visa for both immigrant victims and law enforcement officers[108]

• *Department of Justice, COPs Office* (2011): Promoted the U-Visa as an important tool for community policing and promotes U visa training for law enforcement and the U Visa Law Enforcement Certification Toolkit;[109]

• *The Police Executive Research Forum* (2017): Conducted research and issued a report entitled *U Visas and the Role of Local Police in Preventing and Investigating Crimes Against Immigrants*, which highlighted promising practices employed by law enforcement agencies across the country and the successes, lessons learned and benefits for law enforcement and the community of the San Francisco Police Department's decade-long U visa certification program.[110]

U and T visa certification programs that include training and policies that reflect agency support of the community are important crime-fighting tools that eventually build trust with immigrant and LEP communities, reduce crime and promote officer safety. The following are four recommended steps that law-enforcement agencies can follow to successfully implement U and T visa certification programs:

• **Initiate U and T visa certification practices:** Law enforcement agencies can begin issuing U visa and T visa certifications signed by the Chief/Sheriff/Colonel or by agency staff that the Chief/Sheriff/Colonel designates. According to DHS, designation can be accomplished by the Chief/Sheriff Signing a letter listing the law enforcement agency officials that the Chief designates to be certifiers for the agency. These certifying officials are required by DHS regulations to have supervisory responsibility.[111]

• **Adopt a U and T visa certification policy and language access plan:** Policies play an important role in raising awareness among law enforcement agency officials about the U and T visa programs. Establishing policies that all law enforcement personnel are responsible for being knowledgeable about can promote greater awareness among law enforcement agencies, which helps to address the proportion of officers this survey revealed "do not know" whether and what steps their agencies may have taken in

[108] U.S. Federal Bureau of Investigation, 78 FBI Law Enforcement Bulletin no.4 (2009), https://www.hsdl.org/?view&did=34531

[109] LESLYE E. ORLOFF ET. AL., U VISA TOOLKIT FOR LAW ENFORCEMENT AGENCIES AND PROSECUTORS, NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT (2018), http://niwaplibrary.wcl.american.edu/pubs/uvisatoolkit-police-prosecutors/; Stacey Ivie and Natalie Nanasi, "The U Visa: An Effective Resource for Law Enforcement," *FBI Law Enforcement Bulletin* 78 (2009): 10; Tony Flores and Rodolfo Estrada, "The U-Visa: An Important Tool for Community Policing," *Community Policing Dispatch* 4, no. 1 (January 2011).

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 290 of 380   Page ID #:3254

110 POLICE EXECUTIVE RESEARCH FORUM, http://www.policeforum.org/ (last visited Apr. 27, 2018)

111 U.S. Citizenship and Immigration Services - DHS, 72 Fed. Reg. 53013, 53023 (Sep. 17, 2007) (the person signing the certificate is the head of the certifying agency or person(s) in a supervisory role who has been specifically designated with the authority to issue U nonimmigrant ); 8 CFR 214.14(c)(2)(i)

American University, Washington College of Law                     111

**Page 112**

employing U and T visa certification and continued presence requests as effective crime fighting tools. It is important that any policies issued and any practices implemented follow DHS regulations and guidance on U and T visa certification. Policies also serve as an important tool for developing relationships with the programs serving immigrant crime victims and building trust with immigrant communities.[112] The National Model U and T Visa Certification Policies developed in collaboration with 13 law enforcement agencies with significant certification experience provides an excellent model that can be implemented in jurisdictions across the country.[113]

• **Expand community-policing efforts designed to reach immigrant crime victims:**

This includes assigning greater numbers of officers with expertise and experience in working with crime victims, immigrant crime victims, LEP victims and refugee communities to community policing and also involving more civilian victim advocates to these activities. Develop and maintain ongoing personal working relationships between law enforcement officers who specialize in working with immigrant crime victims and local community-based agencies that provide victim advocacy for and legal representation of immigrant victims in immigration and in family court matters. It is important that these relationships be transferred through training and mentorship that can sustain the relationship through staff changes at both the local law enforcement agency and the victim and legal services agencies.

• **Train law enforcement agency staff on U and T visa certification and continued presence:** Training for all ranks of law enforcement officials is critical for ensuring effective help for immigrant crime victims. Front line officers need knowledge about and an understanding of how these tools, combined with effectively implemented language access plans, facilitate proper identification and investigation of crimes being committed in communities. Mid-level supervisors and specialized investigators, including certifying officials and department leadership, need knowledge of the procedures and requirements to ensure victims receive certifications in a timely manner.[114]

• **Law Enforcement Officials Can Receive Technical Assistance National Law Enforcement Certification Experts:** Numerous training opportunities exist, including free and low-cost training on best practices and model policies for U visa certification provided by a national team of law enforcement and victim attorney experts on immigration relief for immigrant crime victims and U and T visa certification. Peer to peer technical assistance for law enforcement is offered though law enforcement/ prosecutor roundtables and through assistance with issues that may arise in individual cases involving immigrant and LEP crime victims.[115]

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 291 of 380   Page ID #:3255

o  Law Enforcement Agencies can receive interpretation skills training for the agencies' bilingual law enforcement officers and staff to become qualified

---

112 DHS, *U and T Visa Law Enforcement Resource Guide. See* National Model U and T Visa Certification Policies Polices developed in collaboration with law enforcement agencies with significant certification experience: NIWAP, *Model Policy for Interactions with Immigrant Victims of Crime and Human Trafficking & Signing of U Visa Certifications and T Visa Declarations,* 2016, http://niwaplibrary.wcl.american.edu/pubs/proposed-model-u-visa-policy; NIWAP, *Discussion Paper for Model Policy for Working with Immigrant Victims of Crime and Human Trafficking & Signing of U Visa Certification and T Visa Declarations,* 2016, http://niwaplibrary.wcl.american.edu/pubs/discussion-paper-model-policy-u-visa-certification-may-2016.

113 Model U-Visa Certification Protocol for Law Enforcement Agencies, *in* Nat'l Immigrant Women's Advocacy Project (May 2011), http://niwaplibrary.wcl.american.edu/pubs/model-u-cert-protocol-policy/

114 Cal. Penal Code § 679.10. (SB 674)

115 *Law Enforcement & Prosecution Monthly U Visa Roundtable,* Nat'l Immigrant Women's Advocacy Project http://www.niwap.org/tools/law-enforcement-u-visa-certification-roundtables/ (last visited Apr. 27, 2018)

American University, Washington College of Law                                                          112

---

Page 113

interpreters. This training and the technical assistance that comes with it can be provided by the Interpretation Technical Assistance & Resource Center (ITARC) based at the Asian Pacific Institute on Gender Based Violence.[116] Training law enforcement agency staff to be qualified interpreters enhances law enforcement agencies' ability to provide meaningful access to the agencies' services. When qualified interpreters are used at encounters with LEP victims and witnesses by officers responding to 911 calls, at crime scene investigations, when taking police reports and post crime scene investigations, the records in the criminal investigation will not contain flaws in interpretation of statements made by victims and witnesses that can often undermine criminal prosecutions.

**Recommendations for Prosecutors**

The results of the survey research among prosecutors demonstrated that more prosecutors' offices need to adopt U visa and T visa certification practices. This survey also found that both prosecutors and law enforcement officials were under-utilizing continued presence as an important tool that protects victims of human trafficking and helps law enforcement officials. Continued presence provides swift access to temporary protection of legal immigration status for victims of human trafficking who are potential witnesses in human trafficking investigations. This findings of this survey clearly demonstrates that the frequency of instances of defense counsel raising the immigration status of the victim serving as a witness in criminal prosecutions is very common in criminal cases. (See, figure 87).

The national prosecutors' survey results additionally underscored that many prosecutors' offices were delaying certification of U and T visas until after any criminal case the prosecutor was pursuing against the perpetrator was completed. These practices put victims at risk, are not required or supported by the U visa's legislative history, and are not consistent with the letter, the

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 292 of 380   Page ID #:3256

purpose or the spirit of U visa and T visa regulations and DHS publications on the programs.

In criminal prosecutions involving immigrant crime victims as witnesses, prosecutors should implement a case strategy that includes deciding how the prosecution will address issues related to the victim's immigration status in the criminal case. Strategies to consider should include:

- In a domestic violence or child abuse case will the prosecutor want to raise the immigration status of the victim as part of the prosecution's case to demonstrate how the perpetrator used threats of deportation or immigration related power and control over the victim as part of the pattern of abuse;
- The prosecutor can file a pre-trial motion to keep immigration status related issues out of the immigration case as prejudicial and irrelevant;[117]
- Preparing to respond with a timeline demonstrating the point in the case at which the victim learned about immigration relief available to victims and introducing prior consistent statements to counter allegations raised by defense counsel that the victim is making up abuse to gain immigration status;

[116]*Language Access, Interpretation, and Translation*, ASIAN PACIFIC INSTITUTE ON GENDER-BASED VIOLENCE,
https://www.api-gbv.org/culturally-specific-advocacy/language-access/
[117]*See* 2017 WA REG TEXT 475745 (NS); *See also Evidence Rule 413 - Unpacking Washington's New Procedural Protections for Immigrants*, NWLAWYER WASHINGTON STATE BAR ASSOCIATION (forthcoming 2018)

American University, Washington College of Law                                                     113

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

**Page 114**

- Introducing expert witness testimony on the U visa, VAWA self-petitioning or the T visa programs to educate the jury about the history, purpose, and requirements of these programs; and
- Preparing objections to oppose potential requests for discovery of VAWA confidentiality protected immigration case files and information about the existence of any such immigration case the victim may have filed.

The following tools will support prosecutors in making their prosecutions more successful, leading to more convictions. This in turn will, over time, render defense attorneys in prosecutors' jurisdictions less likely to raise the immigration status of victims and the U visa as an issue in future cases. Prosecutor's training tools have been developed emphasizing the following issues:

- Pretrial strategies, the prosecutor may raise immigrant status related abuse, power and control as part of the prosecution's case. Whether or not a prosecutor employs this strategy, prosecutors will need to prepare immigrant victims for cross-examination, develop effective rebuttal questions and consider the use of expert witnesses.[118]

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 293 of 380   Page ID #:3257

- Case preparation. There are advantages to signing U and T visa certifications early in the case for prosecutors, especially when the defense counsel raises the immigration status of the victim or the U or T visas as a discrediting strategy in the criminal case.[119] Case preparation strategies include developing and presenting evidence timelines that help the prosecution successfully admit "prior consistent statements" of the victim as evidence that counters efforts to discredit immigrant victims or use the victims' U visa certifications against them in criminal cases.

- Preventing discovery of VAWA confidentiality protected case files. Federal Violence Against Women Act confidentiality protections limit discovery of information about a victim's immigration case, including information contained in the victim's federal immigration case file, in criminal court cases.[120] Only the certification itself, signed by a law enforcement officer, a prosecutor, or a state court judge could potentially be discovered.

    The success of criminal prosecutions involving immigrant crime victims will also be enhanced if prosecutors' offices implement the following recommendations:

---

[118]Jane Anderson, Leslye E. Orloff, and Benish Anver, What's Immigration Status Got to Do with It? Prosecution Strategies for Cases Involving Undocumented Victims (July 24, 2017), http://niwaplibrary.wcl.american.edu/pubs/pretrial-strategies-7-24-17-final-with-logos/

[119] Jane Anderson, Leslye E. Orloff, and Benish Anver, Certifying Early: When Should You Sign a U or T Visa Certification for a Victim? (July 24, 2017), http://niwaplibrary.wcl.american.edu/pubs/certifying-early-7-24-17-final-w-logo/

[120] Jane Anderson, Leslye E. Orloff, and Benish Anver, VAWA Confidentiality and Criminal Cases: How Prosecutors Should Respond to Discovery Attempts for Protected Information (July 24, 2017), http://niwaplibrary.wcl.american.edu/pubs/discovery-and-vawa-confidentiality-tool-final-7-24-17/; Alina Husain and Leslye E. Orloff, VAWA Confidentiality Statutes, Legislative History, and Implementing Policy (March 11, 2017), http://niwaplibrary.wcl.american.edu/pubs/vawa-confidentiality-statutes-leg-history/; and Quick Reference Guide for Prosecutors: U Visa and VAWA Confidentiality Related Case Law (July 24, 2017), http://niwaplibrary.wcl.american.edu/pubs/case-law-quick-reference-tool-7-24-17-final-w-logo/

American University, Washington College of Law                    114

---

**Page 115**

- Identify formal points of contact within the prosecutor's office and the local victim's advocacy and legal services organizations with expertise serving immigrant victims
- Develop strong relationships and work collaboratively with immigrant victim's advocates and attorneys on:
    - Individual victim's cases to ensure that victims receive information about immigration relief available to victims through the VAWA, T and U visa programs as early as possible in the prosecution
    - Developing partnerships to work on the development and implementation of improvements to local processes and procedures that improve immigrant victim's

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC    Document 106    Filed 07/12/19    Page 294 of 380    Page ID #:3258

- Identify prosecutors who will be the designated U visa certifiers for the prosecutor's office, implement U visa certification practices and policies that encourage U visa certification early in the case and do not wait until the criminal case has concluded
- Work collaboratively with immigrant victim advocates and attorneys to receive training on immigrant crime victim's legal rights and immigration options for prosecutors, and to provide training by victim advocates and attorneys on how they can best assist with prosecutions.

**Recommendations for the Department of Homeland Security**

This survey's findings confirmed that perpetrators of violence against immigrant crime victims during 2016 and 2017 were actively engaged in using threats of deportation and making calls to immigration enforcement officials in efforts to trigger initiation of immigration enforcement actions against immigrant victims. In total 433 immigrant victims of domestic violence, sexual assault, child abuse, and human trafficking who had filed or were in the process of filing VAWA self-petitions, U visa applications, T visa applications and for civil protection orders from state courts became the subjects of immigration enforcement. This amounts to 10% of all of the victims reported by attorneys and advocates in the survey in 2016 and 2017. VAWA self-petitioners were most likely to be subjected to immigration enforcement (18%) followed by U visa (8%) and T visa (9%) victims. (See, figure 112). This research found that what triggered the immigration enforcement action was most often reports from the perpetrator or the perpetrator's family members to immigration enforcement officials.

The percent of immigrant enforcement actions against immigrant victims that were initiated by perpetrators or their family members by case type in this survey was:

- VAWA self-petitioners – 38%
- U visa victims – 25%
- T visa victims – 30%
- Civil protection order applicants – 11%

These findings are consistent with findings from research conducted in 2013, which found that immigration enforcement against crime victims was caused by calls from the perpetrator or the perpetrator's family at the following rates:[121]

---

[121] Krisztina E. Szabo et. al., *Early Access to Work Authorization For VAWA Self-Petitioners and U Visa Applicants*, NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT 25-26 (Feb. 2014), http://niwaplibrary.wcl.american.edu/pubs/final_report-on-early-access-to-ead_02-12/.

American University, Washington College of Law                    115

**Page 116**

•

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 295 of 380   Page ID #:3259

VAWA self-petitioners – 38.3%
• U visas – 26.7%

When immigrant victims who are limited English proficient (LEP) call the police for help and police arriving at the crime scene are not able to communicate with the victims because they do not obtain the assistance of a qualified interpreter, this can result in the police arresting the victim instead of or in addition to the perpetrator.[122] Often the person who speaks English at the crime scene will be the perpetrator or his family member.[123] Prior 2013 research has found that this leads to the victim's arrest in 15.4% of VAWA self-petitioning cases and 7.5% of U visa cases. This research found that in 2016 and 2017 police responding to domestic violence calls arrested the immigrant victim in addition to or instead of the perpetrators at the following rates:

• VAWA self-petitioners – 17%
• U visa victims – 36%
• T visa victims – 10%

It is important to note that traffic stops trigger immigration enforcement against immigrant victims and is the factor that triggered immigration enforcement against crime victims at the following rates:

• VAWA self-petitioners – 11%
• U visa victims – 39%
• T visas – 10%
• Civil protection order victims – 89%

VAWA confidentiality statutory protections were enacted by Congress in 1996 and improved and enhanced by the Violence Against Women Acts of 2000, 2005 and 2013.[124] The legislative history of VAWA confidentiality from VAWA 2005 states:

"This section enhances VAWA's confidentiality protections for immigrant victims and directs immigration enforcement officials not to rely on information provided by an abuser, his family members or agents to arrest or remove an immigrant victim from the United States. Threats of deportation are the most potent tool abusers of immigrant victims use to maintain control over and silence their victims and to avoid criminal prosecution…These provisions are designed to ensure that abusers and criminals cannot use the immigration system against their victims. Examples include abusers using DHS to obtain information about their victims, including the existence of a VAWA immigration petition, interfering with or undermining their victims' immigration cases, and encouraging immigration enforcement officials to pursue removal actions against their victims."[125]

---

[122] See e.g. Leslye E. Orloff; Mary Ann Dutton; Giselle Aguilar Hass; Nawal Ammar, *Battered Immigrant Women's Willingness to Call for Help and Police Response*, 13 UCLA Women's L.J. 43, 100 (2003)

[123] Leslye E. Orloff; Mary Ann Dutton; Giselle Aguilar Hass; Nawal Ammar, *Battered Immigrant Women's Willingness to Call for Help and Police Response*, 13 UCLA Women's L.J. 43, 100 , 64-69 (2003) (In responding to 8.34% of domestic violence calls and 10.7% of sexual assault calls involving immigrant victims police spoke only with the perpetrator who spoke English.)

[124] Alina Husain and Leslye E. Orloff, VAWA Confidentiality: Statutes, Legislative History, and Implementing Policy (March 11, 2017), http://niwaplibrary.wcl.american.edu/pubs/vawa-confidentiality-statutes-leg-history/;

[125] DEPARTMENT OF JUSTICE APPROPRIATIONS AUTHORIZATION ACT, FISCAL YEARS 2006 THROUGH 2009, H.R. NO. 109-233, *in* NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT, 122 (2005) http://niwaplibrary.wcl.american.edu/pubs/conf-vawa-lghist-dojexcerptshr-3402-09-22-2005/.

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforc

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 296 of 380   Page ID #:3260

American University, Washington College of Law                    116

**Page 117**

The Department of Homeland Security recognizes that:

"Violations of Section 1367 could give rise to serious, even life-threatening, dangers to victims and their family members. Violations compromise the trust victims have in the efficacy of services that exist to help them and, importantly, may unwittingly aid perpetrators retaliate against, harm or manipulate victims and their family members, and elude or undermine criminal prosecutions."[126]

The findings from this national research on immigration enforcement highlight the ways perpetrators of domestic violence, sexual assault, child abuse, human trafficking and other violent crimes against immigrant victims are continuing to use their ability to trigger immigration enforcement against victims. Perpetrators who are successful in getting DHS to subject victims to immigration enforcement will be more successful in avoiding criminal prosecution, stopping victims from seeking civil protection orders, and gaining an advantage in custody and divorce proceedings to the detriment of victims and children.

