**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| CITY OF LOS ANGELES, *Plaintiff-Appellee*, | No. 18-56292 |
| v. | D.C. No. 2:17-cv-07215-R-JC |
| WILLIAM P. BARR, Attorney General; ALAN R. HANSON, in his official capacity as Acting Assistant Attorney General of the Office of Justice Programs; RUSSELL WASHINGTON, in his official capacity as Acting Director of the Office of Community Oriented Policing Services; UNITED STATES DEPARTMENT OF JUSTICE, *Defendants-Appellants.* | OPINION |

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued and Submitted April 10, 2019
Pasadena, California

Filed October 31, 2019

2            CITY OF LOS ANGELES V. BARR

Before:  Kim McLane Wardlaw, Jay S. Bybee, and
          Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta;
Concurrence by Judge Wardlaw

## SUMMARY[*]

### Standing / Federal Grants

The panel affirmed the district court's preliminary injunction entered against the U.S. Department of Justice ("DOJ")'s use of the notice and access conditions imposed on recipients of Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG") formula grants.

Byrne JAG authorized the U.S. Attorney General to make grants to state and local governments for criminal justice programs.  The authorizing statute allowed the Attorney General to depart from the statutory formula award in certain circumstances.  DOJ's Office of Justice Programs imposed two new conditions for Byrne JAG funding for fiscal year 2017: the "notice condition," which required a recipient to honor the Department of Homeland Security's requests for advance notice of release times of detained aliens in the recipient's correctional facilities; and the "access condition," which required a recipient to give federal agents access to correctional facilities to meet with detained aliens, or individuals believed to be aliens.  The City of Los Angeles

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

filed this suit against DOJ, seeking an injunction against implementation of the notice and access conditions.

DOJ first argued that the notice and access conditions were within the Assistant Attorney General's authority under a 2006 amendment to § 10102(a)(6) in the Violence Against Women and Department of Justice Act of 2005. The panel rejected Los Angeles's threshold argument that Congress's amendment to § 10102(a)(6) did not give the DOJ any independent authority or power; and held that § 10102(a)(6) confirmed DOJ's authority to place "special conditions on all grants" and determine "priority purposes for formula grants." The panel held that § 10102(a)(6) did not authorize DOJ to require all recipients of Byrne JAG funding to comply with the notice and access condition. Specifically, first, the panel held that the notice and access conditions were not "special conditions" because they were not conditions triggered by specific characteristics not addressed by established conditions. Second, the panel held that priority purposes must be chosen from among the various possible purposes of a Byrne JAG award as set forth in § 10152(a). The panel concluded that because the notice and access conditions met neither of these definitions, DOJ lacked statutory authority to impose them under § 10102(a)(6). The panel agreed with sister circuits that held that § 10102(a)(6) did not give the Assistant Attorney General broad authority to impose any condition it chose on a Byrne JAG award.

The panel next rejected DOJ's argument that the propriety of the notice and access conditions were further supported by provisions in the Byrne JAG statute that authorize the Attorney General to obtain certain information and require coordination with agencies. *See* 34 U.S.C. § 10153(a)(4), (5). First, the panel held that because the Department of

4                    CITY OF LOS ANGELES V. BARR

Homeland Security requests for notice of the release of a
detained alien did not relate to a program funded by Byrne
JAG, the notice condition did not require "programmatic"
information under § 10153(a)(4). Second, the panel held that
§ 10153(a)(5)(C), which required a grant recipient to certify
that "there has been appropriate coordination with affected
agencies," did not give the Attorney General authority to
impose the access condition.

The panel held that because none of DOJ's proffered
bases for statutory authority gave the Attorney General or the
Assistant Attorney General the power to impose the notice
and access conditions, the conditions were ultra vires.

Judge Wardlaw concurred with the majority to the extent
that it held that the challenged immigration conditions were
not authorized by Congress, and were unlawful. Judge
Wardlaw wrote that everything else that the majority wrote
about 34 U.S.C. § 10102(a)(6) was unnecessary to the
decision, and dicta.

**COUNSEL**

Jesse Panuccio (argued), Associate Attorney General; Mark B. Stern, Daniel Tenny, Katherin Twomey Allen, Laura E. Myron, and Brad Hinshelwood, Appellate Staff; Hashim M. Mooppan, Deputy Assistant Attorney General; Nicola T. Hanna, United States Attorney; Joseph H. Hunt, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Neema T. Sahni (argued), Mitchell A. Kamin, and Mónica Ramirez Almadani, Covington & Burling LLP, Los Angeles, California; David M. Zionts, Ivano M. Ventresca, and Benjamin L. Cavataro, Covington & Burling LLP, Washington, D.C.; Michael N. Feuer, City Attorney; James P. Clark, Chief Deputy City Attorney; Leela A. Kapur, Executive Assistant City Attorney; Valerie L. Flores, Managing Senior Assistant City Attorney; Michael Dundas, Deputy City Attorney; Office of the City Attorney, Los Angeles, California; for Plaintiff-Appellee.

Margaret L. Carter and Daniel R. Suvor, O'Melveny & Myers LLP, Los Angeles, California, for Amici Curiae 20 Counties and Cities, Metropolitan Area Planning Council, and International Municipal Lawyers Association.

6          CITY OF LOS ANGELES V. BARR

**OPINION**

IKUTA, Circuit Judge:

This appeal raises the question whether the Department of Justice (DOJ) can require recipients of a formula grant under the Edward Byrne Memorial Justice Assistance Grant Program (Byrne JAG), 34 U.S.C. §§ 10151–10158, to comply with Department of Homeland Security (DHS) requests for notice of a detained alien's release date and time and to allow DHS agents access to detained aliens upon request. We conclude that DOJ lacks statutory authority to impose these conditions on recipients of Byrne JAG formula grants.

I

Congress established Byrne JAG in 2006 as part of the Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, § 1111, 119 Stat. 2960, 3094 (2006); *see also* 34 U.S.C. § 10151(b)(1). Byrne JAG authorized the Attorney General to make grants to state and local governments for "additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice, including for any one or more of" eight programs. 34 U.S.C. § 10152(a)(1). Under this umbrella, eight different types of "programs" can be funded, including, for example, "[l]aw enforcement programs," "[p]rosecution and court programs," and "[d]rug treatment and enforcement programs." *Id.*[1] Congress also established that the Attorney

---

[1] The eight different types of "programs" include (1) "[l]aw enforcement programs," (2) "[p]rosecution and court programs," (3) "[p]revention and education programs," (4) "[c]orrections and

CITY OF LOS ANGELES V. BARR                   7

General could make Byrne JAG awards for any purpose that would have been authorized under Byrne JAG's two predecessor programs, the former Edward Byrne Memorial State and Local Law Enforcement Assistance Programs (LEAP) and the Local Government Law Enforcement Block Grants Program, both of which provided funding to state and local governments for various law-enforcement-related purposes. *Id.* § 10152(a)(2); *see also id.* § 10151(b)(1).

Byrne JAG is administered by the Office of Justice Programs (OJP), a DOJ department headed by an Assistant Attorney General for OJP (referred to here as the "Assistant AG") that administers a variety of grant programs. *See id.* §§ 10101, 10110(1).[2]   The Attorney General has "final authority over all functions" of OJP, including making grants. *Id.* § 10110(2).  Under the Attorney General's final authority, the Assistant AG has responsibility for several grant programs, including Byrne JAG. *See id.* § 10102(a).  The Assistant AG must provide criminal-justice-related information to the public and government entities, coordinate efforts between various government organizations, and fulfill a number of other specified responsibilities.   *Id.*

community corrections programs," (5) "[d]rug treatment and enforcement programs," (6) "[p]lanning, evaluation, and technology improvement programs," (7) "[c]rime victim and witness programs," and (8) "[m]ental health programs and related law enforcement and corrections programs." 34 U.S.C. § 10152(a)(1).

[2] The actual administration of Byrne JAG is carried out by the Bureau of Justice Assistance (BJA), a component organization of OJP.  By statute, a BJA director reports directly to the Assistant AG, *see* 34 U.S.C. § 10141(b), but the majority of the BJA director's authority has been transferred directly to the Assistant AG, *see* Consolidated Appropriations Act, 2000, Pub. L. No. 106-113, app. A, tit. I, 113 Stat. 1501, 1501A–20 (1999).

§ 10102(a)(1)–(5).    Additionally, the Assistant AG must
"exercise such other powers and functions as may be vested
in the Assistant Attorney General pursuant to this chapter or
by delegation of the Attorney General, including placing
special conditions on all grants, and determining priority
purposes for formula grants."  *Id.* § 10102(a)(6).

Byrne JAG is structured and administered as a formula
grant program.    In a formula grant program, Congress
appropriates a set amount of funding and specifies "how the
funds will be allocated among the eligible recipients, as well
as the method by which an applicant must demonstrate its
eligibility for that funding."    Office of Justice Programs,
*Grant Process Overview*, http://go.usa.gov/xPmkA (last
visited June 28, 2019).   Byrne JAG's statutory formula
awards fifty percent of allocated funds to states based on their
populations relative to the population of the United States,
34 U.S.C. § 10156(a)(1)(A), and the other fifty percent to
states based on their relative rates of violent crime, *id.*
§ 10156(a)(1)(B).    Once funding has been allocated to a
particular state under the formula, forty percent of that
funding is allocated to local governments within the state,[3]
while the state itself keeps sixty percent.  *Id.* § 10156(b).

The statute authorizes the Attorney General to depart
from this formula in certain circumstances.  For example, the
Attorney General can reserve up to five percent of Congress's
total allocation if deemed necessary to address a significant
increase in crime or to remedy "significant programmatic
harm resulting from operation of the formula."       *Id.*
§ 10157(b).   The Attorney General can also retain up to

---

[3] Like state applicants, local government applicants receive funding
based on their relative rates of violent crime. 34 U.S.C. § 10156(d)(2)(A).

$20 million for use by the National Institute of Justice to help local governments upgrade their technology, and can withhold a separate $20 million to support local governments' antiterrorism training programs. *Id.* § 10157(a). Additionally, a number of federal statutes enacted independently of Byrne JAG provide additional grounds for withholding funds from an applicant. For instance, the Attorney General has discretion to make up to a ten percent reduction of a state's Byrne JAG award if it fails to comply with federal reporting requirements for deaths that occurred in state custody, *id.* § 60105(c)(2), and must reduce a state's award by ten percent if it fails to "substantially implement" the Sex Offender Registration and Notification Act, *id.* § 20927(a).

State and local governments must submit an application for Byrne JAG funding to the Attorney General, who has discretion to dictate the application's form. *Id.* § 10153(a). Some requirements for the application are set out by statute. The application must include specified certifications and assurances, including assurances that the applicant will maintain and report "data, records, and information (programmatic and financial) as the Attorney General may reasonably require," *id.* § 10153(a)(4), and a certification "made in a form acceptable to the Attorney General" that the program to be funded meets Byrne JAG's requirements, the application's information is correct, "there has been appropriate coordination with affected agencies," and the applicant will comply with all applicable federal law, *id.* § 10153(a)(5). Additionally, applicants must submit a "comprehensive Statewide plan" revealing how Byrne JAG funds "will be used to improve the administration of the criminal justice system." *Id.* § 10153(a)(6).

The Attorney General develops and issues rules to carry out the grant program, *id.* § 10155, and is also responsible for receiving and reviewing applications, *id.* § 10154. Pursuant to these program development responsibilities, the Attorney General has developed a grant award document that includes a long list of requirements and conditions not spelled out in the Byrne JAG statute itself. The grant award document warns recipients that the funding is "subject to such conditions or limitations as are set forth on the attached page(s)." The conditions listed in the grant award document vary from year to year and typically cover a wide variety of subject matter. For example, grant award documents have required recipients to meet specified information sharing and information technology systems requirements, to comply with specified policies relating to human research subjects, and to participate in various training events, technical assistance events, and conferences. Other conditions have related more directly to the use of Byrne JAG funds. For instance, the grant award document provides that recipients can purchase only certain types of body armor with Byrne JAG funds. The Attorney General must comply with general requirements for managing grants, *see* 2 C.F.R. § 2800.101, including "administrative requirements, cost principles and audit requirements," *id.* § 200.100(a)(1).

II

OJP imposed two new conditions for Byrne JAG funding for fiscal year 2017, both of which were included in the grant award documents. The first new condition, referred to as the "notice condition," required a recipient to honor DHS's requests for advance notice of the scheduled release date and time of any detained alien held in the recipient's correctional

facilities.[4]   The second new condition, referred to as the "access condition," required a recipient to give federal agents access to correctional facilities to meet with detained aliens, or individuals believed to be aliens.[5]

---

[4] The notice condition provides:

> With respect to the "program or activity" that is funded (in whole or in part) by this award, as of the date the recipient accepts this award, and throughout the remainder of the period of performance for the award – . . . A local ordinance, -rule, -regulation, -policy, or -practice (or an applicable State statute, -rule, -regulation, -policy, or -practice) must be in place that is designed to ensure that, when a local-government (or local-government-contracted) correctional facility receives from DHS a formal written request authorized by the Immigration and Nationality Act that seeks advance notice of the scheduled release date and time for a particular alien in such facility, then such facility will honor such request and – as early as practicable . . . – provide the requested notice to DHS.

[5] The access condition provides:

> With respect to the "program or activity" that is funded (in whole or in part) by this award, as of the date the recipient accepts this award, and throughout the remainder of the period of performance for the award – A local ordinance, -rule, -regulation, -policy, or -(or an applicable State statute, -rule, -regulation, -policy, or -practice) must be in place that is designed to ensure that agents of the United States acting under color of federal law in fact are given access a local-government (or local-government-contracted) correctional facility for the purpose of permitting such agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States.

The grant award document stated that these conditions were "an authorized and priority purpose of" the Byrne JAG award and applied "[w]ith respect to the 'program or activity' that is funded" by the award.[6]    The document defined "program or activity" by reference to Title VI, a federal civil rights law prohibiting discrimination on the basis of race, color, or national origin in any federally assisted program or activity.  42 U.S.C. § 2000d-4a.  In this context, Congress defined "program or activity" to mean, in relevant part, "all of the operations of . . . a department, agency, special purpose district, or other instrumentality of a State or of a local government," or of "the entity of such State or local government that distributes such assistance and each such department or agency  .  .  .  to which the assistance is extended."  *Id.* § 2000d-4a(1)(A)–(B).  Finally, the 2017 Byrne JAG award document stated that "[f]ailure to comply with any one or more of these award requirements" can result in loss of funding.

The City of Los Angeles applied for a Byrne JAG award for the 2017 fiscal year.  Its application included a letter from

---

[6] The grant award document states:

> Compliance with these requirements is an authorized and priority purpose of this award.  To the extent that such costs are not reimbursed under any other federal program, award funds may be obligated (including for authorized reimbursements) for the reasonable, necessary, and allocable costs (if any) of – (1) developing and putting into place statutes, ordinances, rules, regulations, policies, and practices to satisfy this condition, (2) permitting access as described in [the access condition], and (3) honoring any request from DHS that is encompassed [in the notice condition].

its deputy mayor stating that Los Angeles "is withholding any commitment to, or confirmation of, its compliance with" the notice and access conditions. On September 29, 2017, Los Angeles filed suit against DOJ, seeking an injunction against implementation of the notice and access conditions. In connection with this lawsuit, Los Angeles stated it had a policy against cooperating with federal immigration enforcement on the ground that "being perceived as a 'cooperating' jurisdiction in the view of the current Administration would harm public safety in Los Angeles" because it would have a negative impact on police relationships with immigrant communities.

Following a brief stay pending the Seventh Circuit's affirmance and subsequent en banc vacatur of a nationwide injunction against the notice and access conditions, *see City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018), *reh'g en banc granted in part, opinion vacated in part*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018), *vacated*, No. 17-2991, 2018 WL 4268814 (7th Cir. Aug. 10, 2018), the district court entered a preliminary injunction against DOJ's use of the notice and access conditions on September 13, 2018. DOJ appealed, arguing that the district court erred in determining that Los Angeles was likely to succeed on the merits of its claim that DOJ lacked statutory authority to impose the notice and access conditions.

III

We review the district court's grant of a preliminary injunction for an abuse of discretion, and we review its determination of the underlying legal principles de novo. *See DISH Network Corp. v. FCC*, 653 F.3d 771, 776 (9th Cir.

2011).[7]  When an agency is charged with administering a congressional statute, "both [its] power to act and how [it is] to act [are] authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013).  An agency "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

DOJ advances two possible bases for its statutory authority to introduce the notice and access conditions.

### A

DOJ first argues that the notice and access conditions are within the Assistant AG's authority under a 2006 amendment to § 10102(a)(6) enacted by Congress in the Violence Against Women and Department of Justice Reauthorization Act of 2005, § 1152, 119 Stat. at 3113.[8]

---

[7] Although DOJ has stated that it will not enforce the notice and access conditions while this litigation is pending, *see* Office of Justice Programs, FY 2017 and FY 2018 JAG Award Special Notices, https://ojp.gov/funding/Explore/LegalNotices-AwardReqts.htm (last visited June 26, 2019), such temporary restraint does not amount to a voluntary cessation of DOJ's enforcement of the challenged conditions. *See Fikre v. FBI*, 904 F.3d 1033, 1037 (9th Cir. 2018).  Therefore, this case is not moot.

[8] Section 10102 is contained in subchapter I of chapter 101. This subchapter creates OJP, which oversees the management of all grant programs, both formula and discretionary, including Byrne JAG. (Byrne JAG is contained in subchapter V of the same chapter.) Section 10102(a) provides:

The Assistant Attorney General shall –

From its enactment in 1984 and through 2005, § 10102(a)(6) provided that the Assistant AG shall "exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this title or by delegation of the Attorney General." *See* Joint Resolution, Pub. L. No. 98-473, § 102, 98 Stat. 1837, 2078 (1984). In 2006, Congress amended § 10102(a)(6) to add the phrase

---

(1) publish and disseminate information on the conditions and progress of the criminal justice systems;

(2) maintain liaison with the executive and judicial branches of the Federal and State governments in matters relating to criminal justice;

(3) provide information to the President, the Congress, the judiciary, State and local governments, and the general public relating to criminal justice;

(4) maintain liaison with public and private educational and research institutions, State and local governments, and governments of other nations relating to criminal justice;

(5) coordinate and provide staff support to coordinate the activities of the Office and the Bureau of Justice Assistance, the National Institute of Justice, the Bureau of Justice Statistics, the Office for Victims of Crime, and the Office of Juvenile Justice and Delinquency Prevention; and

(6) exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants.

34 U.S.C. § 10102(a).

"including placing special conditions on all grants, and determining priority purposes for formula grants" at the end of the section. *See* Violence Against Women and Department of Justice Reauthorization Act of 2005, § 1152, 119 Stat. at 3113. Accordingly, § 10102(a)(6) now provides that the Assistant AG must "exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants." 34 U.S.C. § 10102(a)(6). DOJ argues that by amending the statute, Congress gave the Assistant AG the authority to impose notice and access conditions as "special conditions" on Byrne JAG awards and to announce the Attorney General's determination that such conditions are "priority purposes" of the awards.

Before considering DOJ's claim, we first address Los Angeles's threshold argument that Congress's amendment to § 10102(a)(6) does not give the DOJ any independent authority or power. Rather, Los Angeles claims, the statute merely describes the Assistant AG's ability to exercise authority specified elsewhere in the relevant chapter (Chapter 101 of title 34). We disagree. Los Angeles has not identified (and we have not found) any language in the chapter giving the Attorney General or the Assistant AG authority to place "special conditions" or determine "priority purposes" for grants.[9] But by amending § 10102(a)(6), Congress

___

[9] Neither of the sections cited by Los Angeles gives the Assistant AG authority to place "special conditions" on or determine "priority purposes" for any grants. Section 10142(2) provides that the BJA may allocate grants "on terms and conditions determined by the [BJA] Director to be consistent with part B of subchapter V [Discretionary Grants]", 34 U.S.C.

affirmatively indicated its understanding that the Assistant AG's powers and functions could include "placing special conditions on all grants, and determining priority purposes for formula grants." 34 U.S.C. § 10102(a)(6). Therefore, Los Angeles's interpretation deprives the 2006 amendment to § 10102(a)(6) of any meaning; in effect, we would have to conclude that Congress amended § 10102(a)(6) for the purpose of expressly authorizing the Assistant AG to exercise certain powers that do not exist. We decline to do so, because we presume Congress makes amendments with purpose, *see Stone v. INS*, 514 U.S. 386, 397 (1995), and it is generally "our duty to give effect, if possible, to every clause and word of a statute," *United States v. Menasche*, 348 U.S. 528, 538–39 (1955) (internal quotation marks omitted). Accordingly, we reject Los Angeles's construction of the statute. Consistent with Congress's amendment, we read § 10102(a)(6) as confirming the authority of DOJ to place "special conditions on all grants" and determine "priority purposes for formula grants."

On the other hand, we also disagree with DOJ's argument that its notice and access conditions place "special conditions" on Byrne JAG awards and announce the Attorney General's determination that such conditions are "priority purposes" of the awards. To address this claim, we must first interpret the terms "special conditions" and "priority purposes" in § 10102(a)(6). "Canons of statutory construction help give meaning to a statute's words. We

_____

§ 10142(2), and § 10446(e)(3) provides that "[i]n disbursing grants under this subchapter [Grants to Combat Violent Crimes Against Women], the Attorney General may impose reasonable conditions on grant awards to ensure that the States meet statutory, regulatory, and other program requirements," *id.* § 10446(e)(3).

begin with the language of the statute." *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1060 (9th Cir. 2003) (citing *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 56 (1987)). Where the statute does not define the relevant terms, we give them "their ordinary, contemporary, common meaning," and "may consult dictionary definitions." *Transwestern Pipeline Co. v. 17.19 Acres of Prop. Located in Maricopa Cty.*, 627 F.3d 1268, 1270 (9th Cir. 2010) (internal quotation marks and citations omitted). In construing specific words in a statute, we must also look to the "language and design of the statute as a whole," *K Mart Corp. v. Cartier, Inc*., 486 U.S. 281, 291 (1988), and read the specific words "with a view to their place in the overall statutory scheme." *Wilderness Soc'y*, 353 F.3d at 1060 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)); *see also United States v. Lewis*, 67 F.3d 225, 228–29 (9th Cir. 1995) ("Particular phrases must be construed in light of the overall purpose and structure of the whole statutory scheme."). In every case, "it is the intent of Congress that is the ultimate touchstone." *Arizona v. United States*, 567 U.S. 387, 453 (2012) (Alito, J., concurring in part and dissenting in part) (internal quotation marks omitted).

The term "special conditions" is not defined in the statute. Under the dictionary definition, the term "special" means "unusual" or "extraordinary," *Special*, Black's Law Dictionary (9th ed. 2009), or "assigned or provided to meet a particular need not covered under established procedures," *Special*, Webster's New Int'l Dictionary (3d ed. 2002). As this definition of "special" suggests, a "special condition"

would be applied "to meet a particular need" for carrying out a program that is not covered by established requirements.[10]

This interpretation of "special conditions" is consistent with the regulatory backdrop against which Congress enacted both § 10102(a)(6)'s "including" clause and the Byrne JAG statutes. *See* Violence Against Women and Department of Justice Reauthorization Act of 2005, § 1152, 119 Stat. at 3113. At the time, a regulation setting out "administrative requirements for grants and cooperative agreements to State and local governments" provided a definition of the term "special conditions." *See* 28 C.F.R. § 66.12 (2006). The regulation, titled "[s]pecial grant or subgrant conditions for 'high-risk' grantees," provided that if a grantee was "high-risk," then "special conditions and/or restrictions shall correspond to the high risk condition and shall be included in the award." *Id.* § 66.12(a)(5). A grantee could be deemed high risk if it had a history of noncompliance with grant requirements, financial stability issues, or other factors that suggested a propensity toward violation of a grant's terms. *Id.* § 66.12(a). According to the regulation, "[s]pecial conditions or restrictions may include (1) [p]ayment on a reimbursement basis; (2) [w]ithholding authority to proceed to the next phase until receipt of evidence of acceptable performance within a given funding period; (3) [r]equiring additional, more detailed financial reports; (4) [a]dditional project monitoring; (5) [r]equiring the grantee or sub-grantee

---

[10] The distinction between "special conditions" and established conditions arises in other contexts, as well. For example, the Federal Aviation Administration is empowered to issue a special condition—"a regulation that applies to a particular aircraft design"—when a design's novel features take it outside the scope of otherwise appropriate safety regulations. 14 C.F.R. § 11.19.

to obtain technical or management assistance; or (6) [e]stablishing additional prior approvals." *Id.* § 66.12(b). Additionally, the regulation required the awarding agency to inform the grantee of the reasons for the special conditions and identify corrective actions the grantee could take to have the special conditions removed. *Id.* § 66.12(c).

This regulatory meaning of "special conditions" is presumed to have informed Congress's use of the term in § 10102(a)(6). *See FAA v. Cooper*, 566 U.S. 284, 292 (2012) ("[W]hen Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken." (internal quotation marks omitted)). This conclusion is supported by Congress's use of this term in a different provision, § 10109, in the subchapter of the statutes establishing OJP and Byrne JAG, enacted at the same time Congress established Byrne JAG and amended § 10102(a)(6). In § 10109, Congress provided that an Office of Audit, Assessment, and Management within the OJP would assess and review OJP's grant programs to ensure compliance with program terms and requirements. *See* 34 U.S.C. § 10109(a), (b). When conducting such an audit, the auditing office must "take special conditions of the grant into account and consult with the office that issued those conditions to ensure appropriate compliance." *Id.* § 10109(a)(2).[11]  This usage

---

[11] Section 10109(a)(2) provides, in full:

> The purpose of the Office shall be to carry out and coordinate program assessments of, take actions to ensure compliance with the terms of, and manage information with respect to, grants under programs covered by subsection (b). The Director shall take special conditions of the grant into account and consult

indicates that "special conditions" were understood to be individualized requirements included in a specific grant, as set forth in 28 C.F.R. § 66.12(a)(5) (2006).  Otherwise, the auditor would not need to identify the office that issued the condition and engage in consultation on the compliance requirements.

Under the "normal rule of statutory construction," we presume that "identical words used in different parts of the same act are intended to have the same meaning."  *Dep't of Revenue of Or. v. ACF Indus.*, 510 U.S. 332, 342 (1994) (internal quotation marks omitted).  Accordingly, we may presume that Congress intended the use of "special conditions" in § 10102(a)(6) to have the same meaning as it has in § 10109(a)(2), namely to refer to individualized requirements.  Therefore, the inclusion of "placing special conditions on all grants" in § 10102(a)(6) refers to the power to impose tailored requirements when necessary, such as when a grantee is "high-risk" pursuant to 28 C.F.R. § 66.12(a)(5) (2006).**[12]**

We next consider the term "priority purposes."  34 U.S.C. § 10102(a)(6).  The Byrne JAG statute establishes that the "purpose" of an award is to "provide additional personnel, equipment, supplies, contractual support, training, technical

---

with the office that issued those conditions to ensure appropriate compliance.

34 U.S.C. § 10109(a)(2).

**[12]** Congress contemplated that the Assistant AG could place such conditions on both formula and discretionary grants ("all grants"), but may determine priority purposes only "for formula grants."  34 U.S.C. § 10102(a)(6).

assistance, and information systems for criminal justice,"
within various programs proposed by applicants.   *Id.*
§ 10152(a)(1).   The purposes set forth in the predecessor
grant statutes, LEAP and the Local Government Law
Enforcement Block Grants Program, include funding
"additional personnel, equipment, training, technical
assistance, and information systems" for local government
criminal justice programs, Anti-Drug Abuse Act of 1988,
Pub. L. No. 100-690, § 501(b), 102 Stat. 4181, 4329, and
funding for purposes including hiring additional officers,
establishing drug courts, and setting up task forces consisting
of local government and federal law enforcement officials "to
prevent and control crime," among others.   H.R. 728, 104th
Cong. § 101(a)(2) (1995); *see also* Omnibus Consolidated
Rescissions and Appropriations Act of 1996, Pub. L. No. 104-
134, tit. 1, 110 Stat. 1321, 1321–12 (incorporating H.R. 728
by reference).   None of the purposes set forth in
§ 10152(a)(1) or the predecessor grant statutes corresponds to
DOJ's requirement that the recipient honor DHS's requests
for advance notice of detained aliens' release dates or allow
federal agents access to correctional facilities to meet with
detained aliens.

In light of our interpretation of "special conditions" and
"priority purposes," it is clear that § 10102(a)(6) does not
authorize DOJ to require all recipients of Byrne JAG funding
to comply with the notice and access conditions.[13]   First, the
notice and access conditions are not "special conditions"
because they are not conditions triggered by specific
characteristics not addressed by established conditions, as

---

[13] Therefore, contrary to the concurrence's characterization of our
holding, we do not adopt DOJ's interpretation of § 10102(a)(6).
Concurrence at 40–41.

was the case for high-risk grantees under 28 C.F.R. § 66.12(a)(5) (2006). Second, priority purposes must be chosen from among the various possible purposes of a Byrne JAG award as set out in § 10152(a). The notice and access conditions are not included as purposes of the Byrne JAG award, nor are they purposes of either of its predecessor grant statutes. Because the notice and access conditions meet neither of these definitions, DOJ lacked statutory authority to impose them under § 10102(a)(6). Therefore, we reject DOJ's argument that § 10102(a)(6) gives it the authority to impose the notice and access conditions.

Because we interpret the terms "special conditions" and "priority purposes" narrowly, we agree with our sister circuits that § 10102(a)(6) does not give the Assistant AG broad authority to impose any condition it chooses on a Byrne JAG award. *City of Philadelphia v. Attorney Gen. of U.S.*, 916 F.3d 276, 288 (3d Cir. 2019) (concluding that Congress would not hide "such a broad power—the power to place *any* special conditions on all grants—in a statute outlining ministerial duties for an Assistant Attorney General"); *City of Chicago*, 888 F.3d at 286. Such a broad interpretation would be antithetical to the concept of a formula grant, *see City of Chicago*, 888 F.3d at 285 (noting that "the notion of the broad grant of authority to impose any conditions on grant recipients is at odds with the nature of the Byrne JAG grant, which is a formula grant rather than a discretionary grant"), and it would render superfluous Congress's carefully prescribed conditions under which the Attorney General can normally withhold Byrne JAG funding, *see, e.g.*, 34 U.S.C. § 10157(b) (allowing the Attorney General to withhold up to five percent of total allocated Byrne JAG funds to address rapid crime increases or "significant programmatic harm" caused by the normal operation of the funding formula); *id.*

§ 30307(e)(2) (providing that a state will lose five percent of any grant award made under title 34, including Byrne JAG, if it fails to comply with the national standards set out under the Prison Rape Elimination Act).[14]

In opposition to our interpretation of § 10102(a)(6), the concurrence constructs a strawman argument. It ignores our actual interpretation of § 10102(a)(6), and instead accuses us of adopting a "sweeping characterization" of DOJ's authority, Concurrence at 44, that allows the "essentially limitless" imposition of any conditions desired, Concurrence at 44–45 (quoting *City of Chicago*, 888 F.3d at 287). Based on this strawman argument, the concurrence then accuses us of creating a split with our sister circuits, which have rejected such a broad interpretation. Concurrence at 30, 34–36, 37–38, 42, 44.

While the concurrence has an easy time battering its strawman, the concurrence fails to explain how our actual ruling, that DOJ has the limited authority to impose special conditions designed to meet needs for carrying out the Byrne JAG program, could abrogate or "subvert" Byrne JAG's funding scheme. Concurrence at 44. Nor does the concurrence explain how our actual ruling is contrary to our sister circuits, which did not need to consider the viability of a narrowing construction when considering challenges to DOJ's notice and access conditions. Rather, given the issues

---

[14] Moreover, it is unlikely that Congress would recognize such a broad power in § 10102(a)(6), given the ministerial duties described in the rest of the section. *See City of Philadelphia*, 916 F.3d at 288; *City of Chicago*, 888 F.3d at 285. By contrast, our more circumscribed understanding of the power to impose special conditions and determine priority purposes is in accord with the other administrative duties outlined in § 10102.

raised by the appeals before them, our sister circuits merely rejected DOJ's argument—and the concurrence's strawman—that § 10102(a)(6) gives broad authority to impose *any* conditions DOJ may choose. The Seventh Circuit expressly acknowledged that "special conditions" may be a term of art that "cannot be read as an unbounded authority to impose 'any' conditions generally," as we have concluded, but declined to address that potential interpretation of the term. *City of Chicago*, 888 F.3d at 285 n.2. Rather, it merely rejected DOJ's argument "that the 'including clause' itself is a stand-alone grant of authority to the Assistant Attorney General to attach any conditions to any grants . . . ," and it concluded that § 10102(a)(6) did not give "sweeping power to impose *any* conditions on *any* grants." *Id*. at 285; *see also* Concurrence at 37–38. Similarly, the Third Circuit considered the argument that § 10102(a)(6) conferred "a broad power—the power to place *any* special conditions on *all* grants" on the Assistant AG, "a sweeping grant of authority." *City of Philadelphia*, 916 F.3d at 288; *see also* Concurrence at 37–38. In rejecting this broad interpretation, the court did not have occasion to consider whether the Attorney General possessed, and therefore could delegate through § 10102(a)(6), the more modest power to impose special conditions and designate priority purposes as we understand those terms. *See id*. at 287. Given our agreement with our sister circuits that § 10102(a)(6) does not confer broad authority on the Assistant AG sufficient to effectively abrogate the formula grant program Congress has established, the concurrence is wrong to suggest we are creating a circuit split. Concurrence at 30.[15]

---

[15] The concurrence's disagreement with our interpretation of § 10102(a)(6) does not make it dicta. Concurrence at 30, 40–41, 45. "[W]here a panel confronts an issue germane to the eventual resolution of

We conclude that the 2006 amendment to § 10102(a)(6) confirms that the Attorney General and the Assistant AG through delegation have the authority to impose special conditions on all grants and determine priority purposes for formula grants, as those terms are properly circumscribed. The notice and access conditions are not special conditions placed on grants to grantees that exhibit certain risk factors or have idiosyncratic issues that must be addressed individually. Nor are they among the statutorily recognized purposes of a Byrne JAG award as set out in § 10152(a). Therefore, DOJ lacked statutory authority to impose them under § 10102(a)(6).

B

We next consider DOJ's argument that the propriety of the notice and access conditions are further supported by provisions in the Byrne JAG statute that authorize the Attorney General to obtain certain information and require coordination with agencies. *See* 34 U.S.C. § 10153(a)(4),

---

the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes law of the circuit, regardless of whether doing so is necessary in some strict logical sense." *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1173 (9th Cir. 2004) (quoting *United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) (en banc) (opinion of Kozinski, J.)). Only "statements made in passing, without analysis, are not binding precedent." *In re Magnacom Wireless, LLC*, 503 F.3d 984, 993–94 (9th Cir. 2007). In order to resolve the issue on appeal here, we must construe § 10102(a)(6) to determine whether it gave DOJ any authority at all, and if so, whether it gave DOJ authority to impose the notice and access conditions. Our construction of the statutory language, which leads us to conclude that § 10102(a)(6) gives DOJ some circumscribed authority, but not the authority to impose the notice and access conditions, is not dicta under any definition of the term.

(5).[16]  According to DOJ, the notice condition is authorized by § 10153(a)(4), which requires a recipient to report certain programmatic information, and the access condition is authorized by § 10153(a)(5)(C), which requires a recipient to coordinate with an "affected agenc[y]."

We disagree.  First, § 10153(a)(4) requires the applicant to maintain and report information that is financial and "programmatic."  Although the term "programmatic" is not defined in the statute, the dictionary defines it to mean "of, resembling, or having a program."  *Programmatic*, Webster's New Int'l Dictionary (3d ed. 2002).  Section 10152 sets out types of "programs" that Byrne JAG may fund, including "[l]aw enforcement programs," "[p]revention and education programs," and "[d]rug treatment and enforcement programs."  34 U.S.C. § 10152(a)(1).  Given the use of the word "program" elsewhere in the same statutory scheme, the

---

[16] Section 10153(a) provides that an application for Byrne JAG funding must include:

> (4) An assurance that, for each fiscal year covered by an application, the applicant shall maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require.

> (5) A certification, made in a form acceptable to the Attorney General and executed by the chief executive officer of the applicant . . . that –

> . . .

>> (C) there has been appropriate coordination with affected agencies.

34 U.S.C. § 10153(a)(4), (5).

term "programmatic" in § 10153(a)(4) is best read to refer to a program or programs supported by Byrne JAG funding as outlined in § 10152(a)(1), such as a particular law enforcement program or drug treatment program.[17] Accordingly, § 10153(a)(4) merely requires an applicant to maintain and report information relating to the programs funded by a Byrne JAG award. Because DHS requests for notice of the release of a detained alien do not relate to a program funded by Byrne JAG, the notice condition does not require "programmatic" information under § 10153(a)(4).

Moreover, the statute speaks of the maintenance and reporting of data, records, and information "for each fiscal year covered by an application," *id.* § 10153(a)(4), which contemplates yearly reporting. The notice condition's requirement that a recipient have a policy in place requiring the provision of information to DHS on an ad hoc basis—due whenever DHS requests—is inconsistent with this statutory language.

Second, § 10153(a)(5)(C), which requires a grant recipient to certify that "there has been appropriate coordination with affected agencies," does not give the Attorney General authority to impose the access condition. In context, this section requires the grant recipient to certify that it has coordinated with the agencies affected by the program to be funded by the Byrne JAG award. This

---

[17] To the extent DOJ argues that "programmatic" should be read as referring to the definition of "program" set out in 42 U.S.C. § 2000d-4a(1)(A), we disagree. The definition of "program" from federal civil rights law that was incorporated by reference in the 2017 Byrne JAG award letter is not a reasonable interpretation of the word "program" or "programmatic" as used in the statutes authorizing Byrne JAG awards.

statutory language does not support DOJ's interpretation that a recipient must coordinate with DHS agents who are not part of a funded program. Nor does the statutory language (which requires an applicant to certify that "there *has* been appropriate coordination") impose an ongoing obligation on the applicant to coordinate with DHS agents throughout the life of the grant, as required under the access condition. *Id.* § 10153(a)(5)(C) (emphasis added). Therefore, the access condition is not a proper exercise of the Attorney General's authority under § 10153(a)(5)(C).

\* \* \*

Because none of DOJ's proffered bases for statutory authority gives the Attorney General or the Assistant AG the power to impose the notice and access conditions, the conditions are ultra vires. *See City of Arlington*, 569 U.S. at 297. We affirm the district court.[18]

**AFFIRMED.**

---

WARDLAW, Circuit Judge, concurring in the judgment:

We are faced once again with "the Trump Administration's efforts to press state and local police into federal immigration enforcement," *City of Los Angeles v. Barr*, 929 F.3d 1163, 1183 (9th Cir. 2019) (Wardlaw, J., dissenting), this time via an ultra vires attempt to divert

---

[18] Because we affirm the district court on the ground that DOJ lacked statutory authority to impose the notice and access conditions, we need not address Los Angeles's alternative arguments raised on appeal.

Edward Byrne Memorial Justice Assistance Grant Program (Byrne JAG) funds from their congressionally authorized purposes.  I concur with the majority to the extent it holds that the challenged immigration conditions were not authorized by Congress, and are thus unlawful.  But once the majority concluded that the challenged notice and access conditions are not lawful "special conditions" or "priority purposes" and were thus beyond the powers granted by Congress to the Department of Justice, it should have stopped, as in full stop.  Everything else the majority writes about 34 U.S.C. § 10102(a)(6) is "unnecessary to the decision in the case and [is] therefore not precedential."  *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1173 (9th Cir. 2004) (alteration in original) (quoting *Best Life Assur. Co. v. Comm'r*, 281 F.3d 828, 834 (9th Cir. 2002)).  In other words, the rest of the asides cast by the majority are dicta.  In dicta, the majority finds vague, unidentified powers bestowed upon the DOJ in an illustrative 2006 amendment to a "duties and functions" statute in a different subchapter of the Act that established the Byrne JAG program.  *See* Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, 119 Stat. 2960 (2006).  This putative power grab not only unnecessarily portends a circuit split, its analysis also stands contrary to every other court to have addressed the issue in a reasoned opinion.

As both the Third and Seventh Circuits have held, Congress did not grant the Assistant Attorney General for the Office of Justice Programs any authority independent of that already vested by a different statute or by delegation to the Attorney General to impose special conditions and determine priority purposes in 34 U.S.C. § 10102(a)(6).  *See City of Philadelphia v. Attorney Gen.*, 916 F.3d 276, 287–88 (3d Cir. 2019); *City of Chicago v. Sessions*, 888 F.3d 272, 284–87

(7th Cir.), *vacated in part on other grounds*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018). The majority at best misperceives, and at worst, falsely characterizes, these holdings, describing them as rejecting only a "broad interpretation" of § 10102(a)(6) as authorizing the DOJ to impose "any condition it chooses on a Byrne JAG award." Majority Op. at 23. But our sister circuits plainly rejected the notion that § 10102(a)(6) provides *any* independent grant of authority, broad or narrow—a conclusion that the majority suggests is incorrect.

As even the DOJ recognizes, "an agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). The DOJ "does not claim to possess inherent executive authority to impose the grant conditions, and instead recognizes that the authority must originate from Congress." *City of Chicago*, 888 F.3d at 283. Both the Third and the Seventh Circuits rejected outright the argument that the DOJ makes here, that a residual clause of § 10102, which describes the duties and functions of the Assistant Attorney General for the Office of Justice Programs, is such a congressional delegation of power. That section provides in full:

> (a) Specific, general and delegated powers
>
> The Assistant Attorney General shall—
>
> (1) publish and disseminate information on the conditions and progress of the criminal justice systems;

(2) maintain liaison with the executive and judicial branches of the Federal and State governments in matters relating to criminal justice;

(3) provide information to the President, the Congress, the judiciary, State and local governments, and the general public relating to criminal justice;

(4) maintain liaison with public and private educational and research institutions, State and local governments, and governments of other nations relating to criminal justice;

(5) coordinate and provide staff support to coordinate the activities of the Office and the Bureau of Justice Assistance, the National Institute of Justice, the Bureau of Justice Statistics, the Office for Victims of Crime, and the Office of Juvenile Justice and Delinquency Prevention; and

(6) exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, **including placing special conditions on all grants, and determining priority purposes for formula grants.**

34 U.S.C. § 10102(a) (emphasis added).[1]  The DOJ contends that the bolded language independently authorizes the Assistant Attorney General to impose any special conditions he sees fit, as to any grant administered by the Office of Justice Programs, so long as the condition is "germane" to the grant program or to "law enforcement" more generally.[2]  Practically speaking, the DOJ argues that the Assistant Attorney General for the Office of Justice Programs can impose almost any "special condition" on any grant the Office of Justice Programs administers, up to withholding all grant funds due to a grantee's failure to comply with the DOJ's desired policy.

The DOJ's interpretation of § 10102(a)(6) conflicts with the plain language of the statute.  *See Gonzales v. Oregon*, 546 U.S. 243, 258 (2006) (stating that "[t]he starting point" for the inquiry as to whether Congress delegated any authority "is, of course, the language of the [alleged] delegation provision itself").  Specifically, it "runs headlong into an obstacle: the word 'including.'"  *City of Philadelphia*, 916 F.3d at 287.  We have interpreted "including" as "ordinarily defined as a term of illustration, signifying that what follows is an example of the preceding principle."  *Ariz. State Bd. for Charter Schs. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1007 (9th Cir. 2006); *see Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) ("[T]he term

---

[1] This statute appears in Subchapter I, Chapter 101 of Title 34 of the United States Code.  The Byrne JAG statute is in Subchapter V, Chapter 101 of Title 34.  *See* 34 U.S.C. §§ 10151–10158.

[2] See Recording of Oral Argument, *City of Los Angeles v. Barr*, No. 18-56292 (9th Cir. Apr. 10, 2019), at 6:25–7:22, http://www.ca9.uscourts.gov/media/view_video.php?pk_vid=0000015483.

'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle.").[3]    Analyzing Congress's use of the word "including" in § 10102(a)(6), the Third and Seventh Circuits came to the same conclusion.  *See City of Philadelphia*, 916 F.3d at 287 (reasoning that "including" "is used to denote something that is within a larger whole"); *City of Chicago*, 888 F.3d at 284 ("The word 'including' by definition is used to designate that a person or thing is part of a particular group.").

The Seventh Circuit reasoned that the plain meaning of "including" in § 10102(a)(6)

> is to set forth a subcategory of the types of powers and functions that the Assistant Attorney General may exercise when vested in the Assistant Attorney General either by the terms of this chapter or by delegation of the Attorney General. . . . [Because the DOJ] does not even claim that the power exercised here [to impose the notice and access conditions] is authorized anywhere in the chapter, nor that the Attorney General possesses that authority and therefore can delegate it to the Assistant Attorney General . . . the [DOJ's] argument is that the "including" clause itself is a stand-alone grant of authority to the Assistant

---

[3] Dictionary definitions confirm this understanding of the word "including." *See Include*, Webster's New Int'l Dictionary (3d ed. 2002) ("to place, list, or rate as a part of component of a whole or of a larger group, class, or aggregate"); *Including*, New Oxford Am. Dictionary (3d ed. 2010) ("containing as part of the whole being considered").

Attorney General to attach any conditions to any grants in that subchapter or other subchapters even though that authority is not otherwise provided in the chapter and is not possessed by the Attorney General. Because that interpretation is so obviously belied by the plain meaning of the word "including," the Attorney General's position is untenable.

*City of Chicago*, 888 F.3d at 285. The Third Circuit agreed that

"including" signifies that the Special Conditions Clause is part of "such other powers and functions *as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General*." 34 U.S.C. § 10102(a)(6) (emphasis added). Therefore, under the plain text of this provision, the [Assistant Attorney General] has the power to place special conditions on grants only to the extent that such power has been vested in him or her "pursuant to this chapter or by delegation of the Attorney General." . . . [T]he broad authority [the DOJ] urges has not been vested in the Attorney General or the [Assistant Attorney General] in the Byrne JAG statute or anywhere else in the United States Code. Therefore, the Special Conditions Clause cannot authorize this power on its own.

*City of Philadelphia*, 916 F.3d at 287–88. Here, nothing in the statute evinces a congressional intent to use the word

"including" to mean anything other than its ordinary definition.[4] All other courts to consider § 10102(a)(6) have similarly rejected the DOJ's argument that the statute independently authorizes the Assistant Attorney General to impose conditions of any kind on grants.[5]

---

[4] By contrast, in *United States v. Flores*, 901 F.3d 1150 (9th Cir. 2018), we considered a statute listing a number of aggravated felonies, 8 U.S.C. § 1101(a)(43), conviction of which rendered aliens deportable. 8 U.S.C. § 1101(a)(43)(G) listed "a theft offense (including receipt of stolen property)." Congress's express inclusion of an independent crime requiring separate elements of proof led us to conclude that it was at the least ambiguous as to whether Congress intended "including" to mean "a subset" or intended to add an independent theft-related crime to the expanded list of deportable felonies. *Flores*, 901 F.3d at 1157–58. And, as the Board of Immigration Appeals, to which we deferred under *Chevron*, noted, § 1101(a)(43)(G) "is not the only entry within 1101(a)(43)'s list of aggravated felonies [in which Congress used] the word 'including' 'to cover a broader range of offenses than those previously referenced.'" *Flores*, 901 F.3d at 1158 (quoting *Matter of Alday-Dominguez*, 27 I. & N. Dec. 48, 51 n.7 (B.I.A. 2017)).

[5] *See Oregon v. Trump*, ___ F. Supp. 3d ___, 2019 WL 3716932, at *11, *13–15 (D. Or. Aug. 7, 2019), *appeal docketed* No. 19-35843 (9th Cir. Oct. 4, 2019); *City of Providence v. Barr*, 385 F. Supp. 3d 160, 163–64 (D.R.I. June 10, 2019), *appeal docketed sub nom. City of Providence v. U.S. Dep't of Justice*, No. 19-1802 (1st Cir. Aug. 19, 2019); *City & County of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 947 (N.D. Cal. 2018) ("DOJ's interpretation that Section 10102 establishes an independent grant of authority to impose the challenged conditions contradicts the plain meaning of the statute."), *appeal docketed sub nom. City & County of San Francisco v. Whitaker*, No. 18-17308 (9th Cir. Dec. 4, 2018); *States of New York v. Dep't of Justice*, 343 F. Supp. 3d 213, 228 (S.D.N.Y. 2018) (holding that § 10102(a)(6) is not a "stand-alone grant of authority to the Assistant Attorney General to attach any conditions to any grants" (quoting *City of Chicago*, 888 F.3d at 285)), *appeal docketed sub nom. City of New York v. Whitaker*, No. 19-275 (2d Cir. Jan. 28, 2019); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 874 (N.D. Ill. 2018); *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 941–43 (N.D. Ill. 2017)

The DOJ's interpretation of § 10102(a)(6) is at odds with the very structure and purpose of § 10102. *See Gonzales*, 546 U.S. at 273 ("[S]tatutes should not be read as a series of unrelated and isolated provisions." (internal quotation marks omitted)). Section 10102 delineates the "duties and functions" of the Assistant Attorney General for the Office of Justice Programs, much like other "duties and functions" statutes concerning persons who manage agency programs. *See, e.g.*, 34 U.S.C. § 10444 (duties and functions of Director of Violence Against Women Office), § 11293 (duties and functions of the Administrator of the Office of Juvenile Justice and Delinquency Prevention). The first five provisions of § 10102(a) describe the Assistant Attorney General's various administrative duties, from "coordinat[ing] and provid[ing] staff support to coordinate the activities" of other DOJ offices to "maintain[ing] liaison with public and private educational and research institutions, State and local governments, and governments of other nations relating to criminal justice." *Id*. § 10102(a)(1)–(5). The sixth provision, § 10102(a)(6), is a catch-all provision, simply recognizing that the Assistant Attorney General can also exercise such other powers and functions as may be delegated by other authorities—either by Congress in Chapter 101 or by the Attorney General. "The 'including' phrase is tacked on to that." *City of Chicago*, 888 F.3d at 285.

As all other courts have found, it is inconceivable that Congress implicitly intended to delegate any independent

---

(subsequent history omitted); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 321 (E.D. Pa. 2018), *aff'd in part, vacated in part sub nom. City of Philadelphia v. Attorney Gen.*, 916 F.3d 276 (3d Cir. 2019); *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 616–17 (E.D. Pa. 2017) (subsequent history omitted).

powers in this residual clause. "A clause in a catch-all provision at the end of a list of explicit powers would be an odd place indeed to put a sweeping power to impose *any* conditions on *any* grants—a power much more significant than all of the duties and powers that precede it in the listing . . . ." *Id.* (emphasis in original); *see City of Philadelphia*, 916 F.3d at 288 ("Given the ministerial nature of the powers in the preceding five subsections, we would be hesitant to find such a sweeping grant of authority in the sixth subsection absent clear language to support that interpretation."). Congress does not hide such broad powers in such ancillary provisions. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

The DOJ's interpretation of § 10102(a)(6) also interferes with the Byrne JAG program's formula grant structure. Congress created specific, objective eligibility criteria and a formula to allocate Byrne JAG funds among all jurisdictions that meet that criteria. *See* 34 U.S.C. § 10156. Congress further crafted narrow grounds on which the Attorney General is authorized to withhold grant funds to jurisdictions not supporting specific federal priorities, *id*. §§ 10157(b), 12113(e), 20927(a), 30307(e)(2), 40914(b), 60105(c)(2), while ensuring that jurisdictions would receive a minimum grant allocation, *id*. § 10156(a)(2). Against the backdrop of Congress's precise formula and express limits on the Attorney General's ability to deviate from that formula, "it is inconceivable that Congress would have anticipated that the Assistant Attorney General could abrogate the entire distribution scheme and deny all funds to states and localities that would qualify under the Byrne JAG statutory provisions,

based on the Assistant Attorney General's decision to impose his or her own conditions—the putative authority for which is provided in a different statute." *City of Chicago*, 888 F.3d at 286.[6]

"Congress knew how to grant such authority, and explicitly did so in another statute within the same Act that added the 'including' language" to § 10102(a)(6). *Id.* at 286–87 (citing the Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, 119 Stat. 2960 (2006)); *see United States v. Youssef*, 547 F.3d 1090, 1094–95 (9th Cir. 2008) (noting that Congress's omission of a term from one section and inclusion of that term in another "is evidence of Congress's expressed intent not to impose" that requirement on the first section). Congress gave the Attorney General the authority to "impose reasonable conditions on" Violence Against Women Act grants "to ensure that the States meet statutory, regulatory, and other program requirements." 34 U.S.C § 10446(e)(3). Additionally, Congress provided that the Assistant Attorney General shall establish discretionary grant programs under the Bureau of Justice Assistance, "on terms and conditions determined by the [Assistant Attorney General] to be consistent with part B of subchapter V." 34 U.S.C

---

[6] Indeed, the DOJ's interpretation of § 10102(a)(6) gives no weight to Congress's choice to make Byrne JAG a formula grant program. "If Congress sought to provide [the DOJ] the ability to exercise its judgment in the selection of the grantees, it would have made sense for it to do so by employing the discretionary grant model rather than the formula grant structure used here." *City of Chicago*, 888 F.3d at 286. Were § 10102(a)(6) to authorize the DOJ "to withhold all funds because a jurisdiction does not certify compliance with [a policy] of the Attorney General's choosing," it would effectively "turn[] the formula grant into a discretionary one." *City of Philadelphia*, 916 F.3d at 290.

§ 10142(2).[7]  In contrast to these explicit grants of authority to impose conditions on specific grants,

> the Byrne JAG statute provides the Attorney General authority over a carefully delineated list of actions, with no such broad authority to impose reasonable conditions.  If Congress had wanted to vest such authority in the Attorney General regarding the Byrne JAG grant, one would expect it to include explicit language in the grant statute itself, as it did in the Violence Against Women Act.  The Attorney General's argument that such sweeping authority over the major source of funding for law enforcement agencies nationwide was provided to the Assistant Attorney General by merely adding a clause to a sentence in a list of otherwise-ministerial powers defies reason.

*City of Chicago*, 888 F.3d at 287.

Yet, in dicta, unnecessary to its holding, the majority seems to adopt the DOJ's "independent power" construction of § 10102(a)(6), writing in passing that "the Attorney General and the Assistant [Attorney General for the Office of Justice Programs] through delegation have the authority to

---

[7] Congress transferred the functions of the Director of Bureau of Justice Assistance to the Assistant Attorney General for the Office of Justice Programs, with exceptions not relevant here.  *See* Consolidated Appropriations Act, 2000, Pub. L. No. 106-113, 113 Stat. 1501 (1999) (note regarding 42 U.S.C. § 3741, which was transferred to 34 U.S.C. § 10141).

impose special conditions on all grants and determine priority purposes for formula grants, as those terms are properly circumscribed." Majority Op. at 26; *see id.* at 17, 21, 24 n.14, 26 (referring to the Assistant AG's "power" to impose special conditions under § 10102(a)(6)).**[8]** *See In re Magnacom Wireless, LLC*, 503 F.3d 984, 993–94 (9th Cir. 2007) ("[S]tatements made in passing, without analysis, are not binding precedent."); *see also United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) (en banc) (opinion of Kozinski, J.) ("[W]here a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit . . . ."). While the majority characterizes its discussion as a response to a "threshold argument," it is nothing of the sort. Majority Op. at 16. All that is necessary to decide this case is the conclusion, upon which we all agree, that § 10102(a)(6) does not permit the Assistant AG to impose the notice and access conditions at issue here.

In its digression from the issue at hand, the majority places great weight on its contention that the "including" clause must have been intended as a grant of authority, or else the 2006 amendment adding the clause would have no meaning. Majority Op. at 16–17. The majority identifies no other support for its suggestion of a grant of independent powers. The majority's concern that a contrary reading of this residual clause would deprive it of meaning rings hollow,

---

**[8]** The majority never identifies any language in § 10102(a)(6), or any other statute, to support its untethered statement that § 10102(a)(6) grants the Attorney General any authority. Majority Op. at 26. While the DOJ argues that § 10102(a)(6) grants the Assistant Attorney General authority, it never suggests that this authority extends to the Attorney General.

given that the majority's interpretative dictum would render superfluous numerous statutes in which Congress expressly authorized the Attorney General to withhold a set percentage of Byrne JAG funds for a specified purpose. *See* 34 U.S.C. §§ 10157(b), 12113(e), 20927(a), 30307(e)(2), 40914(b), 60105(c)(2). As the Third Circuit noted, "[i]f Congress had already given the [Assistant] Attorney General this sweeping authority to withhold all funds for any reason [by imposing special conditions], it would have no need to delineate numerous, specific circumstances under which the Attorney General may withhold limited amounts of funds." *City of Philadelphia*, 916 F.3d at 286. We generally do not interpret such ancillary ministerial provisions to render superfluous Congress's more specific delegations of power. *See Gonzales*, 546 U.S. at 262 ("It would be anomalous for Congress to have so painstakingly described the Attorney General's limited authority to deregister a single physician or schedule a single drug, but to have given him, just by implication, authority to declare an entire class of activity outside 'the course of professional practice,' and therefore a criminal violation of the CSA."). The notion that through this "including" clause Congress granted independent authority to withhold all funds as to a specific grantee is absurd given that elsewhere Congress explicitly gave the Attorney General authority to withhold funds only in limited circumstances. *See City of Chicago*, 888 F.3d at 285 (recognizing that such "a power granted to the Assistant Attorney General . . . was not granted to the Attorney General"); *United States v. Wilson*, 503 U.S. 329, 334 (1992) (noting that statutory interpretation that leads to absurd results is to be avoided).

In contrast, interpreting the "including" clause to illustrate powers already vested in the Assistant Attorney General or the Attorney General is consistent with Congress's precise

grants of power over the Byrne JAG program to the Attorney General. And, as the City identified, various statutes in Chapter 101 of Title 34 authorize the Attorney General or the Assistant Attorney General to impose terms and conditions on other grants. *See, e.g.*, 34 U.S.C. §§ 10142(2), 10446(e)(3). The authority to impose conditions clearly includes the authority to impose special conditions.[9] Thus, § 10102(a)(6) makes clear that the Attorney General can delegate such authority to the Assistant Attorney General, and that exercising such authority is part of the Assistant Attorney General's "duties and functions." This interpretation satisfies "our duty 'to give effect, if possible, to every clause and word of a statute,' rather than to emasculate an entire section." *United States v. Menasche*, 348 U.S. 528, 538–39 (1955) (citation omitted). That the "including" clause may simply "remove doubt" that the Assistant Attorney General can, under some circumstances, impose special conditions and determine priority purposes does not render the clause meaningless. *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013) (concluding that "the phrase 'and costs' would not be superfluous if Congress included it to remove doubt that defendants may recover costs" under the circumstances set forth in the statute). Even if this interpretation makes Congress's addition of the "including" clause to § 10102(a)(6) somewhat redundant, the addition of incidental language with little meaning does not demonstrate intent to grant the Assistant Attorney General sweeping authority to impose special conditions on all Office of Justice Program-

---

[9] Because other statutes in Chapter 101 provide the DOJ with authority to impose special conditions, the majority is simply wrong to contend that the City of Los Angeles's reading of the "including" clause would "authoriz[e] the Assistant AG to exercise certain powers that do not exist." Majority Op. at 16–17.

administered grants.  *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) ("Redundancies across statutes are not unusual events in drafting . . . .").  The majority fails to confront the ancillary nature of the "including" clause.

The majority's drift is pernicious because the distinction it seemingly draws is between special conditions imposed on individual Byrne JAG grantees, which it suggests are lawful, as opposed to conditions imposed on all grantees, which are not.  *See, e.g.*, Majority Op. at 22 ("[Section] 10102(a)(6) does not authorize DOJ to require *all recipients* of Byrne JAG funding to comply with the notice and access conditions.").  This sweeping characterization is far from a "narrowing construction."  Majority Op. at 24.  It would subvert Congress's carefully crafted statutory scheme for federal law enforcement grants.

The majority protests that it is only recognizing the DOJ's "limited authority to impose special conditions designed to meet the needs for carrying out the Byrne JAG program."  Majority Op. at 24.  But what are the limits of that authority?  Beyond stating nebulously that "special conditions" refer to "individualized requirements" created in response to "certain risk factors" or "idiosyncratic issues," the majority provides no further guidance.[10]  Majority Op. at 21, 26.  It therefore opens the door for the Assistant Attorney General to lay down any number of conditions not contemplated or authorized by Congress, as long as they are imposed on an individual basis

---

[10] While the majority suggests that Congress's use of the term "special conditions" was informed by a since-repealed regulation, 28 C.F.R. § 66.12(a)(5) (2006), Majority Op. at 19–21, it conspicuously does not limit the Assistant Attorney General to imposing only the types of conditions provided for by that regulation.

and can somehow be said to be "designed to meet the needs for carrying out the Byrne JAG program." This essentially limitless authority "is a tremendous power of widespread impact," and, again, "is not the type of authority that would be hidden in a clause without . . . explanation, [or] without any reference or acknowledgment of that authority in the statute that actually contains the grant itself." *City of Chicago*, 888 F.3d at 287.

The Byrne JAG program is the primary provider of federal criminal justice funding to state and local governments.[11] Congress's articulated goal for Byrne JAG grants was to provide States and localities with flexibility to address their local criminal justice needs, specifically through funds for "additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice." 34 U.S.C. § 10152(a)(1); *see also* H.R. Rep. No. 109-233, at 89 (2005) (stating that the new Byrne JAG program was meant to "give State and local governments more flexibility to spend money for programs that work for them"). The majority's dicta, if it were to become law, would allow any Assistant Attorney General for the Office of Justice Programs to set special conditions or funding priorities on specific grantees, thus thwarting Congress's mandate and furthering its own desired policy goals. This supposed power could be wielded over all congressionally enacted grants administered by the Office of

---

[11] *See* Edward Byrne Memorial Justice Assistance Grant Program FY 2017 Local Solicitation, U.S. Dep't of Justice (Aug. 3, 2017).

46          CITY OF LOS ANGELES V. BARR

Justice Programs, worth upwards of $1.2 billion in fiscal year 2018.[12]

The enormous impact of such potential authority left our sister circuits firmly convinced that the plain language of § 10102(a)(6) could not support the DOJ's claimed authority. I would join them, and respectfully disagree with the portions of the majority opinion that seemingly find more capacious powers bestowed by the "including" clause within § 10102(a)(6)'s residual clause.

---

[12] *See FY 2020 Performance Budget*, Office of Justice Programs (U.S. Dep't of Justice), March 2019, at 40, 44, https://www.justice.gov/file/1144566/download (last visited July 29, 2019).



# Office of Justice Programs

U.S. DEPARTMENT OF JUSTICE

Search: [                    ]  [ SEARCH OJP ]

ABOUT US  |  NEWS CENTER  |  GRANTS/FUNDING  |  PARTNERSHIPS  |  RESOURCES  |  FOR CONGRESS  |  TRAINING & TA



Funding Resource Center



Explore

Apply

Grants 101
OJP Grant Process
Frequently Asked Questions



Implement

---

**Not finding what you need? Contact us!**

**Financial Questions?**

- 1-800-458-0786
  (TTY: 202-616-3867)
- Email the Customer Service Branch
- DOJ Grants Financial Guide
- 2014 OJP Financial Guide

**Grant System Questions?**

- 202-514-2024
- Email the Grants Management System (GMS) Help Desk

Sign up to be notified of new funding opportunities

---

## OJP Grant Process

- Grant Process Overview
- Overview of the Grant Management Process
- Grant Application Review Process

### Grant Process Overview

**What is a Grant?**

A Grant is a legal instrument which permits the Office of Justice Programs (OJP) to: (1) transfer money or anything of value to an eligible recipient to accomplish a public purpose of support as authorized by Federal statute; and (2) requires no substantial involvement between OJP and the recipient during of activity. There are two types of grants: Formula and Discretionary. Discretionary grants are generally awarded to eligible recipients at the discretion of the awarding agency and Formula grants are awarded on the basis of a statutorily created formula. The two types of grants, discretionary and formula, are described below.

- **Discretionary Grants** - Discretionary grants are awarded directly by OJP to eligible recipients and are most often awarded on a competitive basis. Some discretionary grants to organization may be awarded on a non-competitive basis, often based on congressional direction. Applicants must find and for OJP competitive discretionary grant solicitations on Grants.gov . Current solicitations are also available online at the Open Solicitations page.

- **Formula or Block Grants** - Formula and/or block grants are awarded directly by OJP to eligible recipients as authorized by statute. For formula and/or block grant programs, statutes or appropriations acts specify how the funds will be allocated among the eligible recipients, as well as the method by which an applicant must demonstrate its eligibility for that funding. Examples of this type of grant at OJP are the OJJDP Juvenile Accountability Block Grants Program and the OVC VOCA Victim Compensation Formula Grants.

  The award amount is calculated by a formula, and may vary among programs. Award calculations can consider such factors as population, census data, juvenile offender population, and Part 1 violent crimes reported to the Federal Bureau of Investigation (FBI) . Formula grant programs can be either for a specific purpose (assisting juvenile offenders, for example) or related to public safety in general. The dollar amount available to applicants under each program is included in the solicitation. The specific recipient for state formula programs should be designated by each state. For state formula programs, OJP maintains a list of the designated agencies authorized by each state to administer the programs.

Top

**What is a Cooperative Agreement?**

A cooperative agreement is a legal instrument which permits OJP to: (1) transfer money or something of value to accomplish a public purpose of support authorized by Federal statute; and (2) requires substantial involvement between OJP and the recipient during performance of the contemplated activity. This is typically a discretionary award.

**What is a Contract?**

A contract is a legal document used to acquire goods, construction or services for the Federal government's direct benefit or use.

### Overview of the Grant Management Process

**Applicant/Grantee and Program Manger Responsibilities**

| Applicant/Grantee Responsibilities | Grant Manager Responsibilities |
|---|---|
| Application Submission | Application Processing |

Cited in City of L.A. et al.
No. 19-cv-... used on OCR/A

| Applicant/Grantee Responsibilities | Grant Manager Responsibilities |
|---|---|
| Register to submit application<br><br>• Formula/block grants, earmarks, and continuations applicants register in the Grant Management System (GMS) . When first time applicants register on GMS, they will need to create a profile.<br>• Register for competitive applications via Grants.gov . Validation, confirmation, and receiving a user name and password will take 5-7 business days prior to the application due date.<br><br>Generate application<br><br>• Review solicitation and ensure that all components are complete.<br><br>  ○ The solicitation package is available at: Grants.gov or the OJP Current Funding Opportunities page .<br>  ○ Common forms to be filled out for OJP funding can be found on the Standard Forms and Instructions page.<br><br>• Ensure that all reporting requirements are understood, making note of any data that you believe you may not be able to report and determine how your organization will collect the data. Review the Performance Measures section for reporting data requirements.<br>• Follow your application's progress online via: Track My Application on Grants.gov or GMS .<br>• Provide information as requested by the grant manager throughout the process. | Review application to ensure that all the requirements are addressed and complete<br><br>Manage the ongoing review process:<br><br>• Program review is required for all applications and considers:<br><br>  ○ Application merit in terms of the extent to which it reflects the goals and objectives of the program for which the application was submitted.<br>  ○ Application completeness which may vary according to program requirements outlined in the solicitation.<br>  ○ Fund request amounts in relation to allowable and available funds as outlined in the solicitation.<br><br>• Peer review is required for competitive discretionary applications. Peer review provides:<br><br>  ○ Objective, independent application review<br>  ○ Subject Matter Expert evaluation of application strengths and weaknesses<br><br>• Financial review is required for all discretionary applications and occurs after peer review for those requiring a peer review. Financial review:<br><br>  ○ Evaluates the fiscal integrity and financial capability of the organization.<br>  ○ Examines the proposed costs for reasonableness, necessity, and compliance with federal cost principles and agency regulations.<br>  ○ Reconciles proposed costs with the budget and budget narrative.<br><br>Request additional information from applicant as needed.<br><br>Generate award package for approved applications.<br><br>Notify applicant of Approval, Denial, or Change Request status. |
| **Post Award** | **Grant Management** |
| Access the award package in GMS, designate a Financial Point of Contact for your award, and sign and return the award document to the Office of the Chief Financial Officer within 45 calendar days of date of award.<br><br>Review the special conditions on the award document and determine what your organization needs to do to be in compliance with them.<br><br>Manage the project according to requirements, standards, and guidance contained in the grant terms and conditions, including the OJP Financial Guide (provided in the award package) and award special conditions.<br><br>Submit quarterly Financial Status Reports in accordance with the OJP Financial Guide.<br><br>Submit Programmatic Progress Reports in accordance with the frequency established in the special conditions of the award document.<br><br>Request approval for modifications to your award as defined in the OJP Financial Guide.<br><br>Complete all deliverables as stated in your application, the solicitation or in a special condition. | Review the grant terms, objectives, conditions, and grantee organization, and key personnel.<br><br>Contact grantee to discuss requirements of the grant.<br><br>Monitor grantee compliance with programmatic, administrative, and fiscal requirements of relevant statutes, regulations, policies, guidelines, and with grantee stated objectives, and implementation plan.<br><br>Perform desk reviews and/or site visits.<br><br>Ensure data reporting from grantee.<br><br>Approve Progress Reports.<br><br>Approve modifications to awards.<br><br>Conduct on-site monitor visits to review the activities of the grant.<br><br>For cooperative agreements, grant managers provide additional direction and oversight. |
| **Grantee Closeout Responsibilities** | **Grant Manager Closeout Responsibilities** |

cited in City of Los Angeles v. Barr,
No. 18-56292 archived on October 25, 2019

| Applicant/Grantee Responsibilities | Grant Manager Responsibilities |
|---|---|
| Submit all closeout documents and complete closeout requirements within 90 days after the end of the grant.<br><br>• Final Programmatic Progress Report<br>• Final Financial Report<br>• Compliance with all special conditions<br>• Financial Reconciliation<br>• Submission of all required deliverables | The Program Office must forward the complete closeout package to the Office of the Chief Financial Officer (OCFO) within 120 days after the end of the grant.<br><br>The OCFO must close the grant 180 days after the end of the grant. |

Top

## Grant Application Review Process

The Grant Application Review Process generally consists of five steps:

1. **Application Review** – The application is submitted and reviewed for registration information and completeness, and to ensure that the applicant meets the basic eligibility requirements defined in the solicitation.

2. **Programmatic Review** – The grant manager reviews the application to make sure that the information presented is reasonable and understandable and the activities proposed in the application are measurable, achievable and consistent with program or legislative requirements as stated in the solicitation.

   For competitive discretionary solicitations, this step may also include a Peer Review of the application. Peer Review is the process of using non-federal independent evaluators, and/or in-house or other federal agency personnel who are subject matter experts to assess the merits of an application or concept paper for federal funding.

   The results of programmatic review are provided to grant decision makers, who use that review along with other relevant factors to assess applications, and make funding decisions.

3. **Financial Review** – The Office of the Chief Financial Officer (OCFO) conducts a financial review of all discretionary awards and cooperative agreements to evaluate the fiscal integrity and financial capability of applicants, examine proposed costs to determine if the budget and budget narrative accurately explain project costs and determine whether costs are reasonable, necessary, and allowable under applicable Federal cost principles and agency regulations.

4. **Award Decisions** – Generally, OJP either notifies an applicant that it will receive a grant award no later than September 30 of the calendar year or issues a rejection letter to unsuccessful applicants by December 30 of the same calendar year.

5. **Final Approved Award** – All Final approved award recommendation memoranda for grant programs undergoing external or internal peer reviews must include the following:

   ○ A list of applications received to include the lowest scoring application to be funded and every application scoring higher, regardless of whether it was funded. This list may be divided into categories and subcategories if they were published in the solicitation.

   ○ A brief explanation as to why an application on the above list was not funded.

   All discretionary recommendations made absent a peer review process must be documented and clearly explain the choices made, the reasons for the choices, and the policy considerations on which they decisions were based. An otherwise uninformed reader should be able to understand the process used and the final decisions made.

   All final award decisions must be documented including any changes made as a result of discussions between those recommending grants and the decision maker. Such changes in the final approved award decision memorandum must reflect who made the decision to vary from a recommendation memo and his or her reasons for it.

Top

Cited in City of Los Angeles v. Barr
No. 18-cv-... Archived on October 16, 2019

---

**BUREAUS AND OFFICES**

- Bureau of Justice Assistance
- Bureau of Justice Statistics
- National Institute of Justice
- Office for Victims of Crime
- Office of Juvenile Justice and Delinquency Prevention
- Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking

**Office of Justice Programs**
810 Seventh Street, NW · Washington, DC 20531

- Accessibility
- Reasonable Accommodation Manual
- Archives
- Privacy Policy
- FOIA
- Legal Policies and Disclaimers
- Notice to Former OJP Employees


STAY CONNECTED



U.S. DEPARTMENT OF JUSTICE

# Office of Justice Programs

Contact Us | Site Map | Careers at OJP | OJP Home

Search: [                    ] [SEARCH OJP]

ABOUT US | NEWS CENTER | GRANTS/FUNDING | PARTNERSHIPS | RESOURCES | FOR CONGRESS | TRAINING & TA





Current Funding Opportunities
Past Funding Opportunities
Legal Overview - FY2018 Awards
Legal Overview - FY2019 Awards
DOJ Program Plan
OJP Award Data
Legal Notices



**Not finding what you need? Contact us!**

**Financial Questions?**

- 1-800-458-0786 (TTY: 202-616-3867)
- Email the Customer Service Branch
- DOJ Grants Financial Guide
- 2014 OJP Financial Guide

**Grant System Questions?**

- 202-514-2024
- Email the Grants Management System (GMS) Help Desk

Sign up to be notified of new funding opportunities

## Legal Notices: Special circumstances as to particular award conditions

### FY 2017 and FY 2018 JAG Award Special Notices

Special Notice Re: FY 2017 Byrne JAG award conditions 52-56 to the following:

> **State of New York and political subdivisions of New York**
> **State of Connecticut and political subdivisions of Connecticut**
> **State of New Jersey and political subdivisions of New Jersey**
> **State of Rhode Island and political subdivisions of Rhode Island**
> **State of Washington and political subdivisions of Washington**
> **Commonwealth of Massachusetts and political subdivisions of Massachusetts**
> **Commonwealth of Virginia and political subdivisions of Virginia**
> **City of New York**

At present, DOJ's authority to require compliance with Award Conditions 52 through 56 in FY 2017 JAG awards to the foregoing jurisdictions is the subject of pending litigation. Accordingly (and consonant with Award Condition 1), DOJ has determined that, at this time, it will not use or enforce those conditions in FY 2017 JAG awards to the foregoing jurisdictions. If the posture of the pending litigation changes (or if the pending litigation is resolved) in a manner that would permit DOJ to use or enforce any or all of Award Conditions 52 through 56 in the FY 2017 JAG awards to the foregoing jurisdictions, then DOJ will provide them with specific, formal, written notice of DOJ's intent to use or enforce these conditions following the notice. During the period in which Award Conditions 52 through 56 are not used or enforced pursuant to this Special Notice, the FY 2017 Byrne JAG – Chief Legal Officer Certification of Compliance with 8 U.S.C. § 1373 shall not be required of the foregoing jurisdictions.

Special Notice Re: FY 2017 Byrne JAG award conditions 52-56 and California: At present, DOJ's authority to require compliance with Award Conditions 52 through 56 in FY 2017 JAG awards to the State of California and jurisdictions within that State is the subject of pending litigation. Accordingly (and consonant with Award Condition 1), DOJ has determined that, at this time, it will not use or enforce those conditions in FY 2017 JAG awards to California or its political subdivisions. If the posture of the pending litigation changes (or if the pending litigation is resolved) in a manner that would permit DOJ to use or enforce any or all of Award Conditions 52 through 56 in the FY 2017 JAG awards to the State or its subdivisions, then DOJ will provide them with specific, formal, written notice of DOJ's intent to use or enforce those conditions following the notice. During the period in which Award Conditions 52 through 56 are not used or enforced pursuant to this Special Notice, the FY 2017 Byrne JAG – Chief Legal Officer Certification of Compliance with 8 U.S.C. § 1373 shall not be required of California or its political subdivisions.

Special Notice Re: FY 2018 Byrne JAG award conditions 41-43 and 45-47 to the following:

> **State of Illinois**
> **State of California and political subdivisions of California**
> **City of Philadelphia**
> **City of Chicago (and its disparate-group subrecipients)**

At present, DOJ's authority to require compliance with Award Conditions 41 through 43 and 45 through 47 in FY 2018 JAG awards to the foregoing jurisdictions is the subject of pending litigation. Accordingly (and consonant with Award Condition 1), DOJ has determined that, at this time, it will not use or enforce those conditions in FY 2018 JAG awards to these jurisdictions. If the posture of the pending litigation changes (or if the pending litigation is resolved) in a manner such that DOJ decides to use or enforce any or all of Award Conditions 41 through 43 and 45 through 47 in the FY 2018 JAG awards to the foregoing, then DOJ will provide them with specific, formal, written notice of DOJ's intent to use or enforce those conditions following the notice. During the period in which Award Conditions 41 through 43 are not used or enforced in an award to a jurisdiction pursuant to this Special Notice, the FY 2018 Byrne JAG Certification of Compliance with 8 U.S.C. §§ 1373 & 1644 shall not be required of that jurisdiction; and during the period in which Award Conditions 45 through 47 are not used or enforced in an award to a jurisdiction pursuant to this Special Notice, the FY 2018 Byrne JAG –Certification Relating to 8 U.S.C. §§ 1226(a) & (c), 1231(a), 1324(a), 1357(a), & 1366(1) & (3) shall not be required of that jurisdiction.

Special Notice Re: FY 2018 Byrne JAG award conditions 45-46 to the following:

> **State of Indiana and political subdivisions of Indiana**
> **State of Wisconsin and political subdivisions of Wisconsin**
> **political subdivisions of State of Illinois, other than Chicago (and its disparate-group subrecipients)**

At issue, DOJ's document-full compliance with the conditions set out in the FY 2018 JAG awards to the foregoing jurisdictions is the subject of pending litigation. Accordingly (and consonant with Award Condition 1), DOJ has determined that, at this time, it will not use or enforce those conditions in FY 2018 JAG awards to these jurisdictions. If the posture of the pending litigation changes (or if the pending litigation is resolved) in a manner such that DOJ decides to use or enforce either or both of Award Conditions 45 and 46 in the FY 2018 JAG awards to the foregoing, then DOJ will provide them with specific, formal, written notice of DOJ's intent to use or enforce those conditions following the notice. During the period in which Award Conditions 45 through 46 are not used or enforced in an award to a jurisdiction pursuant to this Special Notice, the FY 2018 Byrne JAG Certification Relating to 8 U.S.C. §§ 1226(a) & (c), 1231(a), 1324(a), 1357(a), & 1366(1) & (3) shall not be required of that jurisdiction.

**FY17 Byrne JAG Extension**: Recently, a preliminary injunction was issued relating to the "section 1373," "notice," and "access" award conditions that are contained in FY 2017 Byrne JAG awards. As a result, the Department is currently enjoined from enforcing those award conditions in FY 2017 Byrne JAG awards made to members of the U.S. Conference of Mayors. In order to afford the Department time to evaluate its options and provide guidance regarding that preliminary injunction, the Department is extending the deadline to accept FY 2017 Byrne JAG awards to October 5, 2018. This extension applies to all recipients of FY 2017 Byrne JAG award documents, whether or not they are covered under the terms of the preliminary injunction (as members of the U.S. Conference of Mayors).

**Special Notice Re: FY17 Byrne JAG award conditions 52-56**: At present, DOJ's authority to require compliance with Award Conditions 52 through 56 in FY 2017 JAG awards to members of the United States Conference of Mayors is the subject of pending litigation, including a preliminary injunction. Accordingly (and consonant with Award Condition 1), DOJ has determined that, at this time, it will not use or enforce those conditions in FY 2017 JAG awards to such members. If the posture of the pending litigation changes (or if the pending litigation is resolved) in a manner that would permit DOJ to use or enforce Award Conditions 52 through 56 in the FY 2017 JAG awards to such members, then DOJ will provide those recipients of FY 2017 JAG awards that are such members with specific, formal, written notice of DOJ's intent to use or enforce those conditions following the notice.

## BUREAUS AND OFFICES

- Bureau of Justice Assistance
- Bureau of Justice Statistics
- National Institute of Justice
- Office for Victims of Crime
- Office of Juvenile Justice and Delinquency Prevention
- Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking

**Office of Justice Programs**
**810 Seventh Street, NW · Washington, DC 20531**

- Accessibility
- Reasonable Accommodation Manual
- Archives

- Privacy Policy
- FOIA
- Legal Policies and Disclaimers
- Notice to Former OJP Employees

STAY CONNECTED







cited in City of Los Angeles v. Barr
No. 18-56292 archived on October 25, 2019

U.S. Department of Justice

# FY 2020 PERFORMANCE BUDGET

## OFFICE OF JUSTICE PROGRAMS



March 2019

**Table of Contents**

I.     **Overview**                                                                                 4

II.    **Summary of Program Changes**                                           18

III.   **Appropriations Language**                                                  22

IV.    **OJP Programs and Performance by Appropriation Account**   32

   A.  Management and Administration                              33
     1.  Account Description                                              33
     2.  Performance Table                                               33

   B.  Research, Evaluation, and Statistics                        34
     1.  Account Description                                              34
     2.  Performance Tables                                             36

   C.  State and Local Law Enforcement Assistance         40
     1.  Account Description                                              40
     2.  Performance Tables                                             44

   D.  Juvenile Justice Programs                                       55
     1.  Account Description                                              55
     2.  Performance Tables                                             57

   E.  Public Safety Officers' Benefits                              61
     1.  Account Description                                              61
     2.  Performance Tables                                             62

   F.  Crime Victims Fund                                                 63
     1.  Account Description                                              63
     2.  Performance Tables                                             67

   G.  Domestic Trafficking Victims' Fund (Mandatory)   70
     1.  Account Description                                              70
     2.  Performance Tables                                             71

V.     **Program Increases by Item**                                          73

   A.  Violent Gang and Gun Crime Reduction/Project Safe Neighborhoods (PSN)   74
   B.  Research, Evaluation and Demonstration                   78
   C.  Public Safety Officers' Death Benefits Program (Mandatory Funding)   80
   D.  National Criminal Records History Improvement Program   82
   E.  STOP School Violence Act                                         85
   F.  Missing and Exploited Children                               88

cited in City of Los Angeles v. Barr
No. 18-56292 archived on October 25, 2019

G.  Improving Juvenile Indigent Defense Program                           91
H.  Southwest Border Rural Law Enforcement Violent Crime Reduction Initiative   94
I.  Corrections-Related Research, Training, and Technical Assistance       97

**VI.   Program Decreases by Item**                                       **98**

A.  Byrne Justice Assistance Grants                                        99
B.  DNA Initiative                                                        102
C.  NICS Act Record Improvement Program                                   105
D.  Community Oriented Policing Services (COPS) Hiring Program (CHP)       108
D.  Paul Coverdell Grants                                                 112
E.  Delinquency Prevention Program                                        114
F.  Youth Mentoring Program                                               118
G.  Crime Victims Fund                                                    121
G.  OJP Program Eliminations, Shifts, and Reductions                      125

**VII.  Exhibits**                                                        **129**

A.  Organizational Chart
B.  Summary of Requirements
C.  FY 2020 Program Increases/Offsets by Decision Unit
D.  Resources by DOJ Strategic Goal/Objective
E.  Justification for Technical and Base Adjustments
F.  Crosswalk of 2018 Availability
G.  Crosswalk of 2019 Availability
H.  Summary of Reimbursable Resources
I.  Detail of Permanent Positions by Category
J.  Financial Analysis of Program Changes
K.  Summary of Requirements by Object Class
L.  Status of Congressionally Requested Studies, Reports, and Evaluations

Cited in City of Los Angeles v. Barr
No. 562, archived on October 25, 2019

# I.  Overview

cited in City of Los Angeles v. Barr
No. 18-56292 archived on October 25, 2019



**Department of Justice**
**Office of Justice Programs**
**FY 2020 President's Budget Request**
**Overview**

## Mission

The mission of the Office of Justice Programs (OJP) is to be the best crime-fighting-supporting, law enforcement-supporting, victim-supporting agency possible by effectively deploying and sharing OJP's grant funds and other financial resources, research, statistics, and national criminal justice expertise and leadership with state, local, and tribal criminal justice stakeholders.

## Strategy

OJP accomplishes its mission by providing federal leadership in developing the Nation's capacity to prevent and reduce crime, enhance public safety, strengthen law enforcement, improve officer safety, expand services for victims of crime, and enforce victims' rights. OJP works in partnership with the justice community to identify the most pressing crime-related challenges confronting the justice system. OJP and its offices advance proven programs backed by scientific research and evaluation, as well as innovative approaches that are evidence-informed and promise demonstrable results in our communities. OJP works to address public safety needs by supporting law enforcement, prosecution and courts, corrections, and crime reduction programs in state, local, and tribal jurisdictions; assisting victims of crime; providing training and technical assistance to justice practitioners and professionals; and advancing ground-breaking research.

| FY 2020 OJP Budget Request At-A-Glance | |
|---|---|
| FY 2019 Discretionary C.R. Rate: | $2,077.3 million |
| FY 2020 Discretionary President's Budget: | $1,840.0 million |
| Discretionary Program Change: | -$237.3 million |
| ****** | |
| FY 2019 Mandatory C.R. Rate: | $4,534.0 million |
| FY 2020 Mandatory President's Budget: | $2,421.0 million |
| Mandatory Program Change: | -$2,113.0 million |
| **Total, FY 2020 President's Budget Request:** | **$4,261.0 million** |

cited in City of Los Angeles v. Barr, No. 18-56292 archived on October 25, 2019

**Resources**

In FY 2020, OJP requests $1,840.0 million in discretionary funding, which is $237.3 million below the FY 2019 C.R. Rate.  OJP also requests $2,421.0 million in mandatory funding, which is $2,113.0 million below the FY 2019 C.R. Rate.  The FY 2020 Budget proposes an $85.0 million cancellation of prior year discretionary balances (including $70 million in OJP balances and $15 million from balances in COPS).

**Personnel**

The FY 2020 President's Budget seeks to streamline grant administration, management, and oversight functions.  Currently, DOJ has three separate administrative offices that support its grant programs:  1) OJP, 2) the Office of Community Oriented Policing Services (COPS Office), and 3) the Office on Violence Against Women (OVW).

The FY 2020 President's Budget proposes to consolidate the COPS Office and the activities of the National Institute of Corrections (NIC), along with associated personnel, within OJP.   OJP's positions for FY 2020 total 644, including 69 positions transferred from COPS and 34 positions transferred from NIC.

**Organization**

OJP is headed by an Assistant Attorney General (AAG) who leads OJP, sets programmatic priorities for the agency, and ensures the goals of the Administration and the Department are supported.  OJP has six program offices: 1) the Bureau of Justice Assistance (BJA); 2) the Bureau of Justice Statistics (BJS); 3) the National Institute of Justice (NIJ); 4) the Office of Juvenile Justice and Delinquency Prevention (OJJDP); 5) the Office for Victims of Crime (OVC); and 6) the Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking (SMART Office).  The AAG is appointed by the President and confirmed by the Senate.  All other OJP program office heads are presidentially appointed.

**Budget Structure**

OJP's budget structure is comprised of the following six appropriation accounts:

1. **Research, Evaluation, and Statistics:**  Provides grants, contracts, and cooperative agreements for research, development, and evaluation and supports development and dissemination of quality statistical and scientific information.

2. **State and Local Law Enforcement Assistance:**  Funds programs that establish and build on partnerships with state, local, and tribal governments, as well as community and faith-based organizations.  These programs provide federal leadership on high-priority criminal justice concerns such as law enforcement safety, violent crime, gang activity, offender recidivism, illegal drugs, law enforcement information sharing, and related justice system issues.

3. **Juvenile Justice Programs:**  Supports the efforts of state, local, and tribal governments, as well as private organizations, to develop and implement effective and innovative juvenile justice programs.

4. **Public Safety Officers' Benefits:**  Provides benefits to public safety officers who are permanently and totally disabled in the line of duty and to the families and survivors of public safety officers killed or permanently and totally disabled in the line of duty.

5. **Crime Victims Fund:**  Provides compensation to victims of crime, supports victims' services, and builds capacity to improve responsiveness to the needs of crime victims.

6. **Domestic Trafficking Victims Fund:**  Provides support through grant programs to expand and improve services for domestic victims of trafficking and victims of child pornography.

## FY 2020 OJP Priorities

OJP's FY 2020 budget request focuses on the following priorities: 1) reduce and prevent violent crime and improve public safety; 2) promote officer safety and wellness; 3) combat the opioid epidemic; 4) reduce and prevent school violence and improve juvenile justice systems; and 5) support victims of crime.  The request includes increases over the FY 2019 C.R. Rate for Project Safe Neighborhoods (PSN), Public Safety Officers' (Death) Benefits, STOP School Violence Act, Missing and Exploited Children, and the Juvenile Justice Prosecution and Defense Process Improvement Program *(formerly Improving Juvenile Indigent Defense Program).*  Further, the budget continues to include critical funding for the Byrne Justice Assistance Grants (JAG) Program, as well as seeks Crime Victims Fund reform through an authorizing proposal that would provide a more consistent stream of funding for the program, allowing for long-term program planning that will better serve the victims of crime.

**Reduce and Prevent Violent Crime and Improve Public Safety**
The following programs support jurisdictions facing high levels of violent crime based on the challenges and resources of each community.

Violent Gang and Gun Crime Reduction Program/Project Safe Neighborhoods (PSN)
The FY 2020 President's Budget request includes $100.0 million for the Violent Gang and Gun Crime Reduction/PSN program, which is a central component of the Department's efforts to reduce violent crime.  This program will provide additional support for PSN activities at the local level.  Under this program, grants will be awarded to local law enforcement agencies, outreach and prevention service providers, and researchers to support activities implementing local PSN anti-violence strategies.  OJP anticipates awarding funds to all 94 districts using a funding formula that includes crime rate data and other indicators of overall need in order to best target resources.

The PSN Initiative is based on a proven program model that relies on partnerships of federal, state, and local agencies led by the U.S. Attorney in each federal judicial district to enhance the effectiveness of its crime and violence reduction efforts.  The National Institute of Justice (NIJ) identifies this model and many variations as effective on its CrimeSolutions.gov website.

Byrne Justice Assistance Grants (JAG) Program
The FY 2020 President's Budget requests a total of $405.2 million for the Byrne JAG program, which is the primary source of flexible funding for state, local, and tribal jurisdictions across all

cited City of Los Angeles v. Barr,
No. 2:17-cv-07215 as archived on October 25, 2019

components of the criminal justice system, from drug and gang task forces to crime prevention and domestic violence programs, courts, corrections, treatment, border security, and justice information sharing initiatives.

State, local, and tribal governments rely on Byrne JAG funding to address critical gaps in their criminal justice systems in order to increase public safety and prevent crime. This could include overtime pay for officers, vehicles and equipment, information sharing system and technology upgrades, and interagency task force operations.

Beginning in FY 2018, jurisdictions have been required to dedicate a small percentage of their awards on National Incident Based Reporting System (NIBRS) compliance. NIBRS is an incident-based system used by law enforcement agencies for collecting and reporting data on crimes. The FBI plans to transition its Uniform Crime Reporting program to a NIBRS only data collection by 2021.

The FY 2020 President's Budget request includes $5.0 million for Public Safety Partnership (PSP) as a carveout under Byrne JAG. High-crime jurisdictions may benefit from the intensive technical assistance model of the PSP program. The program leverages DOJ resources to reduce violence in cities with the highest violent crime rates in the nation. The partnership includes OJP (including the COPS Office), the Office on Violence Against Women (OVW), the Federal Bureau of Investigation (FBI), the Drug Enforcement Administration (DEA), the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and the U.S. Marshals Service (USMS).

A new $6.0 million carveout under Byrne JAG for the Southwest Border Rural Law Enforcement Violent Crime Initiative is included in the FY 2020 budget request. This initiative will provide resources and training and technical assistance to rural law enforcement agencies along and near the Southwest Border to address precipitous increases of crime unique to this region, as well as promote communication and collaboration between federal, state, local, and tribal agencies.

Second Chance Act (SCA) Program

The SCA program provides grants to help corrections and public safety agencies implement reentry programming to help those returning to communities after a prison or jail sentence. Successful reintegration will reduce rates of criminal recidivism, thus increasing public safety. This program provides grants to help state, local, and tribal corrections and public safety agencies implement and improve a variety of reentry services including housing, educational and employment assistance, mentoring relationships, mental health services, substance abuse treatment services, and family-support services.

In December 2018, the President signed into law the First Step Act. The Act seeks to reduce recidivism, refine sentencing laws, and eliminate disproportionate penalties for certain crimes. In addition to reauthorizing key Second Chance Act programs, the First Step Act directs the National Institute of Justice (NIJ) to evaluate the effectiveness of grants awarded by DOJ to support offender reentry and recidivism reduction programs at the state, local and tribal levels not later than five years after its enactment. The FY 2020 Budget requests an additional $1.5 million for NIJ to support the first phase of this evaluation, which will focus on identifying appropriate outcome measures for SCA programs.

8

Improving prisoner reentry programs is an ongoing challenge for many state, local, and tribal jurisdictions. A significant body of research indicates properly designed and implemented reentry programs can play an important part in reducing criminal recidivism and improving outcomes for those released from prison or jail.

**Promote Officer Safety and Wellness**
OJP continues to support the Administration's priority to protect the safety and wellness of the Nation's law enforcement officers.

VALOR
The FY 2020 President's Budget includes $15.0 million for the Officer Robert Wilson III Preventing Violence Against Law Enforcement Officers and Ensuring Officer Resilience and Survivability (VALOR) Initiative. The VALOR Initiative seeks to prevent violence against law enforcement officers and ensure officer safety, resilience, wellness, and survivability following violent encounters during the course of their duties. The initiative provides multifaceted and innovative training, technical assistance, and specialized programs to state, local, and tribal law enforcement. VALOR is a carveout of the Byrne JAG Program.

Police Act
The Police Act program aims to improve the safety and resiliency of law enforcement officers, other first responders, and communities nationwide through multidisciplinary training to counter active shooter threats or acts of terrorism against individuals or facilities; and to enhance the ability of law enforcement not only to secure the scene, but to increase the survivability of the event and protect officers and first responders from the long-term effects of exposure to trauma. In FY 2020, the President's Budget requests $10.0 million for this program as a carveout of the COPS Hiring Program.

**Reducing School Violence and Improving Juvenile Justice Systems**
Recent high-profile incidents of school violence have prompted many state, local, and tribal law enforcement agencies and school districts to look for more effective ways to address school violence.

STOP School Violence Program
In FY 2020, OJP requests $100.0 million for the STOP School Violence Program. Congress passed the STOP School Violence Act of 2018 to provide OJP and the COPS Office with additional resources to support school safety efforts. BJA and the COPS Office launched the Stop School Violence Act Program in FY 2018 and OJP plans to continue these efforts in FY 2020.

Part B: Formula Grants
The FY 2020 President's Budget also requests $58.0 million for the Part B: Formula Grants Program, administered by the Office of Juvenile Justice and Delinquency Prevention (OJJDP). Part B is the core program that supports state, local, and tribal efforts to improve the fairness and responsiveness of the juvenile justice system and to increase accountability of the juvenile offender.

Prosecution and Defense Process Improvement Program *(formerly Improving Juvenile Indigent Defense Program)*
This request supports two areas of improvement for the juvenile justice system –prosecution and indigent defense.  The juvenile prosecution component is a new addition to the program in FY 2020, and will support states in providing training and professional development and needed resources to ensure juvenile prosecutors have access to information that addresses the unique framework of the juvenile court.  This program will promote model training and technical assistance designed specifically for newly assigned juvenile prosecutors; juvenile prosecutors handling complex and difficult cases; and training for elected prosecutors and their deputy leadership to effectively leverage resources and to develop policy innovation, accountability and performance measures for juvenile justice systems.  The budget requests $2.5 million—an increase of $.500 million from the FY 2019 C.R. Rate—to prevent juvenile crime in the U.S. by improving juvenile indigent defense systems ($1.25 million) and enhancing juvenile prosecutors' abilities to prosecute ($1.25 million).

**Combating the Opioid Epidemic**
The FY 2020 President's Budget includes $330.0 million for programs authorized by the Comprehensive Addiction Recovery Act, including $145.0 million for OJP's Comprehensive Opioid Abuse Program (COAP).  COAP aims to reduce opioid abuse and the number of overdose fatalities and supports the implementation, enhancement, and proactive use of prescription drug monitoring programs to support clinical decision-making and prevent the misuse and diversion of controlled substances.  In FY 2020, the President's Budget proposes to expand the authorized use of COAP funds to address both opioid and stimulant abuse reduction activities, as states in some geographic regions are experiencing a high-rate of overdose deaths due to a deadly combination of cocaine (a stimulant) and fentanyl (an opioid) being sold on the streets.

In addition, the budget request also includes $5 million for the Opioid-Affected Youth Initiative, which is a carveout of the Delinquency Prevention Program, administered by the Office of Juvenile Justice and Delinquency Prevention.  This program supports the Administration's priority of responding to the opioid epidemic by providing support services to children, youth, families, and communities affected by opioid abuse, including early intervention, prevention and diversion services for opioid-affected youth; and services to families with children linked to opioid abuse.

**Supporting Victims of Crime**
OJP continues to work to improve the way the Nation's criminal justice system responds to victims.

Missing and Exploited Children Program
The FY 2020 President's Budget requests $81 million for Missing and Exploited Children Program (MECP), an increase of $5 million from the FY 2019 C.R.  This additional funding will support the Internet Crimes Against Children (ICAC) task forces, which work to enhance the investigative response to technology-facilitated crimes against children.

Victims of Trafficking

In FY 2020, $77.0 million is requested for the Victims of Trafficking program to support ongoing collaborative efforts to identify, rescue, and assist victims of human trafficking across the country.  Jointly administered by OVC and BJA, this program supports comprehensive and specialized victim services for trafficking victims, and coordinates awards to law enforcement and victim services providers located in the same geographic areas to support the development of ongoing human trafficking task forces.  These task forces address the full range of public safety and criminal justice issues surrounding human trafficking.

Crime Victims Fund

The FY 2020 Department Budget reproposes the Crime Victims Fund (CVF) reform included in the FY 2019 President's Budget.  The CVF reform proposal would establish a $2.3 billion mandatory annual appropriation for CVF.  The Office for Victims of Crime (OVC) will provide formula and non-formula grants to the states to support crime victim compensation and victims services programs.  Along with other reforms of the CVF, this provides more reliable funding for the program, allowing for long-term program planning that will better serve victims of crime.

**Consolidations**

The FY 2020 President's Budget includes a request of $99.0 million to transfer the Office of Community Oriented Policing Services (COPS Office) to OJP.  The COPS Office administers grants and provides expertise and other assistance in advancing public safety through the implementation of community policing strategies in jurisdictions of all sizes across the country. Community policing is a philosophy that promotes organizational strategies that support the systematic use of partnerships and problem-solving techniques to proactively address the immediate conditions that give rise to public safety issues such as crime, social disorder, and fear of crime.

The 2020 Budget proposes to transfer these community policing activities to OJP, including $99 million and 69 FTE.  This transfer will allow the Department to centralize and strengthen the partnerships it has with state and local law enforcement and to promote community policing not only through its hiring program, but also through the advancement of strategies for policing innovations and other innovative crime-fighting techniques.

The FY 2020 budget request also includes $8.0 million (and 34 positions) to transfer activities of the Bureau of Prisons' National Institute of Corrections (NIC) to OJP to help consolidate the Department's corrections research and evaluation programs and better align efforts to assist state local and tribal corrections professionals with OJP grant programs.  Of the $8.0 million requested, $3.0 million is for the NIJ to conduct state and local corrections-related research and evaluation. The remaining $5.0 million is for BJA to administer corrections-related training and technical assistance.

**DOJ Strategic Goals and Objectives**

OJP's programs support DOJ Strategic Goal 3:  Reduce Violent Crime and Promote Public Safety; Strategic Objective 3.1:  Combat violent crime, promote safe communities, and uphold the rights of victims of crime.

**FY 2020 OJP Funding Request by Appropriation**

The pie charts below depict OJP's FY 2020 discretionary and mandatory budget requests by appropriation.



FY 2020 OJP Funding Request by Appropriation
Total Discretionary Request: $1.8 billion

Juvenile Justice Programs, $238.5 M, 13%

State and Local Law Enforcement Assistance, $1,482.2 M, 81%

Public Safety Officers' Benefits (Disability and Educational), $24.8 M, 1%

Research, Evaluation, and Statistics, $94.5 M, 5%



**FY 2020 OJP Funding Request by Appropriation**
**Total Mandatory Request: $2.4 billion**

Public Safety Officers' Benefits (Death), $115.0 M, 5%

Domestic Victims of Trafficking Fund, $6.0 M, <1%

Crime Victims Fund, $2,300.0 M, 95%

cited in City of Los Angeles v. Barr
No. 18-56292 archived on October 25, 2019

**Office of Justice Programs**
**Funding by Appropriation**
**FY 2018 - FY 2020**
(dollars in thousands)

| | FY 2018 Enacted (P.L. 115-141) | FY 2019 C.R. | FY 2020 President's Budget | FY 2020 President's Budget vs. FY 2019 C.R. |
|---|---|---|---|---|
| **Justice Assistance/Research, Evaluation, and Statistics** | | | | |
| Criminal Justice Statistics Programs | 48,000 | 48,000 | 48,000 | 0 |
| *NCS-X Implementation Program* | *5,000* | *5,000* | *0* | *(5,000)* |
| Research, Development, and Evaluation Programs | 42,000 | 42,000 | 43,500 | 1,500 |
| *Evaluation Funding – First Step Act of 2018* | | | *1,500* | *1,500* |
| *Research on Domestic Terrorism* | *4,000* | *4,000* | *[JAG]* | *[JAG]* |
| National Institute of Corrections - Research | *0* | *0* | 3,000 | 3,000 |
| **Subtotal, JA/RES** | **90,000** | **90,000** | **94,500** | **4,500** |
| | | | | |
| **State and Local Law Enforcement Assistance** | | | | |
| Adam Walsh Act | 20,000 | 20,000 | 20,000 | 0 |
| Body Worn Camera Partnership Program | 22,500 | 22,500 | *[JAG]* | *[JAG]* |
| Bulletproof Vests Partnership Program | 22,500 | 22,500 | *[JAG]* | *[JAG]* |
| *NIST Transfer* | *1,500* | *1,500* | *0* | *(1,500)* |
| Innovations in Community-Based Crime Reduction (formerly Byrne Criminal Justice Innovation Program) | 17,500 | 17,500 | 0 | (17,500) |
| Byrne Justice Assistance Grants (JAG) | 415,500 | 415,500 | 405,200 | (10,300) |
| *Body Worn Camera Partnership Program* | *[line item]* | *[line item]* | *22,500* | *22,500* |
| *Bulletproof Vests Partnership Program* | *[line item]* | *[line item]* | *22,500* | *22,500* |
| *Capital Litigation Improvement Grant Program* | *[line item]* | *[line item]* | *3,000* | *3,000* |
| *Emergency Federal Law Enforcement Assistance* | *16,000* | *16,000* | *0* | *(16,000)* |
| *Innovative Prosecution Solutions Initiative (formerly Smart Prosecution)* | *2,500* | *2,500* | *0* | *(2,500)* |
| *John R. Justice Loan Repayment Grant Program* | *2,000* | *2,000* | *0* | *(2,000)* |
| *National Missing and Unidentified Persons System (NamUs)* | *2,400* | *2,400* | *3,600* | *1,200* |
| *National Training Center to Improve Police-Based Responses to People with Mental Illness* | *2,500* | *2,500* | *0* | *(2,500)* |
| *Prison Rape Prevention and Prosecution Program* | *15,500* | *15,500* | *15,500* | *0* |
| *Public Safety Partnership (PSP)* | *0* | *0* | *5,000* | *5,000* |
| *Research on Domestic Terrorism* | *0* | *0* | *4,000* | *4,000* |
| *Southwest Border Law Enforcement Violent Crime* | *0* | *0* | *6,000* | *6,000* |
| *Strategies for Policing Innovation (formerly Smart Policing)* | *5,000* | *5,000* | *0* | *(5,000)* |
| *VALOR Initiative* | *10,000* | *10,000* | *15,000* | *5,000* |
| *Violent Gang and Gun Crime Reduction* | *20,000* | *20,000* | *[line item]* | *[line item]* |

Exhibit 202, In City of Los Angeles, et al.
archived on October 25, 2019

14

| | FY 2018 Enacted (P.L. 115-141) | FY 2019 C.R. | FY 2020 President's Budget | FY 2020 President's Budget vs. FY 2019 C.R. |
|---|---|---|---|---|
| Capital Litigation Improvement Grant Program | 3,000 | 3,000 | [JAG] | [JAG] |
| *Review of Post-Conviction Claims of Innocence* | *1,500* | *1,500* | *0* | *(1,500)* |
| Comprehensive Addiction and Recovery Act related activities | 330,000 | 330,000 | 330,000 | 0 |
| *Comprehensive Opioid Abuse Program (COAP)* | *145,000* | *145,000* | *145,000* | *0* |
| *Drug Court Program* | *75,000* | *75,000* | *75,000* | *0* |
| *Justice and Mental Health Collaborations* | *30,000* | *30,000* | *30,000* | *0* |
| *Prescription Drug Monitoring Program* | *30,000* | *30,000* | *30,000* | *0* |
| *Residential Substance Abuse Treatment* | *30,000* | *30,000* | *30,000* | *0* |
| *Veterans Treatment Courts* | *20,000* | *20,000* | *20,000* | *0* |
| Court Appointed Special Advocate Program | 12,000 | 12,000 | 9,000 | (3,000) |
| COPS Hiring Program | [COPS] | [COPS] | 99,000 | 99,000 |
| *Community Policing Development/Training and Technical Assistance* | *[COPS]* | *[COPS]* | *8,000* | *8,000* |
| *Law Enforcement Mental Health and Wellness* | *[COPS]* | *[COPS]* | *2,000* | *2,000* |
| *Police Act* | *[COPS]* | *[COPS]* | *10,000* | *10,000* |
| *Regional Information Sharing Systems* | *[COPS]* | *[COPS]* | *10,000* | *10,000* |
| *Strategies for Policing Innovation (formerly Smart Policing)* | *[JAG]* | *[JAG]* | *0* | *0* |
| *Tribal Resources Grant Program* | *[COPS]* | *[COPS]* | *0* | *0* |
| DNA Related and Forensic Programs and Activities | 130,000 | 130,000 | 105,000 | (25,000) |
| *DNA Analysis and Capacity Program* | *120,000* | *120,000* | *97,000* | *(23,000)* |
| *Post-Conviction DNA Testing* | *6,000* | *6,000* | *4,000* | *(2,000)* |
| *Sexual Assault Nurse Examiners* | *4,000* | *4,000* | *4,000* | *0* |
| Sexual Assault Kit Initiative (SAKI) | 47,500 | 47,500 | 47,500 | 0 |
| Economic, High-tech, White Collar and Internet Crime Prevention | 14,000 | 14,000 | 11,000 | (3,000) |
| *Intellectual Property Enforcement Program* | *2,500* | *2,500* | *2,500* | *0* |
| *Cybercrime Prosecution Pilot Program* | *1,000* | *1,000* | *0* | *(1,000)* |
| *Digital Investigation Education Program* | *1,000* | *1,000* | *0* | *(1,000)* |
| Innovations in Corrections (NIC T/TA) | 0 | 0 | 5,000 | 5,000 |
| Justice Reinvestment Initiative | 25,000 | 25,000 | 0 | (25,000) |
| Keep Young Athletes Safe Program | 2,500 | 2,500 | 2,500 | 0 |
| National Criminal Records History Improvement Program (NCHIP) | 50,000 | 50,000 | 65,000 | 15,000 |
| NICS Act Record Improvement Program (NARIP) | 25,000 | 25,000 | 10,000 | (15,000) |
| National Sex Offender Public Website | 1,000 | 1,000 | 1,000 | 0 |
| Paul Coverdell Grants | 30,000 | 30,000 | 10,000 | (20,000) |
| *Forensic Support for Opioid and Synthetic Drug Investigations* | *17,000* | *17,000* | *0* | *(17,000)* |

Introduced in City of Los Angeles v. Barr
No. CV 56292 archived on October 25, 2019

15

| | FY 2018 Enacted (P.L. 115-141) | FY 2019 C.R. | FY 2020 President's Budget | FY 2020 President's Budget vs. FY 2019 C.R. |
|---|---|---|---|---|
| Second Chance Act/Offender Re-entry | 85,000 | 85,000 | 85,000 | 0 |
| *Children of Incarcerated Parents Demonstration Grants* | *5,000* | *5,000* | *5,000* | *0* |
| *Innovations in Supervision (formerly Smart Probation)* | *6,000* | *6,000* | *6,000* | *0* |
| *Pay for Success (discretionary)* | *7,500* | *7,500* | *0* | *(7,500)* |
| *Pay for Success (Permanent Supportive Housing Model)* | *[5,000]* | *[5,000]* | *0* | *[(5,000)]* |
| *Project Hope Opportunity Probation with Enforcement (HOPE)* | *4,000* | *4,000* | *0* | *(4,000)* |
| State Criminal Alien Assistance Program (SCAAP) | 240,000 | 240,000 | 0 | (240,000) |
| STOP School Violence Act | 75,000 | 75,000 | 100,000 | 25,000 |
| *Implementing Evidence-Based School Safety Programs (BJA)* | *50,000* | *50,000* | *0* | *(50,000)* |
| *School Security Technology and Training (COPS)* | *25,000* | *25,000* | *0* | *(25,000)* |
| Tribal Assistance | 35,000 | 35,000 | [7% set aside] | (35,000) |
| Victims of Trafficking | 77,000 | 77,000 | 77,000 | 0 |
| *Minor Victims of Trafficking Program* | *10,000* | *10,000* | *0* | *(10,000)* |
| Violent Gang and Gun Crime Reduction/Project Safe Neighborhoods (PSN) | *[JAG]* | *[JAG]* | 100,000 | 100,000 |
| **Subtotal, State and Local Law Enforcement Assistance** | **1,680,000** | **1,680,000** | **1,482,200** | **(197,800)** |
| | | | | |
| **Juvenile Justice Programs** | | | | |
| Child Abuse Training Programs for Judicial Personnel and Practitioners | 2,000 | 2,000 | 2,000 | 0 |
| Delinquency Prevention Program (formerly Title V: Local Delinquency Prevention Incentive Grants) | 27,500 | 27,500 | 17,000 | (10,500) |
| *Children of Incarcerated Parents Web Portal* | *500* | *500* | *500* | *0* |
| *Community-Based Violence Prevention Initiative* | *8,000* | *8,000* | *0* | *(8,000)* |
| *Girls in the Juvenile Justice System* | *2,000* | *2,000* | *2,000* | *0* |
| *Opioid-Affected Youth Initiative* | *8,000* | *8,000* | *5,000* | *(3,000)* |
| *Tribal Youth Program* | *5,000* | *5,000* | *0* | *(5,000)* |
| *Youth Violence Prevention and Intervention* | *4,000* | *4,000* | *5,000* | *1,000* |
| Juvenile Justice Prosecution and Defense Process Improvement Program (formerly Improving Juvenile Indigent Defense Program) | 2,000 | 2,000 | 2,500 | 500 |
| *Juvenile Justice Defense* | *0* | *0* | *1,250* | *1,250* |
| *Juvenile Justice Prosecution* | *0* | *0* | *1,250* | *1,250* |
| Missing and Exploited Children | 76,000 | 76,000 | 81,000 | 5,000 |
| Part B: Formula Grants | 60,000 | 60,000 | 58,000 | (2,000) |
| *Emergency Planning - Juvenile Detention Facilities* | *500* | *500* | *500* | *0* |
| VOCA - Improving Investigation and Prosecution of Child Abuse Program | 21,000 | 21,000 | 20,000 | (1,000) |
| Youth Mentoring | 94,000 | 94,000 | 58,000 | (36,000) |
| *Mentoring for Youth Affected by the Opioid Crisis* | *14,000* | *14,000* | *0* | *(14,000)* |
| **Total, JJ** | **282,500** | **282,500** | **238,500** | **(44,000)** |

cited in City of Los Angeles v. Barr No. 06292 archived on October 25, 2019

16

|  | FY 2018 Enacted (P.L. 115-141) | FY 2019 C.R. | FY 2020 President's Budget | FY 2020 President's Budget FY 2019 vs. C.R. |
|---|---|---|---|---|
| **Public Safety Officers' Benefits** |  |  |  |  |
| Public Safety Officers' Benefits Program-Disability and Educational Assistance Benefits Programs | 24,800 | 24,800 | 24,800 | 0 |
| **Total, PSOB Discretionary** | **24,800** | **24,800** | **24,800** | **0** |
|  |  |  |  |  |
| **Total, OJP Discretionary** | **2,077,300** | **2,077,300** | **1,840,000** | **(237,300)** |
|  |  |  |  |  |
| *Flexible Tribal Grant - Set Aside (up to 7%)* | *0* | *0* | *127,064* | *127,064* |
| *Research, Evaluation, and Statistics Set Aside (Up to 3% in the FY 2020 President's Budget)* | *39,120* | *39,120* | *51,621* | *12,501* |
| **Public Safety Officers' Benefits—Mandatory** | 92,000 | 92,000 | 115,000 | 23,000 |
| **Subtotal, PSOB Mandatory** | **92,000** | **92,000** | **115,000** | **23,000** |
| **PSOB Total (Discretionary and Mandatory)** | **116,800** | **116,800** | **139,800** | **23,000** |
|  |  |  |  |  |
| **Total Crime Victims Fund (Mandatory)** | **4,436,000** | **4,436,000** | **2,300,000** | **(2,136,000)** |
| *CVF Grants* | *3,800,920* | *3,800,920* | *1,670,500* | *(2,130,420)* |
| *Inspector General Oversight* | *10,000* | *10,000* | *10,000* | *0* |
| *Innovations in Crime Victims Services (formerly Vision 21)* | *0* | *0* | *12,000* | *12,000* |
| *Tribal Victims Assistance Grants (set aside up to 5% in the FY 2020 President's Budget)* | *133,080* | *133,080* | *115,000* | *(18,080)* |
| *Violence Against Women Act Programs* | *492,000* | *492,000* | *492,500* | *500* |
| **Domestic Victims of Trafficking** | **6,000** | **6,000** | **6,000** | **0** |
|  |  |  |  |  |
| **Total, OJP Mandatory (PSOB, CVF and DVTF)** | **4,534,000** | **4,534,000** | **2,421,000** | **(2,113,000)** |
|  |  |  |  |  |
| **Total, OJP Discretionary/Mandatory** | **6,611,300** | **6,611,300** | **4,261,000** | **(2,350,300)** |
|  |  |  |  |  |
| OJP Rescission (from Unobligated Balances, including from the COPS Program) | (40,000) | (40,000) | (85,000) | (45,000) |

Note:  Numbers in brackets reflect carve-outs of other programs and therefore do not add to the total.

Cited in City of Los Angeles v. Barr, archived on October 25, 2019. No. 18-12.

# II. Summary of Program Changes

cited in City of Los Angeles v. Barr No. 18-56292 archived on October 25, 2019

| Summary of Program Changes | | | | | |
| --- | --- | --- | --- | --- | --- |
| Program Increases (Discretionary) | | | | | |
| **Item Name** | **Program Description** | **Pos.** | **FTE** | **Dollars ($000)** | **Page** |
| Project Safe Neighborhoods (PSN) Grants | Improves the capacity of state, local, and tribal law enforcement and criminal justice agencies as well as communities to address gun violence, violent crime and gangs. A total of $100 million is | 0 | 0 | 100,000 | 74 |
| Research, Evaluation, and Statistics (NIJ Base Program) | Improves knowledge and understanding of crime and justice issues through science, and provides objective and independent knowledge and tools to reduce crime and promote justice, particularly at the state, local, and tribal levels. Request includes additional funding to support the implementation of a Second Chance Act evaluation per the First Step Act. | 0 | 0 | 1,500 | 78 |
| National Criminal History Improvement Program (NCHIP) | Provides support necessary for states and territories to improve the quality, timeliness, and immediate accessibility of criminal history and related records. These records play a vital role in supporting the National Instant Criminal Background Check System (NICS) and helping federal, state, local, and tribal law enforcement investigate crime and promote public safety. | 0 | 0 | 15,000 | 82 |
| STOP School Violence Act | Assists communities to prevent or mitigate incidents of school violence by promoting coordinated, evidence-based programs that: 1) provide prevention training to school personnel and education to students to protect them from violent school attacks; 2) support development and operation of anonymous threat reporting systems; 3) promote development of school threat assessment and crisis intervention teams; and 4) assist efforts to improve school security through law enforcement training, technology, and implementation of security and deterrent measures. | 0 | 0 | 25,000 | 85 |
| Missing and Exploited Children Program | Enhances the justice system response to missing children and their families by providing funding to the National Center for Missing and Exploited Children (NCMEC).  Additional funding is requested specifically to support the Internet Crimes Against Children (ICAC) Task Force program, and assist OJP's state, local, and tribal partners in operating and improving the AMBER Alert network. | 0 | 0 | 5,000 | 88 |
| Improving Juvenile Indigent Defense Program | Promotes efforts to prevent juvenile crime in the U.S. by improving the capabilities of both juvenile indigent defense systems and juvenile justice system prosecutors. A total of $2.5 million is requested. | 0 | 0 | 500 | 91 |
| Southwest Border Rural Law Enforcement Violent Crime Reduction Initiative | To assist law enforcement agencies serving rural jurisdictions along or near the Southwest Border to address increases in crime, with a special focus on violent crime, in border communities. This program is a carveout of Byrne Justice Assistance Grants (JAG). | [0] | [0] | [6,000] | 94 |
| National Institute of Corrections | Transfers activities of the National Institute of Corrections (NIC) from the Bureau of Prison (BOP) to OJP. This transfer will help to consolidate the Department's state and local corrections related research and evaluation programs within OJP's National Institute of Justice ($3 million) and better align efforts to assist state, local, and tribal corrections professionals with BJA grant programs ($5 million).  Program transferred via adjustments-to-base. | 0 | 0 | [8,000] | 96 |
| **Total, Discretionary Program Increases** | | **0** | **0** | **147,000** | |

cit.ourt archive Los Angeles September 25, 2019

No. 18 bbP archive

19

| Program Decreases (Discretionary) | | | | | |
|---|---|---|---|---|---|
| **Item Name** | **Program Description** | **Pos.** | **FTE** | **Dollars ($000)** | **Page** |
| Byrne Justice Assistance Grants (JAG) Program | Provides flexible grants that are the primary source of federal criminal justice funding for state, local, and tribal jurisdictions. | 0 | 0 | (10,300) | 99 |
| DNA-Related and Forensic Programs and Activities program | Provides a comprehensive strategy to maximize the use of forensic DNA technology in the criminal justice system. | 0 | 0 | (25,000) | 102 |
| National Instant Criminal Background Check System (NICS) Act Record Improvement Program (NARIP) | Assists states, territories, and tribes with updating NICS with the criminal history and mental health records of individuals who are precluded from purchasing or possessing guns. | 0 | 0 | (15,000) | 105 |
| COPS Hiring Program | This program places additional community policing officers on the beat by providing funds for the approved entry-level salary and benefits of each newly hired additional officer position over three years.  A total of $99 million is requested for the COPS Hiring Program under OJP. | 0 | 0 | (126,500) | 108 |
| Paul Coverdell Forensic Science Improvement Grants | Improves the quality of forensic science and medical examiner/ coroner services through laboratory capacity building and backlog reduction programs; training and technical assistance; improved forensic analysis technology; and support for accreditation of medical examiner and coroner office accreditation. | 0 | 0 | (20,000) | 112 |
| Delinquency Prevention Program | Supports evidence-based programs that prevent youth at risk of becoming delinquent and from entering the juvenile justice system and intervene with first-time and non-serious offenders to keep them from further contact with the juvenile justice system. | 0 | 0 | (10,500) | 114 |
| Youth Mentoring Grants | Supports mentoring for youth at risk of educational failure, dropping out of school, or involvement in delinquent activities, including gangs. | 0 | 0 | (36,000) | 118 |
| Court Appointed Special Advocate (CASA) | Provides membership, accreditation, and funding to regional, state, and local organizations to promote effective representation for abused and neglected children by court-appointed volunteer advocates in dependency court hearings. | 0 | 0 | (3,000) | 125 |
| Part B Formula Grants Program (also known as Title II) | Supports state and local efforts to increase prevention and intervention programs for youth, ensure appropriate accountability for delinquent behavior, and improve the juvenile justice system. | 0 | 0 | (2,000) | 125 |
| Economic, High-tech, White Collar and Internet Crime Prevention | Enhances the capacity of state, local, tribal, and territorial criminal justice systems to prevent, investigate, respond to, and prosecute economic, intellectual property, cyber, and high-tech crimes through specialized training and technical assistance. | 0 | 0 | (3,000) | 125 |
| Victims of Child Abuse (VOCA) - Improving Investigation and Prosecution of Child Abuse Program | Enhances the effectiveness of the investigation and prosecution of child abuse cases through training and technical assistance to criminal justice child welfare professionals, as well as support for Children's Advocacy Centers (CACs) and multi-disciplinary investigative teams. | 0 | 0 | (1,000) | 125 |
| | **Total Program Decreases** | **0** | **0** | **(252,300)** | |

20

| Program Eliminations | | | | | |
|---|---|---|---|---|---|
| **Item Name** | **Program Description** | **Pos.** | **FTE** | **Dollars ($000)** | **Page** |
| State Criminal Alien Assistance Program (SCAAP) | Reimburses states and localities for part of their prior year costs for incarcerating illegal aliens with at least one felony or two misdemeanor convictions for violations of state or local law. Eliminating this program will allow the Administration to invest in border enforcement and border security initiatives that will more effectively address the public safety threats posed by criminal aliens. | 0 | 0 | (240,000) | 125 |
| Indian Country | Assists tribes in improving the functioning of their justice systems and making their communities safer.  The proposed up to 7% tribal set-aside will provide for these needs. | 0 | 0 | (35,000) | 125 |
| Byrne Criminal Justice Innovation (BCJI) Program | Supports place-based strategies that combine law enforcement, community policing, prevention, intervention, and treatment, and neighborhood restoration. | 0 | 0 | (17,500) | 125 |
| Justice Reinvestment Initiative | Provides targeted technical assistance to help units of state, local, and tribal governments analyze data on their criminal justice systems, identify what factors are driving increases in prison and jail populations and develop strategies to reduce costs, improve public safety, and help ex-offenders with the transition back into mainstream society. | 0 | 0 | (25,000) | 125 |
| **Total, Program Eliminations** | | **0** | **0** | **(317,500)** | |

| Program Consolidations | | | | | |
|---|---|---|---|---|---|
| **Item Name** | **Program Description** | **Pos.** | **FTE** | **Dollars ($000)** | **Page** |
| Body Worn Camera Partnership Program | In FY 2020, this program is requested as a carve-out under the Byrne/Justice Assistance Grants (JAG) program. | 0 | 0 | (22,500) | 125 |
| Bulletproof Vest Partnership | In FY 2020, this program is requested as a carve-out under the Byrne/Justice Assistance Grants (JAG) program. | 0 | 0 | (22,500) | 125 |
| Capital Litigation Improvement Program | In FY 2020, this program is requested as a carve-out under the Byrne/Justice Assistance Grants (JAG) program. | 0 | 0 | (3,000) | 125 |
| **Total, Program Consolidations** | | **0** | **0** | **(48,000)** | |

| Program Increase (Mandatory) | | | | | |
|---|---|---|---|---|---|
| **Item Name** | **Program Description** | **Pos.** | **FTE** | **Dollars ($000)** | **Page** |
| Public Safety Officers' Benefits – Death Benefits Program (mandatory) | Provides a one-time financial benefit to survivors of public safety officers whose deaths resulted from injuries while in the line of duty | 0 | 0 | 23,000 | 80 |
| **Mandatory Program Increase** | | **0** | **0** | **23,000** | |

| Program Decrease (Mandatory) | | | | | |
|---|---|---|---|---|---|
| **Item Name** | **Program Description** | **Pos.** | **FTE** | **Dollars ($000)** | **Page** |
| Crime Victims Fund | Supports victim services, provides compensation to victims through formula and competitive awards. A total of $1.670 billion is requested for grants to states and tribes. | 0 | 0 | (2,136,000) | 121 |
| **Mandatory Program Decrease** | | **0** | **0** | **(2,136,000)** | |

City of Los Angeles v. Barr, No. 17-cv-07215 at 3392 (C.D. Cal. October 25, 2019)

21

# III. Appropriations Language

cited in City of Los Angeles v. Barr
No. 18-56292 archived on October 25, 2019

**Office of Justice Programs**
**Appropriations Language**

*The FY 2020 Budget request of $4,261,000,000, 644 Positions, and 644 FTE includes proposed changes in the appropriations language listed below.  New language is italicized and underlined.*

## RESEARCH, EVALUATION AND STATISTICS

*For grants, contracts, cooperative agreements, and other assistance authorized by title I of the Omnibus Crime Control and Safe Streets Act of 1968 (Public Law 90–351) ("the 1968 Act"); the Juvenile Justice and Delinquency Prevention Act of 1974 (Public Law 93–415) ("the 1974 Act"); the Missing Children's Assistance Act (title IV of Public Law 93–415); the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003 (Public Law 108–21); the Justice for All Act of 2004 (Public Law 108–405); the Violence Against Women and Department of Justice Reauthorization Act of 2005 (Public Law 109–162) ("the 2005 Act"); the Victims of Child Abuse Act of 1990 (Public Law 101–647); the Second Chance Act of 2007 (Public Law 110–199); the Victims of Crime Act of 1984 (chapter XIV of title II of Public Law 98–473); the Adam Walsh Child Protection and Safety Act of 2006 (Public Law 109–248) ("the Adam Walsh Act"); the PROTECT Our Children Act of 2008 (Public Law 110–401); subtitle C of title II of the Homeland Security Act of 2002 (Public Law 107–296) ("the 2002 Act"); the NICS Improvement Amendments Act of 2007 (Public Law 110–180); the Violence Against Women Reauthorization Act of 2013 (Public Law 113–4) ("the 2013 Act"); the Comprehensive Addiction and Recovery Act of 2016 (Public Law 114–198); and other programs, $94,500,000, to remain available until expended, of which—*

*(1) $48,000,000 is for criminal justice statistics programs, and other activities, as authorized by part C of the 1968 Act; and*

*(2) $46,500,000 is for research, development, and evaluation programs, and other activities as authorized by part B of the 1968 Act and subtitle C of title II of the 2002 Act, of which at least $3,000,000 is for corrections-related research, and up to $1,500,000 is for expenses (including related research and evaluation) associated with the National Institute of Justice's implementation of the First Step Act of 2018.*

## STATE AND LOCAL LAW ENFORCEMENT ASSISTANCE

*For grants, contracts, cooperative agreements, and other assistance authorized by the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322) ("the 1994 Act"); title I of the Omnibus Crime Control and Safe Streets Act of 1968 (Public Law 90–351) ("the 1968 Act"); the Justice for All Act of 2004 (Public Law 108–405); the Victims of Child Abuse Act of 1990 (Public Law 101–647) ("the 1990 Act"); the Trafficking Victims Protection Reauthorization Act of 2005 (Public Law 109–164); the Violence Against Women and Department of Justice Reauthorization Act of 2005 (Public Law 109–162) ("the 2005 Act"); the Adam Walsh Child Protection and Safety Act of 2006 (Public Law 109–248) ("the Adam Walsh Act"); the Victims of Trafficking and Violence Protection Act of 2000 (Public Law 106–386); the NICS Improvement Amendments Act of 2007 (Public Law 110–180); subtitle C of title II of the Homeland Security Act of 2002 (Public Law 107–296) ("the 2002 Act"); the Public Safety*

23

*Officer Medal of Valor Act of 2001 (Public Law 107–12); the Second Chance Act of 2007
(Public Law 110–199); the Prioritizing Resources and Organization for Intellectual Property
Act of 2008 (Public Law 110–403); the Victims of Crime Act of 1984 (chapter XIV of title II of
Public Law 98–473; (34 U.S.C. 20101) ("the 1984 Act"); the Violence Against Women
Reauthorization Act of 2013 (Public Law 113–4) ("the 2013 Act"); the Comprehensive
Addiction and Recovery Act of 2016 (Public Law 114–198) ("CARA"); the Keep Young Athletes
Safe Act of 2018 (36 U.S.C. 220531 et seq.); the Student, Teachers, and Officers Preventing
(STOP) School Violence Act of 2018 (34 U.S.C. 10551 et seq.); the Fix NICS Act of 2018 (title VI
of division S of Public Law 115-141); the Justice Served Act (Public Law 115-257); and other
programs, $1,482,200,000, to remain available until expended as follows—*

*(1) $405,200,000 for the Edward Byrne Memorial Justice Assistance Grant program as
authorized by subpart 1 of part E of the 1968 Act (except that section 1001(c), and the special
rules for Puerto Rico under section 505(g) of the 1968 Act shall not apply for purposes of this
Act): Provided, That up to 3 percent of funds awarded hereunder to a State or local government
must be used by the same to enable its full participation in the National Incident Based
Reporting System under the Uniform Crime Reporting Program, to the extent that such full
participation has not yet been achieved, of which, notwithstanding such subpart 1—*

*(A) $15,000,000 is for an Officer Robert Wilson III memorial initiative on
Preventing Violence Against Law Enforcement Officer Resilience and Survivability
(VALOR);*

*(B) $4,000,000 is for use by the National Institute of Justice for research targeted
toward developing a better understanding of the domestic radicalization phenomenon,
and advancing evidence-based strategies for effective intervention and prevention;*

*(C) $22,500,000 is for a competitive matching grant program for purchases of
body-worn cameras and related expenses, or other innovative or technologically-
sophisticated equipment or tools for State, local and tribal law enforcement;*

*(D) $22,500,000 is for the matching grant program for law enforcement armor
vests, as authorized by section 2501 of the 1968 Act;*

*(E) $3,600,000 is for the operationalization, maintenance, and expansion of the
National Missing and Unidentified Persons System;*

*(F) $5,000,000 is for a program of technical and related assistance to reduce
violence in jurisdictions experiencing significant amounts of violent crime;*

*(G) $15,500,000 is for prison rape prevention and prosecution grants to States
and units of local government, and other programs, as authorized by the Prison Rape
Elimination Act of 2003 (Public Law 108–79);*

*(H) $3,000,000 is for the Capital Litigation Improvement Grant Program, as
authorized by section 426 of Public Law 108–405, or for grants for wrongful conviction
review; and*

*(I) $6,000,000 is for a program to address violent crime along the Southwest
Border;*

*(2) $77,000,000 for victim services programs for victims of trafficking, as authorized by
section 107(b)(2) of Public Law 106–386, by Public Law 109–164, or by Public Law 113–4;*

*(3) $20,000,000 for sex offender management assistance, as authorized by the Adam
Walsh Act, and related activities;*

24

(4) $330,000,000 for comprehensive opioid and stimulant abuse reduction activities, including as authorized by CARA, and for the following programs, which shall address opioid and stimulant abuse reduction consistent with underlying program authorities—

(A) $145,000,000 for a comprehensive opioid and stimulant abuse program;

(B) $75,000,000 for Drug Courts, as authorized by section 1001(a)(25)(A) of the 1968 Act;

(C) $30,000,000 for mental health courts and adult and juvenile collaboration program grants, as authorized by parts V and HH of the 1968 Act, notwithstanding section 2991(e) of such Act of 1968;

(D) $30,000,000 for grants for Residential Substance Abuse Treatment for State Prisoners, as authorized by part S of the 1968 Act;

(E) $20,000,000 for a veterans treatment courts program; and

(F) $30,000,000 for a program to monitor prescription drugs and scheduled listed chemical products;

(5) $11,000,000 for a grant program to prevent and address economic, high technology and Internet crime, including as authorized by section 401 of Public Law 110–403, of which not more than $2,500,000 is for intellectual property enforcement grants, including as authorized by section 401 of Public Law 110–403;

(6) $1,000,000 for the National Sex Offender Public Website;

(7) $100,000,000 for the project safe neighborhoods program, including as authorized by Public Law 115-185;

(8) $75,000,000 for grants to States to upgrade criminal and mental health records and records systems for the National Instant Criminal Background Check System: Provided, That, to the extent warranted by meritorious applications, grants made under the authority of the NICS Improvement Amendments Act of 2007 (Public Law 110–180) and the Fix NICS Act of 2018 (title VI of division S of Public Law 115–141) shall be given priority, and that in no event shall less than $10,000,000 be awarded under such authority;

(9) $10,000,000 for Paul Coverdell Forensic Sciences Improvement Grants under part BB of the 1968 Act;

(10) $105,000,000 for DNA-related and forensic programs and activities, of which—

(A) $97,000,000 is for a DNA analysis and capacity enhancement program and for other local, State, and Federal forensic activities, including the purposes authorized under section 2 of the DNA Analysis Backlog Elimination Act of 2000 (Public Law 106–546) (the Debbie Smith DNA Backlog Grant Program): Provided, That up to 4 percent of funds made available under this paragraph may be used for the purposes described in the DNA Training and Education for Law Enforcement, Correctional Personnel, and Court Officers program (Public Law 108–405, section 303);

(B) $4,000,000 is for the purposes described in the Kirk Bloodsworth Post-Conviction DNA Testing Program (Public Law 108–405, section 412); and

(C) $4,000,000 is for Sexual Assault Forensic Exam Program grants, including as authorized by section 304 of Public Law 108–405;

(11) $47,500,000 for a program for community-based sexual assault and related cold case response reform;

(12) $9,000,000 for the court-appointed special advocate program, as authorized by section 217 of the 1990 Act;

25

*(13) $85,000,000 for offender reentry programs and research, including as authorized by the Second Chance Act of 2007 (Public Law 110–199), without regard to the time limitations specified at section 6(1) thereof, of which, notwithstanding such Act of 2007, not to exceed—*

    *(A) $6,000,000 for a program to improve State, local, and tribal probation or parole supervision efforts and strategies; and*

    *(B) $5,000,000 for Children of Incarcerated Parents Demonstrations to enhance and maintain parental and family relationships for incarcerated parents as a reentry or recidivism reduction strategy;*

*(14) $99,000,000 for grants under section 1701 of the 1968 Act (34 U.S.C. 10381) for the hiring and rehiring of additional career law enforcement officers under part Q of such Act notwithstanding subsection (i) of such section: Provided, That, notwithstanding section 1704(c) of such Act (34 U.S.C. 10384(c)), funding for hiring or rehiring a career law enforcement officer may not exceed $125,000 unless the Director of the Office of Community Oriented Policing Services grants a waiver from this limitation: Provided further, That of the amount made available in this paragraph—*

    *(A) $10,000,000 is for regional information sharing activities, as authorized by part M of the 1968 Act;*

    *(B) $8,000,000 is for community policing development activities in furtherance of the purposes in section 1701 of the 1968 Act (34 U.S.C. 10381);*

    *(C) $10,000,000 is for activities authorized by the POLICE Act of 2016 (Public Law 114-199); and*

    *(D) $2,000,000 is for law enforcement mental health and wellness activities: Provided further, That balances from any fiscal year for these programs or other programs that may have been administered by the Office of Community Oriented Policing Services may be transferred from the Community Oriented Policing Services account to this account;*

*(15) $100,000,000 for school safety programs, including as authorized by the STOP School Violence Act of 2018;*

*(16) $2,500,000 for the Keep Young Athletes Safe Act of 2018; and*

*(17) $5,000,000 for corrections-related training and technical assistance.*

## JUVENILE JUSTICE PROGRAMS

*For grants, contracts, cooperative agreements, and other assistance authorized by the Juvenile Justice and Delinquency Prevention Act of 1974 (Public Law 93–415) ("the 1974 Act"); title I of the Omnibus Crime Control and Safe Streets Act of 1968 (Public Law 90–351) ("the 1968 Act"); the Violence Against Women and Department of Justice Reauthorization Act of 2005 (Public Law 109–162) ("the 2005 Act"); the Missing Children's Assistance Act (title IV of Public Law 93–415); the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003 (Public Law 108–21); the Victims of Child Abuse Act of 1990 (Public Law 101–647) ("the 1990 Act"); the Adam Walsh Child Protection and Safety Act of 2006 (Public Law 109–248) ("the Adam Walsh Act"); the PROTECT Our Children Act of 2008 (Public Law 110–401) ("the 2008 Act"); the Victims of Crime Act of 1984 (chapter XIV of title II of Public Law 98–473) ("the 1984 Act"); the Violence Against Women Reauthorization Act of 2013 (Public Law 113–4) ("the 2013 Act"); the Comprehensive Addiction and Recovery Act of*

*2016 (Public Law 114–198); and other juvenile justice programs, $238,500,000, to remain available until expended as follows—*

*(1) $58,000,000 for programs authorized by section 221 of the 1974 Act: Provided, That of the amounts provided under this paragraph, $500,000 shall be for a competitive demonstration grant program to support emergency planning among State, local and tribal juvenile justice residential facilities: Provided further, That notwithstanding sections 103(26) and 223(a)(11)(A) of the 1974 Act, for purposes of funds appropriated in this Act—*

*(A) the term "adult inmate" shall be understood to mean an individual who has been arrested and is in custody as the result of being charged as an adult with a crime, but shall not be understood to include anyone under the care and custody of a juvenile detention or correctional agency, or anyone who is in custody as the result of being charged with or having committed a delinquent offense;*

*(2) $58,000,000 for youth mentoring programs;*

*(3) $17,000,000 for delinquency prevention, of which, pursuant to sections 261 and 262 of the 1974 Act —*

*(A) $5,000,000 shall be for gang and youth violence education, prevention and intervention, and related activities;*

*(B) $500,000 shall be for an Internet site providing information and resources on children of incarcerated parents;*

*(C) $2,000,000 shall be for competitive grant programs focusing on girls in the juvenile justice system; and*

*(D) $5,000,000 shall be for an opioid-affected youth initiative;*

*(4) $20,000,000 for programs authorized by the 1990 Act;*

*(5) $81,000,000 for missing and exploited children programs, including as authorized by sections 404(b) and 405(a) of the 1974 Act (except that section 102(b)(4)(B) of the 2008 Act shall not apply for purposes of this Act);*

*(6) $2,000,000 for child abuse training programs for judicial personnel and practitioners, as authorized by section 222 of the 1990 Act; and*

*(7) $2,500,000 for grants and training programs to improve juvenile justice prosecution and defense process improvement programs, of which $1,250,000 shall be for programs related to juvenile justice prosecution and $1,250,000 shall be for programs related to juvenile justice defense: Provided, That not more than 10 percent of each amount may be used for research, evaluation, and statistics activities related to juvenile justice and delinquency prevention: Provided further, That not more than 2 percent of each amount designated, other than as expressly authorized by statute, may be used for training and technical assistance related to juvenile justice and delinquency prevention: Provided further, That funds made available for juvenile justice and delinquency prevention activities pursuant to the two preceding provisos may be used without regard to the authorizations associated with the underlying sources of those funds: Provided further, That the three preceding provisos shall not apply to grants and projects administered pursuant to sections 261 and 262 of the 1974 Act and to missing and exploited children programs.*

## PUBLIC SAFETY OFFICER BENEFITS
### (INCLUDING TRANSFER OF FUNDS)

*For payments and expenses authorized under section 1001(a)(4) of title I of the Omnibus Crime Control and Safe Streets Act of 1968, such sums as are necessary (including amounts for administrative costs), to remain available until expended; and $24,800,000 for payments authorized by section 1201(b) of such Act and for educational assistance authorized by section 1218 of such Act, to remain available until expended: Provided, That notwithstanding section 205 of this Act, upon a determination by the Attorney General that emergent circumstances require additional funding for such disability and education payments, the Attorney General may transfer such amounts to "Public Safety Officer Benefits" from available appropriations for the Department of Justice as may be necessary to respond to such circumstances: Provided further, That any transfer pursuant to the preceding proviso shall be treated as a reprogramming under section 504 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.*

## GENERAL PROVISIONS – DEPARTMENT OF JUSTICE
### (INCLUDING TRANSFER OF FUNDS)
### (INCLUDING CANCELLATION OF FUNDS)

*SEC. 210. At the discretion of the Attorney General, and in addition to any amounts that otherwise may be available (or authorized to be made available) by law, with respect to funds appropriated by this title under the headings "Research, Evaluation and Statistics", "State and Local Law Enforcement Assistance", and "Juvenile Justice Programs" or otherwise appropriated or transferred under this Act for administration by the Office of Justice Programs—*

*(1) up to 3 percent of funds made available for grant or reimbursement programs may be used by the Office of Justice Programs to provide training and technical assistance;*

*(2) up to 3 percent of funds made available for grant or reimbursement programs, except for amounts appropriated specifically for research, evaluation, or statistical programs administered by the National Institute of Justice and the Bureau of Justice Statistics, shall be transferred to and merged with funds provided to the National Institute of Justice and the Bureau of Justice Statistics, to be used by them for research, evaluation, or statistical purposes, without regard to the authorizations for such grant or reimbursement programs; and*

*(3) up to 7 percent of funds made available for grant or reimbursement programs may be transferred to and merged with funds under the heading "State and Local Law Enforcement Assistance", for assistance to Indian tribes, without regard to the authorizations for such grant or reimbursement programs.*

*SEC. 211. Upon request by a grantee for whom the Attorney General has determined there is a fiscal hardship, the Attorney General may, with respect to funds appropriated in this or any other Act making appropriations for fiscal years 2017 through 2020 for the following programs, waive the following requirements:*

28

*(1) For the adult and juvenile offender State and local reentry demonstration projects under part FF of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (34 U.S.C. 10631(g)(1)), the requirements under section 2976(g)(1) of such part.*

*(2) For grants to protect inmates and safeguard communities as authorized by section 6 of the Prison Rape Elimination Act of 2003 (34 U.S.C. 30305(c)(3)), the requirements of section 6(c)(3) of such Act.*

*Sec. 214. Discretionary funds that are made available in this Act for the Office of Justice Programs may be used to participate in Performance Partnership Pilots authorized under section 525 of division H of Public Law 115-141, section 525 of division H of Public Law 115-31, section 526 of division H of Public Law 113–76, section 524 of division G of Public Law 113–235, and such authorities as are enacted for Performance Partnership Pilots in an appropriations Act for fiscal years 2019 and 2020.*

*SEC. 215. Of the unobligated balances available from prior year appropriations in the Office of Justice Programs, $85,000,000 are hereby permanently cancelled: Provided, That no amounts may be cancelled from amounts that were designated by the Congress as an emergency requirement pursuant to the Concurrent Resolution on the Budget or the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.*

*SEC. 217. Section 642 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1373) is amended as follows—*

*(a) In subsection (a), by replacing "any government entity or official" with "any government law enforcement entity or official" and by striking all that follows after "from" and inserting the following new paragraphs—*

*"(1) sending to, or receiving from, the Department of Homeland Security information, including information related to the nationality, citizenship, immigration status, removability, scheduled release date and time, home address, work address, or contact information, of any individual in custody or suspected of a violation of law, provided that such information is relevant to the enforcement of the immigration laws as defined in section 101(a)(17) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(17)); or*

*"(2) complying with any lawful request made by the Department of Homeland Security pursuant to its authorities under section 236, 241, or 287 of the Immigration and Nationality Act (8 U.S.C. 1226, 1231, 1357), including any request to maintain custody of the alien for a period not to exceed 48 hours in order to permit assumption of custody by the Department pursuant to a detainer for, or provide reasonable notification prior to the release of, any individual.".*

*(b) In subsection (b)—*

*(1) In the introductory clause, by inserting "law enforcement" before "entity" and by replacing "regarding the immigration status, lawful or unlawful, of any individual", with "information, including information related to the nationality, citizenship, immigration status, removability, scheduled release date and time, home address, work address, or contact information, of any individual currently or previously in custody or currently or previously suspected of a violation of law, provided that such*

City of Los Angeles v. Barr
Filed and archived on October 25, 2019
No. 18-56292

29

*information is relevant to the enforcement of the immigration laws as defined in section 101(a)(17) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(17))";*

*(2) In paragraph (1), by replacing "the U.S. Immigration and Naturalization Service" with "Department of Homeland Security"; and*

*(3) In paragraph (2), by inserting ", collecting, inquiring into, or verifying" after "Maintaining".*

*(c) In subsection (c)—*

*(1) By replacing "the Immigration and Naturalization Service" with "the Department of Homeland Security"; and*

*(2) By replacing "the citizenship or immigration status" with "the nationality, citizenship, or immigration status".*

*(d) After subsection (c), by inserting the following—*

*"(d) The Secretary of Homeland Security or the Attorney General may condition a grant or cooperative agreement awarded by the Department of Homeland Security or the Department of Justice to a State or political subdivision of a state, for a purpose related to immigration, national security, law enforcement, or preventing, preparing for, protecting against or responding to acts of terrorism, on a requirement that the recipient of the grant or cooperative agreement agrees that it will—*

*"(1) Send to the Department of Homeland Security information requested by the Secretary of Homeland Security, or the Secretary's designee, including information related to the nationality, citizenship, immigration status, removability, scheduled release date and time, home address, work address, or contact information of any individual in custody or suspected of a violation of law, provided that such information is relevant to the enforcement of the immigration laws as defined in section 101(a)(17) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(17));*

*"(2) Exchange, at the request of the Secretary of Homeland Security, or the Secretary's designee, information, including information related to the nationality, citizenship, immigration status, removability, scheduled release date and time, home address, work address, or contact information, of any individual in custody or suspected of a violation of law, with any other Federal, State, or local government law enforcement entity, provided that such information is relevant to the enforcement of the immigration laws as defined in section 101(a)(17) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(17));*

*"(3) Not prohibit or restrict any entity, official, or employee from collecting, inquiring into, or verifying information, including information related to the nationality, citizenship, immigration status, removability, scheduled release date and time, home address, work address, or contact information, of any individual in custody or suspected of a violation of law, provided that such information is relevant to the enforcement of the immigration laws as defined in section 101(a)(17) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(17)), and will maintain any such information it may collect, during the period of performance of a grant or cooperative agreement conditioned under this subsection; and*

*"(4) Comply with any lawful request made by the Department of Homeland Security pursuant to its authorities under section 236, 241, or 287 of the Immigration and Nationality Act (8 U.S.C. 1226, 1231, 1357), including any request to maintain custody of the alien for a period not to exceed 48 hours in order to permit assumption of custody by*

30

*the Department pursuant to a detainer for, or provide reasonable notification prior to the release of, any individual.".*

*(e) In the section heading, by replacing "Immigration and Naturalization Service" with "Department of Homeland Security".*

*(f) The Secretary of Homeland Security or the Attorney General may require States and political subdivisions of States that apply for Federal grants or cooperative agreements from the Department of Homeland Security or the Department of Justice to include a certification that they will comply with subsection (d) in their applications for award. The Secretary or the Attorney General may prescribe the form of the certification for the Federal grants and cooperative agreements awarded by their respective Departments.*

*(g) The Secretary of Homeland Security and the Attorney General may enforce the provisions of this Section through any lawful means, including by seeking injunctive or other relief from a court of competent jurisdiction.*

*(h) SEVERABILITY.—The provisions of this section are severable. If any provision of this section, or any application thereof, is found unconstitutional, that finding shall not affect any provision or application of this section not so adjudicated.*

cited in City of Los Angeles v. Barr No. 18-56292 archived on October 25, 2019

# IV. OJP Programs and Performance by Appropriation Account

cited in City of Los Angeles v. Barr No. 18-56292 archived on October 25, 2019

## A.  Management and Administration

**(Dollars in Thousands)**

| *Management and Administration* | Direct Pos. | Estimate FTE | Amount |
|---|---|---|---|
| 2018 Enacted | 711 | 658 | $225,000 |
| 2019 C.R. Rate | 711 | 658 | 225,000 |
| Adjustments to Base and Technical Adjustments | (67) | (14) | 20,000 |
| 2020 Current Services | 644 | 644 | 245,000 |
| 2020 Program Increases | 0 | 0 | 20,000 |
| 2020 Request | 644 | 644 | 245,000 |
| **Total Change 2019-2020** | **(67)** | **(14)** | **20,000** |

## 1.  Account Description

In FY 2020, OJP seeks $245.0 million for management and administration (M&A) costs, and will continue its efforts to streamline grant administration, management, and oversight functions.  The request includes costs related to the consolidation of the Office of Community Oriented Policing Services (COPS) and activities of the National Institute of Corrections (NIC) within OJP, and 69 positions and 34 positions associated with the COPS and NIC consolidation, respectively.

Requested funding in FY 2020 will also support the necessary management and administrative structure and resources needed to accomplish Administration and congressional priorities and ensure sound stewardship of OJP's grant programs.

Making awards each year is only a part of OJP's overall responsibility.  In a given year, OJP's oversight responsibilities and M&A costs arise from not only the grants, cooperative agreements, contracts, and other assistance awarded in that year, but also those remaining active from prior years.  Ensuring sound stewardship and proper management of awards is a continuous process encompassing numerous oversight activities throughout the multi-year life cycle of awards, including risk assessment, programmatic and financial monitoring, audit resolution, performance management, and training and technical assistance.  OJP must monitor all active awards to prevent waste, fraud, and abuse of billions of taxpayer dollars.

The M&A budget also supports the work of OJP's Office of the Assistant Attorney General and its business offices, which are responsible for centrally managing general administrative and business support functions, including human resources, procurement, grants and contracts oversight and risk management, financial management, information technology, and legal services.

## 2.  Performance Tables – N/A

33

## B. Research, Evaluation, and Statistics

**(Dollars in Thousands)**

| Research, Evaluation, and Statistics | Direct Pos. | Estimate FTE | Amount |
|---|---|---|---|
| 2018 Enacted | | | $90,000 |
| 2019 C.R. Rate | | | 90,000 |
| Adjustments to Base and Technical Adjustments | | | 0 |
| 2020 Current Services | | | 90,000 |
| 2020 Program Increases | | | 4, 500 |
| 2020 Program Decreases | | | (0) |
| 2020 Request | | | 94,500 |
| **Total Change 2019-2020** | | | **$4,500** |

## 1. Account Description

OJP strives to ensure integrity of, and respect for, science – including a focus on evidence-based approaches in criminal and juvenile justice. In FY 2020, the Department requests $94.5 million for the Research, Evaluation, and Statistics appropriation account, which is $4.5 million above the FY 2019 C.R. Rate. This appropriation account funds the work of the Bureau of Justice Statistics (BJS) and the National Institute of Justice (NIJ).

### BJS

BJS is the principal federal statistical agency of the Department of Justice as authorized by 34 U.S.C. §§ 10131-10135. BJS' national statistical collections support the Administration's focus on data-driven approaches to reduce crime.

The Criminal Justice Statistics Program is the base program of BJS. In FY 2020, OJP requests $48.0 million for the Criminal Justice Statistics program. With this funding, BJS:

- Collects, analyzes, publishes, and disseminates statistical information on crime, criminal offenders, victims of crime, and the operation of justice systems at all levels of government; and
- Provides technical and financial support to state governments in developing capabilities in criminal justice statistics and improving their criminal history records and information systems.

Current core BJS programs provide statistics on victimization, corrections, law enforcement, federal justice systems, prosecution and adjudication (courts), criminal histories and recidivism, and tribal communities.

### NIJ

NIJ is the research and development arm of the Department of Justice, as authorized by 34 U.S.C. §§ 10121-10123. NIJ enhances the administration of justice and public safety by providing objective, independent, evidence-based knowledge and tools to meet the modern

City of Los Angeles v. Barr
cited in and dated October 25, 2019
No. 18-56292

34

challenges of crime and justice at the state, local, and tribal levels.  NIJ products support practitioners and policy makers across the country.

In FY 2020, the Department requests a total of $46.5 million for NIJ, which includes at least $3.0 million for state and local corrections-related research, which will maintain its commitment to informing criminal justice practice and policy by supporting high-quality research, development, and evaluation in the forensic, social, and physical sciences.  NIJ embraces four important goals:

- Continue to research and evaluate innovative programs, tools, and strategies that provide effective ways to prevent crime and to deliver justice.
- Develop, refine, and test innovative technology to protect law enforcement officers.
- Support basic and applied research to strengthen the science of forensics.
- Develop and support strong partnerships to leverage federal research resources.

In December 2018, the First Step Act was signed by the President.  This Act seeks to reduce recidivism, refine sentencing laws, and eliminate disproportionate penalties for certain crimes.  In addition to reauthorizing key Second Chance Act (SCA) programs, the Act directs NIJ to evaluate the SCA not later than five years after its enactment.  The FY 2020 Budget requests an additional $1.5 million for NIJ to support the first phase of this evaluation, which will focus on identifying appropriate outcome measures for SCA programs.

Additionally, OJP expects to continue ongoing projects supported through a discretionary funding set-aside of up to three percent from OJP programs to augment research, evaluation, and statistics to assess existing programs to ensure their alignment with administration priorities, such as officer safety and crime reduction.  This set-aside provides BJS and NIJ an important source of funding for building and enhancing basic statistical systems to monitor the criminal justice system and for conducting research to identify best practices within that system.

Research, Evaluation, and Statistics

## 2. Performance Tables

| PERFORMANCE AND RESOURCES TABLE | | | | | |
|---|---|---|---|---|---|
| Appropriation: Research, Evaluation, and Statistics | | | | | |
| WORKLOAD/RESOURCES | Target | Actual | Projected | Changes | Requested (Total) |
| | FY 2018 | FY 2018 | FY 2019 Continuing Resolution Level | Current Services Adjustments and FY 2019 Program Changes | FY 2020 Request |
| **Workload** | | | | | |
| Percent of solicitations released on time | 75% | 56.8% | 75% | | TBD |
| Percent of awards made against plan | 90% | 70.5% | 90% | | TBD |
| Total Dollars Obligated | $90,000 | $144,371 | $90,000 | $4,500 | $94,500 |
| -Grants | $55,800 | $105,391 | $65,700 | $3,285 | $68,985 |
| -Non-Grants | $34,200 | $38,980 | $24.300 | $1,215 | $25,515 |
| Percent of Dollars Obligated to Funds Available in the FY | | | | | |
| -Grants | 62% | 73% | 73% | 73% | 73% |
| -Non-Grants | 38% | 27% | 27% | 27% | 27% |

| Total Costs and FTE (reimbursable FTE are included, but reimbursable costs are bracketed and not included in the total) | FTE | $000 | FTE | $000 | FTE | $000 | FTE | $000 | FTE | $000 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | $90,000 | | $144,371 | | $90,000 | | $4,500 | | $94,500 |

| TYPE | PERFORMANCE | FY 2018 | FY 2018 | FY 2019 Continuing Resolution Level | Current Services Adjustments and FY 2019 Program Changes | FY 2020 Request |
|---|---|---|---|---|---|---|
| Long Term Outcome | Average number of user sessions per month on BJS and BJS-sponsored websites, including datasets accessed and downloaded via the Internet [BJS] | 468,600 | 396,137 | 498,000 | -2,000 | 496,000 |
| Annual Outcome | Citations of BJS data in social science journals, and publications of secondary analysis using BJS data [BJS] | 3,200 | 1,106 | 3,300 | 100 | 3,400 |
| Annual Outcome | Number of technologies fielded as a result (in whole or in part) of work funded under the NIJ award [NIJ] | 48 | 38 | 44 | -2 | 42 |

| Performance Measure | Applicable Year | Year Type | Footnote | Footnote Comments |
|---|---|---|---|---|
| Percent of solicitations released "on time" versus planned | 2019, 2020 | FY | Target not available | Targets will be established upon the appropriation of funds |
| Percent of awards made against plan | 2019, 2020 | FY | Target not available | Targets will be established upon the appropriation of funds |

cited in City of Los Angeles v. Barr No. 18-56292 archived on October 25, 2019

36

Research, Evaluation, and Statistics

**PERFORMANCE MEASURE TABLE**

| Office/ Program | BJA/ Regional Information Sharing Systems | Performance Report and Performance Plan targets and actuals | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Appropriation | Research, Evaluations and Statistics | FY | | | | | | | | |

| DOJ Strategic Objective | OJP Strategic Objectives | Type | Performance Measure | 2014 Actual | 2015 Actual | 2016 Actual | 2017 Actual | 2018 Target | 2018 Actual | 2019 Target | 2020 Target |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3.1 | N/A | Outcome | Percent increase in inquiries | 7% | 0.97% | -8% | -6% | 3% | -1% | 3% | 3% |
| 3.1 | N/A | Outcome | Percentage of conflicts identified from RISSafe | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 16% |

| Performance Measure | Applicable Year | Year Type | Footnotes | Footnote Comments |
|---|---|---|---|---|
| Percentage increase in inquiries | 2020 | FY | Other | The FY 2018 actual missed the target. The number of inquiries is influenced by many factors, including the types of crimes under investigation, the complexities of those crimes, regional changes and needs, funding and staffing levels, additions/deletions to investigative databases, and a variety of other factors. A large increase in inquiries was experienced from FY 2011 to FY 2012 (15 percent). Immediately following, however, RISS's budget was reduced 40 percent. This decrease resulted in a workforce reduction, as well as other internal changes to help streamline processes while responding to the needs of RISS's members and users. With fewer staff to aid officers and conduct intelligence research, and mostly flat funding for the years that followed, the impact of the reduction resulted in a ripple effect, causing a reduction in inquiries on RISS resources and impacting an inability for RISS to expand certain investigative databases, as planned. |
| Percentage of conflicts identified from RISSafe | 2020 | FY | This measure was established | This measure is newly established, data collection and reporting effective FY2020. |

**PERFORMANCE MEASURE TABLE**

| Office/Program | NIJ/ National Institute of Justice | Performance Report and Performance Plan targets | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Appropriation | Research, Evaluations and Statistics | FY | | | | | | | | |

| DOJ Strategic Objective | OJP Strategic Objective | Type | Performance Measure | 2014 Actual | 2015 Actual | 2016 Actual | 2017 Actual | 2018 Target | 2018 Actual | 2019 Target | 2020 Target |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3.1 | N/A | Outcome | Number of citations of NIJ products in peer reviewed journals | 485 | 612 | 719 | 749 | 700 | 825 | 700 | 700 |
| 3.1 | N/A | Outcome | Number of technologies fielded as a result (in whole or in part) of work funded under the NIJ award | 31 | 30 | 28 | 29 | 48 | 38 | 44 | 42 |

cited in City of Los Angeles v. Barr No. 18-56292 archived on October 2, 2019

37

Research, Evaluation, and Statistics

| 3.1 | N/A | Outcome | Number of scholarly products that resulted in whole or in part from work funded under the NIJ award. | 93 | 240 | 277 | 301 | 375 | 359 | 350 | 300 |

| PERFORMANCE MEASURE TABLE | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Office/Program** | | BJS/Bureau of Justice Statistics | | Performance Report and Performance Plan targets | | | | | | | |
| **Appropriation** | | Research, Evaluations and Statistics | | FY | | | | | | | |
| **DOJ Strategic Objective** | **OJP Strategic Objective** | **Type** | **Performance Measure** | **2014 Actual** | **2015 Actual** | **2016 Actual** | **2017 Actual** | **2018 Target** | **2018 Actual** | **2019 Target** | **2020 Target** |
| 3.1 | N/A | Outcome | Average number of user sessions per month on BJS and BJS-sponsored websites, including datasets accessed and downloaded via the Internet | 422,519 | 442,554 | 455,604 | 454,956 | 468,605 | 396,137 | 408,021 | 420,262 |
| 3.1 | N/A | Output | Agency-level response rate | 91% | 94% | 96% | 91% | 98% | N/A | 98% | 93% |
| 3.1 | N/A | Output | Citizen-level response rate | 88% | 84% | 84% | 80% | 90% | N/A | 90% | 80% |
| 3.1 | N/A | Outcome | Citations of BJS data in social science journals, and publications of secondary analysis using BJS data | 2,480 | 2,728 | 3,201 | 3,857 | 3,200 | 1,106 | 3,300 | 3,400 |
| 3.1 | N/A | Outcome | Congressional record and testimony citing BJS data | 13 | 39 | 33 | 20 | 40 | 10 | 50 | 40 |
| 3.1 | N/A | Outcome | Federal and state court opinions citing BJS data | 43 | 36 | 48 | 27 | 30 | 41 | 40 | 35 |
| 3.1 | N/A | Outcome | Number of products that BJS makes available online | 18,078 | 18,104 | 18,625 | 18,797 | 22,000 | 19,899 | 22,000 | 22,500 |
| 3.1 | N/A | Output | Number of reports issued within one month of the expected release date | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 |
| 3.1 | N/A | Outcome | Number of requests to seek correction of BJS data in accordance with the BJS Data Quality Guidelines | 1 | 2 | 2 | 2 | 0 | 0 | 0 | 1 |

City of Los Angeles v. Barr No. 18-56292 archived on October 25, 2019

Research, Evaluation, and Statistics

| 3.1 | N/A | Outcome | Number of scheduled data collection series and special analyses to be conducted | 24 | 28 | 32 | 28 | 30 | 30 | 30 | 30 |
|-----|-----|---------|----|----|----|----|----|----|----|----|----|

| Performance Measure | Applicable Year | Year Type | Footnotes | Footnote Comments |
|---------------------|-----------------|-----------|-----------|-------------------|
| Agency-level response rate | 2018 | FY | Data is unavailable | Data will be available late Spring/early Summer 2019. |
| Citizen-level response rate | 2018 | FY | Data is unavailable | Data will be available late Spring/early Summer 2019. |
| Number of products that BJS makes available online | 2018 | FY | Other | The number of products was down as a result of the decrease in the number of reports released. |

cited in City of Los Angeles v. Barr No. 18-56292 archived on October 25, 2019

Research, Evaluation, and Statistics

**C.  State and Local Law Enforcement Assistance**
**(dollars in thousands)**

| State and Local Law Enforcement Assistance | Direct Pos. | Estimate FTE | Amount |
|---|---|---|---|
| 2018 Enacted | | | $1,680,000 |
| 2019 C.R. Rate | | | 1,680,000 |
| Adjustments to Base and Technical Adjustments | | | 0 |
| 2020 Current Services | | | 1,680,000 |
| 2020 Program Increases | | | 244,000 |
| 2020 Program Offsets | | | (441,800) |
| 2020 Request | | | 1,482,200 |
| **Total Change 2019-2020** | | | **($197,800)** |

**1.  Account Description**

In FY 2020, OJP requests $1,482.2 million for the State and Local Law Enforcement Assistance account, which is $197.8 million below the FY 2019 C.R. Rate.

State, local, and tribal law enforcement and criminal justice professionals are responsible for the majority of the Nation's day-to-day crime prevention and control activities.  The programs supported by this account help OJP partners throughout the Nation prevent and reduce the incidence of violent crime; improve law enforcement officer safety; address drug-related crime and substance abuse; and identify innovative solutions to crime- and justice system-related challenges.  These programs include a combination of formula and discretionary grant programs, coupled with robust training and technical assistance activities designed to build and enhance the crime fighting and criminal justice capabilities of OJP's state, local and tribal partners.

Key programs funded under this appropriation account include:

- **Byrne Justice Assistance Grants (JAG)**
  Purpose: Supports a broad range of activities by state, local, and tribal governments to prevent and control crime based on local needs.
  Description: This formula program provides both state and local governments with formula grant awards based on population and FBI violent crime statistics.  These formula grants support a broad range of criminal justice and public safety activities, including:  (1) law enforcement programs; (2) prosecution and court programs; (3) prevention and education programs; (4) community corrections programs; (5) drug treatment and enforcement programs; (6) planning, evaluation, and technology improvement programs; and (7) crime victim and witness programs (other than compensation).  Beginning in FY 2018, jurisdictions are required to dedicate a small percentage of their awards on National Incident Based Reporting System (NIBRS) compliance.  NIBRS is an incident-based system used by law enforcement agencies for collecting and reporting data on crimes.  The FBI plans to transition its Uniform Crime Reporting program to a NIBRS only data collection by 2021.

- **Comprehensive Opioid Abuse Program**
  Purpose:  Authorized under the Comprehensive Addition and Recovery Act (CARA) of 2016 (P.L. 114-198), this program provides grants and technical assistance to support state, local, and tribal governments in effectively responding to the opioid epidemic.
  Description: Grant programs are designed to strengthen law enforcement and community responses to the opioid epidemic and provide support for diversion and alternative to incarceration programs for individuals responsible for low-level, non-violent offenses.

- **Violent Gang and Gun Crime Reduction/Project Safe Neighborhoods (PSN)**
  Purpose: Builds on the work of the Department's ongoing PSN Initiative to create safer neighborhoods through sustained reductions in gang violence and gun crime.
  Description: This program will support DOJ's Project Safe Neighborhoods (PSN) initiative by increasing support for PSN activities at the local level.  Under this program, grants will be awarded to local law enforcement agencies, outreach- and prevention service providers, and researchers to support activities implementing local PSN anti-violence strategies.  The PSN Initiative is based on a proven program model that relies on partnerships of federal, state, and local agencies led by the U.S. Attorney in each federal judicial district to enhance the effectiveness of its crime and violence reduction efforts.  OJP anticipates awarding funds to all 94 districts using a funding formula that includes crime rate data and other indicators of overall need.

- **STOP School Violence Act**
  Purpose: To prevent or mitigate incidents of school violence by promoting coordinated, evidence-based approaches to school safety that encourage collaboration between schools and local law enforcement.
  Description: Grant funding awarded under this program must be used to support evidence-based programs and will be distributed equitably among the geographic regions of the United States and among urban, suburban, and rural areas. Federal funds awarded under the STOP School Violence Act Program may be used to pay up to 75 percent of the total cost of any project that they support, requiring a 25 percent cash or in-kind match from the grantee.

- **DNA and Related Forensics Programs and Activities**
  Purpose: To maximize the use of DNA and other forensic technology in the criminal justice system to ensure accuracy and fairness
  Description: Grants to states to purchase equipment, conduct analysis and review of data, and upload data into national databases. DNA and forensic science can speed the prosecution of the guilty, protect the innocent from wrongful prosecution, and exonerate those wrongfully convicted of a crime.

- **National Sexual Assault Kit Initiative (SAKI)**
  Purpose: Addresses a common gap in response to rape and sexual assault at the state, local, and tribal levels by promoting timely resolution of cases associated with sexual assault kits (SAKs) that have never been submitted or are backlogged at crime labs for forensic DNA testing.  In FY 2020, this program will also focus on related cold-case investigations.
  Description: This program supports community efforts to identify critical needs in the areas of sexual assault prevention, investigation, prosecution, and victims' services and to

Cited in City of Los Angeles v. Barr
No. 18-56292 archived on October 25, 2019

State and Local Law Enforcement Assistance

implement strategies to address these needs.  These strategies typically include plans for expediting the analysis of untested evidence kits.  This program also provides training and technical assistance designed to improve the justice system's response to rape and sexual assault cases throughout the Nation. In addition, there are a significant number of violent serial offenders being linked to SAKs. Not only are these offenders committing sexual assaults, but they are frequently responsible for homicides and other violent offenses.

- **National Public Safety Partnership Program (PSP)**
  Purpose: Offers a comprehensive approach to accessing DOJ training, technical assistance, and expertise to support the development of innovative violence reduction strategies in the Nation's most violent cities.
  Description: DOJ and its federal partners invite cities to participate in this program based on analysis of quantitative and qualitative criminal justice data.  Cities that accept this invitation begin a two-year engagement with PSP.  Each city develops a data-driven approach to addressing its unique violence reduction needs during the first year of its engagement.  During the second year, the cities draw on the training, technical assistance, and expertise of OJP and its federal agency partners to assist them in implementing their strategies.  In FY 2020, this program is requested as a carveout of the Byrne JAG Program.

- **Second Chance Act (SCA) Program**
  Purpose: Reduce criminal recidivism by assisting ex-offenders successfully reintegrate into their communities following a prison or jail sentence, thus increasing public safety.
  Description: The SCA program provides grants to help state, local, and tribal corrections and public safety agencies implement and improve a variety of reentry services including housing, educational and employment assistance, mentoring relationships, mental health services, substance abuse treatment services, and family-support services.  A significant body of research indicates that properly designed and implemented reentry programs not only help to reduce recidivism, but also improve outcomes for those released from prison or jail.  The Second Chance Act was reauthorized in the First Step Act, which became law in December 2018 and seeks to reduce recidivism, refine sentencing laws, and eliminate disproportionate penalties for certain crimes.

- **National Criminal History Improvement Program (NCHIP)**
  Purpose: Improves the Nation's safety and security by enhancing the quality and completeness of electronic criminal history record information contributing to the effective implementation of background check systems.
  Description: NCHIP provides grants, training, and technical assistance that help states and territories to improve the accuracy, timeliness, and immediate accessibility of criminal history and related records. These records play a vital role in supporting the National Instant Criminal Background Check System (NICS) and helping federal, state, local, and tribal law enforcement investigate crime and promote public safety.

- **Prison Rape Elimination Act (PREA) Program**
  Purpose: Supports efforts to prevent, detect, and respond to sexual abuse in all state, local, and tribal confinement facilities by helping correctional facilities implement the national PREA standards and monitor the incidence of sexual misconduct in their facilities.

State and Local Law Enforcement Assistance

<u>Description</u>: This program provides grant funding and training and technical assistance to help state, local, and tribal governments ensure their detention and correctional facilities comply with the national PREA standards. It also supports the collection of national-level statistics used to monitor the incidence of prison rape and related sexual offenses.

- **Adam Walsh Act Implementation Grant Program**
  <u>Purpose</u>: Supports state, local, and tribal governments to implement the provisions of the Sex Offender Registration and Notification Act (SORNA), Title I of the Adam Walsh Act.
  <u>Description</u>: This program provides grants and technical assistance to assist jurisdictions with SORNA implementation and with improving practices to aid in the reduction and prevention of sexual violence.

cited in City of Los Angeles v. Barr
No. 18-56292 archived on October 25, 2019

State and Local Law Enforcement Assistance

## 2. Performance Tables

| PERFORMANCE AND RESOURCES TABLE | | | | | |
|---|---|---|---|---|---|
| Appropriation: State and Local Law Enforcement Assistance | | | | | |
| | | | | | |
| WORKLOAD/RESOURCES | Target | Actual | Projected | Changes | Requested (Total) |
| | FY 2018 | FY 2018 | FY 2019 | Current Services Adjustments and FY 2019 Program Changes | FY 2020 Request |
| **Workload** | | | | | |
| Percent of solicitations released on time | 75% | 28.6% | 75% | | TBD |
| Percent of awards made against plan | 90% | 39.3% | 90% | | TBD |
| Total Dollars Obligated | $1,680,000 | $1,353,788 | $1,680,000 | -$197,800 | $1,482,200 |
| -Grants | $1,377,600 | $1,218,409 | $1,512,000 | -$178,020 | $1,333,980 |
| -Non-Grants | $302,400 | $135,379 | $168,000 | -$19,780 | $148,220 |
| Percent of Dollars Obligated to Funds Available in the FY | | | | | |
| -Grants | 82% | 90% | 90% | 90% | 90% |
| -Non-Grants | 18% | 10% | 10% | 10% | 10% |

| Total Costs and FTE (reimbursable costs are included, but reimbursable costs are bracketed and not included in the total) | FTE | $000 | FTE | $000 | FTE | $000 | FTE | $000 | FTE | $000 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | $1,680,000 | | $1,353,788 | | $1,680,000 | | -$197,800 | | $1,482,200 |

| TYPE | PERFORMANCE | FY 2018 | FY 2018 | FY 2019 | Current Services Adjustments and FY 2019 Program Changes | FY 2020 Request |
|---|---|---|---|---|---|---|
| Outcome | Percent of participants who reoffend while participating in the Drug Court program (long-term) | 1% | 4% | 9% | -4% | 5% |
| Outcome | Percent of drug court participants who graduate from the drug court program | 51% | 52% | 55% | 0 | 55% |
| Output | Number of participants in RSAT | 25,000 | TBD | 22,000 | 0 | 22,000 |
| Outcome | Percent increase in the number of DNA profile uploads into the Combined DNA Index System (CODIS) system from the previous fiscal year. | 5% | 7% | 10% | -2% | 8% |

| Performance Measure | Applicable Year | Year Type | Footnote | Footnote Comments |
|---|---|---|---|---|
| Percent of solicitations released on time versus planned | 2019, 2020 | FY | Target not available | Targets will be established upon the appropriation of funds |
| Percent of awards made against plan | 2019, 2020 | FY | Target not available | Targets will be established upon the appropriation of funds |
| Number of participants in RSAT | 2018 | FY | Data is unavailable | Data will become available in March 2019. |

Cited in City of Los Angeles v. Barr
No. 18-56292 archived on October 25, 20

| PERFORMANCE MEASURE TABLE | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Office/Program | BJS/NCHIP | | Performance Report and Performance Plan targets | | | | | | | | |
| Appropriation | State and Local Law Enforcement Assistance | | FY | | | | | | | | |
| DOJ Strategic Objective | OJP Strategic Objective | Type | Performance Measure | 2014 Actual | 2015 Actual | 2016 Actual | 2017 Actual | 2018 Target | 2018 Actual | 2019 Target | 2020 Target |
| 3.1 | 4.2 | Output | Number of states in Interstate Identification Index (III) System | 51 | 51 | 51 | 51 | 52 | 51 | 52 | 52 |
| 3.1 | 4.2 | Output | Number of states participating in the FBI's Next Generation Identification (NGI) system | 55 | 55 | 55 | 55 | 56 | 55 | 56 | 56 |
| 3.1 | 4.2 | Output | Number of states participating in the FBI's protection order file | 53 | | 53 | 53 | 54 | 53 | 54 | 54 |
| 3.1 | 4.2 | Output | Number of states submitting data to the National Instant Criminal Background Check System Index (NICS Index) (at least 10 records) | 46 | 48 | 49 | 49 | 53 | 52 | 53 | 53 |
| 3.1 | 4.2 | Outcome | Percentage of applications for firearms transfers rejected primarily for the presence of a prior felony conviction history | 1.3% | 1.5% | TBD | N/A | 2% | TBD | 2% | 2% |
| 3.1 | 4.2 | Outcome | Percentage of recent state records which are automated | 95% | NA | 96% | N/A | 98% | TBD | N/A | 98% |
| 3.1 | 4.2 | Outcome | Percentage of records accessible through Interstate Identification Index | 81% | NA | 86% | N/A | 82% | TBD | N/A | 86% |

Not cited in City of Los Angeles v. Barr
No. 2:12 archived on October 25, 2019

| Performance Measure | Applicable Year | Year Type | Footnotes | Footnote Comments |
|---|---|---|---|---|
| Percentage of applications for firearms transfers rejected primarily for the presence of a prior felony conviction history | 2018 | FY | Data is unavailable | Data has not been published. |
| Percentage of recent state records which are automated | 2018 | FY | Data is unavailable | Data provided from biennial report of state criminal history information systems (late 2018). |
| Percentage of records accessible through Interstate Identification Index | 2018 | FY | Data is unavailable | Data provided from biennial report of state criminal history information systems (late 2018). |

| PERFORMANCE MEASURE TABLE | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Office/Program | NIJ/DNA Program | | | Performance Report and Performance Plan targets | | | | | | | | |
| Appropriation | State and Local Law Enforcement Assistance | | | FY | | | | | | | | |
| DOJ Strategic Objective | OJP Strategic Objective | Type | Performance Measure | 2014 Actual | 2015 Actual | 2016 Actual | 2017 Actual | 2018 Target | 2018 Actual | 2019 Target | 2020 Target |
| 3.1 | 1.1 | Outcome | Percent increase in the number of DNA profile uploads into the Combined DNA Index System (CODIS) system from the previous fiscal year. | 27% | 7% | | 7% | 5% | 7% | 10% | 8% |

| PERFORMANCE MEASURE TABLE | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Office/Program | NIJ/Coverdell Program | | | Performance Report and Performance Plan targets | | | | | | | | |
| Appropriation | State and Local Law Enforcement Assistance | | | FY | | | | | | | | |
| DOJ Strategic Objective | OJP Strategic Objective | Type | Performance Measure | 2014 Actual | 2015 Actual | 2016 Actual | 2017 Actual | 2018 Target | 2018 Actual | 2019 Target | 2020 Target |
| 3.1 | 1.1 | Outcome | TBD | N/A | N/A | N/A | N/A | N/A | N/A | N/A | TBD |

cited in City of Los Angeles v. Barr
No. 18-56292 archived on October 25, 2019

State and Local Law Enforcement Assistance

| Performance Measure | Applicable Year | Year Type | Footnotes | Footnote Comments |
|---|---|---|---|---|
| TBD | 2020 | FY | Other | This measure is currently under development and will be newly established, reporting effective FY2020. |

| PERFORMANCE MEASURE TABLE | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Office/Program | BJA/Drug Court Programs | | Performance Report and Performance Plan targets and actuals | | | | | | | | | |
| Appropriation | State and Local Law Enforcement Assistance | | FY | | | | | | | | | |
| DOJ Strategic Objective | OJP Strategic Objective | Type | Performance Measure | 2014 Actual | 2015 Actual | 2016 Actual | 2017 Actual | 2018 Target | 2018 Actual | 2019 Target | 2020 Target |
| 3.1 | N/A | Outcome | Percent of participants who reoffend while participating in the Drug Court program | 9% | 2% | 5% | 4% | 11% | 4% | 9% | 5% |
| 3.1 | N/A | Outcome | Percent of Drug Court program participants, enrolled in the program at least 90 days, who tested positive for alcohol or illegal substance | 22% | 23% | 26% | 27% | 22% | 24% | 22% | 22% |
| 3.1 | N/A | Outcome | Percent of drug court participants who graduate from the drug court program | 51% | 53% | 56% | 48% | 51% | 52% | 55% | 55% |
| 3.1 | N/A | Efficiency | Program cost per drug court graduate | $6,953 | N/A | $9,366 | $3,892 | $11,708 | $4,888 | $11,708 | N/A |

| Performance Measure | Applicable Year | Year Type | Footnotes | Footnote Comments |
|---|---|---|---|---|
| Program cost per drug court graduate | 2017 | FY | Other | The cost per drug court graduate in FY 2017 is much lower than expected. This is partially due to 2 large counties that "graduated" a large number of participants with federal awards less than $300,000. |
| Program cost per drug court graduate | 2020 | FY | This measure was discontinued | Reporting for this measure will conclude FY2020. The BJA-funded portion of a Drug Court Program is often only a small percentage of the funding that supports a drug court. Since BJA does not collect data on the other funding sources of its grantees in a systematic way, this measure is not a true reflection of the cost per drug court graduate. Thus it is being retired. |

| PERFORMANCE MEASURE TABLE | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Office/Program** | BJA/Prescription Drug Monitoring Program | | Performance Report and Performance Plan targets and actuals | | | | | | | | |
| **Appropriation** | State and Local Law Enforcement Assistance | | FY | | | | | | | | |
| **DOJ Strategic Objective** | **OJP Strategic Objective** | **Type** | **Performance Measure** | **2014 Actual** | **2015 Actual** | **2016 Actual** | **2017 Actual** | **2018 Target** | **2018 Actual** | **2019 Target** | **2020 Target** |
| 3.1 | N/A | Outcome | Number of interstate unsolicited reports produced | 26,376 | 1,890 | 3,033,593 | 903,010 | 16,208 | TBD | 1,000,000 | N/A |
| 3.2 | N/A | Outcome | Number of interstate solicited reports produced | 4,640,553 | 3,776,750 | 63,840,510 | 132,430,898 | 8,600,000 | TBD | 8,600,000 | N/A |
| 3.1 | N/A | Outcome | Percent of grantees with a registered prescriber rate above 65% in their state PDMPs | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 0.50% |

cited in City of Los Angeles v. Barr
No. 18-56292 archived on October 25, 2019

| Performance Measure | Applicable Year | Year Type | Footnotes | Footnote Comments |
|---|---|---|---|---|
| Number of interstate solicited reports produced | 2018 | FY | Data is unavailable | Data will become available March 2019. |
| Number of interstate unsolicited reports produced | 2018 | FY | Data is unavailable | Data will become available March 2019. |
| Number of interstate solicited reports produced | 2020 | FY | This measure was discontinued | This measures is being retired. This measure has proven to be very volatile and does not seem to be linked well to program funding. Rather, other environmental factors, including the number of prescriptions being filled, have a larger impact on this measure. Due to its volatility, this measure should be retired and replaced with a different PDMP measure (see below). |
| Number of interstate unsolicited reports produced | 2020 | FY | This measure was discontinued | This measures is being retired. This measure has proven to be very volatile and does not seem to be linked well to program funding. Rather, other environmental factors, including the number of prescriptions being filled, have a larger impact on this measure. Due to its volatility, this measure should be retired and replaced with a different PDMP measure (see below). |
| Percent of grantees with a registered prescriber rate above 65% in their state PDMPs | 2020 | FY | This measure was established | This measure is newly established, data collection and reporting effective FY2020. This measure should be added in place of the other PDMP measures. 49 states, the District of Columbia and Guam have a PDMP that is operational. However, states vary in their level of maturity and level of use among prescribers. PDMPs are working toward increasing the utilization of PDMPs by prescribers and end users for things such as solicited and unsolicited reports (i.e., reports that may indicate |

State and Local Law Enforcement Assistance

| | | | suspicions or questionable prescribing practices). This measure is appropriate for this program because PDMPs are only as good as the data that is entered into the databases, primarily done through prescribers. As the prescriber registration rate increase, PDMPs utility across all users also increases. |
|---|---|---|---|

### PERFORMANCE MEASURE TABLE

| Office/Program | BJA/Byrne Memorial Justice Assistance Grants | Performance Report and Performance Plan targets and actuals | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Appropriation | State and Local Law Enforcement Assistance | FY | | | | | | | | |
| DOJ Strategic Objective | OJP Strategic Objective | Type | Performance Measure | 2014 Actual | 2015 Actual | 2016 Actual | 2017 Actual | 2018 Target | 2018 Actual | 2019 Target | 2020 Target |
| 3.1 | N/A | Outcome | Successful completion rate for individuals participating in drug-related JAG Programs | 62% | 63% | 62% | 63% | 57% | 47% | 59% | 0% |

| Performance Measure | Applicable Year | Year Type | Footnotes | Footnote Comments |
|---|---|---|---|---|
| Successful completion rate for individuals participating in drug-related JAG Programs | 2018 | FY | Other | The target was likely missed due to one grantee's extremely low completion rate (8%). Removing this outlier provides an adjusted 54% completion rate bringing the actual closer to target. |

cited in City of Los Angeles v. Barr
No. 18-56292 archived on October 25, 2019

### PERFORMANCE MEASURE TABLE

| Office/Program | BJA/Second Chance Act | Performance Report and Performance Plan targets and actuals | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Appropriation | State and Local Law Enforcement Assistance | FY | | | | | | | | |
| DOJ Strategic Objective | OJP Strategic Objective | Type | Performance Measure | 2014 Actual | 2015 Actual | 2016 Actual | 2017 Actual | 2018 Target | 2018 Actual | 2019 Target | 2020 Target |
| 3.1 | N/A | Output | Number of participants in SCA-funding programs | 7,047 | 6,006 | 6,222 | 5,352 | 4,356 | 5,042 | 4,356 | N/A |
| 3.1 | N/A | Outcome | Percent of participants from the SCA Co-Occurring program completing the | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 60% |

State and Local Law Enforcement Assistance

| | | program that were successful | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

| Performance Measure | Applicable Year | Year Type | Footnotes | Footnote Comments |
|---|---|---|---|---|
| Number of participants in SCA-funding programs | 2020 | FY | This measure was discontinued | This measure is being retired. Going forward, SCA Improving Reentry for Adults with Co-Occurring Substance Abuse and Mental Illness grantees will increase activities focused on system and process improvements. (see below) |
| Percent of participants from the SCA Co-Occurring program completing the program that were successful | 2020 | FY | This measure was established | This measure is newly established, data collection and reporting effective FY2020. This new measure more directly relates to grantee effectiveness in ensuring successful program completion among participants (rather than the overall number of participants). |

### PERFORMANCE MEASURE TABLE

| Office/Program | BJA/Tribal Program | | | | | | | Performance Report and Performance Plan targets and actuals | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Appropriation | State and Local Law Enforcement Assistance | | | | | | | FY | | | |

| DOJ Strategic Objective | OJP Strategic Objective | Type | Performance Measure | 2014 Actual | 2015 Actual | 2016 Actual | 2017 Actual | 2018 Target | 2018 Actual | 2019 Target | 2020 Target |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3.1 | N/A | Output | Number of individuals in Indian Country that are receiving substance abuse treatment services (in-patient or out-patient), including Healing-to-Wellness Court | 0 | 0 | 783 | 553 | 0 | 518 | 500 | 500 |
| 3.1 | N/A | Outcome | Graduation/completion rate of program participants in a Drug Court/Healing-To-Wellness/Treatment program | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 55% |

| Performance Measure | Applicable Year | Year Type | Footnotes | Footnote Comments |
|---|---|---|---|---|
| Number of individuals in Indian Country that are receiving substance abuse treatment services (in- | 2018 | FY | Other | Targets were not established until FY 2019; this measure was established in FY 2016. |

cited in City of Los Angeles v. Barr No. 18-56292, archived on October 25, 2019

State and Local Law Enforcement Assistance

| | Year | Type | | |
|---|---|---|---|---|
| patient or out-patient), including Healing-to-Wellness Court | | | | |
| Graduation/completion rate of program participants in a  Drug Court/Healing-To-Wellness/ /Treatment program | 2020 | FY | This measure was established | This measure is newly established, reporting effective FY2020. |

| PERFORMANCE MEASURE TABLE | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Office/Program | BJA/Project Safe Neighborhoods (PSN) | | | Performance Report and Performance Plan targets and actuals | | | | | | | | |
| Appropriation | State and Local Law Enforcement Assistance | | | FY | | | | | | | | |
| DOJ Strategic Objective | OJP Strategic Objective | Type | Performance Measure | 2014 Actual | 2015 Actual | 2016 Actual | 2017 Actual | 2018 Target | 2018 Actual | 2019 Target | 2020 Target |
| 3.1 | N/A | Output | Number of grants made to state and local law enforcement agencies to promote police/community partnerships for crime reduction | N/A | N/A | N/A | N/A | 15 | 86 | 94 | 94 |

cited in City of Los Angeles v. Barr
No. 18-56292 archived on October 25, 2019

| Performance Measure | Applicable Year | Year Type | Footnotes | Footnote Comments |
|---|---|---|---|---|
| Number of grants made to state and local law enforcement agencies to promote police/community partnerships for crime reduction | 2018 | FY | This measure was established. | The FY 2019 target assumes that the PSN program will be administered as a block grant. |

| PERFORMANCE MEASURE TABLE | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Office/Program | BJA/RSAT | | | Performance Report and Performance Plan targets and actuals | | | | | | | | |
| Appropriation | State and Local Law Enforcement Assistance | | | CY | | | | | | | | |
| DOJ Strategic Objective | OJP Strategic Objective | Type | Performance Measure | 2014 Actual | 2015 Actual | 2016 Actual | 2017 Actual | 2018 Target | 2018 Actual | 2019 Target | 2020 Target |
| 3.1 | 3.4 | Output | Number of participants in RSAT | 26,815 | 24,162 | 24,029 | 19,628 | 25,000 | TBD | 22,000 | 22,000 |

State and Local Law Enforcement Assistance

| 3.1 | N/A | Outcome | Percent of drug and alcohol tests from residential program participants that were drug and alcohol free | N/A | N/A | 94% | 92% | 95% | TBD | 95% | 95% |
| 3.1 | N/A | Outcome | Percent jail based/residential successful completions | 72% | N/A | 68% | 69% | 70% | TBD | 70% | 70% |
| 3.1 | N/A | Outcome | Percent of jail based/residential participants tested positive for alcohol or illegal substances | 4% | N/A | 5% | 8% | 5% | TBD | 5% | N/A |
| 3.1 | N/A | Outcome | Percent of participants who successfully completed all requirements of the aftercare portion of the RSAT program | 38% | N/A | 28% | 51% | 47% | TBD | 47% | 47% |
| 3.1 | N/A | Outcome | Percent of participants that successfully completed aftercare who were arrested on a new charge | 0 | 0 | 7% | N/A | 10% | TBD | 10% | N/A |

| Performance Measure | Applicable Year | Year Type | Footnotes | Footnote Comments |
| --- | --- | --- | --- | --- |
| Number of participants in RSAT | 2018 | FY | Data is unavailable | Data will become available March 2019 |
| Percent of drug and alcohol tests from residential program participants that were drug and alcohol free | 2018 | FY | Data is unavailable | Data will become available March 2019 |
| Percent jail based/residential successful completions | 2018 | FY | Data is unavailable | Data will become available March 2019 |
| Percent of jail based/residential participants tested positive for alcohol or illegal substances | 2018 | FY | Data is unavailable | Data will become available March 2019 |
| Percent of participants who successfully completed all requirements of the aftercare portion of the RSAT program | 2018 | FY | Data is unavailable | Data will become available March 2019 |
| Percent of participants that successfully completed aftercare who were arrested on a new charge | 2018 | FY | Data is unavailable | Data will become available March 2019 |
| Percent of jail based/residential participants tested positive for alcohol or illegal substances | 2020 | FY | This measure was discontinued | Reporting on this measure will conclude in FY2020 |
| Percent of participants that successfully completed aftercare who were arrested on a new charge | 2020 | FY | This measure was discontinued | Reporting on this measure will conclude in FY2020 |

cited in City of Los Angeles v. Barr
No. 18-56292 archived on October 25, 2019

State and Local Law Enforcement Assistance

| PERFORMANCE MEASURE TABLE | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Office/Program** | BJA/Comprehensive Opioid Abuse Program | Performance Report and Performance Plan targets and actuals | | | | | | | | | | |
| **Appropriation** | State and Local Law Enforcement Assistance | FY | | | | | | | | | | |
| **DOJ Strategic Objective** | **OJP Strategic Objective** | **Type** | **Performance Measure** | **2014 Actual** | **2015 Actual** | **2016 Actual** | **2017 Actual** | **2018 Target** | **2018 Actual** | **2019 Target** | **2020 Target** |
| 3.1 | N/A | Outcome | Percent of individuals that received services (recovery support or substance abuse treatment) who do not experience a subsequent overdose within the 6 months following their referral into the program | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 10% |

| Performance Measure | Applicable Year | Year Type | Footnotes | Footnote Comments |
|---|---|---|---|---|
| Percent of individuals that received services (recovery support or substance abuse treatment) who do not experience a subsequent overdose within the 6 months following their referral into the program | 2020 | FY | This measure was established | This measure is newly established, reporting effective FY2020. |

| PERFORMANCE MEASURE TABLE | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Office/Program** | BJA/Justice and Mental Health Collaboration Program | Performance Report and Performance Plan targets and actuals | | | | | | | | | | |
| **Appropriation** | State and Local Law Enforcement Assistance | FY | | | | | | | | | | |
| **DOJ Strategic Objective** | **OJP Strategic Objective** | **Type** | **Performance Measure** | **2014 Actual** | **2015 Actual** | **2016 Actual** | **2017 Actual** | **2018 Target** | **2018 Actual** | **2019 Target** | **2020 Target** |
| 3.1 | N/A | Outcome | % of participants who were tested that did not test positive for the presence of alcohol or illicit substances during the reporting period | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 83% |

| Performance Measure | Applicable Year | Year Type | Footnotes | Footnote Comments |
|---|---|---|---|---|
| | | | | |

cited by City of Los Angeles v. Barr
No. 18-56292 archived on October 25, 2019

53

State and Local Law Enforcement Assistance

| Percent of participants who were tested that did not test positive for the presence of alcohol or illicit substances during the reporting period | 2020 | FY | This measure was established | This measure is newly established, reporting effective FY2020. |
|---|---|---|---|---|

**PERFORMANCE MEASURE TABLE**

| Office/Program | OJJDP/Drug Court Program | | | | | | Performance Report and Performance Plan targets and actuals | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Appropriation | State and Local Law Enforcement Assistance | | | | | | FY | | | | | | |
| DOJ Strategic Objective | OJP Strategic Objective | Type | Performance Measure | 2014 Actual | 2015 Actual | 2016 Actual | 2017 Actual | 2018 Target | 2018 Actual | 2019 Target | 2020 Target |
| 3.1 | N/A | Outcome | Percent of participants successfully completing program requirements (e.g. Graduation Rate) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | TBD |

| Performance Measure | Applicable Year | Year Type | Footnotes | Footnote Comments |
|---|---|---|---|---|
| Percent of participants successfully completing program requirements (e.g., Graduation Rate) | 2020 | FY | This measure was established | This measure is newly established, reporting effective FY2020. |

**PERFORMANCE MEASURE TABLE**

| Office/Program | OJJDP/Second Chance Act Program | | | | | | Performance Report and Performance Plan targets and actuals | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Appropriation | State and Local Law Enforcement Assistance | | | | | | FY | | | | | | |
| DOJ Strategic Objective | OJP Strategic Objective | Type | Performance Measure | 2014 Actual | 2015 Actual | 2016 Actual | 2017 Actual | 2018 Target | 2018 Actual | 2019 Target | 2020 Target |
| 3.1 | N/A | Outcome | Percent of participants successfully completing program requirements (e.g. Graduation Rate) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | TBD |

| Performance Measure | Applicable Year | Year Type | Footnotes | Footnote Comments |
|---|---|---|---|---|
| Percent of participants successfully completing program requirements (e.g., Graduation Rate) | 2020 | FY | This measure was established | This measure is newly established, reporting effective FY2020. |

cited in City of Los Angeles v. Barr
No. 18-56292 archived on October 25, 2019

54

State and Local Law Enforcement Assistance

## D. Juvenile Justice Programs

*(Dollars in Thousands)*

| Juvenile Justice Programs | Direct Pos. | Estimate FTE | Amount |
|---|---|---|---|
| 2018 Enacted | | | $282,500 |
| 2019 C.R. Rate | | | 282,500 |
| Adjustments to Base and Technical Adjustments | | | 0 |
| 2020 Current Services | | | 282,500 |
| 2020 Program Increases | | | 5,500 |
| 2020 Program Offsets | | | (49,500) |
| 2020 Request | | | 238,500 |
| **Total Change 2019-2020** | | | **($44,000)** |

## 1. Account Description

In FY 2020, OJP requests $238.5 million for the Juvenile Justice Programs account, which is $44.0 million below the FY 2019 C.R. Rate. This account supports programs that help state, local, and tribal governments address juvenile crime and delinquency, and assist children victimized by crime and abuse. Office of Juvenile Justice and Delinquency Prevention (OJJDP) programs also promote efforts to improve the functioning of the juvenile justice system; hold juvenile offenders accountable for their actions; and provide appropriate reentry services for youth returning to their communities after detention in secure correctional facilities.

Key programs funded under this appropriation account include:

- **Missing and Exploited Children (MEC) Program**
  Purpose: Supports and enhances the response to missing children and their families.
  Description: This program supports the infrastructure for national efforts to prevent and respond to the abduction and exploitation of America's children. The MEC program supports the Internet Crimes Against Children Task Force Program, National Center for Missing and Exploited Children, and the AMBER Alert Program.

- **Part B Formula Grants**
  Purpose: Supports state and local programs designed to prevent and address juvenile crime and delinquency, as well as improve the juvenile justice system.
  Description: This program awards formula grants to states, which then issue awards and subawards to agencies and organizations at the local and tribal levels. Grantees may use these awards and subawards to: 1) support the development and implementation of comprehensive state juvenile justice plans; 2) improve the fairness and responsiveness of the juvenile justice system and ensure juvenile offender accountability; and 3) fund training and technical assistance to help small, non-profit and faith-based organizations with the federal grants process.

Public Safety Officers' Benefits

- **Victims of Child Abuse (VOCA) – Improving Investigation and Prosecution of Child Abuse Program**
  <u>Purpose</u>: Enhances the effectiveness of the investigation and prosecution of child abuse cases.
  <u>Description</u>: This program provides training and technical assistance to professionals involved in investigating, prosecuting, and treating child abuse. It also supports the development of Children's Advocacy Centers and multidisciplinary teams that prevent the inadvertent re-victimization of an abused child by the justice and social service systems.

- **Youth Mentoring Program**
  <u>Purpose</u>: To reduce juvenile delinquency, gang involvement, academic failure, victimization, and school dropout rates through one-on-one, group, and/or peer mentoring.
  <u>Description</u>: Through this program, OJJDP increases the capacity of state and local jurisdictions and tribal governments to develop, implement, expand, evaluate, and sustain youth mentoring efforts that incorporate evidence-based findings of best practices and principles.

cited in City of Los Angeles v. Barr
No. 18-56292 archived on October 25, 2019

Public Safety Officers' Benefits

## 2. Performance Tables

| PERFORMANCE AND RESOURCES TABLE | | | | | |
|---|---|---|---|---|---|
| Appropriation: Juvenile Justice | | | | | |
| WORKLOAD/RESOURCES | Target | Actual | Projected | Changes | Requested (Total) |
| | FY 2018 | FY 2018 | FY 2019 | Current Services Adjustments and FY 2019 Program Changes | FY 2020 Request |
| **Workload** | | | | | |
| Percent of Solicitations Released on Time | 75% | 54.5% | 75% | | TBD |
| Percent of Awards Made Against Plan | 90% | 72.7% | 90% | | TBD |
| Total Dollars Obligated | $282,500 | $254,976 | $282,500 | -$44,000 | $238,500 |
| -Grants | $271,200 | $244,777 | $271,200 | -$42,240 | $228.960 |
| -Non-Grants | $11,300 | $10,199 | $11,300 | -$1,760 | $9,540 |
| Percent of Dollars Obligated to Funds Available in the FY | | | | | |
| -Grants | 96% | 96% | 96% | 96% | 96% |
| -Non-Grants | 4% | 4% | 4% | 4% | 4% |

| Total Costs and FTE (reimbursable FTE are included, but reimbursable costs are bracketed and not included in the total) | FTE | $000 | FTE | $000 | FTE | $000 | FTE | $000 | FTE | $000 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | $282,500 | | $254,976 | | $282,500 | | -$44,000 | | $238,500 |

| TYPE | PERFORMANCE | FY 2018 | FY 2018 | FY 2019 | Current Services Adjustments and FY 2019 Program Changes | FY 2020 Request |
|---|---|---|---|---|---|---|
| Outcome | Percent of youth who offend and reoffend | 15% | N/A | 15% | 0 | 15% |
| Outcome | Percent of states and territories that are determined to be in compliance with the four Core Requirements of the JJDP Act of 2002 | 90% | N/A | 90% | 0 | 90% |
| Outcome | Percent of grantees implementing one or more evidence-based programs | 59% | N/A | 59% | 1% | 60% |
| Outcome | Percent of youth who exhibit a desired change in the targeted behavior | 73% | N/A | 73% | 0 | 73% |
| Efficiency | Percentage of funds allocated to grantees implementing one or more evidence-based programs | 57% | N/A | 57% | 1% | 58% |
| Outcome | Percent of children recovered within 72 hours of an issuance of an AMBER Alert | 92% | N/A | 92% | 0 | 92% |

Cited in City of Los Angeles v. Barr
No. 17-56292 archived on October 25, 2019

Public Safety Officers' Benefits

| Performance Measure | Applicable Year | Year Type | Footnote | Footnote Comments |
|---|---|---|---|---|
| Percent of solicitations released on time versus planned | 2019, 2020 | FY | Target not available | Targets will be established upon the appropriation of funds |
| Percent of awards made against plan | 2019, 2020 | FY | Target not available | Targets will be established upon the appropriation of funds |
| All remaining performance measures listed above | 2018 | FY | Data is unavailable | Data will become available in March 2019; currently only six months of data is accessible. |

| PERFORMANCE MEASURE TABLE | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Office/Program | OJJDP/ Juvenile Justice Programs | | Performance Report and Performance Plan targets | | | | | | | | |
| Appropriation | Juvenile Justice | | FY | | | | | | | | |
| DOJ Strategic Objective | OJP Strategic Objective | Type | Performance Measure | 2014 Actual | 2015 Actual | 2016 Actual | 2017 Actual | 2018 Target | 2018 Actual | 2019 Target | 2020 Target |
| 3.1 | N/A | Outcome | Percent of youth who offend and reoffend | 7% | 7% | 8% | 12% | 15% | N/A | 15% | 15% |
| 3.1 | N/A | Outcome | Percent of states and territories that are determined to be in compliance with the four Core Requirements of the JJDP Act of 2002 | 89% | 93% | 84% | N/A | 90% | N/A | 90% | 90% |
| 3.1 | N/A | Outcome | Percent of youth who exhibit a desired change in the targeted behavior | 80% | 66% | 64% | 60% | 73% | N/A | 73% | 73% |
| 3.1 | N/A | Outcome | Percent of grantees implementing one or more evidence-based programs | 64% | 59% | 64% | 70% | 59% | N/A | 59% | 60% |
| 3.1 | N/A | Efficiency | Percentage of funds allocated to grantees implementing one or more evidence-based programs | 63% | 65% | 63% | 65% | 57% | N/A | 57% | 58% |
| 3.1 | N/A | Outcome | Percent of children recovered within 72 hours of an issuance of an AMBER Alert | 96% | 94% | 95% | 96% | 92% | 95% | 92% | 92% |
| 3.1 | N/A | Output | Number of forensic exams completed | 65,762 | 59,674 | 77,171 | 84,794 | 32,000 | 84,948 | 32,000 | 55,000 |

City of Los Angeles v. Barr
No. 2:17-cv-07215-JLS-JC, archived on October 25, 2019

| 3.1 | N/A | Outcome | Percent of tribal youth participating in federally-funded, tribally-controlled programs who demonstrate improved outcomes (i.e., change in targeted behaviors). | N/A | 73% | 73% | 81% | 75% | N/A | 75% | 75% |
| 3.1 | N/A | Outcome | Percent of tribal youth participating in federally-funded, tribally-controlled programs who offend. | N/A | 13% | 12% | 8% | 7% | N/A | 7% | 7% |

| Performance Measure | Applicable Year | Year Type | Footnotes | Footnote Comments |
|---|---|---|---|---|
| Percent of states and territories that are determined to be in compliance with the four Core Requirements of the JJDP Act of 2002 | 2017 | FY | Other | JABG, Title II, and TYP data has not undergone data verification. |
| Percent of youth who offend and reoffend | 2018 | FY | Data is unavailable | Data will become available in March 2019; currently only six months of data is accessible. |
| Percent of states and territories that are determined to be in compliance with the four Core Requirements of the JJDP Act of 2002 | 2018 | FY | Data is unavailable | Data will become available in March 2019; currently only six months of data is accessible. |
| Percent of youth who exhibit a desired change in the targeted behavior | 2018 | FY | Data is unavailable | Data will become available in March 2019; currently only six months of data is accessible. |
| Percent of grantees implementing one or more evidence-based programs | 2018 | FY | Data is unavailable | Data will become available in March 2019; currently only six months of data is accessible. |
| Percentage of funds allocated to grantees implementing one or more evidence-based programs | 2018 | FY | Data is unavailable | Data will become available in March 2019; currently only six months of data is accessible. |
| Percent of tribal youth participating in federally-funded, tribally-controlled programs who demonstrate improved outcomes (i.e., change in targeted behaviors) | 2018 | FY | Data is unavailable | Data will become available in March 2019; currently only six months of data is accessible. |
| Percent of tribal youth participating in federally-funded, tribally-controlled programs who offend | 2018 | FY | Data is unavailable | Data will become available in March 2019; currently only six months of data is accessible. |

cited in City of Los Angeles v. Barr No. 18-56292 archived on October 25, 20

| PERFORMANCE MEASURE TABLE | | |
|---|---|---|
| Office/Program | OJJDP/ Tribal Youth Programs | Performance Report and Performance Plan targets |
| Appropriation | Juvenile Justice | FY |

| DOJ Strategic Objective | OJP Strategic Objective | Type | Performance Measure | 2014 Actual | 2015 Actual | 2016 Actual | 2017 Actual | 2018 Target | 2018 Actual | 2019 Target | 2020 Target |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3.1 | N/A | Outcome | Percent of participants successfully completing program requirements (e.g. Graduation Rate) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | TBD |
| 3.1 | N/A | Outcome | Percent of participants successfully completing program requirements (e.g. Graduation Rate) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | TBD |
| 3.1 | N/A | Outcome | Percent of program youth who exhibit a desired change in targeted behavior (substance abuse) during the reporting period | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |

| Performance Measure | Applicable Year | Year Type | Footnotes | Footnote Comments |
|---|---|---|---|---|
| Percent of participants successfully completing program requirements (e.g., Graduation Rate) | 2020 | FY | This measure was established | This measure is newly established, reporting effective FY2020. |
| Percent of participants successfully completing program requirements (e.g., Graduation Rate) | 2020 | FY | This measure was established | This measure is newly established, reporting effective FY2020. |
| Percent of program youth who exhibit a desired change in targeted behavior (substance abuse) during the reporting period | 2020 | FY | This measure was established | This measure is newly established, reporting effective FY2020. |

cited in City of Los Angeles v. Barr
No. 18-55992 archived on October 25, 2019

Public Safety Officers' Benefits

## E. Public Safety Officers' Benefits

**(Dollars in Thousands)**

| Public Safety Officers' Benefits | Direct Pos. | Estimate FTE | Amount |
|---|---|---|---|
| 2018 Enacted | | | $116,800 |
| 2019 C.R. Rate | | | 116,800 |
| Adjustments to Base and Technical Adjustments | | | 0 |
| 2020 Current Services | | | 116,800 |
| 2020 Program Increases | | | 23,000 |
| 2020 Program Offsets | | | 0 |
| 2020 Request | | | 139,800 |
| **Total Change 2019-2020** | | | **$23,000** |

## 1. Account Description

In FY 2020, OJP requests $139.8 million for the Public Safety Officers' Benefits (PSOB) appropriation account (both mandatory and discretionary), which is $23.0 million above the FY 2019 C.R. Rate. This increase will support the mandatory appropriation request, which totals $115.0 million. This program provides benefits to the families and other survivors of public safety officers killed or fatally injured in the line of duty, as well as to public safety officers permanently disabled in the line of duty.

The PSOB program represents a unique partnership between DOJ, state and local public safety agencies, and national organizations. In addition to administering payment of benefits, OJP works closely with national law enforcement and first responder groups, educating public safety agencies regarding the initiative and offering support to families and colleagues of fallen law enforcement officers and firefighters.

The key programs included under this appropriation account are:

- **PSOB Death Benefits**, a one-time financial benefit to survivors of public safety officers whose deaths resulted from injuries sustained in the line of duty, which is funded by a mandatory appropriation. In FY 2018, the PSOB death benefit was $350,079. In FY 2019, the PSOB death benefit is $359,316.

- **PSOB Disability Benefits**, a one-time financial benefit to public safety officers permanently and totally disabled by catastrophic injuries sustained in the line of duty, which is funded through discretionary appropriations. The FY 2018 disability benefit was $350,079. In FY 2019, the disability benefit is $359,316.

- **PSOB Education Benefits**, which provide financial support for higher education expenses (such as tuition and fees, books, supplies, and room and board) to the eligible spouses and children of public safety officers killed or permanently and totally disabled in the line of duty, which is funded through discretionary appropriations. In FY 2019, the PSOB education benefit is up to $1,224 per month.

61

## 2. Performance Tables

| PERFORMANCE AND RESOURCES TABLE | | | | | |
|---|---|---|---|---|---|
| Appropriation: Public Safety Officers' Benefits (Mandatory, Education, and Disability – BJA) | | | | | |
| WORKLOAD/RESOURCES | Target | Actual | Projected | Changes | Requested (Total) |
| | FY 2018 | FY 2018 | FY 2019 | Current Services Adjustments and FY 2019 Program Changes | FY 2020 Request |
| **Workload** | | | | | |
| Number of claims processed | N/A | 384 | N/A | | N/A |
| Total Dollars Obligated | $116,800 | $136,606 | $116,800 | $23,000 | $139,800 |
| -Claims | $103,952 | $125,678 | $107,456 | $21.160 | $128,616 |
| -Other Services | $12,848 | $10,928 | $9,344 | $1,840 | $11,184 |
| Percent of Dollars Obligated to Funds Available in the FY | | | | | |
| -Claims | 89% | 92% | 92% | 92% | 92% |
| -Other Services | 11% | 8% | 8% | 8% | 8% |
| Total Costs and FTE (reimbursable FTE are included, but reimbursable costs are bracketed and not included in the total) | FTE $000 | FTE $000 | FTE $000 | FTE $000 | FTE $000 |
| | $116,800 | $136,606 | $116,800 | $23,000 | $139,800 |

| Performance Measure | Applicable Year | Year Type | Footnote | Footnote Comments |
|---|---|---|---|---|
| Number of claims processed | 2018, 2019, 2020 | FY | Target unavailable | OJP is unable to target the expected number of public safety claims to be processed |

cited in City of Los Angeles v. Barr
No. 18-56292 archived on October 23, 2019

| PERFORMANCE MEASURE TABLE | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Office/Program** | BJA/Public Safety Officers Benefits Program | Performance Report and Performance Plan targets and actuals | | | | | | | | |
| **Appropriation** | Public Safety Officers Benefits Program | FY | | | | | | | | |
| **DOJ Strategic Objective** | **OJP Strategic Objective** | **Type** | **Performance Measure** | **2014 Actual** | **2015 Actual** | **2016 Actual** | **2017 Actual** | **2018 Actual** | **2019 Target** | **2020 Target** |
| 3.1 | N/A | Output | Number of claims processed | 251 | 386 | 384 | 368 | N/A | N/A | N/A |

| Performance Measure | Applicable Year | Year Type | Footnotes | Footnote Comments |
|---|---|---|---|---|
| Number of claims processed | 2018, 2019, 2020 | FY | Other | Target unavailable. OJP is unable to target the expected number of public safety claims to be processed |

## F.  Crime Victims Fund

**(Dollars in Thousands)**

| Crime Victims Fund | Direct Pos. | Estimate FTE | Amount |
|---|---|---|---|
| 2018 Enacted | | | $4,436,000 |
| 2019 C.R. Rate | | | 4,436,000 |
| Adjustments to Base and Technical Adjustments | | | 0 |
| 2020 Current Services | | | 4,436,000 |
| 2020 Program Increases | | | 0 |
| 2020 Program Offsets | | | (2,136,000) |
| 2020 Request | | | 2,300,000 |
| **Total Change 2019-2020** | | | **($2,136,000)** |

## 1.  Account Description

The FY 2020 President's budget continues the Crime Victims Fund (CVF) reform effort included in the FY 2019 budget.  The CVF reform proposal would establish a $2.3 billion mandatory annual appropriation for the CVF, which is $2,136.0 million below the FY 2019 C.R. Rate.  The CVF is financed by collections of fines, penalty assessments, and bond forfeitures from defendants convicted of federal crimes.  Most of the account resources are the result of large corporate cases rather than individual offenders.

Of the $2.3 billion total:

- $492.5 million will be provided to the Office on Violence Against Women;
- $12 million will be used for Innovations in Crime Victims Services (formerly Vision 21);
- $115 million will be for Tribal victims assistance grants; and
- $10 million will be provided to the Office of the Inspector General.

Programs supported by CVF focus on providing compensation to victims of crime and survivors, supporting appropriate victims' service programs and victimization intervention strategies, and building capacity to improve response to crime victims' needs and increase offender accountability.  CVF was established to address the continuing need to expand victims' services programs and assist federal, state, local, and tribal agencies and organizations in providing appropriate services to their communities.

The CVF reform effort would eliminate use of the CVF to offset discretionary spending above legally established spending caps, and would provide more reliable funding for the program, allowing for long-term program planning that will better serve victims of crime.

The CVF reform proposal would amend the Victims of Crime Act of 1984 (VOCA) to:

1. Cap annual receipts into the account at $2.5 billion and sends the remaining to the General Fund of the Treasury;
2. Establish an automatic mandatory appropriation of $2.3 billion per year;

3. Establish a $115 million set-aside for tribal victims assistance programs; and
4. Provide for the transfer of funding for programs authorized under the Violence Against Women Act (VAWA), maintaining the independence of the Office on Violence Against Women.

Funding would continue to be distributed in accordance with the statutory distribution formula (authorized by the Victims of Crime Act of 1984, as amended) in addition to modifications requested through the CVF reform proposal:

- Improving Services for Victims of Crime in the Federal Criminal Justice System (*Statutory set-aside*).  Program funds support:
  - Victim assistance personnel through the Executive Office for U.S. Attorneys;
  - Victim specialists via the Federal Bureau of Investigation (FBI) to provide direct assistance to victims of federal crime; and
  - The Nationwide Automated Victim Information and Notification System (VNS) for investigative, prosecutorial, and corrections components to meet victim notification requirements.  The VNS is jointly administered by the Executive Office for U.S. Attorneys, the Bureau of Prisons, FBI, U.S. Postal Inspection Service, and DOJ's Criminal Division.

- Improving the Investigation and Prosecution of Child Abuse Cases – *Children's Justice and Assistance Act Programs in Indian Country (Statutory set-aside)*.  The program provides support to tribal communities to improve the investigation, prosecution, and overall handling of child sexual and physical abuse in a manner that increases support for and lessens trauma to the victim.  The program funds activities such as:
  - Revising tribal codes to address child sexual abuse;
  - Providing child advocacy services for children involved in court proceedings;
  - Developing protocols and procedures for reporting, investigating, and prosecuting child abuse cases;
  - Enhancing case management and treatment services;
  - Offering specialized training for prosecutors, judges, investigators, victim advocates, multidisciplinary or child protection teams, and other professionals who handle severe child physical and sexual abuse cases; and
  - Developing procedures for establishing and managing child-centered interview rooms.

Funding is divided between the U.S. Department of Health and Human Services (which receives 85 percent of the total for state efforts), and OVC (which receives the remaining 15 percent for tribal efforts).  Up to $20.0 million must be used annually to improve the investigation, handling, and prosecution of child abuse cases.

After funding is allocated for the above purpose areas, the remaining funds are available for the following:

- Victims of Crime Act (VOCA) Victim Compensation – *Victim Compensation Formula Grant Program*:  Of the remaining amounts available, up to 47.5 percent may support grant

Domestic Victims of Trafficking Fund

awards to state crime victims compensation programs. These programs reimburse crime victims for out-of-pocket expenses related to their victimization such as medical and mental health counseling expenses, lost wages, funeral and burial costs, and other costs (except property loss) authorized in a state's compensation statute.

Annually, OVC awards each state at 60 percent of the total amount the state paid to victims from state funding sources two years prior to the year of the federal grant award. If the amount needed to reimburse states for payments made to victims is less than the 47.5 percent allocation, any remaining amount is added to the Victim Assistance Formula Grant Program funding.

Currently, all 50 states, the District of Columbia, the U.S. Virgin Islands, the Commonwealth of Puerto Rico, and the territory of Guam have victim compensation programs. State compensation programs will continue to reimburse victims for crime related expenses authorized by VOCA as well as cover limited program administrative costs and training.

- Victims of Crime Act (VOCA) Victim Assistance – *Victim Assistance Formula Grant Program*: Funds available to support state and community-based victim service program operations are 47.5 percent of the remaining balance plus any funds not needed to reimburse victim compensation programs at the 60 percent prior year payout amount.

All 50 states plus the District of Columbia, Puerto Rico, and the U.S. Virgin Islands receive a base level of funding and a percentage based on population. The base funding level is $0.5 million, and the Northern Mariana Islands, Guam, American Samoa, and Palau receive a base of $0.2 million in addition to funding based off population.

VOCA victim assistance funds support community-based organizations that serve crime victims, including domestic violence shelters; rape crisis centers; child abuse programs; and victim service units in law enforcement agencies, prosecutors' offices, hospitals, and social service agencies.

These programs provide services including crisis intervention, counseling, emergency shelter, criminal justice advocacy, and emergency transportation.

- Non-Formula Grants/Activities Program – *National Scope Training and Technical Assistance and Direct Services to Federal, Tribal and Military Crime Victims*: VOCA authorizes OVC to use up to 5 percent of funds remaining in the CVF, after statutory set-asides and grants to states, to support:
  o National scope training and technical assistance;
  o Demonstration projects and programs;
  o Program evaluation;
  o Compliance efforts;
  o Fellowships and clinical internships;
  o Training and special workshops for presentation and dissemination of information resulting from demonstrations, surveys, and special projects;

No. 18-56292 archived on October 25, 2019
cited or Lodged or rendered Barr

Domestic Victims of Trafficking Fund

- o Compliance monitoring related to guidelines for fair treatment of crime victims and witnesses issued under the Victim and Witness Protection Act as well as the Attorney General's Guidelines for Victim and Witness Assistance;
- o Services and training, in coordination with federal, military, and tribal agencies, to improve the response to the needs of crime victims;
- o Coordination of victim services provided by the Federal Government with victim services offered by other public agencies and nonprofit organizations; and
- o Direct services to victims of federal crime, including financial support for emergency services.

At least 50 percent of the total non-formula funding must be allocated for national scope training and technical assistance, and demonstration and evaluation projects. The remaining amount is allocated for efforts to improve the response to the needs of federal crime victims.

- Tribal Set-Aside: Up to $115.0 million will be set-aside for grants and assistance to tribes to improve services and justice for victims of crime.

- Antiterrorism Emergency Reserve Fund *(Statutory special fund)* – The Director of OVC is authorized to set aside up to $50.0 million in the Antiterrorism Emergency Reserve to meet the immediate and longer-term needs of terrorism and mass violence victims by providing: 1) supplemental grants to states for victim compensation; 2) supplemental grants to states for victim assistance; and 3) direct reimbursement and assistance to victims of terrorism occurring abroad. The Antiterrorism Emergency Reserve Fund is in addition to the $2.3 billion in CVF funding provided under the annual mandatory appropriation for crime victims programs.

- Child Pornography Victims Reserve *(Statutory special fund)* – This new CVF reserve fund was authorized by the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018 (Public Law 115-299), which became law in December 2018. Under the provisions of this act, the Director of OVC is authorized to set aside up to $10.0 million in balances from the CVF to support the Child Pornography Victims Reserve. The Reserve will award defined restitution payments of $35,000 (adjusted annually for inflation) to qualifying victims of child pornography offenses as defined in the Act.

Funding for the Child Pornography Reserve Fund is available in addition to the $2.3 billion in CVF funding provided under the annual mandatory appropriation for crime victims programs. Special financial assessments authorized by the Amy, Vicky, and Andy Child Pornography Victim Assistance Act against defendants convicted of child pornography offenses will also be deposited in the Child Pornography Victims Reserve to fund restitution payments.

cited in City of Los Angeles v. Barr, No. 18-56292 archived on October 25, 2019

Domestic Victims of Trafficking Fund

## 2. Performance Tables

| PERFORMANCE AND RESOURCES TABLE | | | | | |
|---|---|---|---|---|---|
| Appropriation:  Crime Victims Fund | | | | | |
| WORKLOAD/RESOURCES | Target | Actual | Projected | Changes | Requested (Total) |
| | FY 2018 | FY 2018 | FY 2019 | Current Services Adjustments and FY 2019 Program Changes | FY 2020 Request |
| **Workload** | | | | | |
| Percent of Solicitations Released on Time | 75% | 36.8% | 75% | | TBD |
| Percent of Awards Made Against Plan | 90% | 68.4% | 90% | | TBD |
| Total Dollars Obligated | $4,436,000 | $3,838,995 | $4,436,000 | -$2,136,000 | $2,300,000 |
|    -Grants | $4,125,480 | $3,685,435 | $4,258,560 | -$2,050,560 | $2,208,000 |
|    -Non-Grants | $310,520 | $153,560 | $177,440 | -$85,440 | $92,000 |
| Percent of Dollars Obligated to Funds Available in the FY | | | | | |
|    -Grants | 93% | 96% | 96% | 96% | 96% |
|    -Non-Grants | 7% | 4% | 4% | 4% | 4% |

| Total Costs and FTE | | FTE | $000 | FTE | $000 | FTE | $000 | FTE | $000 | FTE | $000 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| (reimbursable FTE are included, but reimbursable costs are bracketed and not included in the total) | | | $4,436,000 | | $3,838,995 | | $4,436,000 | | -$2,136,000 | | $2,300,000 |

| TYPE | Performance Measure | Target | Actual | Projected | Current Services Adjustments and FY 2019 Program Changes | FY 2020 Request |
|---|---|---|---|---|---|---|
| | | FY 2018 | FY 2018 | FY 2019 | | |
| Output | Number of victims of a violent crime that receive services through the Victim Assistance program | 4.8M | 6.452 | 5M | 0 | 5M |

| Performance Measure | Applicable Year | Year Type | Footnote | Footnote Comments |
|---|---|---|---|---|
| Percent of solicitations released on time versus planned | 2019, 2020 | FY | Target not available | Targets will be established upon the appropriation of funds |
| Percent of awards made against plan | 2019, 2020 | FY | Target not available | Targets will be established upon the appropriation of funds |

cited in City of Los Angeles v. Barr No. 18-56292 archived on October 25, 2019

| PERFORMANCE MEASURE TABLE | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Office/Program** | | OVC/ Crime Victims Programs | | Performance Report and Performance Plan targets | | | | | | | |
| **Appropriation** | | Crime Victims Fund | | FY | | | | | | | |
| **DOJ Strategic Objective** | **OJP Strategic Objective** | **Type** | **Performance Measure** | **2014 Actual** | **2015 Actual** | **2016 Actual** | **2017 Actual** | **2018 Target** | **2018 Actual** | **2019 Target** | **2020 Target** |
| 3.1 | N/A | Output | Number of victims served by EOUSA/FBI | N/A | N/A | N/A | N/A | 35,000 | TBD | 35,000 | 35,000 |
| 3.1 | N/A | Output | Number of Victim Notification System notifications made | N/A | N/A | N/A | 16.9M | 15M | 14.1M | 15M | 15M |
| 3.1 | N/A | Output | Number of victims served through Vision 21, tribal, and other non-formula programs | N/A | N/A | N/A | N/A | 6,000 | 39,089 | 6,000 | 8,000 |
| 3.1 | N/A | Outcome | Percent of programs utilizing evidence-based practices in their work | N/A | N/A | N/A | 22% | 20% | 43% | 20% | 20% |
| 3.1 | N/A | Output | Amount of Crime Victims Compensation Program compensation dollars paid | N/A | N/A | N/A | $333M | $325M | $412M | $325M | $325M |
| 3.1 | N/A | Output | Number of Crime Victims Compensation Program claims paid | N/A | N/A | N/A | 227,815 | 225,000 | 246,623 | 225,000 | 225,000 |
| 3.1 | N/A | Output | Number of victims of a violent crime that receive services through the Victim Assistance program | N/A | N/A | N/A | 5,090,479 | 4.8M | 5,836,452 | 5M | 5M |
| 3.1 | N/A | Outcome | Percent of all victim service organizations at least partially funded through Victim Assistance | N/A | N/A | N/A | N/A | 20% | TBD | 20% | 20% |

cited in City of Los Angeles v. Barr No. 18-56292 archived on October 25, 2019

Domestic Victims of Trafficking Fund

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3.1 | N/A | Outcome | Percent of sub-awards using Victim Assistance funding for new or expanded programs | N/A | N/A | N/A | 0.260 | 0.250 | 0.300 | 0.250 | 0.250 |
| 3.1 | N/A | Output | Number of victims provided with emergency services or compensation | N/A | N/A | N/A | NA | 5,000 | 0.000 | 5,000 | 5,000 |

| Performance Measure | Applicable Year | Year Type | Footnotes | Footnote Comments |
|---|---|---|---|---|
| Number of victims served by EOUSA/FBI | 2018 | FY | Data is unavailable | Still waiting on data from EOUSA. |
| Percent of all victim service organizations at least partially funded through Victim Assistance | 2018 | FY | Data is unavailable | Waiting on BJS to release the number of VSPs to calculate this value. |
| Number of victims provided with emergency services or compensation | 2018 | FY | Other | Value is zero because the AEAP program does not run annually like other programs and instead used as needed. Therefore, performance data is sporadic and can have large fluctuations. |

cited in City of Los Angeles v. Barr
No. 18-56292 archived on October 25, 2019

Domestic Victims of Trafficking Fund

### G. Domestic Victims of Trafficking Fund (Mandatory)

**(Dollars in Thousands)**

| Domestic Victims of Trafficking Fund | Direct Pos. | Estimate FTE | Amount |
|---|---|---|---|
| 2018 Enacted | | | $6,000 |
| 2019 C.R. Rate | | | 6,000 |
| Adjustments to Base and Technical Adjustments | | | 0 |
| 2020 Current Services | | | 6,000 |
| 2020 Program Increases | | | 0 |
| 2020 Program Offsets | | | 0 |
| 2020 Request | | | 6,000 |
| **Total Change 2019-2020** | | | **$0** |

### 1. Account Description

In FY 2020, OJP requests $6.0 million for the mandatory Domestic Victims of Trafficking Fund (DVTF), which is equal to the FY 2019 C.R. Rate. This fund is financed by collections of assessments against defendants convicted of trafficking-related offenses under federal law and an annual $5.0 million funding transfer from the Department of Health and Human Services (HHS).

This Fund supports grant programs to deter human trafficking and to expand and improve services for victims of trafficking in the U.S. and victims of child pornography as authorized by the Victims of Child Abuse Act of 1990, the Trafficking Victims Protection Act of 2000, and the Trafficking Victims Protection Reauthorization Act of 2005. Collections from the federal courts may be used to pay for all forms of programming except for medical services; funding transferred from the HHS may be used to cover the costs of medical services along with other services and programs to address and deter human trafficking.

## 2.   Performance Tables

| PERFORMANCE AND RESOURCES TABLE | | | | | |
|---|---|---|---|---|---|
| Appropriation:  Domestic Victims of Trafficking Fund | | | | | |
| WORKLOAD/RESOURCES | Target | Actual | Projected | Changes | Requested (Total) |
| | FY 2018 | FY 209 | FY 2019 | Current Services Adjustments and FY 2019 Program Changes | FY 2020 Request |
| **Workload** | | | | | |
| Percent of Solicitations Released on Time | 75% | 100% | 75% | | |
| Percent of Awards Made Against Plan | 90% | 100% | 90% | | |
| Total Dollars Obligated | TBD | TBD | TBD | | TBD |
| -Grants | TBD | TBD | TBD | | TBD |
| -Non-Grants | TBD | TBD | TBD | | TBD |
| Percent of Dollars Obligated to Funds Available in the FY | | | | | |
| -Grants | N/A | N/A | N/A | TBD | TBD |
| -Non-Grants | N/A | N/A | N/A | TBD | TBD |
| Total Costs and FTE (reimbursable FTE are included, but reimbursable costs are bracketed and not included in the total) | FTE    $000 | FTE    $000 | FTE  $6,000 | FTE   -$5,000 | FTE   $1,000 |
| | TBD | TBD | TBD | | TBD |

| TYPE | | Target | Actual | Projected | Changes | Requested (Total) |
|---|---|---|---|---|---|---|
| | PERFORMANCE | FY 2018 | FY 2018 | FY 2019 | Current Services Adjustments and FY 2019 Program Changes | FY 2020 Request |
| Output | Number of programs and activities developed or enhanced to improve outcomes for child and youth victims of sex and labor trafficking | 10 | 53 | | 0 | 10 |

| PERFORMANCE MEASURE TABLE | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Office/Program** | OVC/ Domestic Trafficking Victim's Fund | | Performance Report and Performance Plan targets | | | | | | | | | |
| **Appropriation** | Domestic Trafficking Victims' Fund | | FY | | | | | | | | | |
| **DOJ Strategic Objective** | **OJP Strategic Objective** | **Type** | **Performance Measure** | **2014 Actual** | **2015 Actual** | **2016 Actual** | **2017 Actual** | **2018 Target** | **2018 Actual** | **2019 Target** | **2020 Target** |
| 3.1 | N/A | Output | Number of programs and activities developed or enhanced to improve outcomes for child and youth victims of sex and labor trafficking | N/A | N/A | N/A | 10 | 10 | 53 | 10 | 10 |

cited in City of Los Angeles v. Barr
No. 18-56292 archived on October 25, 2019

Domestic Victims of Trafficking Fund

| Performance Measure | Applicable Year | Year Type | Footnotes | Footnote Comments |
|---|---|---|---|---|
| Number of programs and activities developed or enhanced to improve outcomes for child and youth victims of sex and labor trafficking | 2017 | FY | This measure was established | |

cited in City of Los Angeles v. Barr
No. 18-56292 archived on October 25, 2019

Domestic Victims of Trafficking Fund

# V. Program Increases by Item

cited in City of Los Angeles v. Barr No. 18-56292 archived on October 25, 2019

Program Increases by Item

## OFFICE OF JUSTICE PROGRAMS
### Increase Request: Violent Gang and Gun Crime Reduction Program/Project Safe Neighborhoods (PSN)

| Funding | |
|---|---|
| FY 2020 Request: | $100.0M |
| FY 2019 CR: | $20.0M* |
| *In the 2019 CR, this program was funded as a carveout under the Byrne Justice Assistance Grants program. | |



### Program Description

**Purpose:** Project Safe Neighborhoods (PSN) is designed to create and foster safer neighborhoods through a sustained reduction in violent crime, achieved by, among other efforts, addressing criminal gangs and the criminal misuse of firearms. The program's effectiveness depends upon the ongoing coordination, cooperation, and partnerships of local, state, tribal, and federal law enforcement agencies—and the communities they serve—engaged in a unified approach led by the U.S. Attorney in all 94 federal judicial districts.

Acting decisively in a coordinated manner at all levels—federal, state, local, and tribal—will help address violent crime and keep American citizens safe. PSN provides critical funding, resources, and training for law enforcement, prosecutors, and their PSN teams to combat violent crime and make their communities safer through a comprehensive approach to public safety that marries targeted law enforcement efforts with community engagement, prevention, and reentry efforts.

**Authorizing Legislation:** Project Safe Neighborhoods Grant Program Authorization Act of 2018 (Public Law 115-185)

**First Year of Appropriation:** 2010

**Administering Agency:** Bureau of Justice Assistance (BJA)

**DOJ Strategic Goal and Objective**
**DOJ Strategic Goal 3:** Reduce Violent Crime and Promote Public Safety
**Strategic Objective 3.1:** Combat violent crime, promote safe communities, and uphold the rights of victims of crime

**Who Can Apply for Funding and How Funds Are Distributed:**
Eligible applicants are PSN Task Force fiscal agents for the U.S. Attorney districts and federally recognized Indian tribal governments (as determined by the Secretary of the Interior). All fiscal agents must be certified by the relevant U.S. Attorney's Office (USAO). Eligible USAO-certified fiscal agents include states, units of local government, educational institutions, faith-based and other community organizations, private nonprofit organizations, and federally recognized Indian tribal governments (as determined by the Secretary of the Interior).

Each federal judicial district is eligible to apply for a funding allocation, based on its violent crime rate and population.



**Violent Gang and Gun Crime Reduction/Project Safe Neighborhoods**
**Five Year Budget Authority**
($ in millions)

**Note:** Between FY 2016 and 2019, this program was funded as a carveout under the Byrne Justice Assistance Grants program. In FY 2020, funding for this program is requested as an independent line item.

cited in City of Los Angeles v. Barr
No. 19-56292 archived on October 25, 2019

74

## Program Goals

The PSN program will address threats to public safety in jurisdictions with the most significant crime problems. The program will build on the previous DOJ PSN Initiative to create safer neighborhoods through sustained reductions in gang violence and gun crime.

The PSN framework requires that the U.S. Attorney be responsible for establishing a collaborative team of federal, state, and local law enforcement and other community members to implement gang violence and gun crime enforcement; violence prevention and intervention initiatives; and community outreach within the district. Each team will be required to produce a strategic plan that outlines its analysis of crime and public safety problems in its jurisdiction and violence reduction strategies to address these problems. These plans will also include a description of the team's strategy development and modification process; organizational changes and innovations that will be implemented through each strategy; and an explanation of the team's plans for collaboration between law enforcement agencies and researchers.

## Accomplishments

- Part I crime in the City of Newburgh, New York experienced a reduction of 15 percent in 2017 compared to 2016. This is the lowest total Part I crime level in 10 years. Part I crime was also below the five-year average. Violent crime has steadily declined in recently years, but in very small increments, until 2017 where it yielded a reduction of 14 percent (-56). Violent crime was also below the five-year average. While homicide figures remained unchanged from 2016 levels and rapes increased by one incident, both robbery and aggravated assaults decreased by double digit figures. The City also experienced a dramatic decrease in shooting incidents in 2017. There were 17 shootings in 2017 compared to 48 the year before. Previously, the City was averaging 47 shootings per year for the last few years.

- Western District of Tennessee: Recent reporting from the Memphis Crime Commission and the University of Memphis indicates that in 2018, the overall violent crime rate in Memphis dropped 4.2 percent compared to 2017. Also, reported gun crimes declined in 2018 by 15.8 percent compared to 2017. The figures include reported crimes committed with guns and charges for illegal possession of guns.

  The US Attorney's Office was also recognized recently in Memphis Mayor Strickland's State of the City address regarding its work to reduce violent crime. See the full text of the speech at this link: https://memphistn.gov/news/what_s_new/text_of_mayor_strickland_s_2019_state_of_the_city

- Eastern District of Kentucky: According to data from the Lexington Police Department, overall violent crime decreased in Lexington by 13.4 percent in 2018, as compared to 2017. More specifically, murders and robberies both dropped by 21 percent, assaults decreased by 11 percent, and shots fired calls decreased by nine percent. Additionally, the United States Marshals Service (USMS) recently completed a three-month enforcement surge. As part of the Operation Triple Beam – Bourbon Trail, the USMS, the Kentucky State Police, ICE, and other agencies made 132 arrests (including 27 gang members), resulting in 16 defendants facing federal prosecution. The initiative also resulted in the removal of 37 firearms from the street and the seizure of various drugs, including cocaine, methamphetamine, and opioids (heroin, fentanyl).

- Southern District of Illinois: Since January 2018, the PSN team has identified over thirty Priority Violent Offenders (PVO). Of those PVOs, over half of them have been charged state and/or federally with gun or other violent crime offenses that will ensure they are in prison for years. Most of the PVOs that have not been charged yet have not been named suspects in new shootings or firearm possession cases, and have

75

Produced in City of Los Angeles v. BARR 18-0292 archives on October 25, 2019

largely dropped off law enforcement radar. To date, there has also been an almost 50 percent reduction in the homicide rate. The IL-Southern District PSN team believes that bringing both state and federal consequences to the most prolific shooters is making the neighborhoods of their target enforcement area safer. Per capita, these numbers are highly significant, and the community has taken notice. At a recent high school basketball game a senior citizen approached the East St. Louis Police Chief to thank him for his recent efforts and noted that a PVO in his neighborhood who would daily shoot an AK-47 out of a vehicle "all day long," now "ain't shootin' no more!"

### Application and Award History

| ($ in millions) | FY 2016 | FY 2017 | FY 2018 | FY 2019 CR | FY 2020 Request |
|---|---|---|---|---|---|
| Amount Available for Funding | $5.8^ | $5.8^ | $33.2*^ | $20.0 | $100.0 |
| Total Funding Awarded | $5.7 | $5.5 | $33.1 | TBD | TBD |
| Number of Applications | 44 | 40 | 94 | TBD | TBD |
| Number of awards | 16 | 17 | 94 | TBD | TBD |
| Percentage of Applications Funded | 36% | 43% | 100% | TBD | TBD |

^ Amount does not include funds used for management and administration, peer review, or other authorized purposes.

*Total includes FY 2018 award funding of $18.2 million plus a reprogrammed amount of $15 million.

### FY 2020 Increase Justification

In FY 2020, the Department is requesting $100.0 million for Project Safe Neighborhoods (PSN), an increase of $100.0 million above the FY 2019 Continuing Resolution (CR) rate. The FY 2019 CR provided $20.0 million for PSN, as carveout of the Byrne Justice Assistance Grants (JAG) program. However, the President's Budget request would establish an independent line item to fund this vital program.

According to the FBI's *Preliminary Semiannual Uniform Crime Report*, which was released in February 2019, violent crime nationwide has decreased more than four percent in the first six months of 2018, compared with the same period in 2017. However, overall crime trends are mixed. The results of the 2017 National Crime Victims Survey indicate that the victimization rates for some offenses, such as robbery, increased, while rates of other crimes, such as burglary and motor vehicle theft, decreased. The FBI's UCR data also show that changes in crime rates vary by region; some cities saw a decrease in violent crime while other cities saw an increase in violent crime. These statistics clearly indicate that many communities throughout the nation still need additional assistance in combatting violent crime.

The PSN Initiative is based on a program model that relies on partnerships of federal, state, and local agencies led by the U.S. Attorney in each federal judicial district to enhance the effectiveness of its crime and violence reduction efforts. Under this program, formula grants will be awarded to local law enforcement agencies, outreach- and prevention services providers, victims-focused providers, and researchers to support activities implementing local PSN anti-violence strategies. The FY 2020 funding request for this program will be sufficient to support PSN initiatives in all 94 federal judicial districts.

When it was first developed, funded, and implemented in 2001, PSN focused on offenders who committed firearms-related violent offenses under federal law. The Department expanded the program in 2006 to address violent street gangs. The current PSN strategy focuses on both the eradication of illegal firearms and the interdiction of violent gang activity. A 2009 Michigan State University study (https://www.ncjrs.gov/pdffiles1/

nij/grants/226686.pdf) shows that PSN strategies, when properly implemented, generated significant reductions in violent crime in large cities (over 100,000 residents).

**For additional information, please visit: <u>Project Safe Neighborhoods</u>.**

cited in City of Los Angeles v. Barr
No. 18-56292 archived on October 25, 2019

Program Increases by Item

## OFFICE OF JUSTICE PROGRAMS
### Increase Request: Research, Development, and Evaluation – "Base" Program for the National Institute of Justice (NIJ)

### Funding

FY 2020 Request:    $43.5M
FY 2019 CR:         $42.0M

Note: The FY 2019 CR included $4.0M for domestic terrorism research, which is requested in FY 2020 as a carve-out in the Byrne Justice Assistance Grants program.



**Average Annual Obligations by Category Funded With NIJ Base Funding**
($ in millions)

| Category | |
|---|---|
| Social Science Research | $12.2 |
| Technology Solutions | $10.1 |
| Building Research Infrastructure | $6.3 |
| Forensic Science R&D | $3.4 |
| Performance Standards and Testing Equipment | $2.7 |

### Program Description

The National Institute of Justice (NIJ) — the research, development, and evaluation arm of the Department of Justice — is dedicated to improving knowledge and understanding of crime and justice issues through science.

With its "base" funding, NIJ:

1. Encourages and supports research, development, and evaluation to further understanding of:
   - Causes and correlates of crime and violence;
   - Methods of crime prevention and control; and
   - Criminal justice system responses to crime and violence.
2. Contributes to the improvement of the criminal justice system and its responses to crime, violence, and delinquency.

**Authorizing Legislation:** Title I of the Omnibus Crime Control and Safe Streets Act of 1968 (sections 201 and 202); the Homeland Security Act of 2002 (sections 231-233).

**First Year of Appropriation:** 1968

**Administering Agency:** National Institute of Justice

### DOJ Strategic Goal and Objective
**DOJ Strategic Goal 3:** Reduce Violent Crime and Promote Public Safety
**Strategic Objective 3.1:** Combat violent crime, promote safe communities, and uphold the rights of victims of crime

### Program Goals

- Increase research efforts and create new programs focused on advancing technology and developing innovative strategies that have measurable impact.

- Strengthen grant programs by integrating NIJ's expertise in the social and behavioral sciences, forensic sciences and technology.

- Develop new multimedia strategies, particularly web-based approaches, to provide practitioners, policy makers, and researchers ready access to the scientific evidence needed to address criminal justice issues and to improve criminal justice policy and practice in an accurate and easily understandable format.



**Research, Development, and Evaluation Program Five Year Budget Authority**
($ in millions)

| | | | | |
|---|---|---|---|---|
| $36.0 | $39.5 | $42.0 | $42.0 | $43.5 |
| FY16 | FY17 | FY18 | FY19 CR | FY20 Req |

78

Cited in City of Los Angeles v. Barr No. 18-56292, archived on October 25, 2019

- Foster greater collaboration and coordination with federal science agencies to leverage their strengths and ensure a more fair and just criminal justice system, minimizing redundancy in efforts and investments.

## Accomplishments

- NIJ-funded research led to the introduction of modern police body armor the most important safety equipment used by the Nation's law enforcement officers.

- NIJ published 59 performance standards, most of which were the first of their kind, including *Ballistic Resistance of Police Body Armor* and *Criminal Justice Offender Tracking Systems*.

- NIJ used "sentinel events" to learn from errors in the criminal justice system since negative outcomes such as wrongful convictions, improper officer-involved shootings, and mistaken prison releases are rarely caused by a single act—but rather are "sentinel events" that signal underlying system weaknesses.

- NIJ supported CrimeSolutions.gov, the national clearinghouse of evaluation research showing what works, what does not work, and what is promising across criminal and juvenile justice programs and practices.

- NIJ leads the federal government's research efforts to combat human trafficking as well as to develop strategies to prevent individuals from becoming committed to terrorist ideologies. In 2018, NIJ made four awards addressing the challenge of human trafficking. These include a study analyzing the lifetime trajectories of system-involved youth. This study will be particularly important in informing our understanding of the prevelance of trafficking in the U.S. Two awards explore the application of Artificial Intelligence to combating human trafficking.

- NIJ-funded research in the use of computers for crime analysis and mapping laid the groundwork for the present, near-pervasive adoption of crime analysis technology. In 2017, NIJ conducted a research challenge project through Challenge.gov that promoted efforts to harness recent advances in data science to improve crime forecasting software.

- NIJ is the only federal agency investing in and supporting the development of the robotic systems that are now used in the majority of U.S. forensic DNA laboratories.

- NIJ funded the development of the Rapid DNA systems now being used in certain forensic laboratories.

## FY 2020 Increase Justification

In FY 2020, the President's Budget requests $43.5 million for Research, Development, and Evaluation Program, an increase of $1.5 million above the FY 2019 Continuing Resolution (CR) rate. NIJ will continue to support a wide range of criminal justice-related research, technology development, and program evaluation efforts in FY 2020. The requested increase will support the first phase of a comprehensive evaluation of the effectiveness of reentry programs, as directed by the First Step Act of 2018. The Act seeks to reduce recidivism, refine sentencing laws, and eliminate disproportionate penalties for certain crimes.

The President's Budget does not request funding for Research on Domestic Terrorism under the Research, Development, and Evaluation Program in FY 2020. Instead, the Research on Domestic Terrorism program is requested as a $4 million carve-out under the Byrne Justice Assistance Grants (JAG) program.

**For additional information, please visit the NIJ website.**

## OFFICE OF JUSTICE PROGRAMS
### Increase Request: Public Safety Officers' Benefits (PSOB) Program

### Funding

| | |
|---|---|
| FY 2020 Request: | $139.8M |
| FY 2019 CR: | $116.8M |



### Program Description
**Purpose**: To provide financial assistance to:

1. Survivors of public safety officers whose deaths resulted from injuries sustained in the line of duty;

2. Public safety officers permanently and totally disabled by injuries sustained in the line of duty; and

3. Eligible spouses and children of public safety officers killed or permanently and totally disabled in the line of duty to help with higher education expenses (such as tuition and fees, books, supplies, and room and board).

**Authorizing Legislation**: The Public Safety Officers' Benefits Act of 1976, Public Law 94-430

**Administering Agency:** Bureau of Justice Assistance (BJA)

### DOJ Strategic Goal and Objective
**DOJ Strategic Goal 3**: Reduce Violent Crime and Promote Public Safety
**Strategic Objective 3.1**: Combat violent crime, promote safe communities, and uphold the rights of victims of crime

**Who Can Apply for Funding:** Eligible beneficiaries include but are not limited to the surviving spouse, children, PSOB designee, life insurance beneficiary, surviving parents, adult children (death claims), and injured public safety officers (disability claims).

**How Funds are Distributed:** A thorough claim process is required to determine eligibility. In FY 2019, the amount of the PSOB benefit is $359,316 for eligible deaths and disabilities occurring on or after October 1, 2018. The amount of the PSOB educational assistance benefit for one month of full-time attendance on or after October 1, 2018, is $1,224.



Public Safety Officers
Benefits (PSOB)
Five Year Budget Authority
($ in millions)

| | FY16 | FY17 | FY18 | FY19 CR | FY20 Req |
|---|---|---|---|---|---|
| | $88.3 | $88.3 | $116.8 | $116.8 | $139.8 |

Cited in City of Los Angeles v. Barr
No. 18-56292; archived on October 25, 2019

### Claim and Benefit History

| ($ in millions) | FY 2016 | FY 2017 | FY 2018 | FY 2019 CR | FY 2020 Request |
|---|---|---|---|---|---|
| Amount Available for the PSOB Discretionary Program (Disability and Educational Assistance) | $15.0 | $13.8 | $16.3 | $24.8 | $24.8 |
| PSOB Mandatory (Death Benefits) | $65.7 | $61.2 | $72.0 | $92.0 | $115.0 |

80

| ($ in millions) | FY 2016 | FY 2017 | FY 2018* | FY 2019 CR | FY 2020 Request |
|---|---|---|---|---|---|
| PSOB Death Benefits Obligations | $112.1 | $111.8 | $72.0 | TBD | TBD |
| Number of Claims Filed | 285 | 356 | 190 claims (324 initiated applications) | TBD | TBD |
| Number of Claims Approved | 330 | 399 | 318 | TBD | TBD |
| PSOB  Disability Benefits Obligations | $8.8 | $22.3 | TBD | TBD | TBD |
| Number of Claims Filed | 61 | 77 | 43 claims (139 initiated applications) | TBD | TBD |
| Number of Claims Approved | 31 | 82 | 59 | TBD | TBD |
| PSOB  Educational Assistance Benefits Obligations | $3.4 | $4 | TBD | TBD | TBD |
| Number of Claims Filed | 679 | 715 | 609 | TBD | TBD |
| Number of Claims Approved | 549 | 601 | 642 | TBD | TBD |

\* In this column "claims" refers to the number of PSOB claims that included enough documentation to meet the minimum requirements for formal review of a PSOB benefits claim. "Initiated applications" refers to the total number of requests for PSOB benefits submitted to OJP that have not yet met the standard for being considered a "claim".

**FY 2020 Increase Justification**
In FY 2020, the Department is requesting a total of $139.8 million for PSOB, an increase of $23.0 million above the FY 2019 Continuing Resolution (CR) rate. This additional funding will enable OJP to promptly pay PSOB death benefits to qualifying survivors of public safety officers killed in the line of duty.

Over the past several years, the number of PSOB claims and resulting benefits payments have increased; in some cases, OJP had to request additional mandatory funds from the Treasury in order to pay all qualifying death benefit claims, which delayed some benefit payments. This increased level of payments is attributed to the number of death claims resulting from exposure to the 9/11 terrorist attacks. In addition, the PSOB 2.0 system has improved the efficiency of the claim review process, leading to an increased number of claims being approved in recent years. The FY 2020 request of $115.0 million for PSOB death benefits brings overall funding for this program in line with the annual payment levels over the past several years.

**For additional information, please visit: Public Safety Officers' Benefits.**

Program Increases by Item

## OFFICE OF JUSTICE PROGRAMS
### Increase Request: National Criminal History Improvement Program (NCHIP)

### Funding

FY 2020 Request:        $65.0M
FY 2019 CR:             $50.0M



**Interstate Identification Index (III) National Fingerprint File (NFF)**
Revised March 31, 2016

### Program Description

**Purpose**: To support states and federally recognized Indian tribes to enhance the quality, completeness, and accessibility of criminal history record information and ensure the nationwide implementation of effective criminal justice and noncriminal justice background check systems to improve the nation's safety and security.

The Bureau of Justice Statistics (BJS) is authorized to provide for improvements in the accuracy, quality, timeliness, immediate accessibility, and integration of state criminal history and related records, support the development and enhancement of national systems of criminal history and related records including the National Instant Criminal Background Check System (NICS) and the records of the National Crime Information Center (NCIC), facilitate state participation in national records and information systems, and support statistical research for critical analysis of the improvement and utilization of criminal history records.

**Authorizing Legislation**: (34 U.S.C. § 40301 (reauthorized under Title I of the Consolidated Appropriations Act of 2018, P.L. 115-141).

**First Year of Appropriation:** 1995

**Administering Agency:** Bureau of Justice Statistics

### DOJ Strategic Goal and Objective

**DOJ Strategic Goal 3**:  Reduce Violent Crime and Promote Public Safety

**Strategic Objective 3.1**:  Combat violent crime, promote safe communities, and uphold the rights of victims of crime

**Who can Apply for Funds:** States and federally recognized Indian tribes. Only the agency designated by the governor to administer the NCHIP program can apply from each state.

**How Funds are Distributed:**  The distribution of NCHIP funding is competitively awarded based on need rather than population or other formula-based methodology. Awards are made for up to 24 months. Funds are also allocated for national initiatives.

National Criminal History Improvement Program (NCHIP) Five Year Budget Authority
($ in millions)

| | FY 16 | FY 17 | FY 18 | FY 19 CR | FY 20 Request |
|---|---|---|---|---|---|
| | $48.0 | $48.0 | $50.0 | $50.0 | $65.0 |

No. 18-56292 archived on October 25, 2019 cited in City of Los Angeles v. Barr

82

<u>**Program Goals**</u>:

- Support the replacement of old and outdated criminal record systems so states and tribes can electronically contribute critical information such as fingerprint-based arrests, prosecutor and court dispositions, and protection orders, using modern well-functioning systems to ensure accurate, timely, and complete records.

- Support the integration of systems to improve access to and exchange of information among criminal justice agencies, including law enforcement, courts, prosecutors, and corrections.

- Support the development of comprehensive data for background checks on persons employed or licensed for sensitive positions such as in airports, government facilities, law enforcement agencies, or with vulnerable populations including children, the elderly, or the disabled.

<u>**Accomplishments:**</u>

- **Increased participation in Interstate Identification Index (III):** Since 1993, the number of states participating in the FBI's III grew from 26 to all 50 states and the District of Columbia. There are over 95 million fingerprint-supported criminal history records accessible through III and available at the time of a background check. An average of 30 million of such exchanges occur monthly for criminal justice and noncriminal justice purposes.

- **National Instant Criminal Background Check System (NICS):** Developed, in part, through NCHIP funding, the NICS now supports over 25 million record checks annually at the presale stage of firearms purchases. The number of electronically available records checked at the time of a firearm background check was nearly 100 million at year-end 2017, the latest data available from the FBI.

- **Domestic Violence and Protection Orders:** States can submit data and flag criminal history records showing convictions for domestic violence or protection orders against people. All 50 states, the District of Columbia, and two territories are submitting records of active protection orders to the NCIC Protection Order File. As of September 30, 2018, the NCIC Protection Order File contained over 1.8 million active orders. An additional 74,000 protection orders were available for firearm-related background checks in the NICS Indices.

### Application and Award History

| ($ in millions) | FY 2016 | FY 2017 | FY 2018 | FY 2019 CR | FY 22020 Request |
|---|---|---|---|---|---|
| Amount Appropriated | $48.0 | $48.0 | $50.0 | $50.0 | $65.0 |
| Total Funding Awarded | $33.9 | $31.9 | $43.2 | TBD | TBD |
| Number of Applications | 42 | 43 | 41 | TBD | TBD |
| Number of Awards | 39 | 41 | 41 | TBD | TBD |

<u>**FY 2020 Increase Justification**</u>

In FY 2020, the President's Budget requests $65.0 million for NCHIP, an increase of $15.0 million above the FY 2019 Continuing Resolution (CR) rate. NCHIP helps states, tribes, and territories improve the quality, timeliness, and accessibility of criminal history records for use by law enforcement. These records play a vital role in helping law enforcement investigate crimes, conduct employment-related background checks, determine a person's eligibility to purchase firearms, and support prosecution and sentencing determinations.

Cited in City of Los Angeles v. Barr
No. 18-56292 (9th Cir.) on December 15, 2019

With this program, the Bureau of Justice Statistics (BJS) is supporting states' efforts to:

1. Modernize Systems. Modern well-functioning systems are essential to ensuring accurate, timely, and complete records. With NCHIP funds, states are replacing old and outdated systems so they can electronically contribute critical information such as fingerprint-based arrests, prosecutor and court dispositions, and protection orders.

2. Integrate Systems. Law enforcement, courts, prosecutors, and corrections need to be able to access and exchange criminal history records.

3. Support background checks for sensitive employment. Comprehensive data from criminal history records needs to be available to support background checks on persons employed or licensed for sensitive positions such as in airports, government facilities, law enforcement agencies, or with vulnerable populations including children, the elderly, or the disabled.

For states that may not meet the eligibility criteria for the NICS Act Record Improvement Program (NARIP), NCHIP can provide vital, immediate support to improve the availability and quality of records vital to NICS, as well as efforts to improve criminal history records more broadly. The funding increase requested will enable OJP to continue to expand NCHIP's support for improvements to the nation's criminal history records systems.

**For additional information, please visit: National Criminal History Improvement Program (NCHIP).**

cited in City of Los Angeles v. Barr
No. 18-56292 archived on October 25, 2019

**OFFICE OF JUSTICE PROGRAMS**
**Increase Request: STOP School Violence Act Program**

### Funding

FY 2020 Request:        $100.0M
FY 2019 CR:             $ 75.0M

### FY 2018 Stop School Violence Act Program Activities



- $24.5
- $27.8
- $19.1

- STOP School Violence Prevention and Mental Health Training Porgram (BJA)
- STOP School Violence Threat Assessment and Technology Reporting Program (BJA)
- School Violence Prevention Program (COPS)

### Program Description

**Purpose**: To prevent or mitigate incidents of school violence by promoting coordinated, evidence-based approaches to school safety that encourage collaboration between schools and local law enforcement.

The STOP School Violence Act is jointly administered by the Bureau of Justice Assistance (BJA) and the Office of Community Oriented Policing Services (COPS Office).

BJA supports the following areas:

1. Providing prevention training to school personnel and education to students to protect them from violent school attacks; training will also be supported for school administrators in responding to mental health driven violence at schools;

2. Supporting development and operation of anonymous reporting systems through mechanisms such as cyber applications, hotlines, and websites; and

3. Promoting the development and operation of school threat assessment and crisis intervention teams, in conjunction with the community and law enforcement.

The COPS Office oversees the following areas under this program:

1. Supporting state, local, and tribal efforts to improve security at schools and on school grounds through coordination with law enforcement;

2. Training for law enforcement officers to prevent student violence;

3. Installation of security equipment and deterrent measures such as metal detectors, locks, and lighting; and

4. Implementation of technology to expedite notification of law enforcement during an emergency.

**Authorizing Legislation**: Student, Teachers, and Officers Preventing (STOP) School Violence Act of 2018 (34 U.S.C. 10555(a) (2))

**First Year of Appropriation:** 2018

**Administering Agencies:** Bureau of Justice Assistance and Office of Community Oriented Policing Services

### DOJ Strategic Goal and Objective

**DOJ Strategic Goal 3**:  Reduce Violent Crime and Promote Public Safety
**Strategic Objective 3.1**:  Combat violent crime, promote safe communities, and uphold the rights of victims of crime

cited in City of Los Angeles v. Barr
No. 18-56292 archived on October 23, 2019

**Who Can Apply for Funding and How Funds are Distributed**:

| Activity | Who Can Apply for Funding | Award Type | Length of Award | Amounts (Up to) |
|---|---|---|---|---|
| STOP School Violence Prevention and Mental Health Training Program (BJA) | States, units of local government, and federally recognized Indian tribes | Competitive discretionary grants | 36 months | $100,000 to $1,000,000 (depending on size of jurisdiction) |
| STOP School Violence Threat Assessment and Technology Reporting Program (BJA) | States, units of local government, and federally recognized Indian tribes | Competitive discretionary grants | 36 months | $100,000 to $1,000,000 (depending on size of jurisdiction) |
| School Violence Prevention Program (COPS) | States, units of local government, and federally recognized Indian tribes | Competitive discretionary grants | 24 months | $500,000 |

## Program Goals

- To provide training to teachers and education to students with the intent to prevent student violence, as well as to provide specialized training for school officials in responding to related mental health crises that may precipitate violent attacks in schools.

- To improve security at schools and on school grounds through evidence-based school safety programs making use of physical security measures, technology, and coordination with local law enforcement.



**Stop School Violence Act Program Five Year Budget Authority**
($ in millions)

Note: Includes funding for both the COPS and OJP portions of this program.

## Accomplishments

- During FY 2018, BJA made 85 awards totaling $27.8 million to support school violence prevention efforts through its STOP School Violence Prevention and Mental Health Training solicitation.

- BJA also made 68 awards, totaling $19.1 million to support the development of school threat assessment and reporting programs under its STOP School Violence Threat Assessment and Technology Reporting solicitation.

- Applications under both of these solicitations grouped applications by the type of applicant (states, local governments, or Native American tribes) and population size to ensure that funding was distributed equitably and reached as many communities as possible.

- The 153 BJA awards were made to jurisdictions in 38 states of which 29 percent rural, 26 percent suburban, 16 percent urban, 29 percent to states and one award to tribal.

- During FY 2018, the COPS Office made 91 awards totaling $24.5 million to support school violence prevention efforts through its School Violence Prevention Program (SVPP) solicitation.

- The 91 SVPP awards were made to jurisdictions in 33 states (40 percent rural, 33 percent suburban, 24 percent urban, and three percent to states).  The most common elements of awarded projects included camera systems, target hardening equipment (access controls, doors, locks, etc.), and technology (panic alarms, radios, etc.).

cited in City of Los Angeles v. Barr No. 18-56292 archived on October 25, 2019

- Based on information provided by successful FY 2018 SVPP applicants, more than 5,300 schools and over three million students will be impacted by the funded school safety improvements.

**Application and Award History**

| ($ in millions) | FY 2016 | FY 2017 | FY 2018 | FY 2019 CR | FY 2020 Request |
|---|---|---|---|---|---|
| **BJA STOP School Violence Prevention and Mental Health Training and Threat Assessment and Technology Reporting Programs** | | | | | |
| Amount Available for Funding ^ | $0 | $0 | $47.5 | $50.0 | TBD |
| Total Funding Awarded | $0 | $0 | $46.9 | TBD | TBD |
| Number of Applications | 0 | 0 | 213 | TBD | TBD |
| Number of Awards | 0 | 0 | 183 | TBD | TBD |
| Percentage of Applications Funded | 0% | 0% | 85% | TBD | TBD |
| **COPS Office School Violence Prevention Program** | | | | | |
| Amount Available for Funding ^ | $0 | $0 | $25.0 | $25.0 | TBD |
| Total Funding Awarded | $0 | $0 | $24.5 | TBD | TBD |
| Number of Applications | 0 | 0 | 202 | TBD | TBD |
| Number of Awards | 0 | 0 | 91 | TBD | TBD |
| Percentage of Applications Funded | 0% | 0% | 45% | TBD | TBD |

^Amount does not include funds used for management and administration, peer review, or other authorized purposes.
**Note:** This program was authorized and received its first appropriation in FY 2018.

## FY 2020 Increase Justification

In FY 2020, the President's Budget requests $100.0 million for the STOP School Violence Program, an increase of $25.0 million above the FY 2019 Continuing Resolution (CR) rate. Funding will be allocated to the three purpose areas addressed by this program as specified in the STOP School Violence Act of 2018, with:

- Approximately two-thirds allocated to the Prevention Training and Response to Mental Health Crisis Program and the Threat Assessment and Technology Reporting Program (administered by OJP's Bureau of Justice Assistance); and

- Approximately one-third allocated to the School Violence Prevention Program (overseen by the COPS Office).

The tragic incidents of school violence over the past several years have prompted many state, local, and tribal law enforcement agencies and school districts to seek more effective ways to address school violence. In response, BJA and the COPS Office launched their respective STOP School Violence Act programs in FY 2018. The additional funding requested would expand upon these efforts by making new awards to states, units of local government, and federally-recognized Indian tribes through a competitive process to support and implement new evidence-based school safety strategies and trainings.

Grant funding awarded under this program must be used to support evidence-based programs and will be distributed equitably among the geographic regions of the U.S. and among urban, suburban, and rural areas. Federal funds awarded under the STOP School Violence Act Program may be used to pay up to 75 percent of the total cost of any project that they support, requiring a 25 percent cash or in-kind match from the grantee.

**For additional information, please visit the BJA** STOP School Violence Program **page and the COPS Office** STOP School Violence Prevention Program**.**

87

## OFFICE OF JUSTICE PROGRAMS
### Increase Request: Missing and Exploited Children Program

### Funding

FY 2020 Request:        $81.0M
FY 2019 CR:             $76.0M

**FY 2018 Activities Chart**



22%

35%

43%

- 🔵 Internet Crimes Against Children
- 🟠 National Center for Missing and Exploited Children
- ⬜ Amber Alert & Other MEC Programs

**Program Description**

**Purpose**: To support and enhance the response to missing and exploited children and their families. Funds support:

1. Internet Crimes Against Children Program – to enhance the investigative response to technology-facilitated crimes against children (including a hiring program for wounded veterans);

2. National Center for Missing and Exploited Children – to enhance information sharing among regional nonprofit organizations and state missing children clearinghouses as well as law enforcement agencies;

3. AMBER Alert Program – a partnership between law enforcement agencies, broadcasters, transportation agencies, and the wireless industry, to activate urgent bulletins in the most serious child-abduction cases; and

4. Other Missing and Exploited Children program activities – to support training and technical assistance, research, and other activities, such as mentoring for child victims of child sex trafficking and National Missing Children's Day.

**Authorizing Legislation**: 34 U.S.C. § 20504(f); 34 U.S.C. § 11291(a); 34 U.S.C. § 11297(a)

**First Year of Appropriation:** 1984

**Administering Agency:** Office of Juvenile Justice and Delinquency Prevention (OJJDP)

**DOJ Strategic Goal and Objective**
**DOJ Strategic Goal 3**: Reduce Violent Crime and Promote Public Safety
**Strategic Objective 3.1**:  Combat violent crime, promote safe communities, and uphold the rights of victims of crime

**Who Can Apply for Funding:** Public agencies, including state agencies, units of local government (including federally recognized Indian tribal governments), public universities and colleges, and nonprofit and for-profit organizations (including faith-based, tribal, and community organizations). For-profit organizations must agree to forgo any profit or management fee. The National Center for Missing and Exploited Children funding opportunity is by invitation only.

**How Funds are Distributed:**  Except for the National Center for Missing and Exploited Children program (which is by invitation only), awards are made through a competitive process for 12-month periods. Based on the availability of funds and determination of successful performance, OJJDP may provide continuation funding for as many as two additional 12-month increments. Award amounts vary by program.  See OJJDP Award Information for more information.

cited in City of Los Angeles v. Barr
No. 18-56292 archived on October 25, 2019

88

## Program Goals

- Support task forces and training and technical assistance for the Missing and Exploited Children Program.

- Disseminate best practices and cutting-edge information and technology (via training and technical assistance) to investigators, prosecutors, child protection agencies, children's advocacy centers, and service providers on how to respond to missing child and/or child exploitation issues.

- Assist state, local, and tribal governments as well as non-governmental organizations in developing a multidisciplinary response to child victimization issues.



**Missing and Exploited Children Program**
**Five Year Budget Authority**
($ in millions)

## Accomplishments

- From the program's establishment in 1984 to December 31, 2018, the National Center for Missing and Exploited Children assisted in the recovery of more than 290,211 missing children.

- As of December 31, 2018, the AMBER Alert program has been credited with the successful rescue of 941 children since its inception in 1996. Wireless Emergency Alert messages were credited for the successful rescue of 55 of those children. In FY 2018, 95 percent of children featured in AMBER Alert were recovered within 72 hours.

- Internet Crimes Against Children Task Forces currently cover all 50 states and in FY 2018 conducted more than 70,000 investigations that have resulted in the arrest of more than 8,700 individuals.

### Application and Award History

| ($ in millions) | FY 2016 | FY 2017 | FY 2018 | FY 2019 CR | FY 2020 Request |
|---|---|---|---|---|---|
| Amount Available for Funding | $64.9^ | $65.4^ | $69.1^ | $76.0 | $81.0 |
| Total Funding Awarded | $64.9 | $65.4 | $69.1 | TBD | TBD |
| Number of Applications | 162 | 127 | 167 | TBD | TBD |
| Number of Awards | 90 | 81 | 83 | TBD | TBD |
| Percentage of Applications Funded | 56% | 64% | 50% | TBD | TBD |

^ Amount of appropriation minus funds used for management and administration, peer review, or other authorized purposes.

### FY 2020 Increase Justification

In FY 2020, the President's Budget requests $81 million for the Missing and Exploited Children (MEC) Program, an increase of $5.0 million above the FY 2019 Continuing Resolution (CR) rate. Through this program, OJJDP plays a leading role in helping law enforcement and criminal justice professionals address the many challenges involved in resolving cases involving missing children. The MEC Program also funds training and technical assistance to support the work of Internet Crimes Against Children (ICAC) task forces throughout the nation. The ICAC Task Force Program is one of the nation's leading efforts to bring federal, state, local, and tribal law enforcement and criminal justice personnel together to combat online child exploitation.

The $5 million increase requested in the President's Budget will support expanded ICAC task force efforts to enhance the investigative response to technology-facilitated crimes against children. OJJDP will also expand its

outreach to American Indian and Native Alaskan communities to help them improve their participation in the AMBER Alert system and address ongoing concerns surrounding the response to missing persons cases involving Native American youth.

**For additional information, please visit: amberalert.gov, icactaskforce.org, or missingkids.com.**

cited in City of Los Angeles v. Barr
No. 18-56292 archived on October 25, 2019

Program Increases by Item

## OFFICE OF JUSTICE PROGRAMS
### Increase Request:  Improving Juvenile Indigent Defense Program Expansion

| Funding | |
|---|---|
| FY 2020 Request: | $2.5M |
| FY 2019 CR: | $2.0M |



Figure 1: From DC Public Defender Service (http://www.pdsdc.org/)

### Current Program Description

**Purpose**: To assess and improve access to high quality juvenile defense and reentry legal services for juveniles in the U.S.

This program provides funding and other resources to:

- Help states and tribes develop effective, well-resourced model juvenile defense delivery systems with standards of practice and policy for their effective management; and
- Provide cost-effective and innovative training for the juvenile defense bar, including court-appointed counsel, particularly in rural, remote and underserved areas.

**Authorizing Legislation:**  Created through Department of Justice appropriations acts

**First Year of Appropriation:** 2015

**Administering Agency:** Office of Juvenile Justice and Delinquency Prevention

**Who Can Apply for Funding and How Funds are Distributed:** Through a competitive process, awards are made as follows:

| Category | Who Can Apply for Funding | Award Type | Award Amounts | Award Period |
|---|---|---|---|---|
| State System Juvenile Defense Enhancements for Youth Offenders | States, territories, units of local government, and federally recognized tribes | Grants | $500,000<br><br>4 awards (or sub-awards) of up to $125,000 each | 36 months |
| National Training and Technical Assistance for Juvenile Defense | Non-profit and for-profit organizations and institutions of higher education. Includes tribal organizations and institutions of higher education. For-profit organizations must agree to forgo any profit or management fee. | Cooperative Agreement | $750,000 | 36 months |

cited in City of Los Angeles v. Barr No. 18-56292 archived dated October 25, 2019

91

## Current Program Goals

- Promote multi-agency, cross-disciplinary collaboration among critical stakeholders to plan and implement system-wide juvenile defense reforms. Stakeholders include those in the juvenile justice system as well as schools, mental health professionals, community advocates, youth and family serving organizations, and policy makers at the state and local level.

- Promote education and technical assistance for juvenile defense professionals on adolescent development, trauma-informed care, appellate and post-disposition advocacy, and other critical topics impacting the effective assistance of counsel.

## Accomplishments

- In FY 2018, under that State System Enhancements for Youth Offenders program, OJJDP awarded grants to the North Carolina Administrative Office of the Courts; Hamilton County (Ohio) Public Defender; Connecticut Public Defender Services; and the Maryland Office of the Public Defender. The funding will support the sites in their efforts to address barriers and gaps within their juvenile justice systems' juvenile defense delivery systems for indigent youth in order to reduce reoffending and decrease recidivism.



- The National Juvenile Defender Center (NJDC), the training and technical assistance provider funded through this program, accomplished the following:

  o Developed assessment and planning tools and materials and provided the four planning grantees with intensive training and technical assistance throughout the statewide reform planning phase;

  o Expanded the Juvenile Training Immersion Program for defenders to include a Reentry module;

  o Developed and disseminated a series of educational resources and materials to educate juvenile defense system professionals and other key stakeholders about the national crisis in juvenile defense; and

  o Provided assistance to individual defenders, defender offices, and regional juvenile defender resource centers.

### Application and Award History

| ($ in millions) | FY 2016 | FY 2017 | FY 2018 | FY 2019 CR | FY 2020 Request |
|---|---|---|---|---|---|
| Amount Available for Funding | $2.3^ | $1.8^ | $1.8^ | $2.0 | $2.5 |
| Total Funding Awarded | $2.3 | $1.6 | $1.7 | TBD | TBD |
| Number of Applications | 6 | 21 | 16 | TBD | TBD |
| Number of Awards | 3 | 2 | 4 | TBD | TBD |
| Percentage of Applications Funded | 50% | 10% | 25% | TBD | TBD |

^ Amount does not include funds used for management and administration, peer review, or other authorized purposes.

92

**FY 2020 Increase Justification**

In FY 2020, the President's Budget requests $2.5 million for the Juvenile Justice Prosecution and Defense Process Improvement Program, an increase of $0.5 million above the FY 2019 Continuing Resolution (CR) rate. The additional funding will enable the Office of Juvenile Justice and Delinquency Prevention to expand the current Improving Juvenile Indigent Defense Program to address the needs of both juvenile prosecutors and defense attorneys handling cases in juvenile court.

This expanded program will support two areas of improvement for the juvenile justice system – juvenile prosecution and juvenile indigent defense. The juvenile defense program will continue to support state and local efforts to provide cost-effective and innovative training and resources for the juvenile defense bar, including court-appointed counsel, particularly in rural, remote and underserved areas. The juvenile prosecution component is a new addition to the program in FY 2020, and will support states in providing training and professional development and needed resources to ensure juvenile prosecutors have access to information that addresses the unique framework of the juvenile court. The juvenile prosecution program will promote and replicate best practices in juvenile prosecution including, but not limited to, juvenile diversion programs, alternatives to detention, mediation, expungement, educational programs, mental health, and youth advocacy.

This program will promote model training and technical assistance designed specifically for newly assigned juvenile prosecutors; juvenile prosecutors handling complex and difficult cases; and training for elected prosecutors and their deputy leadership to effectively leverage resources and to develop policy innovation, accountability and performance measures for juvenile justice systems. The program will identify critical program, practice, and policy needs and gaps; areas for improvement; and aspects that are working and may be replicable and/or scalable across jurisdictions with respect to juvenile prosecution and juvenile defense.

The requested funding will be split evenly between improving juvenile indigent defense systems ($1.25 million) and enhancing juvenile prosecutors' abilities to prosecute ($1.25 million).

**For additional information about the current program, please visit:** http://www.ojjdp.gov/

## OFFICE OF JUSTICE PROGRAMS
### Increase Request: Southwest Border Rural Law Enforcement Violent Crime Reduction Initiative

### Funding

| | |
|---|---|
| FY 2020 Request: | [$6.0M] |
| FY 2019 CR: | $0 |



### Program Description
**Purpose:** To assist law enforcement agencies serving rural jurisdictions along or near the Southwest Border to address increases in crime, with a special focus on violent crime, in border communities. This program is a carveout of Byrne Justice Assistance Grants (JAG).

Through this initiative, OJP will make competitive grant awards to local and tribal law enforcement agencies serving rural jurisdictions along or near the Southwest Border to support field-based projects that improve local crime-fighting capacity. Examples of projects that may be funded include:

- Efforts to improve data collection and information and intelligence sharing;

- Implementation and use of rapid DNA analysis technology in law enforcement investigations;

- Opioid interdiction programs;

- Creating or supporting regional real-time-crime-centers (RTCC); and

- Use of drug trafficking interdiction teams.

BJA will also select a training and technical assistance provider to assist rural law enforcement agencies located along or near the Southwest Border. This provider will assist these agencies in assessing their needs and improving their law enforcement intelligence and information sharing capabilities.

**Authorizing Legislation**: The Department of Justice Appropriations Act (requested in FY 2020)

**Administering Agency:** Bureau of Justice Assistance (BJA)

### DOJ Strategic Goal and Objective
**DOJ Strategic Goal 3**:  Reduce Violent Crime and Promote Public Safety
**Strategic Objective 3.1**:  Combat violent crime, promote safe communities, and uphold the rights of victims of crime

### FY 2020 Increase Justification
This new initiative responds to feedback that the Office of Justice Programs (OJP) has received from law enforcement executives managing agencies that serve jurisdictions on or in close proximity to the Nation's Southwest Border. These leaders report that they need additional assistance, especially in the areas of law enforcement intelligence and information sharing, to help combat violent crime, drug trafficking, gang activity, and recent increases in property crimes.

94

**Budget Request:**

Funding: +$6.0 million, for a total of $6.0 million, as a carve-out under the Byrne Justice Assistance Grants (JAG) program

| | Pos | Agt/ Atty | FTE | Total ($000) | FY 2021 Net Annualization (change from 2020) ($000) | FY 2022 Net Annualization (change from 2021) ($000) |
|---|---|---|---|---|---|---|
| FY 2018 Enacted | 0 | 0 | 0 | $0 | | |
| FY 2019  CR | 0 | 0 | 0 | 0 | | |
| FY 2020 Current Services | 0 | 0 | 0 | 0 | | |
| *Increases:* | | | | | | |
|   Personnel | 0 | 0 | 0 | +0 | 0 | 0 |
|   Non-Personnel | | | | [+6,000] | | |
| Grand Total | 0 | 0 | 0 | [$6,000] | 0 | 0 |

cited in City of Los Angeles v. Barr
No. 18-56292 archived on October 25, 2019

## OFFICE OF JUSTICE PROGRAMS
### Increase Request: Corrections-Related Research, Training, and Technical Assistance

### Funding

FY 2020 Request:        $8.0M
FY 2019 CR:             $0



### Description

In FY 2020, the President's Budget request transfers activities of the National Institute of Corrections (NIC) from the Bureau of Prisons (BOP) to OJP. A total of $5 million is requested for corrections-related training and technical assistance, and $3 million is requested for state and local corrections-related research.

**Authorizing Legislation**: The Department of Justice Appropriations Act (requested in FY 2020)

**Administering Agency:** National Institute of Justice (NIJ) and Bureau of Justice Assistance (BJA)

### DOJ Strategic Goal and Objective

**DOJ Strategic Goal 3**:  Reduce Violent Crime and Promote Public Safety
**Strategic Objective 3.1**:  Combat violent crime, promote safe communities, and uphold the rights of victims of crime

### FY 2020 Increase Justification

In FY 2020, the President's Budget request transfers activities of the National Institute of Corrections (NIC) from the Bureau of Prisons (BOP) to OJP.  This transfer will help to consolidate the Department's state and local corrections-related research and evaluation programs within OJP's National Institute of Justice (NIJ) and better align NIC's efforts to assist state local and tribal corrections professionals with Bureau of Justice Assistance (BJA) grant programs. A total of $8.0 million is being requested to support corrections-related activities through two new OJP programs in FY 2020 as follows:

Cited in City of Los Angeles v. Barr
No. 18-56292 archived October 29, 2019

| Appropriations Account/ Programs | Administered By | Activities Supported | FY 2020 President's Budget Request |
|---|---|---|---|
|  |  |  |  |
| **Research, Evaluation, and Statistics** |  |  |  |
| Corrections-Related Research | NIJ | Corrections-related statistics and research | $3,000 |
|  |  |  |  |
| **State and Local Law Enforcement Assistance** |  |  |  |
| Innovations in Corrections | BJA | Corrections-related training and technical assistance | $5,000 |
|  |  |  |  |
| **Total, National Institute of Corrections** |  |  | **$8,000** |

Founded in 1974, NIC is a center of learning, innovation, and leadership that advances effective correctional practice and policy. NIC leads federal efforts to promote evidence-based corrections programs and identify best practices and promising new programs. It also supports extensive training and technical assistance programs

designed to improve the capabilities of federal, state, local, and tribal corrections personnel and promote leadership development within the corrections field.

Due to common research and programmatic interests, BJA, NIJ, and NIC already work on similar issues. For example, both NIC and NIJ are addressing issues surrounding reducing sexual violence in detention facilities and promoting evidence-based programs and practices. Both BJA and NIC are addressing issues surrounding prisoner reentry programs and reducing sexual violence in detention facilities. Integrating the NIC's programs and activities into BJA and NIJ will better assist state, local, and tribal corrections professionals through closer collaboration in corrections- and reentry-related grant programs.

cited in City of Los Angeles v. Barr
No. 18-56292 archived on October 25, 2019

Program Increases by Item

# VI.  Program Decreases by Item

cited in City of Los Angeles v. Barr No. 18-56292 archived on October 25, 2019

Program Decreases by Item

## OFFICE OF JUSTICE PROGRAMS
### Decrease Request: Byrne Justice Assistance Grant (JAG) Program

### Funding

FY 2020 Request:        $405.2 M
FY 2019 CR:              $415.5 M

#### FY 2018 Activities Chart
($ in millions)



$75.9

$176.8

$79.2

- Formula Grants to States and Territories
- Formula Grants to Local Governments and Indian Tribes
- Byrne JAG Program Carve-outs

### Program Description

**Purpose**: To improve the functioning of the criminal justice system through flexible, multipurpose formula grants to states, local governments, and Indian tribes. The awards support a wide range of criminal justice and public safety initiatives, including:

- Law enforcement
- Prosecution and courts
- Crime prevention and education
- Corrections and community corrections
- Drug treatment and enforcement
- Program planning, evaluation and technology
- Crime victim and witness programs
- Mental health programs and related law enforcement and corrections programs

**Authorizing Legislation:** Omnibus Crime Control and Safe Streets Act of 1968, as amended (Title I of Pub. L. No. 90-351 (generally codified at 34 U.S.C. 10151-10158), including subpart 1 of part E (codified at 34 U.S.C. 10151 - 10158); see also 28 U.S.C. 530C(a).)

**First Year of Appropriation:** 2005

**Administering Agency:** Bureau of Justice Assistance (BJA)

### DOJ Strategic Goal and Objective
**DOJ Strategic Goal 3**:  Reduce Violent Crime and Promote Public Safety
**Strategic Objective 3.1**:  Combat violent crime, promote safe communities, and uphold the rights of victims of crime

### Who Can Apply for Funding and How Funds Are Distributed:

| Activity | Who Can Apply for Funding | Award Type | Amounts |
|---|---|---|---|
| Formula Grants to States | States, the District of Columbia, the Commonwealth of Puerto Rico, the Northern Mariana Islands, the U.S. Virgin Islands, Guam, and American Samoa | Grants available for four years | Determined by formula based on population and violent crime statistics |
| Formula Grants to Local Governments and Indian Tribes | Units of local government and federally recognized Indian tribes. | Awards more than $25,000 for four years Awards less than $25,000 for two years | Determined by formula based on population and violent crime statistics |

cited in City of Los Angeles v. Barr No. 18-56292 archived on October 25, 2019

## Program Goals

In 2018, BJA encouraged states, territories, units of local government (including tribal government) to fund projects focused on addressing challenges in the areas of reducing gun violence, officer safety and wellness, border security, and collaborative prosecution. The use of funding towards compliance with the National Incident Based Reporting System (NIBRS) was mandatory for direct recipients if the entity was not already certified as compliant by the FBI.

## Accomplishments

The **JAG Activity Report** is based on data submitted by grantees through BJA's Performance Measurement Tool (PMT) and highlights award data, including information about how funds were allocated and used.  The most recent report is for 2014-2016, and was issued in September 2018.

**BJA's Success Stories webpage** currently features projects that grantees have indicated have demonstrated success or shown promise in reducing crime and positively impacting communities. This web page is a valuable resource for states, localities, territories, tribes, and criminal justice professionals who seek to identify and learn about JAG and other successful BJA-funded projects advancing innovation, crime reduction, and evidence-based practices.



Byrne Justice Assistance Grants (JAG) Program Five Year Budget Authority ($ in millions)

## Application and Award History

| ($ in millions) | FY 2016 [1] | FY 2017 | FY 2018 | FY 2019 CR | FY 2020 Request |
|---|---|---|---|---|---|
| Amount Available for Funding | $438.5 | $403.0 | $415.5 | $415.5 | $405.2 |
| Total Funding Awarded^ | $363.7 | $254.4 [2] | $256.0 [2] | TBD | TBD |
| *Formula Grants to States and Territories:* | | | | | |
| Funding Awarded | $179.6 | $174.5 | $176.8 | TBD | TBD |
| Number of Eligible Applicants | 56 | 56 | 56 | TBD | TBD |
| Number of Awards | 56 | 56 | 56 | TBD | TBD |
| | | | | | |
| *Formula Grants to Local Governments and Indian Tribes:* | | | | | |
| Funding Awarded | $84.3 | $79.2 | $79.2 | TBD | TBD |
| Number of Eligible Applicants | 1,162 | 1,131 | 1,148 | TBD | TBD |
| Number of Awards | 1,011 | 937 | 881 | TBD | TBD |

^ Does not include funds used for management and administration, peer review, or other authorized purposes

[1] In FY 2016, there was a carve-out of $100 million to support Presidential Nominating Conventions. This total includes those awards.

[2] A select number of FY 2017 and 2018 JAG formula grants have not been released to grantees as a result concerns regarding compliance with federal immigration laws and ongoing litigation related to these matters.

**FY 2020 Decrease Justification**

In FY 2020, the President's Budget requests $405.2 million for the Byrne Justice Assistance Grant (JAG) program, a decrease of $10.3 million below the FY 2019 Continuing Resolution (CR) rate. The Byrne JAG program plays an essential role in supporting state, local, and tribal law enforcement and criminal justice agencies in their efforts to reduce violent crime and make communities safer. The FY 2020 President's Budget request provides an appropriate level of funding for JAG formula grants to state, local and tribal criminal justice agencies, as well as supporting key programs traditionally funded as JAG program carve-outs. This funding decrease will not have any significant impact on this program's overall performance.

In FY 2020, several programs that were previously funded by separate line item appropriations, including the Body Worn Camera Partnership Program ($22.5 million), the Bulletproof Vest Partnership ($22.5 million), and the Capital Case Litigation Improvement Grant Program ($3.0 million), will be funded through Byrne JAG carveouts. In addition, OJP is proposing the following carve-out programs:

- National Public Safety Partnerships ($5.0 million), which will leverage lessons learned from previous experiences with violence reduction programs and consult with local governments on their violence reduction needs through a unified, DOJ approach; and

- Southwest Border Rural Law Enforcement Violent Crime Reduction Initiative ($6 million) *(new)*, will assist law enforcement agencies serving rural jurisdictions along the Southwest Border to address recent increases in crime, with a special focus on violent crime, in border communities.

- National Missing and Unidentified Persons System (NamUs) ($3.6 million), which is a national, centralized repository and resource center for locating and identifying missing persons and unidentified human remains. NamUs provides DNA testing and other forensic services assistance to law enforcement, such as fingerprinting, dental coding, and comparisons of anthropological evaluations.

The FY 2020 President's Budget does not request funding for several existing Byrne JAG carve-out programs:

- OJP is requesting funding for Project Safe Neighborhoods (PSN) activities as an independent line item (the PSN Block Grants program). All of the activities previously supported by the Violent Gang and Gun Crime Reduction/PSN carve-out will be incorporated into the PSN Block Grants program.

- Activities previously supported by the Strategies for Policing Innovation (formerly Smart Policing) and Innovative Prosecution Solutions (formerly Smart Prosecution) programs will be incorporated into other OJP programs to ensure adequate funding is available to support JAG formula grants.

**For additional information, please visit the** Byrne Justice Assistance Grants web page.

cited in City of Los Angeles v. Barr, No. 18-56292 archived on October 25, 2019

Program Decreases by Item

## OFFICE OF JUSTICE PROGRAMS
### Decrease Request: DNA Analysis, Capacity Enhancement, and Other Forensic Activities

### Funding

FY 2020 Request        $105.0M
FY 2019 CR:             $130.0M

In FY 2019:
(1) $120M was provided for DNA Analysis, Capacity Enhancement, and Other Forensic Activities,
(2) $6M was provided for Postconviction DNA Testing, and
(3) $4M for Sexual Assault Forensic Examination programs and activities.



**Program Description:**
**Purpose**: To improve the quality and practice of forensic science.

**Authorizing Legislation:** Created through Department of Justice appropriation acts

**Administering Agency:** National Institute of Justice (NIJ)

### DOJ Strategic Goal and Objective
**DOJ Strategic Goal 3**: Reduce Violent Crime and Promote Public Safety
**Strategic Objective 3.1**: Combat violent crime, promote safe communities, and uphold the rights of victims of crime

**Who Can Apply for Funding:** Eligibility varies by solicitation.

**How Funds are Distributed**: Award type, term, and amounts vary by solicitation.

### Program Goals

- To increase laboratory capacity and reduce backlogs.
- To fund research and development to support the development of accurate, reliable, cost-effective and rapid methods for the identification and analysis of physical evidence.
- To provide technical assistance to state and local law enforcement in the analysis and use of forensic evidence in criminal investigations.

### Accomplishments

- NIJ administers eight highly impactful programs with the appropriated funds for 'DNA and other forensic activities' to address backlogs of DNA evidence, provide technical support to state and local law enforcement, and to strengthen the accuracy and reliability of forensic methods.

- 75 percent of the appropriated funds for this program have been made available directly to forensic laboratories to increase capacity and decrease backlogs of DNA evidence. While the demand for DNA testing continues to increase at an unprecedented rate, federal grants have resulted in increased productivity at our nations forensic laboratories. Labs have reported processing over one million cases and more than 3.4 million database (convicted offender and arrestee) samples, which have allowed law enforcement to apprehend perpetrators and bring justice to victims.



DNA Analysis, Capacity Enhancement, and Other Forensic Activities
Five Year Budget Authority
($ in millions)

- Another 20 percent of the appropriations provided for this program support forensics-related carve-out programs (such as Postconviction DNA Testing and Sexual Assault Forensic Examination programs),

cited in City of Los Angeles v. Barr
No. 18-56292 archived on October 25, 2019

research, and training and technical assistance programs. These efforts assist state local, and tribal grantees in addressing specific forensic challenges, build state and local capacity to analyze and use forensic evidence in criminal cases, and advance understanding of the forensic sciences.

- The remaining five percent of the appropriated funds for this program have been made available for grants to state and local law enforcement agencies to inventory, track, and report sexual assault kits. Since its inception in FY 2016, NIJ has provided funding to 14 different jurisdictions.

- NIJ administers a program for solving cold cases with DNA resulting in over 140,000 cases reviewed and over 2,000 Combined DNA Index System (CODIS) hits. In FY 2019, NIJ will distribute five percent of the 'DNA and other forensic activities' appropriation for the prosecution of cold cases using DNA.

- Since 2017, NIJ has provided critical grant funding to coroners and medical examiners to achieve accreditation and help jurisdictions recruit forensic pathologists to cope with the significant rise in deaths due to the opioid crisis.

- Although NIJ has received a separate appropriation for the National Missing and Unidentified Persons System (NamUs), NIJ has augmented the program with other available resources.  In FY 2019, NIJ plans to use funding from the 'DNA and other forensic activities' appropriation to supplement the NamUs program.

- Through the Postconviction Testing of DNA Evidence program, over 105,000 cases have been reviewed in 27 states, with DNA testing contributing to 48 exonerations. The cumulative time served for all of the exonerees under this program approaches 1,000 years.


## Application and Award History

**DNA Analysis, Capacity Enhancement, and Other Forensic Activities**

| ($ in millions) | FY 2016 | FY 2017 | FY 2018 | FY 2019 Request | FY 2020 Request |
|---|---|---|---|---|---|
| Amount Available for Funding^ | $105.0^ | $96.7^ | $100.0^ | $105.0 | $105.0 |
| Total Funding Awarded | $96.4 | $96.7 | 100.0 | TBD | TBD |
| Number of Awards | 199 | 203 | 191 | TBD | TBD |


**Postconviction DNA Testing**

| ($ in millions) | FY 2016 | FY 2017 | FY 2018 | FY 2019 Request | FY 2020 Request |
|---|---|---|---|---|---|
| Amount Available for Funding^ | $3.6^ | $3.3^ | $5.4^ | $6.0 | $4.0 |
| Total Funding Awarded | $3.6 | $3.3 | $5.4 | TBD | TBD |
| Number of Awards | 7 | 6 | 9 | TBD | TBD |

cited in City of Los Angeles v. Barr

No. 18-56292, archived on October 25, 2019

Program Decreases by Item

**Sexual Assault Forensic Examination Programs**

| ($ in millions) | FY 2016 | FY 2017 | FY 2018 | FY 2019 Request | FY 2020 Request |
|---|---|---|---|---|---|
| Amount Available for Funding^ | $3.6^ | $4.0^ | $3.6^ | $4.0 | $4.0 |
| Total Funding Awarded | $3.2 | $4.0 | $3.6 | TBD | TBD |
| Number of Awards | 5 | 7 | 6 | TBD | TBD |

^ For FYs 2016 – 2018, Amount Available for Funding does not include funds used for management and administration, peer review, or other authorized purposes.

### FY 2020 Decrease Justification

In FY 2020, the President's Budget requests $105.0 million for DNA Analysis, Capacity Enhancement, and Other Forensic Activities, a decrease of $25.0 million below the FY 2019 Continuing Resolution (CR) rate. This program will continue to support forensic laboratory capacity enhancement and backlog reduction programs, research into the latest developments in forensic science and evidence analysis, and training and technical assistance to enhance state, local, and tribal evidence analysis capabilities. The President's Budget request provides sufficient funding to continue all of this program's current activities.

Each year, NIJ considers how to allocate the DNA-related funds based on the needs of the forensic science community; the demand to increase capacity and reduce the backlog of DNA evidence awaiting testing in laboratories; NIJ Technology Working Group recommendations; results from studies and new findings; and NIJ's strategic priorities. The majority of the funding directly supports publicly funded laboratories, police departments, and law enforcement agencies. Approximately a quarter supports the research, development, testing, and evaluation that has created and will continue to create the significant improvements in the field needed to address backlogs.

This funding reduction will allow DOJ to increase its investments in other criminal justice priorities, such as combatting violent crime and improving border security.

**For additional information, please visit: NIJ Forensics.**

## OFFICE OF JUSTICE PROGRAMS
### Decrease Request: National Instant Criminal Background Check System (NICS) Act Record Improvement Program (NARIP)

| **Funding** | |
|---|---|
| FY 2020 Request: | $10.0M |
| FY 2019 CR: | $25.0M |



Estimated number of firearm applications received and denied since the effective date of the Brady Act

### Program Description

**Purpose**: To support states and federally recognized tribes in their efforts to improve the completeness, automation, and transmittal of disqualifying records to state and federal background-check systems. The automation of records also reduces delays for law-abiding gun purchasers and keeps guns out of the hands of those prohibited by federal or state law from purchasing or possessing firearms.

The Bureau of Justice Statistics (BJS) is authorized to provide for improvements in the accuracy, quality, timeliness, immediate accessibility, and integration of state criminal history and related records, support the development and enhancement of national systems of criminal history and related records including the National Instant Criminal Background Check System (NICS) and the records of the National Crime Information Center, facilitate state participation in national records and information systems, and support statistical research for critical analysis of the improvement and utilization of criminal history records.

**Authorizing Legislation**: (34 U.S.C. §10132(c)(19), and the NICS Improvement Amendments Act (reauthorized under Title VI of the Consolidated Appropriations Act of 2018, P.L. 115-141).

**First Year of Appropriation:** 2008

**Administering Agency:** Bureau of Justice Statistics

### DOJ Strategic Goal and Objective
**DOJ Strategic Goal 3**:  Reduce Violent Crime and Promote Public Safety
**Strategic Objective 3.1**:  Combat violent crime, promote safe communities, and uphold the rights of victims of crime

**Who can Apply for Funding:** States that are able to provide a reasonable estimate of records subject to the NICS Improvement Amendments Act's (NIAA) completeness requirements to the Attorney General. The state must also implement a program permitting persons who have had firearm purchase rights restricted for mental health reasons to have such rights restored. This program must be approved by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) to be eligible for funding. Federally recognized Indian tribes are also eligible applicants.

**How Funds are Distributed:**  Awards are made as cooperative agreements for up to 24-month project periods. BJS provides funding based on need and the extent to which the projects



NICS Act Record Improvement Program
Five Year Budget Authority
($ in millions)

No. 18-56292 archived on October 25, 2019
Cited in City of Los Angeles v. Barr

address program priorities.

**Program Goals**:

Support state and tribal efforts to increase automation and transmittal of domestic violence-related records (convictions for misdemeanor crimes of domestic violence and restraining or protection orders) and records on prohibiting mental health adjudications and commitments to state and federal repositories.

**Accomplishments**

- State-submitted records in the NICS Indices have increased over 752 percent, from just over 1.1 million records in January 2008, to over 9.4 million records at the end of FY 2018.

- State submission of *mental health records* has increased more than 12-fold, from about 405,000 records in the beginning of 2008 to 5.3 million records as of September 2018.

- Forty-five states contribute at least 1,000 records to the mental health files in the NICS Indices, compared to only seven states contributing at least 1,000 records in January 2008. As of September 2008, 34 states contribute over 10,000 records.

- BJS has funded the development of reports on state progress in record reporting to NICS to include: Mental Health Submissions, Protection Orders, Fingerprint Processing Advances Improve Background Checks, Misdemeanor Crimes of Domestic Violence, Fugitives from Justice, and Unlawful Drug Users.

**Application and Award History**

| ($ in millions) | FY 2016 | FY 2017 | FY 2018 | FY 2019 CR | FY 2020 Request |
|---|---|---|---|---|---|
| Appropriated Amount | $16.0 | $25.0 | $25.0 | $25.0 | $10.0 |
| Total Funding Awarded | $14.8 | $11.2 | $20.9 | TBD | TBD |
| Number of Applications | 22 | 17 | 20 | TBD | TBD |
| Number of Awards | 20 | 15 | 20 | TBD | TBD |

**Overview of the National Firearm Check System:**

- Prospective firearm applicants must either undergo a NICS background check that has been requested by a Federal Firearms Licensee (FFL) dealer or present a state permit that ATF has qualified as an alternative to the point-of-transfer check.

- About 1,300 federal, state, and local agencies conduct background checks on persons who apply to purchase a firearm or for a permit that may be used to make a purchase.

- Prior to transferring a firearm under the permanent Brady provisions, an FFL is required to obtain a completed Firearm Transaction Record (ATF form 4473) from the applicant. An FFL initiates a NICS check by contacting either the FBI or the state Point of Contact (POC). Most inquiries are initiated by telephone. In 2002, the FBI added E-Check to allow FFLs to request a check electronically.

- The FBI or state POC queries available federal, state, local, and tribal systems and notifies the FFL that the transfer may proceed, may not proceed, or must be delayed pending further review of the applicant's record. The following databases are searched during the background check process:

Cited in the archives of William Barr
No. 19-56292 archived October 25, 2019
Los Angeles

Program Decreases by Item

1. **Interstate Identification Index (III).** The III maintains individual criminal history records. As of December 31, 2017, the III records available to be searched by the NICS during a background check numbered 75,950,530.

2. **National Crime Information Center (NCIC).** The NCIC contains data on persons who are the subjects of protection orders or active criminal warrants, immigration violators, and others. As of December 31, 2017, the NCIC records available to be searched by the NICS during a background check totaled 6,430,380.

3. **NICS Indices.** The NICS Indices, a database created specifically for the NICS, contain information contributed by federal, state, local, and tribal agencies pertaining to persons prohibited from receiving or possessing a firearm pursuant to federal and/or state law. Typically, the records maintained in the NICS Indices are not available via the III or the NCIC. As of December 31, 2017, the NICS Indices contained 17,339,461 records.

4. **U.S. Immigration and Customs Enforcement (ICE):** The relevant databases of the ICE are searched by the NICS for non-U.S. citizens attempting to receive firearms in the United States. In 2017, the NICS Section and the POC states (states that implemented a state-based NICS program) sent 214,823 such queries to the ICE. From February 2002 to December 31, 2017, the ICE conducted more than 1,186,167 queries in support of the NICS.

- An applicant who is denied a firearm transfer or permit may appeal to the FBI or a POC. Some jurisdictions allow a further appeal to a court. A denied person who submitted a false application or has an outstanding warrant may be subject to arrest and prosecution under federal or state laws.

## FY 2020 Decrease Justification

In FY 2020, the President's Budget requests $10.0 million for the NICS Act Record Improvement Program, a decrease of $15.0 million below the FY 2019 Continuing Resolution (CR) rate. This program will continue to assist eligible states and federally recognized tribes in their efforts to improve the completeness, automation, and transmittal of records supporting the FBI's NICS. As noted above, this program has shown considerable success in helping states increase their records submissions to NICS since its creation in January 2008.

The FY 2020 President's Budget proposes to reduce funding for this program because the number of states eligible for NARIP funding is not expected to increase. The $10.0 million request above is sufficient to sustain the existing level of activity under this program and allow OJP to ensure efficient use of existing unobligated balances. For states that may not meet the eligibility criteria for the NICS Act Record Improvement Program (NARIP), the more flexible National Criminal History Improvement Program (NCHIP) can provide vital, immediate support to improve the availability and quality of records vital to NICS, as well as efforts to improve criminal history records more broadly. In FY 2020, an increase of $15.0 million is requested for NCHIP, which will enable OJP to continue to expand NCHIP's support for improvements to the nation's criminal history records systems, and offset the requested decrease for NICS. Therefore, the overall amount for records improvement stays level.

**For additional information, please visit: BJS NICS Act Record Improvement Program.**

Cited in City of Los Angeles v. Barr
No. 18-56267, argued October 25, 2019

## OFFICE OF JUSTICE PROGRAMS
### Decrease Request: Community Oriented Policing Services (COPS) Hiring Program (CHP)

### Funding

| | |
|---|---|
| FY 2020 Request: | $ 99.0M |
| FY 2019 CR: | $225.5M |

**Note:** Includes funding for carveout programs supported by CHP.



**Officers Funded / Officers Requested**

| Year | Officers Funded | Officers Requested |
|---|---|---|
| 2017 | 802 | 3,094 |
| 2016 | 918 | 3,319 |
| 2015 | 915 | 3,083 |
| 2014 | 944 | 3,469 |
| 2013 | 937 | 4,427 |
| 2012 | 800 | 3,780 |

### Program Description

**Purpose:** This program aims to increase the capacity of law enforcement agencies to implement community policing strategies that strengthen partnerships for safer communities and enhance law enforcement's capacity to prevent, solve, and reduce crime through funding for additional officers. The Office of Community Oriented Policing Services (COPS) Hiring Program (CHP) provides funding for entry-level salary and benefits of newly hired or rehired (as a result of layoffs) community policing officer positions over three years.

In addition to the hiring program described above, the CHP supports four carveout programs:

1) Community Policing Development
2) Regional Information Sharing System program (administered by the Bureau of Justice Assistance)
3) POLICE Act Program/ Preparing for Active Shooter Situations (PASS)
4) Law Enforcement Mental Health and Wellness Act Program

(Please refer to individual summaries for additional information on the carveout programs cited above.)

cited in City of Los Angeles v. Barr
No. 18-56292 archived on October 25, 2019

**Authorizing legislation:** Public Safety Partnership and Community Policing Act of 1994 (34 USC § 10381)

**First year of appropriation:** 1995 (as the Universal Hiring Program)

**Administering agency:** Office of Community Oriented Policing Services

### DOJ Strategic Goal and Objective
**DOJ Strategic Goal 3**: Reduce Violent Crime and Promote Public Safety
**Strategic Objective 3.1**: Combat violent crime, promote safe communities, and uphold the rights of victims of crime

**Who Can Apply for Funding and How Funds are Distributed**: U.S. state, local, and tribal law enforcement agencies with primary law enforcement authority may apply for 3-year discretionary awards with a maximum award cap of $125K per funded position. A local match of 25% is required unless waived by the Attorney General based on fiscal need.

### Program Goals
When used to promote community policing, increased law enforcement capacity has been shown to help police gather information about crime and disorder problems, understand the nature of the problems, and solve specific

crimes. Moreover, law enforcement agencies are more effective when they adopt policies and practices that promote fairness, legitimacy, and positive community partnerships. CHP goals are to:

- Enhance the capacity of law enforcement agencies to implement community policing strategies.

- Promote partnerships between law enforcement agencies and community stakeholders for the purpose of crime reduction and related problem solving.

- Encourage law enforcement agencies to consider organizational changes that will enhance their capacity to implement community policing strategies to address violent crime and support public safety.



**Accomplishments**

**Capacity building:** Since 1994, COPS hiring programs have funded 130,000 law enforcement officer positions. Based on grantee provided information, the programs have increased the capacity of agencies to effectively perform community policing. This involves identifying where changes are required within an organization and how to best effect those changes through knowledge, skills, and learning experiences.



**Partnerships:** As of December 2018, active CHP grantees reported 1,949 active partnerships with various community stakeholders for the purpose of advancing community policing practices. The types of partners reported by CHP grantees represent a wide cross section of the affected communities. Some of the most common partners include: 1) educational institutions; 2) faith-based organizations; 3) community groups and home associations; 4) mental health professionals and advocates; 5) substance abuse professionals and advocates; and 6) civic and business organizations.

**Organizational change:** As of December 2018, active CHP grantees cited 1,132 examples where positive organizational changes have been successfully implemented or are in progress. Changes are tracked in two broad categories: agency management and personnel management. These changes are intended to help sustain and institutionalize community partnerships and proactive problem-solving efforts. Some of the most common changes reported include the following:

- Creating or enhancing an agency's mission, vision, and goals to reflect the core values of community policing

- Recruitment and hiring practices that reflect an orientation toward community engagement

- Training programs that teach and test community engagement and problem-solving skills

- Performance measurement systems that include community policing and violent crime control metrics

- Increased level and frequency of communication with community members on crime problems

Program Decreases by Item

**Application and Award History**

| ($ in millions) | FY 2016 | FY 2017 | FY 2018* | FY 2019 CR | FY 2020 Request |
|---|---|---|---|---|---|
| Amount available for funding | $137.0M^ | $137.0M^ | $149.5M^ | $149.5M^ | $69.0M^ |
| Total funding awarded | $119.3M | $98.5M | TBD | TBD | TBD |
| Number officers requested | 3,319 | 3,094 | TBD | TBD | TBD |
| Number of officers funded | 918 | 3,094 | TBD | TBD | TBD |

^ Total funding awarded excludes amounts used for management and administration, peer review, carveout programs, or other authorized purposes. For FY 2019 and FY 2020, the total funding request for the CHP (hiring program only) is shown.

*Release of the FY 2018 CHP grant solicitation is on hold due to a nationwide injunction regarding immigration enforcement provisions included in the 2017 CHP solicitation that was issued by a U.S. District Court on April 12, 2018. The FY 2018 CHP solicitation and awards process will remain on hold while the Department's legal appeal against this injunction is considered.

## FY 2020 Decrease Justification

In FY 2020, the President's Budget transfers the COPS Hiring Program (CHP) to OJP and requests $99.0 million for this program, a decrease of $126.5 million from the FY 2019 CR rate. CHP subsidizes local police departments by funding a portion of entry-level salaries and benefits for newly hired or rehired police officers over three years. In FY 2020, four programs will be funded as carve-outs under this program:

- Community Policing Development - $8.0 million,

- Regional Information Sharing Systems - $10.0 million,

- POLICE Act Program - $10.0 million, and

- Law Enforcement Mental Wellness Initiative (new) - $2.0 million.

The proposal for the COPS Hiring Program in FY 2020 includes a maximum award cap of $125,000 and institutes a 25 percent local match requirement for all grantees. At the conclusion of 36 months of federal funding for each awarded officer position, the agency must retain the additional COPS-funded officer position(s) with state or local funds for a minimum of 12 months. With the $69.0 million available for CHP after accounting for program carve-outs, the request level will fund up to approximately 500 community policing officer positions. This amount assumes no waivers of the 25 percent local match and/or $125,000 salary cap (per officer position).

Program Carve-outs:

**Community Policing Development (CPD):** This program develops the capacity of law enforcement to implement community policing strategies by providing guidance on promising practices through the development and testing of innovative strategies, to build knowledge about effective practices and outcomes, and to support new, creative approaches to preventing crime and promoting safe communities. The CPD Program is a competitive solicitation, open to all public governmental agencies, profit and nonprofit institutions, institutions of higher education, community groups, and faith-based organizations. The FY 2020 President's Budget requests $8 million for this program, which is a decrease of $2 million from the FY 2019 CR rate.

**Regional Information Sharing Systems (RISS):** This program, administered by OJP, supports federal, state, local, territorial, and tribal law enforcement agencies and other criminal justice agencies through six regional RISS centers by providing the following services:

- A secure online information and intelligence-sharing network;

- Officer safety information and deconfliction services;

110

- Investigative and analytical support services;

- Loans of specialized investigative equipment and confidential investigative funds; and

- Training, conferences, and publications designed to assist RISS users in investigating and prosecuting regional, national, and transnational criminal activity.

The FY 2020 President's Budget includes $10 million for the RISS program, which is a decrease of $26 million from the FY 2019 CR rate. The proposed decease for RISS would have an impact on the level of services that could be provided to law enforcement and the organizational structure of RISS, but efficiencies will be explored and implemented in an effort to minimize these as much as possible. For example, the six regional centers that make up RISS also have the option to leverage other federal grant funding and charge user fees to support operations.

While RISS does offer a range of justice information sharing and investigative support services, only part of these resources are focused on addressing national priorities, such as violent and drug-related crime. A number of other federal agencies also support programs, initiatives, and systems that provide services similar to those offered by RISS.

**POLICE Act Program:** This program aims to improve the safety and resiliency of law enforcement officers, other first responders, and communities nationwide through multidisciplinary training to counter active shooter threats or acts of terrorism against individuals or facilities; and to enhance the ability of law enforcement not only to secure the scene, but to increase the survivability of the event and protect officers and first responders from the long-term effects of exposure to trauma. The FY 2020 President's Budget includes $10.0 million for this program, which is equal to the FY 2019 CR rate.

**Law Enforcement Mental Wellness Initiative:** The FY 2020 President's Budget includes $2.0 million for this new program as a carveout of CHP, which will help law enforcement agencies establish or enhance mental health care services for their officers and deputies by making grants available to initiate pilot programs that support peer mentoring, annual mental health checks, crisis hotlines, and the delivery of other critical mental health and wellness services. It will also support the development of resources for the mental health providers who deliver tailored, specific services to law enforcement based on the unique challenges they face.

The training and educational resources developed under this program will:

- Teach peer support crisis intervention skills to public safety officers through programs such as the Indianapolis Metropolitan Police Department's Peer Support and Mentoring program;

- Focus on individual and family resiliency of law enforcement officers; and

- Include suicide prevention models to help officers address duty-related stress and trauma.

**For additional information, please visit the [COPS Hiring Program](#) and [Riss.net](#) web pag**es.

Cited in City of Los Angeles v. Barr
189392 archived October 25, 2019

111

## OFFICE OF JUSTICE PROGRAMS
### Decrease Request: Coverdell Forensic Science Improvement Grants Program

**Funding**

FY 2020 Request:          $10.0M
FY 2019 CR:               $30.0M

Coverdell funds may be used for forensic science or medical examiner/coroner:

- ✓ Personnel
- ✓ Computer hardware and software
- ✓ Laboratory equipment
- ✓ Supplies
- ✓ Accreditation
- ✓ Education, training, and certification
- ✓ Facilities
- ✓ Administrative expenses

**Program Description**

**Purpose**: To help improve forensic science and medical examiner/coroner services. These services are often crucial to the outcome of criminal cases.

The Paul Coverdell Forensic Science Improvement Grants Program ("Coverdell") provides assistance to states and units of local government for the following purposes:

1. Carry out all or a substantial part of a program intended to improve the quality and timeliness of forensic science or medical examiner services, including purchasing updated equipment and software, using funds for accreditation and certification of the laboratory and analysts, and completing a process improvement evaluation and implementation plan.

2. Eliminate a backlog in the analysis of forensic science evidence, including evidence in many forensic disciplines: firearms examination; latent prints; toxicology; controlled substances; forensic pathology; questioned documents; and trace evidence.

3. Train, assist, and employ forensic laboratory personnel as needed to analyze forensic evidence.

4. Implement technology or methodology that addresses emerging forensic science issues (such as statistics, contextual bias, and uncertainty of measurement) and emerging forensic science technology (such as high throughput automation, statistical software, and new types of instrumentation).

5. Educate and train forensic pathologists (to address the shortage of qualified, certified pathologists).

6. Fund medicolegal death investigation systems to facilitate accreditation of medical examiner and coroner offices and certification of medicolegal death investigators.

**Authorizing Legislation:** Title I of the Omnibus Crime Control and Safe Streets Act of 1968 (sections 201 and 202), Part BB, codified at 34 U.S.C. § 10561-10566 (the Coverdell law).

**Administering Agency:** National Institute of Justice (NIJ)

**DOJ Strategic Goal and Objective**
**DOJ Strategic Goal 3**: Reduce Violent Crime and Promote Public Safety
**Strategic Objective 3.1**: Combat violent crime, promote safe communities, and uphold the rights of victims of crime

**Who Can Apply for Funding:** States and units of local government.

**How Funds are Distributed**: As of FY 2017, 85 percent of the total funding provided for Coverdell program in each fiscal year is



Coverdell Forensic Science Improvement Grants Program
Five Year Budget Authority
($ in millions)

Program Decreases by Item

awarded to states through a formula grant process on the basis of population. The remaining 15 percent of funding is awarded to state and units of local government through a competitive, peer-reviewed grants process.  Prior to FY 2017, the split was 75:25.

## Program Goals

- Support forensic scientists to receive needed training to comply with certification requirements, as well as for forensic science service provider facilities to obtain and retain accreditation.

- Support smaller jurisdictions to acquire current technology that they otherwise could not afford, and larger jurisdictions to meet continually growing demands.

- Support laboratories in modernizing and maintaining needed analytical equipment and instrumentation.

- Support laboratories and medical examiner-coroners with resources to battle the escalating opioid epidemic.

## Accomplishments

- Greater than 50 percent of available Coverdell funding was made available to specifically target the challenges the opioid crisis has brought to the forensic science community.

- Forensic service providers at the state and local levels were awarded essential funding for labs to seek/attain/maintain accreditation; for personnel to receive training and or certification; and for labs to update, replace, or add to their existing equipment, among other forensic science service provider needs.

### Application and Award History

| ($ in millions) | FY 2016 | FY 2017 | FY 2018 | FY 2019 CR | FY 2020 Request |
|---|---|---|---|---|---|
| Amount Available for Funding | $12.0^ | $10.7^ | $27.2^ | $30.0 | $10.0 |
| Total Funding Awarded | $12.0 | $10.6 | $27.0 | TBD | TBD |
| Number of Applications | 161 | 180 | 170 | TBD | TBD |
| Number of Awards | 74 | 62 | 77 | TBD | TBD |
| Percentage of Applications Funded | 46% | 34% | 45% | TBD | TBD |

^Amount does not include funds used for management and administration, peer review, or other authorized purposes.

## FY 2020 Decrease Justification

In FY 2020, the President's Budget requests $10.0 million for the Coverdell Forensic Science Improvement Grants Program, a decrease of $20.0 million below the FY 2019 Continuing Resolution (CR) rate. The President's Budget request is sufficient to continue this program's core mission and ensure a reliable funding stream to support state and local medical examiners' and coroners' offices.

In FY 2020, the Department is not requesting funding for the Forensic Support of Opioid and Synthetic Drug Investigations carve-out that was included in the FY 2019 CR. Eliminating this carve-out frees grantees to allocate funding to those activities that best meet their jurisdictions' needs, since drug-related forensic evidence analysis is already an allowable activity under this program.

This funding reduction will allow DOJ to increase its investments in other criminal justice priorities, such as combating violent crime and improving border security.

**For additional information, please visit the NIJ website.**

## OFFICE OF JUSTICE PROGRAMS
### Program Decrease: Delinquency Prevention Program

### Funding

FY 2020 Request:      $17.0M
FY 2019 CR:           $27.5M

#### FY 2018 Activities Chart



7%,
2%
44%
18%
29%

- CBVP & Gangs and Youth Violence Prevention and Intervention
- Tribal Youth Program
- Opioid Affected Youth Initiative
- Children of Incarcerated Parents Web Portal
- Girls in the Juvenile Justice System

### Program Description

**Purpose**: To prevent youth at risk of becoming delinquent and from entering the juvenile justice system and to intervene with first-time and non-serious offenders to keep them from further contact with the juvenile justice system.

The goal is to reduce the likelihood that youth will become serious and violent offenders as adults, reducing potential victimizations and the burden of crime on society.

In FY 2018, this program included funding for the following carve-out programs:
1) Community Based Violence Prevention Program (CBVP), Gangs and Youth Violence Prevention and Intervention (blended funding in FY 2018)

2) Girls in the Juvenile Justice System

3) Children of Incarcerated Parents (COIP) web portal

4) Opioid Affected Youth Initiative

5) Tribal Youth

In FY 2019 and FY 2020, the Girls in the Juvenile Justice System program will also address the needs of girls vulnerable to becoming victims of human trafficking. OJJDP will support prevention and early intervention efforts designed to reach girls who are both involved in the juvenile justice system and at risk of becoming trafficking victims.

**Authorizing Legislation**: This program is authorized under sections 261 and 262 of the Juvenile Justice and Delinquency Prevention Act of 1974, as amended; 34 U.S.C. § 11171

**First Year of Appropriation:** 1994

**Administering Agency:** Office of Juvenile Justice and Delinquency Prevention

### DOJ Strategic Goal and Objective
**DOJ Strategic Goal 3**: Reduce Violent Crime and Promote Public Safety
**Strategic Objective 3.1**: Combat violent crime, promote safe communities, and uphold the rights of victims of crime

**Who Can Apply for Funding and How Funds are Distributed**: Through a competitive process, awards will be made as follows:

Cited in City of Los Angeles v. Barr
No. 18-56292, archived on October 25, 2019

114

| Program | Who Can Apply for Funding | Award Type | Award Amount & Length |
|---------|---------------------------|------------|----------------------|
| CBVP/Gangs | Funds support state (including territories), units of local government, and federally recognized tribal government law enforcement agencies with implementing gang suppression strategies. | Cooperative Agreements | $200K - $1.2M for 36 months |

| Program | Who Can Apply for Funding | Award Type | Award Amount & Length |
|---------|---------------------------|------------|----------------------|
| Gang and Youth Violence Prevention and Intervention Prevention (Training and Technical Assistance) | Funds support nonprofit and for-profit organizations (including tribal nonprofit and for-profit organizations) and institutions of higher education (including tribal institutions of higher education) to provide training and technical assistance to funded program sites. | Cooperative Agreement | $800K |
| Girls in the Juvenile Justice System | Funds support prevention and early intervention programs for girls involved in, or at risk of becoming involved in, the juvenile justice system, who are vulnerable to trafficking. | Cooperative Agreements | $871K to two program sites for final supplement year |
| Children of Incarcerated Parents Web Portal | Funds support "www.youth.gov", a publicly accessible website that consolidates information regarding federal resources, grant opportunities, best and promising practices, and ongoing government initiatives that address and support children of incarcerated parents and their caregivers. | Interagency Agreement with HHS | Up to $450K for 12 months |
| Opioid-Affected Youth Initiative | Funds support states (including territories), units of local government, and federally recognized tribal governments as determined by the Secretary of the Interior to implementing data-driven strategies and programs for youth impacted by opioid abuse.<br><br>Funds support nonprofit and for-profit organizations (including tribal nonprofit and for-profit organizations) and institutions of higher education (including tribal institutions of higher education) to provide training and technical assistance to funded program sites. | Cooperative Agreement | Up to $1M for 36 months |
| Tribal Youth Program (CTAS (Purpose Area #9) | Funds support the development and implementation of youth programs for youth of federally recognized tribes. | Grant | Up to $400K for three years |

Cited in City of Los Angeles v. Barr, archived on October 25, 2019

115

## Program Goals

- Prevent and intervene in youth and community gun and gang violence to enhance public safety.

- Promote improvements in the juvenile justice system nationwide through the adoption of evidence-based practices and strategies that hold youth appropriately accountable.

- Incentivize states, tribes, and localities to implement prevention and intervention programs for girls vulnerable to trafficking and who are most likely to enter the juvenile justice system.

- Support and enhance tribal efforts to prevent and reduce delinquency and strengthen the juvenile justice system for American Indian and Alaska Native youth.

- Support states, local communities, and tribal jurisdictions in their efforts to develop and implement effective programs for children, youth, and at-risk juveniles and their families who have been impacted by the opioid crisis and drug addiction.

- Provide planning and implementation support to eligible communities that demonstrate their readiness to develop or put a comprehensive gang suppression strategic plan into action, based on a multilateral data-driven strategy.

**Delinqency Prevention Program Five Year Budget Authority**
($ in millions)

| FY16 | FY17 | FY18 | FY19 CR | FY20 Req |
|------|------|------|---------|----------|
| $17.5 | $14.5 | $27.5 | $27.5 | $17.0 |

## Accomplishments

Through this program, OJJDP has identified:

- 56 effective programs and practices;

- 127 promising programs and practices; and

- 124 programs and practices which have no demonstrated effect.



These evaluations, available at Delinquency Prevention on CrimeSolutions.gov, help inform practitioners and policy makers about what works, what doesn't, and what's promising in redirecting youth who are considered at-risk for delinquency or who have committed a delinquent offense from deeper involvement in the juvenile justice system.

- In FY 2018, OJJDP provided supplemental funding to two sites, the Vera Institute and the City of New York and PACE Center for Girls in Florida, to implement community-based responses for girls in the juvenile justice system and at risk of entering the juvenile justice system. Grantees are examining girls' pathways into the juvenile justice system by working with local public and private partners to end the practice of placing girls and young women who are status offenders or child sex trafficking victims in the juvenile justice system; reduce the arrest and detention of girls for technical violations of probation; amend mandatory arrest policies for domestic violence to reduce the number of girls arrested for intra-family conflict; and reduce reliance on suspension and expulsion which can lead to academic failure and increased vulnerability for juvenile justice system involvement.

- In FY 2018, OJJDP awarded eight awards totaling over $3 million under the Coordinated Tribal Assistance Solicitation Purpose Area 9 - Tribal Youth Program to federally recognized tribes to develop and implement programs that support and enhance tribal efforts to prevent and reduce juvenile delinquency and

cited in City of Los Angeles v. Barr No. 18-56292 archived on October 25, 2019

strengthen a fair and beneficial juvenile justice system response for American Indian and Alaska Native youth.

- In FY 2018, OJJDP provided supplemental funding to National Gang Center (NGC) in order to provide enhanced technical assistance to sites funded by the gang suppression initiatives.

### Application and Award History

| ($ in millions) | FY 2016 | FY 2017 | FY 2018 | FY 2019 CR | FY 2020 Request |
|---|---|---|---|---|---|
| Amount Available for Funding | $15.5^ | $12.1^ | $24.8 ^ | $27.5 | $17.0 |
| Total Funding Awarded | $15.5 | $12.0 | $22.1 | TBD | TBD |
| Number of Applications | 181 | 48 | 119 | TBD | TBD |
| Number of Awards | 39 [1/] | 15 [2/] | 38[3/] | TBD | TBD |
| Percentage of Applications Funded | 22% | 31% | 32% | TBD | TBD |

^ Amount does not include funds used for management and administration, peer review, or other authorized purposes.

[1/] FY16 – Includes awards from the following programs: Tribal Youth, Gang Prevention, and Community-Based Violence Prevention.

[2/] FY17 – Includes awards from the following programs:  Gang and Youth Violence Prevention, Girls in the Juvenile Justice System, Children of Incarcerated Parents Web Portal, and Community-Based Violence Prevention.

[3/] FY18 – Includes awards from the following programs: Gang and Youth Violence Prevention, Girls in the Juvenile Justice System, Tribal Youth, Opioid Affected Youth Initiative, Children of Incarcerated Parents Web Portal, and Community-Based Violence Prevention. A select number of FY 2018 Gang and Youth Violence Prevention funded grants have not been released to grantees due to concerns regarding compliance with federal immigration laws and ongoing litigation related to these matters.

### FY 2020 Decrease Justification

In FY 2020, the President's Budget requests $17.0 million for the Delinquency Prevention Program, a decrease of $10.5 million below the FY 2019 Continuing Resolution (CR) rate. The President's Budget request for this program is sufficient to support this program's core activities, including the Opioid-Affected Youth Initiative and the Youth Violence Prevention and Intervention program, at their current level of activity.

Much of the decrease in funding for this program results from the elimination of two carve-outs included in the FY 2019 CR, the Community Based Violence Prevention Initiatives and the Tribal Youth Program.

- No funding is requested for the Tribal Youth program carve-out since this program will be supported by the up to seven percent tribal justice assistance set aside under the FY 2020 budget request.

- The activities previously supported by the Community Based Violence Prevention Initiatives will be consolidated with other OJP violent crime reduction efforts under the PSN program in the FY 2020 budget request.

This funding reduction will allow DOJ to redirect funding to address other high-priority criminal justice priorities, such as combatting violent crime, addressing opioid drug abuse, and improving border security.

For additional information, please visit: http://www.ojjdp.gov.

## OFFICE OF JUSTICE PROGRAMS
### Decrease Request: Youth Mentoring

### Funding

FY 2020 Request:        $58.0M
FY 2019 CR:             $94.0M

### FY 2018 Activities Chart



6%    1%
2%
91%

- ■ Mentoring Opportunities for Youth
- ■ Mentoring Resource Center
- ■ Training and Technical Assistance
- ■ Research

**Program Description**

**Purpose**: To reduce juvenile delinquency, gang involvement, academic failure, victimization, and school dropout rates through one-on-one, group, and peer mentoring.

Through this program, OJJDP increases the capacity of state and local jurisdictions and Indian tribal governments to develop, implement, expand, evaluate, and sustain youth mentoring efforts that incorporate evidence-based findings of best practices and principles. In addition, OJJDP funds training and technical assistance and research to support these mentoring programs nationwide.

**Authorizing Legislation:** The Juvenile Justice and Delinquency Prevention (JJDP) Act of 2002 (Public Law 107–273, 34 U.S.C. § 11101 et seq.)

**First Year of Appropriation:** 2005

**Administering Agency:** Office of Juvenile Justice and Delinquency Prevention (OJJDP)

### DOJ Strategic Goal and Objective

**DOJ Strategic Goal 3**: Reduce Violent Crime and Promote Public Safety
**Strategic Objective 3.1**: Combat violent crime, promote safe communities, and uphold the rights of victims of crime

**Who Can Apply for Funding and How Funds are Distributed:** Through a competitive process, awards are made as follows:

| Category | Who Can Apply for Funding | Award Type | Award Amounts | Award Period |
|---|---|---|---|---|
| 1. Mentoring Opportunities for Youth | Category 1: National Mentoring (Organizations with subawardees in 45 or more states) | Grant | Various | Up to 36 months |
| | Category 2: Multi-State Mentoring (Organizations with subawardees in at least 5 and fewer than 45 states) | Grant | Up to $4M | Up to 36 months |
| | Category 3: Mentoring Youth Involved in the Juvenile Justice System (Private organizations including nonprofit organizations and for-profit organizations, and tribal nonprofit and for-profit organizations) | Grant | Up to $500K | Up to 36 months |
| | Category 4: Mentoring Strategies for Youth Impacted by Opioids (Project Site organizations and for-profit organizations, and tribal nonprofit and for-profit organizations) | Grant | Up to $500K | Up to 36 months |
| | Category 5: Statewide and Regional Mentoring Initiative for Youth Impacted by Opioids (Limited to national organizations, as defined in Category 1, states and territories, and federally recognized tribal governments as determined by the Secretary of the Interior) | Grant | Up to $1.25M | Up to 36 months |

County of Los Angeles v. Barr
No. 18-56292 archived on October 25, 2019

| Category | Who Can Apply for Funding | Award Type | Award Amounts | Award Period |
|---|---|---|---|---|
| 2. Training and Technical Assistance | Nonprofit and for-profit organizations (including tribal nonprofit and for-profit organizations) and institutions of higher education (including tribal institutions of higher education) | Cooperative Agreement | Up to $2M | 12 months |

## Program Goals

- To improve outcomes (such as improved academic performance and reduced school dropout rates) for youth at-risk or involved with the justice or tribal justice systems, and reduce negative outcomes (including delinquency, substance use, and gang participation) through mentoring.

- To support innovative research and evaluation efforts that respond to gaps and needs of the mentoring field and examine strategies to improve and increase mentor recruitment.



**Youth Mentoring Program Five Year Budget Authority** ($ in millions)

## Accomplishments

- In 2018, OJJDP issued 38 awards to mentoring organizations totaling nearly $79 million. Awards were made to large national mentoring organizations (such as National 4-H Council and Boys and Girls Clubs of America) as well as smaller community based organizations (such as Family Services of the Merrimack Valley).

  o OJJDP awarded over $10 million to organizations that support youth impacted by opioids in FY 2018 (such as Big Brothers Big Sisters, Rural Opioid Family Mentoring Program, and the Resilient Empowered and Directed (RED) Program).

- OJJDP also awarded $2 million to the National Mentoring Partnership to serve as OJJDP's National Mentoring Research Center.

- In 2017 (the most recent year for which data are available), OJJDP-funded active mentoring grants served nearly a quarter of a million youth. Of these youth:

  o Eighty nine percent were matched with a mentor.

  o More than half (59 percent) exhibited a positive change in behavior (e.g., grade point average, social support, and social competence).

- In addition, 94 percent of OJJDP-funded mentoring programs reported implementing one or more evidence-based programs or practices.

- In FY 2017, the National Mentoring Resource Center (NMRC) released population and topical reviews examining available evidence as it pertains to either mentoring for a specific population of youth (e.g., cross-age mentoring and youth in foster care) or a specific model of mentoring (e.g., group mentoring, e-mentoring). Additionally, NMRC provided no-cost training and technical assistance to organizations and communities throughout the nation. During FY 2017, NMRC provided 8,711 hours of technical assistance to 467 organizations and hosted trainings on topics ranging from matching to effective mentor closure.

cited in City of Los Angeles v. Barr No. 18-56292 archived on October 2019

119

**Application and Award History**

| ($ in millions) | FY 2016 | FY 2017 | FY 2018 | FY 2019 CR | FY 2020 Request |
|---|---|---|---|---|---|
| Amount Available for Funding | $81.2^ | $66.4^ | $85.4 ^ | $94.0 | $58.0 |
| Total Funding Awarded | $81.2 | $66.4 | $81.0 | TBD | TBD |
| Number of Applications | 119 | 176 | 89 | TBD | TBD |
| Number of Awards | 34 | 29 | 39 | TBD | TBD |
| Percentage of Applications Funded | 29% | 16% | 40% | TBD | TBD |

^ Amount of appropriation minus funds used for management and administration, peer review, or other authorized purposes.

### FY 2020 Decrease Justification

In FY 2020, the President's Budget requests $58.0 million for the Youth Mentoring program, a decrease of $36.0 million below the FY 2019 Continuing Resolution (CR) rate. The Department of Justice remains fully committed to supporting its Youth Mentoring program. However, this commitment must be balanced with the need to fund a variety of other state, local, and tribal justice assistance priorities. The proposed decrease in the Youth Mentoring program will enable the Department to redirect funding to other important priorities such as addressing violent crime, investigating child exploitation crimes, and improving officer safety. The Office of Juvenile Justice and Delinquency Prevention will work with its grantees to seek greater cost efficiencies and coordination to ensure that all of its juvenile justice programs operate more cost effectively.

In FY 2020, the Department is not requesting funding for the Mentoring for Youth Affected by the Opioid Crisis carve-out that was included in the FY 2019 CR. The wide range of activities authorized under the Youth Mentoring program already includes mentoring programs for at-risk youth such as those affected by or involved in opioid abuse. Eliminating this carve-out simplifies program administration for grantees and allows them greater freedom in allocating their grant funding to meet the needs of the communities they serve.

**For additional information, please visit:** www.ojjdp.gov/programs/mentoring.html **and** www.nationalmentoringresourcecenter.org.

Program Decreases by Item

## OFFICE OF JUSTICE PROGRAMS
### Decrease Request: Crime Victims Fund

### **Funding**

FY 2020 Funding (CVF Reform):    $2,300.0M
FY 2019 CR:                      $4,436.0M



**CVF Obliation Cap/Mandatory Appropriaton**
FY 2016 - FY 2020
($ in millions)

| | |
|---|---|
| FY16 | $3,042 |
| FY 17 | $2,573 |
| FY18 | $4,436 |
| FY19 CR | $4,436 |
| FY20 Auth Amt | $2,300 |

**FY 2018 Crime Victims Fund Allocations**
($ in millions)



State Formula Funding ($3,457)

Tribal Set-Aside ($133)

EOUSA & FBI Statutory Set-Asides ($61)

OVW, OIG & HHS Transfers ($518)

Non-Formula Awards ($179)

Children's Justice Assistance ($3)

cited in City of Los Angeles v. Barr
No. 18-56292 archived on October 25, 2019

### Program Description

The Crime Victims Fund (CVF) was established by Congress in 1984 as a stable and reliable funding source for crime victims. The Fund is financed by fines and penalties stemming from federal crimes, not from tax dollars.  In FY 2019 and again in FY 2020, the Administration proposes a CVF reform proposal that establishes an annual CVF funding level of $2.3 billion and caps receipts deposited into the account at $2.5 billion. This reform proposal will help to provide funding certainty from year to year, will help to ensure long-term financial solvency, and will improve the way the program operates.

**Authorizing Legislation:**  Victims of Crime Act of 1984; 34 U.S.C. 20101 et seq.

**Administering Agency:** Office for Victims of Crime (OVC)

**CVF Program Purposes:**
1.  Support victim services across the nation.
2.  Provide compensation to victims of crime.
3.  Build capacity of service providers nationwide through technology, training and technical assistance.
4.  Innovate and determine ways to reach every victim of crime.

CVF funds are administered in three distinct ways, each mandated by statute:
1.  Formula funding to the states;
2.  Set aside funding to federal agencies; and
3.  Competitive non-formula awards.

### Formula Funding to the States—
### Victim Assistance and Compensation Programs:

The largest amount of CVF funding is distributed using formula calculations to authorized State Administering Agencies (SAAs) in all 50 states, the District of Columbia, and U.S. territories. SAAs use these funds to carry out two discrete programs—State Victim Assistance and State Compensation. Victim assistance funds are used by the SAAs to subgrant funding to victim service organizations. Victim compensation funds are used to reimburse victims for expenses resulting from their victimization. Additional information is provided on the **OVC website**, including:  **VOCA Formula Calculations** and **Annual State Funding Allocations**.

121

**Formula Accomplishments:** Because of increased CVF obligation limitations, states have dramatically expanded their support to both new and existing local victim service programs. OVC plays a critical role in enriching the state programs through leadership, training, technical assistance, and performance measurement.

- More than 300 State VOCA Program Administrators and staff attended the 2018 VOCA National Training Conference.
- OVC successfully transitioned all victim assistance and compensation grant program reporting to the new Performance Measurement Tool (PMT), which provides more robust performance measurement and will enable OVC to identify nationwide variables and trends associated with these programs. Preliminary data indicate that in FY 2018, Victim Assistance programs funded 7,417 unique state and local victim service organizations through over 9,472 grant awards.

### Statutory Set-Asides

The CVF is also a major funding source for federal victim service programs and related resources designated by statute (allocations are reflected in the pie chart). In 2018, CVF set-asides supported the following federal agency programs:

- *Office on Violence Against Women* (OVW) – $492M was transferred to provide financial and technical assistance to communities across the country that are developing programs, policies, and practices aimed at ending domestic violence, dating violence, sexual assault, and stalking.
- *Executive Office for United States Attorneys* (EOUSA) – approximately $28M supported 181 full time equivalent victim specialist personnel serving in the 93 USAO districts and 12 victim specialist personnel exclusively serving Indian Country.
- *Federal Bureau of Investigation* (FBI) – $28M was provided to the FBI to support the salaries, benefits, and related expenses for 227 victim specialist personnel (up from 203 positions in 2017). These 24 new positions included eight child and forensic interviewers and 15 new victim specialists.
- *Victim Notification System* (VNS) – $5M supported EOUSA to upgrade, enhance, and operate the VNS to provide timely and consistent notification to federal crime victims as mandated by the Justice for All Act of 2004 and the Attorney General Guidelines for Victim and Witness Support.
- *Children's Justice Act* (CJA) – a combined $19M supports CJA programs to improve the investigation, prosecution, and treatment of child abuse victims. Of this amount, $16M (administered by HHS) supports CJA Task Forces in every state and territory and $3M supports six to eight new targeted programs in Indian Country and is integrated into DOJ's Combined Tribal Assistance Solicitation.
- *Office of Inspector General* (OIG) – for the fourth consecutive year, $10M was transferred to the OIG to audit grantees receiving CVF awards and assess OVC's management of CVF programs.
- *Three percent Tribal Set-Aside* – This first-ever tribal set-aside for victim services made $133M available in FY 2018 to meet critical, long-standing needs among the tribes.

### Competitive Non-Formula Awards

After formula and set-aside calculations, remaining funds are used for competitive programs that serve a diverse range of critical areas and emerging victim needs, including federal programs; tribal programs; national scope training, technical assistance, and demonstration projects; and Innovations in Crime Victims Services programs. Examples of 2018 program funding accomplishments include:

cited in City of Los Angeles v. Barr 18:56292 and filed on October 25, 2019

Program Decreases by Item

**Federal Programs**

- *Federal Victim Emergency Funds* ($380K) enabled partnering agencies to support victim expenses in emergency situations, including temporary shelter, transportation, and crisis intervention. These funds allow agencies to address unique emergency victim service problems or populations within their jurisdictions.
- *Training and Technical Assistance* ($1M) enabled partnering agencies to support training and technical assistance costs focusing on specific victimization issues.
- *Supporting Victims in High Profile Trials with Large Numbers of Victims* ($250K) provided assistance to ensure that victims of federal crime were afforded their right to observe and be reasonably heard in high profile criminal justice proceedings with large numbers of victims.
- *National Domestic Violence Housing Technical Assistance Consortium* ($2M)  provided funding to support the collaboration with the Departments of Justice, Housing and Urban Development, and Health and Human Services for federal technical assistance and resource development. The purpose of this federal collaboration is to provide support and encouragement to help grantees and subgrantees build meaningful partnerships with local domestic violence programs, state domestic violence coalitions, and housing service providers with domestic violence programs to implement trauma-informed housing programming.

**Tribal Programs (outside of the Tribal Set-Aside)**

- *American Indian/Alaska Native Training and Technical Assistance Program* ($4M) supports tribal communities' capacity to coordinate the provision of a comprehensive array of culturally appropriate services to victims of crime, their families, and the community.
- *Comprehensive Tribal Victim Assistance Program Purpose Area 7* ($16M) is integrated into DOJ's Combined Tribal Assistance Solicitation and provided 40 new grant awards to help federally recognized tribes (or their designees) develop, establish, and operate multidisciplinary, trauma-informed services for tribal victims experiencing a range of crimes.

**National Scope Training, Technical Assistance, and Demonstration Projects**

- *Enhancing Community-Driven Responses to the Opioid Crisis* ($27M) includes over 41 new awards in an effort to address an urgent gap in crime victim services related to the opioid epidemic and to expand upon existing programs or establish new ones to provide services to children and youth who are victimized as a result of the opioid crisis.
- *Law Enforcement-Based Direct Victim Services* ($7.5M)  will administer 17 new awards to help build direct victim assistance service efforts that can assist victims through law enforcement-based systems and better coordinate their services  with community-based victim service partnerships to address the broader needs and rights of crime victims.
- *Advancing Hospital-Based Victim Services* ($9.3M) funds nine new awards in FY 2018 in an effort to improve linkages between victim assistance and hospitals to increase support for victims of crime, improve their outcomes, and reduce future victimization.
- *Victim Assistance Discretionary Grant Training and Technical Assistance Program for VOCA Victim Assistance Grantees* ($13M) is funding provided to State Victim Assistance formula grant recipients to facilitate training of direct service providers. Activities may include the establishment or enhancement of state victim assistance academies (SVAAs), statewide training initiatives, crime victim-related conferences, basic training for new programs for underserved victims, or scholarships to service providers and others who work with victims of crime.

- *OVC Training & Technical Assistance Center* ($7.7M) delivers cutting-edge training and technical assistance to victim service providers, volunteers, allied professionals and advocates across the nation and helps to strengthen and grow the capacity of service organizations to meet the expansive needs of crime victims. In FY 2018, OVC TTAC provided in-depth training and technical assistance to 53 organizations and over 25,000 individuals.

## FY 2020 Decrease Justification

The FY 2020 President's budget continues the Crime Victims Fund (CVF) reform effort included in the FY 2019 budget. The CVF reform proposal would establish a $2.3 billion mandatory annual appropriation for the CVF, which is a decrease of $2,136.0 million below the FY 2019 C.R. Rate. CVF is financed by collections of fines, penalty assessments, and bond forfeitures from defendants convicted of federal crimes. Most of the account's resources are the result of large corporate cases rather than individual offenders.

Of the $2.3 billion total:

- $492.5 million will be provided to the Office on Violence Against Women;
- $12 million will be used for Innovations in Crime Victims Services (formerly Vision 21);
- $115 million will be for Tribal victims assistance grants; and
- $10 million will be provided to the Office of the Inspector General.

Programs supported by CVF focus on providing compensation to victims of crime and survivors, supporting appropriate victims' service programs and victimization intervention strategies and building capacity to improve response to crime victims' needs and increase offender accountability. CVF was established to address the continuing need to expand victims' services programs and assist federal, state, local, and tribal agencies and organizations in providing appropriate services to their communities.

The CVF reform effort would eliminate use of the CVF to offset discretionary spending above legally established spending caps, and would provide more reliable funding for the program, allowing for long-term program planning that will better serve victims of crime.

The reform proposal would amend the Victims of Crime Act of 1984 (VOCA) to:

1. Cap annual receipts into the account at $2.5 billion and sends the remaining to the General Fund of the Treasury;
2. Establish an automatic mandatory appropriation of $2.3 billion per year;
3. Establish an up to $115 million set-aside for tribal victims assistance programs; and
4. Provide for the transfer of funding for programs authorized under the Violence Against Women Act (VAWA), maintaining the independence of the Office on Violence Against Women (OVW).

The proposal includes $492.5 million for OVW; $1.67 billion for states to support victim assistance and victim compensation formula grants; $10 million for the Office of the Inspector General for oversight and auditing purposes; $115.0 million for tribal governments to improve services and justice for Native American victims of crime; and $12 million for Innovations in Crime Victims Services (formerly Vision 21) for supplemental victims' services and other victim-related programs and initiatives.

**For additional information, please visit the OVC website. Information includes:**
**VOCA Nationwide Performance Reports; Current Funding Opportunities; and Grant Awards Made by OVC.**

## VI. Program Decreases by Item

| | |
|---|---|
| **Item Name:** | **OJP Program Eliminations, Shifts, and Reductions** |
| Budget Appropriation: | State and Local Law Enforcement Assistance<br>Juvenile Justice Programs |
| Strategic Goal: | DOJ Strategic Goal 3 |
| Strategic Objective: | DOJ Strategic Objective 3.1 |
| Organizational Program: | Bureau of Justice Assistance (BJA)<br>Office of Community Oriented Policing Services (COPS)<br>Office of Juvenile Justice and Delinquency Prevention (OJJDP) |
| Program Decrease: | Dollars **-$384,500,000, for a total of $98,000,000**<br>Positions **0**     FTE **0** |

**Justification:** The FY 2020 President's Budget proposes to <u>eliminate or shift</u> $375.5 million in funding to focus the Office of Justice Programs' (OJP) grant funding on addressing the Nation's most important law enforcement and criminal justice priorities.

| Appropriations Account/Program | Administered By | FY 2019 CR | FY 2020 President's Budget Request | FY 2019 President's Budget vs. FY 2019 CR |
|---|---|---|---|---|
| Body Worn Camera Partnership | BJA | $22,500 | $0 | ($22,500) |
| • Body Worn Camera Partnership (Byrne Justice Assistance Grants carve-out) | BJA | [0] | [22,500] | [22,500] |
| Bulletproof Vest Partnership | BJA | 22,500 | 0 | ($22,500) |
| • Bulletproof Vest Partnership (Byrne Justice Assistance Grants carve-out) | BJA | [0] | [22,500] | [22,500] |
| Capital Litigation Improvement Grant Program | BJA | 3,000 | 0 | (3,000) |
| • Capital Litigation Improvement Grant Program (Byrne Justice Assistance Grants carve-out) | BJA | [0] | [3,000] | [3,000] |
| Innovations in Community Based Crime Reduction Program (formerly Byrne Criminal Justice Innovation Program) | BJA | 17,500 | 0 | (17.500) |
| Justice Reinvestment Initiative | BJA | 25,000 | 0 | (25,000) |
| Pay for Success (Second Chance Act carve-out) | BJA | [7,500] | 0 | [-7,500] |
| POLICE Act Program [1/] | COPS | 10,000 | 0 | -10,000 |
| • POLICE Act Program (COPS Hiring Program carve-out) | | | | |
| Project Hope Opportunity Probation with Enforcement (Second Chance Act carve-out) | BJA | [4,000] | 0 | [-4,000] |
| State Criminal Alien Assistance Program | BJA | 240,000 | 0 | (240,000) |
| Tribal Assistance (formerly Indian Assistance) | BJA | 35,000 | 0 | (35,000) |
| Tribal Resources Grant Program (COPS Hiring Program carve-out) | COPS | [30,000] | [0] | [30,000] |
| Tribal Youth Program (Delinquency Prevention Program carve-out) | OJJDP | [5.000] | [0] | [-5.000] |
| **Total, Program Eliminations and Shifts** | | **$375,500** | **$0** | **($375,500)** |

**Note:** Numbers in brackets reflect carve-outs of other programs and therefore do not add to the total.

Cited in City of Los Angeles v. Barr No. 18-56292 archived on October 25, 2019

[1] Funding for this program is not included under the FY 2019 CR level, but is transferred into OJP under as an adjustment to its FY 2020 Current Services level.

***Program Eliminations:***

The FY 2020 President's Budget proposes to eliminate discretionary funding for the following:

- Innovations in Community Based Crime Reduction Program: This program supports data-driven efforts to address violent crime in designated high-crime areas through place-based, community-oriented strategies. Under the FY 2020 President's Budget request, the activities of this program will be consolidated with those of other OJP crime reduction initiatives under the Project Safe Neighborhoods Block Grants program to promote a unified, efficient response to violent crime at the state, local and tribal levels.

- Justice Reinvestment Initiative (JRI):  The Justice Reinvestment Initiative (JRI) has provided technical assistance to state, local, and tribal governments to assist them with:
  - o Analyzing their criminal justice systems data;
  - o Identifying factors that may contribute to prison and jail population growth; and
  - o Developing strategies to improve public safety by focusing and expanding investment in proven corrections and public safety programs.

  OJP has provided funding and technical assistance for state-level JRI initiatives and supported evaluation of the JRI model since FY 2010. The Administration seeks to eliminate JRI and redirect these funds to develop effective data driven programs to address the significant increases of violent crime in many of the Nation's cities and towns.

- Pay for Success: Between FYs 2014 and 2018, OJP has provided up to $7.5 million per year available to support Pay for Success initiatives. Funding has been made available through both OJP competitive grant solicitations and transfers to the Department of Housing and Urban Development to support Pay for Success projects demonstrating the Permanent Supportive Housing Model.  These investments have provided sufficient funding to test this model and DOJ will wait to consider evaluation findings from programs currently being funded before making any additional investments.  In addition, OJP has seen relatively few applications for funding under its recent Pay for Success solicitations, suggesting that there are relatively few communities interested in establishing these types of programs.

- Project Hope Opportunity Probation with Enforcement: This program is modeled on a court-based program initiated in 2004 called Hawaii Opportunity Probation with Enforcement (HOPE) program.  It assists state, local, and tribal governments in developing and implementing community supervision programs based on the HOPE model and other approaches that emphasizes the use of "swift, certain, and fair" (SCF) sanctions for violating conditions of probation. In FY 2020, no funding is requested for this program.  State, local, and tribal governments can seek grant funding to implement SCF-based community supervision programs under the Second Chance Act Program provided they meet its requirements.

- State Criminal Alien Assistance Program: This program does not require recipients to use SCAAP awards solely for the purpose of addressing the cost of detaining illegal aliens in state, local and tribal detention facilities and cannot provide sufficient reimbursement to fully address state and local concerns. The reimbursement rate in FY 2017 was 24 cents on the dollar, which was an increase from the previous three years.  Four states – California, Florida, New York, and Texas – typically receive over two-thirds of available funds. Further, the program has no performance metrics or programmatic requirements associated with the funds to improve public safety. Eliminating this program will allow the Administration to invest in

126

border enforcement and border security initiatives that will more effectively address the public safety threats posed by criminal aliens.

*Program Shifts:*

The FY 2020 President's Budget proposes to shift discretionary funding among appropriated line items or appropriation accounts for the following:

- Body Worn Camera Partnership: The FY 2020 President's Budget funds this program as a $22.5 million carve-out under the Byrne Justice Assistance Grants (JAG) program. This carve-out replaces the $22.5 million line item appropriation that supported this program under the FY 2019 Continuing Resolution (CR).

- Bulletproof Vest Partnership: In the FY 2020 President's Budget, this program is funded as a $22.5 million carve-out under the Byrne Justice Assistance Grants (JAG) program. This program was previously funded as a $22.5 million line item appropriation under the FY 2019 Continuing Resolution (CR).

- Capital Litigation Improvement Grant Program: The FY 2020 President's Budget request eliminates the $3.0 million line item that funds this program under the FY 2019 CR and replaces it with a $3.0 million carve-out under the Byrne Justice Assistance Grants (JAG) program.

- POLICE Act Program: The FY 2020 President's Budget eliminates the $10 million line item that funds this program under FY 2020 Current Services and replaces it with a $10.0 million carve-out under the COPS Hiring Program.

- Seven Percent Tribal Justice Assistance Set Aside: The FY 2020 President's Budget requests an up to seven percent discretionary funding set aside to support its tribal law enforcement and justice assistance grant programs. This set aside replaces three line items or funding carveouts that appeared in the FY 2019 CR:
  - Tribal Assistance, ($35 million),
  - Tribal Resources Grant Program *(carve-out under the COPS Hiring Program)*, ($30 million), and
  - Tribal Youth Program *(carve-out under the Delinquency Prevention Program)*, ($5 million).

Since all of the programs discussed above will be funded at or above their funding levels under the FY 2019 CR, these shifts in funding sources will not have any significant effect on the performance of any of these programs.

In addition, the FY 2020 President's Budget requests minor funding reductions totaling $9.0 million to four OJP programs. These reductions will not have any significant negative effects on these programs and will allow the savings to be redirected to higher-priority programs.

| Appropriations Account/Program | Administered By | FY 2019 CR | FY 2020 President's Budget Request | FY 2019 President's Budget vs. FY 2019 CR |
|---|---|---|---|---|
| Court Appointed Special Advocates (CASA) | OJJDP | $12,000 | $9,000 | ($3,000) |
| Economic, High-tech, White Collar and Internet Crime Prevention | BJA | 14,000 | 11,000 | (3,000) |
| Part B Formula Grants | OJJDP | 60,000 | 58,000 | (2,000) |
| Victims of Child Abuse (VOCA) - Improving Investigation and Prosecution of Child Abuse Program | OJJDP | 21,000 | 20,000 | (1,000) |
| **Total, Minor Program Decreases** | | **$107,000** | **$98,000** | **($9,000)** |

Program Decreases by Item

cited City of Los Angeles v. Barr
166292 archived on October 25, 2019
NOT

*Minor Program Reductions:*

In order to properly balance funding for the Department's various responsibilities, the President's Budget request had to reprioritize and redirect funding from some programs to address higher priority issues such as violent crime reduction, officer safety, and responding to the opioid drug abuse epidemic.

- Court Appointed Special Advocates: This program provides membership, accreditation, and funding to regional, state, and local organizations to promote effective representation for abused and neglected children by court-appointed volunteer advocates in dependency court hearings. The FT 2020 request of $9 million is equal to this program's FY 2017 Enacted funding level and is sufficient to sustain its current level of operations.

- Economic, High-tech, White Collar and Internet Crime Prevention: This enhances the capacity of state, local, tribal, and territorial criminal justice systems to prevent, investigate, respond to, and prosecute economic, cyber, and high-tech crimes through specialized training and technical assistance. The FY 2020 President's Budget request of $11 million will enable OJP to continue this program's activities. In FY 2020, OJP is not requesting any funding for the Cybercrime Prosecution or Digital Forensics Education programs.

- Part B Formula Grants: This program supports state and local efforts to increase prevention and intervention programs for youth, ensure appropriate accountability for delinquent behavior, and improve the juvenile justice system. This program also supports state and local compliance with the core requirements of the Juvenile Justice Delinquency and Prevention Act (JJDP Act). The $2 million reduction requested in the FY 2020 President's Budget will bring overall funding for Part B Formula Grants in line with enacted funding levels seen between FYs 2015 and 2017 (with total enacted funding levels of between $55 and $58 million per year.)

- Victims of Child Abuse (VOCA) - Improving Investigation and Prosecution of Child Abuse Program: This program enhances the effectiveness of the investigation and prosecution of child abuse cases through training and technical assistance to criminal justice child welfare professionals. It also supports the development of Children's Advocacy Centers (CACs) and multi-disciplinary teams to more effectively address child abuse. The $1 million reduction requested in the FY 2020 President's Budget will have no significant negative effects on this program or its ability to meet the current demand for training and technical assistance.

**Budget Request:**

Funding: -$374.5 million for a total of $98.0 million

| | Pos | Agt/ Atty | FTE | Total ($000) | FY 2021 Net Annualization (change from 2020) ($000) | FY 2022 Net Annualization (change from 2021) ($000) |
|---|---|---|---|---|---|---|
| FY 2017 Enacted | 0 | 0 | 0 | $140,000 | | |
| FY 2018 President's Budget | 0 | 0 | 0 | 472,500 | | |
| FY 2019 Current Services | 0 | 0 | 0 | 482,500 | | |
| *Decreases:* | | | | | | |
| Personnel | 0 | 0 | 0 | 0 | 0 | 0 |
| Non-Personnel | | | | -384,500 | | |
| Grand Total | 0 | 0 | 0 | $98,000 | 0 | 0 |

# VII. Exhibits

cited in City of Los Angeles v. Barr No. 18-56292 archived on October 25, 2019

## United States Court of Appeals for the Ninth Circuit

### Office of the Clerk
95 Seventh Street
San Francisco, CA 94103

## Information Regarding Judgment and Post-Judgment Proceedings

**Judgment**
- This Court has filed and entered the attached judgment in your case. Fed. R. App. P. 36.  Please note the filed date on the attached decision because all of the dates described below run from that date, not from the date you receive this notice.

**Mandate (Fed. R. App. P. 41; 9th Cir. R. 41-1 & -2)**
- The mandate will issue 7 days after the expiration of the time for filing a petition for rehearing or 7 days from the denial of a petition for rehearing, unless the Court directs otherwise.  To file a motion to stay the mandate, file it electronically via the appellate ECF system or, if you are a pro se litigant or an attorney with an exemption from using appellate ECF, file one original motion on paper.

**Petition for Panel Rehearing  (Fed. R. App. P. 40; 9th Cir. R. 40-1)**
**Petition for Rehearing En Banc (Fed. R. App. P. 35; 9th Cir. R. 35-1 to -3)**

**(1)    A.    Purpose (Panel Rehearing):**
- A party should seek panel rehearing only if one or more of the following grounds exist:
  - ► A material point of fact or law was overlooked in the decision;
  - ► A change in the law occurred after the case was submitted which appears to have been overlooked by the panel; or
  - ► An apparent conflict with another decision of the Court was not addressed in the opinion.
- Do not file a petition for panel rehearing merely to reargue the case.

**B.    Purpose (Rehearing En Banc)**
- A party should seek en banc rehearing only if one or more of the following grounds exist:

> ► Consideration by the full Court is necessary to secure or maintain uniformity of the Court's decisions; or

> ► The proceeding involves a question of exceptional importance; or

> ► The opinion directly conflicts with an existing opinion by another court of appeals or the Supreme Court and substantially affects a rule of national application in which there is an overriding need for national uniformity.

**(2)  Deadlines for Filing:**
- A petition for rehearing may be filed within 14 days after entry of judgment.  Fed. R. App. P. 40(a)(1).
- If the United States or an agency or officer thereof is a party in a civil case, the time for filing a petition for rehearing is 45 days after entry of judgment.  Fed. R. App. P. 40(a)(1).
- If the mandate has issued, the petition for rehearing should be accompanied by a motion to recall the mandate.
- *See* Advisory Note to 9th Cir. R. 40-1 (petitions must be received on the due date).
- An order to publish a previously unpublished memorandum disposition extends the time to file a petition for rehearing to 14 days after the date of the order of publication or, in all civil cases in which the United States or an agency or officer thereof is a party, 45 days after the date of the order of publication.  9th Cir. R. 40-2.

**(3)  Statement of Counsel**
- A petition should contain an introduction stating that, in counsel's judgment, one or more of the situations described in the "purpose" section above exist.  The points to be raised must be stated clearly.

**(4)  Form & Number of Copies (9th Cir. R. 40-1; Fed. R. App. P. 32(c)(2))**
- The petition shall not exceed 15 pages unless it complies with the alternative length limitations of 4,200 words or 390 lines of text.
- The petition must be accompanied by a copy of the panel's decision being challenged.
- An answer, when ordered by the Court, shall comply with the same length limitations as the petition.
- If a pro se litigant elects to file a form brief pursuant to Circuit Rule 28-1, a petition for panel rehearing or for rehearing en banc need not comply with Fed. R. App. P. 32.

- The petition or answer must be accompanied by a Certificate of Compliance found at Form 11, available on our website at www.ca9.uscourts.gov under *Forms.*
- You may file a petition electronically via the appellate ECF system. No paper copies are required unless the Court orders otherwise. If you are a pro se litigant or an attorney exempted from using the appellate ECF system, file one original petition on paper. No additional paper copies are required unless the Court orders otherwise.

## Bill of Costs (Fed. R. App. P. 39, 9th Cir. R. 39-1)
- The Bill of Costs must be filed within 14 days after entry of judgment.
- See Form 10 for additional information, available on our website at www.ca9.uscourts.gov under *Forms.*

## Attorneys Fees
- Ninth Circuit Rule 39-1 describes the content and due dates for attorneys fees applications.
- All relevant forms are available on our website at www.ca9.uscourts.gov under *Forms* or by telephoning (415) 355-7806.

## Petition for a Writ of Certiorari
- Please refer to the Rules of the United States Supreme Court at www.supremecourt.gov

## Counsel Listing in Published Opinions
- Please check counsel listing on the attached decision.
- If there are any errors in a published <u>opinion</u>, please send a letter **in writing within 10 days** to:
  - ► Thomson Reuters; 610 Opperman Drive; PO Box 64526; Eagan, MN 55123 (Attn: Jean Green, Senior Publications Coordinator);
  - ► and electronically file a copy of the letter via the appellate ECF system by using "File Correspondence to Court," or if you are an attorney exempted from using the appellate ECF system, mail the Court one copy of the letter.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 10. Bill of Costs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form10instructions.pdf*

**9th Cir. Case Number(s)**

**Case Name**

The Clerk is requested to award costs to (*party name(s)*):

I swear under penalty of perjury that the copies for which costs are requested were actually and necessarily produced, and that the requested costs were actually expended.

**Signature**                                 **Date**

*(use "s/[typed name]" to sign electronically-filed documents)*

| COST TAXABLE | REQUESTED *(each column must be completed)* | | | |
|---|---|---|---|---|
| DOCUMENTS / FEE PAID | No. of Copies | Pages per Copy | Cost per Page | TOTAL COST |
| Excerpts of Record* | | | $ | $ |
| Principal Brief(s) *(Opening Brief; Answering Brief; 1st, 2nd , and/or 3rd Brief on Cross-Appeal; Intervenor Brief)* | | | $ | $ |
| Reply Brief / Cross-Appeal Reply Brief | | | $ | $ |
| Supplemental Brief(s) | | | $ | $ |
| Petition for Review Docket Fee / Petition for Writ of Mandamus Docket Fee | | | | $ |
| **TOTAL:** | | | | $ |

***Example:** Calculate 4 copies of 3 volumes of excerpts of record that total 500 pages [Vol. 1 (10 pgs.) + Vol. 2 (250 pgs.) + Vol. 3 (240 pgs.)] as:*
*No. of Copies: 4; Pages per Copy: 500; Cost per Page: $.10 (or actual cost IF less than $.10);*
*TOTAL: 4 x 500 x $.10 = $200.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*