The issuance of ICE Directive Number 11072.1 "Civil Immigration Enforcement Actions Inside Courthouses" on January 10, 2018 was an important step for immigrant crime victims. In this memo ICE confirms (in footnote 2) that immigrant crime victims and witnesses continue to receive VAWA confidentiality protections against courthouse enforcement that are in addition to the limitations on civil courthouse enforcement set out in the January 10, 2018 memo. The requirement that ICE officials cannot undertake civil immigration enforcement actions in non-criminal family and civil court cases and courtrooms without Field Office Director or Special Agent in Charge approval will be very helpful in deterring the kinds of immigration enforcement actions being taken at courthouses against victims that this research documents.[127]

There are additional steps that the Department of Homeland Security should take to address the findings regarding immigration enforcement against crime victims that this report has found. This survey found that immigration enforcement against victims is triggered most often by tips from perpetrators, by a victim's arrest related to the domestic violence and by traffic stops. The following recommendations are designed to ensure full implementation of the ICE Courthouse Enforcement Directive 11072.1 and prevent immigration enforcement against immigrant crime victims protected by federal VAWA confidentiality statutes. These recommendations are designed to reach staff and supervisors at DHS who encounter immigrant crime victims or whose actions in their DHS work directly impacts victims. DHS should:

• Mandate annual training for:

    o   All Immigration and Customs Enforcement and Customs and Border Patrol officials involved in and supervising immigration enforcement activities;

    o   All new ICE and CBP enforcement officers;

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 297 of 380   Page ID #:3261

o   All ICE Trial Attorneys;

126 DEP'T OF HOMELAND SECURITY, INSTRUCTION NUMBER: 002-02-001, IMPLEMENTATION OF SECTION 1367 INFORMATION PROVISIONS, *in* NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT, 15 (Nov. 7, 2013) http://niwaplibrary.wcl.american.edu/pubs/implementation-of-section-1367-all-dhs-instruction-002-02-001/.
127 *Immigration and Customs Enforcement January 2018 Courthouse Enforcement Policy and VAWA Confidentiality Protections for Immigrant Crime Victims,* NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT (Jan. 31, 2018) http://niwaplibrary.wcl.american.edu/courthouse-protections-and-crime-victims/

American University, Washington College of Law                                              117

**Page 118**

o   Any state or local law enforcement officers given authority to conduct immigration enforcement activities on under Section 287(g); and
o   All DHS staff responsible for SAVE verification
o   All DHS staff who receive detainer requests, work at detention centers and have any role in responding to requests about whether or not immigration enforcement officials are interested in a particular person on:
    ▪ VAWA confidentiality requirements including how to access the Central Index System containing the "384" flag assigned to VAWA confidentiality protected cases and the "DHS Broadcast Message on New 384 Class of Admission"
    ▪ ICE Directive Number 11072.1 procedures and requirements
    ▪ ICE and CBP sensitive locations memo
    ▪ ICE Victim Witness memo128
• Require that all DHS staff indicate as part of their performance review whether or not

   they have taken the annual required training courses on VAWA confidentiality laws and courthouse and sensitive locations.
• Require that CBP issue:

   o   A written muster or other policy memo implementing VAWA confidentiality requirements; and
   o   A policy directive or muster that implements the same courthouse enforcement limitations for CBP officials as contained in ICE Directive Number 11072.1 on courthouse enforcement
• Implement practices that will prevent use of immigration enforcement actions,

   immigration court, and detention resources on cases of immigrant crime victims including particularly those with pending VAWA, U visa, and/or T visa and other VAWA confidentiality protected cases.
• Coordinate across DHS including USCIS and ICE to update the process of expedited

   processing of U visa applications by USCIS in cases of immigrant crime victims who are in immigration detention, are in removal proceedings or have final orders of removal. Expand this process to apply to VAWA self-petitioners,129 VAWA cancellation of removal applicants, VAWA suspension of deportation applicants, T visa applicants and

No: 18-55599, archived on July 9, 2019

cited in City of Los Angeles v. Barr

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 298 of 380   Page ID #:3262

any other applications covered by VAWA confidentiality protections. This research has found that perpetrators of crimes continue to use threats, attempts and calls to DHS immigration enforcement officials reporting immigrant victims. Often these calls are resulting in immigration enforcement actions being initiated against victims. An expedited process that works to swiftly adjudicate cases of VAWA, T and U visa victims will be an effective mechanism that cuts off perpetrator's ability to undermine criminal investigations and prosecutions and to harm victims.

### Recommendations for Additional Statutory Protections Needed to Protect Immigrant Crime Victims

This report discusses recommendations that courts, law enforcement, prosecutors, victim advocates, victim attorneys and the DHS can implement that will help remove barriers to accessing

[128] Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs Policy Number: 10076.1 (2011).
[129] VAWA self-petitioners includes definition in INA 101(a)(51) includes battered spouse waiver applicants.

American University, Washington College of Law                    118

**Page 119**

justice and improve access to federal statutory immigration protections designed to help immigrant victims and protect them from deportation. There are additional federal and state statutory protections that would greatly improve protections for immigrant victims of domestic and sexual violence, child abuse and human trafficking. Examples include:

- Federal Legislation to:
  - *Create a statutory list of locations deemed by statute to be sensitive locations* at which immigration enforcement activities cannot be conducted unless the action has supervisor approval and meets limited statutorily defined exceptions. The list of sensitive locations should include but not be limited to:
    - Domestic violence shelters
    - Rape crisis centers
    - Family justice centers
    - Supervised visitation centers
    - Victim services agencies
    - Courthouses
    - Schools
    - Hospitals
    - Places of worship and other religious ceremonies
    - Weddings
    - Funerals
  - *Eliminate the U visa annual cap:* This will shorten the time that U visa victims cooperating with law enforcement and prosecutors in criminal investigations or

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 299 of 380   Page ID #:3263

prosecutions are at risk from abusers attempts to have victims detained or deported.

o *Allocate sufficient resources in appropriations bills and earmark support for sufficient staffing, supervision, and adequate training for the VAWA Unit.* Survey findings about the numbers of immigrant victims who stay with abusers until their cases are adjudicated and daily, weekly and monthly abuse suffered by immigrant victims and their children necessitates staffing levels that will eliminate long waits for U visa adjudication. Ensure that all VAWA self-petitions, battered spouse waivers, U visa and T visa adjudications occur in a swift and predictable manner that allow immigrant crime victims to implement safety plans that protect victims while they await deferred action and work authorization which are both key to victim safety, protection and full participation in the criminal and civil justice systems.

o *Grant victims timely access to employment authorization within 6 months of filing* for a U visa, a VAWA self-petition, a T visa or any other VAWA confidentiality protected case. Lengthy delays in the adjudication process leaves victims of domestic violence, child abuse, human trafficking and workplace violence at the mercy of perpetrators. Without an ability to work, victims cannot support themselves and their children if they flee.[130]

o *Protect survivors from removal while their VAWA self-petitions, VAWA cancellation, U visa, and T visa applications are pending.* The findings of this

---

[130] Krisztina E. Szabo et. al., Early Access to Work Authorization For VAWA Self-Petitioners and U Visa Applicants, NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT 26 (Feb. 2014), http://niwap.org/go/wcl.american.edu/pubs/final_report-on-early-access-to-ead_02-12/.

American University, Washington College of Law                                    119

---

**Page 120**

research updates and builds upon findings in prior research[131] describing the extent to which immigrant crime victims eligible for and applying for immigration relief created to protect them are at risk of becoming the subject of immigration enforcement actions. Victims need to receive formal protection from deportation, detention and issuance of a notice of action against them once they have established a prima facie case. This will provide them protection soon after filing their VAWA, T or U visa case and will assure protection from all immigration enforcement actions whatever the trigger of the immigration enforcement action may be, including perpetrators tips, arrests of LEP victims at crime scenes, traffic stops or from any other source.

• State legislation to:

o Require U visa certification within a specified time after the request is made by government agencies authorized by federal statues to be certifiers. This includes, but is not limited to, law enforcement, prosecutors and judges.[132]

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforce

Case 2:17-cv-07215-R-JC   Document 106   Filed 07/12/19   Page 300 of 380   Page ID #:3264

- Provide access to state funded public benefits for immigrant victims of domestic violence, child abuse, human trafficking and, to immigrant victims with pending status, approved status or who are in the process of filing VAWA confidentiality protected immigration case. This includes, but is not limited to, granting these immigrant victims access to state funded TANF, subsidized health care, drivers' licenses and child care.[133]

- Amend state discovery rules to preclude discovery in state family, civil or criminal court cases of information about any VAWA confidentiality protected immigration case that the victim has filed. This includes information about the existence of the case, actions taken in the case and discovery of the contents of the federal immigration case file.

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

[131] Krisztina E. Szabo et. al., Early Access to Work Authorization For VAWA Self-Petitioners and U Visa Applicants, NAT'L IMMIGRANT WOMEN'S ADVOCACY PROJECT 26 (Feb. 2014), http://niwaplibrary.wcl.american.edu/pubs/final_report-on-early-access-to-ead_02-12/.

[132] Cal. Penal Code §679.10; Conn. Gen. Stat. §46b-38b (2016)

[133] To identify states that have already implemented these provisions go to http://www.niwap.org/benefitsmap/

American University, Washington College of Law                    120



AMERICA OUR HOME





Cited in City of Los Angeles v. Barr
No. 18-55599, archived on July 9, 2019

# Engaging Police in Immigrant Communities:

## Promising Practices from the Field

Pradine Saint-Fort

Noëlle Yasso

Susan Shah



**COP$**

COMMUNITY ORIENTED POLICING SERVICES
U.S. DEPARTMENT OF JUSTICE



VERA
INSTITUTE OF JUSTICE

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

# Engaging Police in Immigrant Communities:

> **Promising Practices from the Field**

Nadine Saiboukian

Noelle Yasso

Susan Shah

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

This project was supported by a Cooperative Agreement 2010-CK-WX-K020 awarded by the Office of Community Oriented Policing Services, U.S. Department of Justice. The opinions contained herein are those of the author(s) and do not necessarily represent the official position or policies of the U.S. Department of Justice. References to specific agencies, companies, products, or services should not be considered an endorsement by the author(s) or the U.S. Department of Justice. Rather, the references are illustrations to supplement discussion of the issues.

The Internet references cited in this publication were valid as of the date of this publication. Given that URLs and websites are in constant flux, neither the author(s) nor the COPS Office can vouch for their current validity.

ISBN: 978-1-932582-63-5

October 2012



U.S. Department of Justice
Office of Community Oriented Policing Services
145 N Street, N.E.
Washington, DC 20530

To obtain details on COPS Office programs, call the COPS Office
Response Center at 800.421.6770.

Visit COPS Online at **www.cops.usdoj.gov.**



Vera Institute of Justice
233 Broadway, 12th Floor
New York, NY 10279

212.334.1300
212.941.9407 (fax)

**www.vera.org**

# Contents

Letters from the Directors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .ii

Acknowledgments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .v

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

Principles of Promising Practices  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

Principles in Action: Promising Practices from the Field. . . . . . . . . . . . . .8

Brooklyn Center and Brooklyn Park Police Departments . . . . . . . . . 8

Chelsea Police Department  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Clearwater Police Department . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Everett Police Department . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Metropolitan Nashville Police Department  . . . . . . . . . . . . . . . . . . 26

Orange County Sheriff's Office  . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Palm Beach County Sheriff's Office . . . . . . . . . . . . . . . . . . . . . . . . 33

Storm Lake Police Department . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Tulsa Police Department . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .45

EPIC Glossary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .46

EPIC Toolkit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .47

Additional Resources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .49

Funding Resources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .55

Appendix. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .56

About the COPS Office. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .62

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019



U.S. Department of Justice
Office of Community Oriented Policing Services

Office of the Director
145 N Street, N.E., Washington, DC 20530



Dear Colleagues,

The Office of Community Oriented Policing Services (COPS Office) is proud to have partnered with the Vera Institute of Justice on this important publication, Engaging Police in Immigrant Communities. The United States is a country that prides itself on its diverse communities and the importance of continuing partnerships and strengthening trust between law enforcement and all members of the community that they serve, must not be taken lightly.

This guidebook highlights 10 law enforcement agencies that have demonstrated great success in enhancing relationships with the communities they serve, specifically with the diverse members of their community. They offer proof that the use of community policing can provide law enforcement with the tools necessary to build partnerships with immigrant community members.

This resource, along with the companion podcasts, will provide law enforcement agencies with innovative ideas and strategies for engagement. These promising practices are meant to serve as guidance for duplication and should ensure that law enforcement agencies across the country are better equipped for working with all members of their community. The materials provided here also include a cadre of resources available for quick download. Our hope is that the podcasts, guidebook, and the featured website offering supplemental materials, will greatly enhance the use of community policing in immigrant populations.

*Bernard K. Melekian*

Bernard Melekian, Director

Office of Community Oriented Policing Services



233 Broadway, 12th Floor
New York, NY 10279

Tel: (212) 334-1300
Fax: (212) 941-9407
www.vera.org

In jurisdictions large and small across the United States, the growing number of immigrants is redefining for law enforcement agencies what it means to ensure public safety. Indeed, the bridging of language and cultural divides and the building of strong police-immigrant relations constitute a new frontier of community policing that most agencies are just beginning to explore. With time and resources often in short supply, however, few can afford to experiment with untested immigrant-centered programs.

For this reason, the Vera Institute of Justice launched the Engaging Police in Immigrant Communities (EPIC) project in partnership with the U.S. Department of Justice's Office of Community Oriented Policing Services. EPIC is a national project to identify, assess, and promote the effective practices police agencies around the country have put in place to work successfully with their immigrant communities. In this report, we highlight the most promising of these approaches, describing the efforts of 10 departments of different sizes, capacities, and circumstances.

From the assignment of bilingual sworn officers as community liaisons to the creation of multicultural advisory councils, the initiatives profiled here are as diverse as the people they aim to serve. They are also practical and field-informed, which is essential for law enforcement agencies that want to achieve success in working with immigrant communities.

Michael P. Jacobson

Director, Vera Institute of Justice

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

# Acknowledgments

The authors would like to thank the COPS Office for providing us with the opportunity to comprehensively document promising practices in this new area of policing. We hope that this, together with other publications developed by the Vera Institute and published by the COPS Office on the topic of police-immigrant relations, will enable agencies that want to effectively police immigrant populations to implement concrete and proven strategies.

We specifically want to thank our program manager, Nicole Scalisi, for her resourcefulness, attentiveness, and never-ending support for our work.

Throughout the course of this project, a number of Vera staff and interns played an important role in moving the research forward. We would like to thank Crystal Scialla, who was a RBF Fellow in Nonprofit Law with the Vera Institute, for her active participation in some of our agency site visits and ensuring that our project consistently complied with legal requirements. We would also like to thank our editor Patricia Connelly, for her thoughtful reviews and edits of numerous drafts of the report and podcast scripts. Vera's publication coordinator Melissa Cippollone also deserves mention for producing and/or editing all graphic elements included in the report. We would be remiss to not thank three stellar student interns—Rika Gorn, Insiyah Mohammad, and Aneesha Gandhi— for whom no job was too big or small. They were always available to offer an extra set of hands whenever it was necessary.

 We wish to acknowledge the following community members who actively participated in the peer review of the report: Debra Ainbinder, Antonio Amaya, Laura Bachman, Rev. Saul Carranza, Marcela Gomez, Sandra Lyth, Seyon Nyanwleh, William Rivera, and Gladys Vega.

They guided us in making the report more useful to community members who wish to partner with local law enforcement in police-immigrant relations initiatives. They and our 12 law enforcement peer reviewers generated or improved a number of the checklists that are included in the report.

In addition to serving as peer reviewers of the report, the following individuals dedicated a number of hours to crafting and recording podcasts on this topic: Monique Drier, Community Liaison, Brooklyn Center Police Department; Robin Martinson, Community Liaison, Brooklyn Park Police Department; Brian Kyes, Chief of Police, Chelsea Police Department; Sergio Fidelis, Police Officer, Clearwater Police Department; Rafael Fernandez, Sergeant, Metropolitan Nashville Police Department; James Stormes, Colonel, Palm Beach County Sheriff's Office; and Jesse Guardiola, Police Officer, Tulsa Police Department. We thank them for their contribution to this project and willingness to be edited by numerous people.

Finally, we thank the other community policing coordinators, liaisons, chiefs, and sheriffs who have been involved in the promising practices profiled in this report. They are truly leaders in the policing field and have taken community policing to another level. We are humbled by their dedication and passion for serving all members of their communities.

Used in City of Los Angeles v. Barr
No. 18-56292 archived on July 9, 2019

# Executive Summary

Community policing philosophy encourages law enforcement agencies to actively pursue and develop meaningful relationships with the people they serve. These relationships help cultivate trust and understanding between the police and the community, which in turn make possible more effective law enforcement responses to crime and other public safety concerns. In short, community policing is effective when agencies work in partnership with the people in whose neighborhoods they work.

Shifting community demographics are changing how agencies form these police-community collaborations. As the number of immigrants in the United States continues to grow, community policing professionals routinely encounter many unfamiliar cultures and languages. As first responders, it is critical that law enforcement personnel are able to interact productively with immigrant communities and communicate effectively with all victims, witnesses, and suspects.

Because very little is known about how most of the 18,000 police agencies nationwide work with immigrant communities, in 2010, the U.S. Department of Justice's Office of Community Oriented Policing Services (COPS Office) partnered with the Vera Institute of Justice (Vera) to take a comprehensive look at how law enforcement agencies are developing effective police-immigrant relations. Vera's Engaging Police in Immigrant Communities (EPIC) project is a national effort to identify, assess, and disseminate promising law enforcement practices that cultivate trust and collaboration with immigrant communities and merit replication.

Vera staff conducted a comprehensive review of policing literature and consulted with policing experts to discern the underlying principles of promising practices for working with immigrant communities. These principles, which form the framework for this report, are:

1. Get to the root causes—Identify the underlying factors that contribute to the crime and disorder that impact immigrant populations.

2. Maximize resources—Seek ways to expand the use of available financial and personnel resources when crafting police responses to immigrant communities.

3. Leverage partnerships—Develop meaningful relationships with organizations or individuals that are deep-rooted in immigrant communities.

4. Focus on the vulnerable—Identify and support the needs and concerns of those community members who are least able to protect themselves.

5. Engage in broad outreach—Communicate directly and regularly with as many community members as possible, using varied means.

6. Train law enforcement and the community—Teach and learn about the values and practices of each other's culture.

7. Monitor successes and failures— Review programs on a regular basis to gauge how well they are responding to the community's needs and producing the desired results.

8. Sustain programs that work—Develop mechanisms to continue successful initiatives with agency-wide support.

## About Vera:

The Vera Institute of Justice is an independent, nonpartisan, nonprofit center for justice policy and practice, with offices in New York City, Washington, D.C., New Orleans, and Los Angeles. Vera combines expertise in research, demonstration projects, and technical assistance to help leaders in government and civil society improve the systems people rely on for justice and safety. Visit www.vera.org for additional information.

To identify practices that exemplify these principles, Vera solicited information about law enforcement practices from more than 1,000 agencies located in jurisdictions with large immigrant populations and evaluated nearly 200 agencies' practices. The evaluation led to the selection of the following 10 agencies as national models for promising police-immigrant relations: Brooklyn Center, Minnesota; Brooklyn Park, Minnesota; Chelsea, Massachusetts; Clearwater, Florida; Everett, Massachusetts; Metropolitan Nashville, Tennessee; Orange County, Florida; Palm Beach County, Florida; Storm Lake, Iowa; and Tulsa, Oklahoma.

Just as these agencies vary in number of personnel, geography, resources, and populations served, their practices also represent a wide array of both practical and creative solutions. Examples include:

■ Hiring a civilian community liaison to get to the root cause of crime and underreporting in an immigrant community

■ Making tactical Spanish language and cultural training part of police academy curriculum

■ Partnering with social service and legal service organizations to form a law enforcement anti-human trafficking task force

■ Engaging the services of a researcher from a local university to evaluate the effectiveness of immigrant-centered initiatives

From the modest to the most ambitious, every one of the 25 promising practices discussed in this report have contributed to building strong and mutually beneficial relations with immigrant communities. With some adaptation, all of these approaches can be applied elsewhere.

# Introduction

According to the 2010 Census, approximately 40 million foreign-born people now live in the United States and seven million of them arrived within the past 8 years alone.[1] Fostering positive police-immigrant relations has never been more important to the success of community policing. Yet law enforcement faces many challenges in reaching new immigrant communities, including language barriers, cultural differences, distrust of police, and reluctance to report crime for fear of deportation. In an effort to overcome these challenges, U.S. Department of Justice's Office of Community Oriented Policing Services (COPS Office) partnered with the Vera Institute of Justice (Vera) to identify and disseminate information on promising practices that law enforcement agencies are using to build successful police-immigrant relations.

This report is a field-informed guide for agencies that are looking to begin or build upon their work with immigrant communities. More than 1,000 agencies across the country were asked about several topics, including the frequency of encounters with immigrants, policies and programs governing police services to immigrants, agency outreach efforts, personnel recruitment, and training activities. The practices of 175 agencies in 42 states were evaluated by Vera. Among these agencies were 133 municipal law enforcement agencies, 27 sheriff's offices, nine state law enforcement agencies, and six other law enforcement agencies. Vera's evaluation methodology included compiling each agency's police-immigrant relations practices and assigning each agency a score on how well it embodied the principles of promising practices. After three rounds of further evaluation, which included in-depth telephone interviews and site visits, the 10 agencies profiled here were selected.

The report is organized into three sections and an appendix. The first section describes eight key principles of promising practices of police-immigrant relations. The second section follows with a more detailed discussion of how 10 policing agencies have applied these principles in the field. The third section provides a glossary of technical terms used in the report and a list of relevant resources. The appendix includes a map of all the assessment respondents and charts summarizing national trends in police-immigrant relations.

To provide additional practical guidance from the field, resources gathered from the 10 profiled agencies accompany this report, including seven podcasts and electronic copies of program documents, such as policies for serving immigrant communities and curricula for training law enforcement and community members. All companion resources are listed in the EPIC Toolkit at the end of the report and can be found on Vera's website at www.vera.org/epic.

It is important to note that the agencies profiled in this report do much more than is detailed here; readers are encouraged to contact the agencies directly to learn more about their community policing initiatives. (See "About the Agencies" chart on page 2 for contact information.)

"When police and community work together, good things can happen on all sides."

— Brooklyn Park community member

---

1.   Nathan P. Walters and Edward N. Trevelyan, *The Newly Arrived Foreign-Born Population of the United States: 2010, American Community Survey Brief* (U.S. Department of Commerce, U.S Census Bureau, 2011, ACSBR/10-16).

# About the Agencies

| Agency Name<br>Leadership<br>Contact Information<br>Jurisdiction Covered (City, County, State) | Area of Jurisdiction (sq. miles) | Population Estimates | Agency Size (Sworn Officers and Civilian Staff) | Predominant Immigrant Communities |
|---|---|---|---|---|
| **Brooklyn Center Police Department**<br>Chief Kevin Benner<br>Contact: Monique Drier – mdrier@ci.brooklyn-center.mn.us<br>Brooklyn Center, Hennepin County, Minnesota | 7.96 | 30,104 | 70 | Hmong, Latino, Liberian |
| **Brooklyn Park Police Department**<br>Chief Michael Davis<br>Contact: Robin Martinson – Robin.Martinson@brooklynpark.org<br>Brooklyn Park, Hennepin County, Minnesota | 26.1 | 75,781 | 163 | Hmong, Latino, Liberian |
| **Chelsea Police Department**<br>Chief Brian A. Kyes<br>Contact: Ofc. Sammy Mojica – SMojica@chelseama.gov<br>or Claire Contreras – CContreras@chelseama.gov<br>Chelsea, Suffolk County, Massachusetts | 1.8 | 45,000 | 107 | Salvadoran, other Latino |
| **Clearwater Police Department**<br>Chief Anthony Holloway<br>Contact: Ofc. Sergio Fidelis – Sergio.Fidelis@MyClearwater.com<br>Clearwater, Pinellas County, Florida | 25.6 | 107,685 | 410 | Mexican, other Latino |
| **Everett Police Department**<br>Chief Steven A. Mazzie<br>Contact: Ofc. Patrick Johnston – Patrick.Johnston@ci.everett.ma.us<br>Everett, Middlesex County, Massachusetts | 3.4 | 41,667 | 106 | Arab, Brazilian, Haitian, Italian, Latino |
| **Metropolitan Nashville Police Department**<br>Chief Steve Anderson<br>Contact: Ofc. Gilbert Ramirez – Gilbert.Ramirez@nashville.gov<br>or Commander Michael Alexander – michael.alexander@nashville.gov<br>Nashville, Davidson County, Tennessee | 475.1 | 601,222 | 1,765 | East African, Egyptian, Iraqi, Mexican, other Latino |
| **Orange County Sheriff's Office**<br>Sheriff Jerry L. Demings<br>Contact: Helen Johnston – Helen.Johnston@ocfl.net<br>Orange County, Florida | 903.4 | 1,145,956 | 2,139 | Haitian, other Caribbean, Mexican, other Latino |
| **Palm Beach County Sheriff's Office**<br>Sheriff Ric Bradshaw<br>Contact: Benito Gaspar – GasparB@pbso.org<br>Palm Beach County, Florida | 1,969.8 | 1,320,134 | 3,914 | Guatemalan-Mayan, Mexican, Haitian |
| **Storm Lake Police Department**<br>Public Safety Director Mark Prosser<br>Contact: Dir. Mark Prosser – prosser@stormlake.org<br>Storm Lake, Buena Vista County, Iowa | 4.1 | 13,000 | 26 | Laotian and Mexican |
| **Tulsa Police Department**<br>Chief Chuck Jordan<br>Contact: Sgt. Mark Sherwood – msherwood@cityoftulsa.org<br>or Ofc. Jesse Guardiola – jguardiola@cityoftulsa.org<br>Tulsa, Tulsa County, Oklahoma | 196.8 | 603,403 | 873 | East Asian, Mexican, other Latino |

Cited in City of Los Angeles v. Barr, No. 18-55599 archived on July 9, 2019

## Highlighted Principles

| Get to the Root Causes | Maximize Resources | Leverage Partnerships | Focus on the Vulnerable | Engage in Broad Outreach | Train Police and the Community | Monitor Successes and Failures | Sustain Programs that Work |
|---|---|---|---|---|---|---|---|
| ■ | ■ |  |  |  | ■ | ■ | ■ |
| ■ | ■ |  |  |  | ■ | ■ | ■ |
|  |  |  |  | ■ | ■ |  |  |
| ■ |  | ■ | ■ |  |  |  | ■ |
|  |  | ■ |  |  |  |  |  |
|  |  |  |  | ■ |  |  |  |
|  |  |  | ■ |  |  | ■ |  |
| ■ |  | ■ |  | ■ |  | ■ |  |
|  | ■ |  | ■ |  |  |  |  |
|  | ■ |  |  | ■ | ■ |  |  |

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

Engaging Police in Immigrant Communities: Promising Practices from the Field

## Five Common Challenges to Providing Public Safety in Immigrant Communities

1. **Language barriers:** Language barriers can prevent immigrants and the police from understanding each other and make it difficult for police to assess and respond to calls for assistance and other situations effectively.

2. Many immigrants and refugees fear police and are often reluctant to report crime because they come from places where law enforcement agencies are corrupt and abusive; criminals also target immigrants because their reluctance to report crime is well-known.

3. **Federal immigration enforcement's effect on local trust-building**: Immigrants may not be able to distinguish between local, state, and federal law enforcement officers and may attribute immigration raids or other federal immigrant enforcement activities to local police and, therefore, mistrust community policing efforts.

4. **Lack of awareness of cultural differences**: Immigrant communities may misunderstand how to interact with police, while police may be unfamiliar with immigrant cultural traditions and practices.

5. **Negative experiences with individual officers**: When individual officers do not treat immigrants respectfully, the entire department's relationship with immigrant communities may suffer.

**Source:** Matthew Lysakowski, Albert Antony Pearsall III, and Jill Pope. 2009. Policing in New Immigrant Communities. Washington, D.C.: U.S. Department of Justice, Office of Community Oriented Policing Services, www.cops.usdoj.gov/RIC/ResourceDetail.aspx?RID=526.

**Map 1.** Percent Change in the U.S. Foreign-Born Population by State, 2000–2010.



Legend:
- 0 − 25%
- 26 − 50%
- 51 − 75%
- 76 − 100%

**Source:** U.S. Census Bureau, *The American Community Survey Reports, The Foreign-Born Population in the United States: 2010,* www.census.gov/prod/2012pubs/acs-19.pdf.

cited in City of Los Angeles v. Barr No. 18-55599 archived on July 9, 2019

# Principles of Promising Practices

An agency's comprehensive approach to police-immigrant relations should aim to encompass all eight of the key principles identified by Vera. Use of these principles increases the likelihood that a department's response to public safety concerns will be effective, long-lasting, and replicable. The agency practices that are profiled in this report were selected because they can serve as useful examples for the field.

### 1. Get to the Root Causes

The primary purpose of community policing is to keep communities safe by reducing crime and minimizing other public safety concerns. Agencies that pursue this purpose most effectively first identify the underlying factors that contribute to threats to public safety. Immigrants' fear and mistrust of police, language barriers, and cultural differences make it especially challenging for police to get to the root causes of crime and disorder in their communities. However, when agencies collect and review quantitative and qualitative information about what is occurring by reviewing crime data and calls for service, and soliciting community input, they are able to understand more fully an immigrant community's public safety concerns and craft informed, deliberate solutions, instead of temporary, reactive responses. Four of the agencies profiled in this report successfully addressed recurring noise complaints, non-emergency calls, robberies, and the underreporting of crimes by focusing intensively on immigrant communities' core public safety needs.

### 2. Maximize Resources

Across the country, law enforcement agencies are asked to provide high-quality service on limited budgets. Four agencies discussed in this report have found creative ways to stretch their available financial and personnel resources while also improving police-immigrant relations within their jurisdictions. These approaches include sharing a community advisory committee that is made up of community members, placing mobile police units in areas with the greatest need, expanding the roles of staff and volunteers to overcome language barriers, and co-hosting community outreach events with other service providers.

### 3. Leverage Partnerships

Developing meaningful partnerships with organizations or individuals that are deep-rooted in local communities is an important part of effective community policing. Law enforcement agencies that partner with such groups or people are better able to address the public safety needs and concerns of the communities in their jurisdictions. While such collaboration may often require a high degree of investment and compromise on the part of both police officers and community members or advocates, it often produces high rewards: law enforcement agencies are able to share resources and expertise, find long-lasting solutions to crime problems, and increase a community's trust in its police department. Four agencies discussed below exemplify this principle by collaborating successfully with a wide range of governmental agencies and non-governmental organizations to combat human trafficking; train immigrants in their native languages about police encounters; and foster positive, lawful behaviors in local immigrant youth.

### 4. Focus on the Vulnerable

Local law enforcement is responsible for the safety of everyone living in its jurisdiction, especially for those who are more vulnerable to victimization because they are less able to protect themselves. The extent to which an agency serves vulnerable persons is indicative of how well it ensures public safety for the community at large. Vulnerable groups can include children, the elderly, persons with mental illness or other disabilities, and crime victims. In immigrant communities, limited English proficiency can make some even more vulnerable. Police agencies can effectively support the needs and concerns of these groups and also encourage crime reporting by dedicating a staff position, program, or policy to serve these groups. Strategies used by three agencies featured here include tailoring outreach to immigrant crime victims, establishing customized crime prevention academies, and creating programs specifically for people with limited English proficiency.

### 5. Engage in Broad Outreach

It is important for law enforcement agencies to have the trust of the people they serve. Regular and direct communication with as many community members as possible can help generate support for, and cooperation with, the police. It can also promote perceptions of safety and knowledge about how best to seek police assistance. Agencies can make the most of their contacts with the public by adapting communication methods to the preferences of the communities they serve. Some of the more successful practices used by four agencies profiled in this report include designating a community liaison, making use of the latest technology to reach a wider audience, hosting community forums, and participating in a humanitarian effort as a demonstration of good will.

### 6. Train Law Enforcement and the Community

A law enforcement agency and an immigrant community will have at least one thing in common—each has a distinct, complex culture. When members of different cultures come into contact, misunderstandings can occur very quickly. To minimize conflict, each group can benefit greatly from learning about the values and practices of the other's culture. When police officers are trained in the practical aspects of a culture, such as what behaviors or languages they will likely encounter in a neighborhood with immigrants, officers are better able to respond appropriately and make informed decisions during interactions with community members. Similarly, when community members understand the purpose behind law enforcement procedures and how they are expected to respond, they are more likely to cooperate with officers in a policing encounter. Four of the agencies described in this report established practical training programs that aim to lessen barriers between police and immigrant communities.

cited in City of Los Angeles v. Barr
No. 18-56292 archived on July 9, 2019

### 7. *Monitor Successes and Failures*

Successful community policing programs must be actively managed. They must be reviewed to gauge how well they are responding to the community's needs and producing the expected results. Consistent monitoring of a practice will ensure that new developments are identified in a timely fashion and the program is adjusted accordingly. For programs that focus on police-immigrant relations, it is critical to routinely obtain immigrant community input, through both informal and formal mechanisms. Community advisory councils can provide on-going community input from trusted sources that understand the police agency's mission and goals. Community satisfaction surveys are another useful tool to gather information from the general public. Four of the agencies profiled in this report monitor their work with immigrant communities by receiving feedback on a regular basis from community members.

### 8. *Sustain Programs That Work*

Many police agencies start new programs or initiatives with limited funding that often ends after a year or two. A program's success alone is no guarantee of its continued existence. Agencies that have found ways to sustain effective programs are better able to serve their communities over time. Successful agencies use a variety of methods to keep their programs going, and three of the agencies discussed in this report did so through formalizing personnel policies, implementing research recommendations, and allowing an initiative to become a self-sustaining community organization.

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

# Principles in Action: Promising Practices from the Field

The promising practices profiled in this report come from 10 different police departments and sheriff's offices and demonstrate the variety of ways the eight key principles above are put into action in the field. Though many of the practices embrace several principles, this report discusses each practice in light of a few principles to show how these principles are carried out in a policing context and what outcomes can be achieved. This report does not attempt to provide an exhaustive account of each agency's activities. The report does aim to present examples of practical and creative approaches to effective police-immigrant relations that may serve as models for other agencies.

## Brooklyn Center and Brooklyn Park Police Departments

www.cityofbrooklyncenter.org/index.aspx?NID=146 and
www.brooklynpark.org/sitepages/pid67.php



The Brooklyn Center and Brooklyn Park police departments (collectively, the Brooklyns) serve adjacent municipalities in the northern suburbs of Minneapolis, Minnesota. Both possess similar immigrant communities consisting largely of Hmong, Latino, and Liberian immigrants. Many of the Hmong and Liberian residents came to the Brooklyns through refugee resettlement agencies. Members of the Latino community moved to the Brooklyns mainly to pursue employment opportunities and a better quality of life. While working with these immigrant populations, the police departments realized that many people did not have a clear understanding of local law or the role of police. Officers were also having difficulty understanding the cultural practices of the diverse immigrant communities in their jurisdictions. In 2005, to collectively address their shared challenges, the police departments partnered with Hennepin County and the Northwest Hennepin Human Services Council to create the Joint Community Policing Partnership (JCPP). Since many of the practices described below are initiatives of the partnership, this report profiles the departments jointly.



cited in City of Los Angeles v. Barr No. 18-55599 archived on July 9, 2019

The JCPP manages to incorporate all eight of the principles of promising police-immigrant relations practices. Below, we discuss how the Brooklyn Center and Brooklyn Park police departments have:

- Hired civilian community liaisons to address the **root cause of ordinance violations** in the immigrant community

- **Maximized resources** by staffing some initiatives with volunteer members of their Multicultural Advisory Committee

- Created a New Americans' Academy to **train recent immigrants** in local laws and police procedures

- **Monitored their efforts** through formal evaluations and by seeking contemporaneous feedback from community partners

- Enlisted both sworn officers and civilian staff to complement and **sustain** the efforts of the JCPP

### Get to the Root Causes

The Brooklyns noticed a spike in complaints about loud house parties and noise violations in neighborhoods where growing numbers of Liberian immigrants reside. Officers responding to these calls soon recognized a pattern: they were going to the same homes to address the same complaints over and over again. Moreover, these repeat visits by the police did not reduce the number of violations or resident complaints. Some of the police responses to these complaints even escalated into heated confrontations with community members who did not understand why police officers were interfering with their socializing.

Executive staff from both agencies met to discuss the underlying causes of this problem. They hypothesized that either the Liberian residents misunderstood what was legally permissible when hosting large gatherings in their homes or there was miscommunication between the police and the immigrant residents. To test these theories and focus more intensively on police-immigrant relations overall, the JCPP provided resources to each department to hire a civilian community liaison.

The community liaisons' first task was to convene a community-police meeting to discuss the issues. The liaisons, who were not members of the Liberian community, had to seek out community members to participate in this meeting. In their initial meetings, the liaisons introduced themselves and explained their role in the police department. After cultivating and maintaining relationships with community members and leaders, the liaisons were able to host the initial meeting and several subsequent question-and-answer sessions with members of the Liberian community and sworn law enforcement personnel from each agency. These meetings, often held in community spaces, allowed the police departments to discuss their concerns about the high incidence of noise violations and other public safety complaints. Police personnel encouraged community members to share their views on those issues. As a result, the departments learned that many new immigrants were both unaware of the noise ordinances and laws governing quality-of-life issues and did not understand the police's role in enforcing them.

Both agencies then turned their attention to developing and disseminating information that was culturally appropriate. For example, the Brooklyn Center Police Department's community liaison developed and personally distributed an informational letter written in plain English addressed to the Liberian community that explained the local ordinances and laws and the police's role in enforcing them, and invited community members to contact the civilian community liaison or a designated police officer who could answer any questions. As a result of these and other efforts, the Brooklyns were able to reduce incidences of noise violations within the growing Liberian community.

**To view a copy of the informational letter addressed to the Liberian community, visit Vera's website at www.vera.org/epic.**

"Our community liaison's work with the community saved us 10-times the amount of time we spend in repeated calls for service for the same problem."

— Brooklyn Center police detective

Barr
Lodged in City of Los Angeles v. Barr
No. 18-56292; Received on July 9, 2019

## Maximize Resources

The JCPP's initiatives, past and present, focus on improving law enforcement relations with local immigrant communities and include teaching immigrant community members about local laws and the role of law enforcement; conducting cultural and community awareness training for law enforcement; planning and hosting outreach events; and recruiting and training multicultural police cadets. Although these initiatives have been fully supported by both agencies' chiefs and are managed by the departments' civilian community liaisons, their full implementation required the commitment of more personnel than any of the partnering organizations alone could provide.

To support the work of the civilian community liaisons of both agencies, the JCPP created a shared Multicultural Advisory Committee (MAC). MAC members include both foreign-born and U.S.-born residents of the Brooklyns, as well as representatives from the county. Members convene monthly to advise the agencies on how to serve and communicate better with the diverse communities of both cities. At meetings, members review drafts of personnel recruitment notices and training materials and discuss ideas for culturally appropriate resources the police departments could develop to address the safety concerns of all communities. MAC members also attend police-organized community events to assist agency staff and to ensure that community members see familiar faces working alongside police personnel.

**Agendas, applications, and other materials from MAC meetings can be found at www.vera.org/epic.**

## Train Law Enforcement and the Community

The Brooklyns have become the home of many newly arrived immigrants, including refugees. The police departments frequently observed that these newcomers often do not understand the role of law enforcement and the local laws, particularly laws against public disorder or domestic violence. Refugees, in particular, are often very fearful of the police based on past negative experiences with law enforcement in their countries of origin. For these reasons, immigrants in the Brooklyns would rarely report crime or voluntarily reach out to law enforcement for assistance.

> "The JCPP and MAC are unique because they work with everyone and they are not restricted to only new Americans. It is important to bridge the gap between immigrant and non-immigrant communities as well."
>
> — Brooklyn Park Police Chief Michael Davis



Multilingual police cadet teaching a group of recent refugees about the police. Brooklyn Park Police Department, July 2011.

cited in USCIS v. Angeles v. Barr
No. 17-55989, argued May 9, 2019

To introduce newly arrived immigrants to members of the police department and teach them about law enforcement and local laws, the agencies created the New Americans' Academy. The academy is a two-hour class that meets once a week for 7 weeks, and is taught by police personnel or a local expert. Each class focuses on a particular safety topic, such as traffic safety, when to call 911, alcohol and drug use, domestic violence and child protection, gang prevention, and city ordinance enforcement activities. Each class also includes a question-and-answer period for participants to ask about crimes or public-safety concerns.

The academy is held twice a year, and each averages about 20 participants. Since 2007, the New Americans' Academy has educated more than 200 recently arrived immigrants and refugees, many of whom have gone on to take part in other JCPP initiatives, including applying for membership in the volunteer-based Multicultural Advisory Committee. Many academy graduates also encourage others in their communities to participate in the New Americans' Academy to learn first-hand from law enforcement personnel how to interact effectively with police and engage in lawful behavior.

**The New Americans' Academy lesson plan and other materials can be found at www.vera.org/epic.**

### The Brooklyns' Top 10 Things the Police Wish You Knew

1. Do not get out of your car if you are stopped by the police. Do not run from the police. Just because the police have stopped you, it does not mean that you are going to jail.

2. If possible, pull over to the right side of the road when you see a police car or emergency vehicle with its lights on behind you.

3. Keep your hands visible as a police officer approaches your vehicle.

4. Always carry photo identification with you.

5. Do not drive if you do not have a valid driver's license.

6. Insurance is needed for operating a vehicle and you must have a valid insurance card in the vehicle.

7. Do not use alcohol if you are going to be driving. Driving with open containers of alcohol in your vehicle is illegal.

8. When you call 911 the police will show up, even if you hang up the phone.

9. Do not use your cell phone when you are interacting with the police. Speak slowly and calmly.

10. Police are there to help you. Be honest with them.

"Most Liberians do not initially see the police as being friendly. When they see the police watching people, they assume that the police just want to put them in jail. At the academy, we learned what police really do and that when they are sitting in their cars, they are not just looking to put us in jail."

– Liberian community member and New Americans' Academy participant

## Monitor Successes and Failures

When the JCPP started, the partner agencies set the following three goals to fostering greater trust and collaboration between police and immigrant communities: 1) improve officers' knowledge and understanding of immigrant communities, 2) improve community members' knowledge and understanding of the law and the police, and 3) provide more opportunities for positive interaction and two-way communication between police and the community. As the JCPP dedicated time and resources on a variety of outreach and training programs, the partner agencies wanted to ensure that the initiatives remained firmly rooted in those core goals.

To monitor the diverse programming in light of these goals, the JCPP assessed the initiatives and actively sought feedback from community members. One year, they also hired an independent evaluator to review the program. Four separate evaluations were conducted in the first 5 years of the JCPP and included the review of data collected from community members and police personnel through interviews and surveys. The evaluation findings were used to adjust the structure of some of the JCPP's larger-scale efforts. For example, the New Americans' Academy was changed to incorporate pre- and post-testing of participants to collect real-time information about how well the class improved participants' understanding of laws and the role of the police.

The Brooklyns also sought feedback from members of the MAC. At monthly meetings, MAC members have the opportunity, in a safe and comfortable setting, to communicate the public safety concerns of their respective communities and provide feedback on how well the JCCP programs are addressing these concerns. In this way, the police departments have a direct line to the communities they serve, and community input informs all of the JCPP's initiatives.

**Go to www.vera.org/epic to see the survey disseminated to MAC members.**

> "Embedding police into any cultural event lends credibility to these events among our long-term residents."
>
> — Brooklyn Center Police Chief Kevin Benner



Brooklyn Center Police Department celebrating Chinese New Year with a local Chinese dance team. Brooklyn Center Police Department, January 2012.



Officer speaking to area residents during a neighborhood event. Brooklyn Park Police Department, July 2011.

## Sustain Programs That Work

As the founding law enforcement agencies of the JCPP, the Brooklyns were keen to develop an initiative that would improve police-immigrant relations and also serve as a model for future JCPP project sites in the county. As the project gained momentum, both agencies' civilian community liaisons, whose primary task was to conduct outreach to the immigrant community, quickly developed a roster of programmatic activities too lengthy to manage without becoming overburdened and consequently ineffective.

To support their community liaisons' efforts and prevent exhaustion, both agencies have strategically assigned command staff, patrol officers, community service officers, bilingual cadets, and MAC community volunteers to assist in a variety of capacities. They have provided logistics and transportation support, advertised events within the community, served as trainers, and assisted with interpretation and translation. Some have also received community input before, during, and after the activities. Perhaps most important, both liaisons continue to receive full management support for involving agency personnel in their efforts and are authorized to grant overtime compensation for officers who work beyond their assigned shifts.

The robust involvement of the departments' patrol officers and command staff in the JCPP has led to agency-wide acceptance of the partnership and support for its continued operation. Neither community liaison has become overextended to the point of being ineffective. Should either community liaison move on to another position, the initiatives will continue with wide departmental support.

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

## Additional Practical Tips

- Want to know more about how to work with multilingual communities when you only speak English?
- Are you a newly hired or appointed civilian community liaison and want to know how to get the support and participation of sworn personnel?
- Would you like some practical tips for making outreach efforts successful?

Listen to two podcasts featuring community liaisons from the Brooklyn Center and Brooklyn Park police departments to get practical answers to these questions and more. Listen/download the podcast at www.cops.usdoj.gov.

## What makes a good police department community liaison?

A checklist for picking the right person for the job.

Based on the experiences of the various agencies profiled in this report, a trusted and effective police-community liaison, whether sworn or civilian, will ideally:

☐ Care about the community he or she is serving

☐ Have formal training or experience in issues that affect the community he or she serves

☐ Understand the demographics, the cultures, the power dynamics, and competing interests present in the communities he or she is serving

☐ Be able to identify the people and groups that represent the needs of the community

☐ Have simultaneous credibility in law enforcement and community circles

☐ Be flexible and understand that compromises can be reached

☐ Clearly communicate goals, initiatives, and duties with both the law enforcement agency and the community

☐ Be able to put people at ease so they feel comfortable enough to communicate their needs

☐ Make an extra effort to portray a positive image of the law enforcement agency

☐ Maintain the highest ethical standards because just one publicized lapse can damage the reputation and accumulated community trust of an entire agency

☐ Cultivate ongoing support, starting with a liaison's immediate supervisor and extending up through the agency's chain of command

☐ Have a passion for this unique approach to police work

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

# Chelsea Police Department

www.chelseama.gov/Public_Documents/ChelseaMA_Police/index





Fifty-five percent of the city of Chelsea's 45,000 residents are foreign born—including immigrants from Central and South America and refugees from Somalia and Iraq—who bring to their new home many different cultures, languages, and experiences with law enforcement. Language barriers and the immigrants' fear of law enforcement challenged the Chelsea Police Department's (CPD) ability to communicate effectively and ensure the safety of both responding officers and community members. To address these problems, the CPD added a sworn community resource officer and civilian newcomer advocate position to their community policing team. Their efforts largely put into practice the eight principles of promising police-immigrant relations. Below, we highlight how the CPD:

- **Developed a targeted and strategic outreach program** by assigning the CPD chief, a community resource officer, and the newcomer advocate to work with different segments of the immigrant community

- Used the community resource officer and newcomer advocate to **train both law enforcement and newly arrived immigrants**

## Engage in Broad Outreach

In 2007, as a result of tenacious advocacy by the Chelsea Collaborative, a community-based organization, Chelsea formally became a sanctuary city. Immigrant communities did not initially understand how and to what extent the policy affected the role of the CPD in enforcing federal immigration laws. In addition, many community members were not able to distinguish CPD officers from other law enforcement personnel, including federal immigration enforcement officials, who did actively enforce immigration violations. As a result, community members often were wary of interacting with police and did not report crime, for fear of deportation. For a densely populated city of nearly 45,000 residents in just 1.8 square miles, unreported crimes can have a detrimental impact on the safety of the entire population.

To publicize the police department's non-enforcement policy with regard to immigration violations and to encourage immigrants to come forward and report crime, the chief of police became an active spokesman at Chelsea Collaborative community forums. The chief recognized that it was important that community members heard from him on this issue—to make clear that the policy was an agency-wide mandate. The chief also quickly learned that presentations at community events alone were not enough to address the community's concerns and clear up misunderstandings about police policy. The community needed more non-adversarial, helpful contacts with law enforcement.

"We realize that we cannot do it alone and we need and count on our community-based partners to accomplish our mutual goals."

— Chelsea Police Chief Brian Kyes

To address the gap, the CPD has assigned a sworn officer to be a community resource officer to serve as a liaison between the department and the Latino community. His primary role is to cultivate trust by maintaining a constant presence in the community to deal with community concerns, educate community members about the law and their rights, and answer questions. He is also bilingual (Spanish and English), which has allowed the officer to communicate with Latino community members in their native language. The relationship that has developed between this officer and community members has improved the relationship between other CPD police officers and the community, which in turn has made distinguishing CPD officers from other law enforcement agencies much easier for Latino immigrants. In addition, the department created a civilian newcomer advocate position, to serve as the primary community contact for the city's large refugee population.

By delegating specific tasks to the chief, a sworn community resource officer, and a civilian newcomer advocate, the CPD was able to communicate and implement its policies related to the immigrant community effectively. Whereas the chief primarily speaks to community leaders and government officials, the community resource officer and newcomer advocate, together with a growing number of other police personnel, are able to reach out to the immigrant community at large.

**A copy of the Chelsea Police Department's policy on its role in immigration enforcement is available at www.vera.org/epic.**

## Train Law Enforcement and the Community

The constant influx of new immigrants and refugees to Chelsea made it difficult for the CPD to become acquainted with all of the cultural traditions and practices in the jurisdiction. Refugees, especially, often fear law enforcement because of their negative experiences with police in their home countries and know little about U.S. laws, which further impaired their full integration into the Chelsea community.



Community resource officer speaks about public safety issues to an "English for Speakers of Other Languages" class. Chelsea Police Department, February 2012.

In order to foster trust and understanding between the CPD and the diverse refugee communities residing in Chelsea, the agency hired a newcomer advocate in 2009, with funding support from the local community hospital. The newcomer advocate has learned about recent arrivals from local refugee resettlement agencies, reached out to the city's newly arrived refugees, and provided training to both refugees and the police about each other's culture.

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

To train officers, the newcomer advocate has invited members from refugee communities to talk to police officers about their previous experiences with law enforcement, as well as their cultural traditions and practices. The advocate also has created factsheets for law enforcement that briefly describe the culture, language, and life in the country of origin for each new group of refugees. The advocate distributed printed versions of the factsheets to officers during roll calls and made electronic versions available on the agency's shared computer network.

The newcomer advocate works with the community resource officer to educate newly arrived refugees and other new immigrants about U.S. and local laws, crime prevention strategies, and the role of law enforcement in maintaining order and ensuring public safety. Each of these trainings has focused on a particular refugee or immigrant group. Trainings were typically 60 to 90 minute workshops that included an opportunity for a member of the group to describe his or her country of origin and culture, followed by brief presentations from sworn personnel of various departments, a question and answer period for community members to speak with CPD personnel, and a tour of the police station.

Through these trainings, community members and law enforcement personnel were able to get acquainted with each other in comfortable and safe settings, which made them more open to accepting new, even challenging, information about each other. As a result, initial encounters between CPD officers and new immigrants became increasingly positive because both groups better understood each other.

**A sample factsheet about a new immigrant group created by CPD's newcomer advocate can be found at www.vera.org/epic.**

> "Be open and flexible. You hear and see a lot of things that can be challenging for both the community and law enforcement."
>
> – Carrie Nedzipovik, former newcomer advocate, Chelsea Police Department, on conducting community and law enforcement trainings.

Table 1: Pros and Cons of a Sworn or Civilian Community Liaison

**Community Liaison: Sworn or Civilian?**

Successful community liaisons can be either sworn or civilian personnel. The choice of whether to have a civilian or sworn community liaison should be based on the specific needs of a jurisdiction and its immigrant communities. The following chart offers some pros and cons for each option.

| Sworn (Uniformed) Liaison | | Civilian Community Liaison | |
|---|---|---|---|
| **Pro** | **Con** | **Pro** | **Con** |
| Has police training and knowledge to respond to crises or questions from community members | May not know as much about certain communities' needs | Has better awareness of community needs because more integrated into the community | May not understand law enforcement culture and the tactics used by law enforcement |
| Assists the community to associate the uniform with helpfulness | May seem intimidating or less approachable | May seem more approachable than a uniformed officer | May not be able to influence police department culture |

## Additional Tips

- Want to know more about how law enforcement can collaborate with community-based organizations on politically charged topics?

- Looking for some advice on selecting an appropriate community partner for a law enforcement program?

Listen to a podcast from the chief of the Chelsea Police Department to get practical answers to these questions and more. Listen/download the podcast at www.cops.usdoj.gov.

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

# Clearwater Police Department

www.clearwaterpolice.com/





The service and tourism industries continue to attract immigrants to the city of Clearwater, Florida, which is now home to a large Mexican population. Among the Spanish-speaking Clearwater residents, nearly 56 percent are considered limited English proficient (LEP). In working to improve communication with the immigrant community, the Clearwater Police Department (CPD) became aware of trends such as underreporting of crime and human trafficking, which jeopardized the safety of all residents. The department was able to employ the eight promising practices principles when developing its approach to policing in its local immigrant communities. In this report, we highlight how the CPD:

- Used confidential informants **to get to the underlying cause** of underreporting within immigrant communities

- **Partnered with multiple organizations** to create the Clearwater Area Task Force Against Human Trafficking, which identifies trafficking victims, provides victim support, and uncovers trafficking networks

- **Focused on a vulnerable subset** of Spanish-speaking LEP immigrants by creating a civilian interpreter program with the YWCA of Tampa Bay

- Turned a police-supported Latino community center into a self-supporting independent organization in order to **sustain** vital services for the Latino immigrant community

## Get to the Root Causes

The CPD received information about criminal activities in the Latino community that were not appearing in the department's crime statistics. The department received this information from confidential informants (CIs), some of whom were members of the Latino immigrant community or lived in areas with a large Latino immigrant population. The department had cultivated a relationship with these CIs to obtain reliable details on illicit activities such as drug distribution or gang-related crimes. Over time, the CIs began to share information about other crimes they had heard about or witnessed that directly affected the Latino immigrant community. When the department compared the CIs' reports with its internal crime data, it realized that immigrant communities were likely underreporting crime.

Cited in City of Los Angeles v. Barr
No. 18-56292 archived on July 9, 2019

"If you start peeling back the layers, you'll find information."

— Clearwater Police Chief Anthony Holloway

To find out exactly why Latino victims or witnesses were not reporting crime, the CPD assigned its Spanish-speaking officers to the areas that the CIs had identified as having high crime but low reporting. These bilingual officers were able to speak in Spanish with LEP community members about their concerns and the crimes that had been taking place. As a result, the department learned that underreporting was occurring largely because victims spoke little or no English or feared that the police would turn them over to immigration authorities for deportation.

The CPD responded by making its Spanish-speaking officers more visible in the Latino community by assigning officers to attend Hispanic events in the city in their formal role as CPD community liaison officers. These officers were able to convey to members of the community, in Spanish, that there was no need to fear deportation when reporting crimes, and that the department could receive community crime reports in Spanish. Today, while CPD's bilingual officers are not routinely given assignments solely based on their language proficiency, these officers do regularly attend Hispanic community events to educate the public and encourage crime reporting. Clearwater's Hispanic Outreach Center and other organizations have launched a media campaign in cooperation with the police to provide bilingual crime prevention tips and information on how to report crimes.

Because of the police department's success in identifying and addressing the reason behind the underreporting of crimes, Clearwater's Latino community members have increased their reports of robberies, sexual assaults, and other crimes.

## Leverage Partnerships

A rise in international human trafficking rings in the Clearwater-Tampa Bay area resulted in a growing number of trafficking victims in the region. CPD officers increasingly encountered trafficking victims who were either abandoned with no resources or were being forcibly exploited as sex workers or manual laborers. Because the CPD faced multiple challenges working with this special immigrant population, in 2006, the department convened the Clearwater Area Task Force on Human Trafficking to enlist the assistance of other groups also working to prevent this criminal activity and assist the victims.

The task force currently includes representatives from the CPD and other local law enforcement agencies, the U.S. Department of Homeland Security's Immigration and Customs Enforcement (ICE), the Federal Bureau of Investigation (FBI), legal services providers, and social service providers. Each partner brings a distinct but complementary expertise to the task force. The CPD, FBI, and ICE officials regularly train law enforcement and social services providers on how to identify trafficking victims. They also train law enforcement on how to identify potential traffickers. ICE also assisted by granting temporary authorization for trafficking victims to remain in the country during the course of CPD investigations. The legal service providers train law enforcement on the options available to victims of trafficking for gaining legal immigration status and legal assistance, and assist qualified victims in applying for legal status. The social service providers support victims by helping them secure housing, clothing, and medical services.

The collaborative work of task force members has resulted in the identification of many trafficking victims and suspected traffickers and a decrease in the incidence of trafficking in the region. As of January 2011, 104 traffickers have been arrested with 37 convicted; and 25 victims of severe forms of human trafficking have been identified. The task force has also helped to curb the continued victimization of trafficked persons by connecting victims to legal and social service providers, who have assisted the victims in their applications for immigration status to the U.S. Citizenship and Immigration Service (USCIS). To date, four victims have gained T visa status and more than 30 victims gained U visa status. An additional seven victims have been granted continued presence, which allows victims of human trafficking to remain in the U.S. temporarily during the ongoing investigation into the human trafficking-related crimes committed against them.

cited in City of Los Angeles v. Barr
No. 18-cv-... archived on ... July 2019

To broaden its impact even further, the task force makes the resources it develops—public service announcements, agency policies, training materials, etc.—readily available on its website for use by law enforcement agencies throughout the state and beyond.

**For more information visit the task force's website at www.catfht.org.**

## Focus on the Vulnerable

In the late 1990s, the number of residents in Clearwater with limited English proficiency increased dramatically. This population was predominantly made up of immigrants from Latin America who spoke Spanish or an indigenous language. The police department, in collaboration with the YWCA of Tampa Bay, developed a civilian interpreter program to communicate with the growing number of LEP residents they served. The department then codified the civilian interpreter program into policy to ensure that all officers properly understood the interpreters' role and would use them appropriately.

The CPD recognized that the civilian interpreter program could serve more than one purpose. In addition to providing essential language assistance to CPD officers on the beat, the program could provide communication assistance to victims and witnesses with limited English proficiency as cases moved through the criminal justice system.

The CPD and YWCA selected a few of the civilian interpreters to become state-certified bilingual victim advocates to guide crime victims with limited English proficiency as they navigated the justice system. In addition to providing general information, these advocates accompanied victims to court and helped them access victim services. The advocates also worked closely with the CPD investigators assigned to cases to facilitate victims' cooperation and understanding of the legal process.

By providing the services of civilian interpreters and bilingual victim advocates, the CPD has been able to help crime victims with limited English proficiency feel more comfortable reporting crime and participating in investigations and prosecutions. Just as important, these services have increased the level of trust in police among a vulnerable sector of the Latino immigrant population in Clearwater. And, over time, this trust has allowed the agency to learn about and respond to additional public safety needs and concerns.

**For copies of the CPD and YWCA's training materials for civilian interpreters and CPD's civilian interpreter program policy, go to www.vera.org/epic.**

Hispanic liaison officer speaking to local residents. Clearwater Police Department, March 2012.

"I don't care how big a law enforcement agency is; in today's global society you can't do it by yourself. You have to reach out to agencies with the skill set you need to get the job done."

— Former Deputy Chief Dewey Williams, Clearwater Police Department

## Sustain Programs That Work

Through a collaboration that started with their joint civilian interpreter program, the CPD and YWCA created the Hispanic Outreach Center (HOC) to serve the city's growing Latino community. The HOC, which is conveniently located within steps of the police department's headquarters, offers bilingual (English and Spanish) victim advocacy, family advocacy, mental health counseling, legal and immigration services, and English as a Second Language (ESL) classes. The center is also the primary workstation for the CPD's Hispanic liaison officer, whose office is located in the back of the building to facilitate confidential interviews with victims.

Although successful, after 7 years, the HOC was underfunded. Neither the YWCA of Tampa Bay nor the CPD could take on the responsibility of fundraising for the HOC. At the same time, the CPD did not want to lose the HOC as a partner. The center had provided the department with many opportunities to connect with the city's large Latino community through its various community policing activities. When the executive director of the HOC took steps to incorporate the center as its own organization, the InterCultural Advocacy Institute, the CPD was in full support. As an independent non-profit entity, the HOC now does its own fundraising and is governed by a board of directors. The CPD participates in the board meetings to stay abreast of the HOC's activities and build upon this partnership. The CPD's willingness to "spin off" one of its initiatives has led to the continued success and growth of a vital source of support for Clearwater's Latino community.

**A copy of the CPD's policy outlining its involvement with the HOC can be found at www.vera.org/epic. For more information about how the HOC was created and the collaboration with the Clearwater Police Department, go to www.clearwaterpolice.com/hispanic/chronology.asp.**



Hispanic liaison officer visiting a local Latino business owner. Clearwater Police Department, March 2012.

### Additional Tips

- Are you facing a transition in law enforcement personnel working on a community-policing program and do you want some guidance on how to ensure continuity?

- Is a police agency you are working with experiencing a change in leadership or other personnel and do you want to ensure that your partnership does not fall through the cracks?

Listen to a podcast featuring the Hispanic liaison officer from the Clearwater Police Department to get practical answers to these questions and more. Listen/download the podcast at www.cops.usdoj.gov.

### Do's and Don'ts of Creating Partnerships

Developing and sustaining meaningful partnerships requires true give-and-take on the part of both partners. Law enforcement personnel who took part in the practices profiled in this report offer their tips on creating a successful partnership.

- ★ **Do** identify the organizations or persons who may be invested in solving a particular community problem, reach out to them, and begin building a partnership before you urgently need it.

- ★ **Do** explain the planned benefits and outcomes of the partnership to your potential partner.

- ★ **Do** try to see things from your partner's perspective and listen to your partner's concerns.

- ★ **Do** come prepared to make concessions in some places and hold your ground in others.

- ★ **Do** encourage top-to-bottom agency acceptance and support for this partnership.

- ★ **Do** pick passionate and dedicated officers to serve as agency liaisons to the community.

- ✖ **Don't** call upon community partners solely when you are confronting an urgent problem.

- ✖ **Don't** only address criminal justice concerns—helping out with a partner's unrelated needs can go a long way.

- ✖ **Don't** be inflexible or refuse to explain your reasoning to a partner.

- ✖ **Don't** discount the importance of personalities and dedication when picking people to represent your agency.

cited in City of Los Angeles v. Barr 18-55599 archived on July 9, 2019

# Everett Police Department

http://everettpolicema.com/





In the past decade, the city of Everett, Massachusetts, has attracted several waves of immigrant communities from the Caribbean, Central and South America, and Europe, among other locations. Through a local nonprofit organization's research, the Everett Police Department (EPD) found out that these new immigrant groups were afraid of and did not understand the local law enforcement procedures. The EPD then worked with other organizations to educate immigrants about police stops in their own language. This intensive collaboration embodied the eight promising practices principles. In this report, we focus on how the EPD leveraged a **partnership** with various organizations to educate and build ties to the city's many immigrant communities.

## Leverage Partnerships

Many immigrants in Everett did not understand the role of local police in enforcing immigration laws or how to interact with officers during routine police encounters, such as motor vehicle stops. Some immigrants feared detention and deportation because they or their family members lacked lawful immigration status. As a result, immigrants often went out of their way to avoid any encounter with the police even if this meant not reporting crimes or accessing other emergency services, including medical services.

Through a partnership with the Joint Committee for Children's Health Care in Everett (JCCHE)—a consortium of children's advocates, researchers, and social service providers—the EPD learned about research the JCCHE was conducting on immigrant access to health care. The JCCHE found that immigrants' fear of local law enforcement was jeopardizing the safety and health of their communities. Together, building upon the EPD's policing experiences and the JCCHE's research findings, the EPD and the JCCHE sought to increase police-community dialogue.

They did this by creating a brochure titled "What to Expect When Stopped by the Police," which was translated by qualified community volunteers into Arabic, Haitian Creole, Italian, Portuguese, and Spanish. The brochure's content was based on questions that the Everett police chief received during a series of forums organized by the JCCHE with local organizations serving the city's immigrant communities. Developing the brochure was a year-long, collaborative effort between the police department and the JCCHE. During this process, community members met and became acquainted with police personnel at various levels as well as police policies and protocols.

The community forums and brochure project proved to be effective vehicles for engaging community members, educating the city's immigrants, and reducing immigrants' concerns about interactions with local law enforcement. The collaboration also encouraged the community to reach out to police personnel they met over the course of the project and report crimes. In addition, participation in the community forums helped the EPD build and sustain better relations with members of Everett's diverse immigrant community.

For a copy of the Everett Police Department's "What to Expect when Stopped by Police" brochure in multiple languages, go to www.vera.org/epic.

---

### Everett's Law Enforcement FAQ

Research on immigrant groups conducted by the JCCHE and the Everett Police Department found that new immigrants in Everett frequently asked the following questions about the law, the role of police, and law enforcement procedure:

- Why do cops search or tow cars as a result of a traffic stop?

- What leads to high-speed car chases? How many car chases have there been?

- DWIs—what is the law and what happens if someone is stopped?

- Can parents discipline their kids? If so, what is allowed?

- When can someone call 911?

- Does the agency use racial profiling?

- What leads to shootings? How many shootings have happened in the past year?

- What are some descriptions of people who fit criminal profiles?

- What types of cases can be easily prosecuted?

---

"Creating the 'What to Expect' brochure was the product of a year-long collaboration and was itself a bonding experience between different members of the community. The creation of the brochure built up the trust between the police and the community."

— Robert Marra, Cambridge Health Alliance

# Metropolitan Nashville Police Department

www.police.nashville.gov

 

Over the past decade, immigrant populations in metropolitan Nashville, Tennessee, have steadily increased. The city's largest group is made up of Spanish-speaking immigrants from across Latin America. To identify and respond to the needs of this community, the Metropolitan Nashville Police Department (MNPD) created El Protector ("The Protector"), a program staffed with two full-time bilingual officers. The program was originally adapted from state highway patrol programs in California and Washington to decrease traffic fatalities in the Latino community. El Protector has a broader community-oriented policing mission: to engage the Latino community in Nashville in reducing DUIs, traffic fatalities, and domestic violence incidents, and participate in crime prevention activities. While El Protector embodies all eight principles of promising police-immigrant relations, in this report, we focus on how the MNPD expanded the reach of its program by:



- **Partnering** with private and social service organizations to host an annual day-long Hispanic Festival as well as other community events that provide services and public safety education on a large scale

- **Reaching out** through radio and social networking media to become more accessible to youth and other segments of the growing Latino population in Nashville

## Leverage Partnerships

As Nashville's Latino immigrant population grew, the police department had to revisit how its longstanding Latino outreach program, El Protector, would be able to accommodate a thriving community of thousands. Since 2004, the El Protector program, staffed by two full-time Spanish-speaking officers, has provided bilingual and culturally tailored public safety trainings to the city's Latino community. The MNPD, in collaboration with a number of public and private organizations, typically hosted numerous small trainings and outreach events in several parts of the city where large numbers of Latino immigrants reside.

Since El Protector had existed for a number of years, its full-time officers became very knowledgeable about the public safety and social service needs of the community. In addition, community members who had interacted with El Protector became more comfortable sharing their concerns with El Protector officers. However, with the steady increase in the Latino population, it became nearly impossible for just two officers to serve the community effectively on a neighborhood-by-neighborhood basis.

To resolve this outreach issue, the MNPD developed the idea of holding an annual day-long Hispanic Festival in a large venue located in a Latino neighborhood. Such an event, the department reasoned, would allow it to provide large-scale community education that would draw in community members from various neighborhoods. But the program had a limited budget. To cover much of the event's costs, the department turned to many of the media, public, and private sector partners that the agency and El Protector had cultivated over the years. One of the corporate partners the MNPD approached was a national cell phone provider which donates cell phones and usage time for an MNPD program that enlists quali-fied community volunteers as interpreters. From this company, and other large private-sector organizations that valued outreach to the Latino community, MNPD was able to secure dona-tions for equipment and entertainment.

The MNPD also invited small local businesses and community-based organizations, including immigration attorneys, health centers, and social service providers, to participate as event sponsors and exhibitors—a great opportunity for the partners to gain exposure to a growing consumer group and for the community to obtain much needed information and services.

The festival drew hundreds of community members and showcased both entertainment and vital information from a variety of providers. No one organization alone could have produced an event of this caliber reaching such a large number of the Latino community. Because of the annual festival's success and community demand, El Protector continues to organize other collaborative community events, including an annual health fair and a winter holiday event for children with special needs and their families.



Officer visiting a booth at the Hispanic Festival. Metropolitan Nashville Police Department, July 2011.

"Large community gatherings like the Hispanic Festival provide a great opportunity for the community to mingle and speak with the police in a way that builds trust. Sometimes building trust within immigrant communities involves focusing on the family as a whole."

— Metropolitan Nashville community member

## Engage in Broad Outreach

For many years in the Latino immigrant community in Nashville, print and broadcast media were the most reliable ways for law enforcement to share information with the community. The department, through its Latino outreach program El Protector, submitted articles on public safety concerns and crime prevention to the local Spanish newspapers and appeared as guests on Spanish radio programs. Over time, as the community grew larger and more connected to new media, the effectiveness of print outreach methods diminished.

Instead of dismantling their existing efforts, El Protector decided to take a closer look at its outreach activities to determine which activities were no longer adequate and which were successful and could be expanded. El Protector officers learned that the Latino community was relying less and less on print media, because either many were unable to read Spanish or could not make the time to read the paper on a regular basis. For these people, the radio was a more consistent medium for receiving news. Previously, El Protector officers would make only the occasional guest appearances on the radio. The department reasoned that with a more regular presence on Nashville's Spanish radio stations, they could have greater and more meaningful community contact. Currently, in addition to making appearances on four radio shows, El Protector officers now have a weekly radio program, "The El Protector Show." The program's topics range from domestic violence and traffic safety to immigration.

More recently, in response to the broad appeal of social networking media, the MNPD created an El Protector page on Facebook™, which features postings in English and in Spanish. Facebook has allowed the agency to reach Nashville's Latino youth, who are quite active online, and quickly publicize community events.

The immigrant communities have welcomed these initiatives, taking a more active role in working with police to ensure their safety. Most notably, the police have seen an increase in cooperation from immigrant victims and witnesses. This support has resulted in improved investigations and stronger prosecutions.

For more information about the El Protector program go to www.police.nashville.gov/safety/elprotector/index.asp.



El Protector Officers answering questions on a live radio show. Metropolitan Nashville Police Department, January 2011.

### Additional Tips

- Is your police agency considering doing outreach to the immigrant community through radio and you want some advice from a seasoned expert?

- Are you interested in inviting a law enforcement official to participate in a radio program and want to create a format that works for everyone?

Listen to a podcast featuring a former El Protector officer from the Metropolitan Nashville Police Department to get practical answers to these questions and more. Listen/download the podcast at www.cops.usdoj.gov.

### Strategies to Ensure Community Engagement

Community leaders who have worked with the agencies profiled in this report offer the following suggestions for keeping community members engaged in police-immigrant relations programming.

- Invite both leaders and members of the community to meetings with law enforcement to discuss needs, concerns, and problems.

- Allow community members to build their own agendas and strategies for working with police.

- Provide the community with information on the role of law enforcement, how law enforcement accepts and deals with resident complaints, and how it carries out community policing.

- Ensure that all meetings with community members occur in neutral locations that are accessible to community members and at dates and times that are conducive to specific community participation.

- Ensure that all materials are translated into languages predominant in the communities and that there are interpreters available at community meetings.

- Create an environment that is conducive to relationship-building by providing food.

"We did not want to be 'old school' in how we connected with the community. We wanted to think of new ways to improve service to the community and saw that an online presence and text messages can work well."

— Metropolitan Nashville Police Chief Steve Anderson

# Orange County Sheriff's Office

www.ocso.com/





The Orange County Sheriff's Office's (OCSO) large jurisdiction, on the eastern coast of central Florida, is home to immigrants from across the globe, especially from South and Central America, Haiti, and other Caribbean countries. The OCSO realized that both new and settled immigrants in the county lacked information about the sheriff's office's role and responsibilities and needed an avenue to express their concerns to the agency. Thus, the OCSO created tailored crime prevention academies and community advisory committees, which put into practice the eight principles for promising police-immigrant relations. In this report, we focus on two principles in which the OCSO:

- **Focused on the public safety and social services needs of vulnerable** elderly Latino community members and LEP crime victims by creating crime prevention academies and recruiting a group of bilingual chaplains

- Created a Caribbean American Advisory Committee to solicit feedback from community leaders and **monitor the sheriff's office's outreach efforts**

## Focus on the Vulnerable

Data on crime in Orange County indicated that certain predatory activities, such as fraud, disproportionately affected the Latino immigrant community. Many new immigrants were routinely victimized; perpetrators would take advantage of their limited English proficiency and lack of awareness of ways to protect themselves from crime. To increase the Latino immigrant community's awareness of crime trends and crime prevention techniques, the OCSO instituted the Hispanic Crime Prevention Academy. Organized by the agency's Spanish-speaking victim-witness advocate, the Hispanic Crime Prevention Academy meets once a week for 8 weeks at a community location. Since 2001, the academy has trained hundreds of community members. Classes are conducted in Spanish and focus on a particular crime trend or public safety concern. Sworn OCSO personnel from various units lead each class and provide attendees with basic information about prevalent crimes, perpetrators' common ways of operating, and how to protect themselves.

cited for Los Angeles Bail

No. 18-55599 archived on July 9, 2019

Based on its positive experience with the Hispanic Crime Prevention Academy, the OCSO realized that elderly members of the Latino community were particularly susceptible to certain types of crime, such as identity theft. In addition to language and cultural barriers, elderly immigrants often have physical or mental challenges that can make them more vulnerable. In response, the OCSO started the Hispanic Senior Crime Prevention Academy in 2009 to address the public safety needs and concerns of senior citizens. The Hispanic Senior Crime Prevention Academy has empowered Orange County's older Latino residents by providing them with the knowledge and skills to be more vigilant in protecting themselves from unscrupulous people who are targeting their community. It has also provided many opportunities for meaningful face-to-face exchanges between the agency and community elders. These interactions give the department the chance to learn more about the needs of elderly Latino community members and allow the elderly to learn more about how police can help and protect them.

The sheriff's office recognized that while these crime prevention academies were a tremendous asset, they did not provide support services for immigrants who were victims of crime. The OCSO had an existing chaplaincy program, through which clergy of various faiths provided religious counseling and assistance to agency personnel and the community. The agency sought to expand this program to serve Orange County's immigrant community by recruiting bilingual clergy who, through faith-based organizations or houses of worship, were already serving large numbers of immigrants. The recruits are required to undergo the same application process as existing clergy in the chaplaincy program, which includes a written application, background check, proof of affiliation with a religious organization, and completion of OCSO training. In the training, clergy are taught about the role of police, how to provide death notifications, and how to assist victims and witnesses. By expanding their clergy pool to include bilingual clergy with ties to the immigrant community, the sheriff's office has been able to reach vulnerable groups during critical times of need.

**A copy of the schedule of the Orange County Sheriff's Office's Hispanic Senior Crime Prevention Academy can be found at www.vera.org/opit.**

cited in County of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019



Sheriff Demings presenting a senior with a certificate of completion of the crime prevention academy. Orange County Sheriff's Office, January 2012.

### Citizens' Police Academies

Agencies profiled in this report host the following academies:

- Brooklyn Center and Brooklyn Park Police Departments: New Americans' Academy
- Chelsea Police Department: Citizens' Police Academy
- Everett Police Department: Junior Police Academy
- Metropolitan Nashville Police Department: Hispanic Teen Academy
- Orange County Sheriff's Office:
  — Clergy Academy
  — Hispanic Crime Prevention Academy
  — Hispanic Senior Crime Prevention Academy
  — Haitian Crime Prevention Academy

Curricula from some of these citizens' police academies can be found at www.vera.org/epic.

## Monitor Successes and Failures

The OCSO's jurisdiction is so large and diverse that sometimes the agency's ability to monitor and assess the effectiveness of its programs in every community it serves becomes compromised. During the Orange County Sheriff's election campaign, the current sheriff learned that members of the Caribbean community felt disengaged and believed they had little access to the agency's leadership. Despite the OCSO's many outreach efforts, some important community concerns—such as the rights of persons held in jail, proper procedure for traffic stops, and immigrants' rights—needed additional attention from the OCSO.

In order to remedy this situation, the OCSO created the Caribbean American Advisory Committee. Composed of respected community leaders, the committee meets regularly with the sheriff to share crime data, discuss the public safety needs of the county's Caribbean residents, and provide feedback on OSCO activities and programs to ensure they appropriately address these needs. In addition, the committee regularly hosts public events such as "Know Your Rights" trainings for the community and question-and-answer forums with representatives of several consulates. The sheriff and a number of agency personnel attend these events, which provide OCSO with additional opportunities to engage with members of their community.

### Community Advisory Councils and Committees

Community advisory councils and committees allow residents to voice community concerns to their local law enforcement agency and provide feedback on the agency's policies and practices. The police departments in Brooklyn Center and Brooklyn Park, Chelsea, Clearwater, Everett, Metropolitan Nashville, and the Orange County Sheriff's Office all have advisory committees that meet regularly and are made up of civilians who represent different communities. Most of these committees require an application and vetting process. Some committees are mostly made up of prominent advocates or well-known leaders; others are open to a wider pool of residents. Some agencies, like the Orange County Sheriff's Office, have specific community advisory boards for different immigrant communities.

To learn more about community advisory councils and committees, including member roles and qualifications, go to www.vera.org/epic.

cited in Los Angeles v. Barr, No. 18-55599, archived July 2, 2019

# Palm Beach County Sheriff's Office

www.pbso.org/





Palm Beach County, Florida, is home to large Latino and Caribbean immigrant populations. The Palm Beach Sheriff's Office (PBSO) observed several important public safety and crime prevention needs in these immigrant communities. Members of the Guatemalan-Mayan community were routinely targeted by robbers and failed to report and cooperate in criminal investigations. Immigrant youth were in need of safe, positive after-school activities. And there was a persistent communications divide with the Haitian community. In response the PBSO launched a number of community-policing initiatives that embodied the eight principles for promising police-immigrant relations. In this report, we discuss how the PBSO has:

> "Immigrants in Palm Beach County were becoming professional victims."
>
> – Palm Beach County Sheriff Ric Bradshaw

- Hired a multilingual civilian community liaison **to uncover the underlying reason** a specific segment of the Latino community were the target of the robberies

- **Partnered with public and private organizations** to create the Kids and Police Tennis Association (KAPTA), a free tennis program for immigrant and low-income youth that serves as a safe after-school activity and a crime prevention strategy

- **Initiated meaningful outreach** to the Haitian community by traveling to Haiti and working with the local community to provide relief in the aftermath of the 2010 earthquake

- **Formally monitored** the impact of the community liaison's outreach to the Guatemalan-Mayan community by engaging the assistance of a researcher from a local university

## Get to the Root Causes

Crime data for the city of Lake Worth in Palm Beach County revealed that there were up to 30 robberies a month in the city, and the victims were often males from the Guatemalan-Mayan community. The victims were typically robbed while carrying large amounts of cash—often their weekly pay—in their pockets. Though the robberies were sometimes very violent, detectives were often left with little information to start an investigation because the victims and witnesses would not come forward or cooperate. As a result, such cases were not being prosecuted. Over time, it became well known among perpetrators that they could target this segment of the Lake Worth community without fear of law enforcement. The agency realized that it needed to understand better how to prevent these crimes in the first place and increase victim cooperation should a robbery happen.

Through a Smart Policing Initiative grant from the U.S. Department of Justice's Bureau of Justice Assistance, the PBSO hired a member of the Guatemalan-Mayan community who was fluent in the two predominant languages, Kanjobal (an indigenous language) and Spanish, to serve as a community liaison. This liaison was able to speak with residents who fit the victim profile to learn more about why they often carried so much cash on their person and would not cooperate with law enforcement should they be victimized. He learned that many community members believed that they could not open bank accounts if they did not have U.S. government-issued identification and thus saw no alternative to carrying large amounts of cash. Those who did not speak any English or have legal immigration status were also fearful of contact with law enforcement.

In response, the PBSO worked with local banks and the Guatemalan Consulate to increase the number of community members who had local bank accounts by assisting them in presenting sufficient identification and educating them about the crime prevention benefits of depositing their wages in the bank. The agency's community liaison, working closely with a robbery detective, also reached out to victims immediately after their initial crime report to explain, in Spanish or Kanjobal, the investigative process and the importance of their participation in it. The PBSO's targeted efforts to understand and meet this community's needs and concerns have begun to reduce the incidence of robberies perpetrated against Latino residents in Lake Worth.

## Leverage Partnerships

The sheriff's office saw the crime prevention potential of positive after-school activities for youth living in Palm Beach County communities that were plagued with high incidences of crime and disorder. One community policing deputy's interest in tennis led him to start the agency's Police Athletic League (PAL) program to start a free after-school tennis program. The funding, equipment, and space to pilot a youth tennis program came from a variety of sources, including the PBSO's Law Enforcement Trust—money collected from unclaimed and confiscated property—local retailers, and private donors. Despite limited advertising, 75 children and their families showed up on the first day to enroll; many of these participants were immigrants from countries in Latin America and the Caribbean. The tennis program is now called the Kids and Police Tennis Association, or KAPTA.

In less than one year, KAPTA has been able to provide comprehensive services—from tennis instruction and academic assistance, to nutrition and fitness education and crime prevention guidance. Many partners make this level of programming possible, including nearly a dozen national and local nonprofit organizations, eight national sporting goods companies, six major retailers, three local law firms, three local universities, and six world-renowned tennis instructors and players. KAPTA also receives funding and technical assistance for its academic assistance, mentoring, and crime prevention programs from both the local chapter and national office of the United States Tennis Association.

Parents of the participants report positive results from the program's comprehensive approach and are very appreciative for the guidance and support their children receive to avoid negative behaviors. PBSO deputies have also observed that program participants are more willing to report crimes. KAPTA currently boasts almost 300 regular participants, and is still expanding in Palm Beach County and beyond.

"In order for a partnership between two organizations to be successful, there has to be a win-win setup at the front end for both organizations."

– Dan Limbago, national manager, United States Tennis Association National Junior Tennis and Learning

cited in O'Donnell v. Harris County, et al. No. 16-55592, Doc. 11 (9th Cir.)

## Engage in Broad Outreach

When an earthquake ravaged much of Haiti in 2010, the devastation touched the large Haitian community in Palm Beach County (nearly 8,000 Haitians live in the city of Lake Worth alone). Still very much connected to family in Haiti, many of the county's Haitian residents were eager to help them. Before the disaster, the PBSO had made efforts to build relationships with the Haitian community, but there was a need to do more to improve relations. Following the earthquake, the PBSO saw an opportunity to join the local Haitian community in providing aid to relatives abroad while, at the same time, communicate the message that the sheriff's office seeks to support, protect, and serve all of the communities in its jurisdiction.

With a small grant from the Palm Beach County Police Benevolent Association and personal funds, a commander, sergeant, and two Haitian-American deputies of the sheriff's office traveled to Haiti—starting in Lake Worth's sister city Saint-Marc—to find out first-hand how the sheriff's office could assist with relief efforts. The PBSO representatives learned that medical supplies and resources for the Haitian National Police were most needed. Upon their return, they launched Operation Kenbe Fèm (which translates to "Hold Strong") to solicit donations from the entire Palm Beach County community. The PBSO partnered with the American Jewish Committee and together they reached out to the media and sponsored fundraising events. They raised $175,000 in funds and supplies to take back to Haiti, filling two large shipping containers with an operating table, two police cars, wheelchairs, and other needed items.

The PBSO's earthquake relief efforts became well known among Lake Worth's Haitian leaders and residents. In the view of many, the PBSO had gone above and beyond the call of duty. As a result, sheriff deputies have noted that the Haitian community is more welcoming of and responsive to law enforcement. In addition, the agency's mindset changed as a result of the relief efforts; those in the agency who traveled to Haiti came back with a better understanding of Haitian culture and traditions—knowledge that now informs the agency's interactions with the community and has led to more culturally-appropriate practices.



Agency staff that launched Operation Kenbe Fèm. Palm Beach County Sheriff's Office, June 2010.

> "KAPTA teaches kids to see police as people who help the community, who deserve respect, and it teaches them that they shouldn't be afraid. This is especially important for Latino children and families."
>
> – Parent of KAPTA participant

cited on City of Los Angeles v. Barr No. 18-55599, archived on July 9, 2019

## Monitor Successes and Failures

After the Palm Beach County Sheriff's Office hired its civilian community liaison to improve police relations with the Latino community and reduce the number of robberies perpetrated against members of this community, the sheriff's office wanted to know whether the community liaison's outreach efforts were meeting the overall goals of the Smart Policing Initiative, which was funding their efforts.

Although the Smart Policing Initiative required a partnership with an outside academic researcher, the PBSO was itself open to have an independent evaluator for its project because it would provide the agency with an impartial analysis of the program's successes and failures. PBSO decided to partner with researchers from a local university in Palm Beach County. The researchers created a methodology to monitor the program by tracking community contacts and outreach events, and comparing community resident perceptions and crime reporting to a similar district in the jurisdiction that did not have a designated community liaison.

To track the activities of the community liaison and his interactions with members of the Latino community, the researchers reviewed the community liaison's weekly reports to come up with an activity log for the liaison to document systematically each of his activities and the amount of time he took to complete the work. This information would then inform the agency's review of the community liaison's workload and efficiency and help determine the sustainability of the program.

The researchers selected a comparison (or control) district that closely resembled Lake Worth in terms of demographics and crime patterns. The researchers then developed surveys to gauge community perceptions of crime and interactions with law enforcement for Latino (predominantly Guatemalan-Mayan) residents of Lake Worth and the comparison district. The community liaison and research assistants disseminated the surveys to Latino immigrants in both districts, who were asked to complete them anonymously. Finally, the researchers worked with the agency's crime analysts to review crime data in both Lake Worth and the comparison district to note any increases in crime reporting by members of the immigrant community.

These monitoring activities provided the sheriff's office with up-to-date and accurate data about their project's performance. The agency has found changes in community attitudes and satisfaction towards law enforcement, which are reflected in survey data and manifested in the increase of Latino residents coming to the sheriff's office to meet with the community liaison. This includes Guatemalan women, who seek advice about, and report, domestic violence and other familial concerns. The PBSO's monitoring shows that compared to the control district, there has been a substantial decrease in robberies and increase in arrests in Lake Worth. This contemporaneous feedback has enabled the PBSO to continue its project activities because it is meeting the project goals.

"Look for strategic opportunities that can build trust. Always do what you are obliged to do and then do something extraordinary."

– Captain Rolando Silva, Palm Beach County Sheriff's Office

Part of 185.50 Exhibits
No. 185.50 cited in, logged on, and archived on July 9, 2019

### The Palm Beach Sheriff's Office Evaluation Strategy

The Palm Beach Sheriff's Office, together with its academic research partner, has adopted the following process to ensure that the program evaluation is data-driven:

1. Collect baseline data and develop realistic performance and outcome indicators.

2. Conduct "pre" and "post" program surveys to measure changes in knowledge among the target population.

3. Identify and discuss challenges, successes, and other issues in quarterly progress reports.

4. Measure success by the decrease in robberies.

5. Measure success by the increase in the number of robberies reported by victims.

For more information, see the PBSO's Smart Policing Initiative's Project Plan at: www.smartpolicinginitiative.com/SPIsites/palm-beach-florida.

### Additional Tips

■ What should law enforcement look for in an outside research partner?

■ When should a research partner get involved in a police-community relations project?

Listen to a podcast featuring the senior executive staff officer for the Department of Law Enforcement Operations and Community Operations in the Palm Beach County Sheriff's Office to get practical answers to these questions and more. Listen/download the podcast at www.cops.usdoj.gov.

"Grants start things. It's an easy way to kick it off. Monitor it well and then continue."

— Palm Beach County Sheriff Ric Bradshaw

Cited in City of Los Angeles v. Barr
no. 18-55599 archived on July 9, 2019

# Storm Lake Police Department

www.stormlake.org/index.aspx?NID=173





As employment opportunities increased because of the expansion of local industry, many immigrants began to work and settle in Storm Lake, Iowa. Twenty-four languages are spoken in this small rural community. The shift in demographics in Storm Lake is best evidenced when looking at the public school population. In the past year, nearly 82 percent of the students enrolled in the elementary school grades were non-Caucasian. The Latino and Laotian communities are among the largest groups. When the immigrants from these communities settled in different neighborhoods throughout the city, the Storm Lake Police Department (SLPD) had to find new and efficient ways to respond to crime and curb the underreporting of crime. With just 19 sworn officers to protect and serve nearly 13,000 residents, the department had to make sure to use its resources efficiently. The SLPD's response to the changing demographics incorporates the eight principles of promising practices for police-immigrant relations. In this report, we discuss how the SLPD:

- **Maximizes its resources** by deploying the mobile command unit with bilingual officers and community resource officers to the immigrant neighborhoods from which the majority of calls for service come
- **Focuses on vulnerable immigrant crime victims** by making them aware of immigration relief available to those who are helpful to law enforcement, thereby encouraging immigrant crime victims to report crime

## Maximize Resources

An analysis of the Storm Lake Police Department's calls for service data revealed that the largest number of calls came from the four neighborhoods in which the majority of the city's Laotian and Latino immigrants live. The analysis also revealed that officers were making several trips per week to the same locations, and that there was a need for a more sustained police presence in these neighborhoods.

The SLPD has a mobile command unit that the department only used for special events. However, as a result of the calls for service analysis, the SLPD decided to expand the use of the mobile command unit by dispatching it to Laotian and Latino neighborhoods, where it could serve as a temporary substation. The department piloted the program over the course of a summer, alternately parking the mobile command unit in each of the four neighborhoods for 2 to 3 hours during the evening when the department typically received the largest number of calls for service.

Each evening, the temporary substation attracts about 50 to 150 community members. Several police department personnel are present at the temporary substation, including the police chief or assistant chief, the night shift supervisor, the on-duty sector patrol officer, and a bilingual civilian community service officer. Staffs of other government agencies, such as the fire department and social service agencies, are present to provide additional services or community outreach. By working out of a neighborhood-based substation, officers are able to respond quickly to emerging issues and make face-to-face contact with many more community members. As a result of this increased contact, some residents have come forward to report crimes and public safety concerns that they would never have reported by calling 911 or traveling to police headquarters. By using data to prioritize the allocation of limited resources, the SLPD has been able to respond to a greater number of the city's crimes and public safety threats in an efficient and responsive manner.

"One evening while our mobile command vehicle was out in the community, one Hmong resident reported that a young Hmong man was ill in an apartment. Officers checked on the young man and learned that he had been lying ill in bed for over a week and the family did not know how to help him. The man was immediately transported to a hospital and was treated. We're confident that the family would not have sought out assistance if we were not standing in their neighborhood. We believe a fatality was averted that evening."

— Storm Lake Public Safety Director Mark Prosser



Mobile command with sworn officers, preparing for deployment in a local neighborhood. Storm Lake Police Department, July 2011.

## Focus on the Vulnerable

Perpetrators of crime were preying on newly settled immigrants in Storm Lake, many of whom spoke little or no English, because these immigrants did not understand the law, feared immigration enforcement, and were not reporting crime. As a result, immigrants were increasingly becoming victims of robberies, violent assaults, and domestic violence.

Although the SLPD knew immigrants were being victimized based on crime data, it was through community members' informal reports that the department recognized why there was a great deal of unreported crime. The department learned, for example, that perpetrators of domestic violence would often tell immigrant victims that the police deport immigrants who report crime. Even for some immigrant victims who had the courage to report crime, the fear of deportation ultimately interfered with their cooperation in prosecutions.

The SLPD concluded that the immigrant community, victims in particular, needed information about what constitutes a crime in the United States and how to report criminal activity. Moreover, immigrant victims needed reassurance that reporting crimes would not make them vulnerable to deportation. To guide its approach to providing this assurance, the department sought the help of local immigration attorneys and national immigration experts. In doing so, the department became familiar with the U visa status, which is an immigration benefit available to some immigrant victims of crime.

The SLPD wanted to leverage the public safety value of this visa status and educate Storm Lake's immigrant community about the potential immigration benefit for crime victims. The SLPD created a brochure about the U visa in Spanish and English, which states the department's commitment to working with all victims of crime to ensure their safety and explains how to safely report a crime. The brochure—available at city hall, libraries, and other public locations—has assisted the police department in reaching a highly vulnerable segment of the immigrant community.

As a result of SLPD's initiative to incorporate the U visa in their efforts to protect immigrant victims of crime, the department has been able to have greater success in criminal investigations and prosecutions involving immigrant victims and achieve lower crime rates throughout the city.

**A copy of the SLPD's U visa brochure, available in Spanish and English, can be found on Vera's website at www.vera.org/epic.**

> "The work around the U visa has helped the police department build its relationship with the immigrant community."
>
> – Justin Yarosevich, Storm Lake assistant city manager

---

### Interested in learning more about the U visa?

Congress created the "U" nonimmigrant status, or U visa, in October of 2000 when it passed the Victims of Trafficking and Violence Protection Act. The U visa provides a way for undocumented victims of violent crime who are helpful to law enforcement in the detection, investigation, or prosecution of the criminal activities to apply to remain legally in the United States. By addressing immigrant victims' fears of reporting crime and working with law enforcement, the U visa strengthens the ability of police agencies to fight crime and cultivate trust.

You can learn more about the U visa online:
National Immigrant Victims' Access to Justice Partnership:
www.vera.org/project/immigrant-victims-access

U.S. Department of Homeland Security (DHS)'s U visa Law Enforcement Certification Resource Guide:
www.dhs.gov/files/resources/u-visa-law-enforcement-guide.shtm

cited City of Los Angeles' answer
No. 1055app04 filed on July 9, 2019



Laotian Storm Lake Residents attending annual festival co-sponsored by the police department. Storm Lake Police Department, July 2011.

# Tulsa Police Department

www.tulsapolice.org/





The manufacturing industry in Tulsa, Oklahoma, has drawn a large Latino immigrant population, the majority of who are Mexican immigrants. Many of these immigrants speak Spanish and are not proficient in English. Because they had few Spanish-speaking officers, the Tulsa Police Department (TPD) experienced difficulties communicating with and responding to the needs of its immigrant population. To overcome these challenges, the department created a Hispanic Outreach Program staffed with a bilingual Hispanic liaison sergeant and officer. The Hispanic Outreach Program effectively puts into practice all eight principles of promising police-immigrant relations. In this report, we highlight how through its Hispanic Outreach Program, the TPD:

**Provides additional services with the same amount of resources** by expanding the duties of their bilingual volunteers to allow them to interpret for police officers during routine police operations

- **Implemented an effective broad outreach strategy** by going door-to-door in the immigrant community, organizing community forums in faith-based institutions, and clarifying the agency's policy on immigration enforcement

- Incorporates tactical **Spanish-language and cultural training** into its police academy curriculum and officer training requirements

<div style="color:#9e5a3a">

## Maximize Resources

The Tulsa Police Department serves a large Spanish-speaking community that is limited English proficient. Language barriers may lead to miscommunication between the police and community members, which can not only be frustrating when trying to resolve a situation, but escalate to aggression on the part of the civilian or the officer. The TPD had employed a few bilingual officers, but these officers were not able to handle all of the interactions with Spanish-speaking residents. After the agency experienced budget cuts that led to decreases in the number of patrol officers able to respond to calls for service, the few bilingual officers became even less available to assist with interactions with Spanish-speaking residents.

The department then turned to their existing Volunteer in Policing Services (VIPS) program to seek out bilingual volunteers who could serve as Spanish-English interpreters for the police department. Interpreter applicants must complete a lengthy application process, pass a background check, and affirm that they will adhere to the agency's confidentiality requirements.

</div>

The volunteer interpreters are only able to provide language assistance during initial calls for service, as they are not certified to testify in court. To date, the department has added 14 volunteer positions for these interpreters. These volunteer interpreters ride along with officers in the Mingo-Valley precinct, which has the greatest number of Spanish-speaking residents. With their assistance, officers are better equipped to respond quickly to calls for service and assess situations with greater accuracy. The volunteer interpreters have also been well received by the Spanish-speaking community because they have helped community members receive appropriate assistance in emotionally-charged or emergency situations.

## How to Register with VIPS

If your agency has a volunteer program, you may want to consider registering it with Volunteers In Police Service (VIPS). The benefits of registering with VIPS include:

- A page on the VIPS website dedicated to your program
- Networking opportunities with other registered VIPS programs
- An opportunity to participate in VIPS to VIPS, a moderated discussion group for volunteer program leaders
- Eligibility to apply for the Award for Outstanding Volunteer Programs
- Recognition of your status by the International Association of Chiefs of Police and the U.S. Department of Justice
- Grant funding opportunities (Some states require registration with VIPS to be eligible for federal grant funding opportunities.)

To register your volunteer program and find out more about VIPS, go to: www.policevolunteers.org.

### Engage in Broad Outreach

Law enforcement agencies in the state of Oklahoma have differing policies for enforcing immigration laws. In Tulsa, the TPD does not have a formal partnership with federal immigration officials to identify and detain immigrants in its custody who do not have lawful status. This is in contrast to their county sheriff's office policy and some other local law enforcement agencies in the state.

When the TPD began to reach out to the Latino immigrant community through its Hispanic outreach liaison—a sworn bilingual officer—the liaison quickly learned that the community feared contacts with the TPD because members did not know or understand the TPD's policies and believed the agency was enforcing immigration law. The liaison realized that he needed to make as many face-to-face contacts with community members as possible to gain their trust and communicate TPD's policies and priorities.

The liaison embarked on a multifaceted outreach approach that began very simply—he went door-to-door to introduce himself and the TPD's Hispanic Outreach Program, and to distribute literature about the program and the department. He went to local businesses and posted Spanish-English posters and flyers with safety tips, names of local organizations that both served the immigrant community and partnered with the TPD, and the phone number for the department's Spanish-language hotline. The liaison also became a regular presence in bilingual media outlets that reached a broad spectrum of the immigrant community and he reached out to youth organizations to locate Latino youth he could mentor and educate about the role of law enforcement.

As the liaison raised his profile throughout the community, he also worked with religious leaders to plan community forums at houses of worship, where community members felt safe enough to ask questions about the role of the TPD in immigration enforcement. The police chief attended these forums to speak about the agency's policies related to

"We provide LEP persons with a huge relief—we assist with live interpretation, which allows the caller to communicate freely and know that he or she will be understood."

— Tulsa Police Department VIPS volunteer

cited in City of Los Angeles v. Barr No. 18-55599 archived on July 9, 2019

immigrants. Officers assigned to the area also attended the forum, so that community members could meet and interact with the officers who were in the community keeping neighborhoods safe. By making both individual and large-group appearances in the Latino community, the liaison has been effective in dispelling myths about the TPD's immigration policies and opening channels for future communication and collaboration between the department and the community.

---

### The Six Pillars of Tulsa's Hispanic Outreach Program

1. Disseminate community surveys
2. Conduct police and community education
3. Create a police liaison to the Hispanic community
4. Conduct outreach through multiple media outlets
5. Add Spanish interpreters to VIPS Program
6. Host a Spanish telephone helpline

For a detailed look at each of the six pillars of Tulsa Police Department Hispanic Outreach Program, go to Vera's website at www.vera.org/epic.

---

## Train Law Enforcement and the Community

Despite efforts to maximize their limited bilingual resources, non-bilingual officers still have to respond to calls with Spanish speakers. Understandably, in these encounters, language barriers can cause frustration and even disproportionate aggression between the officers and the people with limited English proficiency. To reduce the communication challenges that can lead to unsafe encounters, the department turned to training.

The TPD recognized that maintaining control in escalating encounters was essential to officer and civilian safety. For this reason, the department decided to translate commonly used English commands into Spanish and teach officers how to use these commands to stabilize high-stress interactions, until a Spanish interpreter can arrive on the scene to assist. To put these phrases in context, the department provided information about the Latino cultures in Tulsa. The TPD also made the language training a mandatory part of its police academy curriculum and simulation training, and required that it be repeated thereafter every 2 years. The simulation training teaches cadets and officers to effectively control a scene that includes an agitated group of people who are speaking only Spanish—an accurate depiction of what officers might encounter on a call. Cadets and officers have to use one or more of the Spanish-language commands to control the scene.

This language instruction and simulation training provide the TPD officers who do not speak Spanish with practical tools that they can use in the field. Officers who have received this training feel better prepared to respond to calls with Spanish speakers and are equipped to retain control until a bilingual officer, civilian personnel, or volunteer can arrive on the scene and provide language assistance. This diffuses frustrations and averts dangers to officers and civilians that arise from language barriers.

**Tulsa Police Department's Spanish translations of commonly-used commands are available at www.vera.org/epic.**

---

### Additional Tips

- How can language instruction be incorporated into tactical training for police?
- How can training on working with the immigrant community go beyond the textbook?

Listen to a podcast featuring the Hispanic outreach liaison officer from the Tulsa Police Department to get practical answers to these questions and more. Listen/download the podcast at www.cops.usdoj.gov.

> "At the local level, we are the ones who deal with Hispanic victims of crime. There is nothing impersonal about that. We need to help, and we can't help and protect them if they are fearful of us."
>
> — Deputy Chief Daryl Webster, Tulsa Police Department

cited in City of El Paso brief No. 1990 archived July 2019

# Conclusion

This report describes a variety of approaches to building and maintaining effective police-immigrant relations developed by a diverse group of law enforcement agencies. Other agencies may not have the resources or staff to replicate these practices exactly as presented. However, the principles embraced by profiled agencies provide a framework for any other agency to use when adapting what has worked elsewhere to local realities. From getting to root causes to sustaining programs that work, the principles identified in this report can help police agencies across the nation move closer to their common goal: improving public safety.

### Police-Immigrant Relations: Strategies for Getting Started

Personnel from the 10 profiled agencies in this report offered the following suggestions for how to get started in serving immigrant communities. These strategies may be initially carried out for as little time as 2 hours a week.

- Identify the needs of the community by visiting local businesses, restaurants, and community-based organizations.
- Reach out to faith-based organizations and religious institutions, meet with religious leaders to learn about community needs and ask for permission to speak to and assist parishioners with their public safety concerns.
- Sustain trust and good relationships by regularly following up with community contacts.
- Organize ongoing community events such as community forums, trainings, and festivals.
- Involve the police chief, sheriff, or other agency executives in community outreach activities.
- Provide the community with access to police liaisons by disseminating their contact information widely.
- Use media and social networking technology to reach out to the community, including radio, TV, ethnic newspapers, video, Facebook, and Twitter™.
- Evaluate the effectiveness of community outreach by monitoring the number of community contacts police liaisons make each quarter.
- Cultivate in-house language resources by identifying and testing bilingual civilian staff and sworn officers who can assist in communicating with residents with limited English proficiency.

"It is important to educate and not shame our workforce and make this information seem useful to them."

– Deputy Chief Daryl Webster, Tulsa Police Department

# EPIC Glossary

**Bilingual:** Able to speak two languages fluently.

**Human Trafficking:** A worldwide form of exploitation affecting men, women, and children. This includes acts involved in the recruitment, abduction, transport, harboring, transfer, sale, or receipt of persons through force, coercion, fraud, or deception to place persons in situations of forced labor or services, forced prostitution or sexual services, domestic servitude, bonded sweatshop labor, or other debt bondage. These acts can occur within national or across international borders.

**Immigrant:** A person who leaves one country to settle in another. Motives for immigration can include economic, religious, political, or social factors. In this report, people are immigrants if they are foreign born and are living in the United States with or without legal immigration status.

**Limited English Proficient (LEP):** A person is LEP if his or her native language is not English and he or she can only partially speak, read, write, or understand English.

**Refugee:** A person who flees to a foreign country to escape danger or persecution. Refugees selected for relocation to the United States are relocated by refugee resettlement agencies.

**Resident:** A person who lives in a building, area, or jurisdiction. In this report, resident is not used to describe or suggest anyone's legal status in the United States.

**Sanctuary city:** A term given to a municipality that does not allow municipal funds or resources to be used to enforce federal immigration laws. In these localities, police are not permitted to inquire about a person's immigration status during routine police operations or stop or question people solely because an officer believes that they may not have lawful immigration status.

**T visa:** The T visa is a temporary visa for victims of human trafficking who assist law enforcement in the investigation or prosecution of human trafficking. These trafficking victims must demonstrate that they would suffer extreme hardship involving unusual and severe harm if they were to be removed from the United States and also meet other federal statutory requirements. The T visa application includes an optional form to be completed by a law enforcement agency that provides evidence that the applicant is a victim of trafficking and has complied with reasonable requests for assistance from law enforcement.

**U visa:** The U visa is a temporary visa that immigrant victims of crime can receive if they are helpful to law enforcement in the detection, investigation, or prosecution of the criminal activities they experienced and meet other federal statutory requirements. It strengthens the ability of law enforcement agencies to fight crime and cultivate trust by addressing immigrant victims' fears of reporting crime and working with law enforcement. Applicants for the U visa must include a certification, which can be signed by federal, state, or other local law enforcement agencies. U.S. Citizenship and Immigration Services (USCIS) decides whether to grant or deny U visas. (More information about law enforcement use of the U visa can be found here: www.vera.org/project/immigrant-victims-access.)

# EPIC Toolkit

Visit Vera's website at www.vera.org/epic to access resources gathered from the 10 profiled agencies on the following topics:

## Citizens' Police Academies

| | |
|---|---|
| New Americans' Academy program information and lesson plan | Brooklyn Center and Brooklyn Park PDs |
| Pre-test and post-test given to New Americans' Academy participants | Brooklyn Center and Brooklyn Park PDs |
| Citizens' Police Academy weekly schedule | Chelsea PD |
| Hispanic Teen Academy weekly schedule | Metropolitan Nashville PD |
| Clergy Academy weekly schedule | Orange County Sheriff's Office |
| Hispanic Crime Prevention Academy brochure | Orange County Sheriff's Office |
| Hispanic Crime Prevention Academy weekly schedule | Orange County Sheriff's Office |
| Hispanic Senior Crime Prevention Academy brochure (SPANISH) | Orange County Sheriff's Office |
| Hispanic Senior Crime Prevention Academy weekly schedule (SPANISH) | Orange County Sheriff's Office |

## Community Advisory Councils and Committees

| | |
|---|---|
| Description of the role of the Multicultural Advisory Committee | Brooklyn Center and Brooklyn Park PDs |
| Application for a position with the Multicultural Advisory Committee | Brooklyn Center and Brooklyn Park PDs |
| Issues identified as priorities by the Multicultural Advisory Committee | Brooklyn Center and Brooklyn Park PDs |

## Community Education on Laws and Police Practices

| | |
|---|---|
| Age of consent laws brochure (ENGLISH and SPANISH) | Clearwater PD |
| Clearwater/Tampa Bay Area Task Force on Human Trafficking brochure | Clearwater PD |
| "What to Expect when Stopped by the Police" brochure | Everett PD |
| "What to Expect when Stopped by the Police" brochure (ARABIC) | Everett PD |
| "What to Expect when Stopped by the Police" brochure (HAITIAN CREOLE) | Everett PD |
| "What to Expect when Stopped by the Police" brochure (ITALIAN) | Everett PD |
| "What to Expect when Stopped by the Police" brochure (PORTUGUESE) | Everett PD |
| "What to Expect when Stopped by the Police" brochure (SPANISH) | Everett PD |
| Economic Crimes Prevention brochure for senior citizens (SPANISH) | Orange County Sheriff's Office |
| Brochure explaining the U visa | Storm Lake PD |
| Brochure explaining the U visa (SPANISH) | Storm Lake PD |
| "Tulsa Police is not ICE" brochure (SPANISH) | Tulsa PD |

## Community Feedback

| | |
|---|---|
| Survey for members of the Multicultural Advisory Committee | Brooklyn Center and Brooklyn Park PDs |
| Survey for Limited English Proficient individuals (ENGLISH and SPANISH) | Tulsa PD |

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

## Community Outreach

| | |
|---|---|
| Outreach activities planned by the Joint Community Policing Partnership | Brooklyn Center and Brooklyn Park PDs |
| Letter to residents on police efforts to work with the Liberian community | Brooklyn Center and Brooklyn Park PDs |
| Outreach activities organized and attended by the Newcomer Advocate | Chelsea PD |
| Door tags with safety tips for business owners (ENGLISH and SPANISH) | Clearwater PD |
| Hispanic Festival flyer | Metropolitan Nashville PD |
| Hispanic Festival flyer (SPANISH) | Metropolitan Nashville PD |
| Diagram of outreach planned by the Hispanic Outreach Program | Tulsa PD |
| Narrative recounting Haiti relief efforts | Palm Beach County Sheriff's Office |
| Community Event listing | Palm Beach County Sheriff's Office |

## Job Descriptions

| | |
|---|---|
| Community Liaison job description | Brooklyn Center and Brooklyn Park PDs |
| Police Cadets roles and responsibilities | Brooklyn Center and Brooklyn Park PDs |
| El Protector Officer job description | Metropolitan Nashville PD |
| Cricket Volunteer Spanish interpreters criteria | Metropolitan Nashville PD |
| Community Outreach Liaison job description | Palm Beach County Sheriff's Office |

## Law Enforcement Training

| | |
|---|---|
| Fact sheet on the Eritrean immigrant community | Chelsea PD |
| Training curriculum for interpreters | Clearwater PD |
| Diversity Awareness instruction for officers lesson plan | Metropolitan Nashville PD |
| Diversity Awareness instruction for supervisors lesson plan | Metropolitan Nashville PD |
| Command Spanish instruction for law enforcement lesson plan | Metropolitan Nashville PD |
| Basic Spanish instruction for law enforcement lesson plan | Orange County Sheriff's Office |
| Hispanic Outreach presentation for police academy participants | Tulsa PD |
| 27 Spanish Phrases for Law Enforcement | Tulsa PD |
| U visa presentation for officers | Tulsa PD |

## Policies and Procedures

| | |
|---|---|
| "SARA: Scan Analysis Response Assessment" report on Liberian parties | Brooklyn Center and Brooklyn Park PDs |
| Enforcement of Federal Immigration Laws policy | Chelsea PD |
| Consular Notification, Access, and Arrest and Detention of Foreign Nationals in Police Custody policy | Chelsea PD |
| Verizon Language Line policy | Chelsea PD |
| Civilian Interpreter Program policy | Clearwater PD |
| Racial, Religious, and Ethnic Violence policy | Clearwater PD |
| Hispanic Outreach Center policy and procedures | Clearwater PD |
| Hispanic Outreach Center's creation and procedures presentation | Clearwater PD |
| Interpreter Services-Cell Phone Translators and Language Line General Order | Metropolitan Nashville PD |
| El Protector Program standard operating procedures | Metropolitan Nashville PD |
| Interpreters and Related Services policy | Palm Beach County Sheriff's Office |
| Limited English Proficient individuals policy | Tulsa PD |

## Podcasts

Listen to or download the following seven podcasts accompanying this report on The Beat podcast series at www.cops.usdoj.gov:

1. Tips from a police community liaison on getting the trust and support of multilingual communities and sworn officers. Monique Drier, Community Liaison, Brooklyn Center Police Department.

2. Practical tips for doing outreach to multicultural communities. Robin Martinson, Community Liaison, Brooklyn Park Police Department.

3. Working with the community in addressing sensitive topics. Brian Kyes, Chief of Police, Chelsea Police Department.

4. Ensuring continuity in community policing initiatives during police agency transitions. Sergio Fidelis, Police Officer, Clearwater Police Department.

5. Effectively using radio for community outreach. Rafael Fernadez, Sergeant, Metropolitan Nashville Police Department.

6. Tips for selecting a good research partner. James Stormes, Colonel, Palm Beach County Sheriff's Office.

7. Practical foreign language instruction for officers. Jesse Guardiola, Police Officer, Tulsa Police Department.

## Additional Resources

America's Voice Education Fund (AVEF). 2011. *Public Safety on ICE: How Do You Police a Community That Won't Talk to You?* Washington, D.C.: AVEF. http://amvoice.3cdn.net/669182ef0231bbf4d6_kdm6bnsbj.pdf.

Buequeroux, Bonnie, and Robert Trojanowicz. *Community Policing Checklist: How Does Your Department Measure Up?* www.policing.com/articles/pdf/COMMUNITY%20POLICING%20CHECKLIST.pdf.

Carter, David L., Ph.D. 2004. *Law Enforcement Intelligence: A Guide for State, Local, and Tribal Law Enforcement Agencies*. East Lansing, Michigan: U.S. Department of Justice, Office of Community Oriented Policing Services. www.cops.usdoj.gov/pdf/e09042536.pdf.

Charlotte-Mecklenburg Police Department, North Carolina. 2002. *Hispanic Robbery Initiative Reducing Robbery Victimization and Increasing Trust of Police and Financial Institutions in a Hispanic Community*. Washington, D.C.: U.S. Department of Justice, Community Oriented Policing Services and Center for Problem-Oriented Policing. www.popcenter.org/library/awards/goldstein/2002/02-08(F).pdf.

Curtis, Natasha. 2006. *Language Assistance for Law Enforcement*. Seattle, Washington: National Association of Judiciary Interpreters and Translators. www.carlamathers.net/attachments/File/Resources/LawEnforcement200609.pdf.

Davis, Robert C., and Edna Eraz. 1998. *Immigrant Populations as Victims: Toward a Multicultural Criminal Justice System*. Washington, D.C.: U.S. Department of Justice, National Institute of Justice. https://www.ncjrs.gov/pdffiles/167571.pdf.

cited in City of Los Angeles v. Barr
No. 18-55599
Not archived on July 9, 2019

Diamond, Drew, and Deirdre Mead Weiss. 2007. *Advancing Community Policing Through Community Governance: A Framework Document*. Washington, D.C.: U.S. Department of Justice, Office of Community Oriented Policing Services and Police Executive Research Forum. http://cops.usdoj.gov/Publications/e050919202-AdvCommunityPolicing_final.pdf.

Fisher-Stewart, Gayle, Ph.D. 2009. *Community Policing Explained: A Guide to Local Governments*. Washington, D.C.: U.S. Department of Justice Office of Community Oriented Policing Services. www.cops.usdoj.gov/pdf/vets-to-cops/cp_explained.pdf.

Fridell, Lorie A. 2004. *By the Numbers: A Guide for Analyzing Race Data from Vehicle Stops*. Washington, D.C.: U.S. Department of Justice, Office of Community Oriented Policing Services and Police Executive Research Forum. www.cops.usdoj.gov/html/cd_rom/mayors72nd/pubs/ExecutiveSummaryBytheNumber.pdf.

Fridell, Lorie A. 2005. *Understanding Race Data from Vehicle Stops: A Stakeholder's Guide*. Washington, D.C.: U.S. Department of Justice, Office of Community Oriented Policing Services and Police Executive Research Forum. www.cops.usdoj.gov/ric/ResourceDetail.aspx?RID=220.

Gambetta, Ricardo, and Michelle Burgess. 2011. *Public Safety Programs for the Immigrant Community*. Washington, D.C.: National League of Cities and Municipal Action for Immigrant Integration. www.nlc.org/find-city-solutions/research-innovation/immigrant-integration.

Gambetta, Ricardo, and Zivile Gedrimaite. 2009. *Municipal Innovations in Immigrant Integration: Indianapolis Model, 2006–2007*. Washington, D.C.: National League of Cities and Municipal Action for Immigrant Integration. www.nlc.org/find-city-solutions/research-innovation/immigrant-integration.

Gambetta, Ricardo, and Zivile Gedrimaite. 2010. *Municipal Innovations in Immigrant Integration: 20 Cities, 20 Good Practices*. Washington, D.C.: National League of Cities and Municipal Action for Immigrant Integration. www.nlc.org/find-city-solutions/research-innovation/immigrant-integration.

Glendale Police Department, California. 1997. *Day Labor Project: A Community's Response to the Problems of Casual Laborers*. Washington, D.C.: U.S. Department of Justice, Office of Community Oriented Services and Center for Problem-Oriented Policing. www.popcenter.org/library/awards/goldstein/1997/97-22(W).pdf.

Guerette, Rob T. 2006. *Disorder at Day Labor Sites*. Problem-Oriented Guides for Police Problem Specific Guide Series No. 44. Washington, D.C.: U.S. Department of Justice, Office of Community Oriented Policing Services. www.popcenter.org/Problems/problem-disorder_daylabor.htm.

Institute for Policy Research, Northwestern University. 2002. *Community Policing and 'the New Immigrants:' Latinos in Chicago*. Chicago: U.S. Department of Justice, National Institute of Justice. https://www.ncjrs.gov/pdffiles1/nij/189908.pdf.

Institute for Policy Research, Northwestern University. 2002. *Taking Stock: Community Policing in Chicago. Chicago*: U.S. Department of Justice, National Institute of Justice. https://www.ncjrs.gov/pdffiles1/nij/189909.pdf.

International Association of Chiefs of Police. 2004. *Enforcing Immigration Law: The Role of State, Local, and Local Law Enforcement*. Washington D.C.: International Association of Chiefs of Police. www.theiacp.org/Portals/0/pdfs/Publications/ImmigrationEnforcementconf.pdf.

cited in City of Los Angeles v. Barr
No. 17-55599, archived on page 49

International Association of Chiefs of Police. 2007. *A Symbol of Fairness and Neutrality Policing Diverse Communities in the 21st Century*. Alexandria, Virginia: International Association of Chiefs of Police. http://theiacp.org/LinkClick.aspx?fileticket=q7dfIHe1ugo%3D&tabid=87.

International Association of Chiefs of Police. 2007. *Police Chiefs Guide to Immigration Issues*. Alexandria, Virginia: International Association of Chiefs of Police. www.theiacp.org/Portals/0/pdfs/Publications/PoliceChiefsGuidetoImmigration.pdf.

Kathman, Thomas E., and Tim Chesser. 2005. "Latino Academy." *The Police Chief* 72(6). www.policechiefmagazine.org/magazine/index.cfm?fuseaction=display&article_id=616&issue_id=62005.

Khashu, Anita, Robin Busch, Zainab Latif, and Francesca Levy. 2005. *Building Strong Police-Immigrant Community Relations: Lessons from a New York City Project*. New York: Vera Institute of Justice. www.vera.org/download?file=83/300_564.pdf.

Lawrence, Stewart. 2007. "'On the Beat': New Roles and Challenges for Immigrant Police and Firefighters." *Immigration Policy Center* 5(14). www.immigrationpolicy.org/special-reports/beat-new-roles-and-challenges-immigrant-police-and-firefighters.

Lysakowski, Matthew, Albert Antony Pearsall III, and Jill Pope. 2009. *Policing in New Immigrant Communities*. Washington, D.C.: U.S. Department of Justice, Office of Community Oriented Policing Services. www.cops.usdoj.gov/RIC/ResourceDetail.aspx?RID=526.

McMahon, Joyce, and Amanda Kraus. 2005. *A Suggested Approach to Analysing Racial Profiling: Sample Templates for Analysing Car-Stop Data*. Washington, D.C.: U.S. Department of Justice, Office of Community Oriented Policing Services and the CNA Corporation. www.cops.usdoj.gov/ric/ResourceDetail.aspx?RID=5.

Moy, Jones, and Brent Archibald. 2005. "Reaching English-as-a-Second-Language Communities." *The Police Chief* 72(6). http://policechiefmagazine.org/magazine/index.cfm?fuseaction=display&article_id=614&issue_id=62005.

The National Center for Victims of Crime and The Police Foundation. 2002. *Bringing Victims into Community Policing*. Washington, D.C.: U.S. Department of Justice, Office of Community Oriented Policing Services. http://cops.usdoj.gov/Publications/e03021477.pdf.

National League of Cities. 2010. *Civic Engagement and Recent Immigrant Communities: A Planning Guide for Local Officials and Other Community Leaders*. Washington, D.C.: National League of Cities. www.nlc.org/find-city-solutions/research-innovation/immigrant-integration.

Newman, Graeme, R., and Ronald V. Clarke. 2008. *Policing Terrorism: An Executive's Guide*. Washington, D.C.: U.S. Department of Justice, Office of Community Oriented Policing Services. www.popcenter.org/library/reading/pdfs/PolicingTerrorism.pdf.

Organization for Security and Co-operation in Europe (OSCE), Office of the Security General. 2008. *Good Practices in Building Police-Public Partnership*. Vienna: OSCE, Office of the Security General. www.osce.org/spmu/32547.

Los Angeles v. Barr
No. 19-56123, March 9, 2019
Cited: Cited 99.99% XX

Orrick W. Dwayne. n.d. *Best Practices Guide: Developing A Police Department Policy-Procedure Manual*. Alexandria, Virginia: International Association of Chiefs of Police. www.theiacp.org/LinkClick.aspx?fileticket=edP4LF C7RJU%3D&tabid=392.

Police Executive Research Forum. 2001. *Racially Biased Policing: A Principled Response*. Washington, D.C.: U.S. Department of Justice, Office of Community Oriented Policing Services. http://members.policeforum.org/ library/racially-biased-policing/a-principled-response/RaciallyBiasedPolicin gfull%5B1%5D.pdf.

Police Executive Research Forum. 2002. *Excellence in Problem-Oriented Policing: The 2002 Herman Goldstein Award Winners*. Washington, D.C.: Police Executive Research Forum. www.policeforum.org/library/problem-solving-community-policing/Goldstein2002[1].pdf.

Police Executive Research Forum. 2004. *Community Policing: The Past, Present, and Future*. Washington, D.C.: The Annie E. Casey Foundation. www.policeforum.org/library/community-policing/CommunityPolicing Reduced.pdf.

Police Executive Research Forum. 2004. *Protecting your Community from Terrorism: The Strategies of Local Law Enforcement Series*. Washington, D.C.: U.S. Department of Justice, Office of Community Oriented Policing Services. www.cops.usdoj.gov/Publications/protect_comm_terror_v2.pdf.

Police Executive Research Forum. 2008. *Critical Issues in Policing Series: Police Chiefs and Sheriffs Speak Out on Local Immigration Enforcement*. Washington, D.C.: Motorola Foundation. http://policeforum.org/library/ critical-issues-in-policing-series/Immigration(825).pdf.

Police Executive Research Forum. 2010. *Police and Immigration: How Chiefs are Leading their Communities through the Challenge*. Washington, D.C.: Carnegie Corporation of New York. http://policeforum.org/library/ immigration/PERFImmigrationReportMarch2011.pdf.

Police Executive Research Forum. 2012. *Voices from Across the Country: Local Law Enforcement Officials Discuss the Challenge of Immigration Enforcement*. Washington, D.C.: Police Executive Research Forum. http://policeforum.org/library/immigration/VoicesfromAcrosstheCountryon ImmigrationEnforcement.pdf.

Police Foundation. 2009. *The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties*. Washington D.C.: Police Foundation. www.policefoundation.org/strikingabalance/strikingabalance.html.

Police Professionalism Initiative and National Latino Peace Officers Association (NLPOA). 2002. *Police Outreach to the Hispanic/Latino Community: A Survey of Programs and Activities*. Omaha, Nebraska and Petaluma, California: Police Professionalism Initiative and NLPOA. www.unomaha.edu/criminaljustice/PDF/hispanicoutreach.pdf.

Rahman, Insha, Joe Hirsch, and Susan Shah. 2007. *Overcoming Language Barriers in the Criminal Justice System: Can Language Assistance Technology Help?* New York: Vera Institute of Justice. www.vera.org/download?file=1467/Technology%2Bforum%2Bwhite%2B paper%2BFINALweb.pdf.

No. 1 B.C.9 cited by City of Davis and archived on Part 2 Proposed Exhibit 9

Ramirez, Deborah A., Sasha Cohen O'Connell, and Rabia Zafar. 2004. *Developing Partnerships Between Law Enforcement and American Muslim, Arab, and Sikh Communities: A Promising Practices Guide*. Boston: The Partnering for Prevention and Community Safety Initiative at Northeastern University.
www.northeastern.edu/law/pdfs/academics/pfp-exec-sum-dnld-ver.pdf.

Reta, Cathay O., and Martha A. Lane. 2002. *Talking with the Police: An English Language and Civics Workbook for English Language Learners*. Monterey Park, California: Bruggemeyer Memorial Library LAMP Program. www.communityaction.com/StaffPagesDocs/AdultED/Teaching%20Tools/ ESL/talkingwithpolicestudent.pdf.

Rinehart, Tammy A., Anna T. Laszlo, and Gwen O. Briscoe. 2001. *Collaboration Toolkit: How to Build, Fix, and Sustain Productive Partnerships*. Washington, D.C.: U.S. Department of Justice, Office of Community Oriented Policing Services.
www.cops.usdoj.gov/Publications/collaborationtoolkit.pdf.

Roat, Cynthia. 2003. *How to Choose and Use a Language Agency*. Woodland Hills, California: The California Endowment. www.calendow.org/ uploadedFiles/how_to_choose_use_language_agency.pdf.

Schapiro, Amy. 2009. *Report from the Field: Community Policing in the Academy and Beyond*. Washington, D.C.: U.S. Department of Justice, Office of Community Oriented Policing Services.
www.cops.usdoj.gov/html/dispatch/November_2009/police_academy.htm.

Schofield, Regina, and Michael Alston. 2006. "Accommodating Limited English Proficiency in Law Enforcement." *CALEA Update Magazine* 90 (February). http://onlineresources.wnylc.net/pb/orcdocs/LARC_Resources/ LEPTopics/LE/LEPinLawEnforcement.htm.

Shah, Susan, Insha Rahman, and Anita Khashu. 2007. *Overcoming Language Barriers: Solutions for Law Enforcement*. New York: Vera Institute of Justice. www.vera.org/content/overcoming-language-barriers-solutions-law-enforcement.

Shah, Susan, and Rodolfo Estrada. 2009. *Bridging the Language Divide: Promising Practices for Law Enforcement*. New York: Vera Institute of Justice. www.vera.org/content/bridging-language-divide-promising-practices-law-enforcement.

State of Ohio Office of Criminal Justice Services. 2006. *"I Speak" Language Identification Guide*. Columbus, Ohio: State of Ohio Office of Criminal Justice Services. www.hhs.gov/ocr/civilrights/resources/specialtopics/lep/ pocketlanguagecard.pdf.

Summit County Sheriff's Office and City of Lorain Police Department. Undated. *Resource Document for Law Enforcement: Interpretation and Translation Services*. Summit County Sheriff's Office and City of Lorain Police Department. www.co.summit.oh.us/sheriff/LEP.pdf.

U.S. Census Bureau. 2008. *Accessing and Using Language Data from the Census Bureau. Handout from the 2008 Federal Interagency Conference on Limited English Proficiency*. Washington, D.C.: U.S. Census Bureau. www.lep.gov/resources/2008_Conference_Materials/CensusAssessingand UsingLangData.pdf.

U.S. Department of Justice. 2002. *Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons*. Washington, D.C.: U.S. Department of Justice. www.usdoj.gov/crt/cor/lep/DOJFinLEPFRJun182002.pdf.

U.S. Department of Justice. 2004. *Executive Order 13166 Limited English Proficiency Resource Document: Tips and Tools from the Field*. Washington, D.C.: U.S. Department of Justice, Civil Rights Division. www.lep.gov/resources/tips_and_tools-9-21-04.htm.

U.S. Department of Justice. 2004. *Community Policing Beyond the Big Cities*. Washington, D.C.: U.S. Department of Justice, National Institute of Justice. https://www.ncjrs.gov/pdffiles1/nij/205946.pdf.

U.S. Department of Justice. 2006. *Planning Tool: Considerations for Creation of a Language Assistance Policy and Implementation Plan for Addressing Limited English Proficiency in a Department of Corrections*. Washington, D.C.: U.S. Department of Justice, Civil Rights Division. www.lep.gov/LEP_Corrections_Planning_Tools.htm.

U.S. Department of Justice. 2006. *Planning Tool: Consideration for Creation of a Language Assistance Policy and Implementation Plan for Addressing Limited English Proficiency in a Law Enforcement Agency*. Washington, D.C.: U.S. Department of Justice, Civil Rights Division. www.lep.gov/Law_Enforcement_Planning_Tool.htm.

U.S. Department of Justice. 2009. *Community Policing Defined*. Washington, D.C.: U.S. Department of Justice, Office of Community Oriented Policing Services. http://cops.usdoj.gov/RIC/ResourceDetail.aspx?RID=513.

U.S. Department of Justice. 2009. *Implementing Community Policing: Lessons from 12 Agencies*. Washington, D.C.: U.S. Department of Justice, Office of Community Oriented Policing Services. http://cops.usdoj.gov/Publications/ImpCP-Lessons-FINAL-080811-508.pdf.

Venkatraman, Bharathi A. 2006. "Lost in Translation: Limited English Proficient Populations and the Police." *The Police Chief* 73(4). http://policechiefmagazine.org/magazine/index.cfm?fuseaction=display&article_id=861&issue_id=42006.

Vera Institute of Justice. 2007. *Translating Justice: A Spanish Glossary for New York City*. New York: Vera Institute of Justice. www.vera.org/content/translating-justice-spanish-glossary-new-york-city.

Vera Institute of Justice. 2007. *Translating Justice: A Simplified Chinese Glossary for New York City*. New York: Vera Institute of Justice. www.vera.org/content/translating-justice-traditional-chinese-glossary-new-york-city.

Vera Institute of Justice. 2007. *Translating Justice: A Traditional Chinese Glossary for New York City*. New York: Vera Institute of Justice. www.vera.org/content/translating-justice-traditional-chinese-glossary-new-york-city.

Vera Institute of Justice (producer). 2009. Webcast: Bridging the Language Divide: Promising Practices for Law Enforcement. New York: Vera Institute of Justice. www.vera.org/videos/bridging-language-divide-promising-practices-law-enforcement.

cited in: City of Los Angeles v. Barr
No. 19-56035, archived on July 2019

# Funding Resources

Grants.gov www.grants.gov

The U.S. Department of Justice, Bureau of Justice Assistance
https://www.bja.gov/funding.aspx

The U.S. Department of Justice, Office of Community Oriented Policing
Services www.cops.usdoj.gov/

MetLife Foundation Community-Police Partnership Awards Program
www.lisc.org/section/ourwork/national/safety/awards

Smart Policing Initiative www.smartpolicinginitiative.com/background

Volunteers in Police Service (VIPS) www.policevolunteers.org

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

# Appendix

## National Trends

This section consists of figures that illustrate trends and attributes of the 175 agencies that completed Vera's Engaging Police in Immigrant Communities Promising Practices National Assessment in 2011.

### *Characteristics of Law Enforcement Agency Respondents*

**Figure 1:**   Number of Respondent Agencies by State

**Figure 2:**   Type and Size of Respondent Agencies

**Figure 3:**   Total Number of Respondent Agencies by Immigrant Populations in Their Jurisdictions

**Figure 4:**   Percent of Respondent Agencies' Jurisdictions with Influx of Immigrants in Past Five Years

**Figure 5:**   Topics of Policies and Directives of Respondent Agencies for Serving the Immigrant Community

### *Assessing Needs and Building upon Existing Models*

**Figure 6:**   Did Your Agency Conduct a Needs Assessment Before Starting Its Program?

**Figure 7:**   Did Your Agency Build Upon an Existing Model?

**Figure 8:**   Did Immigrant Communities Provide Input During the Development of the Program?

### *Outreach Efforts to the Immigrant Community and Evaluation*

**Figure 9:**   Does Your Agency Conduct Outreach in Substations and Local Precincts?

**Figure 10:**   Does Your Agency Conduct Outreach at Immigrant Community Events?

**Figure 11:**   Does Your Agency Conduct Outreach through Ethnic Media Outlets?

**Figure 12:**   Has Your Agency Evaluated Its Services to Immigrant Communities or Involved the Immigrant Community in Evaluating Its Services?

### *Law Enforcement Services to Ensure Access to Limited English Proficient Individuals*

**Figure 13:**   Agency Resources for Communicating with Limited English Proficient Individuals

**Figure 14:**   Languages Spoken by Bilingual Officers

**Figure 15:**   Does Your Agency Provide Incentives to Bilingual Personnel?

**Figure 16:**   Does Your Agency Assign Bilingual Officers to Areas with Large Limited English Proficient Populations?

**Figure 17:**   Does Your Agency Provide or Pay for Language Instruction?

**Figure 18:**   Types of Foreign Language Instruction Offered by Respondent Agencies

### *Law Enforcement Training Initiatives*

**Figure 19:**   Does Your Agency Train Law Enforcement Personnel on Serving Immigrants?

**Figure 20:**   Does Your Agency Invite Immigrants to Train Law Enforcement Personnel?

cited in City of Los Angeles v. Barr
No. 18-55599 argued &amp; submitted on July 9, 2019

## Characteristics of Law Enforcement Agency Respondents

**Figure 1.** Number of Respondent Agencies by State (N=175)



**Figure 2.** Type and Size of Respondent Agencies (N=175)



**Figure 3.** Total Number of Respondent Agencies by Immigrant Populations in Their Jurisdictions (N=175)



## Characteristics of Law Enforcement Agency Respondents

**Figure 4.** Percent of Respondent Agencies' Jurisdictions with Influx of Immigrants in Past Five Years (N=146)

**Figure 5.** Topics of Policies and Directives for Serving the Immigrant Community (N=116)

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019



### Assessing Needs and Building upon Existing Models

**Figure 6.** Did Your Agency Conduct a Needs Assessment Before Starting Its Program? (N=175)

**Figure 7.** Did Your Agency Build Upon an Existing Model? (N=175)

**Figure 8.** Did Immigrant Communities Provide Input During the Development of the Program? (N=175)



15% Yes (N=27)   85% No (N=148)

9% Yes (N=12)   91% No (N=163)

21% Yes (N=37)   79% No (N=138)

### Outreach Efforts to the Immigrant Community and Evaluation

**Figure 9.** Does Your Agency Conduct Outreach in Substations and Local Precincts? (N=175)

**Figure 10.** Does Your Agency Conduct Outreach at Immigrant Community Events? (N=175)

**Figure 11.** Does Your Agency Conduct Outreach through Ethnic Media Outlets? (N=175)



51% Yes (N=89)   49% No (N=86)

61% Yes (N=107)   39% No (N=68)

54% Yes (N=95)   46% No (N=80)

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

**Figure 12.** Has Your Agency Evaluated Its Services to Immigrant Communities or Involved the Immigrant Community in Evaluating Its Services? (N=175)



42% Yes (N=69)   58% No (N=106)

## Law Enforcement Services to Ensure Access to Limited English Proficient Individuals

**Figure 13.** Agency Resources for Communicating with Limited English Proficient Individuals (N=175)



**Figure 14.** Languages Spoken by Bilingual Officers (N=175)



**Figure 15.** Does Your Agency Provide Incentives to Bilingual Personnel? (N=175)

**Figure 16.** Does Your Agency Assign Bilingual Officers to Areas with Large Limited English Proficient Populations? (N=174)

**Figure 17.** Does Your Agency Provide or Pay for Language Instruction? (N=175)



Cited in City of Los Angeles v. Barr No. 18-55599 archived on July 9, 2019

## Law Enforcement Services to Ensure Access to Limited English Proficient Individuals

**Figure 18.** Types of Foreign Language Instruction Offered by Respondent Agencies (N=160)



**Law Enforcement Training Initiatives**

cited in City of Los Angeles v. Barr
No. 18-55599, argued on July 9, 2019

**Figure 19.** Does Your Agency Train Law Enforcement Personnel on Serving Immigrants? (N=175)

**Figure 20.** Does Your Agency Invite Immigrants to Train Law Enforcement Personnel? (N=175)

**Figure 21.** Does Your Agency Train Immigrants on How to Interact with the Police? (N=175)



## About the COPS Office

**The Office of Community Oriented Policing Services** (COPS Office) is the component of the U.S. Department of Justice responsible for advancing the practice of community policing by the nation's state, local, territory, and tribal law enforcement agencies through information and grant resources.

Community policing is a philosophy that promotes organizational strategies that support the systematic use of partnerships and problem-solving techniques, to proactively address the immediate conditions that give rise to public safety issues such as crime, social disorder, and fear of crime.

Rather than simply responding to crimes once they have been committed, community policing concentrates on preventing crime and eliminating the atmosphere of fear it creates. Earning the trust of the community and making those individuals stakeholders in their own safety enables law enforcement to better understand and address both the needs of the community and the factors that contribute to crime.

The COPS Office awards grants to state, local, territory, and tribal law enforcement agencies to hire and train community policing professionals, acquire and deploy cutting-edge crime fighting technologies, and develop and test innovative policing strategies. COPS Office funding also provides training and technical assistance to community members and local government leaders and all levels of law enforcement. The COPS Office has produced and compiled a broad range of information resources that can help law enforcement better address specific crime and operational issues, and help community leaders better understand how to work cooperatively with their law enforcement agency to reduce crime.

Since 1994, the COPS Office has invested nearly $14 billion to add community policing officers to the nation's streets, enhance crime fighting technology, support crime prevention initiatives, and provide training and technical assistance to help advance community policing.

- By the end of FY2011, the COPS Office has funded approximately 123,000 additional officers to more than 13,000 of the nation's 18,000 law enforcement agencies across the country in small and large jurisdictions alike.

- Nearly 600,000 law enforcement personnel, community members, and government leaders have been trained through COPS Office-funded training organizations.

- As of 2011, the COPS Office has distributed more than 6.6 million topic-specific publications, training curricula, white papers, and resource CDs.

COPS Office resources, covering a wide breadth of community policing topics—from school and campus safety to gang violence—are available, at no cost, through its online Resource Information Center at www.cops.usdoj.gov. This easy-to-navigate website is also the grant application portal, providing access to online application forms.

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

cited in City of Los Angeles v. Barr
No. 18-55599 archived on July 9, 2019

Law enforcement faces many barriers to policing new immigrant communities and cultivating partnerships with these groups. Language barriers, immigrants' reluctance to report crime for fear of deportation, fear of police, federal immigration enforcement, and cultural differences, can lead to misunderstandings between law enforcement and community members. The *Engaging Police in Immigrant Communities* (EPIC) project highlights promising practices that law enforcement agencies nationwide are using to build effective police-immigrant relations. This guidebook is accompanied by podcasts on the same topic, as well as a website with additional materials and resources available through www.vera.org/epic.

 

U.S. Department of Justice
Office of Community Oriented Policing Services
145 N Street, N.E.
Washington, DC 20530

To obtain details on COPS Office programs,
call the COPS Office Response Center at 800.421.6770.

Visit COPS Online at **www.cops.usdoj.gov**



Vera Institute of Justice
233 Broadway, 12th Floor
New York, NY 10279
212.334.1300
212.941.9407 (fax)
**www.vera.org**

ISBN: 978-1-932582-63-5
e071218496
October 2012

**United States Court of Appeals for the Ninth Circuit**

**Office of the Clerk**
95 Seventh Street
San Francisco, CA 94103

**Information Regarding Judgment and Post-Judgment Proceedings**

**Judgment**
- This Court has filed and entered the attached judgment in your case. Fed. R. App. P. 36.  Please note the filed date on the attached decision because all of the dates described below run from that date, not from the date you receive this notice.

**Mandate (Fed. R. App. P. 41; 9th Cir. R. 41-1 & -2)**
- The mandate will issue 7 days after the expiration of the time for filing a petition for rehearing or 7 days from the denial of a petition for rehearing, unless the Court directs otherwise.  To file a motion to stay the mandate, file it electronically via the appellate ECF system or, if you are a pro se litigant or an attorney with an exemption from using appellate ECF, file one original motion on paper.

**Petition for Panel Rehearing  (Fed. R. App. P. 40; 9th Cir. R. 40-1)**
**Petition for Rehearing En Banc (Fed. R. App. P. 35; 9th Cir. R. 35-1 to -3)**

**(1)   A.   Purpose (Panel Rehearing):**
- A party should seek panel rehearing only if one or more of the following grounds exist:
  - ► A material point of fact or law was overlooked in the decision;
  - ► A change in the law occurred after the case was submitted which appears to have been overlooked by the panel; or
  - ► An apparent conflict with another decision of the Court was not addressed in the opinion.
- Do not file a petition for panel rehearing merely to reargue the case.

**B.   Purpose (Rehearing En Banc)**
- A party should seek en banc rehearing only if one or more of the following grounds exist:

> ▶ Consideration by the full Court is necessary to secure or maintain uniformity of the Court's decisions; or

> ▶ The proceeding involves a question of exceptional importance; or

> ▶ The opinion directly conflicts with an existing opinion by another court of appeals or the Supreme Court and substantially affects a rule of national application in which there is an overriding need for national uniformity.

**(2)   Deadlines for Filing:**
- A petition for rehearing may be filed within 14 days after entry of judgment.  Fed. R. App. P. 40(a)(1).
- If the United States or an agency or officer thereof is a party in a civil case, the time for filing a petition for rehearing is 45 days after entry of judgment. Fed. R. App. P. 40(a)(1).
- If the mandate has issued, the petition for rehearing should be accompanied by a motion to recall the mandate.
- *See* Advisory Note to 9th Cir. R. 40-1 (petitions must be received on the due date).
- An order to publish a previously unpublished memorandum disposition extends the time to file a petition for rehearing to 14 days after the date of the order of publication or, in all civil cases in which the United States or an agency or officer thereof is a party, 45 days after the date of the order of publication.  9th Cir. R. 40-2.

**(3)   Statement of Counsel**
- A petition should contain an introduction stating that, in counsel's judgment, one or more of the situations described in the "purpose" section above exist.  The points to be raised must be stated clearly.

**(4)   Form & Number of Copies (9th Cir. R. 40-1; Fed. R. App. P. 32(c)(2))**
- The petition shall not exceed 15 pages unless it complies with the alternative length limitations of 4,200 words or 390 lines of text.
- The petition must be accompanied by a copy of the panel's decision being challenged.
- An answer, when ordered by the Court, shall comply with the same length limitations as the petition.
- If a pro se litigant elects to file a form brief pursuant to Circuit Rule 28-1, a petition for panel rehearing or for rehearing en banc need not comply with Fed. R. App. P. 32.

- The petition or answer must be accompanied by a Certificate of Compliance found at Form 11, available on our website at www.ca9.uscourts.gov under *Forms.*
- You may file a petition electronically via the appellate ECF system. No paper copies are required unless the Court orders otherwise. If you are a pro se litigant or an attorney exempted from using the appellate ECF system, file one original petition on paper. No additional paper copies are required unless the Court orders otherwise.

## Bill of Costs (Fed. R. App. P. 39, 9th Cir. R. 39-1)

- The Bill of Costs must be filed within 14 days after entry of judgment.
- See Form 10 for additional information, available on our website at www.ca9.uscourts.gov under *Forms.*

## Attorneys Fees

- Ninth Circuit Rule 39-1 describes the content and due dates for attorneys fees applications.
- All relevant forms are available on our website at www.ca9.uscourts.gov under *Forms* or by telephoning (415) 355-7806.

## Petition for a Writ of Certiorari

- Please refer to the Rules of the United States Supreme Court at www.supremecourt.gov

## Counsel Listing in Published Opinions

- Please check counsel listing on the attached decision.
- If there are any errors in a published <u>opinion</u>, please send a letter **in writing within 10 days** to:
  - ► Thomson Reuters; 610 Opperman Drive; PO Box 64526; Eagan, MN 55123 (Attn: Jean Green, Senior Publications Coordinator);
  - ► and electronically file a copy of the letter via the appellate ECF system by using "File Correspondence to Court," or if you are an attorney exempted from using the appellate ECF system, mail the Court one copy of the letter.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 10. Bill of Costs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form10instructions.pdf

**9th Cir. Case Number(s)**

**Case Name**

The Clerk is requested to award costs to (*party name(s)*):

I swear under penalty of perjury that the copies for which costs are requested were actually and necessarily produced, and that the requested costs were actually expended.

**Signature**                    **Date**

*(use "s/[typed name]" to sign electronically-filed documents)*

| COST TAXABLE | REQUESTED *(each column must be completed)* | | | |
|---|---|---|---|---|
| DOCUMENTS / FEE PAID | No. of Copies | Pages per Copy | Cost per Page | TOTAL COST |
| Excerpts of Record* | | | $ | $ |
| Principal Brief(s) *(Opening Brief; Answering Brief; 1st, 2nd , and/or 3rd Brief on Cross-Appeal; Intervenor Brief)* | | | $ | $ |
| Reply Brief / Cross-Appeal Reply Brief | | | $ | $ |
| Supplemental Brief(s) | | | $ | $ |
| Petition for Review Docket Fee / Petition for Writ of Mandamus Docket Fee | | | | $ |
| **TOTAL:** | | | | $ |

***Example:** Calculate 4 copies of 3 volumes of excerpts of record that total 500 pages [Vol. 1 (10 pgs.) + Vol. 2 (250 pgs.) + Vol. 3 (240 pgs.)] as:*
*No. of Copies: 4; Pages per Copy: 500; Cost per Page: $.10 (or actual cost IF less than $.10);*
*TOTAL: 4 x 500 x $.10 = $200.*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 10**                                                    *Rev. 12/01/2018*